1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    CR-04-1016 (NGG)

   -against-               :    U.S. Courthouse
                                Brooklyn, New York
RONELL WILSON,               :

           Defendant.        :    TRANSCRIPT OF PROCEEDINGS
                                  February 9, 2006
- - - - - - - - - - - - - - - - X    9:25 a.m.

BEFORE:
        HONORABLE NICHOLAS G. GARAUFIS, U.S.D.J.

APPEARANCES:

For the Government:        ROSLYNN R. MAUSKOPF
                           United States Attorney
                           One Pierrepont Plaza
                           Brooklyn, New York  11201

                           By:  COLLEEN KAVANAGH
                                Assistant U.S. Attorney


For the Defendant:         KELLY SHARKEY, ESQ.
                           EPHRAIM SAVITT, ESQ.
                           MITCHELL DINNERSTEIN, ESQ.


Court Reporter:            Holly Driscoll, CSR
                           Official Court Reporter
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           (718) 260-2469

Proceedings recorded by mechanical stenography, transcript produced by Computer-Assisted Transcript.

```
 1              THE CLERK:  United States versus Wilson.
 2              THE COURT:  Be seated.
 3              THE COURT:  All right, appearances please.
 4              MS. KAVANAGH:  Good morning, Your Honor, Colleen
 5   Kavanagh for the United States.  Also present is Les Owen from
 6   the MDC.
 7              THE COURT:  Very well.
 8              MS. SHARKEY:  Good morning, Your Honor, Kelly
 9   Sharkey for Mr. Wilson.
10              MR. SAVITT:  Ephraim Savitt.
11              MR. DINNERSTEIN:  Mitchell Dinnerstein,
12   D I N N E R S T E I N, also for Mr. Wilson.
13              MR. SAVITT:  Good morning Your Honor.
14              THE COURT:  All right.
15              Good morning, Mr. Wilson.
16              THE DEFENDANT:  Good morning.
17              MS. KAVANAGH:  Judge, as an initial matter, I was
18   remiss in faxing a copy to Ms. Sharkey of the letter that the
19   MDC sent to the Court.
20              THE COURT:  You mean from the paralegal specialist?
21              MS. KAVANAGH:  Correct.
22              THE COURT:  I see.  Well, you were remiss in what
23   way?
24              MS. KAVANAGH:  I didn't do it.  They haven't seen
25   the letter.  I'm just wondering if the Court or the clerk has
```

1  a copy available for them to review.
2              Your Honor, if I may, on the issue of that letter?
3              THE COURT:  We're doing one thing at a time.  First
4  we have to find the letter.  I have the letter, we'll just get
5  the letter.  Just hold on.  I'm going to take it one step at a
6  time.  I want you to see the letter.
7              MR. SAVITT:  Yes, Your Honor.
8              (Pause.)
9              THE COURT:  All right.  Let's show the letter to
10 defense counsel please, then we will return the letter to me
11 please.
12             (Pause.)
13             THE COURT:  All right?
14             MS. SHARKEY:  Yes.
15             THE COURT:  Okay, Mr. Owen.
16             MR. OWEN:  Your Honor, I just wanted to apologize
17 for the letter being sent by Ms. O'Callahan.  I spoke with
18 your clerk the other day.  It came to my attention a couple of
19 days ago she had sent that letter out.  It should have been
20 sent out by the warden but we have been a little short in the
21 department and she took some initiative to send that letter
22 and shouldn't have sent it under her signature.  I just wanted
23 to make that clear.
24             MS. KAVANAGH:  And Judge, frankly, some of that may
25 be my fault as well because after our last court appearance I

1  was aware that two of the attorneys were out of the MDC on
2  training and I wanted to make sure that the Court was
3  apprised, as Your Honor had ordered, regarding Mr. Wilson's
4  status in the SHU so I sort of sent a flag up that this needed
5  to come to the Court's attention right away, so that may have
6  been part of the confusion as well.
7          THE COURT:  Ms. Sharkey.
8          MS. SHARKEY:  Judge, we're going to ask that the
9  Court order the MDC to release Mr. Wilson from Special Housing
10 Unit and into general population.  He's been in SHU since
11 November 2004.  There were incidents.  He's exhausted his
12 administrative remedies.  By the current language of the MDC
13 Mr. Wilson has been incident free, yet, they still maintain
14 that he should be housed in Special Housing Unit with all of
15 the restrictions that that entails and as we've put on the
16 record and discussed at length with the Court previously,
17 Mr. Wilson has abided by both the rules of the MDC and the
18 Court's admonitions and has not garnered any infractions.
19         We're about six months from the commencement of this
20 trial now, we would like Mr. Wilson to be able to interact
21 with us freely and we would like to proceed and we think the
22 time has come, if the Court is willing, to release him, to
23 order the MDC to release him to general population.
24         THE COURT:  I have a question regarding one sentence
25 in this letter.  It states during -- let me just read the

5

1  whole letter because it is a three paragraph letter.
2         It says:  Dear Judge Garaufis,
3         This letter is in response to your request for a
4  monthly update on the status of inmate Ronell Wilson, Federal
5  Register Number 71460053, in MDC Brooklyn Special Housing
6  Unit.  SHU staff have reviewed Wilson's status informally each
7  week and formally once per month.  These reviews show Wilson
8  has been programming, meaning he has been in compliance with
9  SHU rules and regulations.
10        During monthly review on January 18, 2005 -- I guess
11 that means 2006.
12        MS. KAVANAGH:  I would assume.
13        THE COURT: -- staff did note Wilson had been getting
14 agitated during cell rotations and commissary procedures,
15 however, he has not received further incident reports this
16 month.
17        Based on the totality of the circumstances for his
18 placement in the SHU we do maintain our position that at this
19 time it is not appropriate to place Wilson in general
20 population.  In compliance with Bureau of Prisons policy,
21 staff will continue to conduct weekly informal and monthly
22 formal reviews of Wilson's status.  Further, we will continue
23 to provide you with updates on his status.  I trust this has
24 been responsive to your request.  If you have further
25 questions, do not hesitate to call me at -- then the number is

1  stated.  Signed, Kathleen O'Callahan, Paralegal Specialist.
2           What is of concern to me is that there appears to be
3  a contradiction between the general statement that Mr. Wilson
4  has been programming and this assertion that Mr. Wilson has
5  been getting agitated during cell rotations and commissary
6  procedures and there's nothing further that describes this in
7  the letter.
8           Furthermore, this has been the subject of repeated
9  discussions here in court and I would conclude or at least
10 hope that the issue of his status would be receiving more than
11 just the attention of some staff person, as capable as she may
12 be, but that people in a position to make policy in the
13 institution would be contacting me and letting me know what's
14 going on and that is not what happened and even Mr. Owen is
15 not a policy maker, he's not, if you will, in the chain of
16 command in the institution.
17          I've been to the institution, they know who I am,
18 they know that I have a concern that there has to be a
19 distinction made between punitive and administrative detention
20 and, yet, I'm not hearing from any of these people.  What
21 seems to be the problem?
22          MS. KAVANAGH:  Judge, I think it was a communication
23 problem.
24          THE COURT:  No, it is not a communication problem.
25          MS. KAVANAGH:  Well, Judge --

THE COURT:  You know why it is not a communication problem, because you're here, Mr. Owen is here, I have a letter from a paralegal, whatever that is, who I've never seen before, who's never been before me, who I don't think I've ever met even on my visit to the place and I'm not hearing from anyone in a policy making position in any kind of formal way.  This is a federal district court, this isn't the corner bodega.

MS. KAVANAGH:  Judge --

THE COURT:  Well, I'm sorry, unless you've got the warden here to tell me why it is, I'm going to have to make a decision.

MS. KAVANAGH:  Judge, the warden called me this morning.

THE COURT:  Well, isn't that nice.  He didn't call me.

MS. KAVANAGH:  Judge, I don't know if the warden felt it was appropriate to contact the Court ex parte when the lawyers are coming.

THE COURT:  Well, I'm sorry.

MS. KAVANAGH:  Judge --

THE COURT:  This is not the way I plan to do business henceforth.  The fact is that if the management of the prison has a position, I should be hearing what the position is from the management of the prison and that's the

8

way we're going to do it from now on. Maybe I didn't make myself clear, perhaps it is my fault but from now on I don't want letters from lawyers, I want letters from decision makers.

    MS. KAVANAGH: Judge, that's absolutely understood and that's all I meant by saying a communication problem. I reported to the Court, I personally have been the one speaking to Kathleen O'Callahan and she has appeared in court; she has been the one, she sees Mr. Wilson, from my understanding, on a weekly basis and it fell to her because she had the facts at her disposal regarding Mr. Wilson's behavior.

    I apologize. The Court seems very offended by this letter but I wanted to make sure that it came to the Court's attention in a timely manner and both the warden and Mr. Owen, you know, apologized to me and apologize to the Court for not reaching out to the Court personally and I will ensure that in the future it is not a letter from the paralegal that comes to the Court, that it is the warden himself. So, I apologize for that.

    THE COURT: The issue here for me is whether the detainee belongs in the SHU for justifiable reasons and he hasn't had any -- he hasn't been cited for any infractions since October, is it?

    MS. SHARKEY: That's correct.

    MR. SAVITT: Yes, Your Honor.

HOLLY DRISCOLL, CSR
OFFICIAL COURT REPORTER

1           MS. KAVANAGH: Yes.

2           THE COURT: Since October. So, how, based on that,
3   does he remain in the SHU?

4           MS. KAVANAGH: Judge, exactly, and the issue is
5   exactly that one sentence that the Court focused on. I really
6   don't need a mike.

7           THE COURT: You do need a mike because there are
8   people in the back and I want them to be able to hear you.

9           MS. KAVANAGH: That sentence should, in my opinion,
10  should say to the Court that the MDC is trying to work with
11  Mr. Wilson. It's not a knee jerk reaction that staff have
12  when Mr. Wilson begins to get agitated to write him up but I
13  don't think that the test is if Mr. Wilson remains incident
14  free, that's really a very baseline expectation for inmates in
15  an institution not to be written up for noncompliance.

16          My understanding from talking to the warden this
17  morning is that he has gotten quite agitated at times when
18  asked to rotate cells, that's of particular discomfort
19  apparently to Mr. Wilson but, rather, staff were able to calm
20  him down and work with him so it didn't rise to any escalated
21  event that required him to be written up.

22          I think that the MDC wants to proceed with caution
23  understandably given the charges that this defendant is
24  facing, given his history of disciplinary infractions at
25  Rikers and here. He has been incident free for three and a

1  half months. The warden himself feels that that is a very
2  positive step and indicated to me -- I don't want the Court to
3  feel that the MDC is being disingenuous to keep coming to
4  court and saying we're feeling cautiously optimistic, it's
5  been three and a half months, they are cautiously optimistic
6  but I don't think it's time for the Court to intervene and
7  order them to do something.
8        I think that the warden would appreciate additional
9  time to evaluate Mr. Wilson and determine whether or not he's
10 ready to go into general population. It's been 30 days. This
11 is the first status report to the Court since the Court's
12 order. We would ask for more time before the Court
13 intervened.
14       THE COURT: Well, he's going to trial in September,
15 more time is very imprecise and --
16       MS. KAVANAGH: We'll be back in 30 days, Judge.
17       MR. SAVITT: Your Honor, if I --
18       THE COURT: I understand your position and I
19 appreciate the problem and the issue for the institution which
20 is why on previous occasions I have turned down the request,
21 frankly, because I prefer to defer to the judgment of
22 professionals who are running the institution. There does
23 come a point where I have to balance the ability of the
24 defendant to prepare a defense and the cautious approach of
25 the institution. I certainly don't want to be running an

institution with 2,700 or 2,900 individuals, it is not my job but I have to be concerned about the circumstances of this detention.

What do you want to say, sir?

MR. SAVITT: I don't know if I'm really adding anything measurably to this but, frankly, Your Honor, Your Honor pointed out everything I wanted to say. It just seems to me that we are at this point, what is it, six months away from trial, he's been incident free for three and a half months, general population is not without its supervision. Indeed, inmates in general population I would presume are not permitted to just run wild in the institution and I know that it is true of the experience of many of -- most, if not all of my clients in general population, I mean, frankly, if Mr. Wilson does not behave himself in general population, I'm sure he'll find himself in the SHU in the blink of an eye.

He's behaved himself for over a quarter of a year, he's been incident free and he can't focus on preparing for his trial and I'm worried about that.

MS. KAVANAGH: Judge, I would ask to just continue cautiously and we'll be back in 30 days. I just -- the fact that Mr. Wilson's trial is approaching I understand but the MDC is concerned about the safety of their staff and the safety of the other inmates. Mr. Wilson has access to his lawyers, he has access to the telephone, he has access to

1  mail.  I don't think it is time for court intervention at this
2  point.
3              THE COURT:  Well --
4              MR. SAVITT:  Your Honor, may I just very briefly
5  respond and just say that everything Ms. Kavanagh now says is
6  true, there is access to lawyers, that's true, but there's
7  restricted access in terms of his ability to help prepare in
8  his own defense and the fact of the matter is and my
9  experience has consistently been that whenever I visit him,
10 all I'm speaking to him about are the conditions of his
11 confinement and his inability to get beyond that and the fact
12 of the matter is that although it was a rocky beginning in the
13 SHU concededly, he's heeded our advice and his own better
14 instincts and I believe that this letter, perhaps it's
15 deficient but, nevertheless, I think what it does is it
16 clarifies that Mr. Wilson has been incident free and continues
17 to be incident free, he's adjusting well.
18             THE COURT:  All right.  First of all, I'm going to
19 treat this letter as if it were sent to me by the warden
20 because, in effect, what you're saying, this is the position
21 of the warden, is that right, Mr. Owen?
22             MR. OWEN:  Your Honor, if I can elaborate, the
23 warden has the utmost respect for this Court.
24             THE COURT:  And I have respect for the warden,
25 that's not the issue.  My question is whether this letter

represents the position of the warden so that I'm not just taking the statement of the paralegal specialist but this is the warden's position; I have nothing else from the warden, all I have is this and if this isn't the warden's position, let's shred it and get the warden in here to tell me what his position is. That's what I'm asking you. Let's not beat around the bush.

MR. OWEN: It is the warden's position. I'm here as the warden's representative, as the lawyer for the prison to elaborate upon that letter if need be.

THE COURT: Go ahead.

MR. OWEN: Your Honor, your involvement is well understood, well known at the Bureau of Prisons, at the MDC. Mr. Wilson has been treated with kid gloves in the SHU because of that involvement. We are giving him every opportunity to succeed over there. It is the warden's position, it is our position that he simply has not yet quite demonstrated understanding of what life in general population is, of what's expected of him. The letter from Mr. Dinnerstein back on November 21st, I can almost read it as a threat that we need to be kind to Mr. Wilson or he's going to react in an improper manner. That concerns me, that concerns the warden.

We are giving him every opportunity, Your Honor, and this is not an indefinite confinement. We are hopeful that Mr. Wilson will continue to be incident free but he needs to

1  demonstrate that he's going to be capable of responding to
2  staff in the general population.  Refusing an order in SHU
3  when he's locked up in a cell is a whole different ball game
4  than refusing an order in the general population in front of
5  120 to 150 other inmates with one officer running that unit
6  and I would just ask Your Honor to continue for the time being
7  to defer to the warden's discretion in this matter.
8              THE COURT:  I'll reserve on this.  I don't know that
9  I want to wait another month, frankly, for the warden to get
10 around to deciding what's going on with this individual.  If I
11 do order him placed in general population, how long will it
12 take to have that effectuated in an orderly, thoughtful
13 manner, how much time would you need?  In other words, would
14 you need a day, two days, a week to place him in an
15 appropriate setting in an appropriate unit in the MDC, how
16 long would that take?
17             MR. OWEN:  I understand Mr. Wilson may have some
18 separations in the building, Your Honor, and we'd have to
19 evaluate where he can and cannot be placed.
20             THE COURT:  That's why I asked.
21             MR. OWEN:  If Your Honor is inclined to order that,
22 then I would say at least a week to make that determination.
23             THE COURT:  Yes?
24             MS. SHARKEY:  Judge, we were just conferring with
25 Mr. Wilson.  We understand there's only one floor where the

1  inmates that have seps with Mr. Wilson are housed.

2      MS. KAVANAGH:  That's not true.

3      THE COURT:  If I were to order him placed in the
4  general population, I would certainly give the institution the
5  opportunity to make that transition carefully because it would
6  be a major step, frankly, and I would only make it with the
7  greatest concern that if something were to happen and someone
8  were to be hurt, that the responsibility in effect would fall
9  on me.

10     I mean I'm willing to make these decisions, that's
11 why I'm here but I want everyone to understand that this is no
12 small matter.  Mr. Wilson is accused of about the most
13 horrible kind of crime that anyone can commit.  I'd say the
14 crime with which he's accused is on a par with terrorism in my
15 mind because the crime, whoever committed it, is a crime
16 against society, so it is not just a crime against an
17 individual so that's a concern for the Court clearly and I
18 know it is a concern for the institution and I don't minimize
19 that concern one bit but there are other considerations too.

20     An application has been made which is a proper
21 application by the defense.  I am going to seriously think
22 about what everyone has said.  I'm not going to act now,
23 although I had planned to, frankly, and --

24     MS. SHARKEY:  Your Honor, just to inform the issue
25 as the Court is mulling its decision, you should know that

1  phone access to counsel is in fact restricted, that Mr. Wilson
2  does not have free access to the phone and calls us quite
3  infrequently because it is difficult for him to get a phone
4  call out and not only are our counsel visits focused on
5  confinement issues, there are issues, as the Court is well
6  aware, of counsel even getting up to the SHU, despite BOP's
7  efforts, you know, staff is always very amenable but it can
8  take us up to an hour and a half to get from the front door to
9  the SHU.  So, all of that impacts on trial preparation.
10            THE COURT:  I see.  All right.  Well, does anyone
11  else have anything else on this issue?
12            All right.  I want to thank you.  Let me set a date
13  for another status conference.
14            February 23rd at 9:30.  It is a Thursday.  Now, I
15  think we have some issue that I need to discuss ex parte --
16            MS. SHARKEY:  Yes, Your Honor.
17            THE COURT:  -- with the defense but I'll excuse the
18  government.
19            Thank you, Mr. Owen.
20            MS. KAVANAGH:  Judge, actually just on that issue, I
21  have noticed there are an inordinate amount of sealed items on
22  the docket sheet that come in and I, you know, we didn't find
23  out about Ms. Shroff being appointed until we showed up for
24  the court appearance last time so I guess that's of some
25  concern.  I just want to make sure that things under seal are

1  properly under seal.  I'm sort of unclear why Ms. Shroff's
2  appointment had to be ex parte and under seal.
3              THE COURT:  Well, let me just ask.
4              MS. SHARKEY:  Ms. Shroff --
5              THE COURT:  It is not the appointment that should
6  have been ex parte actually, it's the reasons why the defense
7  needs Ms. Shroff or particular activities that may be the
8  subject of defense strategy which the explanation of which
9  might need to be stated to the Court ex parte, is that your
10 position?  I think that was your position in the paperwork.
11             MR. SAVITT:  Yes, Your Honor.
12             MS. KAVANAGH:  Obviously, Judge, I understand that
13 if there's issues of defense strategy but the fact that
14 attorneys are being appointed and --
15             THE COURT:  Right, your point is well taken.  In the
16 future any order appointing someone or to assist the defense
17 as long as it doesn't by its very nature, you know, point to
18 exactly what the trial strategy is should be by an order
19 placed on the public docket.
20             MR. SAVITT:  Yes, Your Honor.
21             MS. SHARKEY:  That's fine.
22             MS. KAVANAGH:  My understanding is she's appointed
23 as a paralegal, not an attorney.
24             MR. SAVITT:  That was our application.
25             THE COURT:  That was the application to assist the

1  attorneys.  That was the application and she's being paid as a
2  paralegal.
3           MS. KAVANAGH:  I see.
4           THE COURT:  And not as one of the capital defense
5  attorneys or lead counsel because we already have three
6  people, yes, I know.
7           MS. KAVANAGH:  Okay.
8           THE COURT:  All right.  What we're going to do next,
9  we're going to have a brief meeting in the robing room with
10 the defense and the defendant and the court reporter to go
11 over one particular issue which should be handled ex parte.
12 Okay.
13          MS. KAVANAGH:  Thank you, Judge.
14          THE COURT:  Thank you, everyone.
15          MR. SAVITT:  I'll ask for in the government's
16 presence a copy of the transcript of today's proceedings.
17          THE COURT:  So ordered.
18          MR. SAVITT:  Thank you.
19          THE COURT:  CJA.  Okay.  Why don't we just set up in
20 the conference room and I'll be right in.  In the meantime,
21 let me take the premotion conference.
22          (End of proceedings in open court.)

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM MY NOTES IN THIS PROCEEDING.

*Holly Driscoll*
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT

HOLLY DRISCOLL, CSR
OFFICIAL COURT REPORTER