1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA     :     CR-04-1016
4
       -against-                      U.S. Courthouse
5                                :    Brooklyn, New York
   RONELL WILSON,
6
           DEFENDANT,            :
7                                     June 16, 2006
   - - - - - - - - - - - - - - X     9:00 o'clock a.m.
8
           TRANSCRIPT OF STATUS CONFERENCE
9          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
           UNITED STATES DISTRICT JUDGE
10

11
   APPEARANCES:
12
   For the Government:      ROSLYNN R. MAUSKOPF
13                          United States Attorney
                            147 Pierrepont Street
14                          Brooklyn, New York  11201
                            BY:  COLLEEN KAVANAGH
15                               JACK SMITH
                            Assistant U.S. Attorney
16

17 For the Defendant:       EPHRAIM SAVITT, ESQ.
                            KELLY SHARKEY, ESQ.,
18                          MITCHELL DINNERSTEIN, ESQ.

19

20
   Court Reporter:          SHELDON SILVERMAN
21                          Official Court Reporter
                            225 Cadman Plaza East
22                          Brooklyn, New York 11201
                            (718) 260-2537
23

24

25 Proceedings recorded by mechanical stenography. Transcript
   Produced By Computer Aided Transcription.

SS      OCR      CM      CRR      CSR

1        THE CLERK:  United States versus Wilson.

2        (Appearances noted.)

3        THE COURT:  Good morning.

4        First item of business we have is, we have a

5   superseding indictment?

6        MS. KAVANAGH:  We do.  Mr. Wilson needs to be

7   arraigned on that indictment.  There are no new substantive

8   charges.  The principal difference is between the superseding

9   indictment and the underlying indictment are that obviously

10  Mr. Wilson's codefendants are no longer in this indictment.

11  We also changed some minor wording in the indictment and also

12  made some changes to the notice of special findings.

13       THE COURT:  Ms. Sharkey, Mr. Savitt, whoever?

14       MR. SAVITT:  We've reviewed the superseding

15  indictment, specifically the changes with Mr. Wilson.

16  Mr. Wilson understands the nature of the charges against him,

17  wishes to enter a not guilty plea.  We waive the public

18  reading of the superseding indictment, your Honor.

19       THE COURT:  He pleads?

20       MR. SAVITT:  Not guilty.

21       THE COURT:  A plea of not guilty is entered for

22  Ronald Wilson on the indictment in CR-04-1016 (S-1).

23       Next, I received a letter -- before we have the oral

24  argument -- a letter from Ms. Sharkey.

25       Are you relieved?

SS      OCR      CM      CRR      CSR

1          MR. SAVITT:  Apparently relieved, in a sense, your

2     Honor.

3          THE COURT:  Having to do with the schedule for jury

4     selection.  Have you all seen that?

5          MR. SMITH:  We have.

6          THE COURT:  I haven't gotten a response from the

7     government.  I might as well get one right now.  The proposal

8     is that the court send out summonses for jury service for 750

9     jurors, final agreement and approval of the questionnaire in

10    August, that the week of September 11th we bring in the

11    jurors, a week later we have the questionnaires ready for

12    review.  This is a big project.

13         Putting aside the very large number of how we go

14    about having the questionnaires reproduced which is a major

15    issue, that jury selection itself will begin the week of

16    October 2nd.

17         MR. SMITH:  Judge, having gone through this process

18    with Mr. Savitt once before, I'm confident we can move much

19    more quickly than this proposed schedule.

20         THE COURT:  Would you turn on your microphone?

21         MR. SMITH:  I'm confident we can move much more

22    quickly than the proposed schedule.

23         First, your Honor, I do not think there will be a

24    need to call in more than 500 jurors, having our experience in

25    the Dixon case, I believe went through 350, close to 400.

4

1        MR. SAVITT:  Close to 400 is my best memory.

2        MR. SMITH:  500 is a safe estimate, it being a

3   one-defendant case.

4        In terms of the questionnaire itself, the government

5   will have a proposed questionnaire which I'll submit to

6   counsel.  We can discuss probably within the next week or two,

7   start talking about that.  If we have a disagreement, we'll

8   come to the court sometime in July.  That shouldn't be an

9   issue having that done well ahead of time.

10       In terms of having the jurors complete the

11  questionnaire, I would submit the way we did it in Dixon is

12  the best way; in that we have all the jurors come in in a

13  single day, half in the morning, 250 in the morning, 250 in

14  the afternoon, fill out the questionnaire.  The last time the

15  government bore the burden of copying the questionnaire,

16  anonymous jury.  The paralegals from the U.S. Attorney's

17  Office got the questionnaires.  We only got the questionnaires

18  after the names were off of them, the clerk's office took care

19  of that, our office made copies.  We were able to turn that

20  around in 48 hours, actually start giving the defense

21  questionnaires even before that time, say the first one

22  hundred as they get done hot off the press, here you go.

23       I submit we go for the same schedule we went for in

24  Dixon.  Then we had met, I think on a Monday, the

25  questionnaires were given to the jurors by Tuesday, late

1 evening, the questionnaires were copied. By the end of that

2 week Friday, we were sitting down with counsel to discuss

3 cause challenges at least for the first few hundred.

4     I don't see any reason why we couldn't begin

5 questioning jurors. We'll have discussions about, already

6 begun discussing propose method of questioning the jurors. If

7 not that Monday, certainly that following week. I would

8 submit to the court that is a realistic schedule for the

9 selection process, at least for the winnowing to a pool we can

10 actually voir dire in the courtroom.

11     MR. SAVITT: It's entirely feasible that we can do

12 that. I do recall everything Mr. Smith is saying is accurate

13 with respect to the Dixon case. The faster these

14 questionnaires --

15     THE COURT: I'm not familiar with the Dixon case.

16 What was the nature of the crime charged?

17     MR. SMITH: One-defendant case, RICO case. There

18 were two different homicides charged. I think it was a murder

19 of a witness. One of them, there were drug charges, similar

20 in a lot of respects to this case. There were also several

21 other uncharged murders offered in evidence as part of the

22 RICO as well. So, similar in several respects.

23     THE COURT: The difference is this involves the

24 murder of two police officers?

25     MR. SMITH: A major difference. I don't think a

1  difference may affect voir dires in certain ways, but I don't

2  think it will affect the timing of the voir dire process.

3        MR. SAVITT:  In a sense, real sense, it will affect

4  the voir dire process because of the nature of the victims in

5  this case as contrasted to Dixon.

6        THE COURT:  One of my concerns, having seen my share

7  of jury selections, we have many potential jurors who are

8  either the relatives of or spouses of, close relatives or

9  friends of police officers.  My fear is that we will not have

10  sufficient qualified potential jurors without prejudice if we

11  keep the numbers low.  That's my only concern about a lower

12  number of 500, for instance, although 500 is a large pool.

13        MR. SMITH:  The other thing we could do to make

14  things move expeditiously, I know this is done in other cases,

15  is let's say in an excess of caution we call in 600

16  witnesses --

17        THE COURT:  Jurors.

18        MR. SMITH:  Jurors.

19        THE COURT:  Never 600 witnesses.

20        MR. SMITH:  What we do is, say, go through the first

21  four hundred in terms of both sides reviewing them, submitting

22  them to the court, see how far we go.  It does take a

23  tremendous amount of time to go through the questionnaires.

24  If we do, say, the first four hundred, see how far it takes

25  us, we want to run out of jurors, we have a reserve of 200

1   other questionnaires of jurors to go through, then we have

2   them, not the burden of going through all the questionnaires

3   before we start the process.

4           MS. DINNERSTEIN:   I'm not sure Dixon would be a

5   good model, a different type of case entirely.  I wonder if it

6   might be appropriate to address what would be hardship

7   language-type issues outside of the questionnaire, talk about

8   those types of issues.  We might actually be able to get

9   people off before they fill out the more extensive

10  questionnaire that addresses the death qualification.  That's

11  something we can talk about.

12          MR. SMITH:   Once we get a questionnaire, we start to

13  go back and forth on the questionnaire, talk about those nuts

14  and bolts of the process, maybe we can agree on something.

15          MS. DINNERSTEIN:   There's three issues, hardship,

16  language and publicity issue which might be something separate

17  from the death penalty issue.

18          THE COURT:   There's always the language issue.  The

19  death penalty issue comes up in cases that are not death

20  penalty cases, as you know, jurors say death penalty case?

21  Here are my views.  They're founded in religious belief, at

22  least that's what I've seen thus far, many times founded in

23  religious belief.  The hardship issue, is hardship

24  connected --

25          MS. DINNERSTEIN:   The length of the trial.

1    THE COURT:  Not in terms of any relationship -- the

2  fourth issue is the law enforcement relationship issue,

3  family, friend or former -- many of these people are former

4  law enforcement officers.

5    MR. SMITH:  Having thought about it for a second,

6  Mr. Dinnerstein's point about the hardship issue might be

7  something.  I think that specifically alone might be a thing

8  worth addressing near the beginning, only because that's one

9  of those things on a questionnaire it's hard for people to

10  kind of explain it all, your Honor.

11    The other things in terms of relationship to police

12  officers, former police officers, those sort of issues can be

13  dealt with on the questionnaire.  Someone can be a former

14  police officer, relatives, still be a juror in this case.

15    THE COURT:  I'm not saying it's disqualifying.  I'm

16  saying it requires substantial amount of inquiry at that

17  point.

18    MR. SMITH:  Obviously there's a point of inquiry

19  after the questionnaires.  That subject matter would be best

20  addressed then.  Initially, the hardship issue is something

21  that takes a lot of time, is something we can talk about what

22  makes sense.  I think this is one of the few areas where all

23  our interests are kind of in line in terms of doing it in the

24  most efficient manner possible.

25    MS. SHARKEY:  That also includes having the

1  opportunity and we've gained no benefit by stringing out voir

2  dire.  It costs all the parties, wastes the court's time.

3        THE COURT:  Exhausts the court.

4        MS. SHARKEY:  All parties.

5        THE COURT:  I'm not a party.

6        MS. SHARKEY:  That's true.

7        As I was saying, we need an opportunity to

8  adequately review the questionnaires.  Of course, everyone's

9  full attention would be turned to it.  Under Mr. Smith's

10 proposal, that left two days, unless my math is wrong, to

11 review 500 or more questionnaires.

12       THE COURT:  I'll get to that.

13       Let's get back to the concept of putting at the

14 front as opposed to at the end of the questionnaire or as a

15 separate and initial question the issue of hardship.

16       MS. SHARKEY:  I've had experience with that.

17       THE COURT:  Tell me.

18       MS. SHARKEY:  I was one of the trial attorneys in a

19 case that was tried in Queens in front of Judge Fisher.

20       THE COURT:  The Wendy's case?

21       MS. SHARKEY:  That's right.  We did hardship

22 questioning of the jurors up front for about two days because

23 of the length of the trial, also a lot of people excluded

24 themselves because of the nature of the charges, the notoriety

25 of the case.

1    THE COURT:  There are two issues that would seem to

2  me sort of paramount before they go to fill out

3  questionnaires, lengthy questionnaires as potential jurors.

4  One is whether they have some religious, moral or

5  philosophical objection to the death penalty.  Isn't that an

6  issue?

7    MR. SMITH:  Yes.

8    THE COURT:  The other is whether they have such an

9  extreme hardship that it would make it impossible for them to

10  focus and be fair jurors, isn't that really what you're

11  talking about?  Aren't there two separate issues up front or

12  wouldn't you want to separate those out and begin with those,

13  to cull out those people who are clearly not qualified in this

14  type of case?

15    MS. SHARKEY:  It wouldn't.  Hardship as far as their

16  physical ability to participate in the trial is something that

17  the court is right on when you say we should address that up

18  front.

19    As far as their views, the philosophical or

20  religious views concerning the death penalty, that's something

21  that should be subject to a questionnaire and subsequent

22  questioning.  I've voir dired jurors who have said one thing

23  on their questionnaire and sometimes you can definitely

24  predict and agree with the prosecution, with the court's

25  approval, this particular juror is going to waste everybody's

1  time.  Frequently people's comments under oath in front of the

2  court are expanding.  It's not so obvious.  Frequently people

3  have said "I said that on the questionnaire because I was

4  rushed in writing out the questionnaire.  Now that I've had

5  time to think and reflect, I would like to share my views more

6  fully." So, I think the death penalty opinion is not something

7  to be done up front, taken care of.  That's the heart and meat

8  of the voir dire.

9         MR. SMITH:  If I may, I don't disagree when we do

10 the individual voir dire of the jurors that the death penalty

11 would be relevant.  In my past experience in one of these

12 selection processes, that if the court were to inquire just

13 generally, again, because in person the person may be able to

14 explain themselves better than on the questionnaire, initially

15 to weed out before we get involved with the questionnaire, the

16 court says absolutely there's no way they would consider being

17 on a death penalty jury, to weed those people out in a

18 face-to-face meeting with the court, I think, would save

19 tremendous amount of time, wouldn't prejudice either side

20 because these are people who are going to fill out the

21 questionnaire, say that, if they're going to come back, say

22 the same thing.

23        There are people, there's no doubt these people are

24 not going to be jurors in this case, if we were to weed those

25 out, not only would it make the process from that point on go

12

1    much better, quickly, but it would also allow us to forecast

2    much more accurately as we go through the process how many

3    jurors we're going to need.  We'll have a lot lower attrition

4    rate from that point on, not having to deal with people who

5    are definitely not going to be part of the process.

6            MR. SAVITT:  In theory that sounds correct.  In,

7    however, in practice, the capital jury questionnaires have a

8    series of questions that vet out, cull out different aspects

9    of individual jurors' thinking, attitudes towards their

10   ability to sit on a capital case.  I don't see how we can have

11   one question up front that says can you absolutely sit on a

12   capital case or not.  Given that choice, many of the jurors

13   who might be able to will say no or yes.

14           THE COURT:  We can have them fill out the entire

15   questionnaire but put the two issues that we're discussing now

16   up front in the questionnaire.

17           MS. DINNERSTEIN:   I would say what I meant by

18   hardship is more traditional hardship; that they have a job

19   problem; that they're not going to be able to sit for four

20   months; that these are the sorts of people we can generally

21   agree on --

22           THE COURT:  I understand that's hardship, but the

23   way the questionnaires are structured, at least the ones I've

24   handled in the past, is that you put the hardship question at

25   the end after everything has been filled out, finished filling

1  out the questionnaire.  By that time their eyes glaze over the

2  questions, sometimes it doesn't register with them.  It's only

3  until they get here or until they get called back or until

4  they're sitting on the jury that they start to focus on the

5  fact they're not going to get paid for more than two weeks or

6  have to pay rent, a mortgage and they're the sole support of

7  their family and so on and so forth; or that unlikely in the

8  fall, it does happen, they have tickets for a ten-day cruise

9  somewhere in October.  Then you end up having to excuse people

10  who are sitting on juries.

11        That creates another problem.  I'm just wondering

12  whether that question, let's list that first, whether we ought

13  to put that question up front on the questionnaire and that we

14  get the answers on that question.  They can fill out the rest

15  of the questionnaire.  They're here, but at least once we have

16  that information, we can do a preliminary review and see who

17  needs to be brought in on the question of hardship.  We can

18  bring them in on the question of hardship and then eliminate

19  those that have true hardships and then should we find we have

20  a shortfall, we can always call in more jurors.  We can always

21  send out another notice, if necessary, if you find out of 600,

22  that's the number I'm thinking of these days, out of 600

23  potential jurors, 400 have hardships, well, you know that

24  you're going to have to call in a whole new group and we're

25  going to have to keep going.  That's my thought at the moment.

1          MS. SHARKEY:  There's something that might

2    compliment; that is, that like a one-page or one and a half

3    page questionnaire on hardship.  They fill out both

4    questionnaires when they come in, you're right, because you

5    have them.  They have the same identifying number on both

6    questionnaires.  We can go through the hardship questionnaires

7    quickly and the clerk could call back the potential, those

8    jurors that need to be questioned more fully on that.

9          THE COURT:  Without reproducing a 60-page

10   questionnaire.

11         MR. SMITH:   I've seen them in non-death penalty

12   cases, I have, put the hardship question first, people won't

13   take the time to fill it out, make a good answer on the

14   hardship part.  You'll get half the boxes checked, other parts

15   not filled out, I'm off on hardship.  That's why we put it

16   last in the Dixon case.  That's a reality.  We'll have every

17   person claiming a hardship.

18         THE COURT:  I don't want to spend a lot of time on

19   this.  It's sort of important we have a sense how to develop

20   the questionnaire.

21         MR. SMITH:  It mike make sense, as I said, I'll have

22   a questionnaire within a week or two, sit down with counsel,

23   see what we can or can agree with.  We'll have a formal

24   discussion after we get that far.

25         THE COURT:  I think it's useful we talked about it

15

1   because it's in no one's interest to spin wheels here and

2   reproduce a 60-page questionnaire for people who are

3   definitely not going to be able to sit on the jury because

4   they just have a hardship, or in some cases, because they have

5   a biased, religious or moral objection to the death penalty.

6           MS. DINNERSTEIN:   Just in terms of mechanics, are

7   you present when the questionnaires are given out or do you

8   give preliminary instructions?

9           THE COURT:   That's how I do it.   I want them to see

10  this is a serious process; that the judge is there when they

11  take an oath to fill out the questionnaire honestly, fully and

12  I want to be able to emphasize in this case this is going to

13  be a lengthy trial, involves potentially the imposition of the

14  death penalty and I think it's essential they understand the

15  gravity of the situation.

16          MS. DINNERSTEIN:   The questions that address issues

17  of hardship, putting aside death, that issue, the issue of the

18  mechanics, whether they can miss more than two weeks of work,

19  whether they have a sick relative or something like that that

20  would present them generally from being on a jury, could those

21  questions at least conceivably be addressed early on, maybe

22  even orally, you can get a show of hands as to people who have

23  those types of hardships?   Maybe those people don't need to

24  fill out the questionnaire.

25          THE COURT:   The problem with that is that it's an

1   indication.  There will be 200 people in the room.  I'll have

2   160 hands.  I think we get a more accurate and honest response

3   when they have to put it down, write it down, swear to it.

4   Oral, sure, do I want to be on a 12-week trial?  I have a

5   hardship.  Then there's also the other problem, point me in

6   the direction, I'll follow, we'll all go over the clip

7   together or out the door together, whatever it happens to be.

8   I don't want the group dynamic to be operating here.  That's

9   why I wouldn't ask any question orally.

10              MR. SMITH:  I agree.

11              THE COURT:  You all talk about it amongst

12   yourselves.  If you come up with an agreed to solution, let me

13   know what it is, I'll let you know whether I agree to it.

14              Is there anything else in terms of process at this

15   point before we talk about the motion?

16              MS. SHARKEY:  No.

17              MR. SMITH:  I have one, I guess not about the

18   motions, but just about the Court's ruling regarding the 12.2

19   notice.  In terms of the 800 pages of documents that we have,

20   the court ruled we cannot turn those over to the firewall

21   assistant or our expert.  The court, however, did rule by

22   August 21st the defense, among other things, has to turn over

23   to our firewall assistant and the expert any raw data that

24   their experts have relied on.  I'm assuming this mass of

25   documents that we have is going to be part of the raw data

1    that the defense experts have themselves relied on.  I assume

2    if I were an expert witness, I would rely on that.

3              I want to make sure that was the court's

4    understanding eventually we'll get this on that timetable

5    through the Court's order this is part of the raw data.

6              MS. SHARKEY:  Yes, part of the raw data.

7              THE COURT:  Part of the raw data, the August 21st

8    data.  I'm glad you asked the question.

9              MR. SMITH:  That's fine.

10             THE COURT:  Anything else?

11             MS. SHARKEY:  Actually, there is one more issue on

12   the 12.2 before we move on to the motion.  The court had

13   directed counsel to supply certain information to the trial

14   team two weeks from the date of your order which is next

15   Thursday.  We're going to ask for a brief extension of that.

16   I'm not here next week.  We're not asking for a lengthy

17   adjournment.  We're asking for an additional two weeks.  We'll

18   provide that information to the prosecution.

19             MR. SMITH:  That's fine.

20             THE COURT:  An extra two weeks, so ordered.

21             MS. SHARKEY:  Thank you, Judge.

22             Turning to the motion --

23             THE COURT:  The defendant may be seated.

24             MS. SHARKEY:  A number of motion are before the

25   court, many of them fully briefed.  For instance, the

SS      OCR      CM      CRR      CSR

1  constitutionality of the federal Death Penalty Act we don't

2  feel needs additional comment.

3        THE COURT:  I think Judge Rakoff who dealt with that

4  and then the Second Circuit dealt with Judge Rakoff's

5  decision?

6        MS. SHARKEY:  Yes.

7        THE COURT:  My sense is that I'm not planning to

8  reverse the Second Circuit yet.  You have every right to make

9  the motion.  I want you to understand we have a decision of

10  the Second Circuit.  I don't think I can reverse the

11  Second Circuit as I understand the way the system works.  Go

12  ahead.

13        MS. SHARKEY:  What we would like to do is focus our

14  argument on a few issues that we would like the court to take

15  particular note of.  We're going to start with the bill of

16  particulars motion.

17        We are now about three months out of the

18  commencement of this trial.  Although the prosecution has

19  provided defense counsel with voluminous discovery, there are

20  certain things that we requested, which we justified with case

21  law, that prevent us from adequately preparing to defend

22  Mr. Wilson at the guilt phase, the penalty phase of this

23  trial.  It is well within the court's discretion to order

24  disclosure.  The court has written opinions on it that was

25  cited within our motion as well as other authority.

1   Specifically, Judge, I'm going to talk about it in groupings

2   of counts.

3          The first group as laid out in the bill of

4   particulars deals with the racketeering act, the racketeering

5   conspiracy which is charged as occurring between October, '99

6   and March, 2003.  Also included are the murder counts, murder

7   in aid of racketeering, conspiracy to murder in aid of

8   racketeering covering a period from October of '99 to March,

9   2003 and conspiracy to murder in aid of racketeering a

10  specific individual, John Doe.

11         We have requested in our bills of particular that

12  the court direct the prosecution to identify the overt acts

13  committed by Mr. Wilson and other coconspirators.  It is

14  impossible for us to defend Mr. Wilson over that 3-year period

15  of time, that's specifically Counts 26 in the old indictment,

16  20, in the new indictment when did the defendant conspire to

17  murder members of a rival 456 group.  Over that three-year

18  period, there's a significant period of time Mr. Wilson was

19  not in the jurisdiction.  There was a significant period of

20  time where other identified members of this conspiracy were

21  incarcerated.  We cannot anticipate or prepare for this

22  evidence without the prosecution identifying for us at this

23  juncture what those overt acts were and the date of those

24  overt acts.

25         Additionally, we have requested the court direct the

1   prosecution to tell us how Ronell Wilson was employed or

2   associated within the enterprise.  Unlike other individuals

3   that have either pled guilty in this matter or have pled

4   guilty and are cooperating, Ronell Wilson has no convictions

5   for any drug sales, no convictions for anything that we

6   believe are part of the prosecution's theory of the

7   racketeering acts that were engaged in by what they have named

8   and we certainly denied, the Stapleton group.

9           We need to know how Ronell Wilson, how the

10  prosecutor suggests Ronell Wilson acted within this

11  enterprise, what his role was within the enterprise.

12          More, Judge, the final two requests which are

13  contained in the bill, and they're numbers one through nine,

14  is how did the murder of police officers Nemorin and Andrews

15  increase Mr. Wilson's position within this crew?  None of this

16  is information available to us from the discovery that we have

17  received.  None of this is available to us from a very

18  aggressive street investigation that we have conducted over

19  the course of our representation.

20          We also requested that the prosecution identify John

21  Doe who appears in Count 28 and Count 22.  In full disclosure

22  we believe we know who John Doe is, we're not sure.  We have

23  had some exchange with the prosecutor over this as we've met

24  with them at ATF to view the evidence in this case, but we

25  need confirmation so we can adequately prepare for trial.

1        By all accounts, keeping the witnesses' identities

2   secret at this point is useless.  We believe we know who the

3   cast of characters are.  We know a number of the witnesses who

4   were initially arrested, indicted and I believe pled guilty in

5   the state case and are cooperating.  We know a number of

6   persons from the neighborhood.  There's no threat.  The only

7   thing it prevents us to do is to prepare adequately.

8        Therefore, Judge, we would request that the court in

9   its discretion grant the bill of particulars that we filed,

10  specifically when we ask for information concerning the length

11  of the conspiracy, both the drug conspiracy and the counts

12  that deal with murder in aid of racketeering.

13       Should I go on?

14       THE COURT:  Let's deal with it issue by issue.

15       MS. KAVANAGH:  Actually, I would like to start with

16  the issue of no threat.  Actually, as recently as of a couple

17  of weeks ago, Mr. Wilson's coconspirators who pled guilty in

18  this case, specifically Mike Whitten and Angel Rodriguez

19  assaulted a person in the MDC.  There are other people

20  involved in the assault.  The person, the victim, required

21  eight stitches in his face.  Mike Whitten and Angel Rodriguez

22  are currently housed in the segregated housing unit as a

23  result of that attack on someone because he was believed to be

24  a cooperator.  So, there is a very real threat to people who

25  are believed to be cooperating with the government against

22

1    Mr. Wilson and his coconspirators.

2          In addition, Mr. Wilson is charged with obstruction

3    of justice murders and the murder of law enforcement officers.

4    Under Urso, as I read it, the court's view of the law in the

5    circuit is that that request of disclosing coconspirators

6    should not be granted when the defendant is charged with

7    extreme violence, so we would submit that's relevant here,

8    that we should not have to disclose the coconspirators, that

9    there are real threats, recent threats.

10         In addition, Judge, the other items that counsel

11   request, specifically --  it's legal theory of the prosecution

12   of how Mr. Wilson's murder of the detectives increased his

13   status within the Stapleton crew.  The government is not

14   required to disclose its legal theories in our case.

15         In addition, the defense has been provided with

16   copious discovery, discovery that we would have deemed would

17   have been turned over under our mandate of 3500, but instead

18   it was provided by the state.  They do have statements of

19   witnesses, of cooperators.

20         This is not a situation where the defense is in the

21   dark about the charges.  In fact, the government has turned

22   over additional discovery since the time of the motions which

23   includes a DVD of one of the victims actually being shot and

24   counsel for the defendant has come over, viewed every single

25   piece of evidence in ATF custody, viewed all the photographs

1   that are associated with the enterprise, of enterprise

2   members.  We've scanned the photographs, provided them on CDs

3   to the defense.  We believe we have complied with Rule 16,

4   above and beyond Rule 16 and the bill of particulars should

5   not be granted.

6          MS. SHARKEY:  I want to go back, despite the

7   discovery that has been provided, I want to focus the court on

8   the three-year period they're saying this enterprise operated.

9   One of the charges is that Ronell Wilson conspired to murder

10  rival members of the 456 crew over a period of three years and

11  a couple of months.  We cannot prepare for that without the

12  prosecutor identifying the overt acts that they claim

13  Mr. Wilson participated in.

14         The other point in this grouping I would like to

15  focus the court on is what manner was Mr. Wilson employed or

16  associated with the crew?  We can figure it out with the other

17  codefendants based on their records, based on who they were

18  arrested with, on drug cases or robbery cases.  Not so with

19  Ronell Wilson.

20         THE COURT:  What about that?

21         MS. KAVANAGH:  Judge, the case law we cite in our

22  brief, indeed this court cited in Urso, the government is not

23  required to disclose the when's, the where's or the with who's

24  of an agreement.

25         THE COURT:  But the defense is entitled to have some

1  guideposts is what is being indicated here.  In Urso, that was

2  a case rich in history or context for the charges made against

3  people who are alleged to be career members of organized

4  crime.  That was their business over 30, 20 or 15 years.  That

5  was an institution that's been testified to numerous times,

6  including last week in this courtroom, that has a

7  "identifiable structure." Here, there's a question there is a

8  structure involved of some kind that would demonstrate there

9  was a conspiracy.

10          I understand Urso --  I don't know that the Urso

11  decision totally informs the decision in this case, is what

12  I'm saying.

13          MS. KAVANAGH:  I understand.  Also, in this case,

14  the defense has, at least in the original indictment which

15  charged Mr. Wilson with his coconspirators, a 26-page

16  indictment which is very specific in terms of outlining the

17  enterprise and the ways in which that enterprise operated.

18  Between the indictment which is quite specific and the

19  discovery which has been provided which is specific to overt

20  acts that will be used to prove up those conspiracies, they

21  have enough.

22          THE COURT:  I understand the arguments.

23          What about the issue of the identities of the

24  alleged victims of the crimes charged in the conspiracy of

25  murder in aid of racketeering?  The defense wants the

1   identities of the victims disclosed, claims they haven't been

2   disclosed in the course of discovery.

3           MS. SHARKEY:  That's correct.

4           THE COURT:  That's one of your arguments.

5           How has the government provided sufficient discovery

6   in relation to that?

7           MR. SMITH:  We provided not only --  we discussed,

8   for example, the DVD of one of these victims being shot, in

9   discussions, not myself but with Ms. Kavanagh and counsel,

10  they've talked about who the victims are in this case.

11          MS. SHARKEY:  One, Mr. Smith.

12          MR. SMITH:  They've interviewed, we know for a fact

13  they've interviewed many of the witnesses, government

14  witnesses in this case, themselves, or attempted to interview

15  many of them.  The fact is they are not in the dark.  In

16  fact --

17          THE COURT:  What about on the narcotics charges?  Is

18  that on attempted murder or assault charge?

19          MR. SMITH:  A lot is interrelated.  For example, the

20  conspiracy to murder members of the 456 group, another point

21  that goes to that as well as the narcotics charge.  In these

22  charges the defendant, Mr. Wilson, is charged with a

23  conspiracy.  He's charged simply with agreeing to commit these

24  offenses over this period of time.  He's not charged with

25  dealing drugs, not charged with shooting anybody on those

1  particular charges.  He's charged with an agreement.

2          What the defense seeks now is evidentiary detail.

3  They want to know how we're going to prove that, want to know

4  what acts we're going to say Mr. Wilson did.  We can infer

5  from those acts his agreement to commit these charges.

6          It would be a different argument if we charged

7  Mr. Wilson with specific attempt to murder a particular

8  individual, a slightly different argument.  Here, there's only

9  a charge of an agreement.  We're charging, it's no secret, he

10  agreed over that period of time charged in the indictment to

11  murder this person.  We charge in the indictment over that

12  period of time he agreed with the other coconspirators, many

13  of whom the defense concededly knows, to sell crack cocaine.

14          The defense also knows in the narcotics conspiracy,

15  disclosed, mentioned in these papers, that coconspirators were

16  arrested in Manhattan.  They have that disclosure, the fact

17  coconspirators were arrested in Manhattan in the course of

18  this.  They know in addition to Staten Island, the drug

19  operation also touched upon Manhattan.  So, it's not as if

20  they don't have any specifics.  To the extent they do, it's

21  more than they are entitled to, given he's charged merely with

22  an agreement.

23          THE COURT:  Anything on the bill of particulars

24  respecting this issue?

25          MS. SHARKEY:  That begs the question as posed by

1   counsel in its motion, frankly posed by the court.  We don't

2   know what manner Wilson was employed in this alleged

3   enterprise.  When counsel says we know everybody, we've done

4   an aggressive street investigation, but the enterprise arises

5   from a neighborhood in which Mr. Wilson's family lived for

6   easily more than a decade.  Many of the witnesses that cross

7   over between both the guilt and penalty phase are mitigation

8   witnesses.  We didn't file a laundry list of requests.  We

9   tried to boil the requests down so we could adequately defend

10  him in his death penalty case.

11          Mr. Smith sloughs off it's merely an agreement.

12  Well, that's part of the heart of the prosecution case at the

13  guilt phase.  Frankly, having done a number of these cases,

14  that's where the jury's impression of the person whose life

15  they are ultimately deciding whether to execute or spare is

16  formed.  We are simply seeking to be adequately prepared to

17  meet the charges three months out of jury selection.

18          THE COURT:  Why don't we go on to the obstruction of

19  justice issue?  There's a question the defense poses is how

20  does the death of the two detectives, how would that be

21  considered intended to obstruct justice?

22          MS. SHARKEY:  And what federal charges?  The way

23  they phrase it in the indictment, the court couldn't say it

24  better, the way they phrase it in the indictment, to obstruct

25  the communication with law enforcement "certain federal

1    offense" not limited to those charged.  What offenses are they

2    talking about?

3              MR. SMITH:  The offenses include the prior gun

4    trafficking that was engaged in by members of the crew and the

5    previous transaction that led to this transaction where

6    Mr. Wilson committed these murders; federal offenses include

7    racketeering organization, all the crimes basically committed

8    by the Stapleton crew charged in the indictment.

9              THE COURT:  You're saying obstruction of justice in

10   the more generic sense?  In what way, she's asking, were these

11   alleged murders intended to obstruct justice under the federal

12   criminal system?

13             MR. SMITH:  By killing these two individuals, they

14   were able -- he was able to kill two people who could have

15   provided information to federal authorities about these

16   federal crimes I just discussed.

17             THE COURT:  I see. .

18             Let's go on to another subject here.

19             MS. SHARKEY:  The other subject, we also filed a

20   bill of particulars on the notice of intent.  Although the

21   prosecutor contested the ability to file a bill, it's within

22   court's discretion to order a bill of particulars and other

23   courts have done so.  We've cited those decisions within the

24   papers.  Not to beat a dead horse, need this information --

25             THE COURT:  Like Glover, Cooper, bin Laden?

1          MS. SHARKEY:  Yes.  The categories that we ask for

2    information on include pecuniary gain.  If the prosecution is

3    saying the buy money for the gun was the only item of

4    pecuniary value in relation to this aggravating factor, we

5    request they commit to that, or if there were other, there's

6    another gain of which we are unaware.  We have asked that the

7    court direct the prosecution to provide counsel with

8    information concerning the date and the location and the acts

9    that Mr. Wilson demonstrated his substantial planning and

10   premeditation, another aggravating factor they received notice

11   on.

12          The court has raised the issue of obstruction of

13   justice.  We asked for information concerning future

14   dangerousness that the prosecution has broken down into four

15   separate categories.  They talk about continuing pattern of

16   violence, a lack of remorse, Mr. Wilson's low rehabilitative

17   potential and membership in a street gang.

18          This might be moot if the court strikes some of

19   these acts, but at this juncture we are entitled to that

20   information in order to adequately prepare.  Of the cases we

21   cited in our motion, the only case that the prosecutor

22   attempted to distinguish was the bin Laden case by indicating

23   that was granted because of the vast number of victims

24   involved in that matter.  Some of the other cases we cited had

25   single victims, where the court found this is such an

important -- not bin Laden -- the court found this is such an important area of evidence, that the defendant is entitled to be prepared to meet it.

We're asking the court grant our bill in full on the notice of intent factors.

MR. SMITH: Your Honor, as to most of the factors listed, the answers to the evidentiary detail which counsel seeks will be given during the course of the guilt phase. How the proof exactly what Mr. Wilson did, regarding killing these two police officers, will all happen through the guilt phase. The government intends to represent the entire group during the penalty phase, that will be there prior thereto, how he obstructed justice, planned it out, the gain he sought and received as a result of these murders. That will all be disclose. There's no reason that the government should be limited in its proof months in advance of trial given the fact the central issue or central proof we'll put forth will address those issues during the guilt phase.

MS. SHARKEY: The defense will be a day late, a dollar short, not be able to prepare to meet those aggravating factors. Many of them may well be presented during the guilt phase, but it's not as if the jury wipes the slate clean at the penalty phase. It's essential for the defense to be able to meet them, understand them, speak to them throughout the entire process, not have the information withheld until

1   openings at penalty.

2          THE COURT:  I'll think about it.

3          Let's talk about the motion for the Wade hearing on

4   the lineup, the photographic identification.

5          MS. DINNERSTEIN:   Your Honor, first I'll speak

6   preliminarily about the May 2nd, 2002 with the, the one the

7   prosecution in their papers indicated there was a traffic

8   stop.  I submit that creates a factual issue.  There should be

9   a hearing to determine what actually was the basis for the

10  stop, the seizure of this gun that was recovered from the car.

11         I'll talk briefly about the March 12th arrest.  The

12  question, a question as to why I believe a hearing ought to be

13  held is we don't know what the particular police officers

14  involved in the arrest of Mr. Wilson and Mr. Bullock in Red

15  Hook knew at the time he arrested him.  He arrested him two

16  days afterwards.  That was on March 12th.  The incident

17  happened on March 10th.

18         I think, your Honor, a hearing is needed to

19  determine what in fact that police officer knew.

20         In terms of the Wade issue, one, your Honor, I'm not

21  going to talk much about whether or not this particular lineup

22  was suggestive or not.  I think the best way of addressing

23  that issue is simply to have a hearing.

24         Another concern that I have with that identification

25  procedure and the others address whether or not witnesses who

observed the lineup or the photo array which occurred on
April 27th actually had seen photographs of Mr. Wilson. As
you know, your Honor, as we all know, his photograph was
splashed all over the newspapers prior to his arrest of
March 12th. I think that a hearing is at least needed to
determine whether or not, not just as to the issue of
suggestiveness but also as to the issue of whether or not
there was a previous taint affected their ability to make an
identification in these lineups.

MS. KAVANAGH: As to the May 2nd stop, the traffic
stop, in addition to the motion to suppress regarding the
March 12th arrest, Mr. Wilson has not submitted an affidavit
based on personal knowledge. If he wants a hearing on the
factual issues of whether or not there was probable cause to
arrest him, whether or not the traffic stop occurred on
May 2nd, he needs to submit an affidavit to create the
material fact in dispute, but right now the court doesn't have
that. We would ask the court to deny the motion on that
basis.

In addition, the lineup can be decided by the court.
I know that counsel provided a copy of the lineup. I actually
have a color copy. I wasn't sure if that's provided. The
court can view this and decide whether or not in the court's
view it was a suggestive lineup. We don't need to have a
hearing on it. The fact that there was press and photographs

1  of Mr. Wilson in the press wouldn't go to suggestiveness on

2  the police officers' part, certainly the witnesses at trial

3  can be questioned about their ID.  We don't need to have a

4  hearing on that.  I could submit this.

5        THE COURT:  Have you provided it to the defense?

6        MS. SHARKEY:  Yes.

7        THE COURT:  Provide it to me.

8        Anything else on the Wade hearing question? .

9        MS. KAVANAGH:  No.

10        THE COURT:  What else?

11        MR. SAVITT:  Nonstatutory aggravating factors.  I

12  don't know if your Honor has a copy of the notice of intent to

13  seek the death penalty.  I have an extra copy for the court.

14        THE COURT:  I'll take it.  Go ahead, Mr. Savitt.

15        MR. SAVITT:  We have set our arguments out in the

16  motion papers, obviously.  Preliminarily, the threshold

17  concern about nonstatutory aggravating factors in general for

18  the defense involves the notion that under Blakely, because

19  none of these factors were submitted to the grand jury and as

20  a result, if there is a jury verdict of conviction in the

21  guilt/innocence phase, none of these nonstatutory factors

22  would have been found beyond a reasonable doubt within the

23  jury verdict as against Mr. Wilson.  We believe we have a

24  serious Blakely problem, understanding, of course, three

25  circuits have ruled contrary to our position, but nevertheless

34

1    the Second Circuit hasn't, to my knowledge --

2            THE COURT:  They may have the opportunity.

3            MR. SAVITT:  They may have.  We raise that as a

4    threshold issue.

5            The other issue, if we go beyond --

6            THE COURT:  We know where the Supreme Court is going

7    on matters apart from the death penalty issue where it's going

8    on matters involving criminal law.  Did you read the Hudson

9    decision yesterday?

10           MR. SAVITT:  No, your Honor.

11           THE COURT:  The no knock?

12           MR. SAVITT:  I did not read it.

13           THE COURT:  It's very instructive.  Go ahead.

14           MR. SAVITT:   Getting beyond that, the concern we

15   have with respect to the nonstatutory aggravating factors is

16   that we have series of double counting of aggravating factors.

17   For instance, if we look at page 4 of the notice of intent, we look a

18   the nonstatutory aggravator number two, the status of the

19   victims, wherein the notice alleges the defendant murdered two

20   law enforcement officers during the course of their official

21   duties, that seems to be subsumed certainly within victim

22   impact which is on page five, begins on page five, number five

23   nonstatutory aggravator, specifically in the component 5-A,

24   characteristics of the victims under subparagraph I, I guess

25   it is;  that wherein it is alleged the defendant caused the

SS        OCR        CM        CRR        CSR

1    death of James Nemorin, a 36-year old detective with the

2    New York City Police Department, and then in the next

3    subparagraph, alleges the same thing with respect to

4    Mr. Andrews, again, identified as the 34-year old detective of

5    the New York City Police Department, thereby rooting these

6    components of the aggravator concerning victim impact evidence

7    based on the status of the victims, once again --

8           THE COURT:  Can't we distinguish the status of the

9    victim as an individual and as a police officer and their role

10   in society?  Are you arguing they're double counting?

11          MR. SAVITT:  The argument is they're double

12   counting.  Of course, we can individualize the victim as a

13   person versus the official duties of that victim.

14          THE COURT:  You can have someone on the street in a

15   drug transaction and that might not implicate obstruction of

16   justice.

17          MR. SAVITT:  That's correct.  I agree with that, but

18   nevertheless, clearly by the language of the statutory --

19   nonstatutory aggravating relating to the status of the

20   victims, and again the components of the victim impact

21   evidence, all rooted on the victims' capacity as law

22   enforcement officers, acting in their official duties, is an

23   impermissible double counting.

24          If we go to nonstatutory aggravator number 5-C, the

25   impact of the offense on the employer and colleagues of the

1   victim, again we're talking about the New York City Police

2   Department, which is the same impermissible double counting,

3   all premised on the status of the victims, not as individuals,

4   but rather as police officers.

5          The problem with that is that it unfairly skews the

6   weighing process to take the same basic route and consider it

7   in triplicate.  If we look at page 4 of the notice, your

8   Honor, the first factors alleged, obstruction of justice,

9   although we again don't have a clear indication from the

10  government what the theory of obstruction of justice is,

11  nevertheless, in their memorandum, the government stated the

12  theory is that the defendant knew that the victims were police

13  officers.

14         Once again, the obstruction of justice factor, the

15  defendant killed the victims in an effort to obstruct justice

16  would seem to duplicate the victim's nonstatutory aggravator

17  as well as the impact, the characteristics of the victims as

18  well as the impact of the offense on the employer and

19  colleagues of the victims all rooted under status of police

20  detectives.

21         Moreover, if we stay on page six with 5-C, where the

22  impact of the offense on the employer and colleagues of the

23  victims, we have a serious concern any such nonstatutory

24  aggravator component which asks the jury to consider what

25  effect the crimes had on the New York City Police Department

1   as an institution is impermissible and beyond anything that

2   was permitted by the Supreme Court in Payne versus Tennessee.

3   It goes beyond any individualized consideration.  What it asks

4   the jury to do is to focus on whether this may have had a

5   chilling effect on the operations of the police department as

6   opposed to what impact the murders had on the victims'

7   families, or perhaps even on the victims' colleagues and

8   friends, which is an understandable consideration for the jury

9   in the weighing process.  But for the jury to focus on whether

10  or not this allegedly had some sort of impact on the New York

11  City Police Department as an institution, I think is

12  impermissible.  Beyond that, it also calls into account other

13  factors such as political considerations as well as

14  administrative considerations having no direct relationship to

15  the actual criminal activity.

16          I think that in and of itself it unfairly skews the

17  process in terms of inviting the jury to find yet another

18  nonstatutory aggravator, impermissible basis rather than of

19  relying on the offender, the victim, the victims's family and

20  friends.

21          There's one other aspect that I want to get into;

22  that is, if we go back to page four of the notice of intent,

23  we have additional double counting in connection with factor

24  three, contemporaneous convictions.  It's alleged the

25  defendant faces contemporaneous convictions for multiple

1   attempted murders, other serious acts of violence.  Obviously

2   focusing on the allegations in the indictment which by the

3   time the jury would consider this would be something that the

4   defendant would be convicted of presumably.

5           THE COURT:  Doesn't one deal with past acts, the

6   other deals with future acts?  That's not double counting, is

7   it?  It's dividing up chronologically the different types of

8   aggravators or facts related to past behavior and projected

9   future behavior.

10          MR. SAVITT:  The government's argument is they're

11  dividing up contemporaneous convictions, future dangerousness,

12  the components of future dangerousness for a continuing

13  pattern of violence and no rehabilitative potential, I

14  understand that.

15          THE COURT:  Is there anything in the Second Circuit

16  on this?

17          MR. SAVITT:  I don't believe so.  I do know all of

18  these components and factors are premised on the very same

19  notion of the contemporaneous convictions.  Once again, the

20  notice is asking the jury to double count factors in its

21  consideration whether or not to impose the death penalty.  We

22  believe that's duplicative, certainly one factor is enough.

23  Three is inviting impermissible skewing of the process.

24          Frankly if we look at component D of the future

25  dangerousness factors on page five, even the membership in

1   criminal street gang where it's alleged defendant demonstrated

2   an allegiance to act of membership in the Stapleton crew, an

3   organization falling within a definition of criminal street

4   gangs, the Stapleton crew is the enterprise alleged in the

5   racketeering as well as in the racketeering conspiracy count.

6   Once again, we're talking about contemporaneous convictions

7   and beyond that, we're also arguing and I believe we have a

8   good argument that language concerning criminal street gang,

9   that the defendant allegedly had an allegiance to act of

10  membership in the Stapleton crew is unconstitutionally vague

11  language, any probativeness is outweighed by the danger of

12  unfair prejudice because the jury isn't given guidance what

13  allegiance to an act of membership would be.

14          Basically, the jury can decide for itself what these

15  terms mean.  They have to be guided in weighing the factors

16  that the government is asking them to consider and potentially

17  imposing a sentence of death in this case.

18          MR. SMITH:  As to the contemporaneous convictions,

19  future dangerousness, I would echo the comments of the court.

20  One goes to the harm Mr. Wilson is sure to cause in the

21  future, one goes towards the harm he's already caused.  There

22  are specific cases, Johnson, Medlock, which all discuss this

23  as a valid way of dividing up aggravating factors in a way

24  that address different harms, different concerns in terms of

25  the defendant's past behavior, his likely future behavior.

40

1          As to the issues regarding the status of the
2     victims, the government's filing submits the status of the
3     victims as police officers is one aggravating factor.  The
4     fact the defendant obstructed justice, a second aggravating
5     factor.  A third, victim impact.

6          The government concedes the proof of some of these
7     aggravating factors does overlap, no question about that.
8     They each address very specific and different harms.  The
9     status of the victims is constitutionally recognized by the
10    Supreme Court, as police officers, as a legitimate aggravating
11    factor.

12          The fact this defendant obstructed justice is
13    without question, a legitimate aggravating factor.

14          In this case, as we cited in our brief, the
15    defendant, though we will prove he believed they were police
16    officers, did not necessarily have to be told that to kill
17    them in an effort to obstruct justice.

18          Victim impact, the impact in this case, I'll deal in
19    issues with the police department in a moment, in terms of the
20    victim impact, the fact some of the victims's close friends
21    who, as counsel concedes, would be relevant victim impact
22    witnesses, might be police officers is not relevant, doesn't
23    touch on the other factors.  They're talking about his
24    individual uniqueness as a human being, the fact he was a
25    police officer shouldn't preclude the government from offering

1  the same evidence it could offer if he was, for example,

2  employed at Wendy's.  These are people who knew the victim,

3  knew things about the victim, maybe family members didn't in

4  terms of what they were like in terms of family, but their

5  commitment to public service.

6          The victim impact evidence in this case is a very

7  important component of the government's proof because

8  depending on the type of person a victim was in a case, the

9  victim impact testimony may be narrow or broad.  If someone is

10 killed who did not have a positive effect on the community,

11 didn't have much of effect on the community, the testimony

12 would be narrow.  In this case these two victims had

13 tremendous effect on the community, both in personal lives,

14 with their families, also in professional lives.

15         As to the police department, the murder of these two

16 police officers, no question had an effect on the police

17 department.  As the Payne case talks about, in addition to the

18 unique individualness of the victims, the effect on the

19 community is also relevant.  When you kill two police officers

20 who are involved in taking guns off the streets of New York

21 City, you have an effect on the community. .

22         The government does not intend to offer a great deal

23 of testimony on this issue.  That's a relevant factor, when

24 you kill two police officers who are engaged in the business

25 of protecting the public, that's an aggravating factor, you

1    affect the police department in that way.

2         THE COURT:  I draw distinction, at least I think I

3    do between effect on the community at large and effect on the

4    police department as an institution.  It would appear to me

5    anecdotally, correct me if I'm wrong, the act of committing

6    murder on two undercover police detectives has the effect on

7    the police department as an institution in the redoubling of

8    its efforts and greater focus of its efforts on the crime or

9    conspiracy that is at work, if it is at work, that caused that

10   particular crime, those particular crimes to take place.

11        In other words there's nothing that gets the

12   attention of the management of the New York City Police

13   Department --  police department as effectively as gruesome a

14   crime as took place on Staten Island three years ago.  So, I

15   don't know, would you put to prove this, who would you put on

16   the stand, the police commission to say this is the effect it

17   had on the institution, the mayor?  Is that what would be in

18   play in this case?

19        MR. SMITH:  No.  It would be to the extent, very

20   similar to the evidence in the case we cited, the Battle

21   case., testimony, probably many of the same witnesses who

22   would already be testifying as colleagues, coworkers about the

23   chilling effect it had, how undercover detectives, we're

24   refusing to go out on the street, do these operations because

25   of the danger, how some even retired from undercover work,

43

1  said I'll be a police officer, but I will not do undercover

2  work anymore.  That has a deleterious effect on the police

3  department to police.

4           I don't think, I want to make it clear, we don't

5  intend to have a day of testimony on this issue.  It's the

6  sort of testimony that will come in through the testimony of

7  witnesses who counsel has conceded, colleagues, who otherwise

8  would be clearly relevant as fact witnesses.

9           THE COURT:  Anything else?

10          MR. SAVITT:  It seems the Battle case is somewhat

11  distinguishable.  I know there are similar factors in the

12  Battle case which involve the killing of a correctional

13  officer within an institution.

14          THE COURT:  I understand the distinctions between

15  the murdering of a correction officer in the confines of a

16  penal institution as opposed to the murdering of two police

17  detectives in Staten Island, but the fundamental similarity is

18  that it's the assault on the law enforcement community that

19  deals with crime in that particular way, deals with criminals

20  in that particular venue, that particular location.  Just

21  because it's Staten Island as opposed to a penal institution,

22  doesn't mean it won't have an effect on the other persons who

23  are sworn to enforce the law and to engage in the kinds of

24  activities, in the case of the penal institution, the

25  correction officers; in the case of the police department, the

44

1    undercover detectives ferreting out the trade in illegal

2    weapons.  So, in that way, there are parallels, aren't there?

3            MR. SAVITT:  There are certainly some parallels

4    concededly.  By the same token, what happened in the aftermath

5    of this crime in connection with the police department as an

6    institution was prompted by complaints regarding the

7    sufficiency of backup and equipment that by certain elements

8    of the police department and they were, quite justifiably it

9    would seem, but also there are political considerations, of a

10   mixture of considerations that go beyond anything that a

11   capital jury should be asked to consider.

12           Clearly, what's fair game here is victim impact

13   evidence, which also includes friends and family.  Once you

14   get to the institution of the New York City Police Department,

15   particularly in this case where there are other components,

16   other elements that work in terms of how it affected the

17   police department, undoubtedly triggered by this crime, but

18   nevertheless, attitude in terms of some political motivations,

19   it becomes --

20           THE COURT:  Political motivations as to what?

21           MR. SAVITT:  The sufficiency of backup.

22           THE COURT:  Sufficiency of?

23           MR. SAVITT:  Of backup of undercover officers, the

24   equipment provided to surveillance officers.  All this becomes

25   thrown into the mix.  As a practical matter --

1      THE COURT:  Just to follow through on that, whether

2  they had backup officers on every street corner and greater

3  communications, would that have had any effect on the

4  circumstances of this particular crime?  They never could have

5  gotten to the police officers between the time someone,

6  whoever it was, decided to execute these two police officers.

7  It wouldn't have thwarted the crime.  The crime would have

8  taken place anyway.  There might have been an arrest

9  effectuated promptly as opposed to an arrest at a later date.

10  Isn't that the only difference, isn't it?

11      MR. SAVITT:  The court is quite correct.  I don't

12  mean to suggest otherwise.

13      The only suggestion I'm posing here is that the

14  consequences of this crime led to all sorts of turmoil.  It

15  was certainly generating a lot of press attention as well as

16  exposure in the press as to complaints within the police

17  department by certain groups who felt there wasn't sufficient

18  backup within the police department.

19      My concern is all this really just something that

20  will sway the jury in an impermissible way.

21      THE COURT:  I understand your argument.

22      Do we have anything else for today?  I'm going to

23  reserve, obviously.

24      MS. SHARKEY:  I was going to add on to that, but the

25  court has the message.

1      THE COURT:  Thank you all for your submissions and

2 your statements here.

3      MS. SHARKEY:  There is one other matter aside from

4 this.  On the last date the court asked the prosecution to

5 inquire of the BOP about Mr. Wilson's visits with family

6 members outside of the SHU.  I would note for the record most

7 recently when I've been visiting, when I come into the

8 institution, the officers downstairs know to get counsel

9 upstairs right away.  Last time when I visited, I waited an

10 hour and a half in the SHU area for Mr. Wilson.  Maybe it was

11 an hour and 15 minutes.  As the trial approaches, Judge, it

12 becomes an incredible time crunch.

13      Were we to be allowed to visit with him in general

14 population, other business could be conducted, not necessarily

15 associated with this case, but to count on hanging out for an

16 hour and a half prior to seeing your client makes it very

17 difficult for defense counsel to meet with him on a regular

18 basis in preparation.

19      MS. DINNERSTEIN:  I would like to bring up one

20 other item of a similar note.  That has to do with the request

21 you made of the U.S. Attorney the last time regarding the

22 visit of his nephew.  I know that visit has not occurred.  I

23 believe the court had asked Ms. Kavanagh to come back and

24 discuss what the position of the Bureau of Prisons is

25 regarding this particular visit.

47

1          MS. KAVANAGH:  I did so.  I spoke with the legal
2    department.  My understanding is that the MDC intends to keep
3    Mr. Wilson housed where he is, to have his visits continued in
4    the SHU and to adhere by BOP or MDC policy not to allow visits
5    with people who are not, children who are not their own,
6    meaning his nephew.
7          THE COURT:  Immediate family?
8          MS. KAVANAGH:  Correct.  No inmate has the right to
9    visit with a nephew or niece.  They're not going to make an
10   exception for Mr. Wilson despite the fact he was told such an
11   exception would be made by a counselor.
12         THE COURT:  What about the issue of access to
13   counsel for the defendant for meetings?  It would seem to me
14   if the meetings are upstairs, there's no question of
15   separations.  Why would Ms. Sharkey have to wait an hour and
16   15 minutes, an hour and a half?
17         MS. KAVANAGH:  This is the first I'm hearing about
18   it.
19         THE COURT:  Why don't you find out and let me know?
20         MS. KAVANAGH:  It would be helpful if these are
21   raised beforehand.
22         THE COURT:  I'm not saying you have to have an
23   answer to a question heard 30 seconds ago.  I would like to
24   know why it is, and what will be done to make these meetings
25   simple in the future.

1          MS. SHARKEY:  You come in the door, those officers

2     are great.  You get lost up on the 9th floor.

3          THE COURT:  I've been in the facility on a number of

4     occasions.  I'm aware of the design of the institution, also

5     its limitations.

6          Anything else for today?

7          MS. KAVANAGH:  No.

8          THE COURT:  The next step, I'll get a propose jury

9     questionnaire?

10         MR. SMITH:  Yes.

11         THE COURT:  Should I set a status conference for

12    July so we can see where we are?

13         MR. SAVITT:  Yes.

14         MS. KAVANAGH:  Judge, also, we will be providing to

15    the court the name and address, obviously to counsel, of a

16    proposed firewall assistant.

17         THE COURT:  July 18th, Tuesday, does that work for

18    everyone at 9:00 o'clock?  Please be on time.  I'll still be

19    on trial.  As this is a complex case, motions are still

20    pending, I'm excluding the time between now and then under the

21    Speedy Trial Act in the interest of justice unless there's

22    some objection I should hear.

23         MR. SAVITT:  No, your Honor.

24         May we have a copy under CJA?

25         THE COURT:  Yes, copy to be provided CJA, the

1   transcript of this proceeding. .

2           (Whereupon this matter was concluded for the date.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SS     OCR     CM     CRR     CSR