UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,

                               **MEMORANDUM & ORDER**
       v.                            **04-CR-1016 (NGG)**

RONELL WILSON,

               Defendant.
--------------------------------------------------X
GARAUFIS, District Judge.

      A jury has found Ronell Wilson ("Wilson") guilty of two counts of murder in aid of

racketeering, two counts of robbery conspiracy, one count of attempted robbery, one count of

carjacking, two counts of causing death through use of a firearm, and two counts of using a

firearm in furtherance of crimes of violence. These charges were based on, *inter alia*, Wilson's

execution of undercover New York City Police Department ("NYPD") Detectives Rodney

Andrews ("Detective Andrews") and James Nemorin ("Detective Nemorin") (together, the

"Detectives"), whom he was attempting to rob of the $1,200 they planned to use to purchase a

firearm from Wilson and his fellow members of the Stapleton Crew[1] street gang. The

Government will seek the death penalty against Wilson in a penalty phase that will begin on

January 16, 2007.

      Each side has filed motions in anticipation of the penalty phase. Wilson has moved the

court (1) to preclude the Government from offering as an aggravating factor the victims' status as

law enforcement officers; (2) to preclude the Government from offering evidence of Wilson's

---

[1] The members of this criminal enterprise never referred to the enterprise by any
particular name. (Tr. at 769, 788.) For the sake of convenience, the court will refer to this
enterprise as the "Stapleton Crew."

1

alleged membership in the Bloods street gang as proof of Wilson's future dangerousness; (3) to require the Government to disclose whether it will offer any evidence of Wilson's alleged continuing pattern of violence and low rehabilitative potential, which are aspects of the "future dangerousness" aggravating factor, other than (a) the crimes for which Wilson was found guilty in this case and (b) Wilson's juvenile criminal history; (4) to acquit Wilson under Fed. R. Crim. P. 29 of (a) the two counts of murder in aid of racketeering and (b) the one count of carjacking; (5) to require the Government to make an offer of proof regarding the testimony it intends to introduce to prove the "victim impact" aggravating factor, and to preclude the use of video footage of Detective Nemorin as proof of that factor; and (6) to order the Government to provide defense counsel with the written comments that peer reviewers sent Government expert Dr. Michael Welner regarding his expert report.

For the reasons set forth below, the motion to preclude the victim-status aggravating factor is DENIED; the motion to preclude evidence of Wilson's membership in the Bloods is DENIED, although such evidence will be limited in ways discussed herein; the motion for disclosure of evidence of future dangerousness is GRANTED to the extent described herein; the motions to acquit are DENIED; the motion for an offer of proof regarding the victim-impact aggravating factor is GRANTED to the extent described herein; and the motion for the written comments of Dr. Welner's peer reviewers is GRANTED.

The Government has moved the court to preclude Wilson from offering, during the penalty phase, the testimony of (1) Wilson's friends and family members regarding their affection for Wilson, (2) Professor Yasser Payne, whom Wilson intends to call as an expert in hip hop culture, (3) Dr. Mark Cunningham, whom Wilson intends to call as an expert in prison-

inmate misconduct, and (4) Donald Romine, whom Wilson intends to call as an expert in corrections management. The Government has also moved the court to order Wilson to provide to the Government any notes Dr. Cunningham took during his interview of Wilson.

For the reasons set forth below, the motion to preclude the testimony of Wilson's friends and family members is DENIED; the motion to preclude the testimony of Professor Payne is DENIED; the motion to preclude the testimony of Dr. Cunningham is DENIED, although his testimony will be limited in ways discussed herein; the motion for Dr. Cunningham's notes is GRANTED; and the motion to preclude the testimony of Mr. Romine is DENIED, although his testimony will be limited in ways discussed herein.

## I. Background

Wilson, also known as "Rated R," is a member of the Stapleton Crew, a criminal enterprise that committed armed robberies, assaults, and drug sales in the area surrounding the Stapleton Houses housing project on Staten Island, New York in 2002 and 2003. (Tr. at 240-53, 260-64, 267-70, 281-88, 758-64, 766, 768, 785-86, 788-96.) Wilson was considered the Stapleton Crew's most violent member. (Id. at 275.)

On March 3, 2003, Stapleton Crew senior members Michael Whitten ("Whitten"), Paris Bullock ("Bullock"), and Omar Green ("Green") sold a firearm to Detective Nemorin. (Id. at 807-11.) At that time, Detective Nemorin was an undercover officer in the NYPD's Firearms Investigative Unit, which was dedicated to investigating and preventing illegal firearms dealing in New York City. (Id. at 54.) Whitten suspected, but did not know, that Detective Nemorin was a law enforcement officer. (Id. at 811.)

One week later, on March 10, 2003, those senior members of the Stapleton Crew discussed and executed a plan to commit an armed robbery of Detective Nemorin, who had agreed to purchase a semiautomatic TEC-9 firearm from them that evening for $1,200.  (Id. at 290-96, 303-04, 811-17, 826-35.)  Wilson and Jessie Jacobus ("Jacobus") were assigned to carry out the robbery.  (Id. at 303-04, 817, 827, 831.)  The Stapleton Crew members who gathered at Green's apartment to plan the robbery, including Wilson, considered the possibility that Detective Nemorin was an uncover law enforcement officer and agreed that Wilson might have to shoot Detective Nemorin in order to carry out the robbery.  (Id. at 834, 839-40.)

Detectives Nemorin and Andrews arrived at the Stapleton Houses that evening in an unmarked Nissan Maxima driven by Detective Nemorin (the "Detectives' car").  (Id. at 64, 304, 308-09.)  Wilson, who had expected Detective Nemorin to arrive alone, was surprised to find him accompanied by Detective Andrews.  (Id. at 309.)  After a brief period of hesitation, Wilson ordered Jacobus to enter the Detectives' car and to sit in the back passenger-side seat behind Detective Andrews.  (Id. at 309-13, 328-30.)  Wilson entered and sat in the back driver-side seat behind Detective Nemorin.  (Id. at 311-13, 330.)  Wilson ordered Jacobus to "pat down" the Detectives and told them that submitting to a pat-down was a pre-condition to transacting business.  (Id. at 235, 328-29.)  The Detectives refused to be patted down, and it is unclear whether Jacobus in fact patted them down.  (Id. at 329.)

Although the Stapleton Crew did in fact own a TEC-9, Wilson and Jacobus did not have it in their possession when they met the Detectives.  (Id. at 328, 331.)  Wilson therefore instructed Detective Nemorin to drive to the intersection of Victory Boulevard and Corson

Avenue, where, Wilson claimed, he would pick up the TEC-9.[2]  (Id. at 330, *et seq.*)  As they

drove, Wilson commented that the neighborhood was "hot," by which he meant that it was full of

undercover law enforcement officers.  (Id. at 331.)  When the car reached Victory and Corson,

approximately one and one-half miles from the Stapleton Houses, Wilson instructed Detective

Nemorin to pull over.  (Id. at 335.)  Wilson then exited the car alone.  (Id. at 333-37.)

The intersection of Victory and Corson was chosen for its proximity to 92 Victory

Boulevard, a small apartment building that was the home of Mitchell Diaz, a Stapleton Crew

member who possessed the Crew's TEC-9 and 44-caliber revolver in March 2003.  (Id. at 748,

798-805.)  While Wilson, Jacobus, and the Detectives drove from the Stapleton Houses to

Victory and Corson, Diaz and Bullock were in Diaz's home, loading the revolver so that Wilson

could use it to rob the Detectives.  (Id. at 845-48.)

When Wilson exited the Detectives' car, he met Diaz in a deli.  (Id. at 856.)  Diaz had the

loaded revolver in his possession, but because he did not want to hand it to Wilson in public

view, the two of them walked separately – first Diaz, then Wilson – to Diaz's home.  (Id. at 856-

57.)  As they walked, each saw men he assumed were undercover law enforcement officers in a

black Ford Expedition parked on Victory Boulevard.  (Id. at 858-61.)  When Wilson arrived at

Diaz's home, he and Diaz discussed the possibility that the men in the black Expedition were

undercover officers.  (Id. at 860-61.)  Although they agreed the men were in fact undercover

---

[2]  Most of the statements Wilson made in the Detectives' car were recorded using a KEL device, which is a radio transmitter disguised as a beeper.  (Tr. at 63.)  It transmitted a radio signal to law enforcement officers monitoring Detectives Andrews and Nemorin.  (Id.)  Because the KEL's radio signal was interrupted shortly before Wilson murdered the Detectives, the shots that killed the Detectives and the conversations immediately preceding those shots were not recorded.  (Tr. at 83-85, 88.)

officers, Diaz persuaded Wilson that the officers were probably in the neighborhood for reasons unrelated to the Stapleton Crew's planned robbery.  (Id.)  Diaz then handed Wilson the revolver and watched as Wilson walked back to the Detectives' car, entered it, and once again sat in the back driver-side seat.  (Id. at 861-66.)

When Wilson re-entered the Detectives' car, he instructed Detective Nemorin to drive west along Corson.  (Id. at 345-46.)  Moments later, Wilson complained that the Detectives' car was being followed by the black Expedition.  (Id.)  In order to evade the black Expedition, Wilson directed Detective Nemorin to turn left on Fremont Street, which was the wrong way on that one-way street, and to then circle back to the intersection of Victory and Corson; Wilson then exited the Detectives' car, ostensibly in order to observe whether it was in fact being followed.  (Id. at 346-50, 354.)  Detective Nemorin followed Wilson's instructions.  (Id.)  Wilson re-entered the car when it was back on Victory and again sat in the back driver-side seat.  (Id. at 350.)

Wilson next instructed Detective Nemorim to drive 1,000 feet north along Daniel Low Terrace, 100 to 200 feet east along Fort Place, 1,000 feet south along Montgomery Avenue, 1,000 feet south along St. Pauls Avenue, and to then turn east and park on Hannah Street.  (Id. at 352-55.)  It appears that Wilson chose this circuitous path in order to evade any law enforcement officers who may still have been following the Detectives' car.[3]

---

[3]  The logical way to travel from Victory and Corson to St. Pauls and Hannah is to drive east along Victory to St. Pauls and then south along St. Pauls to Hannah, a trip of approximately 1,000 feet.  Wilson instead instructed Detective Nemorin to drive more than three times that distance, making two circles and one wrong-way turn, to reach the same destination.

Hannah Street was the planned robbery location.  (Id. at 357.)  When Detective Nemorin parked there, Wilson again exited the car alone and looked up and down the street in order to make sure that the car had not been followed.  (Id. at 357-58.)  When he re-entered the car moments later, he sat in the back driver-side seat, reached into his waistband, pulled out the revolver, and without warning or hesitation shot Detective Andrews in the head.  (Id. at 358-60.)  He then put the revolver to Detective Nemorin's head and demanded, "Where's the shit at?  Where's the shit at?  Where's the money?  Where's the shit at?"  (Id. at 360-61.)  When Detective Nemorin responded by pleading for his life, Wilson pulled the trigger.  (Id. at 361-62.)

Later that night, Jacobus asked Wilson why he had murdered the Detectives.  Wilson answered, "I don't give a fuck about nobody."  (Id. at 378.)

## II.  Wilson's Motions

### A.  Aggravating Factors

When a defendant is found guilty of a federal capital crime, his sentence is determined in a penalty phase by a jury that is ordinarily, as it is in this case, the same jury that determined the defendant's guilt.  18 U.S.C. § 3593(b).  If the defendant was convicted of capital crimes such as those that Wilson committed, then the Government must prove beyond a reasonable doubt, in the penalty phase, that the defendant–

(A)    intentionally killed the victim;

(B)    intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C)    intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

7

(D)        intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a).

If the Government proves one or more of these threshold factors, then "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under [18 U.S.C.] section 3592." 18 U.S.C. § 3593(c). Section 3592 lists seven mitigating factors ("statutory mitigating factors") and, for homicide cases, sixteen aggravating factors ("statutory aggravating factors"), each of which the jury must consider. See 18 U.S.C. § 3592(a)(1)-(7), (c)(1)-(16). Section 3592 also permits the defense to present evidence of unenumerated mitigating factors ("non-statutory mitigating factors"), which the jury must consider, and the Government, if it provides notice, to present evidence of unenumerated aggravating factors ("non-statutory aggravating factors"), which the jury is permitted, but not required, to consider. See 18 U.S.C. § 3592(a)(8), (c). A related provision explicitly authorizes the Government, if it provides notice, to present evidence of "factors concerning the effect of the offense on the victim and the victim's family[.]" 18 U.S.C. § 3593(a).

Information offered to prove a mitigating or aggravating factor "is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials[.]" 18 U.S.C. § 3593(c). This court may, however, exclude information from the penalty phase "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Id.

8

Wilson has moved the court to limit the Government's penalty-phase presentation in two ways and to require an offer of proof on one issue. First, Wilson moved the court to preclude the Government from offering as an aggravating factor the victims' status as law enforcement officers. (Wilson Br. dated Dec. 20, 2006 at 3-5.) Second, Wilson moved the court to preclude the Government from offering evidence of Wilson's alleged membership in the Bloods street gang in support of the non-statutory aggravating factor of Wilson's future dangerousness. (Id. at 7-11.) In addition, Wilson moved the court to require the Government to disclose whether it will offer any evidence of Wilson's (a) alleged continuing pattern of violence and (b) low rehabilitative potential – each of which is a category of proof of future dangerousness – other than (i) the crimes for which Wilson was found guilty in this case and (ii) Wilson's juvenile criminal history. (Id. at 11-14.) I address each motion in turn.

## 1. The Victims' Status as Law Enforcement Officers

The Government intends to prove as an aggravating factor the "status of the victims," *i.e.*, that "[t]he defendant murdered two law enforcement officers during the course of their official duties." (Notice of Intent to Seek the Death Penalty, Docket No. 174 ("NOI") at 3.) Wilson argues that "in order to be validly weighed as a factor in favor of a death sentence, the government must prove that the defendant was aware of the victims' status" and that because such awareness was not proven in the trial phase of this case, "this aggravating factor must be dismissed." (Wilson Br. dated Dec. 20, 2006 at 3.)

In order to grant Wilson's motion to dismiss this aggravating factor, the court would have to hold either (1) that the Government may prove a fact in support of an aggravating factor if and only if that fact was known to Wilson when he murdered Detectives Nemorin and Andrews or

(2) that the Government may offer a fact in support of an aggravating factor if and only if the fact was proven beyond a reasonable doubt in the trial phase. Each of these holdings is untenable.

The first holding is untenable because it contradicts federal statutory law. The statutory aggravating factors enumerated by Congress include that "[t]he defendant committed the offense against . . . a Federal public servant who is . . . a law enforcement officer . . . while he or she is engaged in the performance of his or her official duties," regardless of whether the defendant knew or believed his victims was a law enforcement officer. 18 U.S.C. § 3592(c)(14)(D). This means that if Detectives Andrews and Nemorin had been employed by the United States rather than New York City, the Government would be permitted to prove – and the jury would be required to consider – the Detectives' status as law enforcement officers as an aggravating factor, even if Wilson did not know of their status when he murdered them. This court must therefore reject Wilson's argument that "resting a death sentence on a police officer's status, absent proof that the defendant was aware of that status, would serve no deterrent purpose" (Wilson Br. dated Dec. 20, 2006 at 4), an argument that Congress rejected when it adopted Section 3592.[4]

Wilson's motion assumes that the Government will not be able to prove that Wilson knew or believed that Detectives Andrews and Nemorin were law enforcement officers. (Wilson Br. dated Dec. 20, 2006 at 5.) That assumption is incorrect. The most that can be inferred from the trial phase regarding this issue is that the Government has not already proven that Wilson knew or believed, at the moment he murdered Detectives Andrews and Nemorin, that his victims

---

[4] Congress also rejected this argument when it permitted the Government to offer information proving the impact of Wilson's crime on his victims' families. 18 U.S.C. § 3593(a). That permission is not conditioned upon the Government showing that Wilson knew or should have known of the impact his crimes would have on those families, or even that he was aware that his victims had families.

were law enforcement officers. Such knowledge is not an element of any of the crimes for which the jury found Wilson guilty, and so it cannot be inferred from the jury's verdict.

It does not follow, however, that the Government will not be able to prove such knowledge during the penalty phase. The Government has already shown, during the trial phase, that Wilson and other members of the Stapleton Crew engaged in conduct from which a reasonable juror could infer that Wilson knew or believed that Detectives Andrews and Nemorin were law enforcement officers. More specifically, the Government has shown that (1) Whitten suspected that Detective Nemorin, who had already purchased a firearm from Whitten, was a law enforcement officer (Tr. at 811); (2) a group including Wilson discussed the possibility that Detective Nemorin was a law enforcement officer (id. at 834); (3) Wilson insisted that the Detectives be patted down, a practice the Detectives vociferously resisted (id. at 329); (4) Wilson observed, while in the Detectives' car, that the neighborhood was "hot" (id. at 331); (5) Wilson and Diaz independently observed a black Expedition, which each assumed was occupied by undercover law enforcement officers, parked near the Detectives' car (id. at 858-61); (6) Wilson complained, while in the Detectives' car, that the black Expedition was following the Detectives' car (id. at 345-46); (7) Wilson instructed Detective Nemorin to drive along a route that included two unnecessary circles and one wrong-way turn in order to reach the planned crime scene, ostensibly in order to evade the black Expedition (id. at 346-55); (8) Wilson exited the Detectives' car in order to observe whether it was followed when it made one of those circles and the wrong-way turn (id. at 347-50, 354); (9) Wilson exited the Detectives' car after it reached the crime scene, but before he murdered the Detectives, in order to determine whether the Detectives' car had been followed (id. at 357-58); and (10) Wilson murdered the Detectives, an

act that, had Wilson not believed them to be law enforcement officers, would seem unnecessary in order to rob them.

This leads the court to consider the second holding that could support a decision to grant Wilson's motion: that the Government may, in the penalty phase, offer a fact in support of an aggravating factor if and only if the fact was proven beyond a reasonable doubt in the trial phase. This holding is untenable because the very purpose of the penalty phase is for the jury to consider new proof of new facts bearing on a new issue, that of sentencing. 18 U.S.C. § 3593(c). Indeed, it would be highly prejudicial to a defendant to require the Government to offer evidence in the trial phase of all issues that may become relevant in a penalty phase, such as the effect of the offense on the victim's family, 18 U.S.C. § 3593(a), and the defendant's previous conviction for a violent felony involving firearms, 18 U.S.C. § 3592(c)(2); see also 18 U.S.C. § 3592(4), (10), (12), (15) (listing other types of previous convictions that the Government may offer as aggravating factors in the penalty phase of a capital case).

The Government will not simply be asserting as true the facts underlying its aggravating factors, but will instead be attempting to prove those facts to the jury, just as it did during the trial phase of this case. Because "[t]he burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt," 18 U.S.C. § 3593(c), and because a "finding with respect to any aggravating factor must be unanimous," 18 U.S.C. § 3593(d), Wilson's apparent

fear that the jury will recommend a sentence of death in reliance on unproven facts is unfounded.[5]

> **2.     Wilson's Alleged Membership in the Bloods Street Gang as Evidence of the "Future Dangerousness" Aggravating Factor**

The Government intends to prove Wilson's alleged future dangerousness as an aggravating factor.  (NOI at 4.)  Wilson has moved the court to preclude the Government from offering proof of Wilson's membership in the Bloods street gang to prove his future dangerousness.  (Wilson Br. dated Dec. 20, 2006 at 7-11.)  Wilson argues (1) that the Government did not provide proper notice that it would seek to prove his membership in the Bloods (id. at 7-9) and (2) that the probative value of his membership in the Bloods is outweighed by the danger of creating prejudice, confusing the issues, or misleading the jury (id. at 9-11).  The court will consider each ground in turn.

> **a.     Notice**

When the Government intends to seek the death penalty, it must, "a reasonable time before the trial[,] . . . sign and file with the court, and serve on the defendant, a notice . . . setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death."  18 U.S.C. § 3593(a).  The jury may not consider an aggravating factor for which no notice has been given.  18 U.S.C. § 3592(c).

---

[5]  The court has also considered Wilson's related motion, which was filed separately, "to preclude the government from arguing that Mr. Wilson knew the victims were police officers, and for an instruction to the jury that the government did not prove that he knew the victims' status."  (Wilson Notice of Motion dated Jan. 7, 2007.)  Because the court cannot hold that the Government may assert in the penalty phase only those facts that were proven beyond a reasonable doubt in the trial phase, this motion is denied.

The Government notified Wilson in the NOI, which it filed on September 22, 2006, that it intended to prove future dangerousness through four categories of proof, one of which it called "Membership in a Criminal Street Gang." (NOI at 5.) Under that heading, the Government wrote that Wilson "has demonstrated an allegiance to and active membership in the Stapleton Crew, an organization falling within the definition of criminal street gangs set forth in 18 U.S.C. § 521(a)." (Id.) The Government did not, however, refer to the Bloods in the NOI.

Wilson argues that this omission constitutes a failure to provide the notice required by Sections 3592 and 3593. (Wilson Br. dated Dec. 20, 2006 at 7-9.) The Government argues in response that it satisfied its notice obligation when it set forth the aggravating factor of future dangerousness. (Govt. Br. dated Dec 30, 2006 at 9-10.) According to the Government, it did more than Sections 3592 and 3593 require when it identified gang membership as a category of proof of future dangerousness and Wilson's membership in the Stapleton Crew as a fact within that category. (Id.)

The court need not choose between these arguments because Wilson concedes that the Government sent Wilson a letter on October 1, 2006 providing notice that "in the penalty phase, the government intends to offer evidence of the defendant's continuing membership in the Bloods . . . as proof of his future dangerousness." (Id. at 10; Wilson Br. dated Dec. 20, 2006 at 7-8 & n.8.) Had the Government not sent this letter, the court might be inclined to grant Wilson's motion on the ground of notice, because it would have been reasonable for Wilson to infer from the NOI that the Government's proof of gang membership would be limited to his membership in the Stapleton Crew. This may have prevented Wilson from "rebut[ting] . . . information received at the [penalty] hearing" and denied him "fair opportunity to present

argument as to the adequacy of the information to establish the existence of" the future

dangerousness aggravating factor.  Because the Government sent this letter, however, there is no

basis for the court to find that the Government failed to provide sufficient notice of its intention

to offer Wilson's alleged membership in the Bloods as proof of his future dangerousness.

Section 3592 provides that "[t]he jury . . . may consider whether any [non-statutory] aggravating

factor for which notice has been given exists."  There is no requirement that notice be contained

in the NOI, and therefore no reason for this court to preclude the Government from proving a fact

articulated in a letter but not in its NOI.[6]

### b. Probative Value Versus the Danger of Creating Prejudice, Confusing the Issues, or Misleading the Jury

Wilson argues that proof of his membership in the Bloods is "extremely prejudicial"

because that gang "has wide name recognition with the public" and "Mr. Wilson cannot be held

responsible for the conduct of the Bloods as a whole."  (Wilson Br. dated Dec. 20, 2006 at 9.)

The Government argues in response that "evidence of this defendant's continued membership in

the Bloods gang is highly probative in evaluating his future dangerousness in a prison setting."

(Govt. Br. dated Dec. 30, 2006 at 11.)

The Supreme Court has recognized that "[i]n many cases . . . associational evidence

might serve a legitimate purpose in showing that a defendant represents a future danger to

society.  A defendant's membership in an organization that endorses the killing of any

---

[6] Section 3593 requires the Government to "file with the court" notice of the aggravating factors it intends to prove.  The Government met this obligation by filing the NOI and sending the October 1, 2006 letter, which augmented the NOI.  Because the Government's letter dated October 1, 2006 notified Wilson of its intent regarding the Bloods, Wilson cannot be prejudiced by this amendment.

identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." Dawson v. Delaware, 503 U.S. 159, 166 (1992). Because the Government is offering future dangerousness as an aggravating factor, it is clear as a general matter that some proof of Wilson's membership in the Bloods is relevant in the penalty phase of this case.

Nevertheless, proof of Wilson's Bloods membership is admissible only if it is tailored to Wilson's future dangerousness, as opposed to the dangerousness of the Bloods in general. Under 18 U.S.C. § 3593(c), "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." For that reason, if the Government's proof conflates Wilson's individual characteristics with the those of his associates in the Bloods, then that proof will not be admitted. United States v. Cisneros, 363 F. Supp. 2d 827, 840 (E.D. Va. 2005).

The Government has characterized its penalty-phase proof regarding the Bloods as follows:

> The government will establish that the Bloods has a large active memberships in prison. The Bloods are an extremely violent, hierarchical organization whose members are expected to and do carry out extreme acts violence towards inmates (particularly inmates who have cooperated with the government) and prison officials. Using fellow gang members, incarcerated Bloods members are able to carry out such acts of violence both inside and outside of prison. In fact, while still in state custody for the murders of Detective Nemorin and Detective Andrews, the defendant ordered other Blood members to assault guards on two different occasions.

(Govt. Br. dated Dec. 30, 2006 at 11.)

Based on this representation, the court finds that the Government's intended proof regarding Wilson's Bloods membership is relevant, Dawson at 166, and that the probative value

of the Government's proof outweighs the danger, if any, of creating unfair prejudice, confusing the issues, or misleading the jury, 18 U.S.C. § 3593(c). The Government intends to prove future dangerousness using Wilson's actual conduct as a Blood, not merely by describing the conduct of other Bloods. This court will therefore permit the Government to briefly present information to the jury regarding Wilson's membership in the Bloods in support of the future dangerousness aggravating factor.

### 3. Wilson's Alleged Continuing Pattern of Violence and Low Rehabilitative Potential

Wilson has moved the court to require an offer of proof as to the aspects of Wilson's criminal history that the Government will offer to prove Wilson's future dangerousness. (Wilson Br. dated Dec. 20, 2006 at 11-12.) On January 8, 2007, the Government represented in court that its proof of Wilson's criminal history would consist of (1) Wilson's adjudicated crimes, (2) the racketeering acts alleged in the original indictment filed in this case, and (3) the unadjudicated crimes reflected in material provided to the defense pursuant to 18 U.S.C. § 3500.

There is no need for the court to require an offer of proof as to the first two categories because the facts in those categories are known to the defense. With respect to the third category, the court orders the Government to make an offer of proof regarding Wilson's unadjudicated crimes on a witness-by-witness basis. Before the Government calls a cooperating witness whom it will question about Wilson's unadjudicated crimes, the Government must notify the defense of the crime or crimes about which the witness is expected to testify. The Government's notice must be provided at least one day prior to calling the witness and must state with reasonable specificity the date, location, and general nature of each crime about which the witness is

expected to testify. Should the defense object to a cooperating witness's expected testimony about Wilson's unadjudicated crimes, it may so inform the court.

### B.    Wilson's Rule 29 Motions

Wilson has moved for acquittal on the two counts of murder in aid of racketeering and one count of carjacking. (Wilson Br. dated Dec. 29, 2006 at 2.) A defendant may move for a judgment of acquittal after the jury has returned a guilty verdict. Fed. R. Crim. P. 29(c). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (citation and quotation marks omitted).

In deciding a Rule 29 motion, the court "must credit every inference that the jury may have drawn in favor of the government." United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001) (citation and quotation marks omitted). "The jury's verdict must be sustained, if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 202-03 (emphasis in original) (citation and quotation marks omitted). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).

### 1.    Murder In Aid of Racketeering

To prove that Wilson committed murder in aid of racketeering, the Government must prove, *inter alia*, that Wilson murdered Detectives Andrews and Nemorin either (1) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity" or (2) "for the purpose of

gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity[.]" 18 U.S.C. § 1959(a). In this case, the jury unanimously found that the Government proved each of these alternative motives beyond a reasonable doubt.

### a. Pecuniary Value

Wilson argues that the jury could not have concluded, based on the evidence offered at trial, that Wilson had a pecuniary motive for murdering Detectives Andrews and Nemorin (as distinct from a pecuniary motive for robbing them): "The bottom line is that whatever the jury concluded were Mr. Wilson's motives for shooting the undercover officers, there was no evidence at all that he did so because he had to in order to effect the robbery, or for any other monetary motive[.]" (Id. at 4.)

Wilson's argument is based on his misunderstanding of United States v. Concepcion, 983 F.2d 369 (2d Cir. 1993). Wilson believes that in Concepcion, the Second Circuit held that the pecuniary value motive applies only in the murder-for-hire context, and never where the murderer was a member of the racketeering enterprise who expected to receive pecuniary value from the activities of the enterprise. (Wilson Br. dated Dec. 29, 2006 at 5 (citing Concepcion at 384).) But the panel deciding Concepcion held merely that Section 1959 "is sufficiently inclusive to encompass the actions of a so-called independent contractor." Concepcion at 384. The panel did not hold, and it does not follow as a matter of logic, that Section 1959 does not encompass the actions of a member of a racketeering enterprise who committed murder as consideration for the receipt of pecuniary value from the activities of the enterprise. Indeed, the plain text of the statute clearly encompasses such a defendant.

The court must next consider whether the Government presented sufficient proof of a pecuniary value motive to withstand Wilson's Rule 29 motion. It clearly did. Wilson murdered the Detectives pursuant to the Stapleton Crew's plan to rob Detective Nemorin, whom the Crew expected to be carrying $1,200 and whom the Crew realized it might have to murder in order to rob. (Tr. at 290-96, 303-04, 811-17, 826-35, 839-40.) Jacobus, who witnessed the murders, testified that Wilson shot Detective Nemorin after asking him, "Where's the shit at? Where's the shit at? Where's the money? Where's the shit at?" (Id. at 360-61.) Shortly after Wilson murdered the Detectives, he searched their car and clothing for money. (Id. at 373-74, 1264-65, 1267.) A jury could reasonably infer from these facts that Wilson had a pecuniary motive for murdering the Detectives; indeed, it is difficult to imagine how it could fail to infer that motive.

In the penalty phase of this case, the Government intends to prove, as an aggravating factor, that Wilson "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." (NOI at 3.) This is a statutorily enumerated aggravating factor. See 18 U.S.C. § 3592(c)(8). Wilson asks the court to instruct the jury that it cannot find this factor proven unless the Government proves that the murders, rather than the underlying robbery, were committed for pecuniary gain. (Wilson Br. dated Dec. 29, 2006 at 2.) In other words, Wilson argues that the term "offense" as used in this aggravating factor refers to the murders, not to the attempted robbery. (Id. at 3, 7, 11.) This court agrees, and will instruct the jury accordingly. United States v. Allen, 357 F.3d 745, 750-51 (8th Cir. 2004); United States v. Bernard, 299 F.3d 467, 483 (5th Cir. 2002); United States v. Chanthadara, 230 F.3d 1237, 1263 (10th Cir. 2000).

The court disagrees, however, with Wilson's argument that the proof offered during the trial phase is, on its own, insufficient to support a finding that this aggravating factor has been proven. Furthermore, to the extent that Wilson argues that the pecuniary value aggravating factor applies only in cases of murder for hire, that argument is rejected. United States v. Wicklund, 114 F.3d 151, 153-54 (10th Cir. 1997); United States v. Matthews, 246 F. Supp. 2d 137, 147-148 (N.D.N.Y. 2002); United States v. Cuff, 38 F. Supp. 2d 282, 288 (S.D.N.Y. 1999); United States v. Spivey, 958 F. Supp. 1523, 1530 (D.N.M. 1997); United States v. Nguyen, 928 F. Supp. 1525, 1535-36 (D. Kan. 1996); United States v. Walker, 910 F. Supp. 837, 848-49 (N.D.N.Y. 1995).

### b.    Maintaining or Increasing Status

Wilson also argues that the jury could not have found, based on the evidence introduced at trial, that Wilson murdered Detectives Andrews and Nemorin in order to maintain or increase his position in the Stapleton Crew. (Wilson Br. dated Dec 29, 2006 at 7-9.) The court disagrees. Jacobus testified that committing crimes, including crimes of violence and especially the crime of murder, would increase one's status in the Stapleton Crew. (Tr. at 266, 274-78.) This testimony is sufficient, on its own, to permit a reasonable inference that Wilson murdered the Detectives in order to maintain or increase his status in the Stapleton Crew.

In addition, the murders are inextricably bound up with the robbery, which Wilson committed at the direction of more senior members of the Stapleton Crew. (Id. at 290-96, 303-04, 811-17, 826-35.) The senior members and Wilson considered the possibility that in order to commit the robbery, Wilson might need to commit murder. (Id. at 834, 839-40.) The Stapleton Crew even supplied the murder weapon to Wilson. (Id. at 748, 798-805, 845-66.) Based on

these facts and Jacobus's testimony, a jury could reasonably infer that Wilson murdered the Detectives in order to maintain or increase his status in a racketeering enterprise.

### 2. Carjacking

In order to prove that Wilson committed the crime of carjacking, the Government must prove that he took control of a motor vehicle "with the intent to cause death or serious bodily harm . . . from the person or presence of another by force and violence or by intimidation[.]" 18 U.S.C. § 2119; Holloway v. United States, 526 U.S. 1, 8 (1999). Wilson argues that the Government has failed to prove carjacking because Wilson took the Detectives' car as an "afterthought," and so cannot be found to have taken the car "by force and violence." (Wilson Br. dated Dec. 29, 2006 at 11-15.)

The question for the court is whether the jury could reasonably have found that Wilson, when he murdered Detectives Andrews and Nemorin, intended to take control of their car. Compare United States v. Applewhaite, 195 F.3d 679 (3d Cir. 1999) (overturning carjacking conviction because force was used only to harm the victim, not to take his vehicle, which was taken as an afterthought) and United States v. Harris, 420 F.3d 467 (5th Cir. 2005) (overturning carjacking conviction because defendant took vehicle to escape from the murder scene, rather than committing murder in order to take control of vehicle) to United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006) (affirming carjacking conviction because defendant took vehicle as "an essential part of [his] extortion and robbery plan").

Wilson clearly murdered the Detectives in order to rob them, and the evidence shows that he viewed taking control of the car as an integral aspect of his planned robbery. For example, even before searching the Detectives' clothing for money, Wilson searched the trunk of their car.

(Tr. at 373-74.) When he could not find the money there quickly, he moved the car from the murder scene to a more secluded location so that he could continue his search of the trunk. (Id. at 377-85.) For this reason, his actions more closely resemble those of the defendant in LeCroy than those of the defendants in Applewhaite and Harris. Wilson's motion to acquit on the carjacking count is therefore denied.

### C.    Victim Impact Evidence

Wilson has moved the court to preclude the Government from offering a videotape of Detective Nemorin discussing the hazards of undercover police work. (Wilson Br. dated Jan. 2, 2007 at 4.) The footage the Government intends to offer was captured by an Irish film crew while making a documentary about one of Detective Nemorin's colleagues. The court has viewed this footage. It is approximately twenty minutes long and depicts Detective Nemorin answering questions about his job. In giving those answers, he conveys that his job is dangerous and that he fears being mistaken by a criminal for a confidential informant. Portions of the footage depict Detective Nemorin driving a car.

Wilson argues that this footage is outside the boundaries the Supreme Court established for victim-impact evidence in Payne v. Tennessee, 501 U.S. 808 (1991). This court disagrees. It was in Payne that the Supreme Court observed that "[i]t is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant . . . without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims." Payne at 826 (citation and quotation marks omitted).

18 U.S.C. § 3593(a) provides that the jury, in considering whether to impose a sentence of death, may consider "the effect of the offense on the victim and the victim's family[.]" Because the Government intends to prove these effects, the court will permit the Government to offer the Nemorin video in evidence. This video will help the jury to become acquainted with one of the victims in a way that no amount of testimony about that victim – which is clearly permitted, see United States v. Sampson, 335 F. Supp. 2d 166, 188 (D. Mass. 2004) (collecting cases) – would allow. "Murder is the ultimate act of depersonalization. It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about the person. The Constitution does not preclude a State from deciding to give some of that back." Payne at 832 (O'Connor, J., concurring) (citation and quotation marks omitted).

This court has considered whether the footage of Detective Nemorin is admissible under 18 U.S.C. § 3593(c). The court finds that the probative value of this footage, which bears directly on both the victim-status aggravating factor and the victim-impact aggravating factor, far outweighs the danger, if any, of creating unfair prejudice, confusing the issues, or misleading the jury.

Wilson has also moved the court (1) "to compel the government to provide a detailed outline of the victim impact evidence it wants to introduce – the names and number of witnesses and the content of their prospective testimony," (2) to instruct victim-impact witnesses that they will not be permitted to testify if they cannot control their emotions, and (3) to instruct the jurors that they should not permit the testimony of such witnesses to overwhelm their ability to follow the law. (Wilson Br. dated Jan. 2, 2005 at 3-4.) These motion are granted to the extent described

below for the reasons articulated in <u>United States v. Glover</u>, 43 F. Supp. 2d 1217, 1235-36 (D. Kan. 1999).

The Government must provide the defense "a written statement describing the proposed testimony as to each 'victim impact' witness," <u>Glover</u> at 1235, by January 11, 2007 at 5:00 pm. If the defense believes that any victim-impact witness's testimony should not be admitted, it shall inform the court by January 12, 2007 at 5:00 pm. The court instructs the Government to advise victim-impact witnesses that they must make every reasonable effort to control their emotions and maintain the dignity of these proceedings. The court will also instruct the jurors that they should not permit the testimony of such witnesses to overwhelm their ability to follow the law. The defense shall provide to the Government and the court a proposed jury instruction to this effect before the hearing scheduled for January 10, 2007 at 11:00 am. The parties shall be prepared to discuss the defense's proposed instruction at that conference.

### D. Dr. Michael Welner

Wilson has moved the court to order the Government to provide defense counsel with the written comments, if any, of peer reviewers that Dr. Welner, the Government's mental-condition expert, received regarding his draft expert report. That motion is granted. The Government shall provide those written comments, if any, to the defense by January 10, 2007 at 5:00 pm.

## III. The Government's Motions

### A. Wilson's Friends and Family

The Government has moved the court to preclude "[t]estimony that the defendant's friends and family love him, that a verdict of death would have a negative impact on them, and their own personal views about the death penalty[.]" (Govt. Ltr. to Judge Garaufis dated Jan. 2,

2007 at 1.)  The basis for the Government's motion is its argument that this information is not relevant to Wilson's background, record, or character or to any circumstances of his offense.  (Id. at 1-2.)

When a defendant is found guilty of a federal capital crime, the jury sitting in the penalty phase "shall consider any mitigating factor" offered by the defendant, 18 U.S.C. § 3592(a), including "factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence," 18 U.S.C. § 3592(a)(8).

Although the court is mindful of the cases the Government cited in support of its argument, none of which were decided by the Supreme Court or Second Circuit, the court declines to adopt the Government's position.  The limiting language in 18 U.S.C. § 3592(a)(8) ("the defendant's background, record, or character or any other circumstances of the offense") does not trump the clear language at the beginning of 18 U.S.C. § 3592(a): "the finder of fact shall consider any mitigating factor, including the following[.]"  Section 3592(a)(8) describes one type of mitigating factor, but it clearly was not intended to proscribe all factors not bearing on background, record, character, or circumstances of the offense.  Furthermore, the sort of evidence the Government seeks to preclude, *i.e.*, how Wilson's family would feel if he were executed, may fairly be considered part of Wilson's "background" as that term is used in Section 3592(a)(8).  As with victim-impact witnesses, the court instructs the defense to advise Wilson's family and friends that they must make every reasonable effort to control their emotions and maintain the dignity of these proceedings.

### B.    Professor Yasser Arafat Payne

The Government seeks to preclude the testimony of Professor Payne, Wilson's expert in hip hop culture, who is expected to testify about the handwritten rap lyrics that were found in Wilson's pocket when he was arrested two days after murdering Detectives Andrews and Nemorin.  Those lyrics were admitted into evidence during the trial phase of this case.  (Order dated Nov. 22, 2006 at 4.)  The lyrics include lines that seem to describe aspects of Wilson's murders of the Detectives, such as [sic throughout] "Come teast Rated U Better have that vast and dat Galock / Leavea 45 slogs in da back of ya head cause I'm getting dat bread I aint goin stop to I'm dead."  (Order dated Dec. 13, 2006 at 7.)  Professor Payne was not permitted to testify during the trial phase because the defense's notice of his intended testimony was untimely and insufficient. (Id. at 5-10.)

The Government argues that Professor Payne should be precluded from testifying in the penalty phase of this case because his "personal speculation as a Criminal Justice academic on what Ronell Wilson might have meant when he wrote this song would not assist jurors in deciding what weight to give this admission."  (Govt. Ltr. to Judge Garaufis dated Jan. 2, 2007 at 4.)[7]  In considering this argument, the court must first determine whether Professor Payne's testimony is relevant to proving any mitigating factor or rebutting any Government aggravating factor.  18 U.S.C. § 3593(c).  Wilson has written that Professor Payne "is being offered as a

---

[7]   The Government also argues that Professor Payne should be precluded from testifying because he "has never been qualified as an expert witness in the field of 'rap music.'"  (Govt. Ltr. to Judge Garaufis dated Jan. 2, 2007 at 3.)  Based on Professor Payne's curriculum vitae and Wilson's representations about Professor Payne, the court is satisfied that he is sufficiently knowledgeable about rap music to testify about recurring themes and phrases in that genre.  (See Wilson Br. dated Jan. 5, 2007 at 12-13.)

rebuttal witness should the government, as it [did] during the trial, ask[s] the jury to rely on the so-called rap evidence as proof that Mr. Wilson is a remorseless killer." (Wilson Br. dated Jan. 5, 2007 at 13.) Wilson will offer Wilson's remorse as a mitigating factor. It seems likely that the Government will use Wilson's lyrics to rebut information offered as proof of Wilson's remorse. The court therefore finds that Professor Payne's testimony is relevant for the purpose identified by Wilson, *i.e.*, addressing the import of those lyrics.

The court must next consider whether the probative value of Professor Payne's testimony is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. 18 U.S.C. § 3593(c). Professor Payne's testimony will address words written by Wilson, not some abstract or technical issue. The court therefore believes that the jury will be able to evaluate the plausibility of Professor Payne's theories, and is not likely to be confused or misled by his testimony.

The Government's motion to preclude the testimony of Professor Payne is therefore denied.

### C.     Dr. Mark Cunningham

The Government has moved the court to preclude Dr. Cunningham, another of Wilson's experts, from testifying in the penalty phase. (Govt. Ltr. to Judge Garaufis dated Jan. 2, 2007 at 5-11.) Wilson intends to call Dr. Cunningham to testify "about the rates of inmate misconduct in prison," "the predictive factors associated with inmate misconduct," and "the security measures that can be brought to bear to reduce inmate misconduct in prison." (Wilson Br. dated Jan. 5, 2007 at 2.) His testimony will be offered to rebut information offered by the Government in

support of the future dangerousness aggravating factor by showing that Wilson will not be a future danger while in the custody of the Federal Bureau of Prisons ("BOP").

The Government argues that Dr. Cunningham's testimony is not sufficiently tailored to Wilson to be admitted in the penalty phase of this case.  (Govt. Ltr. to Judge Garaufis dated Jan. 2, 2007 at 6-11.)  The court is mindful of the well-reasoned cases supporting this argument. Schmitt v. Kelly, 189 Fed. Appx. 257, 264 (4th Cir. 2006); United States v. Johnson, 223 F.3d 665 (7th Cir. 2000); United States v. Edelin, 180 F. Supp. 2d 73 (D.D.C. 2001).  The court finds those cases distinguishable and therefore reaches a different conclusion in this case.

The three cases cited by the Government state or suggest that testimony such as that offered by Dr. Cunningham in this case is inadmissible as proof of a defense mitigating factor.[8] See Schmitt at 264 n.5; Johnson at 674-75; Edelin at 76.  In this case, however, Dr. Cunningham will testify not in mitigation but in order to rebut the Government's aggravating factor of future dangerousness.  Because it will be obvious to the jury that the Government's proof of this factor is intended to show that Wilson, rather than criminals in general, is a future danger, it will be equally obvious to the jury that Dr. Cunningham's testimony, though based on statistical evidence, is intended to shed light on Wilson's future dangerousness, not on that of anyone else. And because the Government will argue for the death penalty based in part on Wilson's alleged future dangerousness, this court must give Wilson "fair opportunity to present argument as to the adequacy of the information to establish the existence" of that aggravating factor.  18 U.S.C. § 3593(c).

---

[8] In at least one of the three cases cited by the Government, the court precluded the testimony of Dr. Cunningham himself.  See Edelin at 374.

Although Dr. Cunningham will be permitted to testify about federal prisons in general, he may not testify about any specific institution in which Wilson is unlikely to be housed, such as the Administrative Maximum facility in Florence, Colorado ("ADX Florence"). ADX Florence is where the BOP "houses offenders requiring the tightest controls (*e.g.*, the most violent)." (BOP, http://www.bop.gov/locations/institutions/flm/index.jsp (last visited Jan. 9, 2007).) Testimony about a specific institution in which Wilson is unlikely to be housed would be unduly speculative and is likely to confuse the issues or mislead the jury.[9] It is therefore inadmissible. 18 U.S.C. § 3593(c). If Wilson believes that Dr. Cunningham has expertise regarding a particular facility in which Wilson is likely to be housed, it may notify the court and seek permission to have Dr. Cunningham testify about that facility.

Defense counsel recently indicated that Dr. Cunningham interviewed Wilson but will not base his testimony on that interview. When the Government learned of that interview, it moved the court to require defense counsel to provide the Government with the notes Dr. Cunningham took during the interview. Although Wilson has represented that Dr. Cunningham will not base his testimony on his interview of Wilson, basic fairness requires the court to permit the Government to cross-examine Dr. Cunningham about that interview. Defense counsel must therefore provide to the Government any and all notes prepared by Dr. Cunningham based on his interview of Wilson, except those notes that concern statements Wilson made about the crimes

---

[9] To the best of this court's knowledge, prisoners are generally sent to ADX Florence only after committing acts of violence in other prisons. It would therefore seem that suggesting to the jury that Wilson is likely to be housed in ADX Florence would augment rather than rebut the Government's argument that Wilson is a future danger.

alleged in this case.  The notes must be provided to the Government by January 10, 2007 at 5:00 pm.

**D.    Donald Romine**

The Government has moved the court to preclude the testimony of Mr. Romine, a retired BOP Warden who is expected to testify that the BOP is capable of managing inmates convicted of violent offenses such as capital murder.  (Govt. Ltr. to Judge Garaufis dated Jan. 2, 2007 at 11-12.)  This motion is based on the arguments underlying the motion to preclude Dr. Cunningham from testifying, *i.e.*, that Mr. Romine's testimony is not sufficiently tailored to Wilson as an individual.  This motion is denied for the same reasons that the motion to preclude Dr. Cunningham's testimony is denied.  As in the case of Dr. Cunningham, Mr. Romine may testify about BOP procedures in general in order to rebut information offered by the Government to prove future dangerousness.  Mr. Romine may not, however, testify about the features of any particular facility in which Mr. Wilson is unlikely to be housed, such as ADX Florence.

**IV.    Conclusion**

For the reasons set forth above, Wilson's motions are resolved as follows: the motion to preclude the victim-status aggravating factor is DENIED; the motion to preclude evidence of Wilson's membership in the Bloods is DENIED, although such evidence will be limited in ways discussed above; the motion for disclosure of evidence of future dangerousness is GRANTED to the extent described above; the motions to acquit are DENIED; the motion for an offer of proof regarding the victim-impact aggravating factor is GRANTED to the extent described above; and the motion for the written comments of Dr. Welner's peer reviewers is GRANTED.

For the reasons set forth above, the Government's motions are resolved as follows: the motion to preclude the testimony of Wilson's friends and family members is DENIED; the motion to preclude the testimony of Professor Payne is DENIED; the motion to preclude the testimony of Dr. Cunningham is DENIED, although his testimony will be limited in ways discussed above; the motion for Dr. Cunningham's notes is GRANTED; and the motion to preclude the testimony of Mr. Romine is DENIED, although his testimony will be limited in ways discussed above.

SO ORDERED.

Dated: January 9, 2007                              /s/ Nicholas G. Garaufis
        Brooklyn, N.Y.                              NICHOLAS G. GARAUFIS
                                         United States District Judge