UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
UNITED STATES OF AMERICA,

v.

RONELL WILSON,

Defendant.
-----------------------------------------------X

**SENTENCING STATEMENT**
**04-CR-1016 (NGG)**

GARAUFIS, District Judge.

Before I sentence Mr. Wilson, I would like to offer some observations about this case. I would also like to express my gratitude to the jurors and lawyers who devoted so much of their time to it.

## I. The Unique Nature of This Case

It has been widely reported that more than fifty years have passed since the death penalty was last imposed on a federal defendant convicted in New York. I leave it to others to speculate as to why and to predict whether or not the death penalty will be recommended with any greater frequency in the future. With regard to this particular case, however, I would like to note that it presented a confluence of four factors rarely found together. They are: (1) certainty as to guilt, (2) unusually sympathetic victims, (3) a defendant who is remorseless, and (4) a defendant who is likely to be dangerous in the future. Those who ask why this case culminated in a sentence of death ought to consider these factors, each of which I will now briefly discuss.

**A. Factor 1: Certainty As To Guilt**

The first factor is certainty as to guilt.

Perhaps the most powerful argument against the death penalty is that once it is imposed, it cannot be reversed. For that reason, and because no system of justice can guarantee perfect accuracy, it is possible for the death penalty to be imposed on people later found to be innocent, an outcome that few, if any, consider acceptable.

That argument is not available in this case, however, because Ronell Wilson's guilt has been proven not merely beyond a reasonable doubt, but beyond all doubt. To review just some of the evidence presented during the guilt phase of this case: Audio recordings of Wilson's voice and the voices of the detectives established that Wilson and the detectives were in a car together when the Detectives were murdered. Two eyewitnesses testified, one of them an accomplice who watched Wilson murder the two detectives, the other an innocent man who had the misfortune to be taking out his refuse on the street where, and at the precise time when, the murders occurred.

The jury also heard from another accomplice who loaded and handed Wilson the murder weapon and who, minutes after the murders, heard Wilson admit to committing them. The jury learned about the extensive forensic evidence proving Wilson's guilt, including the samples of the detectives' DNA that were left on Wilson's clothing and hands. The jury heard about the inculpatory statement Wilson made to a police officer moments after murdering Detectives Andrews and Nemorim, and the inculpatory lyrics that Wilson wrote by hand, which were found in his pocket two days after he murdered the detectives. Finally, the jury watched Wilson's own crime-scene expert – who had testified that it was possible that Wilson's accomplice fired the

fatal shots – twist, lean, and bend in an effort to demonstrate just how the accomplice could have shot the detectives. Despite his contortions, he could not do so, and the jury rightly rejected his tortured explanation.

Certain crimes are so extreme that Congress has decided the death penalty must be available in order to redress the resulting injury to the victims and society. There is no doubt that Wilson committed such crimes.

**B. Factor 2: The Victims**

The second factor I will discuss is the status of the victims in this case, Detectives Rodney J. Andrews and James Nemorin.

In many – perhaps in most – federal murder cases, the victims are criminals working in the same illegal industries as the defendants. In this case, however, the victims were police officers who devoted their lives to preventing people like Wilson from committing the very crimes he committed against them. And they were not just any police officers. They were the very best this city had, specially selected to serve in an elite unit that performed the most dangerous work police do: posing as criminals in order to buy guns from real criminals.

This case offers the ultimate illustration of how dangerous and important their work was. The two guns at issue, the TEC-9 the detectives arranged to buy from Wilson and the revolver Wilson used to murder them, had only one purpose in the hands of a criminal: to hunt human beings. Every time Detectives Andrews and Nemorin and their colleagues took such weapons out of the hands of criminals, they prevented those criminals from inflicting death and terror on socioeconomically disadvantaged communities like the Stapleton houses where Wilson himself once lived.

But Detectives Andrews and Nemorin were not only police officers who put their lives at risk on a daily basis in order to make the rest of us safe. They were also two men who were proudly devoted to their families. Those of us who heard the Detectives' family members testify will never forget Christian Andrews, Detective Andrews' older son, recounting his daily chess games with his father, or their annual family trips to Universal Studios in Florida. Nor will we ever forget Marie-Jean Nemorin, Detective Nemorin's sister, explaining how she gave her baby brother the nickname Tichou, which means Little Sweetheart, or Rose Nemorin, Detective Nemorin's widow, describing how their three children now celebrate Father's Day in a cemetery, where they hug a cold wall instead of their father.

When Wilson murdered Detectives Andrews and Nemorin, he took two police officers from this city, two fathers from their children, two husbands from their wives, two brothers from their siblings, and two sons from their parents. While all murders are tragic, it is hard to imagine two victims who had a more positive impact on this world than Detectives Andrews and Nemorin, and it is certain that they would have continued to make this world a better place had Wilson spared their lives. That the jury likely took this into account when considering whether a sentence of death was justified is both understandable and appropriate.

**C. Factor 3: Lack of Remorse**

The third factor I will address is Wilson's lack of remorse for murdering Detectives Andrews and Nemorin.

Wilson's remorse, or lack thereof, was an issue extensively litigated by the parties to this case. In particular, the parties disagreed about whether Wilson should be permitted to allocute to his remorse – that is, to articulate his remorse to the jury without swearing to tell the truth and

without subjecting himself to cross-examination by the Government.  In Orders issued January 12 and 19, 2007, I found that Wilson had no Constitutional right to allocute to his remorse or any other subject.  I nevertheless exercised my discretion to permit Wilson to allocute to his remorse, although I declined to permit him to speak about other subjects without taking the witness stand.

Wilson's allocution was unconvincing, and after hearing it, the jury unanimously found that he lacked remorse for his crimes.  It would appear, although I of course do not know, that the jurors rejected Wilson's allocution because it was difficult for them to believe his words when considered in the context of his conduct.  Wilson's murders were shockingly cold-blooded, and suggest that he lacks the capacity for remorse.  He shot Detective Andrews without warning.  Moments later, he shot Detective Nemorin as he pleaded for his life.  He then dropped the detectives' dead or dying bodies in the middle of a residential street, disposing of them in a way that most people would not dispose of garbage.

Some time in the next two days, Wilson wrote song lyrics glorifying these murders.  I quote: "Come teast Rated U Better have that vast and dat Golock / Leavea 45 slogs in da back of ya head cause I'm getting dat bread I ain't goin stop to I'm dead."  These lyrics do not merely suggest that Wilson lacked remorse.  Rather, they demonstrate that he was proud of what he had done, and that he murdered Detectives Andrews and Nemorin not just for the $1,200 they were carrying, but in order to impress his criminal associates.  This was confirmed when Wilson's friend testified that Wilson recently expressed that he hoped the nature of his crimes and the status of his victims will earn him the position of "O.G.," the highest-ranking member of his prison gang.

After learning all of this, it is easy to understand why the jurors all found that Wilson, his allocution notwithstanding, feels no remorse for murdering Detectives Andrews and Nemorin. I concur with that conclusion.

**D.     Factor 4: Future Dangerousness**

The fourth and final factor I will address is Wilson's future dangerousness.

The jury unanimously found that Wilson represents a continuing danger to the lives and safety of others and is likely to commit criminal acts of violence in the future. The evidence supporting this finding was overwhelming. Wilson has been violent for as long as he has been physically capable of violence. At age eleven, he threw a bottle at a marked police car for no apparent reason. As a young teenager, he was a one-man crime wave, mugging and terrorizing children his own age, in his own neighborhood. At age nineteen, he slashed a rival criminal in the face, requiring 300 stitches. That he did this in the middle of Times Square, in front of dozens of witnesses, suggests that he is capable of committing acts of violence anywhere and at any time. And shortly before this trial began, he made a series of calls, from prison, instructing his cousin and another man to retaliate with violence against a group that had apparently attacked his cousin.

It appears to me, although again I do not know, that Wilson's future dangerousness weighed heavily in the jury's determination to recommend the death penalty. Wilson's entire history – including of course his execution of Detectives Andrews and Nemorin – suggests that if he were sentenced to life imprisonment without possibility of release, he would one day harm or kill another prisoner or a corrections officer. Although I have high regard for the Bureau of Prisons, it would be unrealistic to expect with certainty that the Bureau's staff will prevent a

proven double-murderer from committing future acts of violence, particularly when that murderer is incapable of remorse and motivated by status. The evidence in this case suggested, and the jury probably believed, that a system based on rules and human beings can only do so much.

This is because rules are effective only to the extent that they are followed and, when not followed, enforced. Wilson recently demonstrated that he has no regard for prison rules, and that there are limits to the enforcement of those rules, when he smashed two plexiglass windows in a visiting room in the Metropolitan Detention Center. He apparently did this because his special visit with his mother, which he had requested and I had authorized, was deemed a "non-contact" visit. He therefore took it upon himself to attack the barriers that separated him from her, using a metal chair to destroy them. In the meantime, the visiting area had to be cleared of both inmates and visitors. It took 45 minutes for guards to restore order, which they accomplished without resorting to force. Their restraint was as remarkable as Wilson's conduct was terrifying.

Although Wilson smashed these windows after the jury voted to recommend the death penalty, his actions confirm the jury's finding that he is a future danger because they demonstrate both that he has no regard for rules and that prison officials, despite their best efforts, cannot guarantee that rules will be followed. Given all that the jury learned about Wilson, it is not surprising that it unanimously found that he will be dangerous in the future if given even the slightest opportunity. Based upon the foregoing, I find that Wilson is capable of committing extreme acts of violence without warning or provocation.

## II.     Clarifying the Record

I would now like to clarify the record concerning two incidents that occurred during this trial, the first at the beginning of the trial phase, the second at the end of the penalty phase.

### A.     Audience Response to the KEL Tape

On November 28, 2006, the second day of the trial phase, the Government played an audio recording created the night Wilson murdered Detectives Andrews and Nemorin. The recording featured the voices of the detectives in what would turn out to be their final moments alive. While the recording was played, two members of Detective Nemorin's family became emotionally upset and voluntarily left the courtroom. Before they left, they both cried, and one of them repeated Detective Nemorin's first name, "James," two or three times. I instructed the jury to leave the courtroom when this happened. The jurors followed my instructions and filed out in an orderly manner. No jurors looked at the gallery or at Wilson while leaving the courtroom.

That Detective Nemorin's relatives were upset is understandable. They were hearing the voice of their deceased loved one while sharing a room with the man they believed to be his murderer. They were nevertheless correct to leave the courtroom and observe the remainder of the day's proceedings on closed-circuit television elsewhere in the courthouse. The court greatly appreciates their decision to do so.

I am confident that the conduct of these relatives did not improperly affect the jury in either the trial phase or the penalty phase of this case. In the trial phase, as I have already discussed, Wilson's guilt was proven beyond all doubt. I am therefore confident that the verdict

of guilt was based on the admitted evidence, not on any undue sympathy for the victims' families.

Furthermore, Detective Nemorin's family members responded to Detective Nemorin's voice, not to anything Wilson said or did, and their response was not directed at Wilson. It therefore could not have suggested to the jury that Wilson was guilty, or even that the Nemorin family believed Wilson was guilty, but only that Detective Nemorin was a man whose loss was felt deeply.

I instructed the jury that its deliberation as to Wilson's guilt must not be based on fear, prejudice, bias, or sympathy. This jury was among the most attentive and serious I have ever seen, and I have every reason to believe that it followed this and every other instruction, and that the family members' emotional response of November 28 played no role in the jury's deliberation as to guilt.

I am equally confident that this conduct did not affect the jury when it deliberated in the penalty phase of this case. I note first that the penalty-phase deliberation began on January 29, 2007, two months after Detective Nemorin's relatives became upset upon hearing his voice. It is extremely unlikely that the jury reached its sentencing decision because of what it saw and heard on November 28 rather than because of the voluminous, persuasive, and moving evidence it heard before and after that moment.

Furthermore, in the unlikely event that the relatives' November 28 response did linger in the jurors' minds two months later, its effect was dwarfed by the effect of the penalty-phase testimony of the victims' relatives, colleagues, and friends. That testimony was admitted because Congress has provided that a jury sitting in the penalty phase of a death penalty case may

consider "the effect of the offense on the victim and the victim's family," and that this effect may be shown through oral testimony. Title 18, United States Code, Section 3595(a).

By January 29, pursuant to this provision, the jury had heard extensive testimony explaining how the detectives' deaths affected their relatives, colleagues, and friends. Therefore, to the extent that the emotional response of November 28, 2006 was still on the jurors' minds on January 29, 2007, I find that the November 28 emotional response was redundant to the victim-impact testimony offered in the penalty phase, and that the latter was immeasurably more detailed, extensive, moving, and damning than the former.

In addition, I note that on January 29, 2007, immediately before the jurors began deliberating, I instructed them as follows:

> In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you. Passion, prejudice, and arbitrary considerations have no role to play in your efforts to reach a just result in this case.

As I have already stated, my observation of this jury leads me to conclude that it followed all of my instructions, including this one.

**B.     Juror Number One**

The other incident I will discuss occurred on January 29, 2007, at the end of the penalty phase of this case. At a sidebar conducted after closing arguments, the defense moved the court to dismiss Juror Number One because, the defense alleged, he mocked its arguments by smirking and laughing during the defense's closing argument. I denied that motion and observed that Juror Number One did not appear to me to be mocking any person working for the defense or any argument made by the defense. I also noted that the entire jury appeared to me to be taking this

case very seriously, and that nothing Juror Number One had done or was claimed to have done indicated that he would not consider all of the evidence and arguments presented in this case and follow all of the court's instructions.

I would like to clarify what it is that Juror Number One did and did not do. I observed the jurors, including Juror Number One, throughout closing arguments. My observation is that Juror Number One did smile or smirk two or three times during the defense's closing argument, but that he did not at any time laugh. I fully adhere to my previous finding that he was not mocking the defense or any of its arguments. Rather, it is clear to me that his expression was a visceral response to one particular argument, which is that Ronell Wilson is "borderline mentally retarded." Defense counsel repeated that phrase three times during its closing argument, and it was only at these moments that Juror Number One reacted, apparently because he found the assertion to defy credulity.

It is easy to understand why. By the time defense counsel suggested that Wilson was retarded, the jury had already seen a list of the defense's mitigating factors. That list stated that Wilson "performed well below grade level in school" and "was placed in Special Education classes," and that his "scores on standardized intelligence tests are below average." It did not, however, state that Wilson was mentally retarded or borderline mentally retarded. Because the defense crafted its own mitigating factors, its list would have included such a statement if Wilson had intended to submit evidence as to his alleged mental retardation. When Juror Number One reacted upon hearing the phrase "borderline mentally retarded," he was responding viscerally to an argument for which no evidence had been presented.

In addition, the word "borderline" sounds like a lawyer's word, a word added to an otherwise false statement in order to render it defensible. After sitting attentively through five weeks of testimony and argument, and after having already deliberated to verdict in the guilt phase, Juror Number One was able to recognize that word for what it was.

Perhaps more importantly, by the time the defense presented its closing argument, the jurors in this case had gotten to know Wilson very well. In addition to learning about his crimes, the jurors heard his voice when the Government played the audio recording created in the moments before he murdered Detectives Andrews and Nemorin. In that recording, Wilson is heard declaring that he is in charge of the purported gun deal. He is heard instructing his accomplice to "pat down" the detectives, and admonishing the detectives when they express a reluctance to be patted down. He is heard declaring that another vehicle, a black Ford Expedition that he correctly deduced was driven by undercover officers, was following him and the detectives. He is then heard directing traffic, instructing Detective Nemorin to drive along a route that Wilson chose in order to evade the black Expedition.

In a separate series of recordings played in the penalty phase of this case, Wilson was heard directing his cousin and another man to retaliate against a group that had attacked the cousin. In these recordings, as in the recording created the night Wilson murdered Detectives Andrews and Nemorin, Wilson sounded confident, strategic, and, within the framework of his criminal aspirations, perfectly rational.

Nobody who heard these recordings could reasonably believe that Wilson is mentally retarded. It was not inappropriate for Juror Number One, after spending more than five weeks with Wilson, to find the defense's argument that Wilson is "borderline mentally retarded"

implausible, or to evince his finding through a visceral, unobtrusive facial expression. I fully believe that Juror Number One, and all other jurors, followed my instructions to consider all admitted evidence and arguments when deliberating as to whether a sentence of death was justified. Nothing Juror Number One is claimed to have done suggests otherwise.

## III. Other Observations

I would like to close my observations by commending the people involved in this difficult trial. I begin with the jurors. Nearly 600 potential jurors came to this courtroom to fill out 56-page questionnaires prepared by the parties and the court. Of those nearly 600, 269 were called in for one-on-one voir dire, 77 of whom were then found qualified by this court under Supreme Court case law. That case law requires, among other things, that if a juror has views for or against the death penalty, those views not prevent or substantially impair the performance of the juror's duties in accordance with this court's instructions. In other words, each juror deemed qualified was found by this court to be a person who, on the one hand, would meaningfully consider recommending a death sentence in the event of a conviction for a capital crime, and on the other, would not automatically vote to recommend a death sentence after a guilty verdict – even for the crime of murdering two police officers.

From this pool of 77 qualified jurors, 12 jurors and 6 alternates emerged after the parties exercised their peremptory strikes. Between November 27, 2006, when opening statements were made, and January 30, 2007, when the sentence was announced, we lost no jurors and only one alternate, who was excused by the court due to circumstances outside his control.

I observed the jury carefully throughout the trial. As I have already stated, the jurors and alternates who served on this case were among the most attentive and thoughtful I have ever

seen. In the courtroom, they listened carefully to every argument and all witness testimony, and examined every piece of evidence introduced in this case. I am confident that they carefully considered the evidence when they deliberated, both in the trial phase and in the penalty phase.

I would next like to thank the attorneys on both sides of this case. The Assistant United States Attorneys assigned to this case prosecuted it zealously but fairly, demonstrating admirable restraint and sensitivity throughout the trial. The defense lawyers worked diligently to defend an extremely unpopular client, and in doing so demonstrated remarkable courage and deep moral conviction. They are a credit to their profession. Their hard work, their sincere and deep feeling for their client, and their moral opposition to the death penalty were obvious to all who observed this trial, and more than justified my decision to appoint them.

I appointed Mr. Savitt lead trial counsel because of his extensive experience in federal criminal trials, including his prior experience defending death-eligible defendants. I appointed Ms. Sharkey and Mr. Dinnerstein lead and associate learned counsel, respectively, both because of their extensive experience defending death-eligible defendants in the New York State Capital Defender Office and because they had represented Wilson in state court proceedings for approximately 20 months before the federal government assumed responsibility for prosecuting him. I doubt that Wilson could have paid for a better defense team. Indeed, federal taxpayers have already spent approximately 1.2 million dollars on his defense. I consider every penny well spent.

Finally, I wish to thank the families of Detectives Andrews and Nemorin, and the Wilson family. They maintained their composure and dignity throughout a trial that must have been difficult for them in ways most of us cannot imagine.