1

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - X

4

5   UNITED STATES OF AMERICA,   :

                                        CR-04-1016
6
             -against-                  United States Courthouse
7
                               :        Brooklyn, New York
8
    RONELL WILSON,

9
               Defendant.
10                             :        March 29, 2007
                                        2:30 o'clock p.m.
11  - - - - - - - - - - - - - - X

12  TRANSCRIPT OF SENTENCING
    BEFORE THE HONORABLE NICHOLAS G.  GARAUFIS
13  UNITED STATES DISTRICT JUDGE

14  ATTORNEYS FOR GOVERNMENT:
    ROSALYNN M. MAUSKOPF
15  United States Attorney
    BY:  CATHLEEN KAVANAGH
16       JACK SMITH
         MORRIS J. FODEMAN
17  Assistant United States Attorneys
    225 Cadman Plaza East
18  Brooklyn, New York 11201

19  ATTORNEY FOR DEFENDANT:
    EPHRAIM SAVITT, ESQ.
20  KELLEY J.  SHARKEY, ESQ.
    MITCHELL DINNERSTEIN, ESQ.
21

22  Court Reporter:
    Marsha Diamond
23  225 Cadman Plaza East
    Brooklyn, New York
24  TEL: (718) 613-2489

25  FAX: (718) 613-2369

2

1

2          Proceedings recorded by mechanical stenography,

3     transcript produced by CAT.

4

5          (The following took place in the robing room).

6          THE COURT: Appearances please.

7          MS. KAVANAGH:  For the government, Cathleen

8     Kavanagh, Jack Smith and Moe Fodeman, and also, Case Agent

9     Thomas Shelton, good afternoon.

10          THE COURT:  Good afternoon.

11          Who is appearing for the defense?

12          MR. SAVITT:   Ephraim Savitt, Kelley Sharkey and

13     Mitchell Dinnerstein and for purposes of this proceeding, we

14     waive Ronell Wilson's appearance.

15          MR. DINNERSTEIN:  Good afternoon.

16          THE COURT: Good afternoon. First of all there was a

17     request that Mr. Wilson's mother be permitted to meet with him

18     alone with counsel this afternoon.  Have the marshals agreed

19     to the request which I made on your behalf, did that occur?

20          MR. SAVITT:  Yes.

21          MS. SHARKEY : Thank you.

22          MR. SAVITT:   We appreciate that, and the marshals

23     were extremely helpful, and the whole situation made it

24     helpful for the proceeding.

25          THE COURT:  Also, there was a request to me about

3

1    some clothing issue that had been made -- that Mr. Wilson wear

2    some clothes, like street clothes.  I assume that was taken

3    care of?

4             MR. SAVITT:  Yes, it was Your Honor.

5             THE COURT:  I had discussions with the marshals

6    where they felt that for safety purposes it was not possible

7    to agree with respect to restraints, that he would be

8    handcuffed in front and probably no one would see it very

9    much, but that because of the recent history I think what

10   happened, that they felt it was prudent to have those limited

11   restraints, but those restraints, in any event.  So I did

12   raise it, and when they pointed their concerns out to me I

13   thought that their concerns were well-founded, so he will be

14   wearing handcuffs in the courtroom.

15            MS. KELLEY:  We take exception to that, Judge.  We

16   have spent some time talking to him about the procedure, and

17   the dignity that he would want to exhibit during the course of

18   the proceeding. Obviously, we don't have a crystal ball, but

19   we certainly believe there would be no issue as far as safety

20   or acting out. So we would request -- I imagine it's a done

21   deal.

22            THE COURT:  Well, I'll talk to the marshals about it

23   again.

24            MS. KELLEY:   Thank you.

25            THE COURT:  I will discuss it with them, but you

4

1  know, they have this concern and after all, I have to rely on

2  their expertise to some degree.  I am not a law enforcement

3  officer and I've never been one, so I really can't take that

4  upon myself to know everything about those concerns, but I

5  will raise the point that you have just made that he's aware,

6  and he understands the importance of having a dignified

7  proceeding.  So why don't you tell me what everyone's planning

8  to do in terms of making statements, so I know what the plans

9  are for both sides.

10         From the government.

11         MS. KAVANAGH:    I think that Derrick Williams, who

12  testified in the penalty phase briefly, he is Rodney Andrew's

13  cousin, would like to address the court. Perhaps one of

14  Detective Nemorin's sisters, Mary-Jean, has also indicated

15  that she would like to address the court, although she is less

16  certain that she's going to do it, but those are the two

17  family members who have indicated they would like to address

18  the court.

19         THE COURT:  Was the government going to say anything

20  further?

21         MS. KAVANAGH:    No, Judge. We will answer any

22  questions that the court obviously has about the submissions,

23  the guidelines and the non-capital counts but we don't plan on

24  --

25         THE COURT:  The defense has made certain objections.

5

1  I assume they don't want to address them in open court is what

2  I understood, but if you, do you may.

3          MS. KELLEY:   We don't think we need to.

4          THE COURT:  I have an obligation to reach certain

5  conclusions, which I will on the record, and you can except,

6  to them, you can agree with them, or except to them, and your

7  exceptions will be noted for the record.  All right.

8          MS. KELLEY:   All right.

9          THE COURT:  Based on your submission.

10          MR. SAVITT:   Yes.

11          THE COURT: So you needn't say anything more.  You

12  don't have to have a debate over them for you to retain your

13  exceptions for appeal.

14          MR. DINNERSTEIN:  I understand.

15          THE COURT:  So I deem the exceptions to have been

16  made to any ruling I may make which may be in disagreement

17  with your position.

18          MR. SAVITT:   Thank you, Judge.

19          THE COURT:  So that's taken care of, and what about

20  the defense?

21          MR. SAVITT:   We each would like to address the

22  court, Mr. Dinnerstein and Ms. Sharkey and myself in that

23  order. Mr. Wilson would like to address the Court. I don't

24  know which order that Your Honor would prefer that it go but

25  --

1    THE COURT:  Well, let me tell you what I have in

2 mind. I would have the victim statements go first after we've

3 done the computation of the guidelines, and then I would have

4 the government make any further statements it might have and

5 you needn't say anything more, and then I would ask defense

6 counsel in what order.

7    MR. SAVITT: Mr. Dinnerstein, Ms. Sharkey and myself.

8    THE COURT:  And then if defendant has anything to

9 say, I will let him address the court, and the court will then

10 address the defendant, and then I'll impose the judgment of

11 the court.  The judgment is going to be signed this afternoon

12 in court, so you will have your ten days to appeal.

13    MR. SAVITT:   Yes, sir.

14    THE COURT:  I'm not going to tell you to appeal, but

15 I will tell you now that it's my strong recommendation that no

16 matter what anyone has said or thought that I would feel, I

17 feel very strongly that an appeal should be immediately filed

18 in this case and -- -

19    MR. SAVITT:   -- yes, Your Honor --

20    THE COURT:  -- that it should run its course.  It

21 shall certainly before the weekend.

22    MS. KELLEY:  One other thing that we received from

23 Ms. Kavanagh's response --  thank you, I know it was only

24 submitted to you yesterday probably or the day before -- we

25 requested that the court or going to request that the court

7

1    make explicit in the judgment that New York is the venue for

2    the implementation of any potential sentence of execution,

3    frankly. I think counsel -- opposing counsel agreed with us

4    that New York is the appropriate venue.

5              THE COURT:  I don't think they said that in their

6    letter. What did you say? I read it.  What did you say?

7              MS. KAVANAGH:  Actually, we disagree. We agree that

8    because New York still does have a death penalty statute on

9    the books that the method that New York State imposes the

10   death penalty, that is, lethal injection, should be followed,

11   but that the way the statute works is because New York does

12   have death penalty protocol to follow -- the court actually

13   doesn't designate a state, so that can happen.  The execution

14   can happen in Indiana at Taraji.

15             THE COURT:  But the protocols for the execution must

16   follow New York law.

17             MS. KAVANAGH:  Correct.

18             MR. SMITH:  Right.

19             MS. KELLEY:  It is our belief that the court can

20   and should in the judgment designate the 2d Circuit as the

21   circuit which, in fact, effectuates those protocols, rather

22   than having -- I think it is 7th Circuit.

23             THE COURT: I don't think there is any case law which

24   requires me to do that, frankly. If there is you have got to

25   tell me about it now.

8

1        MS. KAVANAGH:  It is actually contrary to what the

2    statute says and the defense cited Sampson, which is a

3    completely different posture, because Massachusetts where the

4    defendant was sentenced in Sampson didn't have a death penalty

5    protocol, so the court there had to designate by statute a

6    different state.  The government had requested Indiana since

7    that's where federal death penalty inmates are housed and the

8    defense requested New Hampshire which the court went along

9    with, but again, the court only had authority in that case

10   because Massachusetts didn't have a death penalty. Here New

11   York does, so the court doesn't have the same authority.

12       MS. KELLEY:  We disagree and we have laid it out in

13   our letter.

14       THE COURT:  I understand that. I agree with the

15   government's position. My judgment will simply say that the

16   execution should take place in accordance with law and you

17   have your exception to that.

18       MS. KELLEY:  Okay.

19       THE COURT:  And it may be the subject of appeal, or

20   it may be the subject of some later proceeding that -- if it's

21   not considered in the direct appeal, should the appeals be

22   unsuccessful and there should be an execution scheduled, I am

23   sure it will be the subject of a litigation later on, if you

24   so wish. Anything further?  What I plan to do is --

25       MR. DINNERSTEIN:  Yes, one other matter, Judge. I

9

1   don't believe it happened when there was the verdict, and I

2   think it was probably an oversight on your part, and that is,

3   just to forewarn the audience to act appropriately and to act

4   in a dignified manner.  You know, a great concern that we had

5   is that at the time that the verdict was read by the jury is

6   that the audience applauded or acted in a way that was really

7   undignified, and we would just ask Your Honor that it not

8   occur today and that the court as strongly as it can inform

9   the audience.

10              THE COURT: I appreciate that.

11              MR. SMITH:  We have no objection to that, Judge.

12              THE COURT:  That is fine, and I am going to discuss

13  that at the very beginning, but also, in terms of that, you

14  all are going to be there. The marshals plan to bring the

15  defendant in after I come in?

16              THE MARSHAL: Yes, that was our plan.

17              THE COURT:  All right. When they bring the defendant

18  in I'll then advise everyone that they are to behave in an

19  orderly fashion and I think they will comply. At the end of

20  the proceedings what I plan to do is I plan to have Mr. Wilson

21  removed from the room and then I'll leave the room when he's

22  out and that will be the end of the proceeding, but he will

23  leave first and go back into the holding area.

24              MR. SMITH:   Judge, just one thing we don't know.  I

25  have not discussed what counsel plans to say.  As we said, the

1  government doesn't feel there is anything further to say.

2  However, depending on what is said we have the opportunity to

3  respond if there's an issue that needs response.  I don't

4  think it will be necessary but just in case.

5          THE COURT:  You'll let me know.

6          MR. SMITH:   Okay.

7          THE COURT:  But about how long do you think you will

8  be speaking?  I just want to get a sense of this.

9          MS. KELLEY:   Me, a minute.

10         MR. DINNERSTEIN:   Probably ten minutes.

11         MR. SAVITT:   Five minutes at the most.

12         THE COURT:  Does anyone have anything further?

13         MR. SMITH:  No.

14         MR. DINNERSTEIN:  One item that also is of a concern

15  and maybe there might be some marshals in the hallway so that

16  there's, at least, you know, some sense that the courtroom

17  also include to some degree the hallway in terms of clearing

18  or applause.

19         THE MARSHAL:  They are not outside.  We don't have

20  anybody outside.  Everybody is either seated in the courtroom

21  or on the third floor.

22         THE COURT:  When I discuss this I will ask everyone

23  to maintain the dignity of the proceeding, and the court, in

24  the courtroom until they leave the building, you know, because

25  this is a very solemn moment, a proceeding that has not been

1    held in a federal courthouse in New York for over five

2    decades, and I think they will understand that and really,

3    with respect to the police officers who are there, you know.

4    It's like attending another funeral, frankly, I think.

5              MS. KELLY: Just at the time of the verdict I have to

6    state the marshals were wonderful with the family, and more

7    problematic than the police officers was the press, quite

8    frankly.  The press were thrusting themselves in the family's

9    face.

10             THE COURT:  What I will tell the press -- I'll tell

11   press that in order to maintain the decorum of the court I'm

12   going to ask them not to conduct any interviews until they

13   leave the courthouse. They can address the -- I'm asking the

14   marshals to enforce my instructions.  So I'm not concerned

15   about the in-house press so much.  I am concerned about

16   everybody who shows up once in 20 years.  I am going to tell

17   them that I have instructed the marshals and I am instructing

18   the marshals to escort members of the press out of the

19   building if they can't adhere to this stricture.  So I'll do

20   that, too.  Well, let's see if we can't in a sad event have a

21   dignified event here.

22             Now, Chief Hogan, Ms. Sharkey had mentioned

23   something about the restraints for Mr. Wilson and just tell

24   him directly so that he can make his decision.

25             MS. KELLEY:   We would request that he will not be

1  cuffed.  We spoke with Mr. Wilson at length.  His mother thank

2  you, for accommodating that.  Spoke with Mr. Wilson.  The

3  family is begging for a dignified proceeding.  Mr. Wilson is

4  in  accord with that.  I, obviously, do not  have a crystal

5  ball but none of us feel -- and I will be the person standing

6  closest to him -- that there will be an issue.

7            THE MARSHAL:  As the people who are responsible for

8  the security of everyone in the courtroom, and for the

9  protection of everyone, we feel it's necessary.

10            THE COURT:  All right. Thank you.  I will be out in

11  a moment. This is all on the record so anyone can have it.

12            MR. SAVITT:   Thank you.  We will ask for a copy.

13            THE COURT:  I am saying if the media asks for all of

14  this, this is on the record.   It is not a sealed

15  conversation.

16            (The following took place in open court)

17            THE CLERK: United States versus Ronell Wilson.

18            THE COURT:  Please be seated. You may bring in the

19  defendant.

20            (Whereupon, the defendant enters the courtroom)

21            THE COURT:  Appearances please.

22            MS. KAVANAGH:  Cathleen Kavanagh, Jack Smith, Morris

23  Fodeman for the government, and also present, the case agent,

24  Thomas Shelton.

25            THE COURT:  Good afternoon.

13

1          MR. SAVITT: Ephraim Savitt, Kelley Sharkey and

2   Mitchell Dinnerstein.

3          MR. DINNERSTEIN:  Good afternoon, Your Honor.

4          THE COURT: Good afternoon.

5          MR. SHARKEY:  Good afternoon.

6          THE COURT:  This is the sentencing proceeding for

7   Ronell Wilson, and we will begin by reviewing a number of

8   procedures which I request everyone to follow. This is a very

9   sobering day for everyone, and it's the end of a process --

10  and one process, and it's the beginning of another process in

11  the criminal justice system, and therefore, I'm asking

12  everyone here to treat this occasion as the solemn occasion

13  that it is, and to maintain the dignity of the judiciary, the

14  court and of the judicial system by doing the following. In

15  the course of this proceeding I'm requesting, and I don't even

16  think I need to request, but I'm requesting, nonetheless, that

17  everyone maintain silence, that there are no comments made at

18  any time by anyone.  I'm also requesting that at the

19  conclusion of the proceeding, that after court is adjourned,

20  that you quietly leave the courthouse, that there be no

21  discussion inside the courthouse, and that I'm requesting of

22  the media that there be no interviews inside the courthouse.

23  All interviews, if anyone is to be interviewed, be outside the

24  building. Failure to follow that instruction will result in

25  having the U.S. Marshals escort anyone who doesn't follow the

1    instructions out of the courthouse simply because it's better

2    to conduct those interviews outside of the building, and there

3    are a lot of people here. This room is filled and then there's

4    another overflow room which has many people in it. So we have

5    hundreds and hundreds of visitors. We want to make sure

6    everyone leaves in a decorous way. So I thank you, in advance

7    for following my instructions.

8          Now, the first order of business is as to the

9    non-death counts of the indictment. The court must establish

10   the appropriate sentencing guidelines offense levels. The

11   government has submitted a letter dated March 14, 2007. Has

12   the defense received a copy of the government's letter?

13         MR. SHARKEY:  We have.

14         THE COURT:  Very well.

15         In that letter the government proposes a calculation

16   of the following:

17         As to Counts Three and Four of the second

18   superseding indictment to which the defendant's been found

19   guilty, the adjusted offense level is a 45, and I know that

20   the defense has provided the court with certain objections.

21   The objections were overruled, the exceptions are noted, and

22   the court finds the adjusted offense level is a 45.

23         With respect to Count Six, firearm use in

24   furtherance of a crime of violence, there is a ten-year

25   consecutive term of imprisonment which is the minimum term of

1    imprisonment.

2           MS. KAVANAGH:    Correct.

3           THE COURT:  And the maximum term of imprisonment.

4           MS. KAVANAGH:    Is life.

5           THE COURT: Is life.  The court concurs with the

6    government's conclusion.

7           As to Count Nine, conspiracy to rob Oz Clothing

8    Store, the adjusted offense level is 21 and the maximum

9    sentence for that count is 20 years; is that right?

10          MS. KAVANAGH:  That's right, Judge.

11          THE COURT:  And as to Count Ten, the maximum

12   sentence for that count is?

13          MS. KAVANAGH:  Maximum is life. The minimum is

14   25 years.

15          THE COURT:  Twenty-five years.

16          All right.  The court concurs as to all of those

17   conclusions of the government.

18          The court finds that the total offense level is a

19   45, and that makes the guideline under the sentencing

20   guideline system life in prison, irrespective of criminal

21   history category.

22          MS. KAVANAGH:  Yes, Judge.

23          THE COURT:  Very well. Now, the next step in

24   sentencing is to afford an opportunity for the victim's family

25   members, and others to address the court prior to sentencing.

1  Ms. Kavanagh.

2          MS. KAVANAGH:  Your Honor, my understanding is that

3  Derrick Williams who is Detective Rodney Andrews' cousin would

4  like to address the Court at this time.

5          THE COURT:  MR. Williams, you may come forward.

6          MR. WILLIAMS:  Thank you, Your Honor.  Good

7  afternoon.

8          THE COURT:  Good afternoon.

9          MR. WILLIAMS:  Good afternoon, ladies and gentlemen.

10  I would like to take this opportunity to say I'm very proud of

11  the men and women of New York City Police Department, and

12  proud of my brother --I am sorry -- my cousin Rodney Andrews

13  and his partner James Nemorin, and also, what these ladies and

14  gentlemen do is very hard job, and I would like to thank the

15  men and women of the jury for their decision to give Ronell

16  Wilson the death penalty because I believe it is very

17  deserving in this case. Please excuse my I'm nervousness.

18          It's been very hard, you know, to have to live with

19  this for the past four years. About six weeks ago when I was

20  preparing my testimony with Ms. Kavanagh  she asked me

21  questions.  She said how did your cousin's death affect you.

22  Given the fact that we didn't see each other as often as we

23  did as kids, I didn't think it affected me that much, but you

24  know, as it I sit at my desk and do my job, every so often I

25  think about what the last few minutes of -- last few hours of

1   his life was like, and I sit there and at times it is hard not

2   to break down and cry because it was -- he was a good man

3   doing a tough job, and I'd just like to say, once again, that

4   I thank the men and women of the New York City Police

5   Department for your hard work and all your efforts in keeping

6   us safe. Thank you.

7            THE COURT:  Thank you.

8            MS. KAVANAGH:    If I may have a moment?

9            THE COURT:  Yes, you may.

10           (Pause in the proceeding)

11           MS. KAVANAGH: Your Honor, none of the other family

12   members are going to address the court. I am sure the court

13   has firmly in mind their testimony at the penalty phase of

14   this trial.

15           THE COURT:  Very well. Thank you, very much.

16           Does the government wish to make any further

17   statement before we go forward?

18           MR. SMITH:   Not at this time, Your Honor.

19           THE COURT:  Very well. Do defense counsel have

20   anything further to say to the court prior to the imposition

21   of sentence?

22           MR. SAVITT:   Yes, Your Honor, we do.  With the

23   Court's permission, Mr. Dinnerstein would like to address the

24   court, followed by Ms. Sharkey, followed by myself, and

25   Mr. Wilson would like to address the court as well.

1          THE COURT:  Very well. Mr. Dinnerstein.

2          MR. DINNERSTEIN:    Yes, Your Honor. May I speak from

3    here please?

4          THE COURT: Yes, you may.

5          MR. DINNERSTEIN:    Thank you.

6          THE COURT:  Just bring the microphone closer to you

7    and each of you should do that, so you can be heard outside

8    the courtroom as well as in the courtroom.

9          MR. DINNERSTEIN:    As a lawyer, and a citizen of

10   this country I believe in our justice system. I believe in its

11   fundamental core principles that are, frankly, the envy of the

12   word. We strive to be a system of rational non-passionate law.

13   We say that all men are created equal before that law. We are

14   taught that vengeance is not justice, that raw emotion has no

15   place in the court of law, and that all criminal cases must be

16   decided by the rule of law, for reason must rein. Today I am

17   saddened that those fundamental principles were not followed

18   in this case. What is being done today is wrong and is not

19   justice. I say that after I have carefully listened to the

20   very real pain of the family -- of both Nemorin and Andrews'

21   families throughout this entire ordeal. Their loss is

22   immeasurable. Their loss is tragic. Ronell's death will not

23   restore to them what they have lost.

24          I am personally, as are all of us, truly sorry for

25   their losses, but Ronell's death will not restore to them what

1  they have lost. We have heard throughout the trial what I say
2  is rhetorical exaggerated words from the government. That,
3  more than anything, drove the kind of decision-making in this
4  courtroom that brought about a verdict based on vengeance and
5  raw emotion and not a verdict based in justice or reason or
6  real respect for human life. This is an extremely sad day for
7  justice. Justice was not done in this courtroom. Justice will
8  not be served by Ronell receiving the death sentence.

9        I sat next to Ronell Wilson for four months. Ronell
10 has always acted throughout this entire ordeal in a quiet
11 dignified manner. I am proud of the way he behaved while his
12 every movement was unfairly being scrutinized by others. Even
13 today, the worst of all days for him and his family, he is
14 trying to maintain his dignity. I know as a certainty that he
15 is not the worst of the worst. I know that he does not deserve
16 to die.  Nothing the lawyers for the government can say or
17 have said can make that so. Nothing written in the newspapers
18 can make that so. Ronell is no demon.  He is no devil. He is
19 no one worthy of death by the law of our country. He does not
20 deserve to be put to death.

21       Four years ago Ronell was 20 years old, neglected,
22 uneducated, vulnerable kid. He deserves to be punished, but he
23 does not deserve this ultimate punishment. Our law requires
24 that this punishment should be saved for the very worst
25 amongst us. Ronell Wilson is not that person.

1    The government lawyers argued throughout this trial

2  that this was a cold blooded execution. This idea certainly

3  inflamed the jury, the audience the press and the politicians.

4  This idea worsened the crime, but the government had no proof

5  of this, save the word of Jessie Jacobus, a boy who may have

6  sold his soul for leniency from the government. He may have

7  saved himself but who knows if he told the truth.

8    The government says Ronell knew that they were

9  police officers but there's no proof of that. Could anyone

10  actually know with certainty what happened in that car on that

11  dark street after the police officers had lost their backups?

12    Can anyone explain why $1200 was left in the front

13  pants pocket of one of the detectives?

14    Even now with the whole of the trial behind us no

15  one has mentioned why if the killings were planned and

16  heartless, why was the money left behind?

17    Doesn't common sense, doesn't reason suggest money

18  being left behind speaks of panic, of an act of impulse and

19  not a plan?

20    The fact that $1200 was left behind is

21  incontrovertible.

22    Soon I suspect that the government lawyers will

23  receive awards and promotions for this victory today. This is

24  a shame. I have already heard the applause and seen the hi

25  fives in this courthouse by certain members of the public.

1  That is also a shame. I hope that we will not see a repeat of

2  that today because it is a sure sign of justice when justice

3  is not served when people celebrate death. Courthouses should

4  be sanctuaries for justice, for truth, and for wisdom.

5       Ronell, my last words will be to you. I am sorry

6  that this day has come. I am sorry that I did not have the

7  words to persuade the jury to save you. This country, our

8  system of justice, its fundamental core principle is built

9  upon an idea that all of us are created equally. That is sadly

10  not a fact. It is only a dream. It is only a hope. You were

11  not created equal, Ronell. You were not treated equally, not

12  ever, and not here. You suffered because of the place of your

13  birth, you suffered because we were indifferent to your life's

14  struggles.  You suffered because we did not care to help you

15  find a better way. You suffered here in this courtroom, too,

16  where you were held accountable for our collective neglect,

17  our collective disregard for what you were entitled to and

18  never got.

19       We acted as if you could have raised yourself, as if

20  any one of us could have met your challenge without being

21  deeply harmed. We have failed you. We failed you before, we

22  are failing you now. Justice cannot be served when vengeance

23  drives decision-making, but that is what happened here.

24       Ronell, as you go forward from this moment I want

25  you to know that all is not lost. This decision will be

22

1    appealed. We will try to save your life. Be strong. Hold

2    yourself to a higher standard than we sadly hold for

3    ourselves. Begin again.  Try to make a life of meaning for

4    yourself.  Rise above the wrong we are about to do to you and

5    try to turn it around and do good. Do good despite the wrongs

6    that we have done to you. Do good also to right the wrongs

7    that you have done. Do good to actually honor Detectives

8    Nemorin and Andrews.

9            Today justice has not happened but tomorrow, Ronell,

10   is another day, and as long as you are alive you can try to do

11   good. Try, and we will try together, to work for the day that

12   reason and justice can rein.

13           THE COURT:  Ms. Sharkey.

14           MR. SHARKEY:  Your Honor, on behalf of Mr. Wilson

15   and the defense team, first of all, we would like to thank

16   you, for permitting the visit between Mr. Wilson and his

17   mother this morning. It was an act of compassion and we are

18   grateful. This is a wrenching day for all the participants. I

19   know it is a wrenching day for Mr. Wilson's family, for

20   Mr. Wilson, for the defense team.  I'm sure with all my heart,

21   it is a wrenching day for the families of the deceased

22   detectives, and unfortunately, no matter what we say or what

23   we say to you prior to your imposing sentence I cannot affect

24   it, cannot affect the sentence that you are required by law to

25   impose, but it is important for me to repeat briefly on behalf

1   of Mr. Wilson that he is deeply remorseful for his

2   participation in the events that led to the deaths of

3   Detectives Nemorin and Andrews.

4              I've known Ronell since 2003. Mr. Wilson has

5   expressed his remorse to me on countless occasions and it's

6   important, Your Honor, that you know that, and the families

7   know that.

8              Like all children of God, Ronell Wilson is capable

9   and desiring of redemption. Unfortunately, our law does not

10  allow you the option of permitting that to happen, and so, we

11  move on to the next phase.

12             Thank you, for allowing me to address the Court,

13  Judge.

14             THE COURT:  Mr. Savitt.

15             MR. SAVITT:   Thank you, very much, Your Honor.

16             Your Honor, I've been coming to this ceremonial

17  courtroom for various events since 1982, since the day that I

18  was sworn in in January of that year as an Assistant United

19  States Attorney, and Judge Glasser was sworn in in this

20  ceremonial courtroom later on that day, and I've experienced a

21  lot of joy at many occasions of joy for the bench, for the

22  Eastern District of New York, for new judges for new

23  magistrate judges.  I have also been here for memorial

24  services for judges who have past away, but never in my life

25  did I ever fathom that I would be standing in this ceremonial

1   courtroom to hear the pronouncement of a death sentence on my

2   client. I never dreamt this day would come and it is a sad

3   day, as Your Honor noted, for all of us.  It is a sad day for

4   the court and it is a sad day, certainly, for the families of

5   the deceased detectives, and it is a sad day for the police

6   department, and for everybody who has participated in these

7   proceedings.

8          The jury has already pronounced its decision as to

9   the capital counts, rendered a sentence of death five times.

10  Your Honor, under the law, does not have the authority to

11  disturb that sentence, and so, in great measure whatever I say

12  is really of no moment other than, perhaps, to assuage my own

13  need to make some comments on behalf of my comments.

14         When I met Ronell Wilson some three years ago --

15  even longer than that, he was a young cocky kid and he was

16  immature and he was very confused, and during the course of

17  the next three years as he faced one ordeal after another, one

18  challenge after another, and a trial of over four month, the

19  trial of his life, he went through a metamorphosis of

20  maturity, and it is sad to say that, unfortunately, these sad

21  circumstances brought about a measure of maturity in

22  Mr. Wilson where he literally matured decades in the course of

23  several years where he was facing literally death.

24         Mr. Wilson really has changed, Your Honor. Of

25  course, nothing changes the fact that two detectives were

1    slain or executed in March of 2003.  Nothing can restore to

2    the victims' families -- the widows, the children -- the

3    presence of husbands and fathers, human beings.  Nothing can

4    restore to the police department honored colleagues and valued

5    police officers who protected us all, but the execution of

6    Mr. Wilson will in no way -- can in no way right any wrong.

7          If we look at the sentencing goals that Congress

8    articulated at sentencing statute, a sentence of death in this

9    case does not provide any of those sentencing goals.  It does

10   not promote respect for the law more than a sentence of life

11   imprisonment without the possibility of release, in fact, less

12   respect of law. It certainly does not promote rehabilitation.

13   That's very clear. It doesn't protect the public in any way

14   because Mr. Wilson for all practical purposes has been removed

15   from the public forever under either potential sentence,

16   either life imprisonment or the death penalty, and it doesn't

17   act, unfortunately, as a deterrence.  As we sadly saw in the

18   several months after the pronouncements of the death verdicts

19   in this case, no less than six police and auxiliary police

20   officers have been the victims of shootings, two of them

21   fatally, and so, we see none of those goals being promoted by

22   an execution.

23          In the case of a young man born in circumstances

24   where he really never had a chance, and although that's not

25   really an excuse, it is also a young man who certainly did not

1   know when he got into that car on the evening of March 10th

2   the two men in the front seat were police officers, and in

3   fact, the evidence at the trial shows otherwise. It does not

4   deter any criminals on the street from shooting others who

5   they believe are also criminals, and it turns out that they

6   are undercover police officers.  So, sadly, it does not

7   promote deterrence. No real good can come out of this, except

8   perhaps the more baser human instinct of a need to impose a

9   measure of vengeance for crimes.  That is not the most noble

10  goal, unfortunately, that we can aspire to. I understand that

11  Your Honor has no option but to impose this sentence

12  pronounced by the jury.  I regret this day has come, and I

13  hope that everybody, both the victims' families, the victims'

14  colleagues, my client and his family reach in their own

15  separate ways a measure of closure and comfort from these very

16  sad events.

17              Thank you, very much, Your Honor.

18              THE COURT:  You are welcome.

19              Does the government have anything?

20              MR. SHARKEY:  Mr. Wilson.

21              THE COURT: I'd like Mr. Wilson to speak last.

22              MR. SHARKEY:  Judge, I apologize.

23              THE COURT:  That's quite all right.

24              MR. SMITH:  Your Honor, I would like to comment on

25  Mr. Dinnerstein 's comments about the conduct of the trial,

1    and the jury's verdict.  The government has great respect for

2    the work of the jury in this case .

3            These were citizens chosen by both sides from

4    throughout our community, people who had no interest here but

5    then to seek justice, and their verdict, the verdict that

6    Ronell Wilson knowingly and intentionally murdered two heros

7    of this city speaks more eloquently than anyone in this room

8    could. Mr. Dinnerstein said that tomorrow is another day for

9    Ronell Wilson. Well, that cannot be said about Detective

10   Andrews and Detective Nemorin and that is because of Ronell

11   Wilson's actions, and, Your Honor, that is why this verdict is

12   justice.

13           THE COURT:  Very well. Mr. Wilson, would you like to

14   address the court?  You may stand, sir.

15           THE DEFENDANT:  Yes, sir.

16           I would like to say since there's no jury like the

17   prosecutor had said plenty of time that I have to prove to

18   them, I'd like to say to the family of the victims that I'm

19   sorry, I'm, a, very sorry for the pain and I really caused

20   you. I know it don't mean much and you still look at me as

21   lowest thing on earth but in my heart that I tell you that I'm

22   sorry once again. And as for the Judge, I want to thank you,

23   for accommodating me, and when I was at the prison, things

24   that you have done that was in your power to do, and I want to

25   thank you for that, and I want to thank my lawyers for doing

28

1  their best to protect my rights and things of that nature.

2  And also, I want to thank my family.  And I want to say I am

3  sorry for the pain that I caused you also. And as for

4  prosecution, Mr. Smith, as this whole so-called enterprise, me

5  Michael Wynn, Paris Bullock, Jessie Jacobus, Mitchell Diaz,

6  Omar Green, none of us knew these men was cops period, and I

7  would like to thank the court for letting me speak at this

8  time.

9       THE COURT:  All right.  Before I address Mr. Wilson

10  I would like to offer some observation about this case. I

11  would also like to express my gratitude to the jurors, and the

12  lawyers who devoted so much of their time to it.

13       It has been widely reported that more than 50 years

14  have passed things since the death penalty was last imposed on

15  a federal defendant convicted in New York. I leave it to

16  others to speculate as to why and to predict whether or not

17  the death penalty will be represented with any greater

18  frequency in the future. With regard to the particular case,

19  however, I would like to note that it presented a confluence

20  of four factors rarely found together.

21       They are: One, certainty as to guilt, two, unusually

22  sympathetic victims, three, a defendant who is remorseless,

23  and four, a defendant who is likely to be dangerous in the

24  future. Those who ask why this case culminated in a sentence

25  of death ought to consider these factors, each of which I will

1 now briefly discuss.

2          The first factor is certainty as to guilt. Perhaps

3 the most powerful argument against the death penalty is that

4 once it is imposed it cannot be reversed. For that reason, and

5 because no system of justice can guarantee perfect accuracy,

6 it is possible for the death penalty to be imposed on people

7 later found to be innocent, an outcome that few, if any,

8 consider acceptable. That argument is not available in this

9 case, however, because Ronell Wilson's  guilt has been proven

10 not merely beyond a reasonable, but beyond all doubt.

11          To review just some of the evidence presented during

12 the guilt phase of this case: Audio recordings of Wilson's

13 voice, and the voices of the detectives established that

14 Wilson and the defendants were in a car together at about the

15 time detectives were murdered.

16          Two eyewitnesses testified, one of them an

17 accomplice, who watched Wilson murder the two detectives, the

18 other an innocent man who had the misfortune to be taking out

19 his refuse on the street where and at the precise time when

20 the murders occurred.

21          The jury also heard from another accomplice who

22 loaded and handed Wilson the murder weapon and who minutes

23 after the murders heard Wilson admit to committing them. The

24 jury learned about the extensive forensic evidence proving

25 Wilson's guilt, including the samples of the defendant's DNA

30

1    that were left on Wilson's clothing and hands.

2            The jury heard about the inculpatory statement

3    Wilson made to a police officer moments after murdering

4    Detectives Andrews and Nemorin, and the inculpatory lyrics

5    that Wilson wrote by hand which were found in his pocket two

6    days after he murdered the detectives.

7            Finally, the jury watched Wilson's own crime scene

8    expert -- who had testified that it was possible that Wilson's

9    accomplice fired the fatal shots -- twist clean and bend in an

10   effort to demonstrate just how the accomplice could have shot

11   detectives.  Despite his contortions he could not do so, and

12   the jury rightly rejected his tortured explanation.

13           Certain crimes are so extreme that Congress has

14   decided the death penalty must be available in order to

15   redress the resulting injury to the victims and society. There

16   is no doubt that Wilson committed such crimes.

17           The second factor I will discuss is the status of

18   the victims in this case. Detective Rodney J. Andrews and

19   James Nemorin. In many, perhaps in most, federal murder cases

20   the victims are criminals working in the same illegal

21   industries as the defendants. In this case, however, the

22   victims were police officer who devoted their lives to

23   preventing people like Wilson from committing the very crimes

24   he committed against them, and they were not just any police

25   officers, they were the very best this city had, specially

1  selected to serve in an elite unit that performed the most

2  dangerous work police do: Posing as criminals in order to buy

3  guns from real criminals.

4          This case offers the ultimate illustration of how

5  dangerous and important their work was. The two guns at issue,

6  the TEC-9, the defendant arranged to buy from Wilson and the

7  revolver Wilson used to murder them had only one purpose in

8  the hands of a criminal: To hunt human beings. Every time

9  Detectives Andrews and Nemorin and their colleagues took such

10 weapons out of the hands of the criminals it prevented those

11 criminals from inflicting death and terror on

12 socioeconomically disadvantaged communities like the Stapleton

13 Houses where Wilson himself once lived.

14         But Detectives Andrews and Nemorin were not only

15 police officers who put their lives at risk on a daily basis

16 in order to make the rest of us safe, they were also two men

17 who were proudly devoted to their families.  Those of us when

18 we heard the Detectives' family members testify will never

19 forget Christian Andrews, Detective Andrews' older son,

20 recounting his daily chess games with his father, or their

21 annual family trips to Universal Studios in Florida.  Nor will

22 we ever forget Marie-Jean Nemorin, Detective Nemorin's sister,

23 explaining how she gave her baby brother the nickname Tichou,

24 which means little sweetheart or Rose Nemorin, Detective

25 Nemorin's widow describing how their three children now

1   celebrate Father's Day in the cemetery where they hug a cold

2   wall instead of their father.

3          When Wilson murdered Detectives Andrews and Nemorin,

4   he took two police officers from this city, two fathers from

5   their children, two husbands from their wives, two brothers

6   from their siblings, and two sons from their parents. While

7   all murders are tragic, it is hard to imagine two victims who

8   had a more positive impact on this world than Detectives

9   Andrews and Nemorin, and it is certain they would have

10  continued to make this world a better place had Wilson spared

11  their lives. That the jury likely took this into account when

12  considering whether a sentence of death was justified is both

13  understandable and appropriate.

14         The third factor I will address is Wilson's lack of

15  remorse for murdering Detectives Andrews and Nemorin.

16         Wilson's remorse, or lack thereof, was an issue

17  extensively litigated by the parties to this case. In

18  particular, the parties disagreed about whether Wilson should

19  be permitted to allocute to his remorse -- that is, to

20  articulate his remorse to the jury without swearing to tell

21  the truth and without subjecting himself to cross-examination

22  by the government. In orders issued on January 12th, 2007, I

23  found that Wilson had no constitutional right to allocute to

24  his remorse or any other subject. I, nevertheless, exercised

25  my discretion to permit Wilson to allocute to his remorse,

1    although I declined to permit him to speak about other

2    subjects without taking the witness stand.

3            Wilson's allocution was not convincing, and after

4    hearing it, the jury unanimously found that he lacked remorse

5    for his crimes. It would appear, although, I, of course, do

6    not know, that the jurors rejected with Wilson's allocution

7    because it was difficult for them to believe his words when

8    considered in the context of his conduct. Wilson's murders

9    were shockingly cold-blooded and suggests that he lacks the

10   capacity for remorse. He shot Detective Andrews without

11   warning. Moments later he shot Detective Nemorin as he pleaded

12   for his life. He then dropped the Detectives' dead or dying

13   bodies in the middle of a residential street, disposing of

14   them in a way that most people would not dispose of garbage.

15           Some time next two days Wilson wrote song lyrics

16   glorifying these murders. I quote: "Come teast Rated U Better

17   have that vast and dat Golock/Leavea 45 slogs in da back of ya

18   head cause I'm getting dat bread I ain't goin stop to I'm

19   dead." These lyrics do not merely suggest that Wilson lacked

20   remorse. Rather, they demonstrate that he was proud of what he

21   had done, and that he murdered Detectives Andrews and Nemorin,

22   not just for the $1200 they were carrying, but in order to

23   impress his criminal associates. This was confirmed when

24   Wilson's friend testified that Wilson recently expressed that

25   he hoped the nature of his crimes and the status of his

1  victims will earn him the position of "O. G", the highest

2  ranking member of his prison gang.

3           After learning all this it is easy to understand why

4  the jurors found that Wilson, his allocution notwithstanding,

5  feels no remorse for murdering Detectives Andrews and Nemorin.

6  I concur with that conclusion.

7           The fourth and final factor I would address is

8  Wilson's future dangerousness.

9           The jury unanimously found that Wilson represents a

10 continuing danger to the lives and safety of others, and is

11 likely to commit criminal acts of violence in the future. The

12 evidence supporting this finding was overwhelming. Wilson has

13 been violent for as long as he has been physically capable of

14 violence.  At age 11 he threw a bottle at a marked police car

15 for no apparent reason.  As a young teenager he was a one-man

16 crime wave, mugging and terrorizing children his own age in

17 his own neighborhood. At age 19 he slashed a rival criminal in

18 the face requiring 300 stitches. That he did this in the

19 middle of Times Square in front of dozens of witnesses

20 suggests that he is capable of committing acts of violence

21 anywhere and at any time. And shortly before this trial began

22 he made a series of calls from prison instructing his cousin

23 and another man to retaliate with violence against a group

24 that had apparently attacked his cousin.

25           It appears to me, although again I do not know, that

1    Wilson's future dangerousness weighed heavily in the jury's

2    determination to recommend the death penalty. Wilson's entire

3    history, including, of course, his execution of Detectives

4    Andrews and Nemorin, suggests that if he were sentenced to

5    life imprisonment without the possibility of release, he would

6    one day harm or kill another prisoner or a corrections

7    officer.  Although, I have high regard for the Bureau of

8    Prisons, it would be unrealistic to expect with certainty that

9    the Bureau's staff will prevent a proven double-murderer from

10   committing future acts of violence, particularly when that

11   murderer is incapable of remorse and motivated by status. The

12   evidence in this case suggested, and the jury probably

13   believed, that a system based on rules and human beings can

14   only do so much.

15           This is because rules are effective only to the

16   extent that they are followed, and when not followed,

17   enforced. Wilson recently demonstrated that he has no regard

18   for prison rules and that there are limits to the enforcement

19   of those rules.  When he smashed two Plexiglass windows in a

20   visiting room in the Metropolitan Detention Center. He

21   apparently did this because his special visit with his mother,

22   which he had requested and I authorized, was deemed a

23   "non-contact" visit. He, therefore, took it upon himself to

24   attack the barriers that separated him from them, using a

25   metal chair to destroy them. In the meantime, the visiting

1   area had to be cleared of both inmates and visitors. It took

2   45 minutes for guards to restore order, which they

3   accomplished without resorting to force. Their restraint was

4   as remarkable as Wilson's conduct was terrifying.

5          Although, Wilson smashed these windows after the

6   jury voted to recommend the death penalty, his actions confirm

7   the jury's finding that he is a future danger because they

8   demonstrate both that he has no regard for rules and that

9   prison officials despite their best efforts cannot guarantee

10  that rules will be followed. Given all that the jury learned

11  about Wilson, it is not surprising that it unanimously found

12  that he will be dangerous in the future if given even the

13  slightest opportunity. Based upon the foregoing, I find that

14  Wilson is capable of committing extreme acts of violence

15  without warning or provocation.

16         I would now like to clarify the record concerning

17  two incidents that occurred during this trial, the first at

18  the beginning of the trial, and the second at the end of the

19  penalty phase.

20         On November 28, 2006, the second day of trial phase

21  the government played an audio recording created the night

22  Wilson murdered Detectives Andrews and Nemorin. The recording

23  featured the voice of the Detectives in what would turn out to

24  be their final moments alive. While the recording was played

25  two members of Detective Nemorin's family became emotionally

37

1  upset and voluntarily left the courtroom.  Before they left

2  they both cried and one them repeated Detective Nemorin's

3  first name James two or three times. I instructed the jury to

4  leave the courtroom when this happened.  The jurors followed

5  my instruction and filed out in an orderly manner. No jurors

6  looked at the gallery or at Wilson while leaving the

7  courtroom.

8        That Detective Nemorin's relatives were upset is

9  understandable. They were hearing the voice of their deceased

10 loved one while sharing a room with the man they believed to

11 be his murderer. They were, nevertheless, correct to leave the

12 courtroom and observed the remainder of the day's proceedings

13 on closed circuit television elsewhere in the courthouse. The

14 court greatly appreciates their decision to do so.

15        I am confident that the conduct of these relatives

16 did not improperly affect the jury in either the trial phase

17 or the penalty phase of this case. In the trial phase, as I

18 have already discussed, Wilson's guilt was proven beyond a

19 reasonable doubt. I am, therefore, confident that the verdict

20 of guilt was based on the admitted evidence, not on any undue

21 sympathy for the victims' families.

22        Furthermore, Detective Nemorin's family members

23 responded to Detective Nemorin's voice, not to anything Wilson

24 said or did, and their response was not directed at Wilson.

25 It, therefore, could not have suggested to the jury that

1   Wilson was guilty, or even that the Nemorin family believed

2   Wilson was guilty, but only that Detective Nemorin was a man

3   whose loss was felt deeply.

4           I instructed the jury that its deliberation as to

5   Wilson's guilt must not be based on fear, prejudice, bias or

6   sympathy.  This jury was among the most attentive and serious

7   I have ever seen, and I have every reason to believe that it

8   followed this and every other instruction, and that the family

9   members' emotional response on November 28 played no role in

10  the jury's deliberation as to guilt.

11          I am equally confident that this conduct did not

12  affect the jury when it deliberated in the penalty phase of

13  this case. I note first that the penalty-phase deliberation

14  began on January 29th, 20007, two months after Detective

15  Nemorin's relatives became upset upon hearing his voice. It is

16  extremely unlikely that the jury reached its sentencing

17  decision because of what it saw and heard on November 28th,

18  rather than because of the voluminous, persuasive and moving

19  evidence it heard before and after that moment.

20          Furthermore, in the unlikely event that the

21  relatives' November 28th response did linger in the jurors'

22  minds two months later, its effect was dwarfed by the effect

23  of the penalty-phase testimony of the victims' relatives,

24  colleagues and friends. That testimony was admitted because

25  Congress has provided that a jury sitting in a penalty phase

1    of a death penalty case may consider the "effect of the

2    offense on the victim, and the victim's family,"  and that

3    this effect may be shown through oral testimony.   Title 18,

4    United States Code, Section 359 (a).

5              By January 29th, pursuant to this provision, the

6    jury had heard extensive testimony explaining how the

7    Detectives' death affected their relatives, colleagues and

8    friends. Therefore, to the extent that the emotional response

9    of November 28th, 2006 was still on jurors' minds on

10   January 29th, 2007, I find that the November 28th emotional

11   response was redundant to the victim impact testimony offered

12   in the penalty phase and that the latter was immeasurably more

13   detailed, extensive, and moving and damning than the former.

14             In addition, I note that on January 29th, 2007,

15   immediately before the jurors began deliberating, I instructed

16   them as follows:

17             "In engaging in the weighing process, you must

18   avoid any influence of passion, prejudice, or undue sympathy.

19   Your deliberations should be based upon the evidence you have

20   seen and heard, and the law on which I have instructed you.

21   Passion, prejudice and arbitrary consideration have no role to

22   play in your efforts to reach a just result in this case."

23             As I have already stated, my observation of this

24   jury leads me to conclude that it followed all of my

25   instructions, including this one.

1        The other incident I will discuss occurred on

2   January 29, 20007 at the end of the penalty phase of this

3   case. At a side-bar conducted after closing arguments the

4   defense moved the court to dismiss Juror Number One because

5   the defense alleged he mocked its arguments by smirking and

6   laughing during the defense's closing argument. I denied that

7   motion and observed that Juror Number One did not appear to me

8   to be mocking any person working for the defense or any

9   argument made by the defense. I also noted that the entire

10  jury appeared to me to be taking this case very seriously and

11  that nothing Juror Number One had done or was claimed to have

12  done indicated that he would not consider all of the evidence

13  and arguments presented in this case and follow all the

14  court's instructions.

15        I would like to clarify what it is that Juror Number

16  One did and what he did not do. My observation is that Juror

17  Number One did smile or smirk two or three times during the

18  defense's closing arguments, but that he did not laugh at any

19  time laugh. I fully adhere to my previous finding that he was

20  not mocking the defense or any of its arguments. Rather, it is

21  clear to me his expression was a visceral response to one

22  particular argument, which is that Ronell Wilson is

23  "borderline mentally retarded."  Defense counsel repeated that

24  phrase three times during its closing argument, and it was

25  only at these moments that Juror Number One reacted,

1  apparently because he found the assertion to defy credulity.

2      It is easy to understand why. By the time defense

3  counsel suggested that Wilson was retarded the jury had

4  already seen a list of the defense's mitigating factors. That

5  list stated that Wilson "performed well below grade level in

6  school," and "was placed in Special Education Classes," and

7  that his "scores on standardized intelligence tests are below

8  average." It did not, however, state that Wilson was mentally

9  retarded or borderline mentally retard.  Because the defense

10  crafted its own mitigating factors its list would have

11  included such a statement if Wilson had intended to submit

12  evidence as to his alleged mental retardation.  When Juror

13  Number One reacted upon hearing the phrase "borderline

14  mentally retarded" he was responding viscerally to an argument

15  for which no evidence had been presented.

16      In addition, the word "borderline" sounds like a

17  lawyer's word,  a word added to an otherwise false statement

18  in order to render defensible. After sitting attentively

19  through five weeks of testimony and argument, and after having

20  already deliberated to verdict in the guilt phase, Juror

21  Number One was able to recognize that word for what it was.

22      Perhaps more importantly, by the time the defense

23  presented its closing argument, the jurors in this case had

24  gotten to know Wilson very well. In addition to learning

25  about his crimes, the jurors heard his voice when the

1   government played the audio recording created in the moments

2   before he murdered Detectives Andrews and Nemorin. In that

3   recording, Wilson is heard declaring that he is in charge of

4   the purported gun deal.  He is heard instructing his

5   accomplice to "pat down" the Detectives and admonishing the

6   Detectives when they express a reluctance to be patted down.

7   He is heard declaring that another vehicle, a black Ford

8   Expedition that he correctly deduced was driven by undercover

9   officers, was following him and the Detectives. He is then

10  heard directing traffic, instructing Detective Nemorin to

11  drive along a route that Wilson chose in order to evade the

12  black Expedition.

13          In a separate series of recordings played in the

14  penalty phase of this case, Wilson was heard directing his

15  cousin and another man to retaliate against a group that had

16  attacked the cousin. In these recordings, as in the recordings

17  created the night Wilson murder Detectives Andrews and

18  Nemorin, Wilson sounded confident, strategic and within the

19  framework of his criminal aspirations, perfectly rational.

20          Nobody who heard these recordings could reasonably

21  believe that Wilson is mentally retarded. It was not

22  inappropriate for Juror Number One, after spending more than

23  five weeks with Wilson, to find the defense's argument that

24  Wilson is "borderline mentally retarded" implausible or to

25  evince his finding through a visceral, unobtrusive facial

1  expression. I fully believe that Juror Number One, and all

2  other jurors followed my instructions to consider all admitted

3  evidence and arguments when deliberating as to whether a

4  sentence of death was justified. Nothing Juror Number One is

5  claimed to have done suggests otherwise.

6          I would like to close my observations by commending

7  the people involved in this difficult trial. I begin with the

8  jurors. Nearly 600 potential jurors came to this courtroom to

9  fill out a 56-page questionnaire prepared by the parties and

10 the court. Of those nearly 600, 269 were called in for

11 one-on-one voir dire, 77 of whom were then found qualified by

12 this court under Supreme Court case law. That case law

13 requires, among other things, that if a juror has views for or

14 against the death penalty, those views not prevent or

15 substantially impair the performance of the juror's  duties in

16 accordance with this Court's instructions. In other words,

17 each juror deemed qualified was found by this court to be a

18 person who, on the one hand, would meaningfully consider

19 recommending the death sentencing in the event of a conviction

20 for a capital crime, and the other, would not automatically

21 vote to recommend a death sentence after a guilty verdict,

22 even for the crime of murdering two police officers.

23          From this pool of 77 qualified jurors, 12 jurors and

24 six alternates emerged after the parties exercised their

25 peremptory strikes.  Between November 27, 2006, when opening

1  statements were made, and January 30, 2007, when the sentence
2  was announced, we lost no jurors and only one alternate, who
3  was excused by the court due to circumstances outside his
4  control.

5          I observed the jury carefully throughout the trial.
6  As I have already stated, the jurors and alternates who served
7  on this case were among the most attentive and thoughtful I
8  have ever seen. In the courtroom they listened carefully to
9  every argument and the witness testimony, and examined every
10 piece of evidence introduced in this case.  I am confident
11 that they carefully considered the evidence when they
12 deliberated, both in the trial phase, and in the penalty
13 phase.

14         I would next like to thank the attorneys on both
15 sides in this case.  The Assistant United States Attorneys
16 assigned to this case prosecuted it zealously but fairly,
17 demonstrating admirable restraint and sensitivity throughout
18 the trial. The defense lawyers worked diligently to defend an
19 extremely unpopular client, and in doing so, demonstrated
20 courage and deep moral conviction.  They are a credit to their
21 profession. Their hard work, their sincere and deep feeling
22 for their client, and their moral opposition to the death
23 penalty were obvious to all who observed this trial and more
24 than justified my decision to appoint them.

25         I appointed Mr. Savitt lead trial counsel because of

1   his extensive experience in federal criminal trials, including

2   his prior experience defending death-eligible defendants.  I

3   appointed Ms. Sharkey and Mr. Dinnerstein lead and associate

4   learned counsel, respectively, both because of their extensive

5   experience defending death-eligible defendants in the New York

6   State Capital Defender Office and because they had represented

7   Wilson in state court proceedings for approximately 20 months

8   before the federal government assumed responsibility for

9   prosecuting him.  I doubt that Wilson could have paid for a

10  better defense time.  Indeed, federal taxpayers have already

11  spent approximately $1.2 million on his defense. I consider

12  every penny well spent.

13          Finally, I wish to thank the families of Detectives

14  Andrews and Nemorin, and the Wilson family. They maintained

15  their composure and dignity throughout a trial that must have

16  been difficult for them in ways most of us cannot imagine.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          THE COURT:   (Continuing)

2          Will the defendant stand?

3          Are you ready to be sentenced, Mr. Wilson?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Pursuant to the jury verdict, returned

6 on December 20, 2006, finding the Defendant guilty on all

7 counts of the Second Superseding Indictment, the Defendant is

8 adjudged guilty of each of the following offenses:

9          Count One, Murder in Aid of Racketeering of James

10 Nemorin; date of offense, March 10, 2003.

11          Count Two, Murder in Aid of Racketeering, Rodney J.

12 Andrews; date of offense, March 10, 2003.

13          Count Three, Robbery Conspiracy; date of offense,

14 March 10, 2003.

15          Count Four, Attempted Robbery; date of offense,

16 March 10, 2003.

17          Count Five, Carjacking With Death Resulting; date of

18 offense, March 10, 2003.

19          Count Six, Use of a Firearm; date of offense,

20 March 10, 2003.

21          Count Seven, Causing Death Through Use of a Firearm

22 of Rodney J. Andrews; date of offense, March 10, 2003.

23          Count Eight, Causing Death Through Use of a Firearm

24 of James Nemorin; date of offense, March 10, 2003.

25          Count Nine, Robbery Conspiracy; date of offense,

1  March 2, 2002.

2     Count Ten, Use of a Firearm; May 2, 2002, date of

3  offense.

4     Pursuant to the Federal Death Penalty Act of 1994,

5  18 United States Code, Section 3591-3595, including

6  18 United States Code, Section 3593(c), which provides that

7  "when a defendant is found guilty or pleads guilty to an

8  offense punishable by death, no presentence report shall be

9  prepared"; and the sentencing hearing conducted by the Court

10  pursuant to 18 United States Code Section 3593(c), which along

11  with the trial in this case provided the Court sufficient

12  information to sentence the Defendant without a presentence

13  report; and the Special Findings of the jury; and the jury's

14  unanimous vote, returned on January 30, 2007, recommending

15  that the Defendant, Ronell Wilson, be sentenced to death on

16  Counts One, Two, Five, Seven and Eight, it is the Judgment of

17  the Court that the Defendant, Ronell Wilson, is sentenced to

18  death separately on each of Counts One, Two, Five, Seven and

19  Eight of the Second Superseding Indictment.

20     Pursuant to the provisions of 18 United States Code

21  Section 3596, it is Ordered that the Defendant, Ronell Wilson,

22  is committed to the custody of the Attorney General of the

23  United States until exhaustion of the procedures for appeal of

24  the judgment of conviction and for review of the sentence.

25  When the sentence is to be implemented, the Attorney General

1   shall release the Defendant to the custody of a United States

2   Marshal, designated by the Director of the United States

3   Marshals Service, who shall supervise the implementation of

4   the sentence in accordance with law.

5          It is further Ordered that the sentence shall be

6   executed on a date and at a place designated by the Director

7   of the Federal Bureau of Prisons in accordance with law.

8          It is further Ordered pursuant to the Sentencing

9   Reform Act of 1984, and 18 United States Code Section 3593(c),

10  which provides that "when a defendant is found guilty or

11  pleads guilty to an offense punishable by death, no

12  presentence report shall be prepared," and the sentencing

13  hearing conducted by the Court pursuant to 18 United States

14  Code Section 3593(c), which along with the trial in this case

15  provided the Court sufficient information to sentence the

16  Defendant without a presentence report, that the Defendant,

17  Ronell Wilson, is sentenced as follows on the non-capital

18  counts of the Second Superseding Indictment.  The Defendant is

19  hereby committed to the custody of the United States Bureau of

20  Prisons to be imprisoned for a toilet term of:  20 years for

21  Count Three, 20 years for Count Four, life for Count Six,

22  20 years for Count Nine, and life for Count Ten.  The

23  sentences for Counts Three, Four, Six, Nine and Ten shall run

24  consecutively.

25          It is further Ordered that should the Defendant be

GR      OCR      CM      CRR      CSR

49

1   released, he shall be on supervised release for a term of five

2   years for each of Counts Three, Four, Six, Nine and Ten of the

3   Superseding Indictment, which shall run concurrently.   The

4   standard conditions of supervised release shall apply.

5          As required by 18 United States Code Section 3013,

6   it is Ordered that the Defendant shall pay a special

7   assessment of $1,000, which is mandatory and which shall be

8   due immediately.   The Court declines to impose a fine due to

9   the defendant's inability to pay a fine.   Pursuant to

10  18 United States Code Section 3663A, restitution is mandatory;

11  however, all reimbursable expenses incurred by the victims'

12  families have been paid by another source, namely, the New

13  York City Police Department.   Accordingly, no restitution is

14  ordered.

15         You have the right to appeal your conviction and

16  sentence to the United States Court of Appeals for the Second

17  Circuit.   Your time to appeal is extremely limited.   You must

18  file your notice of appeal with the Clerk of the Court for

19  this district within ten days of today.   Accordingly, you

20  should discuss with your attorneys immediately whether you

21  wish to pursue your appeal.

22         It is so ordered.

23         You may be seated.

24         Does the government have anything further?

25         MR. SMITH:   No, Judge.

1          MS. KAVANAGH:  No, Your Honor.

2          THE COURT:  Does the defense have anything further?

3          MS. SAVITT:  Only to note our continued objections

4    to the rulings that Your Honor reiterated today on the record

5    in order to preserve our client's appeal, and we do plan on

6    filing a notice of appeal by tomorrow, Your Honor.

7          THE COURT:  Your exceptions are noted.  Your

8    intention to appeal is also noted.

9          At this time I will ask the marshals to remove the

10   Defendant from the courtroom, and everyone else shall remain

11   seated.

12         (The Defendant is removed from the courtroom by the

13   marshals.)

14         THE COURT:  There being no further -- are there any

15   further requests from either side?

16         MS. SHARKEY:  No.  Thank you very much, Your Honor.

17         THE COURT:  Court is adjourned.

18         (Matter concludes.)

19

20

21

22

23

24

25