JAL:JGM
F.# 2004R01762

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -               Cr. No. 04-1016 (NGG)

RONELL WILSON,
    also known as "Rated R,"

            Defendant.

- - - - - - - - - - - - - - - -X


**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF A MOTION TO RECONSIDER THE COURT'S DECISION OF FEBRUARY 13, 2012 AND IN OPPOSITION TO DEFENDANT'S MOTION CONCERNING THE GOVERNMENT'S PROPOSED TESTING IN CONNECTION WITH THE <u>ATKINS</u> HEARING**


LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201


James G. McGovern
J.E. Shreve Ariail
Carter H. Burwell
Assistant U.S. Attorneys
    (Of Counsel)

## INTRODUCTION

The government respectfully requests that the Court reconsider its February 13, 2012 decision in which it (1) prohibited the government from reviewing expert reports and other materials disclosed or created in connection with the defendant's 2006 Federal Rule of Criminal Procedure 12.2 notice, and (2) prohibited the government from relying on its previously retained experts in connection with the Atkins hearing currently scheduled for September 17, 2012.  As explained herein, the defendant has opened the door to the government's access, review and use of such materials and experts by providing notice on March 7, 2012 of its intent to select certain Rule 12.2 materials to use in connection with the Atkins proceeding, most notably by notifying the Court of its intent to rely in the Atkins hearing on a 2003 IQ test provided to the Richmond County District Attorney's Office ("RCDA") and the Department of Justice ("DOJ") by the defendant to avoid a death penalty prosecution.

Relatedly, the government also submits this Memorandum of Law in opposition to the defendant's "Motion Concerning Government Proposed Testing For Upcoming Atkins Hearing," served on the government via email on May 15, 2012.  While seeking to pull selectively from its batch of Rule 12.2 materials, the defendant simultaneously seeks to circumscribe the government's own access to such materials and its experts, and to limit and potentially disrupt the testing proposed by the government's

experts.  Specifically, the defendant objects to: (1) the
government's partial reliance on adaptive functioning information
"self-reported" by the defendant, (2) the number and scope of the
interviews proposed, and (3) the qualifications of at least one
of the experts the government has noticed.  Finally, in an
obvious effort to disrupt the government's analysis of the
defendant's mental condition, the defendant also demands (4) that
the government provide more specificity regarding testing noticed
by the government, particularly as those tests relate to
assessing malingering, and (5) that defense counsel be permitted
to be present during the government's interviews.

   For the reasons set forth herein, the defendant's
objections and demands are meritless or premature, and are
clearly designed to disrupt and circumscribe the government's
analysis of the defendant's mental condition.

I. The Government Should Be Permitted Access To
  The Rule 12.2 Materials From the Prior Trial

   Because the defendant has opened the door to the Rule
12.2 materials by permitting his experts to review and rely upon
sealed information to formulate their opinions, the government
and its experts should be permitted similar access to such
materials, which are clearly relevant to the issues to be
resolved at the Atkins hearing.  To do otherwise denies the
government the full and fair opportunity to rebut the defendant's
mental retardation claim.

A.   <u>History of the Rule 12.2 Materials</u>

As a preliminary matter, it is worth reviewing how and when the Rule 12.2 materials were produced, and when, and under what circumstances, the defendant sought to re-seal them.  On March 10, 2003, the defendant murdered two New York City Police Department detectives, James Nemorin and Rodney J. Andrews. After his arrest, the defendant was initially prosecuted by the RCDA; he was later indicted in federal court.  On January 20, 2006, pursuant to Rule 12.2(b)(2) of the Federal Rules of Criminal Procedure, the defendant filed notice, (Docket #76), that he intended to introduce expert evidence relating to mental disease or defect or other mental condition during the penalty phase of this proceeding.

On May 1, 2006, in response, the government filed a motion, regarding Rule 12.2 discovery and procedures seeking additional discovery and notice related thereto. (Docket #97). Among other things, the government requested that the Court formally authorize the disclosure to its expert witnesses of approximately 800 pages of the defendant's medical records that the defense team originally turned over to the RCDA in connection with the defendant's efforts to avoid a death penalty prosecution in state court.  <u>Id</u>.  The same records were also subsequently provided to the DOJ to assist the United States Attorney General

-3-

determine whether the a capital prosecution was warranted in the defendant's case.  Id.

At the time, the government argued that any defense privilege related to those materials had "clearly been waived by their production to two different prosecuting offices," but that it delayed disclosing them to its experts "in an excess of caution."  Id.  Ultimately, the Court ruled that, to the extent that the records were privileged at all, there was no waiver of that privilege due to the "conditional disclosure to the Richmond County D.A. and to the U.S. Attorney's Office for the Eastern District of New York."  United States v. Wilson, 493 F. Supp.2d 348, 363 (E.D.N.Y. 2006).  The court specifically stated that it took no position on whether the materials were in fact privileged, but denied the government's request for access to those materials.  Id.  Because the defendant had not yet been convicted, the Court also ordered the appointment of a "fire wall" attorney from outside the Eastern District of New York.  Id. The Court also ordered that the defendant submit to mental examination by the government's experts.  Id.

The defendant was convicted in December 2006, following a jury trial, of multiple death-eligible crimes arising from the murders of Detectives Nemorin and Andrews.  In light of the defendant's convictions and the prior Rule 12.2 notice, the government's firewall came down and the government's trial team

−4−

began reviewing the Rule 12.2 materials in advance of the sentencing proceeding. See Fed. R. Crim. P. 12.2(c)(2).

On January 10, 2007, upon motion of the government, the Court further ordered the defendant to "confirm or withdraw, by January 11, 2007, at 11:00 a.m., his intent to offer, during the penalty phase, any expert evidence about his past, present, or future mental condition," and advised the defendant that "[n]o statement made by [the defendant] in the course of any examination conducted by Dr. Welner under Fed. R. Crim. P. 12.2, no testimony by Dr. Welner based on any such statement, and no other fruits of any such statement may be admitted into evidence against [the defendant] in the penalty phase of this case on an issue regarding his mental condition on which [the defendant] has introduced expert evidence requiring notice under Fed. R. Crim P. 12.2(b)(2). Fed. R. Crim. P. 12.2(c)(4)B)." (Docket # 291). No filing by the defendant on January 11, 2007 is reflected in the docket sheet.

Ultimately, in an apparent effort to avoid opening the door to testimony pursuant to the Court's order of January 10, 2007, the defendant chose not to call any expert witnesses to testify about his mental condition. Instead, the defendant offered various documents, including some IQ testing, medical and educational records, which were relied upon by the government's and the defendant's experts in their evaluation of him. The

-5-

defendant then moved to preclude the government from calling a "mental-condition expert witness [i.e. Dr. Welner] to rebut evidence that" the defendant sought to offer regarding the defendant's mental condition; the Court denied the defendant's motion to preclude the rebuttal testimony without prejudice. (Docket #294).  No further motion on this issue was filed.

On January 31, 2007, a jury returned a verdict of death on all death eligible counts.  The Court subsequently sentenced the defendant on March 29, 2007, and a judgement of death was entered on that day.

The jury's subsequent decision to impose the death penalty (and the Court's entry of judgement) was overturned by the Second Circuit in June 2010.  The defendant's convictions for the murders are final, and he remains in the custody of the Bureau of Prisons.  In April 2011, the Court appointed current counsel to represent the defendant in connection with the "retrial" of the penalty phase of this case.  Over the ensuing months, despite a clear decision by prior trial counsel not to offer expert testimony regarding the defendant's mental condition, either pre-trial or at the sentencing hearing, newly-appointed counsel has informed the Court and the government that it now intends to present evidence that the defendant is mentally retarded and therefore ineligible for the death penalty, pursuant

to 18 U.S.C. § 3596(c) and Atkins v. Virginia, 536 U.S. 304 (2002).

At a status conference on November 9, 2011, the government noted its view that a "firewall" was no longer necessary, because the defendant already had been convicted of capital murder charges.  See Fed. R. Crim. P. 12.2(c)(2).  At that status conference, defense counsel tentatively agreed with that position, and the Court indicated its concurrence.  (See Docket # 581, p. 15-16).  By letter dated December 5, 2011, however, the defendant altered its position, objecting to "the government's review of any of the materials disclosed during the last proceeding," because such material "was not related to an Atkins claim." See Defendant's December 5, 2011 Letter (attached as Exhibit A to Docket # 4025).  The defendant objected to the government's review of any reports or materials provided by experts retained by the government in 2006, including Michael Welner, Jonathan Brodie, Manfred Greiffenstein and William Foote. Id.  The defendant also objected to the review by the assigned government lawyers of the government's own files "in order to identify documents that [we] are entitled to review," as such a review "would necessarily risk improper disclosure."  Id.

Then, on January 11, 2012, the government moved again to compel the defendant to provide timely notice of the defendant's intent to offer mental health evidence and requested

-7-

that the Court permit the government's trial team to access all mental health evidence in its possession, including Dr. Welner's interview of the defendant.  (Docket # 599).  In its response the Government's motion, the defendant argued that review by the government of its own reports was "premature," given that the defendant had not yet filed its 12.2 notice.  (Docket #612). The defendant also suggested that the reports and information developed by the government's experts were irrelevant to an assessment of the defendant's mental retardation.  (See id. ("Our primary focus is on mental retardation, which is extremely complicated issue, factually and forensically.")).

In its February 13, 2012 order, the Court ruled that the government could not "rely on expert reports or other materials produced to firewalled prosecutors in advance of the 2006 penalty phase, subject to further order of the Court" and prohibited the "disclosure of materials created and relied on by [those] experts."  (Docket #625).

On March 7, 2012, the defendant provided notice of its intent to call four mental health experts in its "case in chief to establish that Mr. Wilson meets the diagnostic and legal criteria for mental retardation."  (See Defendant's March 7, 2012 Letter).  Among other issues, the defendant indicated that the experts would testify regarding, among other things, (1) "retrospective assessments of [the defendant's] adaptive

-8-

functioning," (2) the defendant's "pediatric medical history," (3) prior "neurophysiological tests, including IQ tests" conducted on the defendant, (4) additional "neurophysiological tests," presumably not yet conducted, and (5) "disparate medical and psychological data."  Id.

The government subsequently filed notices indicating its intent to call as witnesses various experts related to the defendant's mental conduction and to conduct additional testing of the defendant prior to the Atkins hearing scheduled on September 17, 2012.  To date, the government has relied solely on the defendant to obtain materials to provide to its experts.

At the most recent status conference, the government advised the Court that it felt unfairly hamstrung by the defendant's unwillingness to disclose all of the available medical evidence necessary to rebut to the defendant's Atkins claim.  In response, the defendant invoked the Court's February 13, 2012 order to argue that the government was not entitled to all of the relevant evidence.  The Court asked the government whether it wanted to move for reconsideration of the prior order; the government does now.

B.   The Court Should Reconsider February 13, 2012 Decision

The government respectfully submits that the Court should reconsider its February 13, 2012 decision and permit current government counsel access to Rule 12.2 materials that

-9-

were previously produced in connection with the 2007 sentencing
hearing.   In its decision, the Court ruled that "[d]ue to Rule
12.2's strict prohibition on the disclosure and use of expert
mental condition evidence outside the circumstances it
enumerates, the court denies the Government's motion for access
to the previously disclosed, <u>sealed</u> information." (Docket # 625,
p. 7)(emphasis supplied).  What the government demonstrates
herein is that the defendant is using re-sealing of previously
collected, relevant data to cherry-pick evidence from the Rule
12.2 materials that he deems helpful to his <u>Atkins</u> claim, while
depriving the government of a full and fair opportunity to rebut
the claim.

          As an initial matter, there can be little question that
the information compiled in the Rule 12.2 reports and
examinations pertain to a prior attempt by the defendant to
demonstrate that he suffers from some form of mental retardation.
Indeed, one of the experts in the government's Rule 12.2
evaluation, Michael Welner, M.D., has stated that his:

> "work and the work of [his] colleagues
> provide a very large quantity of data points
> that inform both questions of [the
> defendant's] intelligence and functional
> impairment.  Standard forensic practice in
> the assessment of mental retardation would
> evaluate all available mental health reports
> and data and analyses.  The data from a 13.5
> hour videotaped interview, covering a range
> of questions, is also vital to the assessment
> of retardation.  Given the range of
> functional abilities informed by such a

-10-

> lengthy interaction, and the aforementioned
> reports, a mental health examiner who ignored
> reviewing this data and accounting for it
> would be committing professional malpractice
> . . ."

(Welner's February 1, 2012 Letter to Court, Docket # 616-1).  As
was evident in the 2007 sentencing proceeding, previous counsel
clearly relied on aspects of the Rule 12.2 data to argue to the
jury that the defendant was mentally retarded.[1]  (See Transcript
of Defendant's Summation at 2007 Sentencing Hearing, pp. 1671
("We are talking about somebody [i.e., the defendant] who is
borderline mentally retarded.") and 1687 ("I submit to you the
answer to that is not a case where an individual [i.e., the
defendant] has borderline mental retardation.").   Thus, it is
most probable that the Rule 12.2 materials are highly relevant to
core question to be decided by the Court at the upcoming Atkins
hearing: is the defendant actually mentally retarded?

       To advance his claim, the defendant has recently served
the government with an expert notice identifying the four experts
that he intends to call at the Atkins hearing.  (Defendant's
March 7, 2012 Letter to Government, pp. 1-4).  In that letter,

---

[1]     The defendant summation in the sentencing hearing
emphasized defendant's alleged mental retardation so heavily that
government counsel was prompted to confront the allegation in the
first moments of her rebuttal:  "Now, before I begin, there is
just one thing that I need to clear up. [The defendant], he's not
retarded.  He's not even half retarded. [Defense counsel] claimed
a couple of times that he is borderline retarded.  It is just not
true."  (Transcript of Sentencing Hearing at 1693).

the defense also identified the neuropsychological tests that were planned for the defendant and announced, citing United States v. Hardy, 762 F. Supp.2d 849, 881 (E.D.La. 2010), that it did not intend to administer another IQ test.  Id.  Instead, the defense stated that it intended to rely on only two IQ tests: one conducted before the murders, on December 5, 1994, and one conducted afterwards, on October 17, 2003.  That second IQ test upon which the defendant intends rely at the Atkins hearing is part of the Rule 12.2 materials that the Court has re-sealed at the defendant's request; it was performed by Dr. Sandy Drob, one of experts the defendant retained in 2003 to assist him in his campaign to avoid the death penalty for his crimes.  In fact, the defendant has previously conceded, in a letter to the government, that Dr. Drob's reports are part of the sealed Rule 12.2 materials:

> "Th[e Rule 12.2] notice was not related to the Atkins claim and the material disclosed should therefore remain under seal.  This includes a videotaped interview of [the defendant] by Michael Welner, the reports and related material that were submitted by prosecution experts (Dr. Welner, Jonathan Brodie, Manfred Greiffenstein and William Foote), and the reports and associated data that were submitted by defense experts (Sandy Drob and Monte Buchsbaum)."

(Defendant's December 5, 2011 Letter, p. 1).  Notably, at the 2007 sentencing hearing, the defendant elected not to offer evidence of Dr. Drob's October 17, 2003 IQ test, despite offering

-12-

several other IQ tests into evidence.  (See Defendant's March 7, 2012 Letter to Government, p. 5, n.1).

Beyond looking to the Rule 12.2 materials for IQ testing, the defendant has also indicated that he intends to have one of his new experts, George W. Woods, Jr., M.D., rely on the 2005 PET (Positron Emission Tomography) scan, conducted and interpreted by Monte S. Buchsbaum, M.D., another of the defendant's Rule 12.2 experts.  (Id. at 4; Exhibit E).  In his report, Dr. Buchsbaum concluded that a differential diagnosis based on the PET scan evidence must include traumatic brain injury or other developmental disorders, such as mental retardation.  (See id.).

Importantly, there is no question that the 2003 IQ test and 2005 PET scans are part of the Rule 12.2 materials the defendant has endeavored to keep from government counsel. Certainly, these documents were among the more than 800 pages of records that the defendant turned over to the RCDA and the DOJ as part of his unsuccessful attempt to avoid a capital prosecution, or were among the "results of tests and reports of examinations administered to [the defendant] in the course of [his experts] reaching [their] expert opinions, and all raw data obtained by defense experts," which the Court ordered disclosed to the previous firewalled AUSA by August 21, 2006.  Wilson, 493 F. Supp.2d at 360-63.

-13-

What is evident from the notice that the defendant has served in advance of the Atkins hearing is that he is selectively violating the sealing order the Court recently issued, at his request, to pick and choose the items of evidence that he believes will be helpful to establish his alleged mental retardation. Such tactics are unfair and prevent the government from fully defending the Atkins claim, for which the defendant bears the burden of proof. See Lewis v. Quarterman, 541 F.3d 280, 283 (5th Cir. 2008); United States v. Webster, 421 F.3d 308 (5th Cir. 2005); United States v. Davis, 611 F. Supp.2d 472, 474 (D. Md. 2009); United States v. Nelson, 419 F. Supp.2d 891, 894 (E.D. La. 2006); United States v. Sablan, 461 F. Supp.2d 1239 (D.Colo. 2006). Importantly, this is not a bell that can be unrung. By permitting his experts to review and rely on sealed materials, the defendant has tainted them, because their opinions are irreversibly based on information that the Court previously ruled was unavailable for the purposes of the Atkins hearing.

It is also clear that the Rule 12.2 materials that the defendant seeks to keep from the government are directly relevant the to the Atkins claim. Given the contents of Dr. Welner's February 1, 2012 letter, the administration of IQ testing and PET scanning, and the sentencing arguments offered by prior defense counsel, it is patent that the Rule 12.2 materials contain data that is germane to the Atkins determination. Because current

-14-

government counsel, unlike the defense, does not have access to
the Rule 12.2 materials it cannot state for sure, but the
government expects, as Dr. Welner describes, that the materials
he and his colleagues compiled contain "a very large quantity of
data points that inform both questions of [the defendant's]
intelligence and functional impairment," two of the three
components of making a mental retardation diagnosis.  As for the
third component, i.e., the onset of retardation before age 18,
certainly information collected and examinations performed within
2 or 3 years of the defendant's 18th birthday would be more
valuable than those conducted a dozen years later.  In fact, the
defendant's instant motion to limit the scope of the government's
proposed testing is quite critical of what it expects the
government to rely on to rebut a diagnosis of mild mental
retardation.  In particular, the defense argues that a
retrospective mental retardation diagnosis must focus the
defendant's IQ and adaptive functioning prior to the age of 18,
and argues that adaptive functioning testing is unreliable when
applied to a person who has been incarcerated for more than a
decade.  (Defendant's Brief (Br.), pp. 7-9).  By requesting that
the Court continue to seal the Rule 12.2 materials, however, the
defense prevents the government from obtaining access to the very
information that it contends would be probative of mental

retardation (*i.e.*, data collected within a few years of the defendant turning 18 and entering the prison system).

Finally, the government respectfully submits that allowing the defendant to proceed with his current plan to compel the government to defend an <u>Atkins</u> claim where it armed only with a portion of the relevant evidence is unreasonable and unfair. Although it may be true, as the Court noted in its February 13, 2012 decision (<u>see</u> Docket 625, p. 1), that the post-reversal posture of this case raises several issues of "first impression," it cannot be said that several other district courts have not faced pre-trial <u>Atkins</u> claims and resolved them by permitting prosecutors (or their fire-walled colleagues) the opportunity to use Rule 12.2 materials to rebut the claim.  <u>See</u>, <u>e.g.</u>, <u>United States v. Davis</u>, 611 F. Supp.2d 472 (D.Md. 2009); <u>United States v. Umana</u>, 08-CR-134 (W.D.N.C. March 19, 2010).

For all of these reasons, the government respectfully submits that the Court should reconsider its February 13, 2012 ruling and grant government counsel access to all of the Rule 12.2 materials because (1) the defendant has opened the door to the Rule 12.2 materials by revealing and using them to prepare his experts; (2) the materials contain information that is highly relevant and will therefore assist the Court in justly resolving the <u>Atkins</u> claim; and (3) it is unreasonable and unfair to permit

-16-

the defendant to withhold such information at an Atkins hearing where he bears the burden of proof.

## II. The Defendant's Objections to the Proposed Testing Methods are Without Merit and Premature

### A. As a General Matter, the Defendant's Proposed Restrictions Would Unfairly Restrict the Government's Ability to Assess the merits of the Defendant's Atkin's Claim

As with his plan to selectively pick and choose from the Rule 12.2 materials, the defendant simultaneously seeks to circumscribe the government's own access to such materials and its experts, and to limit and to disrupt the testing proposed by the government's experts, thereby limiting the government's ability to fully and fairly assess the merits of the defendant's Atkins claim, for which he bears the burden of proof.  The defendant's strategy is unreasonable and unfair and should not be permitted by the Court.  See United States v. Webster, 162 F.3d 308, 338-40 (5th Cir. 1998)(in the context of Rule 12.2 litigation, the government should be given a "fair opportunity" to rebut any of a defendant's mitigating evidence).  Given the significance of the defendant's claim of mental retardation, the government should be given a full opportunity to evaluate the defendant for the presence of any mental deficiency and its impact on sentencing.  Restricting the government now will certainly not assist the Court in making its determination, and

will likely leave the Court with a one-sided perspective of the analysis.

Significantly, despite his adamant objections, the defendant points to no harm or prejudice that can conceivably arise from the government's testing and interviews.  In other words, the defendant, who bears the burden, and who, at best, will be serving a sentence of life without the possibility of release, does not identify any prejudice that he will suffer because the government's experts ask him questions and apply testing scales with which he disagrees.  To the extent that the defendant objects to the government's methods, he may later move to preclude the government from offering certain evidence and may cross-examine the government's experts about the validity of their methods.

The court in United States v. Hardy, 644 F. Supp.2d 749, 751 (E.D.La. 2010), a case often cited by the defendant, was faced with a similar attempt by the defendant to limit the scope and conduct of the government's Atkins examination.  There, Hardy asked the court to limit the scope of the government's examination to matters of "cognitive functioning, hence no questions about the crime, allegations of remorse or lack thereof, or about testimony or evidence concerning the crime or the alleged unproven aggravators . . . because none have any bearing on the question of mental retardation."  Id. (internal

quotations omitted).  In refusing circumscribe the government's examination, the court ruled that it was not willing to "restrict the scope of the examination" because it was "simply not in a position to know what lines of inquiry are appropriate from the standpoint of the experts."  Id.  The court also ruled that, after the examination, defense counsel would be free to "lodge objections to the admissibility of whatever portions [of the interview] deemed inappropriate or violative of Hardy's rights, and also object to the admission of any conclusions by the government expert that it found to be based on improper lines of inquiry."  Id.  The government respectfully submits that the Court should employ the same reasoning to resolve the defendant's current objections.

> B.   The Defendant's Objections To The Government's Proposed
>      Use of Adaptive Functioning Analysis Is Without Merit

Turning to the specifics of the defendant's objections, the defendant's objection to the government's proposed use of adaptive functioning scales is entirely without merit.  As an initial matter, the government has provided the defendant with notice of the three experts it currently intends to use in its analysis of the defendant's mental retardation claim.[2]  As set

---

[2]    The government notes that the defendant has not provided it with any documents or reports that contain a conclusion that the defendant is mentally retarded.  For purposes of this memorandum, however, the government assumes that the defendant's experts have concluded or will conclude that the defendant is mildly mentally retarded.  (See Br. at 2 (". . . a

forth in various letters filed with the Court, the government has informed the defendant that it has retained Drs. Robert L. Denney, a board certified neuropsychologist and forensic neuropsychologist, Robert L. Mapou, a board certified clinical neuropsychologist, and Raymond Patterson, M.D., a board certified psychiatrist and forensic psychiatrist, to evaluate whether the defendant suffers from any degree of mental retardation. (See Government Letters dated March 7, April 2 and May 2, 2012). Additionally, the government has provided the defendant with *curriculum vitae* for each of these experts and, up to this point, the government has indicated that Drs. Denney and Mapou intend to interview the defendant.[3]

Having surmised that Dr. Denney intends to evaluate the defendant's adaptive functioning, i.e., his ability to function on a daily basis, by assessing him according to standardized adaptive living scales, including, to the extent possible, the Adaptive Behavior Assessment System – 2nd Edition ("ABAS-II") and

---

person with a mild intellectual disability, such as Mr. Wilson. . .)).

[3]     Dr. Mapou recently informed the government that he also desires an opportunity to interview the defendant for approximately one hour to conduct a general learning disability interview, in which Dr. Mapou would ask the defendant about his educational history. Dr. Mapou's preliminary review of the defendant's educational records indicates that the defendant may be suffering from a learning disability, a condition that could be highly relevant in any diagnosis of mental retardation. As noted, Dr. Mapou is clinical neuropsychologist who is qualified to screen individuals for learning disabilities.

Vineland Scales, (Br. 2), the defendant attacks the reliability of considering "self-reported" adaptive functioning for a variety of reasons.  (Br. 2-9).  The defendant notes that, if a defendant is in fact mentally retarded, he "may exaggerate [his] adaptive abilities to appear more competent."  (Br. 2 (citing United States v. Lewis, 2010 WL 5418901 *23 (N.D. Ohio Dec. 23, 2010)(a case in which Dr. Woods, one of the defendant's current experts, testified about the validity of this assertion)).  While the merits of "self-reporting" by individuals with mild mental retardation are debatable and are certainly dependent on individual circumstances, the defendant's objection is predicated on an assumption that the defendant is mentally retarded, a diagnosis that the government's experts have not yet been given full and fair opportunity to evaluate.

     The defendant's motion also misconstrues the government's brief statement about Dr. Denney's anticipated use of the ABAS-II and Vineland Adaptive functioning scales.  The defendant interprets the government's notice to indicate that Dr. Denney intends to place undue significance on the results of the defendant's performance on adaptive functioning testing.   Dr. Denney is an educated, experienced and accomplished neuropsychologist who has conducted 1000s of neuropsychological examinations and is eminently qualified to assess the relative value of the defendant's performance on either the ABAS-II or

-21-

Vineland scales.  He should be permitted to complete his evaluation of the defendant in a thorough and professional manner without limits.

Nevertheless, the defendant's motion demands that the Court simply prohibit the government's experts from employing any "self-reporting" methods to evaluate the defendant's adaptive functioning.  (Br. 2-9).  Such a categorical ban would not only be unreasonable because it would prevent the government's experts from conducting their own assessments, but it would be clearly at odds with the literature the defendant cites in support of his demand.  Indeed, the American Association on Intellectual and Developmental Disabilities (AAIDD) manual that the defendant relies upon in making his objection plainly states that "the authors of [the] Manual caution against relying only on the information obtained from the individual himself."[4]  (Br. 4)(citing AAIDD, Intellectual Disability: Definition, Classigication and System of Supports, pp. 51-52 (2010 11th

---

[4]     By no means is the government conceding that the AAIDD definition of mental retardation/intellectual disability should be applied to make the current Atkins determination.  Because the AAIDD is an advocacy group that advocates on behalf of the mentally retarded, and courts have "traditionally shown a healthy skepticism for research conducted by persons who have an interest in the outcome," some courts have determined that the more prudent course is to adopt the definition of mental retardation promulgated by the American Psychiatric Association as set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th Edition)("DSM-IV"), and reject the one offered by the AAIDD.  See United States v. Johnson, 2010 WL 4659587 (E.D.La. 2010).

Ed.)(emphasis supplied).  Accordingly, the AAIDD Manual does not indicate that "self-reporting" should never be used, but only that clinicians should use caution before relying heavily on such data.  To the extent that the government expects that its experts will rely on, or even obtain, "self-reported" evidence, it is confident those same experts are amply qualified to afford such data the appropriate amount of significance, consistent with their training and experience as well as the relevant scientific literature.

The defendant likewise overstates the significance court's holding in <u>Lewis</u>, suggesting that the court there ruled categorically that "self-reporting by a person . . . with mild intellectual disability should not be permitted." (Br. 4). While it may be true that the court <u>Lewis</u> was not particularly impressed with the self-reported evidence, the court did permit the government's experts the opportunity to collect such information and testify about their views concerning its significance. <u>Lewis</u>, 2010 WL 5418901 *23.  And again, as of this point, there remains an open question about whether the defendant suffers from any form of intellectual disability, mild or otherwise.

The defendant also objects to the government's use of any instrument to measure adaptive functioning on the premise that such analysis has not "been appropriately normed for . . . a

-23-

group of individuals with intellectual disability." (Br. 5). This objection is similarly inaccurate and premature. The government expects that its experts will disagree with the substance of this objection altogether and again, they should be permitted a full and fair opportunity to evaluate the defendant and later defend their methods and findings at the scheduled hearing. Apart from this disagreement, however, the government notes that this objection is again predicated on the unproven assertion that the defendant is, in fact, mildly retarded.

The defendant also argues that the government experts should not be permitted to rely on adaptive functioning tests as the defendant has been incarcerated since 2003, and "[a]ssessing deficits in adaptive functioning among prisoners is . . . complicated because no measures of adaptive functioning have been designed or normed for the use with prisoners." (Br. 6-7)(citations and internal quotations omitted). To this, the government notes that its experts are aware of the potential challenges incarceration may present, but they are confident that an assessment can be made.[5]

---

[5]   That adaptive function evaluations are difficult to conduct on individuals who have been incarcerated for extended periods of time is yet another reason why the government should be permitted access to the Rule 12.2 materials that were compiled between 2003 and 2006.

B.    The Defendant's Objections to the Scope and Number of
      Exams are Meritless

Despite having recently noticed four psychiatric and
neuropsychological experts, at least two of which have already
examined the defendant, the defendant objects to the government's
requests that Drs. Denney and Patterson interview him.  (Br.
11).  To advance this argument, the defendant relies on United
States v. Fell, 372 F. Supp.2d 753, 761 (D.Vermont 2005), where
the court indicated, in the context of Rule 12.2, that the Rule
permits the government "to select one expert, not three."  What
the defendant neglects to inform this Court, however, is that as
of the date of the Fell decision, two government experts had
already interviewed the defendant, and the court permitted a
third expert, Dr. Michael Welner, M.D., the opportunity to
interview Fell "concerning his mental condition at the time of
the alleged offense."  Id.  Given the fact that the defendant has
been examined by at least two of his own experts, combined with
his intent to use information generated during two prior
examinations conducted by defense experts (Drs. Sandy Drob and
Monte Bushbaum), the government respectfully submits that it is
only fair and reasonable to permit the government to have its
neuropsychologists and psychiatrist interview the defendant, just
as his own experts did.

The defendant also contends that an examination by Dr.
Patterson would be "unnecessary and irrelevant" because Dr.

-25-

Patterson's *curriculum vitae* does not provide the defendant with sufficient confidence that Dr. Patterson has "any expertise in intellectual disability evaluations."[6]  (Br. 11).  During the Atkins hearing, the government is certain that it will be able to demonstrate that Dr. Patterson is exceedingly qualified to evaluate the defendant for mental retardation.  Of course, it is not the defendant, but the Court who decides whether a witness is qualified to testify as an expert.  United States v. Bermudez, 526 F.2d 89 (2d Cir. 1975)(district court judge has quite wide discretion in determining the qualification and competency of a witness to express an opinion as an expert).

Concerning the scope of the proposed interviews, the defendant first argues that the government's experts should not be permitted to question the defendant about his current living situation and issues related to his current mental status.  (Br.

---

[6]    The defendant has previously indicated that he will be calling a psychiatrist, Dr. George Woods, to testify regarding "disparate medical and psychological data . . . to explain the evidence and to show its relevance to mental retardation" in support of an "intellectual functioning component of a mental retardation diagnosis."  Defendant's March 7, 2012 Letter, p. 3.  As part of that process, Dr. Woods will "review Mr. Wilson's strengths and weaknesses and determine whether he meets all the criteria for a diagnosis of mental retardation."  Id.  Moreover, Dr. Woods has, to the government's knowledge, already conducted a psychiatric interview of the defendant in which he had "administered a trail making test, a neurological questionnaire, and a review of systems test and "several screening neurological tests."  Id. at 4; Defendant's March 23, 2012 Letter to the Court, p. 1.

-26-

12).  The defendant cites no real authority, legal, psychological or otherwise, for this position.  The defendant simply provides authority for the traditional parameters of an <u>Atkins</u> hearing and an anecdotal reference to a case where the court was underwhelmed by the government's reliance on evidence of the defendant's current functioning.  (Br. 12-13)(citing <u>United States v. Smith</u>, 790 F. Supp.2d 482 (E.D.La. 2011)).  The government expects that its experts will place the appropriate amount of reliance on information concerning the defendant's current circumstances in formulating their opinions about whether he is mentally retarded. Certainly, if the government's experts inappropriately consider the significance of the defendant's current functioning, such improprieties can be brought to the Court's attention in a later-filed motion <u>in</u> <u>limine</u> or during cross-examination.

        Relatedly, the defendant asserts that the government's experts should be prohibited from reviewing and relying upon the defendant's criminal history and prison records in evaluating whether he is mentally retarded.  (Br. 13).  Citing multiple forms of scientific and legal authority questioning the validity of such materials, the defendant argues that such information is unreliable if not irrelevant to the question of mental retardation.  Put simply, the governments experts (who have vast experience evaluating incarcerated individuals) disagree with the defendant's assessment of the value of this information, and are

-27-

certainly qualified and prepared to defend their respective
positions during an <u>Atkins</u> hearing, which is the proper forum for
the defendant's challenges to such opinions.  Nevertheless,
contrary to the defendant's current position, criminal history
and prison records are recognized as fertile areas for experts
seeking evidence of an individual's adaptive functioning:

> Information obtained from an evaluee's
> records often provides one of the most
> valuable sources of data in an *Atkins*
> evaluation.  Records regarding a defendant's
> family history, medical history, school
> history, employment history, social history,
> criminal history, and previous incarcerations
> can be quite illuminating regarding
> historical adaptive functioning in the
> community in range of contexts.

MacVaugh, G. and Cunningham, M., <u>Atkins v. Virginia: Implications</u>
<u>and recommendations for forensic practice</u>, The Journal of
Psychiatry and Law, Volume 37, p. 162 (2009); <u>see also</u> AAIDD,
<u>Intellectual Disability</u>, pp. 94-96 ("A thorough history is
essential for diagnosis, classification, and supports planning in
ID . . . the clinician should take a holistic approach that
focuses on the individual's limitations).  Indeed, when defense
counsel advised the Court of the efforts his team were
undertaking to prepare the current <u>Atkins</u> claim, he acknowledged:

> "We're also trying to collect records and
> filling gaps in records which reflect [the
> defendant's] behavior in jails, in hospitals,
> in schools, in all kinds of situations where
> records were kept at a time when no one had
> any motive to make claims that were false, by
> which I mean the didn't anticipate he would

-28-

be facing capital charges and potentially
making this Atkins claim."

(Transcript of November 9, 2011 Status Hearing, Docket #581, p.
4).  In short, review of criminal and prison records should be
part of any expert's comprehensive evaluation of the defendant
for mental retardation.

The defendant also contends that his Fifth Amendment
rights could be violated if he is compelled to answer questions
about his past criminal conduct in the course of the government's
examinations.[7]  This claim is meritless.

A defendant cannot present expert testimony on his
mental condition and yet refuse, on Fifth Amendment grounds, to
answer questions put to him by the government's experts.  Fed. R.
Crim. P. 12.2(c)(1)(B); United States v. Bartelho, 129 F.3d 663,
673-74 (1st Cir. 1997).  In other words, a defendant who puts his
mental state at issue with psychological evidence may not then
use the Fifth Amendment to bar the government from rebutting in

---

[7]   In making this argument, the defendant makes passing
reference to a potential Sixth Amendment violation (Br. 15),
predicated on a denial of the defendant's right to counsel and
ineffective assistance of counsel.  As discussed below, a
defendant's right to counsel is not violated simply because
counsel is not present during the government's mental
examination.  Otherwise, the defendant fails to articulate how
following well-established procedures for advancing a psychiatric
defense amounts to ineffective assistance of counsel.  See, e.g.,
Porter v. McCollum, ___ U.S. ___, 130 S.Ct. 447 (2009)(finding
that defense counsel was ineffective because failed to present
any meaningful mitigation evidence concerning mental health, war
experience, poor education and family instability).

-29-

kind.  Schneider v. Lynaugh, 835 F.2d 570, 575 (5th Cir. 1988).

In Buchanan v. Kentucky, 483 U.S. 402, 422-23, 107 S.Ct. 2906 (1987), the Supreme Court held that "if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."  Id. at 422-23, 107 S.Ct. 2906. This rule rests upon the premise that it is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective, and sometimes the only, means of rebuttal. Schneider at 576.  This is a different situation from admitting a defendant's statements during a pretrial psychological examination where the defendant is not advised that he has a right to remain silent and that any statement he makes could be used against him in court.  See Estelle v. Smith, 451 U.S. 454, 461-69 (1981).  As the government's experts believe that questioning the defendant about his past criminal behavior and periods of incarceration is relevant to their evaluation of mental retardation, such questioning should be permitted to allow the government to prepare a fair rebuttal to the defendant's Atkins claim.  Moreover, because the defendant's prior criminal history was exhaustively vetted and litigated during the first trial and sentencing proceeding, his fear that the government

will learn of additional criminal activity is not only entirely
speculative but improbable.  In any event, to the extent that the
defendant reveals additional criminal activity during these
Atkins evaluations, the defendant, as he concedes (Br. 15-16),
reserves the right to seek preclusion of such matters at
sentencing.

Finally, the defendant demands more specificity
regarding certain malingering tests that Dr. Denney intends to
administer during the course of his examination of the defendant
(Br. 16).  Dr. Denney has advised that he is unwilling to
disclose the names of the malingering tests that he may use with
the defendant because identifying the names of the tests would
permit the defendant to prepare for such testing, thereby
undermining the tests' effectiveness.  In addition, given the
anticipated fluidity of the neuropsychological interview, Dr.
Denney is currently unable to identify which malingering tests he
will employ because that decision will be dependant on the
circumstance of the interview.  As with the defendant's many
other objections, if he later determines that any malingering
tests or reading comprehension tests were irrelevant or produced
unreliable results, such matters can be brought to the Court's
attention during cross-examination.

C.    Requiring the Defense Counsel's Presence During the
      Government's Interviews Will Interfere with the
      Government's Evaluation

Notwithstanding that the defendant failed to invite
government counsel to its interviews and testing (and failed to
videotape them), the defendant now demands that his attorney be
present when government experts examine the defendant (and that
the interviews be videotaped).[8]  (Br. 17).  The defendant also
claims that his attorney's presence is necessary to protect his
Fifth and Sixth Amendment rights.  (Br. 17-18).

As a threshold matter, the government's experts have
expressed a desire to conduct their examinations of the defendant
without the presence of defense counsel because the presence of
third parties during examinations can be disruptive and have
adverse effects on the performance and outcome of the evaluation.[9]

_____

[8]    It is current government counsel's understanding that
defense attorneys did not attend the government examinations
performed before the defendant's 2006 trial.  Those examinations
were videotaped, a practice that was clearly known to current
counsel when they opted not to videotape the latest round of
defense examinations.

[9]    Several Courts of Appeals decisions have been premised
on the potential harm that an attorney or even investigator may
bring with him or her to attend a mental health interview or
testing session.  United States v. Byers, 740 F.2d 1104, 1122
(D.C. Cir. 1983), cert. denied, 464 U.S. 1046 (1984) (en banc
plurality opinion); United States v. Cohen, 530 F.2d 43, 48 (5th
Cir.), cert. denied, 429 U.S. 855 (1976); United States v.
Greene, 497 F.2d 1068, 1079-80 (7th Cir. 1974), cert. denied, 420
U.S. 909 (1975); United States v. Albright, 388 F.2d 719, 726
(4th Cir. 1968).  Indeed, other district court cases have also
reached this conclusion.  Rogers v. Director, TDCJ-ID, 864 F.
Supp. 584, 594 (E.D. Tex. 1994), aff'd sub nom. Rogers v. Scott,

Certainly, the neuropsychological literature supports this argument. See Eastvold, A., Belanger, G. & Vanderploeg, D., <u>Does a Third Party Observed Affect Neuropsychological Test Performance?  It Depends</u>, The Clinical Neuropsychologist, p. 16 (2012)(meta-analytic review supporting position that third-party observers should not be permitted during neuropsychological testing because such presence has a measurable effect on task performance).

Moreover, as detailed above, when the defendant puts his mental state at issue with psychological evidence he may not then use the Fifth Amendment to bar the government from rebutting the allegation.  Thus, the absence of the defendant's attorney during the government-conducted examinations will not violate his Fifth Amendment rights.  Indeed, the Fifth Amendment creates no entitlement to the presence of counsel.  As the Supreme Court made clear in <u>Estelle v. Smith</u>, the Fifth Amendment simply requires that the defendant be *advised* at the commencement of the examinations of his rights to remain silent and to consult with counsel, and that whatever he says in the examinations could be used against him.  See 451 U.S. at 466-69.

---

70 F.3d 340 (5th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1235 (1976); <u>Godfrey v. Francis</u>, 613 F. Supp. 747 (N.D. Ga. 1985), <u>aff'd sub nom. Godfrey v. Kemp</u>, 836 F.2d 1557 (11th Cir.), <u>reh'g denied</u>, 842 F.2d 339, <u>cert. dismissed sub nom.</u>, <u>Zant v. Godfrey</u>, 487 U.S. 1264 (1988).

With respect to the Sixth Amendment, the defendant incorrectly asserts that he is "entitled to have counsel present at the government examinations to advise him and to interpose appropriate objections." (Br. 18). The Supreme Court rejected a similar Sixth Amendment argument in Buchanan, where the defendant claimed a violation because his attorney did not attend a psychiatric evaluation, which the attorney requested in the hope of establishing that the defendant suffered from a mental condition:

> Given our decision in [Estelle v. Smith], . . . counsel was certainly on notice that if, as appears to be the case, he intended to put on a "mental status" defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal. In these circumstances, ... there was no Sixth Amendment violation.

483 U.S. at 423-425. The Second Circuit reached a similar conclusion in Hollis v. Smith, 571 F.2d 685 (2d Cir. 1978), where the court held that the accused was not entitled to the presence of counsel at a post-conviction psychiatric examination that was incident to the determination of punishment for a sex offender. Id. at 691-92. The Court noted that the presence of a third party, such as counsel, at such an examination would undermine the effectiveness of the interview, concluding that it "is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's

-34-

questions and advising his client not to answer this question and that." Id. at 692.  Likewise, in United States v. Trapnell, 495 F.2d 22, 24-25 (2d Cir. 1974), the court held that there is no right to counsel at a psychiatric examination, as the presence of counsel could destroy the effectiveness of the examination. See also United States v. Baird, 414 F.2d 700, 711-12 (2d Cir. 1969) (holding that a pretrial court-ordered psychiatric examination does not constitute the kind of critical stage in a criminal proceeding at which the assistance of counsel is needed or at which counsel can make a useful contribution).

As in Buchanan, the defendant here will be on actual notice of the psychiatric and psychological evidence addressing the mental retardation claim.  Thus, there can be no Sixth Amendment violation, as the government will ensure that the defendant is advised accordingly at the commencement of the examinations, bearing in mind that any refusal by the defendant to cooperate in the examinations would provide the Court with cause to bar the defense evidence to which the government's examination relates.

III. <u>Conclusion</u>

For the reasons set forth above, the government's motion to reconsider the Court's February 13, 2012 decision should be granted, and the defendant's motion to restrict the government's proposed testing in connection with the Atkins hearing should be denied in its entirety.

Dated:    May 30, 2012

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York


                    By:  _____/s/_____
                              James G. McGovern
                              Shreve Ariail
                              Carter H. Burwell
                              Assistant United States Attorneys
                              (718) 254-6293/6616/6313

cc:  Michael Burt, Esq.
     David Stern, Esq.
     Colleen Brady, Esq.
     Beverley Van Ness, Esq.

-36-