UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA

    -against-                                      Docket No.  04 CR 1016 (S-2) (NGG)

RONELL WILSON,

    Defendant.

---------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN RESPONSE TO GOVERNMENT'S MOTION TO RECONSIDER COURT'S PRIOR ORDER CONCERNING DEFENDANT'S 2006 12.2 NOTICE, AND IN SUPPORT OF DEFENDANT'S MOTION CONCERNING GOVERNMENT'S PROPOSED TESTING AND PROCEDURES FOR UPCOMING <u>ATKINS</u> HEARING**

MICHAEL N. BURT
Law Office of Michael Burt
1000 Brannan Street Suite 400
San Francisco, California 94103

DAVID S. STERN
COLLEEN BRADY
*Attorneys for Defendant
Ronell Wilson*

Beverly Van Ness, Of Counsel

**INTRODUCTION**

On May 31, 2012, the government filed a memorandum (ECF # 723) supporting its motion for reconsideration of the Court's Memorandum & Order dated February 13, 2012 (ECF #625). That Order precluded the government from reviewing reports and related material generated in connection with Mr. Wilson's prior, withdrawn12.2 notice. It also prohibited the government from relying on experts in the Atkins litigation that it had retained in connection with the 12.2 notice that was filed in connection with his trial. In its memorandum, the government also responded to the defense motion, dated May 14, 2012 (ECF #718), objecting to certain tests the government's experts contemplated administering to Mr. Wilson, and raising other issues associated with government testing and interviews. See ECF #723. This memorandum addresses both subjects.

**I.   THE GOVERNMENT'S MOTION FOR RECONSIDERATION SHOULD BE DENIED**.

Local Criminal Rule 49.1(d), effective March 29, 2012, provides that a motion for reconsideration must set forth "the matters or controlling decisions which counsel believes the Court has overlooked." This language is identical to that in its civil counterpart, Local Rule 6.3. As this Court has noted, the movant must "'demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.'" Equal Employment Opportunity Commission v. Federal Express Corporation, 268 F.Supp.2d 192, 195 (E.D.N.Y. 2003) (citing cases). The Rule is "strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." Id.; see also, e.g., this Court's decision in United States v. Goldenberg, 2006 WL 1229152 (E.D.N.Y. 2006) (the overlooked facts or

1

decisions relied on by the movant should reasonably be expected to alter the court's initial decision).

Here, the government cites virtually no authority at all in its motion for reconsideration, much less controlling authority.[1] Nor has the government cited any factual matters or arguments not previously raised, except as follows: It contends that the defense has "selectively violated the sealing order" by disclosing, in its Atkins expert notice dated March 7, 2012, that its experts would review certain "sealed information": namely, a 2003 IQ test administered by Dr. Drob, and a PET scan made in 2005 by Dr. Buchsbaum.[2] This, the government contends, "open[s] the door" to review by the government of all the prior expert reports and related material (govt. MOL, pp. 1, 2, 12-14).[3]

Notably, however, the Court's prior order did not deny access to these reports by defense

---

[1] The cases it cites on p. 15 of its memorandum simply hold that the defendant bears the burden of proof that he is a person with mental retardation, by a preponderance. This sheds no light whatsoever on what documents the government can review in connection with the issue, nor does it remotely suggest that it is "unfair" to deny it access to documents relating to a prior, withdrawn, 12.2 notice that did not reference mental retardation. The only other cases the government cites, on p. 16, do not support the proposition for which they are cited – they have nothing to do with "12.2 materials." And, even if they were helpful to the government, it was free to cite them when the motion was originally before the Court (they do not post-date the Court's decision) and did not do so. The Court did not "overlook" these opinions (Local Criminal Rule 49.1(d)) because its attention was never called to them, nor can they possibly be construed as "controlling" (id.).

[2] This material has been provided to the government (see defense Atkins expert notice, dated March 7, 2012, pp. 4-5). Moreover, the government has long had possession of all the historical IQ data that exists (id., p. 5 at n.1), as well as hundreds of pages of records introduced during the penalty phase, supplemented by educational and psychiatric records supplied to the defense mental retardation experts and turned over to the government.

[3] Page numbers refer to the pages of the memorandum itself, in the bottom margin, not to the ECF filing numbers for document #723, at the top of each page.

counsel. Indeed, it is abundantly clear from the prior papers filed and oral argument of the motion that defense counsel has all of the "12.2 material" and that they have not sealed themselves off from it. The prior defense team acquired documents during its investigation of the case, and retained experts in anticipation of presenting "mental condition" evidence relevant to punishment. Present defense counsel's review of all the reports, and the documents on which they were based, is mandated by Mr. Wilson's Sixth Amendment right to the effective assistance of counsel, and is also in keeping with the seriatim procedures set forth in Rule 12.2(b) and (c).

Moreover, the statements Mr. Wilson made during any examination or interview previously conducted by the government, as a result of the filing of the (later withdrawn)12.2 notice, are obviously reviewable by his attorneys. Such review does not violate Mr. Wilson's Fifth Amendment rights or Rule 12.2. Rather, it is only the government which is precluded from using these statements against him. See U.S. Const., Amend. V; Rule 12.2 (c)(4). When Mr. Wilson submitted to Dr. Welner's interview in 2006, both the Fifth Amendment and the statute barred any use of his statements against him absent fulfillment of a specific condition precedent: his presentation of expert testimony, at a capital sentencing hearing, on an issue regarding his mental condition. See Rule 12.2 (c)(4). That condition was not satisfied in this case, and when Mr. Wilson withdrew his 12.2 notice, the trial prosecutors were prohibited from any use or derivative use of these materials.[4] Cf. United States v. Harrington, 923 F. 2d 1371, 1377 (9th

---

[4] In direct violation of the Rule and this Court's orders based thereon, the government again offers the letter of Dr. Welner to convince the Court that Welner's examination is somehow relevant to the issue of mild mental retardation. This derivative use of Welner's examination should not be permitted. See United States v. Nanni, 59 F.3d 1425, 1431 (2d Cir. 1995) ("The government's direct use of immunized testimony by, for example, presenting it at a trial of the witness who gave it or by referring to it in an application for court authorization to obtain evidence against the witness, is plainly a violation of the witness's Fifth Amendment

Cir.1991) (holding that statements made by defendant during court-ordered mental examination could not later be used against him because state statute provided that such statements would remain confidential).

By its terms, and properly, the Court's February 13th order, which the government now seeks to undo, prohibited only the government from reviewing the expert reports and related 12.2 documents. See Order, ECF #625, at p. 7. In a comprehensive opinion, the Court determined that since the prior 12.2 notice was withdrawn, and no expert evidence relating to defendant's mental condition was presented at the penalty proceeding, the government was denied access to the 12.2 material in connection with an Atkins hearing; the Court determined that such a hearing is distinct from a "capital sentencing hearing" referenced in Rule 12.2, and that the Rule provided no authority for disclosure to the prosecutors absent satisfaction of the necessary condition precedent: the defendant's introduction at the sentencing hearing of expert evidence concerning his mental condition. See Order, pp. 4-7.

In an effort to overturn the Court's decision, the government speculates that defense counsel is acting in bad faith, selectively picking from the pile only those documents it believes will be helpful to establish his mental retardation, and burying the rest. It complains that this is "unfair and prevents the government from fully defending the Atkins claim" (MOL, pp. 10, 14).

This is yet another attempt to impugn counsel's credibility, without any basis.

Further, there is nothing unfair about it. The defense will turn over all the material it provides to its own Atkins experts, and the government is free to give its experts any fruits of its own investigation that it chooses, excluding only the documents that were disclosed or generated

---

rights.")

solely in connection with defendant's prior 12.2 notice, which are protected. The government acts as if it is without resources, and can only blindly pass on what the defense gives it. On the contrary, however, the government indicted Mr. Wilson in 2003 and it has conducted an intensive and far-reaching investigation as to both guilt and penalty. It has the trial and penalty transcripts, and the exhibits introduced by both sides, and all of defendant's jail and prison records, and 3500 material for its witnesses, and a vast array of other records. It has law enforcement personnel at its disposal, and subpoena power, and an array of prosecutorial tools with which to gather information. Mr. Wilson's sentence was vacated in June, 2010, and the current prosecutorial team had the opportunity to review its files and conduct additional investigations long before a mental retardation claim was raised as a possibility.

The government has also retained three new experts to address the Atkins claim, with whom the prosecutors have been working for some time. Those experts have told the prosecutors what tests they want to administer, and what they would like to interview Mr. Wilson about. The defense has raised certain objections (discussed below), and the Court will rule. If the Court sides with the government, it will have everything it has asked for. If the Court sides with the defense, the precluded tests or interview subjects will not, in the Court's opinion, be appropriate for its Atkins determination. In either event, the government will suffer no prejudice from not being able to review prior tests or interviews conducted by other experts.

As we noted in our initial motion papers, defendant's mental retardation was not in issue at the prior penalty proceeding. In a speculative effort to suggest the relevancy of Dr. Welner's interview and its prior experts' reports, the government argues that mental retardation was before the jury (MOL, pp. 10-11). In support, it cites two instances during defense counsel's penalty

5

summation where she described Mr. Wilson as "borderline mentally retarded" (MOL, p. 11). The jury had before it documents reflecting numerous historical IQ tests given to Mr. Wilson, buried among hundreds of pages of records submitted as Defense Exhibit W. However, the defense did not adduce any evidence about mental retardation at the proceeding, expert or otherwise. (Nor had the defense ever sought a pretrial ruling from the Court barring the death penalty on the ground that Mr. Wilson was mentally retarded). The brief summation references the government now seizes on were clearly a misstatement. In any event, the government's attempt to argue the relevancy of the previous expert reports is misguided, because the issue here is one of privilege, not relevancy.

The government, in short, is not at all hamstrung by the Court's 12.2 Order. It has a full and fair opportunity to investigate the mental retardation claim and prepare to rebut it, with experts it believes are well-qualified to address the issue. Since it has advanced no basis for the Court to reverse its Order, the motion to reconsider should be denied.

II.    **THE DEFENDANT'S MOTION CONCERNING PROPOSED GOVERNMENT TESTING AND PROCEDURES SHOULD BE GRANTED**.

We will not restate the arguments set forth in our motion as to either the invalidity of administering adaptive behavior scales to Mr. Wilson or interviewing him about his adaptive functioning in a prison environment; the irrelevancy of Dr. Patterson's proposed examination to detect DSM-IV disorders -- which, whether or not found, do not exclude a diagnosis of mental retardation; and the irrelevancy and dangers of interviewing Mr. Wilson about his criminal history. All of these arguments in the defense motion are well-supported by specific authority, including the AAIDD manual, recent mental retardation literature and relevant case law. See ECF

6

#718, pp. 2-16.

The government brushes all of this authority, and the analysis that accompanies it, aside. It merely assures the Court that its experts know what they are doing and should be left alone, to test and interview however they see fit. See, generally, govt. MOL, pp. 17-35. It cites one case to support this position, United States v. Hardy, 644 F.Supp.2d 749, 751 (E.D.La. 2010) (MOL, pp. 18-19). The government does not say, and we do not know, what specific arguments were made by the defense in that case, or on what authorities it relied. This Court will make its own determination based on the arguments and authorities advanced by Mr. Wilson, and the government's response. Notably, the government cites virtually no supporting authority for any of its specific contentions (versus general propositions untethered to Atkins claims).

Moreover, some of the government's citations are misleading. First, citing MacVaugh, G. and Cunningham, M., Atkins v. Virginia: Implications and recommendations for forensic practice, The Journal of Psychiatry and Law, Volume 37, p. 162 (2009), the government claims that "criminal history and prison records are recognized as fertile areas for experts seeking evidence of an individual's adaptive functioning." (govt. MOL, p. 28). The defense agrees that, as stated in the portion of the article quoted by the government, " [r]ecords regarding a defendant's family history, medical history, school history, employment history, social history, criminal history, and previous incarcerations can be quite illuminating regarding historical adaptive functioning in the community in range of contexts" (govt. MOL, p. 28 [emphasis added]). However, the government fails to mention that the article goes on to state that

> an assessment of a particular inmate's adaptive behavior while in a
> highly-structured prison environment has very limited
> correspondence to the adaptive demands of the open community,

7

> whether or not the offender's adaptation is compared with other inmates. It is the discrepancy in adaptive capability as compared to persons in the open community that demonstrates the functional expression of intellectual deficiency. Comparisons become near meaningless when the adaptive demands are profoundly minimized by institutionalization and where the institution itself functions to provide pervasive "assistance."

Atkins Journal article, p. 161.

It is exactly to avoid such "meaningless" comparisons that the defense seeks an order limiting the scope of the government's adaptive functioning assessment to functioning in the community prior to the age of 18, not current or post-arrest functioning in a correctional setting.

The government also fails to mention that the article's authors state that "'criminal adaptive behavior' is not a concept that has passed peer review or been accepted by the professional psychiatric and psychological community. It is not a concept that has been found useful as part of a diagnostic scheme for this disorder." Atkins Journal article, p. 166. The authors also specifically caution:

> Evaluators are discouraged from utilizing criminal behavior to ascertain the presence or absence of deficits in adaptive functioning. Evaluators are also discouraged from relying exclusively on data obtained regarding a defendant's behavior within the context of the alleged capital offense, which could result in grave ethical and practice implications. Forensic examiners are cautioned against allowing their Atkins access to the defendant to serve as a pretext for a custodial interrogation for purposes of trial.

Id., p. 169.

In accordance with this article, cited by the government itself as authoritative, as well as the additional authorities relied on by the defense in its motion, the defense asks the Court to prohibit the government experts from interviewing Mr. Wilson about his criminal behavior, either

8

for the offenses for which he stands convicted or any prior or subsequent offense.

We also note that the government has both denigrated the American Association on Intellectual and Developmental Disabilities (AAIDD) (MOL. p. 22, n. 4), and yet relied on the AAIDD manual when it suits its purposes (MOL, pp. 22, 28). When it seeks to discredit the AAIDD, and its definition of mental retardation/intellectual disability, the government portrays the Association as a biased "advocacy group" (MOL, p. 22, n. 4). The government states that "some courts" have actually disavowed the AAIDD definition, but cites only one, United States v. Johnson, 2010 WL 4659587 (E.D.La. 2010) (id.).[5] This is not a District Court decision. Rather, the language on which the government relies comes from a post-hearing memorandum filed by the government in [Johnson/]Smith. A prosecutor's bald assertion in another case is thus converted into legal authority by the government here.

Moreover, the Court in Smith not only did not disavow the AAIDD definition, the Court embraced it. 790 F.Supp.2d 482, 489. The Court cited and discussed both this definition and the one promulgated by the American Psychiatric Association that is mentioned in the government's memorandum (p. 22, n.4). See Smith, 790 F.Supp.2d at 484-86. As the Supreme Court itself has recognized, the two definitions are similar. Atkins v. Virginia, 536 U.S. 304, 317-18 (2002).[6]

---

[5] John Johnson was the lead defendant in a case in which one of his co-defendants, Joseph Smith, raised and prevailed on an Atkins claim. United States v. Smith, 790 F.Supp.2d 482 (E.D.La. 2011). The docket number for both defendants is the same (Criminal Action No. 04-017), and some of the pleadings for Smith are evidently listed in the lead defendant's name. However, Mr. Johnson did not seek Atkins relief.

[6] The Court did not cite the AAIDD definition, but, rather, the definition used by the American Association on Mental Retardation ("AAMR"); subsequent to the Supreme Court's decision in Atkins, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities. See Smith, supra, 790 F.Supp.2d at 484.

9

Both definitions were cited with approval.  Id.

On the issue of whether adaptive functioning tests should be administered to Mr. Wilson, the government argues that "defendant's objection is predicated on an assumption that [he] is mentally retarded," a finding that has not yet been made (MOL, p. 21).  This ignores a principal argument we have made to support our objection: that the self-report versions of the ABAS-II and Vineland-II have not been normed on a sample containing intellectually-disabled individuals (see defense MOL, pp. 5-6).  This point holds true regardless of whether Mr. Wilson himself is intellectually disabled.  If the test has not been normed on an intellectually-disabled sample, then it cannot possibly be used to reliably distinguish between those who are intellectually disabled and those who are not.  For example, a self report cutoff score of 70 has meaning only if those with intellectual disability score 70 or lower on the test.

Next, the government not only advocates having two of its experts conduct lengthy -- and repetitive -- interviews of the defendant, on a virtually limitless series of topics (see defense MOL, ECF #718, p. 10, quoting government's proposed interviews by Dr. Denney and Dr. Patterson ), it now proposes that its third expert should interview Mr. Wilson as well (govt. MOL, p. 20 at n. 3). It erroneously states that we seek to preclude its experts from reviewing and relying on Mr. Wilson's criminal history and records (MOL, pp. 27-29), when we only objected to Mr. Wilson being interviewed about this subject (defense MOL, pp. 14-16).  The government has obtained the defendant's criminal records on its own, and introduced them into evidence during the prior proceeding in support of the future danger aggravator.  If the prosecutors want their experts to review these documents, that is up to them.

The government has also refused to identify additional tests that might be administered by

its experts because -- attempting, once again, to impugn defense counsel's integrity -- it asserts the defense will then coach Mr. Wilson on how to respond (MOL, p. 31). The defense has provided specific notice to the government of every test its experts plan to give, and there is no reason why its experts cannot do the same. Indeed, that was a primary purpose of the parties' respective expert notices – the government would know the parameters of defense testing in order to decide what is relevant rebuttal, and the defense would get notice of proposed government testing so that it could lodge appropriate objections, if any. Such specific testing notice was agreed to by the government, and so ordered by the Court (see scheduling order, ECF #618, p. 2).

       The government would entirely suspend the defendant's Fifth Amendment privilege and his Sixth Amendment right to counsel simply because he filed an Atkins notice (MOL, pp. 32-35). It ignores our offer to sit out of defendant's sight to avoid distraction (defense MOL, p. 18), apparently taking the position that counsel's presence is necessarily "disruptive"(govt. MOL, p. 32), even if Mr. Wilson cannot see the attorney. However, the government poses no objection to our alternative requests to, at least, be present nearby with a live audio feed, and to videotape the examinations (id.). Notably, the latter procedures were used during the previous 12.2 examination, as the government acknowledges (MOL, p. 32, n. 9), without any problems. There is ample authority supporting such procedures. See United States v. Fell, 372 F. Supp. 2d 753, 761 (D. Vt. 2005); United States v. Johnson, 362 F.Supp.2d 1043, 1091 (N.D. Iowa 2005); United States v. Sampson, 335 F. Supp. 2d 166, 247-248 (D. Mass. 2004). Indeed, in connection with the prior 12.2 notice, this Court specifically ruled that "certain procedures will need to be worked out in connection with the testing so that the court and the Defendant are certain that Wilson's Fifth and Sixth Amendment rights are protected." United States v. Wilson, 493 F. Supp. 2d 348,

11

360 (E.D.N.Y. 2006).

The government even refuses to stipulate that any statements made by Mr. Wilson during government testing and interviewing, and any fruits thereof, may not be used against him in any proceeding – including a possible penalty re-trial – except the Atkins hearing, and then only insofar as his statements bear on whether he is a person with mental retardation (see defense motion, ECF #718, pp. 14-16). The only points which it apparently accepts -- since it did not respond to them -- are our requests that government examinations and interviews be videotaped, and that, if counsel is excluded from the room, arrangements be made for them to be nearby with a live audio feed (see id., pp. 18-19). As noted, these procedures were used during the government's prior 12.2 examinations. To the extent the government complains that defense examinations have not been videotaped, we remind the government that it has no Fifth and Sixth Amendment protection. See United States v. Edelin, 134 F.Supp.2d 45, 59 (D.D.C.2001) ("Defendant Edelin shall not be required to videotape, record, or otherwise memorialize the testing done by his expert mental health witnesses. The Government has not provided the Court with any legal authority for its request to videotape the defense mental health examination, and the Court DENIES the Government's request for a recording of the defense examination."); United States v. Beckford, 962 F.Supp. 748, 765-766. (E.D.Va.1997) (same).

## CONCLUSION

For the reasons stated, Mr. Wilson respectfully asks this Court to deny the government's motion to reconsider and to grant the relief requested in his motion dated May 14, 1012.

Dated: June 8, 2012

12

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the aforegoing Reply were served electronically on June 8, 2012, by filing a copy of same through the court's electronic filing system.

_____/ s /_____

MICHAEL N. BURT