UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

RONELL WILSON,

Defendant.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**04-CR-1016 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

In September, this court will hold an evidentiary hearing on whether Defendant Ronell Wilson is mentally retarded and therefore ineligible for the death penalty under the Eighth Amendment, see Atkins v. Virginia, 536 U.S. 304, 321 (2002), and the Federal Death Penalty Act, 18 U.S.C. § 3596(c).  Today the court addresses two motions related to this hearing.

First, the Government moves for reconsideration of the court's February 13, 2012, Order, which:  (1) prohibited the Government from reviewing materials regarding Wilson's mental health that the defense previously disclosed, under Federal Rule of Criminal Procedure 12.2, to firewalled Government counsel in connection with Wilson's 2006 capital trial; and (2) prohibited the Government from relying on its previously retained mental health experts in connection with the Atkins hearing.  Second, Wilson has filed a motion concerning the Government's proposed testing for the Atkins hearing, which:  (1) objects to the Government experts' use on Wilson of two tests designed to assess his adaptive functioning; (2) objects to the scope and number of the Government experts' proposed examinations of Wilson; (3) demands that the Government be more specific regarding the tests its experts plan to use on Wilson; and (4) requests that the court

1

permit defense counsel to be present when Wilson is examined by the Government experts, or, alternatively, to monitor these tests using an audio feed and to videotape them.

The Government's motion for reconsideration is frivolous and unavailing:  it does not reference, let alone apply, this Circuit's stringent standards for motions for reconsideration; it points to no law, controlling or otherwise, calling into question the court's February 13, 2012, Order; and it accuses the defense of violating that Order by providing its experts with materials that the court prohibited only the *Government* from accessing.  The motion is therefore DENIED.

Closer questions are presented by the objections and requests raised in Wilson's motion, but the court finds his arguments largely premature.  The bulk of Wilson's objections are directed toward preventing the Government from conducting tests that the defense considers to be of limited value for determining whether Wilson is mentally retarded.  But such arguments are more properly made by the defense's experts in their reports, through cross-examination of the Government's experts at the <u>Atkins</u> hearing, or in motions after the hearing.  Although the court might ultimately be persuaded by the defense's arguments about the flaws in certain kinds of information the Government experts intend to seek, it is not currently in a position to prevent those experts from *collecting* this information.  Moreover, to the extent that the defense's arguments are premised upon Wilson's Fifth Amendment rights, the court concludes that these rights are not endangered by the Government's proposed testing.  For these reasons and those set forth more fully below, Wilson's motion concerning the Government's testing is DENIED.

I.      BACKGROUND

In 2006, Wilson was tried before this court for capital-eligible crimes arising from the murder of two New York City Police Officers.  The jury convicted Wilson and voted to impose the death penalty.  (<u>See</u> Jury Verdict (Docket Entry # 351).)  On appeal, the Second Circuit

affirmed Wilson's convictions but vacated his death sentence and remanded the case to this court for a new penalty phase. United States v. Wilson, 610 F.3d 168 (2d Cir. 2010).

The court appointed new counsel to represent Wilson in this penalty phase "retrial." Counsel informed the court that it intended to present evidence that Wilson is mentally retarded and thus ineligible for the death penalty under the Eighth Amendment, see Atkins, 536 U.S. at 321, and the Federal Death Penalty Act, 18 U.S.C. § 3596(c). On February 1, 2012, the defense formally filed notice of its request that this court hold a pretrial hearing to determine whether Wilson is mentally retarded. (Docket Entry # 614.)

By Order dated February 1, 2012, the court set a schedule regarding Wilson's Atkins motion—including an evidentiary hearing to take place on September 17, 2012—and addressed several issues the parties had raised with respect to aspects of this case beyond the Atkins motion. (Order of Feb. 1, 2012 (Docket Entry # 618).) The court decided that "resolution of the Atkins claim should precede litigation of other mental health issues." (Id. at 1.)

On February 13, 2012, the court addressed: (1) the Government's request that it be permitted to review expert reports and other materials regarding Wilson's mental health that the defense previously disclosed, under Federal Rule of Criminal Procedure 12.2, to firewalled Government counsel in connection with Wilson's 2006 capital trial; and (2) Wilson's request that the Government be prohibited from relying upon its previously retained mental health experts in connection with the Atkins hearing. (Order of Feb. 13, 2012 (Docket Entry # 625) ("February 13 Order"); see also Gov't 12.2 Mot. (Docket Entry # 599); Def. 12.2 Opp'n (Docket Entry # 612).)[1] The court denied the Government's motion for access to the Rule 12.2 material and prohibited the Government from reviewing or relying upon this material in connection with

---

[1] The February 13 Order explains in detail the procedural history surrounding Wilson's 2006 Rule 12.2 disclosures. (See February 13 Order at 2-3.) The court will not repeat that history here.

the Atkins hearing, on the grounds that the phrase "capital sentencing proceeding" in Rule 12.2(c)(4)(B) "was intended to refer to the penalty phase of a capital trial, not to an Atkins proceeding." (February 13 Order at 6.) The court granted Wilson's motion to prohibit the Government from relying upon the Government's previously retained mental health experts in preparing for the Atkins hearing, but denied without prejudice Wilson's request that the Government be prohibited from relying upon these experts in *all* aspects of the penalty phase retrial (should such a trial occur after resolution of the Atkins claim). (Id. at 7-8.)

On March 7, 2012, the defense provided the Government with notice of its intent to call four mental health experts in support of its Atkins motion and with information regarding the intended subject matter of their testimony. (Def. Ltr. of Mar. 7, 2012 (Docket Entry # 637).) By letters dated March 7, April 6, and May 2, 2012, the Government provided notice of its intent to call three witnesses at the Atkins hearing: Dr. Robert L. Denney, a neuropsychologist; Dr. Robert Mapou, a clinical neuropsychologist; and Dr. Raymond Patterson, a psychiatrist. (Gov't Ltr. of Mar. 7, 2012 (Docket Entry # 638); Gov't Ltr. of Apr. 6, 2012 (Docket Entry # 676); Gov't Ltr. of May 2, 2012 (Docket Entry # 697).) As will be discussed in relevant detail in Part II.B.2, the Government's letters gave a description of the nature of the tests the Government's experts intend to conduct.

On May 14, 2012, the defense filed a motion concerning the Government's proposed testing for the Atkins hearing. (Def. Mem. (Docket Entry # 718).) This motion: (1) objects to the Government experts' use on Wilson of two tests designed to assess his adaptive functioning; (2) objects to the scope and number of the Government experts' proposed examinations of Wilson; (3) demands that the Government be more specific regarding the tests its experts plan to use on Wilson; and (4) requests that the court permit defense counsel to be present when Wilson

4

is examined by the Government experts, or, alternatively, to monitor these tests using an audio feed and to videotape them.  (Id.)

At a status conference on May 16, 2012, the Government advised the court that it felt unfairly hamstrung by its inability to access the materials disclosed in connection with Wilson's 2006 Rule 12.2 notice.  The court asked the Government whether it wanted to move for reconsideration of the February 13 Order, and the Government responded that it did.  On May 30, 2012, the Government filed a memorandum of law in support of a motion for reconsideration of the February 13 Order and in opposition to Wilson's motion.  (Gov't Mem. (Docket Entry # 723).)  Wilson submitted a memorandum of law in opposition to the Government's motion and in further support of his own motion.  (Def. Reply (Docket Entry # 741).)  The Government filed a letter addressing both motions.  (Gov't Reply (Docket Entry # 767).)

## II.    DISCUSSION

### A.    The Government's Motion for Reconsideration

The Government has moved for reconsideration of the court's February 13 Order prohibiting the Government from accessing the materials regarding Wilson's mental health that Wilson disclosed in connection with his 2006 Rule 12.2 notice, and from relying upon its previously retained mental health experts in connection with the Atkins hearing.  (Gov't Mem. at 2-17.)  This motion is wholly lacking in merit.

The standard for granting a motion for reconsideration is "strict."  Schrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).  As this court has stated, "[a] motion for reconsideration may be granted only if a court overlooked (1) factual matters that were put before it on the underlying motion or (2) controlling legal authority."[2]  Rollins v. N.Y. State Div.

---

[2]    There is case law suggesting that a motion for reconsideration may be granted on two additional grounds: (1) "that there has been a change in decisions or data"; and (2) "that there has been a change in controlling law."

of Parole, No. 03-CV-5952 (NGG) (RLM), 2007 WL 539158, at *2 (E.D.N.Y. Feb. 16, 2007);

see also Shrader, 70 F.3d at 257 ("[R]econsideration will generally be denied unless the moving

party can point to controlling decisions or data that the court overlooked . . . ."); Equal Emp't

Opportunity Comm'n v. Fed. Express Corp., 268 F. Supp. 2d 192, 194 (E.D.N.Y. 2003).

Accordingly, the Local Criminal Rules of the United States District Court for the Eastern District

of New York require that a motion for reconsideration be accompanied by "[a] memorandum

setting forth concisely the matters or controlling decisions which counsel believes the Court has

overlooked."[3] Local Criminal Rule 49.1(d).

 As an initial matter, the Government does not reference the stringent standards set forth

in this Circuit for motions for reconsideration.  It makes a passing reference to Local Criminal

Rule 49.1(d) (see Gov't Reply at 1), but only to suggest that the Rule does not apply.  The

Government claims that the defense failed to "accurate[ly] assess[]" the Government's motion by

invoking Local Criminal Rule 49.1(d) because the Government's motion is based on a contention

that "the defendant is using and relying upon the Rule 12.2 materials, previously deemed

privileged and sealed, to establish his Atkins claim."  (Id. at 1-2.)

 The court is baffled by this argument.  Regardless of the grounds upon which the

Government's motion based, there is no question that this motion is one for reconsideration of a

previous Order of this court, thus implicating Local Criminal Rule 49.1(d) and the strict

standards discussed above.  In effectively disavowing any need to satisfy these standards, the

Government comes close to conceding that it is not entitled to prevail on its motion.

---

Hughes v. McWilliams, No. 04-CV-7030 (KMW), 2009 WL 2971757, at *1 (S.D.N.Y. Sept. 16, 2009).  As set forth below, however, the events that have occurred since the court's February 13 Order do not support the Government's motion for reconsideration, and the Government does not argue that there has been a change in controlling law.

[3]  This language is identical to Local Civil Rule 6.3.  Although the standards for motions for reconsideration quoted above were set forth in civil cases, this court "draw[s] from and mirror[s]" the civil practices in criminal cases.  United States v. Goldenberg, No. 04-CR-159 (NGG), 2006 WL 1229152, at *1 (E.D.N.Y. May 5, 2006).

In any event, the Government has provided nothing resembling the material required by Local Criminal Rule 49.1(d) and this Circuit's case law.

First, the Government does not cite any controlling legal authority supporting its motion. See Local Criminal Rule 49.1(d); Rollins, 2007 WL 539158, at *2.  In its memorandum of law, the Government cites a number of out-of-Circuit cases that—apart from being non-controlling—in no way call into question the analysis of Rule 12.2 in the February 13 Order.[4]  (See Gov't Mem. at 14, 16.)  In its reply letter, the Government cites In re Sims, 534 F.3d 117 (2d Cir. 2008), for the proposition that a party waives the psychotherapist-patient privilege when he "'attempts to use the privilege both as a shield and a sword,'" which, the Government claims, Wilson has done by "inject[ing] portions of the privileged materials into the litigation while attempting to keep the remainder out of the reach of the government."  (Id. at 3 (quoting Sims, 534 F.3d at 131).)  But this privilege has nothing to do with the Government's motion.  Although Wilson has previously argued that the Government should be denied access to the Rule 12.2 materials because they are covered by the psychotherapist-patient privilege and the Fifth Amendment privilege against self-incrimination (see id. at 2), the February 13 Order was not grounded in those privileges; it was grounded solely in Rule 12.2 (see February 13 Order at 4-7 & n.5), which by its terms permits a defendant to "shield" the Government from certain medical information while essentially using this information as a "sword"—i.e., by providing it to its

---

[4]     The Government cites some cases for the uncontroversial—and uncontroverted—proposition that Wilson bears the burden of proof on his Atkins claim.  (See Gov't Mem. at 14.)  And it cites other cases in support of its oddly phrased argument that "it cannot be said that several other district courts have not faced pre-trial Atkins claims and resolved them by permitting prosecutors (or their fire-walled colleagues) the opportunity to use Rule 12.2 materials to rebut the claim."  (Id. at 16 (citing United States v. Davis, 611 F. Supp. 2d 472 (D. Md. 2009); United States v. Umana, No. 08-CR-134 (W.D.N.C. Mar. 19, 2010).)  The Government does not provide pincites to the portions of those decisions that supposedly support its position, and the court is unable to discern what these decisions have to do with "Rule 12.2 materials."  In any event, the Government did not cite these cases in support of its original motion, and so it cannot now claim that the court "overlooked" them, even if they were controlling (which they are not).  Local Criminal Rule 49.1(d); Rollins, 2007 WL 539158, at *2.

experts.  See Fed. R. Crim. P. 12.2(c)(4).  The Government never references the text of Rule 12.2 or any controlling cases interpreting it, and never suggests that the court misapplied the Rule in its February 13 Order.  That alone demonstrates the frivolity of the Government's motion.

Second, the Government does not suggest that the court "overlooked [ ] factual matters that were put before it on the underlying motion."  Rollins, 2007 WL 539158, at *2.  The primary basis for the Government's motion is that Wilson "is selectively violating the sealing order the Court recently issued, at his request, to pick and choose the items of evidence that he believes will be helpful to establish his alleged mental retardation," while simultaneously "depriving the government of a full and fair opportunity to rebut the claim."  (Gov't Mem. at 10, 14.)  Specifically, the Government asserts that Wilson has "cherry-pick[ed]" and provided to his experts two pieces of evidence disclosed in connection with his 2006 Rule 12.2 notice:  (1) an IQ test Wilson took in 2003 that was performed by Dr. Sandy Drob, one of Wilson's Rule 12.2 experts; and (2) a 2005 Positron Emission Tomography scan conducted by Dr. Monte Buchsbaum, another of Wilson's Rule 12.2 experts.  (Id. at 10, 12-13.)  The Government argues that, "[b]y permitting his experts to review and rely on sealed materials, the defendant has tainted them, because their opinions are irreversibly based on information that the Court previously ruled was unavailable for the purposes of the Atkins hearing."  (Id. at 14.)

The Government has either grossly misread or deliberately mischaracterized the February 13 Order.  That Order prohibited only the *Government* from accessing the 2006 Rule 12.2 materials and placed *no* limitations on the defense's ability to access those materials.  (See February 13 Order at 7-8 ("the court denies the Government's motion for access to previously disclosed, sealed information"; "the Government may not rely on expert reports or other materials produced to firewalled prosecutors in advance of the 2006 penalty phase"; "[t]he

Government may not review [Rule 12.2] material").)  That should come as no surprise because

Rule 12.2 limits a *defendant's* access only to those examinations conducted at the *Government's*

request, see Fed. R. Crim. P. 12.2(c)(2), and limits access to examinations conducted at the

*defendant's* behest only to the extent that they would be used "*against the defendant*," i.e., by the

Government, Fed. R. Crim. P. 12.2(c)(4) (emphasis added).  It is therefore senseless for the

Government to suggest that the defense is "selectively violating" the February 13 Order by

disclosing Rule 12.2 material generated by the previous defense team to its current experts, or

that its experts are "tainted" because of their reliance on these materials.  (Gov't Mem. at 10, 14.)

 Rather than providing any plausible legal basis for its motion for reconsideration, the

Government complains incessantly that its inability to access the Rule 12.2 materials is

"unreasonable" and "unfair" and that it needs those materials in order to have a "full and fair

opportunity" to rebut Wilson's Atkins claim.  (E.g., Gov't Mem. at 2, 10, 16; Gov't Reply at

3-4.)  Of course, to the extent that Rule 12.2 places the Government in an "unfair" position, that

quibble is best presented to the Advisory Committee that drafted Rule 12.2, not to this court.  But

there is also nothing unfair about the Government's situation.  Rule 12.2 specifically

contemplates that there will not be precise symmetry with respect to the materials to which the

parties have access until the parties are involved in a "capital sentencing proceeding."  Fed. R.

Crim. P. 12.2(c)(4)(B).  The February 13 Order simply held that an Atkins proceeding—which,

in the majority of cases, will occur even before a determination of *guilt*—does not qualify as a

"capital sentencing proceeding" under the Rule.  (See February 13 Order at 6-7.)  The

Government suggests that it is "unfairly hamstrung" by the February 13 Order (Gov't Mem. at 9)

because, until such a proceeding occurs, it will be "limited" to relying upon the trial and previous

penalty phase transcripts, the exhibits introduced by both sides, Wilson's prison records, the

Government's law enforcement personnel, its subpoena power, court-ordered examinations of Wilson, and the Government's many other resources, to gather information to provide to its experts.  The court is not sympathetic.[5]

In short, the Government's motion for reconsideration has no basis in law, fact, or common sense.  It is denied.

### B.    Wilson's Motion Concerning the Government's Proposed Testing

Turning now to more difficult matters, Wilson has filed a motion raising a number of objections and requests regarding the Government's proposed testing for the Atkins hearing. (See Def. Mem.)  Before addressing the substance of Wilson's motion, the court finds it helpful (both in understanding Wilson's motion and going forward) to discuss briefly the general legal standards governing an Atkins motion, which have not yet been set forth in this Circuit.

### 1.    Legal Background

The Federal Death Penalty Act, enacted in 1988, provides that a "sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).  Fourteen years later, the principle embodied in the Act became a constitutional requirement when, in Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court held that a sentence of death for criminals who are mentally retarded violates the Eighth Amendment's ban on "cruel and unusual punishment."  Id. at 321.  The Court concluded that although the deficiencies of mentally

---

[5]    While the Government asks for reconsideration of the entirety of the court's February 13 Order—including the portion prohibiting the Government from relying upon its own previously retained mental health experts in connection with the Atkins hearing (see Gov't Mem. at 1)—the substantive arguments in its briefing are wholly directed toward the portion denying the Government access to the previously disclosed Rule 12.2 materials.  Thus, the Government has provided the court with no basis to reconsider the part of its February 13 Order related to the Government's previously retained experts.  In any event, that part of the Order was largely premised upon the portion related to the Rule 12.2 materials—which the Government has failed to convince the court to modify.  (See February 13 Order at 7 ("Given that Rule 12.2 prohibits the disclosure of materials created and relied on by [the Government's previously retained] experts, the court finds that the potential for spillover of information generated in connection with the 2006 12.2 notice would create substantial risks in terms of both potential prejudice to Defendant and expenditure of the court's time should Kastigar hearings become necessary." (citing Kastigar v. United States, 406 U.S. 441 (1972))).)

retarded criminals did "not warrant an exemption from criminal sanctions," such criminals "should be categorically excluded from execution" because:  (1) there was "a serious question as to whether either justification that [the Court] ha[s] recognized as a basis for the death penalty"—retribution or deterrence—"applies to mentally retarded offenders"; and (2) there was an enhanced risk in the case of mentally retarded offenders "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," due to "the possibility of false confessions" and the "lesser ability of mentally retarded defendants to make a persuasive showing of mitigation."  Id. at 318-320.

The Court did not set forth a precise definition of "mental retardation," but instead left it to individual states to develop a means of enforcing the restriction against execution of mentally retarded offenders.  See id. at 317.  Nevertheless, the Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  Id. at 318.  In support, the Court cited two clinical definitions of mental retardation—one provided by the American Association on Mental Retardation ("AAMR"), now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD");[6] and the other provided by the American Psychiatric Association ("APA").[7]  Id. at 308 n.3.

---

[6]     The AAMR/AAIDD defines mental retardation as follows:  "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  AAMR, Mental Retardation:  Definition, Classification, and Systems of Supports 8 (10th ed. 2002).

[7]     The APA has stated that a diagnosis of mental retardation requires:

A.  Significantly subaverage intellectual functioning:  an IQ of approximately 70 or below on an individually administered IQ test . . . .
B.  Concurrent deficits or impairments in present adaptive functioning (i.e., a person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

Under either of these "essentially identical" formulations, "[t]he definition of mental retardation is effectively three-pronged.  An individual must have (1) significantly below average intellectual functioning, (2) significant deficits in adaptive behavioral skills, and (3) onset of the condition before age eighteen."  United States v. Davis, 611 F. Supp. 2d 472, 475 (D. Md. 2009); see also Atkins, 536 U.S. at 318.  The burden is on the defendant to establish each of these prongs by a preponderance of the evidence.  See Davis, 611 F. Supp. 2d at 474.

Regarding the first prong—below-average intellectual functioning—"the APA and AAMR/AIDD are in substantial agreement on the standard to be used:  a score of 75 or below on one of the generally accepted tests of intelligence."  United States v. Hardy, 762 F. Supp. 2d 849, 879 (E.D. La. 2010) ("Hardy II"); see also Davis, 611 F. Supp. 2d at 475 (although "an IQ score two standard deviations below the mean—the benchmark for mental retardation—is approximately 70," the "standard error of measurement . . . in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75" (citing AAMR, Mental Retardation:  Definition, Classification, and Systems of Supports 58-59 (10th ed. 2002) ("AAMR Manual"); APA, Diagnostic and Statistical Manual of Mental Disorders 41-42 (4th ed. 2000) ("DSM-IV-TR")).[8]

The second prong—adaptive functioning—"refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence

---

C.  The onset is before 18 years of age.

APA, Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed. 2000).

[8]      The APA categorizes mental retardation as mild, moderate, severe, and profound, with a residual category of "mental retardation, severity unspecified."  DSM-IV-TR at 42-44.  Mild mental retardation, associated with an IQ of 50-55 to 70-75, is the largest segment (about 85%) of those with the disorder.  Id. at 43.  It includes those who, as adults, "achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance."  Id.  "With appropriate supports," such individuals "can usually live successfully in the community, either independently or in supervised settings."  Id.

expected of someone in their particular age group, sociocultural background, and community setting.'" Wiley v. Epps, 625 F.3d 199, 216 (5th Cir. 2010) (quoting DSM-IV-TR at 42).  The definition of "adaptive functioning" is "less settled than that for intellectual functioning."  Hardy II, 762 F. Supp. 2d at 879.  The APA "requires concurrent deficits in at least two of eleven relatively specific areas of adaptive functioning."  Id. (citing DSM-IV-TR at 49).  (See also supra n.7.)  "The AAMR/AAIDD takes a more holistic approach and treats adaptive behavior as a global characteristic," finding significant limitations in adaptive functioning where a person performs "'at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior:  conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.'"  Hardy II, 762 F. Supp. 2d at 879-80 (quoting AAMR Manual at 14).  (See also supra n.6.)  Nevertheless, the differences between the APA and AAMR/AAIDD definitions have been described as "mostly theoretical" because both "direct clinicians to the same standardized measures of adaptive behavior," such as the Vineland Adaptive Behavior Scales ("Vineland Scales") and the Adaptive Behavior Assessment System-Second Addition ("ABAS-II").[9]  Hardy II, 762 F. Supp. 2d at 880 (citing DSM-IV-TR at 42; AAMR Manual at 76-78, 87-90).

Finally, it is important to emphasize the backward-looking nature of a court's determination of mental retardation.  For one thing, as discussed above, a person may be

---

[9]      The court need not decide at this time whether it will apply the APA or the AAMR/AAIDD definitions of adaptive functioning in ruling on Wilson's Atkins motion.  The Government suggests that it might be improper to use the AAIDD definition "[b]ecause the AAIDD is an advocacy group that advocates on behalf of the mentally retarded."  (Gov't Mem. at 22 n.4.)  It states that "some courts have determined that the more prudent course is to adopt the definition of mental retardation promulgated by the [APA]," and cites "United States v. Johnson, 2010 WL 4659587 (E.D. La. 2010)," for this proposition.  (Id.)  What the Government surprisingly fails to point out is that it is not citing a district court decision but is referencing, if anything, a memorandum filed by the Government in that case.  (See Def. Mem. at 9. & n.5.)  The Government also ignores the fact that Atkins itself cited favorably the definition of mental retardation provided by the AAIDD's predecessor, the AAMR, see 536 U.S. at 308 n.3, and that several courts have relied heavily upon the AAIDD's publications in ruling on Atkins claims, see, e.g., United States v. Smith, 790 F. Supp. 2d 482, 485-86 (E.D. La. 2011); United States v. Lewis, No. 08-CR-404 (SO), 2010 WL 5418901, at *5, *23 (N.D. Ohio Dec. 23, 2010); Hardy II, 762 F. Supp. 2d at 854.  The Government is strongly discouraged from making this argument in future submissions to the court.

diagnosed with mental retardation only if the disability manifested itself before the person

reached the age of eighteen.  See generally Atkins, 536 U.S. at 308 n.3, 318.  Moreover, for the

purposes of an Atkins determination, the question is whether the criminal defendant "was

mentally retarded *at the time of the crime* and therefore ineligible for the death penalty, not

whether a person is currently mentally retarded and therefore in need of special services."  Hardy

II, 762 F. Supp. 2d at 881 (emphasis added).  In other words, mental retardation must "be

diagnosed, if it is to be diagnosed at all, retrospectively in every sense of the word."  Id.

       2.    Wilson's Arguments

With these general standards in mind, the court turns to the arguments raised in Wilson's

motion concerning the Government's proposed testing.

       a.    *Objections to Use of the ABAS-II and Vineland Scales on Wilson*

The Government has stated that it "expects Dr. Denney to evaluate the defendant's

adaptive functioning by assessing him according to standardized adaptive living scales" (Gov't

Ltr. of Mar. 7, 2012, at 1), including "the ABAS-II or Vineland Scales" (Gov't Ltr. of Apr. 6,

2012, at 2).  Although the defense does not object to the use of the ABAS-II and Vineland Scales

on reliable third parties (Def. Mem. at 7), it objects to the use of those tests on Wilson himself

(id. at 2-9).  The defense argues that when these tests are "administered to a person with a mild

intellectual disability, such as Mr. Wilson, . . . the results are unreliable and entitled to little

weight."  (Id. at 2-3.)  It gives three reasons for this position:  (1) "'the use of Defendant as an

informant to his own adaptive behavioral capabilities, known as 'self-reporting,' is disfavored by

the [AAIDD]'" because "'individuals with mild intellectual disability[10] . . . may exaggerate

---

[10]    The AAIDD Manual uses the term "intellectual disability" ("ID") rather than "mental retardation," but the Manual makes clear that "the term ID covers the same population of individuals who were diagnosed previously with mental retardation."  AAIDD Manual at xvi.

their adaptive abilities to appear more competent'" (id. at 3 (quoting United States v. Lewis, No.

08-CR-404 (SO), 2010 WL 5418901, at *23 (N.D. Ohio Dec. 23, 2010) (citing AAIDD,

Intellectual Disability:  Definition, Classification, and Systems of Supports 51 (11th ed. 2010)

("AAIDD Manual"))); (2) the ABAS-II and Vineland Scales have not been appropriately

"normed for"—i.e., sufficiently tested on—"individuals with intellectual disability"; (id. at 5);

and (3) "an evaluation of an individual's adaptive behavior . . . cannot be based on evaluating his

functioning in a prison environment," but must rather be based on "an individual's functioning in

a typical community setting, such as home, school or work" (id. at 7-8).[11]  The court is

unconvinced that these potential flaws call for preclusion of the Government's proposed testing.

As a general matter, "[a] full psychiatric examination requires considerable freedom to

the examiner."  United States v. Taveras, No. 04-CR-156 (JBW), 2008 WL 4630514, at *1

(E.D.N.Y. Oct. 20, 2008).  The court expects that Dr. Denney is aware of the flaws pointed out

by the defense and will not place undue reliance on Wilson's performance on adaptive

functioning testing.  If indeed he does rely upon the results of this testing, he will of course have

to justify that reliance in his submissions to the court and at the Atkins hearing.  The defense will

then have the opportunity to cross-examine Dr. Denney regarding his reliance on the ABAS-II

and Vineland Scales, to put forth its own experts to cast doubt on this reliance, and to file

post-hearing motions requesting that the court discount or disregard Dr. Denney's testimony on

this basis.  For now, however, the court is not in a position to categorically preclude Dr. Denney

from administering the adaptive functioning tests on Wilson, and doubts that their mere use will

---

[11]     The Government contends that Wilson's various arguments are "predicated on an assumption that [he] is
mentally retarded."  (Gov't Mem. at 21; see also id. at 24.)  Yet again the Government's argument makes no sense.
As the defense correctly points out, if a test cannot be reliably conducted on individuals with intellectual disability,
"then it cannot possibly be used to distinguish between those who are intellectually disabled and those who are not."
(Def. Reply at 10.)  In other words, the defense's argument does not *assume* that Wilson is mentally retarded; it
merely suggests that *if* he is mentally retarded, the tests proposed by the Government might fail to reveal that fact
because of their inherent problems.

cause significant harm to the defense's case.  Cf. United States v. Hardy, 644 F. Supp. 2d 749, 751 (E.D. La. 2008) ("Hardy I") (refusing to "restrict the scope of the [Government's] examination" because the court was "not in a position to know what lines of inquiry are appropriate from the standpoint of the experts," and noting that the defense could later "object to the admission of any conclusions by the government expert that i[t] found to be based on improper lines of inquiry").

Moving on to Wilson's specific arguments in favor of preclusion of the tests, the court first finds that although the medical literature cited by the defense cautions against placing too much emphasis on a defendant's self-ratings, most of this literature does not flatly oppose *any* adaptive functioning testing of the defendants themselves, and, indeed, appears to contemplate at least some limited reliance on such testing.  See, e.g., AAIDD Manual at 51-52 ("Self-ratings of individuals . . . *may* contain a certain degree of bias and should be interpreted *with caution* when determining an individual's level of adaptive behavior. . . .  [T]he authors of this manual caution against relying *heavily only* on the information obtained from the individual . . . ." (emphases added)); Marc J. Tasse, Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases, Applied Neuropsychology 16: 2, 114, 119 (2009) ("Relying *solely* on the individual's self-report is fraught with problems." (emphasis added)); Kay B. Stevens and J. Randall Price, Adaptive Behavior, Mental Retardation, and the Death Penalty, 6 J. of Forensic Psych. Practice 1, 17 (2006) ("To accept a criminal defendant's self report *without skepticism* is forensically naïve and constitutes a deviation from acceptable practice that may result in unreliable data." (emphasis added)).  To be sure, some of the literature the defense cites does speak in more absolute terms.  See, e.g., Keith Widaman and Gary Siperstein, Assessing Adaptive Behavior of Criminal Defendants in Capital Cases:  A Reconsideration, Am. J. of

Forensic Psych., Vol. 27, Issue 2, at 5, 27 (2009) ("Courts should never use [self-report] assessments . . . as evidence in a high-stakes court proceeding that determines mental retardation.").  But the court sees no reason at this stage to give more weight to the absolutist literature than to the cautionary literature.

Second, the court finds premature the defense's argument that the ABAS-II and Vineland Scales have not been normed for individuals with mental retardation.  (See Def. Mem. at 5-6.) The defense cites a number of sources for the general proposition that an instrument must be appropriately normed for the relevant population before it may properly be used to measure adaptive behavior (see id. at 5), but the support it provides for its argument that the ABAS-II and Vineland Scales themselves have not been appropriately normed for mentally retarded individuals is (1) not overwhelming and (2) in part the opinions of its own experts (see, e.g., id. at 6 (citing J. Gregory Olley and Ann W. Cox, Assessment of Adaptive Behavior in Adult Forensic Cases:  The Use of the Adaptive Behavior Assessment System-II, in Thomas Oakland and Patti L. Harrison, Adaptive-Behavior Assessment System-II:  Clinical Use and Interpretation 390 (2008)).)  Presumably, if Dr. Denney ultimately decides to use these tests on Wilson, he will have determined that the tests are capable of producing meaningful results when employed on mentally retarded individuals.  The court lacks sufficient information at this time to decide whether such a determination would be incorrect.

Third, and for similar reasons, the court is unconvinced by the defense's argument that Dr. Denney should be prohibited from using the ABAS-II and Vineland Scales on Wilson because Wilson is currently living in prison.  (See Def. Mem. at 6-9.)  The defense is correct that the relevant issue is not Wilson's present adaptive functioning in prison but rather his functioning, prior to age eighteen, "in a typical community setting, such as home, school or

17

work." (Id. at 7.)  See also AAIDD, User's Guide:  Intellectual Disability:  Definition,

Classification, and Systems of Supports 20 (11th ed. 2012) ("AAIDD User's Guide") ("The

diagnosis of ID is not based on the person's . . . behavior in jail or prison . . . ."); Hardy II, 762 F.

Supp. 2d at 899 ("An institutional environment of any kind necessarily provides 'hidden

supports' whereby the inmates or residents are told when to get up, when to eat, when to bathe,

and their movements are highly restricted.").  But the court cannot say at this point that it is

impossible to obtain accurate data *about* Wilson's functioning in a typical community setting by

*testing* him while he is in prison.  As the court noted in Hardy II:

> Certainly a person's level of adaptive functioning in the present might provide
> some information about his abilities during the developmental period, as, all
> things being equal, a person without limitations in the present is less likely to
> have had limitations before, and a person with limitations today is more likely to
> have had them during the developmental period.

762 F. Supp. 2d at 881.  Once again, Dr. Denney is likely aware of the potential challenges

incarceration may present, and believes that an accurate assessment in this context is possible.

(See Gov't Mem. at 24.)  The court is not yet in a position to conclude that he is wrong.[12]

In sum, although the court appreciates the concerns inherent in the administration of the

ABAS-II and Vineland Scales on Wilson, the court concludes that the arguments put forth by the

defense are insufficient to categorically preclude Dr. Denney from conducting those tests.  The

defense may re-raise its arguments at or after the Atkins hearing.

---

[12]    The court also notes that the cases upon which the defense relies in support of its argument (see Def. Mem.
at 8-9) were about whether the Government could properly administer adaptive functioning tests on *correctional
officers*—who would likely have known little about the defendant's behavior prior to being incarcerated—not on the
defendant himself.  See Smith, 790 F. Supp. 2d at 517-520; Hardy II, 762 F. Supp. 2d at 899-900; Davis, 611 F.
Supp. 2d at 495.

> b.     *Objections to the Scope and Number of the Government Experts'*
> *Proposed Examinations of Wilson*

Next, Wilson raises a number of objections to the scope of the Government experts'

proposed interviews of Wilson and the number of examinations they plan to conduct.  (Def.

Mem. at 9-16.)  The court finds each of these objections to be either premature or without merit.

> (1)     Number of Examinations

First, Wilson argues that "the government should be entitled to one examination, not

two."  (Id. at 11.)  He relies upon United States v. Fell, 372 F. Supp. 2d 753 (D. Vt. 2005), in

which the court stated that "Rule 12.2 gives the government the ability to select one expert, not

three," id. at 761,[13] and Nelson v. United States, No. 04-CV-8005 (FJG), 2010 WL 2010520

(W.D. Mo. May 18, 2010)), in which the court stated, in the context of a petition for writ of

habeas corpus, that "[t]he ABA standard cited by the Government does not support the

examination by multiple mental health professionals for one side," id. at *3.

There is, however, no hard-and-fast rule requiring a specific number of experts in an

Atkins proceeding, and the court finds that the gravity and complexity of such a proceeding

distinguishes it from the typical Rule 12.2 and habeas contexts.  Moreover, it does not appear

that the Government's proposed tests will be duplicative, given that one test will be administered

by a neuropsychologist—Dr. Denney—and one by a psychiatrist—Dr. Patterson.  In light of the

defense's plan to call at least *four* experts at the Atkins hearing (see Def. Ltr. of Mar. 7, 2012),

the court sees no reason not to give the Government the opportunity to conduct two examinations

on Wilson, and thus collect a greater variety of potentially helpful information.

---

[13]     As the Government correctly points out (see Gov't Mem. at 25), Fell is not particularly helpful to the
defense because, as of the date of the Fell decision, two Government experts had already interviewed the defendant,
and the court found that those experts' examinations were more reliable than any subsequent examinations would be
because they were conducted "at a time much closer to the relevant events."  372 F. Supp. 2d at 761.

(2)      Dr. Patterson's Interview

Second, Wilson objects specifically to the Government's proposal that psychiatrist Dr.

Raymond Patterson interview Wilson.  (See Def. Mem. at 11-12.)  The Government has

indicated that, "[d]uring these meetings, Dr. Patterson intends to conduct a standard psychiatric

examination of the defendant, which will include questioning about the defendant's

psycho-social, family, medical, educational, employment and criminal histories," as well as a

"formal Structured Clinical Interview, as that term is used in the context of the detection of

DSM-IV disorders."  (Gov't Ltr. of May 2, 2012, at 1-2.)  The defense argues, based on Dr.

Patterson's Curriculum Vitae ("CV") (See Def. Mem. at 10), that as a general and forensic

psychiatrist, "Dr. Patterson does not appear to have any expertise in intellectual disability

examinations" (id. at 11).  Further, it argues, a standard psychiatric examination to detect

DSM-IV disorders is "unnecessary and irrelevant" because "the DSM-IV-TR itself is clear that

'[t]he diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore,

the diagnosis of mental retardation should be made whenever the diagnostic criteria are met,

*regardless of and in addition to the presence of another disorder.*'"  (Def. Mem. at 11 (quoting

DSM-IV-TR at 47).)  See also Lewis, 2010 WL 5418901, at *32; Davis, 611 F. Supp. 2d at 485.

The court disagrees.  For one thing, the Government represents that "Dr. Patterson is

exceedingly qualified to evaluate the defendant for mental retardation" (Gov't Mem. at 26), and

the court is not prepared to draw a contrary conclusion based merely on Dr. Patterson's CV.  The

defense may raise its argument about Dr. Patterson's qualifications in a Daubert motion or on

cross-examination.   Moreover, although the defense is correct that the presence of additional

DSM-IV disorders does not exclude a diagnosis of mental retardation, the court is not convinced

that a standard psychiatric examination would be irrelevant.  As the court in Lewis pointed out,

"individuals with intellectual disability are three to four times more likely to have comorbid mental disorders than the general population." 2010 WL 5418901, at *32. To the extent that the existence of additional DSM-IV-TR disorders might *support* a diagnosis of mental retardation, the Government's experts should have this information as part of a thorough and complete analysis of Wilson's mental state. Indeed, it appears that Dr. Gordon Woods, one of the defendant's experts, has already conducted a standard psychiatric interview of Wilson. (Def. Ltr. of Mar. 7, 2012, at 4.) Dr. Patterson should have the same opportunity.

(3)     Questions about Current Activities

Third, Wilson argues that, "to the extent that the government proposes to have either Dr. Denney or Dr. Patterson question Mr. Wilson about 'current living situation and activities, and current mental status related issues,' such questioning is simply irrelevant to the Atkins issue." (Def. Mem. at 12.) The court rejects this argument for similar reasons discussed concerning the defense's argument that Dr. Denney should be prevented from using the ABAS-II and Vineland Scales on Wilson because Wilson is currently living in prison. (See Def. Mem. at 6-9.) Although the defense is correct that "[t]he point of an Atkins hearing is to determine whether a person was mentally retarded at the time of the crime and therefore ineligible for the death penalty," there is also the possibility that "a person's level of adaptive functioning in the present might provide some information about his abilities during the developmental period." Hardy II, 762 F. Supp. 2d at 881. If the Government's experts place undue significance on Wilson's current functioning, the defense will have the opportunity to bring that impropriety to the court's attention during cross-examination at the Atkins hearing or through a subsequent motion.[14]

---

[14]     The defense cites Smith in support of its argument, but as discussed above (see supra n.12), the court in Smith was primarily concerned with the Government experts' heavy reliance on interviews with correctional officers, not with the defendant. See 790 F. Supp. at 517-18. In any event, the court did not preclude such

(4)      Questions about Criminal History

Wilson's final objection to the scope of the Government's proposed testing is that Dr.

Denney and Dr. Patterson should not be permitted to "question Mr. Wilson about criminal

history[] and prison records" because:  (1) "such questioning is irrelevant to the Atkins issue

before the court"; and (2) "questioning him about such activities would violate his Fifth

Amendment rights."  (Def. Mem. at 13-14 (emphasis and internal quotation marks omitted).)

The court is not persuaded by either of these reasons.

With respect to relevance, the court agrees with the defense that there is substantial

medical literature suggesting that past criminal behavior should not be used to assess adaptive

functioning.  See, e.g., AAIDD Manual at 103; AAIDD User's Guide at 291.  However, the

Government represents that its "experts . . . disagree with the defendant's assessment of the value

of this information," (Gov't Mem. at 27-28), and cites its own literature stating that "[r]ecords

regarding a defendant's . . . criminal history . . . can be quite illuminating regarding historical

adaptive functioning," Gilbert S. MacVaugh III and Mark D. Cunningham, Atkins v. Virginia:

Implications and Recommendations for Forensic Practice, J. of Psych. & Law, Vol. 37, at 162

(2009).[15]  Moreover, although "[t]he defendant's alleged criminal acts and enterprises do not

preclude a holding that [he] is mentally retarded," Davis, 611 F. Supp. 2d at 507 (emphasis

added), the defense itself asserts that "'willful and/or anti-social behavior' is [ ] evidence that

defendant 'has not adapted.'"  (Def. Mem. at 14 (quoting Holladay v. Campbell, 463 F. Supp. 2d

_____

interviews entirely, but simply found that the experts' opinions were entitled to less weight because they had relied
too heavily upon the prison interviews.

[15]      The defense argues that the Government misrepresents this article because the article also states that "an
assessment of a particular inmate's adaptive behavior while in a highly-structured prison environment has very
limited correspondence to the adaptive demands of the open community."  MacVaugh and Cunningham, Atkins v.
Virginia:  Implications and Recommendations for Forensic Practice, at 161.  But this statement relates to the
relevance of an inmate's behavior while in prison, not to his criminal history.

1324, 1345 (N.D. Ala. 2006), aff'd, 555 F.3d 1346 (11th Cir. 2009)).)  Thus, the defense admits

that past criminal behavior—which may prove to be willful or ant-social behavior—has at least

some relevance to an assessment of adaptive functioning, and there is no reason why the

Government's experts should be prevented from collecting that information simply because it is

more likely to be helpful than harmful to Wilson's Atkins motion.  Cf. Hardy I, 644 F. Supp. 2d

at 751 (refusing to prevent Government from examining defendant regarding his crime).

     The court also disagrees with the defense's argument that questioning Wilson regarding

his past crimes would violate his Fifth Amendment privilege against self-incrimination.[16]

     Compelling a criminal defendant to submit to a psychiatric examination may violate the

Fifth Amendment where the defendant has not placed his mental state at issue.  See, e.g., Estelle

v. Smith, 451 U.S. 454, 468 (1981).  But when the defendant initiates a "defense of mental

incapacity or disturbance," he makes a limited waiver of his Fifth Amendment rights that permits

the Government to conduct an examination of the defendant as a "rebuttal to the psychiatric

defense."  Gibbs v. Frank, 387 F.3d 268, 274 (2d Cir. 2004) (citing Buchanan v. Kentucky, 483

U.S. 402 (1987)); see also United States v. Williams, 731 F. Supp. 2d 1012, 1017 (D. Haw.

2010) ("When a defendant raises a defense that relies on an expert examination of his mental

condition, the Fifth Amendment does not protect him from being compelled to submit to a

similar examination conducted on behalf of the prosecution . . . .").

     The defense acknowledges that this limited waiver permits the Government to interview

Wilson.  (See Def. Mem. at 14.)  It argues, however, that because "Wilson's criminal conduct is

not germane to the issue of mental retardation, questioning him about such activities" should not

---

[16]     The defense mentions in passing that questioning Wilson about his crimes would violate his "Sixth
Amendment right to counsel and to the effective assistance of counsel."  (Def. Mem. at 15.)  This might be a
reference to its argument (discussed in Part II.B.2.d) that the court should permit counsel to be present at the
Government experts' interviews of Wilson.  To the extent that Wilson is in fact making a separate argument, he has
not explained it, and so the court is unable to grant his motion on this ground.

be considered part of a "rebuttal" of his Atkins defense and thus "would violate his Fifth Amendment rights." (Def. Mem. at 14.) See also Gibbs, 387 F.3d at 274. At the same time, according to the defense, there is a danger that Wilson will reveal to the Government crimes that have not yet been charged, which the Government could then use at the penalty phase retrial in support of an aggravating factor of future dangerousness. (Def. Mem. at 15.)

The defense's argument with respect to Wilson's Fifth Amendment rights is contingent upon its argument that Wilson's past criminal activities are irrelevant to whether he is mentally retarded, and the court's rejection of the former leads it to reject the latter. Because information about Wilson's past crimes is potentially relevant, questions designed to elicit that information are properly considered part of a comprehensive "rebuttal" to Wilson's Atkins defense, and thus fall within the scope of Wilson's limited Fifth Amendment waiver. Gibbs, 387 F.3d at 274; see also Williams, 731 F. Supp. 2d at 1017. Moreover, given that Wilson's criminal history was so heavily vetted and litigated during his 2006 penalty phase, the court considers speculative the defense's fear that the Government will learn of criminal activity of which it is currently unaware. See Estate of Fisher v. C.I.R., 905 F.2d 645, 649 (2d Cir. 1990) ("The danger of self-incrimination must be real, not remote or speculative."). And, to the extent that Wilson does indeed reveal additional criminal activity, he may later seek to preclude the Government from presenting this evidence either at the Atkins hearing or at the penalty phase retrial; Wilson's Fifth Amendment rights will not be endangered simply by the experts' collection of information on his past crimes. See Chavez v. Martinez, 538 U.S. 760, 769 (1994) ("[M]ere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness.").[17]

---

[17]     The defense requests that the court prohibit the Government from admitting Wilson's testing results and the fruits thereof "in any criminal proceeding—including the Atkins hearing and any future penalty proceeding—except

c.     *Demand for Specificity Regarding Intended Examinations*

The defense demands that the Government be more specific regarding three categories of tests its experts plan to use on Wilson:  (1) the tests Dr. Denney plans to conduct to determine whether Wilson is malingering; (2) Dr. Denney's planned "reading comprehension testing"; and (3) Dr. Patterson's planned "formal Structural Clinical Interview."  (Id.; see also Gov't Ltr. of Apr. 6, 2012, at 2; Gov't Ltr. of May 2, 2012, at 1.)  The defense argues that there are many different kinds of tests in the categories the Government describes, and that the Government's "broad" descriptions of those tests "fail[] to give [the defense] notice so that [it] may lodge objections if necessary," particularly to those tests that "have not been demonstrated to be appropriate for those with significantly low cognitive abilities."  (Def. Mem. at 16.)  The Government suggests in response that, "given the anticipated fluidity of [a] neuropsychological interview," its experts are not able at this time to identify the precise tests it will employ because those decisions "will be dependent on the circumstance of the interview."[18]

The court takes the Government at its word that its experts do not yet know exactly which tests they plan to conduct, and does not anticipate that the defense will be prejudiced if it is unable to bring objections to the various tests until after they are actually conducted, particularly because the defense presumably will not be preparing Wilson for the tests.[19]  (See Def. Mem. at 11.)  Thus, no additional specificity is required of the Government.

---

with respect to the issue of his mental retardation as to which he has presented expert evidence."  (Def. Mem. at 16.) For similar reasons to those just discussed, the court find's this request premature and denies it without prejudice.

[18]     The Government actually only provides this response with respect to the malingering tests, but the same argument would presumably apply to all of the tests for which the defense demands increased specificity.

[19]     The court also disagrees with the defense's contention that the specificity it demands is required by the court's February 1, 2012, Order.  That Order requires only an "exchange of experts either party intends to call at an Atkins hearing, experts' C.V.s, and tests either party intends to administer."  (Order of Feb. 1, 2012, at 2.)  The Government's general description of the kinds of tests it intends to conduct complies with this Order.

d.   *Counsel's Involvement in the Government's Examinations*

Finally, Wilson requests "that defense counsel be permitted to be in the room when [Wilson] is tested and interviewed by government expert(s)," in order "protect his Fifth Amendment right to remain silent as to matters beyond the scope of the hearing, and to effectuate his Sixth Amendment rights" by "advis[ing] him and [ ] interpos[ing] appropriate objections."  (Def. Mem. at 17-18.)  In the alternative, Wilson requests:  (1) "that during the government's administration of formal test instruments counsel be given a nearby venue in which to sit and monitor the proceedings, with an audio feed, so that counsel has an opportunity to object"; and (2) "that the government examination(s) be videotaped."  (Id. at 18-19.)  The court denies the defense's requests.

As discussed in Part II.B.2.b(4), the court does not believe that the examinations the Government plans to conduct pose a serious danger to Wilson's Fifth Amendment rights—or at least a danger that cannot be addressed through post-examination motions—and therefore sees little need for counsel to be present to protect those rights.  Moreover, the Sixth Amendment does not require that a defendant be permitted to have counsel present at a mental examination conducted to rebut a psychiatric defense he has initiated; the Supreme Court has held only that counsel must be "*notified* in advance" of the examination so that counsel may advise the defendant regarding "the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed."  Estelle, 451 U.S. at 471 (emphasis added); see also Buchanan, 483 U.S. at 424-25 (no Sixth Amendment violation where the defendant's attorney did not attend a psychiatric evaluation because counsel was "informed about the scope and nature of the proceeding" and was therefore "on notice that if . . . he intended to put on a 'mental status' defense for [defendant], he would have to anticipate the use

of psychological evidence by the prosecution in rebuttal"); Hollis v. Smith, 571 F.2d 685, 691-92

(2d Cir. 1978).  Such notice has of course already occurred in this case.

At the same time, the court finds compelling the Government's representation that,

according to its experts, "the presence of third parties during examinations can be disruptive and

have adverse effects on the performance and outcome of the evaluation."  (Gov't Mem. at 32.)

The Second Circuit and district courts in this Circuit have repeatedly denied requests by counsel

to be present at mental examinations because of these precise effects.  See, e.g., Hollis, 571 F.2d

at 692 ("It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is

upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's

questions and advising his client not to answer this question and that."); United States v. Baird,

414 F.2d 700, 711 (2d Cir. 1969) ("[T]he presence of a third party, such as counsel . . . , at [a

mental] examination tends to destroy the effectiveness of the interview."); Marsch v. Rensselauer

Cty., 218 F.R.D. 367, 371 (N.D.N.Y. 2003) ("In federal court, [ ] the attendance of a subject's

counsel or other observer is generally prohibited unless required by unusual circumstances.");

Equal Emp't Opportunity Comm'n v. Grief Bros. Corp., 218 F.R.D. 59, 63-64 (W.D.N.Y. 2003)

("[F]ederal law generally rejects requests that a party's attorney attend a [mental]

examination."); Baba-Ali v. City of N.Y., No. 92-CV-7957 (DAB) (THK), 1995 WL 753904, at

*2 (S.D.N.Y. Dec. 19, 1995) ("The weight of authority is clearly against the presence of counsel

at a[ mental] examination.").

Defense counsel proposes to alleviate these problems by "sitt[ing] out of Wilson's sight

and remain[ing] silent except when imposing an objection."  (Def. Mem. at 18.)  But that

option—which presumably would have been available in each of the cases cited above—still

leaves us with the problem that the defense might pose objections, and that those objections

(1) would interfere with the examinations, (2) would likely be meritless given the court's conclusions about Wilson's Fifth Amendment rights, and (3) could be made just as effectively after the examinations are over, in the event that the Government seeks to introduce evidence from the examinations that the defense believes would violate Wilson's constitutional rights. See Chavez, 538 U.S. at 769.

The court draws the same conclusions regarding the defense's alternative request that counsel be permitted to monitor the proceedings using an audio feed and to videotape the examinations.  (Def. Mem. at 18-19.)  These safeguards are unnecessary given the court's conclusions about Wilson's Fifth and Sixth Amendment rights, and are disfavored by courts for the same reasons that attorney presence is disfavored.  Indeed, "[m]ost courts analyze a request for recording in the same way that they evaluate a motion to permit the presence of an attorney" because, while "recording is less intrusive than permitting a third-party to be present, it would still impede one-on-one communication between the patient and the [examiner] and tend to undermine the [examiner's] evaluator technique."  Hirschheimer v. Associated Metals & Minerals Corp., No. 94-CV-6155 (JFK), 1995 WL 736901, at *4 (S.D.N.Y. Dec. 12, 1995); see also Lahar v. Oakland Cty., No. 05-CV-73920 (VAR), 2006 WL 2269340, at *8 (E.D. Mich. Aug. 8, 2006) ("[T]he majority of federal courts decline to allow either recording or an observer [in a mental examination] absent a showing of a special need or good reason."); Grief Bros., 218 F.R.D. at 64; but see Nelson, 2010 WL 2010520, at *3.  The court agrees with the weight of authority that the recording of a mental examination changes its tenor and feel in such a way that could potentially undermine its effectiveness.  And, because there are no specialized circumstances justifying a recording here, the court will not permit it.

28

**III.     CONCLUSION**

For the reasons set forth above, the Government's motion for reconsideration of the court's February 13, 2012, Order is DENIED; and Wilson's motion concerning the Government's proposed testing is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
      June 22, 2012

    /s/ Nicholas G. Garaufis
    NICHOLAS G. GARAUFIS
    United States District Judge