UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

-against-

**04-CR-1016 (NGG)**

RONELL WILSON,

       Defendant.

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

  Before the court are Defendant Ronell Wilson's motions seeking: (1) to preclude Government experts Dr. Robert Denney and Dr. Raymond Patterson from testifying at Wilson's upcoming penalty phase re-trial; and (2) more specific disclosure from the Government detailing the evidence to be used to prove Wilson's future dangerousness and victim impact.[1] For the reasons set forth below, Wilson's motion to preclude expert testimony is DENIED WITHOUT PREJUDICE and his motion for more specific disclosure is GRANTED IN PART and DENIED IN PART.

**I. BACKGROUND**[2]

  **A. Motion to Preclude Expert Testimony**

  On February 25, 2013, the Government noticed its "inten[t] to call Drs. Robert Denney and Raymond Patterson as rebuttal experts should the defendant present evidence of his intellectual abilities, particularly through the use of medical and educational histories, including

---

[1] With the court's permission, Wilson and the Government filed many of their papers relating to these issues under seal given their confidential contents. The court's characterization of the issues, however, is not sensitive and is therefore public.

[2] The court will discuss only the background pertinent to the issues addressed in this opinion. Additional background can be found in the Second Circuit's decision in this case. See United States v. Whitten, 610 F.3d 168, 173-77 (2d Cir. 2010).

1

the results of IQ testing" pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G). (Feb. 25, 2013, Gov't Ltr. (Dkt. 1027) at 1.)

On March 21, 2013, the Government filed notice of its intent to "call Dr. Denney as an expert in its direct case to offer his opinion about the future dangerousness of the defendant." (Mar. 21, 2013, Gov't Ltr. (Dkt. 1072) at 2.) That same day, Wilson moved to preclude all testimony by Dr. Denney and Dr. Patterson on the ground that admitting their testimony would violate the Fifth Amendment's privilege against self-incrimination and the Sixth Amendment's right to counsel. (Def. Expert Mem. (Dkt. 1073).)

On March 27, 2013, the Government opposed Wilson's motion. (Gov't Expert Opp'n (Dkt. 1081).) Although it withdrew notice of its intent to offer Dr. Denney in its case-in-chief as an expert on Wilson's future dangerousness (id. at 3 n.4), it argued that Wilson's planned mitigation case necessitates the admission of Dr. Denney's and Dr. Patterson's rebuttal testimony (id. at 4-11). On March 29, 2013, Wilson replied. (Def. Expert Reply (Dkt. 1083).)

### B. Motion for More Specific Disclosure

On March 18, 2013, Wilson moved for an "order directing the government to make an offer of proof concerning the evidence upon which it intends to rely in establishing the future danger and victim impact aggravating factors." (Dkt. 1061.) Later that day, the Government affirmed that it had "disclosed to the defendant . . . a description of its future dangerousness evidence, which the government intends to rely upon to prove that non-statutory aggravating factor at the upcoming sentencing proceeding." (Mar. 18, 2013, Gov't Ltr. (Dkt. 1062).)

On March 20, 2013, Wilson moved for a more detailed offer of proof "beyond the allegations contained in [the Government's] letter dated March 18, 2013." (Def. Disclosure Mem. (Dkt. 1069) at 1 (citing Mar. 18, 2013, Gov't Ltr. (Ex. A to Def. Disclosure Mem. (Dkt.

1069-1))).) In this submission, Wilson also requested that (1) "the government . . . turn over the psychiatric and criminal history records for each inmate witness that it intends to call to substantiate its future danger allegations"; and (2) because the Government had implied that the its list of evidence was not exhaustive, the court "limit the government to the allegations set forth in [its] letter, to be supplemented only by acts committed after its March 18th date." (Id. at 4-5.)

After the Government opposed (Gov't Disclosure Opp'n (Dkt. 1075)), Wilson filed a reply that made five additional requests, asking the court to: (1) preclude certain unadjudicated bad acts as legally insufficient or irrelevant to future danger; (2) strike certain allegations that "do not contain any intimation of violence . . . unless the government can satisfy the Court that they are relevant to the underlying aggravator"; (3) require the Government provide notice of "which of Mr. Wilson's prior convictions, bad acts, telephone calls and writings it introduced at the prior penalty trial that it intends to submit at the re-retrial"; (4) "preclude the government from calling additional [victim impact] witnesses beyond those who appeared at the prior penalty trial"; and (5) order the Government to instruct "that these witnesses . . . control their emotions while testifying" (Def. Disclosure Reply (Dkt. 1077) at 4-8).

## II. DISCUSSION

### A. Motion to Preclude Expert Testimony

#### 1. Fifth Amendment[3]

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection extends to the guilt and penalty phases of a criminal proceeding. Estelle v. Smith, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilty and penalty phases of [a]

---

[3] Because the Government has withdrawn its notice to call Dr. Denney in its case-in-chief (Gov't Expert Opp'n at 3 n.4), the court need not decide whether Wilson's presentation of his Atkins claim permits affirmative expert testimony to prove his future dangerousness.

3

capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."). Inherent in the right against self-incrimination is the well-settled rule that "absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.'" Id. at 466-67 (quoting Miranda v. Arizona, 384 U.S. 436, 467-69 (1966)).

This right, however, may be waived. "When the defendant initiates a 'defense of mental incapacity or disturbance,' he makes a limited waiver of his Fifth Amendment rights that permits the Government to conduct an examination of the defendant as a 'rebuttal to the psychiatric defense.'" United States v. Wilson, No. 04-CR-1016 (NGG), 2012 WL 6962982, at *13 (E.D.N.Y. June 22, 2012) (quoting Gibbs v. Frank, 387 F.3d 268, 274 (3d Cir. 2004)); see also United States v. McSherry, 226 F.3d 153, 156 (2d Cir. 2000) ("[I]f the defense relies on expert testimony as to the defendant's mental state, it is estopped from depriving the government of an opportunity to examine the defendant."). This rule is founded on fundamental fairness: selectively invoking a constitutional privilege as both a shield and a sword may leave the trier of fact with an incomplete picture. See United States v. Premises Known as 81 Sysosset Woodbury Rd., 71 F.3d 1067, 1072 (2d Cir. 1995) ("[I]n discussing the Fifth Amendment's privilege against self-incrimination, this Court has said that an act of testimony can constitute a waiver of the privilege when the witness's prior statement's create a risk that the truth will be distorted and when the witness should reasonably have known that his or her statements would be interpreted as a waiver of the privilege."). As the Second Circuit has explained,

> [t]he unfairness courts have found which justif[y] imposing involuntary forfeiture
> [of a privilege] generally result[s] from a party's advancing a claim to a court or

4

> jury . . . while relying on its privilege to withhold from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim.

In re. Sims, 534 F.3d 117, 138 (2d Cir. 2008) (citation omitted) (third alteration in original).

Here, it is clear that Wilson partially waived his Fifth Amendment rights when he argued that he is mentally retarded and therefore ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304 (2002), and the Federal Death Penalty Act, see 18 U.S.C. 18 U.S.C. § 3596(c). As Wilson acknowledges, his argument regarding mental retardation permitted the Government to examine him with its own experts, who then testified at the Atkins hearing and rebutted Wilson's claim. (See Def. Expert Mem. at 3.) But a defendant's waiver of his right against self-incrimination may be limited in scope. See United States v. Miranti, 253 F.2d 135, 139 (2d Cir. 1958) ("[I]t is well established that a waiver of the privilege [against self-incrimination] in one proceeding does not affect the rights of a witness or the accused in another independent proceeding."). The parties disagree as to whether Wilson's intended mitigation case at the penalty phase permits the Government to call these experts in rebuttal.

Wilson asserts that he "will not contend at the trial that [he] is mentally retarded. Nor does he intend to call any expert witness who has evaluated or interviewed him in connection with this litigation." (Def. Expert Mem. at 2.) He assures the court that he will not "rely on any IQ or neurological tests conducted after his arrest in this case." (Id. at 3.) He maintains that introduction of other forms of mitigation evidence will not constitute a Fifth Amendment waiver because "[a] waiver is effected only if the defendant presents expert testimony as to his mental condition." (Id. at 4.)

The Government states that Wilson "has represented to the government that he intends to support his case for a sentence of life imprisonment by offering the same documentary exhibits

that he offered during the 2007 penalty phase hearing[,] . . . [which include] multiple observations and statements of diagnoses of mental conditions made by mental health professionals." (Gov't Expert Opp'n at 1.) It adds that Wilson has noticed his intent to call a "childhood trauma" expert to "testify that 'exposure to trauma is associated with long physical, psychological, and emotional harm.'" (Id. at 2 (quoting Mar. 15, 2013, Def. Ltr. (Dkt. 1060)).) Wilson's motion, the Government argues, would "inject . . . favorable psychological evidence into the sentencing proceeding without allowing the government to adequately rebut this type of evidence." (Id. at 9.)

The court realizes that, in a sense, this dispute is not ripe—Wilson has obviously not yet put on his mitigation case (if any), and the propriety of rebuttal expert testimony can only be truly determined after hearing all of Wilson's evidence. But based upon the representations of the parties, the court is willing to establish certain guidelines to help streamline the penalty phase and foster efficiency.

It must be stressed that Wilson has only represented that he will not include a very limited set of evidence: IQ tests administered after March 2003 and experts who have interviewed him "during the course of this litigation." (Def. Expert Mem. at 3.) Wilson makes no mention of omitting: (1) the results of IQ tests administered before Wilson's arrest in March 2003; (2) any diagnoses made by psychiatrists, psychologists, or other experts who have not interviewed him after his arrest; (3) medical records; and (4) teachers' reports concerning his mental abilities. (See also Def. Expert Reply at 2 ("[T]he defense intends to introduce *all* of Mr. Wilson's historical educational, medical and mental health records . . . ." (emphasis added)).)

A mitigation case that eventually includes these types of evidence may very well waive Wilson's Fifth Amendment privilege against self-incrimination. Whether a defendant has

waived his Fifth Amendment right is not claim-specific; it is based on principles of fundamental fairness. Buchanan v. Kentucky, 483 U.S. 402 (1987), is in instructive in this regard. In Buchanan, the parties had jointly requested an evaluation of the defendant to determine whether he should be involuntarily hospitalized. 483 U.S. at 410-11 & n.11. At trial, the defendant presented an "extreme emotional disturbance" defense and called a social worker to read other "reports and letters dealing with evaluations of petitioner's mental condition." Id. at 409. On cross-examination, the state had this witness read from reports from the jointly requested evaluation concerning the defendant's need for involuntary hospitalization. Id. at 410. The Supreme Court held that admission of this testimony did not violate the Fifth Amendment because "if a defendant requests [a psychiatric] evaluation *or presents psychiatric evidence*, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." Id. at 422-23 (emphasis added). It did not matter that the challenged report was made as part of a determination whether the defendant should be involuntarily hospitalized but offered in rebuttal to his "'mental status' defense of extreme emotional disturbance." Id. at 423. The crux of the case was that the state needed the fair opportunity to rebut the defendant's mental condition evidence. See id.; Schneider v. Lynaugh, 835 F.2d 570, 576 (5th Cir. 1988) (holding that the defendant "clearly put his mental state at issue" when he called only "social workers and counselors" who, although not qualified as experts, were "presented [as] witnesses . . . presenting experience that enhanced their credibility on the central issue at the sentencing phase—[the defendant's] sincerity in wanting to reform"); see also Sims, 534 F.3d at 132 ("In dealing with testimonial privileges other than the psychotherapist-patient privilege, we have held that a waiver may be implied in circumstances where it is called for in the interests of fairness."); cf. Smith, 451 U.S. at 466, 472 (finding

7

admission of testimony concerning the defendant's future dangerousness predicated on a competency examination unconstitutional where the defendant "introduced no psychiatric evidence, nor had he indicated that he might do so," noting that "a different situation arises where a defendant intends *to introduce psychiatric evidence at the penalty phase*" (emphasis added)).

The court will not adopt Wilson's proposed rigid rule that would find that the presentation of any mitigation evidence other than recent IQ scores and expert testimony cannot constitute a Fifth Amendment waiver, and finds the Government's submission compelling on this point.[4] If Wilson opens the door by introducing evidence (and/or making arguments) concerning Wilson's diminished mental capacity predicated upon statements he has made, then the jury may be left with a lopsided view of the facts. Principles of fundamental fairness may then require allowing the Government to rebut this evidence with testimony predicated on examinations that Wilson invited when he asserted his Atkins claim. Wilson cannot *implicitly* argue his mental capacity with evidence containing his own statements while concurrently seeking to prevent the Government from *explicitly* asserting the same.

Thus, at the close of Wilson's case, the court will determine whether he has placed his mental condition at issue—whether through the introduction of IQ tests, medical records,[5]

---

[4] Wilson may be correct that his statements made in examinations required by Federal Rule of Criminal Procedure 12.2 cannot be used against him in the penalty phase unless he introduces expert evidence. Fed. R. Crim. P. 12.2(c)(4) ("No statement made by a defendant in the course of any examination conducted under this rule . . . maybe be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant . . . (B) has introduced *expert evidence* in a capital sentencing proceeding . . . ." (emphasis added)). But Dr. Denney's and Dr. Patterson's examinations were not compelled by Rule 12.2. (See Feb. 2, 2012, Order (Dkt. 618); Feb. 13, 2012, Mem. & Order (Dkt. 625) (holding that an Atkins proceeding is not a "capital sentencing proceeding").) And in any event, the Second Circuit has held that Rule 12.2 does not supplant the court's "inherent power to 'supervise the administration of criminal justice in order to ensure fundamental fairness.'" McSherry, 226 F.3d at 156 (quoting United States v. Baird, 414 F.2d 700, 710 (2d Cir. 1969) (holding that a court, outside the procedures of Rule 12.2, may compel a defendant's examination by the Government where the defendant has noticed an intent to rely on experts).

[5] Wilson has offered to "redact *all* mental health diagnoses from the exhibits [he] introduces, from

teacher comments, counsel's arguments, experts, or otherwise; if so, it will permit Dr. Denney and Dr. Patterson to testify in rebuttal *solely* on Wilson's mental condition.[6] Accordingly, Wilson's motion to preclude the testimony of Dr. Denney and Dr. Patterson is denied without prejudice to renew at the close of his mitigation case.[7]

    2.    <u>Sixth Amendment</u>

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. This right attaches at any "critical stage" of a criminal proceeding, that is, one where "counsel's absence might derogate from the accused's right to a fair trial." <u>United States v. Kon Yu-Leung</u>, 910 F.2d 33, 38 (2d Cir. 1990). At such stages, criminal defendants are entitled "consultation with counsel." <u>Buchanan</u>, 483 U.S. at 424. "Such consultation, to be effective, must be based on counsel's being informed about the scope and nature of the proceeding." <u>Id.</u>; <u>see also</u> <u>id.</u> at 424-25 ("[T]he effectiveness of the consultation also . . . depend[s] on counsel's awareness of the possible uses to which [a defendant's] statements in the proceeding could be put."). When a defendant is not provided sufficient opportunity to consult with his counsel prior to a custodial interrogation in violation of Sixth

---

'borderline IQ' to 'oppositional defiant disorder.'" (Def. Expert Reply at 3 (emphasis in original).) The parties may discuss this option, which may very well affect whether Wilson's mitigation case has waived his Fifth Amendment rights.

[6]    As Wilson has indicated (<u>see</u> Def. Expert Reply at 4), it is possible that the Government's experts may go beyond mere rebuttal and discuss the Government's aggravating factors, such as Wilson's alleged lack of remorse, which the Government has offered as affirmative proof of his future dangerousness (<u>see</u> Notice of Intent to Seek the Death Penalty (Dkt. 174) ¶ 3(b)). If Wilson opens the door and presents evidence on his mental condition, at Wilson's request the court is willing to instruct the jury that the Government's rebuttal experts' testimony is only to be used for rebuttal purposes and not as affirmative proof of any aggravating factor. The court is also willing to entertain applications to redact portions of these experts' reports that do more than simply rebut Wilson's mitigation case or are unduly prejudicial under 18 U.S.C. § 3593(c)).

[7]    The court stresses, however, that the penalty phase will not become a re-litigation of the <u>Atkins</u> proceeding. The court will carefully limit the Government's experts so that they only rebut any mental condition mitigation evidence.

Amendment, testimony predicated upon that interrogation must be excluded. Id. at 424. And unlike the Fifth Amendment, the Sixth Amendment's prohibition against such testimony cannot be waived. See Powell v. Texas, 492 U.S. 680, 686 (1989); Gibbs, 387 F.3d at 274

Wilson's argument that introduction of testimony from Dr. Denney and Dr. Patterson would violate the Sixth Amendment fails.[8] To begin, it is important to note that the facts here are more akin to those in Buchanan than those present in Smith. In Smith, the death-eligible defendant had been compelled to submit to a psychiatric examination to determine whether he was competent to stand trial. Id. at 456-57. Defense counsel "were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness."[9] Id. at 470-71. Nevertheless, the trial court allowed that psychiatrist to testify at the defendant's sentencing proceeding as to his future dangerousness. Id. at 470-71. The Supreme Court unanimously[10] vacated the defendant's death sentence and held that the court-ordered examination conducted without proper notice to defense counsel violated the Sixth Amendment. See id. at 471; see also Powell, 492 U.S. at 681 (describing Smith's holding as "once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes [a psychiatric]

---

[8] Neither the Supreme Court nor the Second Circuit has addressed whether an Atkins proceeding (or a Government-requested examination conducted as part of an Atkins proceeding) is a "critical stage" such that the Sixth Amendment's right to counsel applies. But as the Tenth Circuit recently noted (and which the parties do not seem to dispute), an Atkins proceeding is "inextricably intertwined with sentencing" and holds "significant consequences for the accused." Hooks v. Workman, 689 F.3d 1148, 1184 (10th Cir. 2012) (citation omitted). Accordingly, the court holds that a criminal defendant is guaranteed the right to counsel at an Atkins proceeding and any associated examination by Government-appointed experts. See id. ("We are hard-pressed to imagine a more significant consequence for the accused than a determination of whether the State has the power to take his life." (internal quotation marks and alteration omitted)). But as the court has previously indicated, this does not mean that defense counsel are entitled to be *present* at such examinations, Wilson, 2012 WL 6962982, at *14-15, only that counsel must be informed of the "scope and nature of the proceeding," Buchanan, 483 U.S. at 424.

[9] The record was unclear as to whether defense counsel were even informed that the defendant was to be examined at all. See Smith, 451 U.S. at 471 n.15.

[10] Although Justices Stewart, Powell, and Rehnquist expressed some reservations concerning the Court's alternate holding on Fifth Amendment grounds, Smith, 451 U.S. at 474 (Stewart, J., concurring in judgment), 474-75 (Rehnquist, J., concurring in judgment), all justices agreed on the Sixth Amendment issue.

examination without first notifying counsel that 'the psychiatric examination [will] encompass the issue of their client's future dangerousness'" (citation omitted) (second alteration in original)).  By contrast, the Court in Buchanan found no Sixth Amendment violation where the prosecution introduced evidence "from a psychiatric examination of [the criminal defendant] proffered *solely to rebut other psychological evidence* presented by [the defendant] . . . where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense."  483 U.S. at 404 (emphasis added).  Here, like in Buchanan, it is clear that Wilson and his counsel were aware that the examinations by the Government's experts' were to evaluate Wilson's mental condition.

Wilson argues that he "was never notified that the scope of the examination would encompass the issue of his future dangerousness[, and therefore] was denied the assistance of counsel in making a decision to submit to interviews that would be used for an undeclared purpose."  (Def. Expert Mem. at 5-6.)  This is, of course, true.  But it is clear that Wilson and his counsel were aware that the Government's experts could use their interviews with Wilson against him on the issue of his mental condition, whether as to his Atkins claim or otherwise. Indeed, in the context of a dispute over the scope of the Government's expert's examinations, the court explained that

> [c]ompelling a criminal defendant to submit to a psychiatric examination may violate the Fifth Amendment where the defendant has not placed his *mental state* at issue.  But when the defendant initiates a "defense of *mental incapacity* or disturbance," he makes a limited waiver of his Fifth Amendment rights that permits the Government to conduct an examination of the defendant as a "rebuttal to the *psychiatric defense*."

Wilson, 2012 WL 6962982, at *13 (citations omitted) (emphases added); see also id. at *14 ("[T]the Supreme Court has held only that counsel must be 'notified in advance' of the examination so that counsel may advise the defendant regarding 'the significant decision of

11

whether to submit to the examination and to what end the psychiatrist's findings could be employed. . . . Such notice has of course already occurred in this case." (citations omitted) (emphasis removed)).

It is true that

> the effectiveness of the consultation [guaranteed by the Sixth Amendment] . . . depend[s] on counsel's awareness of the possible uses to which [a defendant's] statements in the proceeding could be put. Given [the Supreme Court's] decision in <u>Smith</u>, however, counsel was certainly on notice that if he intended to put on a 'mental status' defense for [the defendant], he would have to anticipate that the use of psychological evidence by the prosecution in rebuttal.

<u>Buchanan</u>, 483 U.S. at 424-25. The same is true here: Wilson's decision to put his mental condition at issue in the <u>Atkins</u> context put him and his counsel on notice that if he were to again place his mental condition at issue through the presentation of "psychiatric evidence" at the penalty phase, then then the Government would have a fair opportunity to use its examinations in rebuttal. <u>Smith</u>, 451 U.S. at 468. Accordingly, introduction of Dr. Denney's and Dr. Patterson's testimony will not violate the Sixth Amendment.

### B. Motion for More Specific Disclosure

#### 1. <u>Future Dangerousness Evidence</u>

At Wilson's request, on March 18, 2013, the Government informed him of the unadjudicated crimes that it intends to introduce to prove his future dangerousness. (Mar. 18, 2013, Gov't Ltr.) It gave general dates, locations, and descriptions of these incidents. (<u>See</u> <u>id.</u>) Wilson maintains that this proffer is insufficient "to protect [his] right to a fair and reliable sentencing determination." (Def. Disclosure Mem. at 2.) Specifically, Wilson requests that the court order the Government to provide specific dates, the names of all involved parties, the content of certain statements, and other details. (<u>See</u> <u>id.</u> at 2-4; <u>see also</u> Def. Disclosure Reply at 5 ("We ask the Court to require the government to provide additional information, with dates,

names of witnesses or specific documentary evidence on which it will rely, and the precise conduct involved.").) Without this information, he argues that "the future danger presentation will amount to an ambush, with the jurors potentially exposed to irrelevant, unreliable or unduly prejudicial proof that the defense has not had an opportunity to meet." (Def. Disclosure Mem. at 4.) He is mistaken.

The Government is not required to provide hyper-specific information about the evidence it intends to introduce at the penalty phase. Indeed, the Federal Death Penalty Act requires only that the Government provide notice that "set[s] forth the aggravating factor or factors that [it] proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(2); see also United States v. Higgs, 353 F.3d 281, 325 (4th Cir. 2003) ("The FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor . . . not notice of the specific evidence that will be used to support it."). And although this court has noted that "'due process requires a defendant to receive sufficient notice of aggravating factors to enable him to respond and to prepare his case in rebuttal,'" United States v. Wilson, 493 F. Supp. 2d 364, 377 (E.D.N.Y. 2006) (citation omitted), "[a] bill of particulars is not a discovery device . . . and should be ordered only as necessary to 'apprise the defendant of the charges against him with sufficient precision,'" United States v. Basciano, 763 F. Supp. 2d 303, 358 (E.D.N.Y. 2011) (quoting Wilson, 493 F. Supp. 2d at 369-70).

Here, the Government has met—and likely exceeded—its disclosure obligations concerning the evidence it seeks to introduce in support of the future dangerousness factor. In its letter of March 18, 2013, the Government provided approximate dates, locations, and general descriptions of the particular acts. (Mar. 18, 2013, Gov't Ltr.) It has also disclosed incident reports compiled by the Bureau of Prisons, numerous photographs, videos, and recorded

13

telephone calls. (See id. at 1-2.) As detailed below, the Government must also make an offer of proof at least one day before it calls *any* witness (whether pursuant to a cooperation agreement or not) that will discuss any unadjudicated conduct. This evidence is all in addition to the prior trial's exhibits and transcripts that are available to Wilson. Overall, the court concludes that this information is more than sufficient to "'enable [Wilson] to respond and to prepare his case in rebuttal.'" Wilson, 493 F. Supp. 2d at 377 (citation omitted).

Wilson's cited authority is inapposite (and non-binding). In United States v. Hargrove, No. 03-20192-CM, 2005 WL 2122310 (D. Kan. Aug. 25, 2005), for instance, the court noted that the defendant was "not statutorily entitled to advance notice of the specific evidence the government intends to offer in support of an aggravating factor," but under its "inherent supervisory power" ordered the Government—which had noted its intent to only offer evidence of "criminal conduct for which defendant has been adjudicated guilty"—to provide detailed notice only in the event it "change[d] its position." Id. at *7-8. In United States v. Basciano, 763 F. Supp. 2d 303 (E.D.N.Y. 2011), this court required the Government disclose evidence with roughly the same level of specificity that it has done here.[11] See id. at 356-58. And in many of Wilson's other cited authorities the courts held hearings examining unadjudicated criminal conduct where there were questions of reliability and/or admissibility. See, e.g., United States v. Corley, 348 F. Supp. 2d 970, 972 (N.D. Ind. 2004) (ordering a hearing prior to the penalty phase to determine the reliability of unrelated criminal charges that had been previously dismissed); United States v. Cooper, 91 F. Supp. 2d 90, 107 (D.D.C. 2000) (ordering a hearing where the

---

[11] Wilson argues that in Basciano this court required a proffer from the Government "upon completion of the guilt phase" to allow the defendant to "move to exclude particular evidence or for a reliability hearing," and noted that the penalty phase is not "a forum to try dozens of alleged, past, uncharged crimes." (Def. Disclosure Reply at 3 (quoting Basciano, 763 F. Supp. 2d at 356-58).) The circumstances in Basciano are very different from those present here. In Basciano, the Government had noticed its intent to prove the defendant's "Participation in Additional Uncharged Homicides, Attempted Homicides or Other Serious Crimes of Violence" as a stand-alone non-statutory aggravating factor. 763 F. Supp. 2d at 355-56. And the court in Basciano did not require additional offers of proof before each testifying witness, as will be the case here.

14

court was "concerned about the reliability" of unadjudicated criminal conduct); cf. United States v. Glover, 43 F. Supp. 2d 1217, 1227-28 (D. Kan. 1999) (noting that the Government had to that point "reveal[ed] nothing about the specific acts on which [it] propos[ed] to rely," and ordering disclosure to "adequately apprise [the defendant] of the nature of the evidence on which the government will rely").

Wilson's concern about "tainting" the jury is misguided. For the original penalty phase in this case, the court ordered that:

> the Government . . . make an offer of proof regarding Wilson's unadjudicated crimes on a witness-by-witness basis. Before the Government calls a cooperating witness whom it will question about Wilson's unadjudicated crimes, the Government must notify the defense of the crime or crimes about which the witness is expected to testify. The Government's notice must be provided at least one day prior to calling the witness and must state with reasonable specificity the date, location, and general nature of each crime about which the witness is expected to testify.

(Jan. 9, 2007, Mem. & Order (Dkt. 288) at 17-18.) The Government has agreed (and is again ordered) to make such a showing at least one day before calling *any* witness who will testify as to specific unadjudicated crimes. (See Gov't Disclosure Opp'n at 2 n.2.) With all of this information, Wilson may effectively move to preclude certain evidence on reliability, prejudice, or cumulative grounds: (1) immediately; (2) after it has performed its own investigation; (3) after the Government makes an "offer of proof regarding Wilson's unadjudicated crimes on a witness-by-witness basis"; or (4) on direct examination.[12] If necessary, the court will hold a hearing outside the presence of the jury to determine the reliability of such evidence. The court

---

[12] For this reason, the court will not now preclude certain unadjudicated acts (including non-violent conduct and verbal threats) as insufficient to establish future dangerousness. (See Def. Disclosure Reply at 4 & n.1, 5.) And while Wilson is free to make any objections he deems necessary, the court notes that it has previously held that "[e]ach [past criminal] incident is probative because each increases the probability that Wilson is a future danger. . . . [And b]ecause the jury must consider the sufficiency of the aggravating factors found to exist, and must weigh those factors, if any, against mitigating factors found to exist, it is entitled to know not merely whether Wilson is a future danger, but just how dangerous he actually is." Wilson, 493 F. Supp. 2d at 513-14.

15

will also consider limited requests for additional time to investigate any incidents for which Wilson believes he did not receive notice. These measures are sufficient to protect Wilson's statutory and constitutional rights. Accordingly, his motion for more specific disclosure concerning the future dangerousness aggravating factor is denied.[13]

### 2. Victim Impact Evidence

As with future dangerousness evidence, the Government is obligated to disclose information about its victim impact evidence sufficient to "'enable [Wilson] to respond and to prepare his case in rebuttal.'" Wilson, 493 F. Supp. 2d at 377 (citation omitted). Before the first penalty phase, the court ordered that the Government "provide the defense 'a written statement describing the proposed testimony as to each 'victim impact' witness.'" (Jan. 9, 2007, Mem. & Order (quoting Glover, 43 F. Supp. 2d at 1235).) The Government therefore provided a summary of eleven possible victim impact witnesses' proposed testimony. (Jan. 11, 2007, Gov't Ltr. (Dkt. 459).)

For this trial, the Government noted its intent to call eight witnesses who testified at the last trial, and to read into the record testimony of two other witnesses who are no longer available. (Mar. 18, 2013, Gov't Ltr. (Dkt. 1082).) The Government also generally described the testimony of four other likely victim impact witnesses who did not testify at the first trial. (Id. at 2.) It also stated that it "may call one more undercover officers" who worked with the victims, indicating that "[t]hey will testify about their professional and personal experiences with the victims," and agreed to "supplement this disclosure with further details." (Id. at 2-3.)

---

[13] Wilson also objected to the Government's use of the phrase "including, but not limited to" as to items 8 and 9 identified in its March 18, 2013, letter. (Def. Disclosure Mem. at 4.) The Government has signaled that its "intention is to be as detailed and specific as possible in listing the acts that comprise items 8 and 9, but it does not intend to limit its right to elicit additional details regarding these acts." (Gov't Disclosure Opp'n at 5.) The court takes this to mean that the Government does not intend to introduce other unadjudicated acts in support of the future dangerousness aggravating factor. If, however, Wilson learns that the Government intends to introduce other unadjudicated acts (whether through an offer of proof made in advance of a witness's testimony or otherwise), he may, as prescribed above, request a hearing or additional time to investigate.

16

Wilson claims that he needs even more specific information as to these witnesses' intended testimony. He argues that the Government's notice "does not provide sufficiently detailed information about the content of each witness's testimony so that the Court can exercise its gatekeeper function." (Def. Disclosure Reply at 7.) This, he argues, makes it "impossible for defense counsel to make objections or for the Court to assess prejudice." (Id.) He is mistaken.

The Government has provided sufficient detail as to these witnesses' proposed testimony. It has provided the general subject matter of these witnesses' possible testimony, their interactions with the victims, and has done so with the same level of particularity that it did in before the first trial. (Compare Mar. 18, 2013, Gov't Ltr., with Jan. 11, 2007, Gov't Ltr.) Wilson is not entitled to a line-by-line script of these witnesses' planned testimony. The Government's Notice of Intent to Seek the Death Penalty, its two letters summarizing intended victim impact witnesses' testimony, and the prior trial's transcript give Wilson sufficient information to move to preclude or restrict certain victim impact testimony either now, before certain witnesses testify, or on direct examination. At this stage, the Government has provided sufficient detail.[14]

Wilson also asks that the court "preclude the government from calling additional [victim impact] witnesses beyond those who appeared at the prior penalty trial." (Def. Disclosure Reply at 8.) The court is sensitive to Wilson's concerns about redundant and potentially prejudicial victim impact evidence and is prepared to appropriately tailor the scope and volume of such testimony as required by Payne v. Tennessee, 501 U.S. 808 (1991). But the court will not at this

---

[14] Wilson argues generally that the he needs further disclosure because the amount and content of victim impact testimony "exceeds the 'quick glimpse' of the victims' lives that the Supreme Court authorized" and "will necessarily turn the issue of victim impact into a referendum on victim worth." (Def. Disclosure Reply at 7-8.) He also seems to argue that Sarah Nemorin, daughter of victim Detective James Nemorin, should be prevented from testifying because she "was an infant at the time of the offense . . . and has no independent knowledge or memory of the victim or his death." (Id. at 8 n.2.) Because the court denies Wilson's request for further disclosure, these substantive arguments concerning the admissibility of such testimony are premature. He is free to re-argue these points as to specific evidence going forward.

17

stage limit the Government's case to a particular set of witnesses. Rather, as the case unfolds and the court begins its continuing oversight, it will entertain more specific objections. This request is therefore denied without prejudice.

Finally, Wilson's request that the court take the same precautions it did in the first penalty phase with regard to victim impact testimony (see Def. Disclosure Reply at 8) is granted. The Government is again ordered to "advise victim-impact witnesses that they must make every reasonable effort to control their emotions and maintain the dignity of these proceedings." (Jan. 9, 2007, Mem. & Order at 25.) And as part of its final charge to the jury, the court will give the following instruction:

> When considering the testimony of victim impact witnesses, you may not permit the emotional nature of such testimony to overwhelm your ability to follow the law.

### 3. Prison and Mental Health Records

Wilson also requests that the court order the Government to "turn over the psychiatric and criminal history records for each inmate witness that it intends to call to substantiate its future danger allegations." (Def. Disclosure Mem. at 4.) The Government states that "it is aware of its obligations under Giglio v. United States, 405 U.S. 150 (1972), and it intends to comply accordingly." (Gov't Ltr. at 5.)

It is well-settled that material impeachment evidence concerning a prosecution witness must be disclosed to a criminal defendant upon request. See 18 U.S.C. § 3500; Giglio v. United States, 405 U.S. 150 (1973); Brady v. Maryland, 373 U.S. 83 (1963); see also United States v. Bagley, 473 U.S. 667, 675-76 (1985). This disclosure ordinarily follows a three-step process: first, upon a defendant's request, "the prosecution itself makes the initial determination as to what evidence must be disclosed to the defense," United States v. Leung, 40 F.3d 577, 582 (2d

18

Cir. 1994); second, "[t]o the extent that there is a question as to the relevance or materiality of a given group of documents, the documents are normally submitted to the court for in camera review," United States v. Wolfson, 55 F.3d 58, 60 (2d Cir. 1995); and third, the court resolves the dispute and, if the defendant objects to the court's ruling, the material is preserved for appellate review, id.; see 18 U.S.C. § 3500(c). United States v. Preldakaj, 456 F. App'x 56, 59 (2d Cir. 2012) (outlining this procedure).

Here, the court is satisfied that based on the Government's representation, it will comply with its disclosure obligations, which may very well include psychiatric and prison records insofar as they weigh on the witness's credibility. In the event that there is a dispute over the scope of such disclosure, the court is prepared to review the materials in camera. Accordingly, Wilson's request for all psychiatric and prison records at this time is denied.

### 4. Additional Evidence

Wilson has requested notice of "which of Mr. Wilson's prior convictions, bad acts, telephone calls and writings it introduced at the prior penalty trial that it intends to submit at the re-trial." (Def. Disclosure Reply at 6.) Wilson has also requested "advance disclosure of all photographic and another exhibits the government intends to introduce in connection with its victim impact presentation." (Def. Disclosure Mem. at 7.) The Government has disclosed such evidence. (Mar. 29, 2013, Gov't Ltr. (Dkt. 1086).) Accordingly, these requests are denied as moot.

## III. CONCLUSION

Wilson's motion to preclude the testimony of Dr. Denney and Dr. Patterson is DENIED WITHOUT PREJUDICE to his right to renew at the close of his mitigation case. Wilson's

motion for more specific disclosure is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated: Brooklyn, New York
April 1, 2013

   /s/ Nicholas G. Garaufis  
NICHOLAS G. GARAUFIS
United States District Judge