UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

-against-

**04-CR-1016 (NGG)**

RONELL WILSON,

                Defendant.

-----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is the Government's motion to strike Juror #322 for cause and Defendant Ronell Wilson's motion to strike Juror #358 for cause. For the reasons set forth below, the Government's motion is GRANTED and Wilson's motion is DENIED.

**I.    BACKGROUND**[1]

The court is currently conducting oral voir dire to select a jury that will decide whether Wilson will be sentenced to death or to life in prison without the possibility of release at an upcoming penalty phase re-trial scheduled to begin on June 24, 2013.

**A.    Juror #322**

The Government moves to strike Juror #322 for cause on the ground that his answers given at voir dire sharply contrast those provided in his questionnaire, preventing the parties from being able to know whether he would meaningfully consider both possible sentences, leaving the court with no confidence that he could follow its instructions to do just that. Wilson opposes, maintaining that some of Juror #322's questionnaire responses are consistent with those

---

[1] The court will discuss only the background pertinent to the issues addressed in this opinion. Additional background can be found in the Second Circuit's decision in this case. See United States v. Whitten, 610 F.3d 168, 173-77 (2d Cir. 2010).

1

given at voir dire, and that although Juror #322 may oppose the death penalty generally, he can put aside this opposition aside and meaningfully consider imposing both possible penalties.

    **B.    Juror #358**

Wilson challenges Juror #358, claiming that she in unqualified to serve because when the court asked her whether she believed that there was a presumption in favor of the death penalty for individuals who commit intentional murder, she answered in the affirmative. The Government argues that Juror #358 ensured that, if instructed to the contrary, she could put aside any personal belief regarding presumptions and that, taken as a whole, the record reflects that Juror #358 is a qualified juror.

**II.    STANDARD OF REVIEW**

    **A.    Ability to Follow the Court's Instructions**

A prospective juror may be dismissed for cause where her "inconsistent positions" make it "unlikely that she w[ill] follow[] the court's instructions if empaneled." United States v. Fell, 531 F.3d 197, 216 (2d Cir. 2008). This is because "'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror.'" Id. at 211 (quoting Wainwright v. Witt, 469 U.S. at 424-26 (1985)). A prospective juror may be stuck on these grounds "even when the juror 'indicated some degree of willingness to put aside personal biases,'" id. at 213 (citation omitted), since "a juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment," id. at 215. See also Uttecht v. Brown, 551 U.S. 1, 18 (2007) ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not

overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case . . . .").

### B. Life Qualification

"[T]he proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Morgan v. Illinois, 504 U.S. 719, 728 (1992) (quoting Witt, 469 U.S. at 424).

A defendant may challenge for cause "[a] juror who will automatically vote for the death penalty in every case [because that means he] will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729. This is often referred to as the requirement that a juror be "life-qualified." United States v. Basciano, No. 05-CR-060 (NGG), 2011 WL 4574925, at *1 (E.D.N.Y. Mar. 11, 2011).

## III. DISCUSSION

### A. Juror #322

The Government has moved to strike Juror #322 for cause. That motion is granted.

In his questionnaire, Juror #322 expressed general opposition to the death penalty. For instance, in response to question #39, which asks prospective jurors to generally describe their views on the death penalty "for someone who killed two police officers," Juror #322 wrote: "I don't believe in the death penalty. I don't think it's anyone's decision but a higher power if someone should live or die. But then again if it was one of my family members that was murdered I would be in favor. Guess I'm on the fence until affects me or my family directly." (grammar and punctuation corrected.) In response to Question #42, which asks whether the

3

prospective juror believes in "an eye for an eye," Juror #322 responded, "A higher power should determine a person[']s fate."

At the beginning of voir dire, consistent with his answers to questions #53, #54, and #55 of the questionnaire, Juror #322 stated that he could consider imposing either possible sentence—death or life in prison without the possibility of release. (Apr. 29, 2013, Hr'g Tr. at 849:19-850:7.) The court then asked Juror #322 about his views on the death penalty, noting that on his questionnaire he twice mentioned that a "higher power" should determine whether someone lives or dies. (Id. at 852:17-853:9.) Juror #322 stated that he "pretty much" believed that God should determine someone's fate, but added, "[t]here are exceptions"—"[f]amily members, law enforcement, you know, pretty much, that's it; family members and law enforcement." (Id. at 853:10-17.) Because this was the first time that Juror #322 had hinted that he could make an exception to his general feelings regarding the death penalty for cases involving the murder of law enforcement officials, the court followed-up on the subject and asked whether it would "be necessary for the defendant to have known that they were law enforcement when he killed them." (Id. at 853:21-23.) Juror #322 replied, "Yes." (Id. at 853:24.)

After this initial colloquy, however, Juror #322's views began to change. For instance, the court asked whether he could impose the death penalty if it were proven that Wilson did *not* know that his victims were police officers. (Id. at 860:21-24.) Juror #322 replied, "I guess it's all up to the way you instruct us to make—to come up with the decision. It doesn't really, that doesn't really matter, I guess." (Id. at 860:25-861:2.) Having now determined that the limited exceptions to Juror #322's opposition to the death penalty were readily expanding, the court asked whether Juror #322 could impose the death penalty on someone who killed two individuals

4

who were not police officers.  (Id. at 861:9-12.)  This time Juror #322 said that he could, and when pressed on this, stated that he could do so "if this was an intentional like intentional murder."  (Id. at 861:13-17.)

Because Juror #322 had given such conflicting answers, the court asked how his responses concerning the belief that a "higher power" should decide a person's fate squared with those implying that he could impose the death penalty for the intentional murder of two individuals.  (Id. at 862:7-13.)  Juror #322 responded:

> Well, that's kind of tough. . . . It's kind of tough, I don't believe in eye for an eye. . . . But then again, I believe we all have, we all should—it should be a fair fight, basically.  That's why we're here, right?  We're going to decide if this gentleman should live or die, if he should spend the rest of his life in jail or should he, should he, or should he get the death penalty.
>
> So, I honestly, if I was in his situation, I would rather go through a trial where someone will have to decide that.  It's a fair fight when you have a jury that that has to decide on your fate.  I don't believe in an eye for an eye, I really don't, but then again, this is how we do things, right?
>
> I don't know if that answers your question, Your Honor.

(Id. at 862:14-863:8.)

These answers reveal that the only consistent trait about this prospective juror is that he is inconsistent.  From his questionnaire responses, one would think that Juror #322 would only consider imposing the death penalty under one condition—if one of his family members were killed.  At voir dire, this juror stated for the first time that he would consider imposing the death penalty if a member of law enforcement was killed, so long as the defendant knew that his victims were police officers.  Minutes later, however, Juror #322 stated that it "doesn't really matter" whether the defendant knew that his victims were law enforcement officials at the time of the murder.  Shortly after that, Juror #322's "exceptions" to his general opposition to the death penalty expanded to include *any* case where someone was intentionally killed.  And when the

5

court gave Juror #322 a chance to explain these contradictions, he could not.

All told, the court is deeply troubled by this juror's conflicting responses, which were given with no confidence or conviction. Whether this demonstrates a willingness to disregard his own beliefs or a dearth of true convictions, Juror #322 gave answers that prevent the parties and the court from having any understanding of whether he would be able to follow the court's instructions to meaningfully consider the evidence and both possible sentences. Similarly, the court believes that Juror #322 could not meaningfully express his views during jury deliberations. Thus, "[g]iven [Juror #322's] inconsistent positions, it is unlikely that []he [can] follow[] the court's instructions if empaneled in this case." Fell, 531 F.3d at 216; see also id. at 215 ("A juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment."); cf. Uttecht, 551 U.S. at 18 ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case . . . .")). The Government's motion is therefore granted.

**B.      Juror #358**

Wilson has moved to strike Juror #358 for cause. That motion is denied.

Juror #358's questionnaire presents a set of detailed and thoughtful responses that indicate her willingness to consider all relevant evidence and, depending on the circumstances, sentence Wilson to either death or to life in prison without the possibility of release. For instance, in response to question #39, Juror #358 stated that her "general belief is for the death penalty . . . in extreme situations. It is my belief that each situation has to be examined fully before I can fully agree with putting an individual to death." When asked to detail her views "about the penalty of life in prison without the possibility of release as opposed to the death

6

penalty for someone who killed two police officers, and why," Juror #358 extensively described the merits of both sentences, noting "I do believe in life in prison . . . ." When asked about her views on "an eye for an eye," Juror #358 stated that "[t]his is a tough question for me," and circled the words "not sure." In response to question #43, which asks how the prior death sentence in this case would influence her decision in this proceeding, Juror #358 stated, "I would have to hear all the facts [and] then decide how I feel." She also wrote in response to question #44 that she would not automatically impose the death penalty if Wilson were proven to be a future danger, writing, "I think if I had to make a decision either way, I would be able to do so." Similarly, she expressed a belief that a defendant's childhood experiences should be considered in making the punishment decision: "I do believe all fact[s and] circumstances should be considered to give everyone a fair shake." And in response to question #73 inquiring whether she had any "views about people other than [her] own race or ethnicity that would impact the way [she] think[s] or feel[s] about this case," Juror #358 checked the "No" box, adding, "I feel I am an open-minded loving person who deals with each person on an individual basis—[]regardless of race/ethnicity."

    Nearly all of Juror #358's responses at voir dire were thoughtful and credible, which confirmed that she is an open-minded juror who could meaningfully consider all relevant evidence and carefully follow the court's instructions to reach a punishment decision. For instance, she expressed a sincere ability to impose both death and life in prison without the possibility of release. (Apr. 29, 2013, Hr'g Tr. at 913:20-914:24.) Juror #358 affirmed that she could "consider all of the mitigating evidence," "consider all the aggravating evidence," and be open-minded about evaluating childhood experience evidence. (Id. at 917:15-22, 918:22-919:14.) When asked about her views on "an eye for an eye," Juror #358 stated that she

7

is not sure if it is "applicable" to the current case, a determination that would "depend[] on the scenario that is involved and the facts and issues presented." (Id. at 919:18-920:12.) And when the court inquired as to whether Juror #358 would "always impose the death penalty if someone were convicted of intentional murder," Juror #358 replied, "I really have to hear the facts. I am not sure if I would go straight to the death penalty of someone. I would need to hear all the facts." (Id. at 921:5-10.)

Wilson argues that Juror #358 must be struck, however, because of her responses to two questions. First, Wilson contends that Juror #358 is substantially impaired because when asked by the court whether she has a "presumption that the death penalty is the right penalty for intentional murder," she said, "Yes." (Id. at 921:11-13.) Immediately after this answer, however, the court probed the strength of this belief:

> THE COURT: If I instruct you that you are not allowed to have that presumptions, that you must consider the mitigating factors, as well as the aggravating factors, before you reach a decision in balancing the two choices, would you follow the Court's instructions and set aside that presumption of yours?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: Do you think could you do that?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: In good faith?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: Where someone's life is on the line?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: This person's life right there, that gentleman over there, could you do that?
>
> PROSPECTIVE JUROR: Yes, I can.

(Id. at 921:17-922:7.) These emphatic and credible answers assure the court that any belief Juror #358 may have regarding a presumption in favor of the death penalty could be set aside, and that the totality of the record demonstrates that Juror #358 is an open-minded woman who would dutifully follow the court's instructions.

Wilson argues that Juror #358's statement concerning a presumption in favor of the death penalty renders her unqualified, and that the court's questions concerning her ability to follow instructions that do not include such a presumption are insufficient because "you can't instruct people's beliefs." (Id. at 924:17-18.)

This argument fails for two reasons. First, the Supreme Court has instructed that a juror who may be generally opposed to the death penalty may nevertheless be qualified if she can set aside those personal views, follow the court's instructions, and be willing to actually impose a death sentence. See Witherspoon v. Illinois, 391 U.S. 510, 522 (1968); see also Morgan, 504 U.S. at 728 ("[A] juror who in no case would vote for capital punishment, *regardless of his or her instructions*, is not an impartial juror and must be removed for cause." (emphasis added)); Fell, 531 F.3d at 213 ("Even 'those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases,' as long as they are able *to subjugate their own beliefs to the need to follow the court's instructions*." (emphasis added) (citation omitted)); cf. Morgan, 504 U.S. at 738 ("Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention *not to follow the instructions* to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." (emphasis added) (other emphasis removed)); United States v. Johnson, 366 F. Supp. 2d 822, 828 (N.D. Iowa 2005) ("[T]he Court in Morgan held that . . . a [capital] defendant is also entitled to strike for cause any juror who will *automatically* vote for

9

death if the defendant is convicted, without regard to the facts *or the court's instructions on the law*." (second emphasis added)). Indeed, Wilson has argued that other jurors should not be struck merely because they expressed general opposition to the death penalty. (See Apr. 25, 2013, Mem. & Order (Dkt. 1133) (Juror #107).) Thus, if a prospective juror can set aside certain personal beliefs, she may be still be qualified.

More importantly, as a factual matter, the court does not believe that Juror #358's momentary hesitation concerning a presumption in favor of the death penalty reflected a strongly held view. Juror #358 did not independently conjure up her thoughts on the presumption—she responded to a question posed by the court. She also quickly, confidently, and repeatedly stated that she could put aside any such belief and follow the court's instructions. Additionally, Juror #358's belief about a presumption—a word fraught with legal implications that likely does not carry the same weight in a layman's vocabulary—concerns a relatively minor issue. If the Supreme Court has stated that a juror who generally opposes the death penalty (on religious grounds or otherwise) may be qualified if she clearly expresses an ability to put aside such views, so too can Juror #358.

Finally, Juror #358's inability to state—without any prompting—when she might impose the life sentence for someone convicted of intentional murder is not fatal. Asking a prospective juror to freely recall such a circumstance is extremely difficult (as reflected by a myriad of other questionnaires) and not very probative. Moreover, Juror #358's questionnaire and voir dire answers repeatedly indicate her willingness to impose a life sentence in cases involving intentional murder. (See, e.g., Questionnaire Responses #41, #42, #44; Apr. 29, 2013, Hr'g Tr. at 913:20-914:24; 917:15-22; 919:18-920:12; 921:5-10.)

Ultimately, given the entire record concerning Juror #358, the court is confident that her

10

comments regarding a presumption and her inability to conjure up examples of when she might impose a life sentence for intentional murder do not overcome the substantial evidence demonstrating that she can: (1) consider both possible sentences; (2) meaningfully evaluate mitigation evidence; and (3) dutifully follow the court's instructions. Juror #358 is therefore not substantially impaired, and Wilson's motion is denied.

## IV. CONCLUSION

The Government's motion to strike Juror #322 is GRANTED and Wilson's motion to strike Juror #358 is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
April 30, 2013

　/s Nicholas G. Garaufis　
NICHOLAS G. GARAUFIS
United States District Judge