UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

-against-

**04-CR-1016 (NGG)**

RONELL WILSON,

               Defendant.

----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is Defendant Ronell Wilson's motion to strike for cause Juror #473, Juror #544, and Juror #669. Also before the court is the Government's motion to strike for cause Juror #675. For the reasons set forth below, Wilson's motion to strike Juror #473 is GRANTED. His motion to strike Juror #544 and Juror #669 is DENIED. The Government's motion to strike Juror #675 is GRANTED.

**I.     BACKGROUND**[1]

The court is currently conducting oral voir dire to select a jury that will decide whether Wilson will be sentenced to death or to life in prison without the possibility of release at an upcoming penalty phase re-trial scheduled to begin on June 24, 2013.

**A.     Juror #473**

Wilson argues that Juror #473 is substantially impaired because he (1) would automatically impose the death penalty in cases of premeditated murder; and (2) cannot meaningfully consider mitigation evidence. The Government opposes, contending that although

---

[1]     The court will discuss only the background pertinent to the issues addressed in this opinion. Additional background can be found in the Second Circuit's decision in this case. See United States v. Whitten, 610 F.3d 168, 173-77 (2d Cir. 2010).

1

he might generally support the death penalty, Juror #473 can consider mitigating evidence, including a defendant's childhood experiences, and is able to impose a life sentence.

### B. Juror #544

Wilson moves to strike Juror #544 on the grounds that she is unable to (1) properly consider mitigation evidence; and (2) adhere to her belief as to the appropriate punishment in the face of opposition from other jurors. The Government contends that at voir dire Juror #544 stated that she can consider mitigation evidence, and implied that she was unable to answer the court's question about facing jurors' contrary views only because she was not aware of all the facts of the case.

### C. Juror #669

Wilson challenges Juror #669 because many of her family members are (or were) police officers, and that she would hold defendants who killed those who serve others to a "higher standard." He also contends that the court did not sufficiently ask whether Juror #669 could impartially consider victim impact evidence in light of her familial relations. The Government describes Juror #669 as a thoughtful juror who said that she represents "two ends of the spectrum"—on one end, her affinity for law enforcement; on the other, her experience as a New York City teacher, where she worked with underprivileged students. The Government adds that Juror #669 affirmed that she would be able to impose a life sentence irrespective of any concerns about possible later discussions with her family about having imposed such a sentence, confirming that her ties to law enforcement are not disqualifying.

### D. Juror #675

Finally, Juror #675 is challenged by the Government on the ground that it has "no confidence" that he can actually impose the death penalty, particularly given his questionnaire

responses, which contrast those given at oral voir dire. Wilson argues that he is satisfied about Juror #675's ability to contemplate mitigation evidence, and contends that although Juror #675 may be "odd," nothing in his answers given at voir dire were disqualifying.

## II. STANDARD OF REVIEW

### A. Life Qualification

"[T]he proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Morgan v. Illinois, 504 U.S. 719, 728 (1992) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)).

A defendant may challenge for cause "[a] juror who will automatically vote for the death penalty in every case [because that means he] will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729. This is often referred to as the requirement that a juror be "life-qualified." United States v. Basciano, No. 05-CR-060 (NGG), 2011 WL 4574925, at *1 (E.D.N.Y. Mar. 11, 2011).

### B. Consideration of Mitigation Evidence

To be a qualified juror in a capital case, a person must, among other things, be open to considering relevant mitigation evidence. "[T]he sentencer [may not] refuse to consider, *as a matter of law*, any relevant mitigating evidence. . . . The sentencer . . . may determine the weight to be given relevant mitigating evidence[, b]ut [it] may not give it no weight by excluding such evidence from [its] consideration." Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982) (emphasis in original); see also 18 U.S.C. § 3592(a) ("In determining whether a sentence of death is to be imposed on a defendant, the finder of fact *shall consider* any mitigating factor

3

. . . ." (emphasis added)); cf. Morgan, 504 U.S. at 729 (stating that a defendant may challenge for cause a "juror who will automatically vote for the death penalty in every case [because he] will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do"). Similarly, a death-eligible defendant is entitled to have the jury "consider[], as a mitigating factor, any aspect of [his] character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis removed).

### C. Bias

A prospective juror may be excused for cause based on many forms of bias. As the Second Circuit has explained,

> Juror partiality can . . . take various forms: actual, implied, or inferred. See United States v. Torres, 128 F.3d [38,] 43 [(2d Cir. 1997)]. Actual bias is "bias in fact," id., generally evidenced by "express proof," such as a juror's admission to "a state of mind prejudicial to a party's interest." United States v. Haynes, 398 F.2d [980,] 984 [(2d Cir. 1968)]. Implied bias is "bias conclusively presumed as a matter of law" from circumstances in which an average person in the position of the prospective juror would be prejudiced. United States v. Torres, 128 F.3d at 45. Inferred bias exists "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." Id. at 47.

United States v. Quinones, 511 F.3d 289, 301 (2d Cir. 2007). "While blunt acknowledgment of bias may support removal without further inquiry, the more ambiguous a prospective juror's responses, the more useful demeanor, and thus oral inquiry, become in allowing a trial judge to identify partiality warranting removal for cause." Id. at 301-02.

As to "implied bias," "the issue . . . is whether an average person in the position of the juror in controversy would be prejudiced." Torres, 128 F.3d at 45. If so, bias is presumed, and a prospective juror's "'statements upon voir dire [about his ability to be impartial] are totally

4

irrelevant.'" Id. (alteration in original) (citation omitted). "Such automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself." Id. Accordingly, "the doctrine of implied bias is reserved for 'exceptional situations' in which objective circumstances cast concrete doubt on the impartiality of a juror." Id. at 46.

As to "inferred bias," "there exist a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a court may, nevertheless, properly decide to excuse a juror." Id. at 46-47. "[Such b]ias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." Id. at 47.

### D. Ability to Follow the Court's Instructions

A prospective juror may be dismissed for cause where her "inconsistent positions" make it "unlikely that she w[ill] follow[] the court's instructions if empaneled." United States v. Fell, 531 F.3d 197, 216 (2d Cir. 2008). This is because "'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror.'" Id. at 211 (quoting Witt, 469 U.S. at 424-26). A prospective juror may be stuck on these grounds "even when the juror 'indicated some degree of willingness to put aside personal biases,'" id. at 213 (citation omitted), since "a juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment," id. at 215. See also Uttecht v. Brown, 551 U.S. 1, 18 (2007) ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable

5

inference from his other statements that in fact he would be substantially impaired in this case . . . .").

## III. DISCUSSION

### A. Juror #473

Wilson moves to strike Juror #473. That motion is granted.

Juror #473 is challenged on the ground that he would always impose the death penalty in cases of intentional murder, and relatedly, that he cannot meaningfully consider mitigation evidence.

In his questionnaire, Juror #473 described his views on the death penalty for someone who killed two police officers as follows: "I support the death penalty for cold blooded murder." (Questionnaire Response #39.) When asked whether childhood experiences should be taken into account in the punishment decision, however, Juror #473 stated that they should, adding, "Everything should be considered when a life and death decision is made." (Questionnaire Response #46(b).)

At voir dire, Juror #473 gave hedged remarks concerning whether he could meaningfully consider mitigation evidence and a life sentence where the defendant had killed two police officers. For instance, when asked whether he could consider "background information, information about family, growing up, upbringing, and other personal characteristics for someone who killed two police officers," Juror #473 replied, "Well, I would listen to them with an open mind, *but I think I would be hard-pressed to use that as a mitigating [factor] of this crime right now*." (May 7, 2013, Hr'g Tr. at 1467:7-14 (emphasis added).) Similarly, when presented with a hypothetical in which the mitigating factors "form grounds to impose a life sentence" and the aggravating factors did not "resonate" with him, Juror #473 "suppose[d that

he] could" impose a life sentence, adding, "once again, I would have to hear what those might be." (Id. at 1467:15-25.) And when the court asked whether he could think of "anything in terms of the defendant's background or experience" that he would be "interested in knowing about," Juror #473 replied:

> Well, once again I will listen to what is presented. As a 20-year-old, he's a responsible adult. There has to be a point where you have to take personal responsibility for your actions, I assume. And you know, *using all of these mitigating circumstances, whatever, is almost a scapegoat. I'm not too in favor of that.* But once again, I will listen to it.

(Id. at 1458:2-14 (emphasis added).)

The court then asked Juror #473 when he might impose a life sentence in cases involving intentional murder. Juror #473 could not come up with an example (other than cases involving crimes of passion, which he recognized were not at issue here), and instead stated that "a coldly calculated plan to murder somebody deserves the death penalty." (Id. at 1468:16-1469:5.) The court then asked, "You would say that categorically?" (Id. at 1469:6.) Juror #473 replied, "Yes, sir." (Id. at 1469:7.)

After a sidebar, Juror #473 clarified that by repeatedly stating that he could "listen" to mitigating evidence, he meant that he would "consider" such evidence. (Id. at 1473:9-16.) He also affirmed his answer given on the questionnaire that indicated that he believes that childhood experiences should be taken into account, and that "everything" should be considered. (Id. at 1472:22-1473:8.) But these responses do not give the court sufficient confidence that Juror #473 is open to considering a life sentence or relevant mitigation evidence in these circumstances. Juror #473 flatly, confidently, and credibly affirmed that he would "categorically" impose the death penalty in cases involving coldblooded murder. He also characterized the presentation of mitigation evidence as a "scapegoat," and that he is "not too in favor of that." All told, the court

7

is convinced that Juror #473 is substantially impaired. See Morgan, 504 U.S. at 729; Eddings, 455 U.S. at 113-14. Wilson's motion is therefore granted.

B. Juror #544

Wilson moves to strike Juror #544 for cause. That motion is denied.

Wilson first moves to strike Juror #544 on the ground that she could not assure the court that if she were the lone juror who believed that a life sentence was the appropriate penalty, she would be able to adhere to her beliefs. Although Juror #544 did not unequivocally state that she would always vote for a life sentence in such circumstances, the court believes that this prospective juror was simply hesitant in answering a speculative question without having heard all of the facts, which is entirely reasonable. For instance, when the court asked whether, if she were "morally satisfied and convinced that [she was] right and [the other eleven jurors] were wrong, would [she] go along with them," Juror #544 responded, "I really don't know. *I'm not hearing the [w]hole case. I can't say right now.*" (May 7, 2013, Hr'g Tr. at 1487:3-7 (emphasis added).) Moreover, based on Juror #544's demeanor at voir dire, the court does not believe that she would be unable to follow its instructions, including that she must make her own personal, moral decision as to punishment. The court concludes that Juror #544 would simply be willing to consider alternate viewpoints during deliberations, which, of course, is not disqualifying. (See id. at 1486:25-1487:2 ("I think in that situation [in which she was the lone juror who believed that a life sentence was appropriate] I would have to look at it in a different way for the death sentence.").)

It is also argued that Juror #544 cannot meaningfully consider mitigation evidence because she expressed an interest in knowing whether a murderer has a prior criminal record and might be inclined to impose the death penalty if Wilson were proven to be a future danger. This

8

argument also fails.

Juror #544 repeatedly stated at oral voir dire that she is willing and able to meaningfully consider relevant mitigation evidence. For instance, after some initial confusion, the court asked: "Can you consider meaningfully evidence about the defendant's family, his upbringing, his schooling, his problems as a teenager, so that you can make a careful, thoughtful decision as to what the sentence should be?" (Id. at 1485:14-17.) Juror #544 replied, "Yes, I can." (Id. at 1485:18.) Similarly, after the court confronted Juror #544 with her questionnaire response that indicated that she would not consider childhood experiences in making a penalty determination, it explained that "[she] will receive this information and . . . will be asked to consider it," and asked, "Will you consider it if it's presented to you as evidence?" (Id. at 1486:2-15.) Juror #544 then replied, confidently and immediately, "Yes." (Id. at 1486:16.) Given this response, including the demeanor in which it was given, the court is confident that Juror #544 could seriously consider all forms of mitigation evidence, despite her initial questionnaire response to the contrary.

Wilson's concern that Juror #544 indicated an interest in learning about his criminal record is misplaced. The colloquy to which Wilson refers proceeded as follows:

> THE COURT: Is there anything in particular that you would like to know about the defendant's background that might be helpful to you?
>
> PROSPECTIVE JUROR NO. 544: If he had other criminal records in the past, any other convictions.
>
> THE COURT: Okay.
>
> PROSPECTIVE JUROR NO. 544: That would be based on how I would feel.

(Id. at 1485:19-1486:1.) The court did not ask, as it sometimes does with other jurors, what about the defendant's background might be relevant *mitigation evidence*. Rather, the court asked

what information about Wilson's background "might be helpful." That Juror #544 mentioned Wilson's criminal history—an aggravating factor (see Notice of Intent to Seek to the Death Penalty (Dkt. 174) ¶ C(3)(a))—is perfectly reasonable. Thus, although the court posed this question after discussing possible mitigating evidence, the court does not believe that she confuses mitigating evidence with aggravating factors.

Nor is Wilson's belief that Juror #544 is unable to consider mitigation evidence if Wilson were proven to be a future danger persuasive. In her questionnaire, Juror #544 indicated that she would not be unable to consider a life sentence in such circumstances, adding that, "I feel [a] sentence of life would be good." (Questionnaire Response #44.) And at voir dire, Juror #544's few references to Wilson's dangerousness were part of a discussion concerning both aggravating and mitigating evidence in which the prospective juror was clearly confused by the court's question. (See May 7, 2013, Hr'g Tr. at 1483:23-1485:17.)

Thus, given the entire record, the court is left with the firm impression that Juror #544 could meaningfully consider all forms of mitigation evidence and that she would be able to follow the court's instructions, including a directive that she make her own personal, moral punishment decision. Wilson's motion is therefore denied.

C. **Juror #669**

Wilson moves to strike Juror #669 for cause. That motion is denied.

Wilson's challenge to Juror #669 revolves around the fact that she has numerous family members who are (or were) police officers, including members of the New York City Police Department. Recognizing that this juror self-identified as having come from a "police family" (Questionnaire Response #28), the court began its substantive portion of voir dire by asking, because she "ha[s] so many family members who are NYPD [officers], . . . would [she] be able

10

to be fair and impartial in considering the evidence in the penalty phase of this case," to which Juror #669 replied confidently, "I believe I can." (Id. at 1520:16-20.) Similarly, after a sidebar, the court asked whether, if Juror #669 voted for a life sentence, she would "have difficulty in going back home and talking to [her] relatives," and whether it would "affect [her] relationship with other people." (Id. at 1536:15-1537:8.) Juror #669 thoughtfully answered, "I don't think it would affect my relationship. Would it matter? It would stay with me and it would be something that would definitely be—that would—I would, obviously, think back on and— . . . You can't forget about something like that." (Id. at 1537:9-15.) That is, while the juror noted the importance and significance of the decision *for her*, she evinced no concern about interactions with her family members playing any role in her deliberations. Additionally, the court later asked Juror #669 whether, after hearing victim impact testimony, she could still meaningfully consider evidence of the defendant's background as mitigation evidence. (Id. at 1538:8-17.) Juror #669 replied, "Yes."[2] (Id. at 1538:18.)

These answers give the court confidence that Juror #669 is not actually or implicitly biased, and the court finds no reason to exercise its discretion to excuse her on the basis of "inferred" bias. See Quinones, 511 F.3d at 301. It is clear that Juror #669 herself does not believe that her ties to police would affect her ability to remain impartial, and these familiar relations are not of the kind where "an average person in the position of the juror in controversy would be prejudiced." Torres, 128 F.3d at 45; see also id. at 46 ("[T]he doctrine of implied bias is reserved for 'exceptional situations' in which objective circumstances cast concrete doubt on

---

[2] Wilson's challenge to the court's phrasing of its question concerning victim impact evidence is unavailing for three reasons. First, Juror #669 repeatedly stressed that her ties to law enforcement would not bias her whatsoever. (See, e.g., May 7, 2013, Hr'g Tr. at 1520:16-20, 1536:15-1537:8.) Second, the fact that she could still meaningfully consider mitigation evidence despite the presence of victim impact evidence (and her ties to law enforcement) is very probative of her lack of bias. Third, after the court asked this question, Wilson declined its invitation to suggest any further follow-up questions. (Id. at 1538:19-21.)

11

the impartiality of a juror."). To the contrary, Juror #669 described herself as someone who "represent[s] both sides," i.e. she has "p[er]spective and understanding what the job [of being a police officer] is about," but also worked with troubled youth, which means that she can "relate to both sides." (May 7, 2013, Hr'g Tr. at 1527:14-22.)

Along these lines, the court rejects Wilson's argument that Juror #669 is unable to meaningfully consider mitigation evidence. Wilson stresses that Juror #669 indicated that she would be more willing to impose the death penalty on someone who had killed individuals who "risk their lives for others." In her response to question #42 of the Questionnaire, Juror #669 did state that she believes in an "eye for an eye" "when it comes to people who risk their lives for others." (Questionnaire Response #42.) But Juror #669 clarified that this response indicated her belief that she respects that certain people put their lives on the line for others, not that she would automatically impose the death penalty for someone who murdered two police officers:

> THE COURT: So in a case where this defendant murdered two police officers, *would that automatically cause you to impose a death sentence*?
>
> PROSPECTIVE JUROR: *No. No.* But that's one—he's already been convicted. Am I correct?
>
> THE COURT: Yes.
>
> PROSPECTIVE JUROR: So I just believe the punishment should be. He should be punished.
>
> THE COURT: All right. So—
>
> PROSPECTIVE JUROR: *It doesn't literally mean he should be killed.* It's a— you know, it's—
>
> THE COURT: So you're saying there should be punished. Everyone should be punished for the crimes they commit?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: Is that it? I mean, is that what you really mean? I'm not trying to

> put words in your mouth.
>
> PROSPECTIVE JUROR: No, punishment should be imposed, yes, if you commit a crime.

(May 7, 2013, Hr'g Tr. at 1534:25-1535:14 (emphases added).)

More importantly, Juror #669 repeatedly expressed her ability to meaningfully consider all forms of mitigation evidence, no matter the particular factual circumstance. On her questionnaire, Juror #669 affirmed that she would be able "to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant presented a future danger to others." (Questionnaire Response #44.) She also affirmed in her questionnaire that childhood experiences should be considered in making the punishment decision, adding, "if there is pro[of] that a person has been damage[d] emotional[ly] to cause such behavior." (Id. #46(b).) And at voir dire, Juror #669: (1) expressed an ability to "consider the mitigating factors that are presented . . . with the possibility of imposing a life sentence for the killing of two police detectives" (May 7, 2013, Hr'g Tr. at 1524:4-8); (2) noted her desire to know Wilson's childhood experiences given her experience as a teacher (id. at 1524:10-1525:5); (3) denied that it is "impossible for [her] to consider the mitigating factors" if Wilson were proven to be a future danger (id. at 1538:3-7); and (4) would not "foreclose" the possibility of imposing a life sentence for someone who murdered two police officers, adding that she "definitely would listen to everything and make a judgment based on that" (id. at 1535:19-1536:7; see also id. at 1527:4-6 ("I have to be honest with you, I'm on the fence; that's what I'm telling you. I'm on the fence with it and I toss and turn thinking about it."), id. at 1535:22-23 ("[A]gain, I'd have to hear the background on what led him there.")).

Juror #669 did state that she has a "high standard" for those who put their lives on the line for others, including police officers and military service members. (Id. at 1526:22-24.) She

13

did not, however, state that she would hold individuals who kill those who put their lives at risk *to a higher standard*. At most Juror #669 believes that a particular aggravating factor—the victims' status—carries certain weight. She did *not* state that she would always impose the death penalty or refuse to consider mitigating evidence in such circumstances. Rather, she confidently, consistently, and honestly stated her ability to consider all forms of evidence and both potential penalties. Accordingly, Juror #669 is qualified, and Wilson's motion is denied.

### D.    Juror #675

The Government moves to strike Juror #675 for cause. That motion is granted.

Juror #675's questionnaire depicts an individual generally in favor of the death penalty and unable to consider mitigation evidence. For instance, Juror #675 rated himself as a 6 on a scale of 1 to 7, with 1 representing "strongly opposed to the death penalty," and 7 representing "strongly in favor of the death penalty." (Questionnaire Response #38.) Along these lines, he stated that "some cases" of intentional murder may "qualify" for a life sentence. (Id. #47.) Juror #675 also affirmed that he would be "unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant presented a future danger to others," adding, "Some people may be beyond redemption." (Id. #44.) He also expressed concern over the cost of incarcerating a prisoner for life. (Id. #45.) When asked whether childhood experiences play a role in "a person's behavior and choices as an adult," Juror #675 wrote that they may "have a limited role," but also stated that such evidence should not be considered when determining to impose a sentence of death or life in prison without the possibility of release. (Id. #46(a), (b).)

At voir dire, however, Juror #675 expressed sharply contrasting views. The court first asked whether he recalled identifying himself as a 6 on the 1-to-7 scale. (May 7, 2013, Hr'g Tr.

14

at 1563:19-24.) Juror #675 did not recall this, and when asked where his beliefs fell on this spectrum, he identified himself as a 3. (Id. at 1563:25-1564:6.) The court later asked Juror #675 if there are "any types of intentional murder that are more appropriate for the possible imposition of the death penalty than others." (Id. at 1564:15-17.) He replied, "I don't really understand how taking a life would solve a problem. That would make someone just like a criminal? So I—there may be a few cases where it's justified." (Id. at 1564:18-22.) He then clarified, "If you're a mass murderer, someone like Saddam Hussein, Hitler, I can see it happening in accepting that view." (Id. at 1564:24-1565:1.) When the court asked whether the death penalty "should ever be imposed" for the intentional murder of two individuals, Juror #675 replied, "It's difficult for me to say. Because if you—if you put somebody away for life, sometimes that would be . . . harder punishment [than] putting them to death." (Id. at 1565:2-8.) And later, the court asked whether the death penalty is "ever justified" for the intentional killing of "one or two individuals," which Juror #675 answered, "Honestly, I would like to give a definitive answer. Right now I can't give a definitive answer." (Id. at 1565:15-21.)

As the court indicated at voir dire (see id. at 1571:15-19), it has no confidence in what Juror #675's true views are and, consequently, whether he could meaningfully follow the court's instructions.[3] This prospective juror indicated in his questionnaire that "some" types of intentional murder might qualify for life in prison, but at voir dire indicated that he might only impose the death penalty for mass murderers or dictators. Although Juror #675 ultimately stated that he could vote for the penalty in the case of someone who murdered two individuals, he qualified this answer by stating that he could do so "in view of all the overwhelming evidence," which he later clarified meant that "[i]f someone presents evidence of this individual would

---

[3] Further supporting the court's belief that Juror #675 could not follow the court's instructions is the fact that on his questionnaire he mistakenly indicated that he knew someone associated with this case. (See Questionnaire Response #37; May 7, 2013, Hr'g Tr. at 1562:20-1563:2 (denying knowledge of anyone associated with this case).)

15

commit the same crime or a greater crime, you know, some other time, then you have to take that into consideration." (Id. at 1569:15-23, 1575:3-10.) Perhaps most troubling, he changed his rating on the 1-to-7 scale from a 6 to a 3 without any explanation (or realization that this was striking).

Juror #675's changing views about the consideration of mitigation evidence also indicate that he is unable to follow the court's instructions. In his questionnaire, Juror #675 indicated that he would not consider childhood experiences in making his punishment decision (see Questionnaire Response #46(b)), but at voir dire he twice stated otherwise (see May 7, 2013, Hr'g Tr. at 1573:13-23).

Thus, "[g]iven [Juror #675's] inconsistent positions, it is unlikely that []he [can] follow[] the court's instructions if empaneled in this case." Fell, 531 F.3d at 216; see also id. at 215 ("A juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment."); cf. Uttecht, 551 U.S. at 18 ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case . . . .")). The Government's motion is therefore granted.

## IV. CONCLUSION

Wilson's motion to strike Juror #473 is GRANTED. His motion to strike Juror #544 and Juror #669 is DENIED. The Government's motion to strike Juror #675 is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York  
      May 9, 2013

   /s/ Nicholas G. Garaufis  
NICHOLAS G. GARAUFIS  
United States District Judge