UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

-against-

**04-CR-1016 (NGG)**

RONELL WILSON,

     Defendant.

------------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

  Before the court are Defendant Ronell Wilson's motions in limine to (1) amend the future dangerousness aggravating factor; (2) ensure the introduction of evidence concerning New York State's ban on capital punishment pursuant to United States v. Gabrion, 648 F.3d 307 (6th Cir. 2011) ("Gabrion I"), rev'd en banc, No. 02-1386, 2013 WL 2301946 (6th Cir. May 28, 2013) ("Gabrion II"); and (3) preclude certain types of arguments that the Government may make at the penalty phase re-trial. For the reasons set forth below, Wilson's motions concerning the future dangerousness factor and the admissibility of Gabrion evidence are DENIED. Wilson's motion to preclude certain forms of arguments is DENIED WITHOUT PREJUDICE.

## I. BACKGROUND[1]

###   A. Amend the Future Dangerousness Factor

  In relevant part, the future dangerousness factor provides: "The defendant *represents* a continuing danger to the lives and safety of other persons. The defendant is *likely to commit* criminal acts of violence in the future that would constitute a continuing a serious threat to the

---

[1]   The court will discuss only the background pertinent to the issues addressed in this opinion. Additional background can be found in the Second Circuit's decision in this case. See United States v. Whitten, 610 F.3d 168, 173-77 (2d Cir. 2010).

1

lives and safety of others . . . ." (Notice of Intent to Seek the Death Penalty (Dkt. 174) ¶ C(3) (emphases added).) Wilson moves to amend this factor to read, "The defendant *will* commit criminal acts of violence in the future that *will* constitute a serious threat to the lives and safety of others." (Def. Agg. Factor Mem. (Dkt. 1206) at 6 (emphases added).) According to Wilson, the phrases "represents a continuing danger" and "is likely to commit criminal acts of violence" conflict with the provision of the Federal Death Penalty Act ("FDPA") requiring that the aggravating factors be proven beyond a reasonable doubt. The Government opposes and argues that the current phrasing is not inconsistent with the FDPA, as many courts have held. (See Gov't Agg. Factor Opp'n (Dkt. 1255).)

### B. New York's Ban on Capital Punishment

Wilson has noticed his intent to introduce evidence concerning the unavailability of the death penalty in New York State pursuant to Gabrion I. (Def. Gabrion Mem. (Dkt. 1212).) The Government opposes introduction of such evidence, arguing that as the Sixth Circuit ruled en banc, evidence concerning the unavailability of the death penalty in New York State is "'irrelevant to a reasoned moral response to [the defendant's] background, character, and crime.'" (Gov't Gabrion Opp'n (Dkt. 1243) at 1 (quoting Gabrion II, 2013 WL 2301946, at *10) (alteration in original).)

### C. Preclusion of Certain Forms of Government Arguments

Wilson moves for an order precluding the Government from making at least fourteen different types of arguments in its opening and closing remarks. (Def. Arg. Mem. (Dkt. 1223).) Wilson contends that "a motion in limine is an appropriate vehicle to determine the contours of proper opening and summation remarks." (Id. at 3-4.) The Government generally opposes this motion, describing it as "extremely premature" and tantamount to a request for an advisory

opinion. (Gov't Arg. Opp'n (Dkt. 1277) at 2.) Nevertheless, the Government proffers that it will not make at least ten of the arguments identified in Wilson's motion. (See id. at 10-19.)

**II.     DISCUSSION**

   **A.     Amend the Future Dangerousness Factor**

Wilson moves to amend the future dangerousness factor to read, in part: "The defendant will commit criminal acts of violence in the future that will constitute a serious threat to the lives of others." (Def. Agg. Factor Mem. at 6.) He argues that the current use of the phrases "likely" and "represents a continuing danger" impermissibly alters the requirement that the Government prove any aggravating factor beyond a reasonable doubt. He is mistaken.

As Wilson notes, all of the enumerated statutory factors are presented in absolute, not probabilistic, terms. See, e.g., 18 U.S.C. § 3592(c)(3) ("The defendant *has* previously been convicted of another Federal or State offense resulting in the death of a person . . . ." (emphasis added)); id. § 3592(c)(5) ("The defendant . . . knowingly *created* a grave risk of death to 1 or more persons in addition to the victim of the offense." (emphasis added)); id. § 3592(c)(6) ("The defendant *committed* the offense in an especially heinous, cruel, or depraved manner . . . ." (emphasis added)); id. § 3592(c)(8) ("The defendant *committed* the offense as consideration for the receipt . . . of anything of pecuniary value." (emphasis added)). Wilson argues that in order to avoid "dilut[ing]" the beyond a reasonable doubt standard by "prosecutorial fiat," the Government must prove that Wilson "will" commit acts of violence in the future. (Def. Agg. Factor Mem. at 3, 6.)

What Wilson fails to fully appreciate, however, is that each of the statutory aggravating factors identified in 18 U.S.C. § 3592(c) concerns a historical fact that either did or did not occur. For instance, a capital defendant either did or did not knowingly create a grave risk of

3

death to multiple people, see 18 U.S.C. § 3592(c)(5), or did or did not commit the offense as consideration for anything of pecuniary value, see id. § 3592(c)(8). It would of course be improper to require the Government prove beyond a reasonable doubt that it is "likely" that a verifiable fact exists. As to future dangerousness, however, requiring the Government prove that it is "likely" that a defendant will commit a crime beyond a reasonable doubt is logically consistent. In other words, the Government must prove to a high degree of certainty that Wilson will likely commit future acts of violence. This does not in any way undermine the FDPA's requirement that aggravating factors be proven beyond a reasonable doubt.[2]

Requiring the Government prove beyond a reasonable doubt that Wilson *will* commit serious acts of violence would effectively render this aggravating factor a nullity. See United States v. Umana, 707 F. Supp. 2d 621, 635 (W.D.N.C. 2010). It is difficult—but appropriately so—to conclusively prove the *likelihood* of a future event. It is functionally impossible to prove beyond a reasonable doubt that such incident *will* occur. Such a requirement would be tantamount to requiring the Government predict the future with near certainty.[3]

Perhaps for this reason, many courts have sanctioned the use of a future dangerousness factor that asks whether the prosecution has proven beyond a reasonable doubt that the defendant is likely to commit further crimes. For instance, the Supreme Court has implicitly approved the

---

[2]  At the risk of confusing attorneys averse to any form of mathematics, the use of variables helps illustrate this point: Let Wilson's likelihood of future violence be "V." If V is equal to, say, 75%, then it might be said that Wilson is "likely" to commit violent acts in the future. As drafted, the future dangerousness factor requires that the Government prove beyond a reasonable doubt that V is indeed 75%. There is nothing illogical or problematic about this requirement. After hearing the Government's evidence, the jury may believe that it is not very likely that V is in fact 75%. On the other hand, it may conclude that it is abundantly clear that there is a 75% chance that Wilson will commit serious acts of violence in the future. And if so, the jury may reasonable believe that this established probability of future dangerousness supports the imposition of the death penalty.

[3]  It is worth noting that if the Government were required to prove beyond a reasonable doubt that Wilson *will* commit future acts of violence, the future dangerousness factor might become a "super-aggravator" that would trump all other considerations and skew the FDPA's weighing process. If the Government proves that there is no reasonable doubt that Wilson *will* be violent in the future, the court imagines that any juror open to imposing the death penalty would do so. To vote against the death penalty in that case would be akin to *sanctioning* Wilson's future violence. The court will not place jurors in such a predicament.

4

language Wilson challenges. In Jurek v. Texas, 428 U.S. 262 (1976), the Supreme Court rejected a defendant's challenge to a Texas statute that permitted a jury to impose the death penalty only if the prosecution proved beyond a reasonable doubt "'a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'" 428 U.S. at 269, 274-76 (citation omitted). The Court dismissed the argument that "it is impossible to predict future behavior and that th[is] question is so vague as to be meaningless." Id. at 275. It reasoned that "[t]he task a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice." Id. at 276; see also Franklin v. Lynaugh, 487 U.S. 164, 177-78 (1988). Furthermore, lower courts have *expressly* rejected Wilson's position. See, e.g., United States v. Williams, No. 4:08-CR-00070 (YK), 2013 WL 1335599, at *33 (M.D. Pa. Mar. 29, 2013) ("[T]he Court rejects Defendant's argument that the language of the future dangerousness factor [concerning whether the defendant 'represents a continuing danger'] lessens the Government's burden of proof."); Umana, 707 F. Supp. 2d at 635 (rejecting the defendant's argument that "by alleging that he 'is likely' to commit acts of violence in the future, the factor improperly suggests that the government's proof is less than is required by due process and the FDPA" as "without merit" because, in part, "[t]he term 'is likely' is necessary phrasing because, of course, one cannot predict future events with absolute certainty"); United States v. Williams, No. CR-05-920 (RSWL), 2008 WL 4644830, at *6 (C.D. Cal. Oct. 15, 2008) ("It is not illogical to say that the jury must find that Defendant is likely to commit future criminal acts beyond a reasonable doubt."); cf. United States v. Wilson, No. 04-CR-1016 (NGG), 2013 WL 563517, at *8 (E.D.N.Y. Feb. 15, 2013) (rejecting Wilson's argument that "a reasonable jury would be unable to find the future dangerousness aggravator

5

beyond a reasonable doubt").[4]

For these reasons, Wilson's motion is denied.

**B.     New York's Ban on Capital Punishment**

Wilson seeks to introduce evidence concerning the unavailability of the death penalty in New York State. This request is denied.

Wilson cannot identify a single court that has allowed the introduction of such evidence. In Gabrion I, a panel of the Sixth Circuit held that the FDPA's language permitting the admission of "any mitigation factor," 18 U.S.C. § 3592(a), required the introduction of evidence concerning the state of Michigan's "policy against the death penalty and an argument based on the absence of proportionality in punishment when life or death is made to turn on chance and the lives of other equally guilty psychopaths are spared." 648 F.3d at 323. On May 28, 2013, however, the Sixth Circuit, sitting en banc, reversed the panel and held that evidence of Michigan's ban on the death penalty is irrelevant to a determination of a defendant's "culpability and character." Gabrion II, 2013 WL 2301946, at *9. This opinion forcefully reasoned that evidence of a state's public policy against the death penalty is entirely irrelevant to a federal jury's sentencing determination. See id.

Even if the court were to apply the panel's opinion in Gabrion I, that case is distinguishable on numerous grounds. In 1963, the citizens of Michigan amended their state

---

[4]     Wilson's citations are inapposite. As Wilson seems to recognize, its citation to the Supreme Court's comment on the beyond a reasonable doubt standard is dicta. See Concrete Pipe and Products of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602 (1993). In Concrete Pipe, the Supreme Court denied a procedural due process challenge to an arbitrator's adjudication of an employee benefits dispute, in part, because a statute that gave deference to certain factual findings unless they were proven "by a preponderance of the evidence [to be] unreasonable or clearly erroneous." Id. at 620-25. In doing so, the Court characterized this standard as "meaningless" and stated, "[o]ne might as intelligibly say, in a trial court, that a criminal prosecutor is bound to prove each element probably true beyond a reasonable doubt." Id. at 625. This dicta simply reinforces the uncontroversial point that proof of an *historical* fact—including any element of a crime—should only be measured by the beyond a reasonable doubt standard. It does not imply that it is illogical or impermissible to require the Government prove the *likelihood* of a future event to a high degree of certainty.

constitution to ban the death penalty, Mich. Const. art. IV, § 46, becoming the only state to do so, see Gabrion I, 648 F.3d at 321 n.4. The Gabrion I panel relied on this fact to conclude that the defendant should have been permitted to introduce "information about Michigan's policy against the death penalty." 648 F.3d at 323. By contrast, capital punishment is unavailable in New York solely because the Court of Appeals ruled in 2004—*after* Wilson killed Detectives James V. Nemorin and Rodney J. Andrews—that the "deadlock instruction" required by the state statute was impermissibly "coercive" under the New York State Constitution. See People v. Lavalle, 3 N.Y.3d 88 (2004). Unlike the people of Michigan, the citizens of New York did not make a decision that the death penalty is improper as a matter of policy. To infer that the New York Legislature's failure to cure the defect identified in Lavalle and reinstitute the death penalty reflects a policy decision is entirely speculative. Unlike Michigan in Gabrion, it cannot be said that New York has a similar "policy against the death penalty." 648 F.3d at 323.

Finally, even if the court were to conclude that the unavailability of the death penalty in New York has any probative value, it is clear that such value is "outweighed by the danger of . . . confusing the issues[] or misleading the jury." 18 U.S.C. § 3593(c). As mentioned above, New York's position on the death penalty has hardly any probative value considering the fact that (1) the death penalty statute is still technically valid; (2) the ban on capital punishment is due to a technical Court of Appeals decision in 2004, not the conscious, longstanding policy of the State Legislature; and (3) when Wilson committed the crimes, the death penalty was available in New York. On the other side of the balancing equation, introduction of this issue is extremely likely to mislead and/or confuse the jury. New York's ban on capital punishment is due to a specific, technical opinion by the State's highest court that would require substantial explanation. Additionally, the court is concerned that jurors might confuse the unavailability of the death

7

penalty in New York with the propriety of capital punishment in federal court.[5]

Accordingly, Wilson may not introduce evidence of the unavailability of capital punishment in New York.

### C. Preclusion of Certain Forms of Government Arguments

Wilson moves for an order precluding the Government from making at least fourteen different forms of arguments during its opening and closing statements. (Def. Arg. Mem.) He contends that the court should resolve these "issues" at this stage because it can do so "more fully and deliberately than if they were raised for the first time at a sidebar during opening and closing arguments with the jury in the box." (Id. at 5.) According to Wilson, because "many forbidden arguments [by the Government] are so inflammatory or otherwise prejudicial . . . even sustaining a defense objection [at trial] and giving a curative instruction could not remedy their effect." (Id.) Finally, Wilson believes that resolving these issues now will "best enable the appellate courts to have a complete record of each side's positions." (Id.)

What Wilson fails to appreciate, however, is that his request for an omnibus order addressing nearly every form of potentially improper argumentation is inefficient, potentially unnecessary, and would require the court to issue an advisory opinion.

As a general matter, Wilson may very well be correct that certain forms of argument he identified are improper. Indeed, the Government has voluntarily stated that it does not intend to make at least ten of the identified forms of argument. (See Gov't Arg. Opp'n. at 10-18.) But it is "extremely difficult to rule in advance of trial that a particular argument is improper" because "the propriety of remarks in summation is inevitably wedded to the evidence that has been

---

[5] Indeed, during voir dire the court encountered numerous jurors who were confused as to why the death penalty is an available option given New York's ban.

admitted during the trial."[6] United States v. Lujan, No. 05-CR-924 (RB) (D.N.M. Mar. 25, 2011), Dkt. 737, at 4; see also id. at 7 ("[I]t is impossible to determine whether the other summations targeted [by the defendant] would be improper without knowledge of the context and the evidence."). Rather than foster efficiency, Wilson would have this court speculate as to (1) the evidence introduced by the Government at the penalty phase re-trial; (2) the evidence introduced by the defense; (3) the arguments made by the Government; and (4) the arguments made by the defense, all in an attempt to rule on the propriety of at least fourteen different types of arguments. This is not the goal of pre-trial motion practice. Indeed, motions in limine are traditionally used to prevent the introduction of inadmissible *evidence*, not *arguments*. See Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) ("The purpose of an in limine motion is to 'aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted *evidence*, as to issues that are *definitely set for trial* . . . .'" (emphases added) (citation omitted)); Mem. Op. & Order, Lujan, at 7 ("It is material that motions in limine normally concern evidentiary matters.").

Ultimately, the court cannot—and therefore will not—decide Wilson's motions at this time because it is "practically impossible to issue an informed ruling if the hypothetical argument is divorced from the context of the trial." Mem. Op. & Order, Lujan, at 4. This is partly because closing arguments are "seldom carefully constructed in toto before the event." Donnelly v. DeChristoforo, 416 U.S. 637, 646-47 (1974). The best time to evaluate the propriety of a particular form or argument is at trial, at which point the court has heard the relevant evidence, understands the particular context in which the argument is being made, and can hear the tone of the argument to determine whether "a prosecutor intends an ambiguous remark to have its most

---

[6] In fact, the presentation of evidence at trial affects whether a particular argument will be made at all. See Mem. Op. & Order, Lujan, at 7 ("[A]t this stage in the proceedings, the Court is not in a position to predict what kind of arguments the prosecution might make in summation.").

9

damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Id. at 647; see also United States v. Wexler, 79 F.2d 526, 529-30 (2d Cir. 1935) (Hand, J.) ("It is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion.").

For these reasons, Wilson's motion to preclude certain types of arguments is denied without prejudice to his right to object to actual arguments made at trial. The Government has been put on notice of the types of arguments to which Wilson will likely object. Wilson is aware of certain forms of argument that the Government agrees should not be presented, and those it contends are appropriate. With this preparation, the court is confident that it can thoroughly and expeditiously resolve any disputes about this subject that may arise.

### III. CONCLUSION

Wilson's motion to amend the future dangerousness factor is DENIED. His motion to introduce evidence of the unavailability of the death penalty in New York State is DENIED. His motion to preclude certain forms of argument by the Government is DENIED WITHOUT PREJUDICE to his right to raise specific objections to particular arguments at trial.

SO ORDERED.

Dated: Brooklyn, New York
     June 14, 2013

    /s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge