UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA

        -against-                        Docket No.  04 CR 1016 (S-2) (NGG)

RONELL WILSON,                         NOTICE OF MOTION

        Defendant.

--------------------------------------------------------X

        On behalf of the defendant, counsel respectfully moves this Court for an order granting

Mr. Wilson a new penalty trial.

        This motion is made pursuant to the Fifth, Sixth, and Eighth Amendments to the United

States Constitution, and is based upon the attached memorandum of law.

Dated: New York, New York
        August 19, 2013

                             Respectfully submitted,

                             DAVID M. STERN
                             Rothman Schneider Soloway & Stern
                             100 Lafayette St., Suite 501
                             New York, New York  10013

                             RICHARD JASPER
                             ROBERT SOLOWAY

                             Attorneys for Defendant *Ronell Wilson*

BEVERLY VAN NESS, Of Counsel

## MEMORANDUM OF LAW IN SUPPORT OF MR. WILSON'S MOTION
## FOR A NEW PENALTY PROCEEDING

On behalf of Mr. Wilson, counsel respectfully submits this memorandum of law in support of his motion for a new penalty proceeding.  In addition to the authorities cited below, he relies on his right to due process and to a fair and reliable sentencing determination pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, and 18 U.S.C. § 3595(c) (a death sentence cannot stand if "imposed under the influence of passion, prejudice, or any other arbitrary factor").

**I.      The future dangerousness aggravating factor was not supported by legally sufficient evidence.**

In determining whether to grant a motion for a judgment of acquittal on the grounds of insufficient evidence, the Court must view the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).  The motion must be granted if no rational juror could have found the defendant guilty beyond a reasonable doubt.  *Id.*   These standards have been applied when reviewing the sufficiency of evidence supporting an aggravating factor.  *See, e.g., United States v. Brown*, 441 F.3d 1330, 1368, 1371 (11th Cir. 2006); *United States v. Sampson*, 335 F.Supp.2d 166, 201-02 (D. Mass. 2004).

The Court of Appeals has noted that when making a sufficiency challenge, the defendant "shoulders a heavy burden, but not an impossible one."  *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004).  "A judgment of acquittal is warranted if the evidence is 'nonexistent *or so meager* that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v.*

1

*Wexler*, 522 F.3d 194, 209 (2d Cir. 2008) (emphasis added) (citation omitted).  The

government's burden is not met by a "mere modicum" of evidence.  *Jackson v. Virginia*, 443

U.S. 307, 320 (1979).  Rather, there must be "substantial evidence" to support the finding.

*Glasser v. United States*, 315 U.S. 60, 80 (1942).  That standard was not met here with respect to

the future dangerousness aggravating factor.

       As charged to the jury, the government was required to prove, beyond a reasonable doubt,

that "the Defendant represents a continuing danger to the lives and safety of other persons, that

is, the Defendant is likely to commit criminal acts of violence in the future that would constitute

a continuing and *serious threat to the lives and safety of others*" (T. 7967 [emphasis added]).

The jury was further instructed that "likely" means "probable," and that it was the likelihood of

Mr. Wilson's future dangerousness in prison that was at issue: "In considering whether this

aggravating factor has been proven, you may consider the fact that if the Defendant is not

sentenced to death, he will be sentenced to life imprisonment without the possibility of parole or

other release" (T. 7968).

       The Court also listed for the jury the four "allegations" which "the government argues

may evidence[]" the defendant's future dangerousness (T. 7967-68):

       "(a)    <u>Continuing Pattern of Violence</u>:  The Defendant has engaged in a

continuing pattern of violence, attempted violence, and threatened violence, including the crimes

charged in the indictment and other robberies, assaults, narcotics activity and weapons

possession.  The Defendant's alleged continuing pattern of violence includes his juvenile and

adult criminal acts.

       (b)    <u>Lack of Remorse</u>:  The Defendant has demonstrated a lack of remorse for

2

the capital offenses committed in this case, as indicated by Defendant's statements and actions during the course of and following the offenses charged in the Superseding Indictment.

        (c)      <u>Low Rehabilitative Potential</u>:  The Defendant has demonstrated a low potential for rehabilitation as evidenced by his longstanding involvement in violent criminal activities leading up to the capital offenses charged in the Superseding Indictment.

        (d)      <u>Membership in a Criminal Street Gang</u>:  The Defendant has demonstrated an allegiance to and active membership in the Stapleton Crew and the Bloods."

With respect to the first allegation, continuing pattern of violence, that pattern may have been evidenced by criminal acts Mr. Wilson committed in the community, when he was free to associate with whomever he chose and was effectively unmonitored.  But the government offered no evidence that street violence is predictive of prison violence, particularly in the highly-structured and supervised environment of a United States penitentiary.

In fact, Mr. Wilson's behavior in custody has been markedly *non*-violent.  While incarcerated in the free-wheeling New York City jail on Rikers Island, Mr. Wilson engaged in a handful of fist fights with inmates, none of which resulted in serious injury, and two physical alterations with staff: he spun around and hit an officer in the chest with a handcuff when he was 17 – 14 years ago; and a guard's finger was dislocated when Mr. Wilson was subdued in July 2004, ten years ago.  In June 2003, Mr. Wilson was accused of punching Officer Vickers and was charged with assaulting staff (infraction 432-03), but this charge was found to be unsubstantiated and dismissed.

Subsequently, after Mr. Wilson was taken into federal custody, he did not commit any acts of violence against anyone.  He made some threatening remarks, but he never acted upon

them.  This includes using the "shank" inmates said he had at the MDC.  Assuming for the sake of this sufficiency argument that that allegation is true, he possessed what appeared to be a meat thermometer for a brief period of a day or two.  After the two inmate witnesses came forward, their allegations not only did not result in any charges against him, but he remained in general population (T. 7704).  Mr. Wilson may have acted like a bully while housed in the psychiatric unit, controlling the television channels and interfering with inmates' use of the microwave, but he never tried to hurt anyone.

Nor did he intentionally hurt Officer Jimenez during his extraction from the recreation deck.  Rather, the officer bumped his head on the wall when Mr. Wilson was subdued (T. 5661).  The resulting injury was insignificant enough (T. 5663) that Jimenez did not even report it when, right after the extraction, the officers described their physical condition on the videotape.  Refusing to leave the rec deck was certainly misconduct, and Mr. Wilson was punished for refusing to obey a direct order.  But he was not charged with assault, and he did not attempt to injure any of the officers on the extraction team.  This incident is not reflective of the likelihood that he will commit "criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others."

The same is true for Mr. Wilson's conduct in breaking the visiting booth window with a chair in 2007.  There was no proof that any person was in range of the plexiglass when it was shattered, and that anyone was in jeopardy.  Indeed, Mr. Wilson was charged with breaking a plexiglass because of his act, not with attempted assault or reckless endangerment (T. 5682).  This was misconduct to be sure, spawned by the fact that he was denied a contact visit with his family shortly after being sentenced to death, when he was bound for Indiana and would not

4

likely see them again (T. 5686-88).  But it was not an act evincing a probability that he would

engage in violent acts that would pose a "serious threat to the lives and safety of others."

      The government's second allegation in support of future dangerousness, lack of remorse,

is grounded on conduct close in time with the murders, and prior to the first death sentence.

Even accepting here that Mr. Wilson lacked remorse at that time, a person can certainly grow to

feel remorse as time passes.  Significantly, there was no evidence that Mr. Wilson is without

remorse now, unless jurors used his silence against him – something they were forbidden to do

by the Court's charge (T. 7956).  Indeed, there is only one recent statement that could

conceivably be construed as lack of remorse: when watching television, Mr. Wilson remarked

that "armor-piercing bullets" were "called cop killer bullets like him" (T. 5862).  But however

unappealing this remark may be, it was a true statement – he did kill police officers.[1]  The remark

is neutral as to how Mr. Wilson felt about his crime.

      No matter what the record contains, moreover, the government did not offer any evidence

of a correlation between lack of remorse and future dangerousness.  The prosecutors simply

asked jurors to assume such a correlation.  In fact, a lack of remorse has not been found "to be

predictive of violence in prison."  See Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy,

Capital Jury Decision-Making: The Limitations of Predictions of Future Violence, 15

Psychology, Public Policy & Law 223, 228 (2009).  It was the government's burden to establish a

connection, and it failed to do so.

      The government's third allegation in support of future dangerousness is Mr. Wilson's low

---

    [1] It is also true that he has been "called" a "cop killer," in the press, for example. See e.g.
New York Daily News article 2/5/13; NY Post article 2/6/13; Newsday article 7/24/13.

rehabilitative potential, resting entirely on the violent crimes he committed "leading up to the capital offenses."  As previously discussed, the government did not present any proof that street violence is predictive of violence in a high-security federal prison, and Mr. Wilson's institutional record belies such a claim.  Moreover, in the structured environment of death row, he not only held a job, but he also studied in an effort to obtain his GED.  He again obtained a job at the MDC.  It is not clear what rehabilitative opportunities exist for high-security federal inmates, but Mr. Wilson made efforts to use his time productively, and his overbearing actions toward a few inmates on K-81 is not evidence that he will commit life-threatening acts of violence in the future.  Indeed, he has been back in New York City for almost 2 1/2 years, yet the government produced only two inmates, Johansen and Rodriguez, who reported having any problems with the defendant.

The government's final allegation in support of future dangerousness is his membership in and allegiance to the Stapleton Crew and the Bloods.   Since the Stapleton Crew is effectively defunct, with its principal members in jail, the government's focus at the penalty trial was the Bloods.  It stipulated that there are only 569 Bloods – members, suspected members and associates – in United States penitentiaries (T. 7705), of which there are 16 (T. 7354.  It elicited testimony from Inspector Sheridan and Shabucalick Geralds about bad acts and methods of communication by Bloods members.  But Sheridan had never been employed by the federal Bureau of Prisons (T. 6339-40) and he had no knowledge of how gang members operated in the federal system.  Geralds, similarly, could not speak with any authority on that issue. He had spent very little time in United States penitentiaries, and during virtually all of that time he was segregated in Special Housing Units, not in general population. And he had not been in federal

custody at all since the end of 2009 (T. 7702-03).

Even more significant, save for one incident at Rikers Island in July 2004, when Mr. Wilson was said to have incited another inmate to head-butt a guard by shouting "pop off," the government did not adduce a shred of evidence that Mr. Wilson's Bloods affiliation precipitated a single violent act, either by him or at his behest. In the ensuing ten years, he got some tattoos, identified himself as a Blood, said he had Blood associates, and sent a "kite" to another Blood trying to quash speculation that he (Wilson) was a "rat," but he never committed or incited a single act of violence. Other gang members may have done so, but the government did not prove that he had. Mr. Wilson's Bloods' membership, accordingly, proved nothing of relevance to his future dangerousness.

Finally, the government argued that Mr. Wilson had manipulated Nancy Gonzalez, which made him a dangerous inmate (T. 7799-802, 7918-19). But there is no evidence in the record of any manipulation. "Manipulate" means "to control or play upon by artful, unfair, or insidious means especially to one's advantage." Merriam-Webster on-line dictionary, http://www.merriam-webster.com/dictionary/manipulate. If a corrupt prison guard brings heroin into jail to supply inmates, in exchange for sexual favors or other consideration, those facts alone would not suggest that the guard was manipulated by the inmates. Rather, those facts show that the guard voluntarily engaged in criminal behavior. Here, too, there is evidence that Mr. Wilson and Nancy Gonzalez had a sexual relationship, and that she appeared to be fond of him. Because of her position as a correction officer, such behavior was criminal and she was indicted. There is not a shred of proof, however, that Mr. Wilson preyed upon her in any way, or used any wiles to gain an advantage. The relationship was voluntary and consensual, and anything she did was

7

done of her own accord.

The government also argued that Mr. Wilson manipulated psychologist Lorie Nicholas into allowing him to put his property in an empty cell, to not have a cellmate, and to move Kevin Johansen (T. 7754), and that he was able to use his power with guards to obtain privileges such as his orderly job (T. 7801). There is no evidence to support these statements, either. On the contrary, Nicholas testified without contradiction that other people – the counselor, unit manager or case manager made job assignments (T. 7186-87), none of whom were shown to have any relationship with Mr. Wilson much less be under his thrall; she also testified without contradiction that she had never moved an inmate or made a cell assignment based on an inmate's request (T. 7187-89). She said Mr. Wilson was courteous to her, but he was not of any particular significance, just another inmate.

In sum, the government speculated about what *could* have happened but did not, and elicited proof of violent acts committed by others in BOP custody or in city facilities. But the government failed to prove, beyond a reasonable doubt, that Mr. Wilson, himself, "represents a continuing danger to the lives and safety of other persons, that is, the Defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others."

The Court should accordingly vacate the jury's finding that Mr. Wilson is a future danger as insufficiently supported and order a new penalty proceeding. This aggravating factor was prominently featured in the government's case for death, both in the amount of evidence presented and on opening and rebuttal summations. The jury's erroneous finding was weighed by the jurors, and it undoubtedly weighed heavily given its showcasing by the government.

**II.     The prosecutors committed misconduct on summation that denied Mr. Wilson a fair penalty proceeding.**

A prosecutor is not merely an advocate at trial.  Rather,

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.  It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

The prosecutors crossed the line in this case in several significant ways.

**A.     Material misstatements of the evidence**

"It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw."  *United States v. Young*, 470 U.S. 1, 8 n.5 (1985) (citation and internal quotation marks omitted); *see also United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008); *United States v. George*, 201 F.3d 370, 373-74 (5th Cir. 2000).

> Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." . . . This is particularly true in the case of prosecutorial misrepresentation because a jury generally has confidence that the prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty.

*Gall v. Parker*, 231 F.3d 265, 313 (6th Cir. 2000) (*quoting Donnelly v. DeChristoforo*, 416 U.S.
637, 646 (1974), and citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

      Thus, courts have condemned government closing statements that are not reasonably
supported by the evidence. *See, e.g., Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009)
(where no direct evidence of events at victim's home, improper for prosecution to invite the
jurors to speculate on interactions between defendant and victim; "The prosecutor exceeded the
bounds of appropriate conduct by claiming to describe exactly what happened, and particularly
what was said, with such specificity."); *Bland v. Sirmons*, 459 F.3d 999, 1028-29 (10th Cir.
2006) (because jury did not convict defendant of felony-murder charged, predicated on robbery,
improper for the prosecution to argue that the homicide was committed in the course of a robbery
during penalty-phase summations); *Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002)
(prosecution improperly misstated the evidence, arguing that defendant laughed after the
homicide; "The Assistant District Attorney's comment was erroneous in that it mischaracterized
trial testimony in order to show that [defendant] was either remorseless or actually made light of
the tragic events of that day.  No evidence supports this characterization of the . . . testimony.");
*Miller v. Lockhart*, 65 F.3d 676, 682 (8th Cir. 1995) (prosecutor suggested without support in
evidence that defendant escaped from jail before); *Tucker v. Kemp*, 762 F.2d 1496, 1507 (11th
Cir. 1985) (*en banc*) (although prosecution may argue reasonable inferences from the evidence
adduced at trial, prosecution's closing argument that defendant forced the victim to engage in
oral sex was a "gratuitous and unsupported charge" and, therefore, "serious professional
impropriety").  *See also United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998) (reversal based on
prosecutor's repeated argument that the defendant had committed a murder when no evidence

supported that argument); *United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1996) (reversal based on prosecutor's inaccurate statement concerning evidence of defendant's motive).

Here, most egregiously, both prosecutors misrepresented the time that elapsed between the deaths of the two victims: Ms. Cohen stated no less than four times that a period of "minutes" separated the two shots (T. 7775, 7776, 7777 [twice]), and Mr. McGovern reiterated it was "several minutes" (T. 7909; *see also* T. 7910: "minutes"). Moreover, the rebuttal prosecutor castigated defense counsel for allegedly misleading the jury when he pointed out, on the defense summation, that it was actually just seconds (T. 7909-10; *see* Stern at T. 7849). In reality, defense counsel was correct: Detective Nemorin was shot "two to five seconds" after Detective Andrews, "possibly as long as five to ten seconds," pursuant to the stipulation the government signed and admitted into evidence (*see* stipulation concerning testimony of Scott Van Campen, T. 5184).

As we pointed out in our letter dated July 23, 2013, the prosecutors' misstatements suggested that Detective Nemorin was pleading for his life for an extended period. This was used to support their argument that the murders were particularly heinous, since Mr. Wilson had "a choice" to spare Detective Nemorin as he "begged . . . for mercy," but he pulled the trigger instead (T. 7777; *see also* T. 7894). Indeed, Ms. Cohen specifically asked jurors to "imagine the terror that James Nemorin felt" during those "few minutes," when he purportedly "knew that he would never be able to touch his wife again, his children, his mother and father, his sisters and brothers" (T. 7777). And Mr. McGovern suggested that defense counsel had sought to minimize the period "because it sort of diminishes the amount of terror that Detective James Nemorin was suffering at the defendant's hand as the defendant pressed the muzzle of that gun to the back of

his head" (T. 7910).   These suggestions were a matter of speculation, particularly given that the

two murders were virtually simultaneous.  *See United States v. Rodriguez*, 581 F.3d 775, 803

(8th Cir. 2009) (improper for prosecutor to refer to "fear" victim felt since there was no evidence

about this).  And the image the prosecutors falsely painted, of Detective Nemorin's prolonged

agony, constituted "a very powerful argument" for the death penalty as defense counsel

underscored (T. 7943-44).

It appears that the prosecutors' misrepresentations were deliberate given the number of

times they were made, even after defense counsel tried to remedy the matter.  Ms. Cohen referred

to the Van Campen stipulation to make another point (T. 7771), so she had reviewed it when

drafting her summation, and Mr. McGovern had the opportunity to check the stipulation before

making his rebuttal argument in which he misstated its contents. The Court refused our request to

give a curative instruction, leaving the misstatements uncorrected.

The government will undoubtedly argue that the jurors had the stipulations in the jury

room during deliberations, and may have reviewed the one for Van Campen.  That is a matter of

speculation, however, and an unlikely scenario given the mountain of exhibits and stipulations

the jurors had with them and the relative speed of the verdict.  In any event, the government

should not be able to rely on such speculation as a cure for a prejudicial error it repeatedly

injected into the proceedings.  Notably, the prosecutors resisted the defense request for a curative

instruction, even though the fact that they made the misstatement complained of was

conclusively established.

The prosecutors made other important misstatements during closing arguments.  They

were permitted to argue that Mr. Wilson had manipulated officer Nancy Gonzalez and

psychologist Lorie Nicholas to show he was a future danger, when there was no supporting

evidence of this in the record (*see* discussion, *supra*, as well as letter of David Stern, dated July

22, 2013, and T. 7754-55). Ms. Cohen also argued, again in support of future dangerousness,

that when Mr. Wilson smashed the visiting booth window, "[h]e didn't think about visitors who

were coming in. He didn't think about inmates in the next room who could have been hurt" (T.

7797). As previously discussed, there was no proof that a single person was in range of the

plexiglass when it was shattered, and there was accordingly no basis to argue that anyone "could

have been hurt."

Next, the prosecutor speculated, again without evidence in support, that Mr. Wilson

became an orderly on death row so he could "get out of [his] cell" and "move around" (T. 7812).

This paralleled the similarly unsupported claim that Mr. Wilson manipulated MDC staff to get an

orderly job so he could have more freedom to commit bad acts (*see* discussion *supra*).

According to Brian English, during Mr. Wilson's time in Phase 2, the only period when he was

allowed to work, he already had the ability to get out of his cell. Moreover, Mr. English could

not say what area or areas Mr. Wilson was assigned to clean (T. 7541, *see* T. 7587), so there was

no basis for an inference that he sought to work in order to obtain any kind of advantage or

engage in any misconduct. The prosecutor also argued that once Mr. Wilson learned he was

leaving Terre Haute, he no longer cared about his job and had no motive to continue to scam the

system (T. 7812). In fact, Mr. Wilson's sentence was reversed on June 30, 2010 (T. 7759), and

he continued to work as an orderly until September 20, 2010 (T. 7541).

Finally, referring to a remark defense counsel made on summation, that Mr. Wilson was

"not the brightest bulb in the chandelier" (T. 7850), Mr. McGovern did not counter that he was

bright enough to commit the crime.  Instead, he informed the jury that Mr. Wilson's "bulb was perfectly fine" (T. 7917).  This was not a fair response to counsel's point, which was that in the world in which Mr. Wilson and several government witnesses lived, double dealing was common, and that this world view may have colored the perceptions of Mr. Wilson, who was not the brightest person besides, and contributed to the shootings: Mr. Wilson had told Jacobus afterwards, when finding Detective Nemorin's gun in the car, "Look, they were going to get us before we got them" (T.7850).  The prosecutor's rebuttal made a more sweeping point, that Mr. Wilson was of average intelligence and did not have any intellectual difficulties as several mitigation witnesses had testified he did.

This was a misleading argument, in light not only of the trial record but also of the *Atkins* hearing record.  As the prosecutor well knew, its expert, Dr. Denney, had found Mr. Wilson to have a full scale IQ of 80, only the 9th percentile in the population (Denney's report, dated September 4, 2012, p. 41).   The Court, in turn, found that score to be inflated, and reduced it to 78.02 after adjusting for the Flynn effect (Court's decision dated February 7, 2013, ECF #1015, p. 38).  Indeed, all of Mr. Wilson's Flynn-adjusted IQ scores were in the 70's, save one in 1994 of 68.35 and another in 2000 of 82.35 (*id.*).  The Court concluded that Mr. Wilson was not mentally retarded, but his intellectual ability was by no means "perfectly fine" as the prosecutor assured the jurors.  The prosecutor's summation statement violated the spirit of the holding in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), which forbids the government's knowing use of false evidence to secure a conviction.[2]

---

[2]  The government's argument that Mr. Wilson manipulated Nancy Gonzalez also ran afoul of *Napue v. Illinois*, in that it was inconsistent with the notes of the prosecutors' interview of Ms. Gonzalez.  The proffer notes were not in evidence (we ask that they be made a court

The misstatements catalogued above were all used to amplify the heinousness of the crime or strengthen the claim that Mr. Wilson would commit violent acts in the future, two pivotal government arguments in favor of a death sentence.   The misconduct warrants reversal of the sentence and a new penalty proceeding.

### B.   Invoking comparative justice between the victims and the defendant as a reason to impose the death penalty

It is "prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." *Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006). Such appeals improperly "make light of the penalty of life in prison," *id.*, and constitute an impermissible appeal to sympathy for the victim, encouraging the jury to fail to consider mitigating evidence, *Le v. Mullins*, 311 F.3d 1002, 1015-16 (10th Cir. 2002).

In a federal capital prosecution under the FDPA, the Eighth Circuit held that the government transgressed this prohibition in its penalty-phase closing arguments.  The government argued, *inter alia*,

> • Those victims have been dead for 12 years.  This defendant has lived for 12 years after being involved in the murder of 5 people. Ten years passes from now, and [the victims] will still be dead. Twenty years will pass while [the defendant is] living in prison, and [the victim] will still be dead.  Thirty years from now, [one victim] will still be ten years old, and [the second victim] will still be six years old.
> . . .
>
> No matter how small [defendant's] cell may be, it's going to be larger than the coffin that [the victims] are laying [sic] in now.

exhibit, under seal, in the event that Mr. Wilson's post-verdict motions are denied and the record is reviewed by the Court of Appeals; we believe the Court has a copy, if not, we will supply it). Nevertheless, the prosecutors were aware that Ms. Gonzalez described a wholly voluntary and consensual relationship, with no devious or overbearing conduct on Mr. Wilson's part.

*United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007).  On appeal, the Eighth Circuit

concluded that "[t]he prosecutor's comments in this case . . . went beyond the bounds of

permissible argument.":  "Although the government was entitled to respond to [the defense]

portrait of a miserable thirty years behind bars, it should not have used the victims' plights to do

so."  *Id.*

In another recent federal capital prosecution, the government argued:

- He [defense counsel] essentially asks you to send him [Johnson] to his room where he gets privileges, three squares, and the ability to have visitors.  The only visitors that [the victim] will have come to his grave site.

*United States v. Johnson*, 713 F. Supp. 2d 595, 631 (E.D. La. 2010).  The district court granted

defendant's motion for a new sentencing hearing in part based on this "inappropriate emotional

appeal to impose the death penalty out of sympathy for the victim."  *Id.* at 27, 34.

Other examples condemned by courts include:

- "Maybe the Defendant will be in prison, maybe he will be behind that concrete and those jail bars with his T.V. and his cable and good food.  But one thing . . . is for sure, [the victim] won't be here and his family won't be able to be with him, they won't be able to share holidays with him."

*Bland*, 459 F.3d at 1027.

- "Next year [defendant] will be a year older and [the victim] will be 34 years old from now to eternity.
  . . .

  "[D]o you really think that justice would be done if this man goes to prison, gets three meals a day and a clean bed every night and regular visits from his family while [the victim] lays [sic] cold in his grave[?]"

*Le,* 311 F.3d at 1014-16.

- Improper to ask whether it would be "justice [to] send this man down to prison, let him have clean sheets to sleep on every night, three good meals a day, visits by his friends and family, while [the victim] lies cold in his grave?"

*Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002).

Here, the prosecutors made repeated, highly emotional references to the victims' deaths and all the moments they and their families had lost and events they would not share. On the opening summation, there were references to "all the photographs that are missing" from the family albums, such as Detective Nemorin attending his son's graduation and walking his daughter down the aisle at her wedding, and pictures of family Christmases (T. 7766-68). The jurors were asked to think about "the moments that these men lost with their loved ones," the "moments that make up a lifetime," and they were then repeatedly asked, "What does justice demand?" for the loss Mr. Wilson caused the victims and their loved ones (T. 7768-69): "What does justice demand when you steal a father away from his children so that on Father's Day they are forced to wrap their arms around a tombstone?"; "What does justice require when we see the effect that these murders have had on these children ten years later?"; Detective Andrews "wanted to grow old with his children. What does justice demand when you take that from him?"; "what does justice demand . . . when you steal a husband from the love of his life and you leave her alone with her three children?"

In juxtaposition to this misery, the prosecutor invoked the many pleasures of prison life that Mr. Wilson had and would continue to enjoy, and argued how "outrageous" it was that he was able to have email and Facebook access, watch television, have sex, and see and speak to his family (T. 7810-11). The prosecutor acknowledged that "jail is tough," but Mr. Wilson would

"still [have] birthdays and Christmases and visitors.  He will still be able to speak to his mother" and other family members, he will "walk out into the recreation area" and "be able to feel the warm sun in his face . . . [and] smell spring coming," and "play basketball or baseball where he will be laughing with his friends" (T. 7812-13).  Jurors were asked to "weigh that" against "all that he has ripped away from these victims, . . . what he has caused to the victims' family.  They won't get hugs anymore.  They can't hear their dad say I love you.  They can't hear the love and advice that you know their dad would have given their children [in] years to come" (T. 7813).

These contrasting pictures of the victims' losses and the defendant's privileges if allowed to live, and the argument that justice required Mr. Wilson's execution to right this grossly inequitable imbalance, was forcefully recapitulated on the government's rebuttal summation:

> there's that question of what does justice require?
>
> Well, on one side of the equation we have the Andrews family; we have the Nemorin family; we have the children.  We have the innocents, the people who didn't do anything.  And what is on their side of the balance sheet, if you will, what is on their side of the scale?  Tears.  Memorials.  Trips to grave sites.  They say you don't know loneliness until you see your loved one's name etched in stone.  And that's what they do on a regular basis.
>
> They've been through the funerals.  They've been through the therapy.  They've been through the problems.  And as you've heard those problems exist and the mourning exists.  It will probably exist until they're in the cemetery.
>
> Then you have on the other side of the equation this defendant – remorseless, cashing in on the crime that he committed [objection overruled].  Telephone calls; TV; email; support of his family.  Visits; Facebook; being alive.  Remember that whole thing the defendant was telling you during summation about you're going to grow old and those tattoos are going to sag.  Well, that's something that it's part of everybody's life and, unfortunately, because of this defendant's actions, James Nemorin never got to experience. that.

> Never got to do the things that a father does with his children –
> birthdays, Christmases.
>
> But even in those moments that the defendant will have if he gets
> what he so desires, that trip to a USP in this country, he's going to
> have good days and he's going to have bad days.  He's going to
> have days where he can look up at the sky and live and that's what
> he took away.  He didn't take away from just one person, he took
> away from two people.  Two heroes who deserve to live and had
> so, so much to live for.
>
> So that's the analysis for justice we submit to you that when you
> put those aggravating factors against those mitigating factors the
> scales of justice almost tip over in favor of the death penalty.

(T. 7925-27).

There is a due process line between appropriate arguments about the impact of a murder

on the victim and his family and an emotional appeal to impose the death penalty out of

sympathy for the victim.  *See Le v. Mullin*, 311 F.3d 1002, 1014-16.  That line was crossed in this

case.   "[A]ll homicides, by definition, have a victim who will forever remain dead.  Repeated

attempts by the prosecution to contrast the living defendant with the dead victim might

encourage the jury not to consider mitigating evidence, in violation of the Eighth Amendment."

*Id.* at 1016.  Indeed,"[t]o argue that it would be unfair for the defendant to live while the victim is

dead, 'creates a super-aggravator applicable in every death case.  No amount of mitigating

evidence can counter this argument, and if the jury agrees they may not even consider mitigating

evidence'."  *United States v. Johnson*, 713 F.Supp.2d 595, 632, quoting *Le v. Mullin*.

The comparative justice arguments in this case were lengthy and detailed.  The many

losses suffered by the victims and their relatives were juxtaposed to the "outrageous" privileges

Mr. Wilson would have if permitted to live – just his "being alive" was couched as a privilege (T.

19

7926).  In order to rectify this injustice, the prosecutors argued, the death penalty was required.

These arguments were improper and highly prejudicial.[3]

## C.    Urging the jury to disregard mitigating evidence

Jurors must be able to consider and give effect to any and all relevant mitigating evidence

offered in support of a sentence less than death, *see, e.g., Penry v. Johnson*, 532 U.S. 782, 797

(2001); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986); *Eddings v. Oklahoma*, 455 U.S. 104,

113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978.  Jurors may believe themselves

precluded from considering relevant mitigation evidence not only as a result of the judge's

instructions, "but also as a result of prosecutorial argument dictating that such consideration is

forbidden." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21 (2007).

Accordingly, "[a] prosecutor errs by directing the jury to ignore a proposed mitigating

factor."  *United States v. Rodriguez*, 581 F.3d 775, 800-801 (8th Cir. 2009) (direct review of

federal death sentence) (citations omitted); *see also Sinisterra v. United States*, 600 F.3d 900,

909 (8th Cir. 2010) ("To ensure the reliability of the determination that death was the appropriate

punishment, a prosecutor may not argue that [meaningful] consideration [of potentially relevant

mitigating evidence] is forbidden.") (citation omitted); *DePew v. Anderson*, 311 F.3d 742, 749

(6th Cir. 2002) (granting habeas relief and ordering resentencing from state death sentence,

where prosecution's inadmissible, inflammatory, and misleading comments "were designed to

---

[3] Defense counsel acknowledges that these arguments were not objected to when made.
However, the defense had flagged the impropriety of comparative justice arguments, including
specific examples of arguments that have been condemned, in its motion to prohibit certain
forms of prosecutorial misconduct on summation.  *See* ECF #1223, pp. 15-18.  The government
did not dispute that such arguments are improper (*see* ECF #1277, pp. 13-14), and should have
refrained from making them.

20

keep the jury from properly considering and weighing the mitigating evidence offered by the defendant"); *Le v. Mullin*, 311 F.3d 1002, 1018 (10th Cir. 2002) (prosecutor may not imply that "the jury had the ability to ignore the legal requirement that it must consider mitigating evidence").

Examples of such improper argument include:

- This is the time for punishment.  Punishment.  And let me caution you respectfully, and I mean this respectfully, the issue of punishment for the Defendant is not an issue of how it affects his family, not under the law.

*Rodriguez*, 581 F.3d at 800 (standing alone, this argument would have improperly directed the jury that family-impact mitigating factors are irrelevant "under the law." *See also Pierce v. Thaler*, 604 F.3d 197, 211 (5th Cir. 2010) ("By essentially instructing the venire members that 'youth isn't relevant,' the [prosecutor's] comments may have undermined the jury's ability to give mitigating effect to evidence of [defendant's] youth . . . .").

Here, one of the mitigating factors presented was, "Ronell Wilson has a loving relationship with friends and family members, who will suffer grief and loss if he is executed." That a defendant has family members who know him and love him, and that they would suffer grief and loss if he were to be executed, speaks positively of his background and character.  It "demonstrate[s] that defendant has the capacity to be of emotional value to others." *State v. Stevens*, 879 P.2d 162, 168 (Or. 1994); *accord United States v. Fell*, 2005 WL 1634067, *2 (D.Vt. 2005) (such evidence also shows the defendant's "positive qualities" and "the nature of his interpersonal relationships"); *see, also, Marshall v. Hendricks*, 313 F.Supp.2d 423, 456-57 (D.N.J. 2004) (holding trial counsel ineffective, in part due to failure to present as mitigation the

"harmful impact [defendant's] execution would have on his family, particularly his then fifteen-year-old son"), *aff'd Marshal v. Cathel*, 428 F.3d 452, 470-71 (3rd Cir. 2005) (focusing on "powerful mitigation evidence" the son could have provided had he been called to testify, including that defendant was a loving father, and that son did not want his father to be executed).

Execution impact testimony is therefore relevant mitigation evidence, and it has been permitted in close to 70 federal capital cases of which we are aware, including – without objection – this one.   Yet the prosecutor urged Mr. Wilson's jurors to discount it.  He argued on rebuttal that if jurors concluded that the mitigating factor was factually proven, as they likely would, "that's not a concern to you."  That Mr. Wilson's relatives would be upset if he were executed was his own fault, since he committed the murders that authorized that punishment. Accordingly, the effect on his family "has nothing to do with you in the exercise of your duty" (T. 7925).  Defense counsel objected to this argument but was overruled (T. 7925).  The prosecutor then allowed as how the jury had a right to "consider" this evidence, and could "afford that some weight," but "we don't think it has much significance because that's an issue between the defendant and his family" (T. 7925).

In every capital case, the impact of a defendant's execution on his loved ones is, necessarily, the result of his capital crimes: he would not face the death penalty but for commission of a death-eligible offense.  As noted, however, execution impact testimony is well-established mitigation, and the prosecutor erred by urging jurors to dismiss it.  The error was prejudicial, moreover, since the impact of Mr. Wilson's death on his loved ones was an important mitigating factor in his case – it was based on testimony from several different people over the course of his life, who described his worth to them.  It should not have been denigrated.

The prosecutors also improperly devalued Mr. Wilson's mitigating evidence generally, through the use of two tactics.  First, they repeatedly argued that justice demanded or required the death penalty based on the facts of the crime alone, or simply because Mr. Wilson killed two people with families (T. 7768, 7769, 7770, 7779, 7894-95, 7925-27).  This was a thinly-veiled invocation of an eye for an eye: death was the just and fair punishment for murder, and execution should automatically follow the commission of intentional murder, irrespective of the content or extent of the mitigation evidence.

Next, when the prosecutor did, finally, discuss some of the mitigating factors, she shifted the burden of proof to the defense to justify a life sentence.  She did this when she first started to address Mr. Wilson's mitigation: "ask yourself whether the mitigating factors outweigh the aggravating factors" (T. 7810).  And she did it at the conclusion of her discussion: did Mr. Wilson's "bad" childhood "outweigh the pain and the suffering that he has caused the victim's families in this case?  Does it outweigh what he has done?" (T. 7818).  This mischaracterized the weighing step, which authorizes consideration of a death sentence only when the aggravating factors outweigh the mitigating factors, and outweighs them sufficiently to justify that sentence. *See* 18 U.S.C. § 3593(e).

### D.   Encouraging jurors to consider themselves victims of Mr. Wilson

It is improper to invite jurors to put themselves in the victim's shoes.  Such so-called "golden rule" arguments are "'universally recognized as improper because [they] encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'"  *United States. v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989) (citation omitted); *accord, e.g., United States v. Moreno*, 947 F.2d 7, 8 (1st Cir. 1991).

23

Here, the prosecutor invited jurors to think of themselves as victims of Mr. Wilson,
because the detectives' murders had impacted them personally as residents of New York City
who had lost their protection.  In a sustained, emotional appeal, she asked jurors to let their
verdict "speak to the rippling effect that these murders have had on those who loved [the victims]
*and relied on them.  Let it speak to all that these heros still had to give this world" (T. 7763-64
[emphasis added]).  Mr. Wilson had killed officers "who risked and ultimately gave their lives to
protect *our* community, by taking guns off the streets, guns like these and out of the hands of
criminals like him" (T. 7763 [emphasis added]), men like Detective Andrews who had "served
*our* community" and dedicated himself  "to taking guns and drugs off of the street, to make *this
city* a better place"  (T. 7764, 7765 [emphasis added]).

"These were men who struggled and worked hard to overcome their struggles, to
contribute to their community," who "made a choice . . . to protect and serve the people *of this
city*" (T. 7765 [emphasis added]).  The victims "were men that *this city* was lucky to have
protecting it (T. 7765 [emphasis added]).  They "were tasked with the most dangerous, and one
of the most important jobs, tragically working to rid *this city* of the types of firearms that led to
their executions" (T. 7780-81 [emphasis added]).  They "risked their lives every day to make the
streets safer.   The defendant . . . attacked the very protection that law enforcement affords *this
community*" (T. 7781 [emphasis added]).

These comments "were akin to a golden rule violation because they suggested the jurors
were themselves direct victims of [defendant's] crimes."  *United States v. Palma*, 473 F.3d 899,
902 (8th Cir. 2007).  They were also an improper emotional appeal to the passions of the jurors.
*See United States v. Smyth*, 556 F.2d 1179, 1185 (5th Cir. 1977) (in case involving charge of

conspiring to defraud the United States, it was an "improper appeal to the passion and prejudices of the juror[s]" for prosecutor to argue to jury that it was not "Uncle Sam" who took "the ride," but "that's *your* tax money") (emphasis added).

*        *        *

In sum, through a combination of improper and harmful arguments, the government obtained an unfair advantage and skewed the jury's deliberations.   Cumulatively, at the least, this misconduct cited warrants a new penalty trial.

## CONCLUSION

For all the reasons stated, the Court should set aside the jury's death sentences and remand the case for a new penalty proceeding.