UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -               04-CR-1016(S-2) (NGG)

RONELL WILSON,

           Defendant.

- - - - - - - - - - - - - - - - -X


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR A NEW PENALTY PROCEEDING</u>**


LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201


James G. McGovern
Celia A. Cohen
Assistant U.S. Attorneys
   (Of Counsel)

## **PRELIMINARY STATEMENT**

On December 20, 2006, the defendant was convicted of, *inter alia*, murdering undercover New York City Police Department Detectives James Nemorin and Rodney Andrews, and was subsequently sentenced to death.  On June 30, 2010, the Court of Appeals overturned the death sentence and remanded for a new sentencing phase.  See United States v. Whitten, 610 F.3d 168, 205 (2d Cir. 2010).  On July 24, 2013, following a five-week resentencing proceeding, the jury once again recommended a death sentence for the defendant.  The defendant has filed a motion for a new penalty proceeding.  See ECF #1461.

The government respectfully submits this memorandum of law in opposition to the defendant's post-hearing motion for a new penalty proceeding.  The defendant argues, utilizing a Rule 29 standard, that the future dangerousness aggravating factor was not supported by legally sufficient evidence, and that the Court should therefore order a new penalty proceeding.  The defendant further argues that the government committed misconduct on summation that denied the defendant a fair penalty proceeding.

For following reasons, the Court should deny the defendant's motion in its entirety.

**ARGUMENT**

I.   The Future Dangerousness Aggravating Factor was Supported by Overwhelming Evidence

A.   Applicable Law

When attacking a jury's verdict on the grounds of insufficient evidence, a defendant bears a "very heavy burden." United States v. Marji, 158 F.3d 60, 63 (2d Cir. 1998); United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994). The evidence must be viewed in the light most favorable to the government, and the Court must credit every inference that the jury may have drawn in favor of the government. United States v. Wilkerson, 361 F.3d 717, 724 (2d Cir. 2004); United States v. Downing, 297 F.3d 52, 56 (2d Cir. 2002). In addition, the Court must review the evidence as a whole and resolve all issues of credibility in the government's favor. Downing, 297 F.3d at 56. A defendant's conviction will not be overturned provided that "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Wilkerson, 361 F.3d at 724 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The Second Circuit has made clear that the strict Rule 29 standard is "necessary to avoid judicial usurpation of the jury function." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984). Rule 29 thus must not be used as a vehicle for the trial court to substitute its own determination of the weight of the evidence and the reasonable inferences to drawn from the

-2-

evidence for that of the jury.  <u>United States v. Guadanga</u>, 183

F.3d 122, 129 (2d Cir. 1999); <u>Mariani</u>, 725 F.2d at 865.[1]

      B.   <u>Argument</u>

          (i). Future Dangerousness is Not Necessary to Survive a
             <u>Sufficiency of the Evidence Claim</u>

The defendant argues that a new sentencing is warranted

because there was insufficient evidence to support a finding of

the future dangerousness non-statutory aggravating factor.  Def.

Mot. at 2.  The defendant's argument is without merit.  Even if

the evidence of future dangerousness factor was insufficient (as

opposed to here where it was overwhelming), a new death penalty

proceeding would not be warranted because the government needed

only to prove one of the statutory aggravating factors to justify

a death sentence.  <u>See</u>  18 U.S.C. § 3593(d) ("If no aggravating

---

     [1]    Although Rule 29 is not directly applicable to the
Federal Death Penalty Act, the Eleventh Circuit and several
district courts have adopted the Rule 29 standard applicable to
guilt phase determinations.  <u>See</u> <u>e.g.</u>, <u>United States v. Brown</u>,
441 F.3d 1330, 1368-1371 (11th Cir. 2006) ("To affirm the
district court's denial of what should be viewed as a Rule 29
motion, 'we need only determine that a reasonable fact-finder
could conclude that the evidence established the defendant's
guilty beyond a reasonable doubt.'  Because the murder and the
robbery occurred nearly simultaneously, and because there is
conflicting evidence regarding the extent to which [the victim]
may have resisted, a jury reasonably could have found that [the
defendant] committed the murder in expectation of pecuniary
gain."); <u>United States v. Sampson</u>, 335 F.Supp.2d 166, 201-202
(D.Mass 2004) (adopting the Rule 29 standard applicable to guilt
phase determinations in a death phase); <u>United States v. Roman</u>,
371 F. Supp.2d 36, 43 (D. Puerto Rico, 2005) (The FDPA does not
divest the court of its inherent power to evaluate the
sufficiency of information presented during the penalty phase,
applying the standards set forth in Fed. R. Crim. P. Rule 29).

factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law."); 18 U.S.C. § 3593(e) (if the jurors unanimously agree that the aggravating factors sufficiently outweigh the mitigating factors or the aggravating factors alone are sufficient, then the jury must recommend a sentence of death).  The defendant conceded prior to the sentencing proceeding that two statutory aggravating factors alleged in this case were both proven, as well as two of the non-statutory aggravating factors.  See 2013 Sentencing Proceeding Transcript ("Tr.") at 7653 (COURT: And with regard to the statutory aggravating factors, I just need to confirm that the defense is agreeing that the jury should be instructed that four aggravating factors have been found -- two statutory and two nonstatutory . . .; Mr. SOLOWAY: That's correct, Judge.").  To suggest that the jury disregarded all four of these aggravating factors and solely made their decision on the future dangerousness aggravating factor is not only speculation, but extremely unlikely.  In any event, because four aggravating factors were already proven, the government satisfied its burden of providing sufficient evidence to justify a sentence of death and, therefore, the defendant's motion should be denied on this ground.

-4-

> ### (ii) The Government Presented Overwhelming Evidence of Future Dangerousness

Even assuming the future dangerousness aggravating factor was necessary to justify a death sentence, the defendant cannot meet his heavy burden of proving insufficiency of the evidence.  The defendant argues that the government failed to provide evidence of any of the four allegations within the future dangerousness factor: (I) continuing pattern of violence; (ii) lack of remorse; (iii) low rehabilitative potential; and (iv) membership in a criminal street gang.  Def. Mot. at 2-8.  As the record reflects, however, the government provided overwhelming evidence of each of these allegations.

With respect to the first allegation, the government demonstrated the defendant's continuing pattern of violence through extensive evidence of his criminal background, which started at age 11 and culminated in the murders of Detectives Nemorin and Andrews.  The government further showed that since his conviction in 2006, the defendant has continued to demonstrate a continuing pattern of violence through his acts while incarcerated, including evidence of threats that he made to other inmates while he was facing the death penalty, both verbally and with a jailhouse shank.  Tr. 5963 - 5966; 6062-6063; 6086-6087; 6219-6220.  In addition, the defendant's actions in refusing to leave the recreation deck in September 2012, as well

-5-

as his smashing of the visiting room window in 2007, evidenced his capacity for violence.  Tr. 5993 -5395; 5675-77.

The defendant argues that no physical injury, apart from dislocating a prison guard's finger, has resulted from anything that the defendant has done since killing Detectives Nemorin and Andrews.  Def. Mot. at 5.  This argument, of course, intentionally ignores that the jury was permitted to infer from the defendant's recent conduct, when he had a potential death sentence hanging over his head, what acts he would be likely to commit in the future if he escaped the death sentence.  As the government argued in summation, the defendant's potential for violence would be particularly high if he received a life sentence because he would no longer have an incentive to behave appropriately, and he would likely be housed in general population.  Thus, it was certainly reasonable for the jury to conclude, based solely on the totality of the evidence showing the defendant's continued pattern of violence, that the defendant represents a continuing danger to the lives and safety of others.

Second, contrary to the defendant's argument, the government provided overwhelming evidence that the defendant has no remorse for his crimes.  The government's allegation of lack of remorse was not, as defendant alleges, solely "grounded on conduct close in time with the murders alone."  Def. Mot. at 5. For example, the government demonstrated that the defendant

-6-

routinely and recently referred to himself as a "cop killer" - a reference unlikely to be made by someone with remorse.  See testimony of Kevin Johansen (Tr. 5862, "he said that they were called cop killer bullets like him."; Tr. 5857, "he said we all know why I'm here, and he'd [sic] smiled when he said it."); testimony of  Tommy Germosen (Tr. 5964-65, "He supposedly said that he had killed policeman and he didn't care anymore. . . . That with the type of case against him, he could do anything, he could attack any person because he was a violent person. . .  He kept saying basically the same thing, all the time.").  In addition, the government demonstrated that the defendant tried to benefit from his crimes.  See testimony of Shabucalik Geralds (Tr. 6451-6452, "He said, 'I put in enough work.  I should be the OG.'").  The government also introduced evidence that the defendant stuck his tongue out at the victims' families in January 2007, when the original death verdict was rendered.  That act alone, the government submits, showed a complete lack of remorse for the murders.  Finally, the government proved that the defendant obtained Bloods tattoos on his body following his original conviction and sentencing, which demonstrated his continued commitment to the very organization that, in part, drove him to commit the murders.  Accordingly, in addition to the powerful evidence of the defendant's lack of remorse following the crimes, including (I) dumping and searching the bodies in the

-7-

street, (ii) telling Jesse Jacobus, "I don't give a fuck about nobody," (iii) advising Mitchell Diaz that he "popped them," (iv) taunting Police Officer Six, by boasting, "what are you looking for, more trouble tonight," (v) and writing rap lyrics celebrating the murders, the government persuasively demonstrated that the defendant lacks remorse to this day.

The defendant further argues that the government did not offer any proof evidencing a correlation between lack of remorse and future dangerousness. Def. Mot. at 5. The government, however, was not required to prove such a correlation. It was up to the jury to determine if the defendant's lack of remorse contributes to his potential for future dangerousness. The government argued at closing, nevertheless, that the defendant's lack of remorse and caring is what makes him extremely dangerous. Consistent with this argument, Juan Infante testified about his view, based upon the defendant's statements and actions, that the potential death sentence was the only thing keeping the defendant in line. See testimony of Juan Infante, Tr. 6064 ("He would just always refer to his case as . . . these people want to kill me. That's why, you know, basically that's why he was acting the way he was acting. He was very passive. He said these folks want to kill me, exact words . . . That's what was keeping him in line."). Given the evidence of his lack of remorse and lack of concern for

others, it was reasonable for the jury to infer that, if the defendant received a life sentence, he would pose a serious danger to prison staff, inmates and even individuals outside of prison.  Thus, there was sufficient evidence for the jury to find that the defendant's lack of remorse contributed to the finding that the defendant represents a future danger.

Although the defendant cites an article that states that a lack of remorse has not been found to be predictive of violence in prison, the government is not under any obligation to disprove that allegation when there was no evidence of it at trial.  Def. Mot. at 5.  In fact, the defendant noticed Thomas J. Reidy, one of the authors of that article, as an expert witness, but chose not to call him as a witness.  Therefore, the government's evidence that there is a correlation between lack of remorse and future dangerousness was sufficient, and there was no contrary evidence presented.

Third, in arguing that the government did not prove that the defendant has low-rehabilitative potential, the defendant completely overlooks the evidence in support of this factor.  Def. Mot. at 6.  To dispute the validity of this aggravating factor, the defendant merely acknowledges his "overbearing actions toward a few inmates on K-81" and the testimony of Johansen and Anthony Rodriguez.  Id.  The government, however, provided overwhelming evidence of the

-9-

defendant's low rehabilitative potential.  Just last September,
the defendant refused to leave the recreation deck for hours
after staff repeatedly requested him to do so.  The defendant,
knowing that a use of force team was about to converge on the
recreation deck, aggressively yelled at the team, refused to
comply with verbal instructions and then attempted to jump over
the team as they entered the recreation area.  Tr. 5394.   The
videotape of the defendant's actions, including his post-
extraction smiles and laughter, undoubtedly demonstrated the
defendant's low rehabilitative potential.  Indeed, the
defendant's own expert, Dr. Mark Bezy, agreed that an inmate who
would "act like that and attack[] officers under [that] situation
is a dangerous inmate."  Tr. 7410.  Moreover, even though the
2012 recreation deck incident would have been sufficient to
demonstrate this factor, the government also offered evidence of
the defendant smashing the visiting room window in 2007, his
threats to Anthony Rodriguez with a shank, his continued
membership in the Bloods and his general behavior in K-81 to
establish overwhelmingly the defendant's low-rehabilitative
potential.  Tr. 5675-79; 6219-20; 5968; 6036-37; 6043-44;
6060-6064.

          Fourth, the defendant claims that the government did
not prove that the defendant's Bloods membership demonstrates his
future dangerousness.  Def. Mot. at 6.  But the government

-10-

provided overwhelming evidence of the defendant's continued membership in the Bloods - a violent street gang - which was all that the government was required to prove.  As with a lack of remorse, it was up to the jury to determine if the defendant's continued membership proves or contributes to the defendant's future dangerousness.  The government certainly gave the jury the evidence essential to conclude that the defendant's membership in the Bloods makes him a future danger, including, for example, evidence that Bloods members commit violent acts to maintain their status (Tr. 5435; 5461; 6323-24), evidence that the defendant is a high-ranking Bloods member who recently inducted a fellow inmate (and murderer) into the Bloods (Tr. 6043-44; 6057), and evidence that the defendant threatened others that his fellow Bloods members would commit violence on his behalf. (Tr. 5174-75; 6062; 5358-59).

Finally, the defendant claims that the government failed to provide evidence of the defendant's manipulation of the prison guard, Nancy Gonzalez.  Def. Mot. at 7.  The government presented evidence of the defendant's actions with Gonzalez through inmate testimony and surveillance videos, which was more than sufficient to allow the government to argue that the defendant manipulated her.  It was up to the jury to decide whether the uncontroverted evidence of the sexual relationship between the defendant and Gonzalez demonstrated the defendant's

manipulation of prison staff and supported a future dangerousness finding.  Of course, the defendant was free to argue on summation that he did not manipulate Gonzalez, but the instant sufficiency argument must fail because there was ample evidence for the jury to conclude that the defendant is manipulative.  Furthermore, the jury was not required to make this finding in order to determine that the defendant is a future danger, and thus for Rule 29 purposes, this argument has no merit.

For all the foregoing reasons, the defendant's claim of insufficiency of the evidence with respect to the future dangerousness factor fails.  Therefore, the defendant's motion should be denied on this ground.

II.  The Defendant Received A Fair Sentencing Hearing and The Interests Of Justice Do Not Warrant a New Trial

A.  Applicable Law

This Court has authority under Federal Rule of Criminal Procedure 33(a) to order a new trial "if the interest of justice so requires."  The ultimate question for the district court in ruling on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 133, 134 (2d Cir. 2001); United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992).  Rule 33 gives a court "broad discretion . . . to set aside a verdict and order a new trial to avert a perceived miscarriage of justice." Ferguson, 246 F.3d at 133.  While courts have "broader discretion to grant a new trial

under Rule 33 than to grant a motion for acquittal under Rule
29," they "nonetheless must exercise the Rule 33 authority
'sparingly' and in 'the most extraordinary circumstances.'"
United States v. Triumph Capital Group, Inc., 544 F.3d 149, 159
(2d Cir. 2008) (internal citations omitted).[2]

Here, the defendant's motion for a new penalty phase
trial is based largely on what he alleges to have been improper
comments made by the government during its closing and rebuttal
summations.  As the Second Circuit recently explained, however:

> It is a 'rare case' in which improper
> comments ... are so prejudicial that a new
> trial is required." United States v.
> Rodriquez, 968 F.2d 130, 142 (2d Cir.1992)
> (quoting Floyd v. Meachum, 907 F.2d 347, 348
> (2d Cir.1990)).  Such comments do not amount
> to a denial of due process unless they
> constitute "egregious misconduct." United
> States v. Shareef, 190 F.3d, 71, 78 (2d Cir.
> 1999) (internal quotation marks omitted). In
> assessing a claim, we consider: (1) "the
> severity of the misconduct"; (2) "the
> measures adopted to cure it"; and (3) "the
> certainty of conviction in the absence of the
> misconduct." Id. (internal quotation marks
> omitted).

---

[2]     Apparently recognizing the difficult burden that Rule
33 requires a defendant to meet to justify a new sentence, the
defendant does not even bother to cite Rule 33 in support of his
motion.  Rather, he relies on his right to due process and to a
fair and reliable sentencing determination pursuant to the Fifth,
Sixth and Eight Amendments to the United States Constitution and
18 U.S.C. § 3596(c).  A motion on these procedural grounds,
however, is inappropriate at this juncture.

United States v. Ferguson, 653 F.3d 61, 83-84 (2d Cir. 2011)
(overruled on other grounds).

Furthermore, where a defendant does not allege that the
government misled the jury about its role in the capital
sentencing process, an alleged improper prosecutorial remark
violates the constitution only where the remark "so infected the
trial with unfairness" that it resulted in a denial of due
process.  See Donnelly v. DeChristoforo, 416 U.S. 637, 643
(1974).  A jury verdict "is not to be lightly overturned on the
basis of a prosecutor's comments standing alone;" rather, to
merit reversal a defendant "must demonstrate misconduct so
egregious that, when viewed in the context of the entire trial,
it substantially prejudiced him."  United States v. Newton, 369
F.3d 659, 680 (2d Cir. 2004) (internal quotation marks and
citation omitted); see also id. at 681 ("[I]t is particularly
important for appellate courts . . . not to give disproportionate
emphasis to isolated incidents of alleged error.") (internal
quotation marks and citation omitted).  In assessing whether the
defendant has suffered prejudice from an alleged improper
argument, the Court should consider "the severity of the alleged
misconduct, any curative measures taken by the trial court, and
the likelihood of conviction absent the challenged conduct."  Id.
at 680.

Moreover, where a defendant does not object to allegedly improper remarks below, consideration of the issues, if considered at all, must be reviewed only under a plain error standard.[3]  See Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") 52(b); United States v. Caracappa, 614 F.3d 30, 41 (2d Cir.), cert. denied, 131 S. Ct. 675 (2010).  The Federal Rules of Criminal Procedure dictate that to preserve a claim of error, a party should inform the court of the error "when the ruling or order is made or sought" and the "action the party wishes the court to take, or the party's objections to the court's action and the grounds for that objection."  See Fed. R. Crim. P. Rule 51(b).  The purpose of this rule is "to enable the court to correct its error, if any, or to enable the opposing party to correct any alleged defect."  28 Moore's Federal Practice, §651.03[1], 3d Ed. (1997).  And it prevents a litigant from 'sandbagging' the court - remaining silent about his objection and belatedly rasing the error only if the case does not conclude in his favor.  United States v. Gomez, 705 F.3d 68, 74-75 (2d Cir. 2013) (citing Puckett, 556 U.S. at 134).  Failure to abide by this contemporaneous-objection rule ordinarily precludes the raising on appeal of the unpreserved claim of trial error.

---

[3]     The government will identify each issue that was not preserved for review by the defendant.  The government will answer those issues on the merits, but the government does not concede that the merits should be even reached on those issues.

<u>Puckett v. United States</u>, 556 U.S. 129, 135 (2009).  Fed. R.

Crim. P. 52(b), however, recognizes a limited exception to that

preclusion and will be reviewed by an appellate court only for

plain error that affects substantial rights.  <u>Id</u>.

As the Supreme Court has held:

> We explained in <u>United States v. Olano</u>, 507
> U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508
> (1993), that Rule 52(b) review—so-called
> "plain-error review"—involves four steps, or
> prongs.  First, there must be an error or
> defect—some sort of "[d]eviation from a legal
> rule"—that has not been intentionally
> relinquished or abandoned, i.e.,
> affirmatively waived, by the appellant. <u>Id</u>.,
> at 732–733, 113 S.Ct. 1770.  Second, the
> legal error must be clear or obvious, rather
> than subject to reasonable dispute.  <u>See id.</u>,
> at 734, 113 S.Ct. 1770.  Third, the error
> must have affected the appellant's
> substantial rights, which in the ordinary
> case means he must demonstrate that it
> "affected the outcome of the district court
> proceedings."  <u>Ibid</u>.  Fourth and finally, if
> the above three prongs are satisfied, the
> court of appeals has the discretion to remedy
> the error—discretion which ought to be
> exercised <u>only if the error " 'seriously
> affect[s] the fairness, integrity or public
> reputation of judicial proceedings.' "</u> <u>Id</u>.,
> at 736, 113 S.Ct. 1770 (quoting <u>United States
> v. Atkinson</u>, 297 U.S. 157, 160, 56 S.Ct. 391,
> 80 L.Ed. 555 (1936)).  Meeting all four
> prongs is difficult, "as it should be."
> <u>United States v. Dominguez Benitez</u>, 542 U.S.
> 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157
> (2004).

<u>Puckett</u>, 556 U.S. at 135; <u>see also</u> <u>Gomez</u>, 705 F.3d at 75 ("before

an appellate court can correct an error not raised at trial,

there must be (1) error (2) that is plain and (3) the affected

substantial rights").  The Second Circuit has recognized that the failure to object at trial indicates counsel's own difficulty in finding any prejudice.  <u>United States v. Caniff</u>, 521 F.2d 565, 572 (2d Cir. 1975).

> B.   <u>Argument</u>
>
> > (i)   There Were No Material Misstatements Of the Evidence

The defendant alleges that the defendant suffered prejudice when the government mistakenly stated that the time between the killing of the two victims was minutes rather than seconds.  Def. Mot. at 11.  The government admits that this was an inadvertent error.  Obviously, the government would not have invited the jurors to review the Van Campen stipulation if it did not believe at the time that the stipulation indicated that there were minutes between the shots.  But this mistake did not prejudice the defendant.  First, the argument that the government made in the closing was mainly directed at the defendant's ruthlessness, even when faced with Detective Nemorin's plea for his life.  The government correctly argued that the evidence demonstrated, through Jacobus's testimony and the ballistics evidence, that, even after Detective Nemorin begged for his life, the defendant put the muzzle of the gun to the back of the detective's head and pulled the trigger.  Tr. 4548; 6170-71.  Whether Detective Nemorin begged for minutes or seconds, there was sufficient proof to demonstrate that the defendant had a

-17-

choice at that time:  either to spare Detective Nemorin's life or to kill him.  Therefore, even if the government was not mistaken about the amount of time that lapsed between the murders, there would have no material difference in the summation argument to the jury.

Second, the defendant raised this issue in a letter following the summations, and the Court issued a curative jury charge that specifically instructed the jurors that they "alone decide what the facts are and that the comments by counsel, including opening statements and closing arguments, are not evidence."  Tr. at 7956-57.  Additionally, if the jury thought that it was significant whether it was minutes or seconds during which Detective Nemorin sat with a gun to his head, they were able to review the Van Campen stipulation, which was sent into the jury room, and/or ask for a read-back of Jacobus's testimony.[4] Therefore, it is highly unlikely that the issue of how much time elapsed between the killings made any difference in the jury's deliberations, particularly because establishing that fact was not essential to their verdict.  Indeed, to the extent there was a relevant aggravator (killing of more than one victim in a single criminal episode), that factor was conceded as proven by

---

[4]     The defendant argues that it would be speculative to assume that the jury reviewed the Van Campen stipulation and discovered the government's misstatement.  Respectfully, the government submits that it would be as speculative to conclude that the jury did not do so.

-18-

the defendant.  In sum, because the defendant cannot show prejudice from this misstatement, a new trial is not warranted on this ground.

With respect to the defendant's remaining claims of "material mistatements," the government submits, as set forth below, that there were no other misstatements during the government's closing or rebuttal arguments.  Rather, the government drew fair inferences supported by the evidence in the record.

First, the defendant argues that there was no evidence supporting the allegation that the defendant manipulated a prison guard.  Def. Mot. at 12-13.  This issue, however, was litigated prior to the closing, when the Court observed at sidebar that:

> Given the evidence in the record before the jury, the jury may infer (and the government may argue) that the defendant manipulated Gonzalez, a correctional officer, into having a sexual relationship.  First, there has been substantial evidence in the record concerning Wilson's ability to manipulate staff including Gonzalez.  For instance, Anthony Rodriguez testified that Gonzalez purposely did not interfere when Wilson confronted Gonzalez in an aggressive manner. Also, Kevin Johansen testified that Wilson was able to manipulate a psychologist into permitting Wilson to keep his property in empty cells; to not have a cell mate; and to have Johansen reassigned to a different cell after he told authorities about Wilson's

-19-

> encounters with Gonzalez.  Second,
> as a correctional officer, Gonzalez
> had a sworn duty to uphold the
> safety of the unit in the MDC.  It
> is fair to infer that her
> relationship with Wilson was the
> product of his manipulation.
> Given these facts, the Government
> may argue that Wilson manipulated
> Gonzalez.

Tr. at 7754 - 7755.  As the Court had already acknowledged, therefore, there was sufficient evidence available for the government to make the argument that the defendant manipulated Gonzalez and the MDC psychologist.  Accordingly, the defendant's argument that there was insufficient evidence of the defendant's manipulation must fail.[5]

Furthermore, the defendant's allegation that the government's manipulation argument ran afoul of <u>Napue v. Illinoios</u>, 360 U.S. 264, 269 (1959), in that it was inconsistent

---

[5]    Furthermore, the government did not make a separate manipulation point in support of its future dangerousness argument.  The government generally argued that the defendant manipulated prison guards, which the defendant's expert admitted is an "extremely dangerous thing for an inmate."  During summation, the government only mentioned the defendant's manipulation of Gonzalez twice:  (1) Gonzalez failed to stop the fight between Rodriguez and the defendant by the microwave "because the defendant had her in his pocket."  Tr. 7802.; and (2) "through his manipulation, the defendant was able to stop [Johansen's cop-out] from getting into the right hands, hands that weren't manipulated by him.  Hands that would have stopped the defendant from meeting up with Officer Gonzalez last April."  Tr. 7800.  The government did not make any mention of the MDC psychologist.  Thus, the government made reasonable inferences that were entirely supported by the record.

with the notes of the prosecutors' interview of Ms. Gonzalez, is simply wrong. Def. Mot. at n. 2. As the government argued at sidebar, in addition to the proffer notes, the government is also in possession of Gonzalez's tape-recorded statements made to another inmate, with whom she had a relationship subsequent to the defendant. During those conversations, Gonzalez complained that she was manipulated by the defendant, that the defendant had obtained her an attorney, and that she was unaware of who was paying that attorney's fees. Although Gonzalez, in a proffer, later told the government that those statements were lies, the statements were made at a time when Gonzalez was unaware that anyone was listening, and when she appeared to be openly stating her feelings to the other inmate. See Tr. 7693-94. Even if Gonzalez truly wanted to downplay her interactions with the defendant to the other inmate, as she contended in her proffer meeting, certainly her statements about the defendant manipulating her were unnecessary to make her point. Furthermore, the government did not credit many of Gonzalez's proffer statements, including her explanation why she made certain statements to the other inmate. Thus, the argument that the defendant manipulated Gonzalez was consistent with Gonzalez's

tape-recorded statements and, more importantly, the sentencing record in this case.[6]

The defendant also claims that there was no basis for the government to argue that the defendant's smashing of the visiting room glass demonstrated future dangerousness because there was no proof that anyone was near the glass.[7]  Def. Mot. at 13.  But, as set forth above, whether someone was actually hurt has no bearing on the defendant's violent actions and what they prove he may be capable of committing in the future.  The jury was free to decide whether the defendant's act of smashing the window demonstrated his future dangerousness, and the government appropriately argued that the defendant smashed the windows without any concern for others.

Similarly, the defendant's claim that the prosecutor inappropriately speculated about the defendant's reason for becoming an orderly on death row, as well as the reason that he started performing poorly in that job, should also fail.[8]  Def.

---

[6]    The proffer notes were not in evidence, and they should not be made part of the record, particularly without the corresponding conversations that Gonzalez had with the other inmate.

[7]    The defendant failed to object to this argument during the closing arguments, and should therefore be precluded from raising it here.  Even if the argument is reviewed for plain error, the defendant cannot demonstrate that the government's argument violated his substantial rights.

[8]    The defendant failed to object to these arguments during the government's closing argument, and should therefore be

Mot. at 13.  First, the government is permitted to make inferences that the jury can consider and adopt or reject. Second, the arguments were not made in support of the government's aggravating factors; rather, they were made in response to the defendant's mitigator that, if he was not sentenced to death, he would spend the rest of his life in prison.  Numerous witnesses testified that the orderly job is one of the most desirable jobs in a prison because it enables an inmate to move around.  Tr. 5445-46; 5972-73.  Thus, it was appropriate for the government to argue that the defendant wanted the job that would give him the most freedom.  This demonstrated that the defendant copes with prison life very well in direct response to the defendant's claimed mitigating factor.  In addition, the argument that the defendant began performing badly after his sentence was reversed is a reasonable inference based on the record, and defense counsel was free to argue in closing, as he did, that the defendant continued to perform well two months after his sentence was overturned.  Therefore, there was nothing inappropriate about either of these arguments.

Finally, the government's statement that the defendant's bulb was "perfectly fine" was in direct response to the defense counsel's statement that the defendant was "not the

---

precluded from raising it here.  Even if the argument is reviewed for plain error, the defendant cannot demonstrate that the government's arguments violated his substantial rights.

-23-

brightest bulb in the chandelier."[9]   Def. Mot. at 13-14.   The
government raised this very issue during the Court's charging
conference, and requested that the Court charge the jury that the
evidence of the defendant's psychiatric history was not offered
to decrease the defendant's culpability for the crime.   Tr. 7671
- 7679.   The defense opposed the charge and argued that if they
opened the door, the government would free to make the argument.
Tr. 7678-79.   Ultimately, the Court did not include the requested
charge regarding mental defect.   During the defense closing,
however, while discussing how the crime occurred, Mr. Stern
argued that "and if you're Ronell, not the brightest bulb in the
chandelier, and impulsive, bad things can happen."   This
statement was a direct reference to the defendant's mental
capability at the time of the crime, and, as such, the government
observed in rebuttal that "your bulb doesn't have to burn too
bright to come up with, I don't want to go to jail, I'm going to
shoot this person in the head (meaning he figured out that the
victims were police officers), and that the evidence showed that
"his bulb was perfectly fine."   Tr. 7917.   Such statements
appropriately attempted to stop the jury from considering whether
there was something wrong mentally with the defendant at the time

---

[9]      Defense counsel did not object to this during the
closing arguments, and thus they should be barred from raising
the issue here.   Even if the argument is reviewed for plain
error, the defendant cannot demonstrate that the government's
argument violated his substantial rights.

-24-

that he committed the crime.  See Caniff, 521 F.2d at 571-572
(questionable statements and characterizations by the prosecutor
"were in response to excesses on the part of defense counsel, who
can hardly expect to gain judicial sympathy or redress for having
goaded a prosecutor to skirt close to the line.""").  Moreover,
the government did not argue that the defendant was exceptionally
smart or that he had a high IQ.  Rather, the government aptly
stated that the defendant had the mental capability to figure out
that the victims were police officers and to know what he was
doing.  Certainly, the trial record and the Atkins hearing record
support such an argument.

Overall, there were no misstatements in the
government's summation that warrant a new penalty proceeding, and
the defense has not demonstrated that the defendant suffered any
prejudice whatsoever.

(ii).    Comparative Justice Was Not Improperly
         Invoked

The defendant next claims that the jury's sentencing
recommendation should be vacated because the government's
summation arguments crossed the "due process line between
appropriate arguments about the impact of a murder on the victim
and his family and an emotional appeal to impose the death
penalty out of sympathy for the victim." Def. Mot. at 19.  By
repeatedly contrasting the defendant with the dead victims, the
defendant argues, the government might have "encouraged the jury

-25-

not to consider the mitigating evidence, in violation of the Eighth Amendment." Id. at 19 (quoting Le v. Mullins, 311 F.3d 1002, 1016 (10ᵗʰ Cir. 2002)).  In short, the present claim is baseless, as the government's summation arguments were not improper, and the jurors, as instructed by the Court, clearly considered the defendant's mitigation evidence in reaching their verdict.

As indicated above, the Second Circuit has held that it is a rare case that when improper comments are so prejudicial as to require a new trial.  United States v. Rodriquez, 968 F.2d 130, 142 (2d Cir.1992).  To amount to a due process violation, the comments have to amount to egregious misconduct.  Shareef, 190 F.3d at 78. (internal quotation marks omitted).  Therefore, the inquiry is whether the government's comments were improper and, if so, whether the remarks so "infected the trial with unfairness as to make the resulting [death sentence] a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

Stringing together numerous quotations from the government's closing arguments concerning the impact the murders had on the victims, a non-statutory aggravating factor pled and presented to the jury in this case, the defendant claims that the government employed impermissible "comparative justice"

arguments.[10]  Def. Motion at 15-19.  Because these forbidden

arguments were so lengthy and detailed, he argues, the government

essentially argued that "the death penalty was required."  Id. at

19-20.  Asserting that these arguments were "improper and highly

prejudicial," the defendant alleges that the government violated

due process.  Id. at 20.  The defendant is incorrect.

To make his argument, the defendant relies on a few

Tenth and Eighth Circuit cases in which none of the courts

reversed the respective death sentences, but all expressed an

aversion to prosecutors making comparisons between the plight of

the victim and the defendant's life in prison.  Id. at 15 (citing

Bland v. Sirmons, 459 F.3d 999, 1027-28 (10th Cir. 2006)(though

critical of prosecutors' specific comparison of defendant's life

in prison and that of dead victim, did not reverse death penalty

because substantial evidence of aggravating factors and little

evidence of mitigating circumstances); Le, 311 F.3d at 1015-16

(10th Cir. 2002)(despite specific comparisons between the victim

and defendant's prison life, relief denied because of

---

[10]     As alleged in the Notice of Intent, the Court
instructed the jurors on the non-statutory aggravating factor of
victim impact evidence, stating "[a]s reflected by the victims'
personal characteristics as human beings and the impact of the
offenses on the victims and the victims' families, the defendant
caused loss, injury and harm to the victims and the victims'
families . . .."  Tr. 7968.  The Court also instructed the jury
about the government's claim that, due to the defendant's crimes,
"[t]he victims' families have suffered severe and irreparable
harm."  Id. 7969.

overwhelming evidence of guilt and aggravating factors, and defense closing argument and court's instructions effectively countered government's arguments); Duckitt v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002)(even though specific comparisons between live defendant and victim in cold grave, relief not warranted where trial fair and sentencing unaffected by prosecutor's comments); United States v. Johnson, 495 F.3d 951, 979-80 (8th Cir. 2007)(due process not violated despite questionable comparisons between size of defendant's jail cell and size of six and ten year old victims' coffins because not likely that remarks evoked an appreciably greater degree of sympathy for the young victims).  These cases, however, are inapplicable to the circumstances here.

In contrast to the cases cited by the defendant, the impact of these murders on the victims was specifically pled as a non-statutory aggravating factor in this case.  Accordingly, it was entirely proper for the government to make reference, as it did, to the victim impact evidence during summation.  The court in Le acknowledged that in cases where victim impact evidence is permitted, comments that attempt "to convey to the jury the impact of the murder on the victim's family . . . comport with due process absent a showing that they rendered the trial fundamentally unfair."  Le, 311 F.3d at 1015 (citing Payne v. Tennessee, 501 U.S. at 827).  Here, all of the summation comments

pertaining to the severity of the victims' losses due to the murders were tailored to convey to the jury the massive impact that the defendant's crimes had on the Nemorin and Andrews's families.  See Beuke v. Houk, 537 F.3d 618, 648 n.9 (6th Cir. 2008)(relying on Supreme Court's holding in Payne to find that numerous references victims and their families not fundamentally unfair trial as Payne contemplated a government summation that contained numerous references the mother and her two-year-old child brutally murdered).  Other than providing a detailed accounting of the government's comments about the victims, he offers nothing to demonstrate that the sentencing was rendered fundamentally unfair by them.  Indeed, most of the cited comments are direct references to the testimony offered by the victims from the witness stand.

Apart from the government's comments about the victim impact evidence, the defendant complains that it was the "juxtaposition" of the victims' misery to the defendant's privileged prison life that made the government's summation all the more prejudicial.  Def. Mot. at 17-18.  Specifically, the defendant's excerpts a lengthy portion of the government's rebuttal summation, which he claims, represents a forceful recapitulation of the government's impermissible comparative justice tactic.  Id. at 18-19.  Respectfully, this comparative justice claim suffers from some fatal flaws.

-29-

First, the very first mitigating factor the defendant wanted presented to the jury was "(1) If not sentenced to death, Ronell Wilson will be in prison for the remainder of his life without the possibility of release." Tr. 7971. Thus, it was entirely proper for the government to comment on that factor and its significance. Moreover, as the evidence demonstrated, and the government argued, life in prison means different things for different people. Tr. 7810-12. Importantly, there was ample evidence in the record to support each of the government's observations about the defendant's life in prison.

Second, under the FDPA, after aggravating factors and mitigating factors are established, the jury is required to balance those factors to determine whether the aggravating factors sufficiently outweigh the mitigating factors so as to justify a death sentence. Thus, in the context of this FDPA case, it was fair argument for the government to discuss the relative significance and weight that should be afforded to the aggravating and mitigating factors. To be sure, if the statute demands that the factors be weighed against each other, it was proper for the government to balance the victim impact factor against any and all of the defendant's mitigating factors.

Third, during the defendant's summation, he spoke extensively, dramatically and in detail about what the defendant's life in prison would look like. To support the

significance of his first mitigating factor, the defendant

offered the following in summation:

> The question is: "Must he die? If you give
> him a life sentence, he will be punished.
> There will be consequences. He will be held
> accountable.  The Government wants you to
> think that because jails have basketball
> courts and TVs, it's not really punishment.
> Ask yourselves if that's true. For the rest
> of his life, if he gets a life sentence, this
> is where Ronell will live.  All of his
> possessions will fit in that little box in
> the corner.  Another person, not of his
> choosing, will sleep in a bunk bed with him.
> When they go to the bathroom, he will be
> present.  And when he goes to the bathroom,
> they'll be present.  If he gets a life
> sentence, once he walks out this door, he'll
> never wear civilian clothes again. Every
> day he'll wear khakis given to him by the
> prison.  He won't look in the mirror and say,
> Wow, look how good that shirt looks on me.
> Hey, I'm looking pretty slim. Every day the
> same exact clothing.  Vain or not vain, no
> one wants to wear the same clothes every day.
> He'll eat what he's told. He'll wear what
> he's told to. He'll go where he's told.
> He'll wake up and go to sleep when he's told.
> But all of that is really the least of it.
> He'll never marry.  When his loved ones die,
> he won't go to the funeral. He won't have
> Christmas or graduations. He'll be alone and
> get older and older.  And each day he'll know
> that he put himself there.  One day he'll
> look down and the Bloods tattoo on his chest
> will begin to sag. His knees will hurt. His
> hearing will go.  And life would have passed
> him by.  And as these things come to pass, he
> will know that he put himself there.  After a
> while, kids, fresh faced and proud of their
> crimes will begin to call him pops.  They
> won't be impressed by him. They'll just walk
> around him, a person of no consequence. And
> maybe then he'll tell them like he tried to
> tell his cousin Henry: Don't make the
> mistakes I made. Don't be like me, never come

-31-

> back here.  It's a slow death.  And may be
> one kid will hear.  Finally, one day he'll
> die wearing those some khaki clothes that he
> wore for 20 or 30 or 40 years.  Very few will
> know and even fewer will care.  That is
> punishment.  He will have been in jail much
> longer than he was ever on the streets and he
> will have been punished.

Tr. 7841-43.  Given this extensive review of the defendant's

expected life in a United States Penitentiary, the government

submits that it was fairly entitled to comment on what it

believed the evidence showed as to how the defendant existed in

prison.  Moreover, unlike the defendant's dramatic presentation,

the government's arguments about prison life for the defendant

were not founded on imagery and story-telling, but on the

evidence developed in the sentencing record.

Fourth, to the extent the government's rebuttal

summation set out a direct comparison between the significance of

aggravating factors in relation to the mitigating factors, such a

comparison was a proper comment on the balancing test required by

the FDPA.  In his motion, the defendant quotes the rebuttal

summation at length to demonstrate the government's attempts to

engage in prohibited comparative justice argumentation.  What the

defendant leaves out, of course, is the comments that led into

that discussion:

> It is the law in this country that if you
> commit the types of crimes the defendant
> committed, you should be eligible for the
> death penalty.  And this eligibility as we

-32-

> could see and I want to take you through
> these factors.  But it's proven on top of
> proven on top of proven on top of proven on
> top of proven on top of proven.  Gateway
> factors, statutory factors, there's very
> little for you to deliberate on whether or
> not the Government has met its burdens in
> this case.  In fact, all of its burdens are
> met down to two non-statutory aggravating
> factors.  The judge will charge you at the
> end of this that you have to engage in the
> balancing.  Balancing of the aggravating
> factors against whatever mitigating factors
> you found to exist.  And when you do that, we
> want you to analyze this case from the point
> of not Ronell Wilson as the 11-year-old boy,
> but Ronell Wilson as the 20-year-old,
> 21-year-old man and the choices that he made.
> The choices that he made in not listening to
> the positive influences in his life.  The
> choices he made coming back from Pennsylvania
> to hang out with his gang member friends.
> The choices that he made to kill these two
> detectives.  His choices.
>
> *          *          *          *          *
>
> So we have all of the aggravating factors in
> place, I've discussed the mitigating factors
> with you.  We submit we've given you
> overwhelming proof that the death penalty is
> the appropriate sentence in this case. But
> there's that question of what does justice
> require?

Tr. 7924-25.

This discussion of the sentencing scheme is completely

consistent with what is required by the FDPA and what was related

to the jury by the Court in its final instructions.  See 18

U.S.C. § 3593(e) ("the jury . . . shall consider whether all the

factor or factors found to exist sufficiently outweigh all the

-33-

mitigating factor or factors found to exist to *justify* a sentence of death.")(emphasis supplied); Tr. 7975.  Thus, contrary to what the defendant claims, taken together, the above summation excerpt and that contained in the defendant's motion demonstrate that the government was not engaging in comparative justice argumentation. Rather, the government was properly identifying, weighing and arguing that the established aggravating factors sufficiently outweighed the mitigating factors, and therefore justified a sentence of death in this case.  Moreover, to the extent that the government specifically compared the defendant's life in prison to the fate of the murdered victims, such comparison was fair comment on the defendant's dramatic description of his future and ultimate demise in a federal prison (e.g., "the Bloods tattoo on his chest will begin to sag").  Tr. 7842, 7926.  Accordingly, the government's summation arguments were proper comment on the existence and significance of the alleged victim-impact non-statutory aggravating factor, and the references to the relative significance of the proven aggravating and mitigating factors was appropriate comment on the FDPA's sentencing scheme.

Fifth, even if the Court credits the defendant's arguments, it is clear that the jury did not disregard the mitigating evidence, which would have been a result at odds with the Eighth Amendment.  As the jury verdict form reveals, the jurors unanimously decided that the vast majority of the

-34-

defendant's pled mitigating factors were proven.  See Special
Verdict Form, ECF # 1437, pp. 8-11.  Thus, there can be little
question that the jury followed the Court's detailed instructions
and appropriately engaged in the statutorily required weighing
process.[11]  Accordingly, the defendant's claim that the government
impermissibly engaged in purportedly improper "comparative
justice" arguments is unfounded and should be rejected.  See
United States v. Umana, 2010 WL 3023498, *14 (W.D.N.C. July 27,
2010) (rejecting comparative justice argument claim on the ground
that the findings on the penalty selection verdict forms showed
that jury did not disregard the mitigating factors, and because

---

[11]    The Court instructed:

        After you determine whether the defendant
        proved the existence of any mitigating
        factors, you will engage in a weighing
        process. That means that each of you
        must weigh, in your own mind, any aggravating
        factors that the jury unanimously finds to
        exist against any mitigating
        factors that you individually find to exist.
        You shall then consider whether you are
        unanimously persuaded that the
        aggravating factors proven sufficiently
        outweigh the mitigating factor or factors
        proven; or, in the absence of a
        mitigating factor, whether the aggravating
        factors alone are sufficient to justify a
        sentence of death.  As I previously
        instructed you, no jury is ever required to
        impose the death penalty. Indeed, you may
        decline to impose the death penalty without
        giving a reason for that decision.

Tr. 7975.

the strength of the evidence of guilt and aggravating factors rendered any error in such argument harmless).

Finally, the government notes that the defendant did not object to these alleged "comparative justice" arguments either during or immediately following the government's summations.  A footnote in the current motion acknowledges this fact.  See Def. Mot. at 20, n. 3.  In that footnote, the defendant claims that he raised this issue pretrial and that it was therefore preserved for the purpose of this motion.  Id. That is not the case.  On the contrary, the defendant's pretrial motion in limine regarding closing arguments was denied by the Court "without prejudice to his right to object to actual arguments made at trial."  ECF # 1300, p. 10.  The defendant failed to object to these arguments when they were made, and has thus failed to preserve them for review.  Additionally, contrary to the suggestion of the defendant's motion, the government did dispute the propriety of offering comparative arguments in its opposition to the pretrial motion.  At most, the government assured counsel and the Court that it did not intend to run afoul of the Supreme Court's ruling in Payne v. Tennessee, which it did not do during this sentencing.

> (iii).   The Government Appropriately Addressed the
>          Defendant's Mitigating Evidence

The defendant's claim that the government urged the jury to disregard mitigating evidence is completely belied by the

-36-

record.  Def. Mot. at 20.  First, on rebuttal, the government did
not improperly urge the jury to disregard execution impact
evidence.  Instead, the government argued that the jury should
give it no weight because it is the defendant's actions that put
him in that place, and it urged the jury not to worry that in
fulfilling their oath they personally will upset the defendant's
family.  See Tr. at 7925 ("So if his family members are upset,
they'll be upset because of his actions and that has nothing to
do with you in the exercise of your duty.").  Indeed, the
government specifically mentioned it in the context of the
weighing process and stated, "if you want to afford that some
weight, that his family members will be upset, you have every
right to consider it because we don't think it has much
significance because that's an issue between the defendant and
his family."  Id.  The government thus commented on the weight
that the jury should afford this mitigator and in no way urged
the jury to disregard it.  Tellingly, all 12 jurors unanimously
found that this mitigator was proven.  See Special Verdict Form,
ECF# 1437.

          Second, the government's statement that a death penalty
is justified by the facts alone did not devalue the defendant's
mitigation evidence.  In fact, the government conceded many of
the defendant's mitigators, and appropriately argued that the
aggravating factors sufficiently outweighed them.  For example,

the government conceded that the defendant had a bad childhood, but argued that it did not outweigh the enormity of defendant's actions, nor the pain and suffering of the victims' families. Tr. 7818. And contrary to defendant's claim, this argument did not improperly shift the burden to the defense to justify a life sentence. Def. Mot. At 23. Instead, it asked the jury to engage in the weighing process – a process in which the aggravators are on one side and the mitigators on the other. Whether the aggravators outweigh the mitigating factors or the mitigating factors outweigh the aggravating factors, it is the same. To flip the order around does not "mischaracterize" the weighing process. Furthermore, the jury was instructed that they should consider the defendant's mitigating evidence, and that it did not have to have any connection to the crime.[12] Tr. 7970. Thus, through both the jury instructions and the prosecutor's arguments, it was abundantly clear that the jury had to consider the mitigating factors. Indeed, all twelve jurors unanimously

---

[12] The government also reminded the jury during closing arguments: "Now, after you consider the four steps you must then consider the defendant's mitigating factors, step five. Mitigating factors can be anything, they don't have to have any connection to the crime and you'll see that most, in fact, do not have any connection. And you should consider these mitigating factors as you engage in the sixth step, the weighing process." Tr. 7809.

found 15 of the 24 mitigating factors.  <u>See</u> Special Verdict Form.[13]

In sum, because the government did not urge the jurors to disregard the defendant's mitigation evidence, and because the jury actually considered all of the defendant's mitigators (unanimously finding most of them), a new trial is not warranted on this ground.

(iv).    The Government Did Not Encourage Jurors to Consider Themselves Victims

Lastly, the defendant argues that in closing argument the prosecutor invited jurors to think of themselves as victims of the defendant in violation of the so-called "Golden Rule." Def. Mot. at 23.  Generally, golden-rule arguments either ask jurors to place themselves in the position of the victim or ask jurors how they would feel if they were the victims of the

---

[13]    Of the remaining factors, most of them were still found by a majority of the jurors: eleven jurors found that during his early childhood, Ronell Wilson was exposed to an unsafe and unsanitary home environment; seven jurors found that the defendant grew up in poverty and deprivation; six jurors found that he had few positive role models; eleven jurors found that the defendant's Aunt Lillian Barnes was ill-equipped to handle the defendant's needs as a child and adolescent; seven jurors found that but for Michael Whitten and Omar Green, the defendant would not have been involved in the murders; two jurors found that the defendant did not believe that the victims were police officers; one juror found that the Federal Bureau of Prisons can impose adequate restrictions on the defendant; two jurors found that the defendant's life has value; and no jurors found that there were other factors in the defendant's background and other circumstances of his offenses that mitigate against the imposition of the death penalty.

alleged crime.  See United States v. D'Anna, 450 F.2d 1201, 1206 (2d Cir. 1971) (defendant was not denied a fair trial even when the prosecutor asked the jurors to consider the fact that they as citizens carry an additional burden when someone does not pay his taxes); United States v. Stinson, 2012 WL 1130520, *5 (2d Cir. April 5, 2012) (prosecutor's error in asking the jury, in the context of discussing whether the defendants were induced to engage in the theft of firearms, "What would persuade you to do this?" did not justify reversal.  While such arguments are improper, the defendant must demonstrate that the statements so infected the trial with unfairness as to make the resulting conviction a denial of due process.  See Donnelly, 416 U.S. at 643; D'Anna, 450 F.2d at 1206 (the question to be answered is whether these statements deprived the defendant of a fair trial).

The government's statements about the victims protecting "this city" and "this community" were not violations of the "golden rule" because they did not invite the jurors to put themselves in the victims' shoes or to think of themselves as victims.  The statements were made in the context of the victims' roles as police officers.  A statement that the victims protected the "city of New York" is no different than stating "this city," and certainly did not cross the line so as to make the jurors believe that they are personally victims because they lost the protection of Detectives Andrews and Nemorin.  See Johnson v.

Ercole, 2007 WL 778478, * 4 (E.D.N.Y. March 13, 2007) (The
prosecutor did not inflame the jury's emotions so as to infect
the trial with unfairness by reminding the jury that the victim
was a New York City firefighter where the victim was, in fact, a
firefighter.).  In any event, even if this phrase was improper,
it certainly did not "so infect the trial with unfairness as to
make the resulting conviction a denial of due process."  See
Donnelly, 416 U.S. at 643

        Furthermore, the prosecutor's statement that the jurors
should let their verdict "speak to the rippling effect these
murders have had on those who loved [the victims] and relied on
them" also did not violate the "golden rule."  Tr. 7763.  The
statement "those who relied on them" was a reference to the
victim's families - their wives and children.  Thus, the
statement directly addressed one of the government's non-
statutory aggravators - the impact of the offense on the victims'
family members - and, as such, could not possibly have violated
the "golden rule."

        Finally, given that defense counsel never objected to
the phrase "this city," which the prosecutor said four times, or
"this community," which was said once, further demonstrates that
counsel did not believe that there was anything prejudicial about
these statements.  At this juncture, the standard is plain error,
and the defendant cannot show that the statements were so

-41-

egregious that they affected substantial rights and seriously affected the fairness, integrity or public reputation of the judicial process.  See Gomez, 705 F.3d at 74-75.

### CONCLUSION

For all the foregoing reasons, the government respectfully requests that the defendant's motion be denied in its entirety.  Not only are most of the claims barred by the fact that the defendant failed to object, but the defendant cannot meet his high burden of proving that a new penalty trial is warranted.

Dated:    Brooklyn, New York
          August 26, 2013

                                Respectfully submitted,

                                LORETTA E. LYNCH,
                                United States Attorney,
                                Eastern District of New York


                       By:    _____/s/_____
                                James G. McGovern
                                Celia A. Cohen
                                Assistant U.S. Attorneys
                                (718) 254-6293/6147

cc:  David Stern
     Robert Soloway
     Richard Jasper
     Beverly Van Ness