EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

UNITED STATES OF AMERICA

              -against-                              Docket No.   04 CR 1016 (S-2) (NGG)

RONELL WILSON,

              Defendant.

-------------------------------------------------------X


**MEMORANDUM IN RESPONSE TO ORDER OF JULY 1, 2014**


DAVID STERN
Rothman, Schneider, Soloway & Stern, LLC
100 Lafayette Street, Ste 501
New York, NY 10013
(212) 571-5500

*Attorney for Mr. Wilson*

September 2, 2014

MICHAEL BURT, Of Counsel
Law Office of Michael Burt
1000 Brannan Street
Suite 400
San Francisco, California
415-522-1508

## TABLE OF CONTENTS

I.   Procedural History...................................................................................1

II.  Introduction..........................................................................................2

III. Issues Raised by *Hall v. Florida* ...........................................................4

IV.  Issues and Proposed Next Steps ...............................................................9

     *a.*  This Court Adopted the Wrong Confidence Interval. .....................................10

     *b.*  The Search for Greater Precision than the Confidence Interval Conflicts
         with *Hall*.........................................................................................12

     *c.*  This Court Misapplied the Critical Concept of SEM ....................................13

     *d.*  When a Person Has Taken an IQ Test 9 Separate Times, Practice Effects,
         In Particular Progressive Error, Cannot Be Discounted
         . ....................................................................................................14

     *e.*  The Court's Use of Averages to Evaluate the Import of Mr. Wilson's
         Nine IQ Scores Deviates from Clinically Accepted Standards and Is
         Unconstitutionally Arbitrary ..................................................................17

     *f.*  This Court Erroneously Refused to Consider Evidence of Deficits in
         Mr. Wilson's   Functioning  ...................................................................18

     *g.*  "Clinical Judgment" Has an Exact and Rigorous Meaning in the Professional
         Community — a Meaning at Odds with How This Court
         Applied the Concept ............................................................................22

     *h.*  Clinical Judgment Anticipates Multi-Disciplinary Input, and Nothing
         Requires a Single Clinician to Conduct Every Test or Every Possible
         Aspect of the Diagnosis........................................................................24

     *i.*  Remaining Issues.
        .................................................................................................25

V.   Conclusion, request for merits briefing and a reopened hearing. ..............................25

**MEMORANDUM IN RESPONSE TO ORDER OF JULY 1, 2014**

On June 25, 2014, the Court of Appeals for the Second Circuit issued an order, sua sponte, remanding the above-captioned cause to this Court to "reconsider its decision that Wilson is not intellectually disabled, United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013), in light of Hall v. Florida, 134 S. Ct. 1986 (2014)." (CA Dkt. 55.) Thereafter, this Court held a status conference on July 1, 2014, at which it ordered the parties to submit a memorandum which sets forth what issues have been identified in Hall or by virtue of Hall that should be addressed by the District Court pursuant to the remand order, and to propose what further steps should be taken by the District Court. (Dkt. 1504, at 5.) In response to this order, Mr. Wilson submits as follows.

I.      **Procedural History**

Ronell Wilson was indicted by a federal grand jury in the Eastern District of New York on November 17, 2004. A notice of intent to seek the death penalty was subsequently filed on August 2, 2005, and in September 2006, the grand jury approved a superseding indictment that served as the trial indictment, charging Mr. Wilson on five capital counts as well as five non-capital counts.

He was convicted following a trial on December 20, 2006, and the jury subsequently returned a penalty verdict of death. This Court thereafter sentenced Mr. Wilson to death on March 29, 2007.

On appeal, the Court of Appeals concluded that Mr. Wilson's penalty proceeding had been corrupted by prosecutorial misconduct, and consequently reversed Mr. Wilson's death sentence. United States v. Whitten, 610 F. 3d 168 (2d Cir. 2010).  The cause was remanded to this Court for retrial of the penalty phase.

1

In the course of that resentencing litigation, Mr. Wilson raised and this Court considered the specific question of whether Mr. Wilson is intellectually disabled, in which case he would be ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304 (2002) and 18 U.S.C. § 3596(c). After a nine-day evidentiary hearing, and the submission of post-hearing briefs, this Court found that Mr. Wilson was not intellectually disabled. Specifically, the Court concluded that Mr. Wilson's IQ scores did not qualify him for a legal determination of intellectual disability. The Court did not consider the evidence of Mr. Wilson's adaptive deficits. United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013).

Mr. Wilson proceeded to a second trial of the penalty phase before a new jury, which returned a verdict of death on July 25, 2013. Consistent with this verdict, this Court entered a judgment sentencing Mr. Wilson to death on September 13, 2013. A notice of appeal was filed on September 23, 2013 (CA Dkt. 1), and the Court of Appeals issued the instant remand on June 25, 2014 (CA Dkt. 55).

**II.     Introduction**

At the close of the evidentiary hearing, this Court emphasized that "this is a close case." (Atkins Hearing Tr. ("Tr.") at 2127.)  Nonetheless, the Court declined to find that Mr. Wilson was intellectually disabled. In doing so, the Court relied on the definitions of the condition from both the American Association on Intellectual and Developmental Disabilities (AAIDD) and the American Psychiatric Association (APA), which involve the following components: (1) Significantly subaverage intellectual functioning; (2) concurrent deficits or impairments in adaptive functioning; and (3) onset prior to the age of 18.  In assessing the evidence of Mr. Wilson's intellectual function, the Court noted

2

that this is primarily measured using standardized and individually administered assessment instruments; the Court further noted that AAIDD "makes clear that the IQ scores themselves do not tell the whole story about someone's intelligence; rather, 'one needs to use clinical judgment' to interpret those scores and other relevant information." 922 F. Supp. 2d at 344.

That said, the Court's analysis focused on Mr. Wilson's IQ scores, holding that it would use a 66% confidence interval to band the obtained scores, i.e., a range of one SEM below to one SEM above. Id. at 347. The Court further held that it would assess the meaning of Mr. Wilson's obtained IQ scores as adjusted pursuant to the "Flynn Effect," which is the effect of the obsolescence of the norms used to evaluate Mr. Wilson's IQ test results. Id. at 351. In addition, the Court indicated that it would consider the phenomenon known as the "practice effect," although the Court explicitly declined to apply any point adjustment to Mr. Wilson's IQ scores on this basis. Id. at 354, 359-60.

The Court concluded that, as a matter of law, the diagnostic criteria were separate and independent, and not legally susceptible to a conjunctive assessment. Accordingly, the Court declined to consider evidence of Mr. Wilson's deficits in adaptive functioning as at all connected to the question of whether he also had deficits in intellectual functioning. Id. at 356-57.. Id. at 356-57. Instead, the Court focused on the IQ scores, and employed as a primary mode of analyzing the scores from the nine IQ tests administered to Mr. Wilson over the course of his life, a review of the means and medians of those scores. Id. at 358-59, 367-68. Finally, the Court found persuasive, as an appropriate exercise of clinical judgment, that none of the individuals who had previously administered IQ tests to Mr. Wilson when he was of school age had ever diagnosed him

3

with ID and that most had asserted that his obtained IQ scores underestimate his "true intelligence." Id. at 360-61. Ultimately, finding that "Wilson's IQ scores are not indicative of significantly subaverage intellectual functioning," id. at 367, a finding it found supported by the "clinical judgments of the test administrators," id. at 368, this Court held that Mr. Wilson had failed to carry his burden of establishing that he is a person with intellectual disability.  Id.

After this Court's order declining to find that Mr. Wilson is intellectually disabled, the United States Supreme Court issued its decision in Hall v. Florida, 134 S. Ct. 1986 (2014). Soon after Hall came out, the Second Circuit, acting sua sponte, issued its broad remand order:

> We REMAND for the District Court to reconsider its decision that Wilson is not intellectually disabled, United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013), in light of Hall v. Florida, 134 S. Ct. 1986 (2014). The District Court should address whether it needs to consider evidence of Wilson's adaptive deficits given Wilson's IQ scores. The District Court may consider any other issue it deems appropriate and conduct additional factfinding if warranted.

(CA Dkt. 55.)

Following the remand, this Court issued an order detailing the steps it would take in addressing the Circuit's remand:

> The first stage is to obtain from the defense a memorandum that sets forth what issues it considers to have been identified in Hall or by virtue of Hall that would require additional guidance from the District Court to the Circuit Court on the subject of whether the defendant is suffering from an intellectual disability such that he could not be subject to the death penalty and recommending or proposing further steps to be taken by the District Court.

(Dkt. 1504, at 5). Accordingly, Mr. Wilson, below, respectfully lays out the issues he believes to have been raised by Hall and proposes further steps to be taken by this Court.

III.      **Issues Raised by _Hall v. Florida_**

In <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the Supreme Court announced that the 8th Amendment forbids executing persons with intellectual disability. It endorsed the clinical definitions promulgated by AAIDD (then known at the American Association on Mental Retardation) and by the APA, but left to "the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," 536 U.S. at 308 n.3, 317.

Last term, the Court revisited <u>Atkins</u> in <u>Hall v. Florida</u>, 134 S.Ct. 1986 (2014), and transformed the landscape — upending the analysis required under <u>Atkins</u> in ways that extend well beyond its conclusion that Florida's strict IQ cutoff ran afoul of the 8th Amendment. <u>Hall</u>'s changes bear directly on the analysis employed by this Court in addressing Mr. Wilson's contention that he is exempt from execution under <u>Atkins</u>.

Specifically, <u>Hall</u> works four changes that warrant additional fact-finding and briefing, as contemplated by the remand order from the Second Circuit. <u>Hall</u> also compels reconsideration of this Court's conclusion that Mr. Wilson is not a person with intellectual disability, and is thus eligible to be sentenced to death.

First, <u>Hall</u> relies heavily on, implicitly endorsing, the newest edition of the APA's <u>Diagnostic and Statistical Manual of Mental Disorders</u>, the "DSM-5," which was published after judgment was entered in Mr. Wilson's case. <u>See</u>, <u>e.g.</u>, 134 S. Ct. at 1990, 1991, 1994, 1995, 2000, 2001. As described more fully below, the DSM-5 itself breaks radically with the prior edition, the DSM-IV-TR, on which this Court relied.

Second, <u>Hall</u> held that intelligence tests, on their own terms, suffer "inherent imprecision." 134. S. Ct. at 1995. As a result of the instruments' imprecision, the Court

5

explained, IQ "cannot be read as a single fixed number." Id. at 1995. Given the inherent

imprecision of intelligence testing, a proper understanding and application of the

concepts of standard error of measurement and confidence intervals is critical to the

evaluation of intellectual functioning.  Id., quoting R. Furr & V. Bacharach,

Psychometics 118 (2d ed. 2014)).

Hall noted that the need to employ proper confidence intervals does not diminish

when multiple intelligence tests have been administered:

> Even when a person has taken multiple tests, each separate score must be
> assessed using the SEM, and the analysis of multiple IQ scores jointly is a
> complicated endeavor. See Schneider, Principles of Assessment of
> Aptitude and Achievement, in The Oxford Handbook of Child
> Psychological Assessment 286, 289–291, 318 (D. Saklofske, C. Reynolds,
> V. Schwean, eds. 2013). In addition, because the test itself may be flawed,
> or administered in a consistently flawed manner, multiple examinations
> may result in repeated similar scores, so that even a consistent score is not
> conclusive evidence of intellectual functioning.

Id. at 1995-96.

Indeed, it understates the import, to call such considerations critical to an Atkins

evaluation: Florida's failure to recognize the imprecision of IQ scores and to provide

room for the appropriate clinical consideration of SEM and confidence intervals rendered

its system unconstitutional. After Hall, these failures have constitutional dimensions.

This Court's analysis cannot be squared with this central feature of Hall. Multiple

aspects of the Court's approach -- conflating burden of proof and confidence intervals,

the resort to averaging, and a concern with the upper bound of the confidence intervals --

indicate a search for a formula to reach a "true IQ," a degree of precision beyond the

reach of standardized measures of intelligence, as explained in Hall. And, at the level of

specifics, the Court's analysis adopts the wrong confidence interval; sweeps into SEM

6

certain specified categories of error (e.g., scoring errors) that are not included in the scientifically accepted definition; and fails to consider the specific kind of practice effects — progressive error — essential in this case with nine administrations of Wechsler intelligence tests. After <u>Hall</u>, such failures run afoul of the 8th Amendment.

Third, and relatedly, especially given the limited nature of IQ scores, <u>Hall</u> makes plain that neither the diagnostic criterion of "significant limitations in intellectual functioning," nor the ultimate question of whether or not a person has an intellectual disability, can be determined exclusively by resort to IQ scores. The Court reversed precisely because: "Florida's rule disregards established medical practice . . . . It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity." <u>Id.</u> at 1995. The Court went further to squarely hold: "Intellectual disability is a condition, not a number. . . .   It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." <u>Id at 2001.</u> Florida's judgment was vacated because its governing rule improperly excluded from the analysis whether the person had deficits in adaptive functioning: " . . . evidence of past performance, environment, and upbringing." <u>Id.</u> at 1996.

Where, as here, "a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."[1] <u>Id.</u> at 2001. As detailed below, this Court's analysis began and ended with IQ scores, and declined the

---

[1] Mr. Hall, too, had received nine IQ evaluations, "with scores ranging from 60 to 80, . . . but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80." <u>Id.</u> at 1992.

request of both parties to consider, as part of the evaluation of Mr. Wilson's intellectual functioning, evidence of his adaptive behavior.

Finally, and perhaps most significantly, Hall recalibrates the weight to be afforded the definitions, standards, and opinions of the scientific community. In essence, it severely curtails, if not overrules, Atkins' statement that the states were free to develop their own rules for implementing Atkins' protections. See Hall, 134 S. Ct. at 2002 (Alito, J., dissenting) "In Atkins[], the Court held that the Eighth Amendment prohibits a death sentence for defendants who are intellectually disabled but does not mandate the use of a single method for identifying such defendants. Today, the Court overrules the latter holding based largely on the positions adopted by a private professional organization."). While acknowledging that the constitutional question remains a legal one, to be determined by the Court, the Hall majority's analysis makes plain that the "professional community's teachings are of particular help." Id. at 2000. As the dissent suggests, given the actual holding of the case, the weight meant by a phrase like "particular help" is substantial, at least: The majority strikes as unconstitutional a sovereign state's rule, because that rule deviated from the accepted standard and practices of the professional community — and not at the more abstract level of definitions and diagnostic criteria, endorsed in Atkins, but at the level of detail such as the proper clinical interpretation of standardized measures of intelligence.

This Court, too, held that, while its analysis would not be dictated by clinical standards, such standards would "inform" its decision. See 922 F. Supp. 2d at 339; see also, e.g., id. at 343 ("[T]he definition of mental retardation is ultimately a legal matter, and so the court may—and will—exercise its own judgment as to the appropriate

8

definition of mental retardation in the Atkins /FDPA context."). Yet, as set forth in detail below, in significant ways — such as, adopting a 66 percent confidence interval; including within the SEM various categories of error that are excluded from the scientifically accepted definition; averaging IQ scores; failing to consider progressive error; and refusing to consider, in the assessment of Mr. Wilson's intellectual functioning, evidence of his adaptive behavior — the Court's analysis departs sharply from the practices of the professional community. And the departures evidence that the weight this Court afforded the views of the scientific community was less than that now required under Hall.

Given Hall's break from Atkins and its greater deference to professional standards, Mr. Wilson respectfully requests the opportunity to present additional testimony from nationally recognized experts, leaders in the field of intellectual disability and intelligence assessment, who will, as described below and set out in the accompanying declaration proffers, detail the practices and standards widely accepted in the scientific community as they relate to the assessment of Mr. Wilson's intellectual function. Mr. Wilson also respectfully requests the opportunity to submit additional briefing and argument.

## IV.        Issues and Proposed Next Steps

Given Hall's clear directive, there are a number of aspects of this Court's Atkins ruling which should be reconsidered.  Mr. Wilson respectfully requests additional factfinding as well as merits briefing on several issues, including but not limited to the following aspects of Hall's application to the district court opinion:

*a.  This Court Adopted the Wrong Confidence Interval.*

To evaluate Mr. Wilson's IQ test scores, this Court concluded that "a 66 percent confidence interval—i.e., a range of one SEM below to one SEM above the obtained score—is appropriate . . . ."[1] 922 F. Supp. 2d at 347. The Court cited three reasons in support of its conclusion: First, the Court noted that it was aware of "no clinical authority (outside of some of the expert opinions in this case) that has expressly advocated for the use of more than one SEM to set the confidence interval." Id. And it found that, prior to the most recent "inconclusive statements" by the AAIDD, the "overwhelming practice" has been "to set a range from one SEM below to one SEM above the observed IQ score, which corresponds to using a 66% confidence interval." Id.

> In other words, it appears that the use of a range from one SEM below to one SEM above the observed score remains the best practice in both the psychological and legal communities. Absent any definitive contradictory statement by the AAIDD, the court has no particular reason to depart from this practice . . . .

Id. Second, and relatedly, the Court observed that, for tests where the SEM is five points, a 95 percent confidence interval would permit scores as high as 80 — "well above what has previously been considered the approximate upper bound for a finding of subaverage intellectual functioning" — to satisfy the diagnostic criterion. Id. at 347-48. Third, and finally, this Court concluded that a 66 percent confidence interval was functionally consistent with Mr. Wilson's burden of proof.   Id. at 348.

Contrary to the Court's conclusions, however, as detailed in the attached declarations of Prof. Luckasson and Drs. Tasse, Kaufman, and McGrew, both the

---

[1] Actually, the confidence interval defined with respect to one SEM is 68 percent, not 66. See Tasse, Ex. E at ¶13 n.4; McGrew, Ex. B at ¶18 n.5; Manly, Ex. C at ¶9; The 66 figure derives from a typographical error in the AAIDD manuals. See Tasse, Ex. E at ¶13 n.4; McGrew, Ex. B at ¶18 n.5.

AAIDD and the DSM, in fact, have long advocated the use of a 95 percent confidence interval: the 5 points referenced in the manuals itself expresses and is intended to capture a 95 percent confidence interval. See Luckasson, Ex. D at ¶15; Tasse, Ex. E at ¶17-26; Kaufman, Ex. A at ¶31-33; McGrew at ¶19-20. Moreover, as explained by Drs. Kaufman, McGrew, and Manly, a confidence interval of 90-95 percent is overwhelmingly recognized as the appropriate measure in the clinical and scientific communities; a 68 percent confidence interval permits too high a rate of error, degrading the reliability of the test instruments (to something approaching flipping a coin) and would not be tolerated clinically or scientifically regarding a determination of any significance. See Kaufman, Ex. A at ¶37-40; McGrew at ¶19-20; Manly, Ex. C at ¶10-13. A score with a 68 percent confidence interval, contrary to the Court's conclusion, would not constitute "strong evidence" of anything. See Luckasson, Ex. D at ¶16.

Moreover, the Court's concern that a score of 80 would transgress previously understood upper bounds is misplaced. As the Court itself recognized, the AAIDD, at the time of the evidentiary hearing in this case, had already rejected a fixed cut-off. 922 F. Supp. 2d at 348. As detailed by Prof. Luckasson and Dr. Tasse, the new DSM-5, breaking radically with the DSM-IV-TR current at the time of the hearing, now joins the AAIDD and emphatically rejects a fixed upper bound. See Luckasson, Ex. D at ¶10; Tasse, Ex. E at ¶30-31. And the Court's hypothetical score of 80, with a lower bound of 95 percent confidence interval approaching 70 could, despite the obtained score, qualify as "approximately two standard deviations below the mean."  In any event, this hypothetical is not at issue in this case.

Finally, this Court improperly conflated confidence intervals and the defendant's burden of proof — in effect requiring Mr. Wilson to attempt to carry his legal burden with evidence inappropriately (and unnecessarily) degraded according to the accepted standards of the professional community. The Court's approach creates an "unacceptable risk" of executing a person with intellectual disability in violation of <u>Hall</u>. 134 S. Ct. at 1990.

Accordingly, Mr. Wilson requests this Court to take additional evidence, on the issues and from the experts described above, as representing the accepted standards and practices of the scientific community, and at the conclusion of that hearing to permit further briefing from the parties on these critical issues.

       *b.*   *The Focus on Precision Greater than the Confidence Interval Conflicts with <u>Hall</u>.*

Throughout its opinion, the Court indicated its concern with understanding Mr. Wilson's "true IQ": a precise number that reflected his intellectual functioning. <u>See</u>, <u>e.g.</u>, 922 F.Supp.2d at 367 (noting the Court was "66% confident that his true IQ score lies higher than the benchmark of 70"), 359 (observing that "Wilson's true IQ is at least as likely to be one SEM *above* his observed score as one SEM below," and, indeed, due to regression to the mean, more likely to be above).

The notion that Mr. Wilson's "true IQ" is what matters, rather than the confidence interval around his obtained score, however, is inconsistent with <u>Hall</u>. "The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score." 134 S. Ct. at 1995; <u>see</u> <u>also</u> <u>id.</u> ("IQ test scores should be read not as a single fixed number but as a range.") Quests to further refine the banded score, or to determine where within that band the true IQ lies, misconceive the "inherent

imprecision" of measures of intelligence. Because the range is how IQ is expressed, if the bottom of the confidence interval approximates two standard deviations below the mean, the score may, with the proper exercise of clinical judgment, satisfy the diagnostic criterion.

In this case, as Dr. McGrew explains in the attached declaration, when confidence intervals and practice effects are considered consistent with standards accepted in the scientific community, Mr. Wilson's scores "meet or approximate" two standard deviations below the mean. Mr. Wilson, accordingly, asks the Court to take testimony from Dr. McGrew on this topic and, after the additional evidence is heard, to permit additional briefing from the parties.

   c.   *This Court Misapplied the Critical Concept of SEM.*

At three places in its opinion, this Court brushed aside concerns about scoring error raised by Mr. Wilson. It rejected the defense concern that Ms. Drezner had improperly departed from test protocols, substituting subtests in her administration of the WISC-III: "the court has no reason to conclude that Ms. Drezner's substitution caused more than a minor inflation to Wilson's score that would be contemplated by the SEM, let alone that this score is invalid." 922 F. Supp. 2d at 361 n.28. Similarly, it dismissed the defense concern about Dr. Popp's omission of a subtest, doubting that the omission would "would impact the FSIQ too significantly or to a degree not accounted for by the SEM." Id. at 363 n.30. And the Court dismissed the defense concerns about missing raw data, explaining, in part, "errors in IQ test administration are already largely taken into account by the interpretation of IQ tests using the SEM and confidence intervals." Id. at 354.

To the contrary, such scoring errors are *not* accounted for in the critical concept of SEM or in the confidence intervals derived from SEM. The Court's reasoning, then, runs afoul of <u>Hall</u>, which holds that an appropriate accounting for SEM and confidence intervals is constitutionally required. <u>See</u> <u>Hall</u>, 134 S. Ct. at 1995 (describing SEM). Moreover, as explained by Drs. McGrew and Manly, this Court's definition cannot be reconciled with the uniformly accepted definition of the scientific community. <u>See</u> McGrew at ¶21; Manly, Ex. C at ¶14-15.

Accordingly, Mr. Wilson asks this Court to hear additional evidence, from these experts concerning the accepted definition of SEM, and at the close of such evidence to permit additional briefing on the new evidence.

### d. When a Person Has Taken an IQ Test 9 Separate Times, Practice Effects, and in Particular Progressive Error, Cannot Be Discounted.

In light of <u>Hall</u>'s emphasis on the need to fully account for the imprecision of IQ scores, this Court must revisit the erroneous manner in which it accounted for the practice effects, which bore on the scores obtained in Mr. Wilson's having been subjected to repeated testing with the same instruments. In its opinion, this Court declined to adopt the general recommendation of one of the foremost experts on the topic, Dr. Alan Kaufman, in part because the support for it was introduced in the form of his peer-reviewed publications on the topic, and not in the form of his direct-testimony. The Court also noted its understanding that there was no consensus in the field of how to account for practice effects, in terms of adjusting the scores.

The Court held that it instead would "interpret" Wilson's IQ scores in light of the practice effect without reducing his scores on that basis. In the course of this interpretation, the Court concluded that any practice effect on Mr. Wilson's obtained

scores was minimal because Mr. Wilson had not been tested twice within any one year, and also due to the fact that the later scores were "consistent." The Court placed emphasis on its understanding that the length of intervals between Mr. Wilson's retests significantly diminished any practice effects, and concluded that any adjustment for them "should be minimal." 922 F. Supp. 2d at 351-54, 359-60. In the end, the Court concluded that any practice effect was not significant enough to change its conclusion that Mr. Wilson did not have deficits in intellectual function consistent with ID.

This analysis rests on significant errors that must be redressed in light of <u>Hall</u>. These errors are itemized here and additionally discussed in the attached declarations from Drs. Kaufman and McGrew. First, practice errors are well established as having a substantial impact on successive Wechsler IQ tests, precisely because components of the instruments measure tasks that should be novel to the test-taker. Kaufman, Ex. A at ¶ 11-12. Because Mr. Wilson had so many tests that utilized the same instrument, appreciation of the practice effects is key to understanding the meaning of Mr. Wilson's IQ scores. <u>Id.</u>; McGrew, Ex. B at ¶ 23; Manly, Ex. C ¶ 18.

The Court's reliance on "consistency" to conclude that practice effects were inconsequential is misplaced; given the myriad other variables that are known to impact an obtained score, including the SEM, the health of the test-taker on the given day, interaction between the examiner and the test-taker, etc.; administrative or scoring error, the Court could not have known how the practice effects were masked. It was error to give so little weight to the evidence that practice effects were significant in this case <u>Hall</u>, 134 S. Ct. at 1995 (citing AAIDD on myriad of errors); <u>see also</u> McGrew, Ex. B at ¶ 21, 23 (citations omitted). To conclude from consistency that there was no practice effect of

any consequence fails to appreciate how practice effects operate, and is an unconstitutionally arbitrary analysis under Hall.

In addition, it is clear that, contrary to the Court's opinion, practice effects are consistently observed notwithstanding long intervals between tests. This aspect of the Court's analysis is flatly contradicted by the science of practice effects. See Kaufman, Ex. A at ¶ 15-17; McGrew, Ex. B at ¶ 18, 24, 2; Manly, Ex. C at ¶ 18.

Furthermore, in situations such as Mr. Wilson's where there are so very many instances involving the same instrument – nine – there is a particular practice effect in play that is known in the field as progressive error. That particular effect has been observed in several longitudinal studies of intelligence testing over time. Kaufman, Ex. A at ¶ 18-24; McGrew, Ex. B at 24-25.   Progressive error has been demonstrated to have significant impact for years, and the research literature suggests that this source of score inflation "is an empirical fact."  McGrew, Ex. B at 27.  According to Dr. Kaufman, this particular effect can be quantified as having, in and of itself, about three points of upward-impact on the obtained scores. Kaufman, Ex. A at ¶ 25.

However, at no point did this Court address the impact of progressive error on Mr. Wilson's obtained scores. Indeed, because of the distinct phenomenon of progressive error in situations like Mr. Wilson's, the Court's opinion is flatly incorrect where it asserts that any practice effect would diminish significantly as the length of time between test administrations increases. 922 F. Supp.2d at 354. Drs. Kaufman and McGrew are prepared to provide the Court with testimony in support of the application of practice effects, and specifically progressive error, to Mr. Wilson's IQ scores.[1]

---

[1] Although this Court was dismissive of Dr. Kaufman's published opinions on practice effects because he was not called to testify at the evidentiary hearing, the articles which set forth his positions at trial were

Here, practice effects are of particular legal significance because Mr. Wilson's banded scores were so close to 70. In fact, even when using the 66% percent confidence interval as the Court did here, the proper accounting for practice effects would have brought all of Mr. Wilson's obtained scores close enough to the benchmark to compel the consideration of Mr. Wilson's significant adaptive deficits.  Had the Court correctly applied an understanding of the practice effect to the analysis of Mr. Wilson's obtained scores, it could not have concluded that Mr. Wilson had failed to establish deficits in intellectual function.

> e.   *The Court's Use of Averages to Evaluate the Import of Mr. Wilson's Nine IQ Scores Deviates from Clinically Accepted Standards and Is Unconstitutionally Arbitrary.*

At several points in the opinion, the Court indicated that it was focusing significant aspects of its analysis on the medians and means of Mr. Wilson's IQ scores. See, e.g., 922 F. Supp. 2d at 359, 368. In Hall, however, the United States Supreme Court made clear that simple averaging is not consistent with the Eighth Amendment's requirements of reliability in determinations of who is eligible for the death penalty. Hall, 124 S. Ct. at 1995.

Simply put, using an average or median score is not a scientifically valid way to determine a person's IQ. For one thing, averaging fails to account for the practice effects of successive tests, see supra at 14. Dr. Jennifer Manly is prepared to testify that "taking the average and median of the nine IQ test scores in this case grossly underestimates the role of practice on each follow-up test." Manly, Ex. C at ¶.

---

exchanged with the Government prior to trial, and were admitted without objection into evidence on the first day of testimony.   Tr. at 134.

In addition, the process of averaging changes the standard deviation, which makes the interpretation of the scores no longer rationally based on a notion that 70 represents 2 standard deviations below the mean.  McGrew at ¶11. Although, as this Court noted, other district courts have made use of averages, 922 F. Supp. 2d at 359, the fact is that averages must be rescaled in order to reflect a figure that is comparable to IQ in terms of statistical and psychometric significance. McGrew at ¶ 11. Finally, combining scores compounds the imprecision and arbitrariness, because it magnifies other errors as well. Id. at ¶ 20.

The legal significance of this is particularly grave where, as here and in Hall, the scores are so close to 70. Thus, Mr. Wilson respectfully requests an opportunity to present evidence on the meaning of the average of his IQ scores, as well as merits briefing.

> f.   *This Court Erroneously Refused to Consider Evidence of Deficits in Mr. Wilson's Functioning.*

This Court noted that  "[b]oth parties and their experts" were of the view that, in evaluating Mr. Wilson's intellectual functioning, the Court should consider evidence of his adaptive functioning, but the Court refused to do so. 922 F. Supp. 2d at 355. Observing it had struggled throughout the hearing to elicit an explanation of "exactly how the adaptive functioning prong interacts with the intellectual functioning prong," id. at 356 ("No expert gave a particularly clear response . . . ."), this Court ultimately characterized its "takeaway" of the evidence as "something of a sliding scale": "that is, if the first prong is a close call, the court may turn to the second prong to nudge it one way or the other." Id. This Court rejected such interconnection between the diagnostic criteria as inconsistent with "the principle that mental retardation involves three 'indispensable'

18

prerequisites."[2] Id. Further, even assuming that such an approach were accepted clinical practice, this Court still declined to follow it as a matter of law: "In any event, even assuming that it is proper for *psychologists* to use a holistic approach when interpreting IQ scores in light of their clinical judgment, this does not mean that a *court* should meld the two prongs together when making a legal determination of who is ineligible for the death penalty." Id. at 356 (emphasis in original).

As an initial matter, Mr. Wilson respectfully disagrees with the Court's characterizations of the record or the position of the experts. Neither Mr. Wilson nor the government, nor the parties' experts, advocated the "sliding scale" described by the Court and, accordingly, Mr. Wilson requests that the court hear additional testimony from his hearing experts (Drs. Shapiro, Olley, James, and Woods) to clarify their testimony or, in the alternative, an opportunity for further briefing on the issue.[3]

In any event, this Court's holding deviates from the standards and practices uniformly accepted in the scientific community. As explained by Prof. Luckasson and Dr. Tasse, under the established standards of the AAIDD, the intellectual and adaptive functioning (as well as age of onset) criteria are intimately connected, requiring a concurrent, holistic approach, incompatible with the disjunctive, sequential, consideration

---

[2] Describing three wholly separate and distinct diagnostic prongs, this Court cited, inter alia, the Florida state court decision, Hall v. State, 109 So. 3d 704, 710 (Fla. 2012), subsequently overturned by the U.S. Supreme Court in Hall v. Florida.

[3] Moreover, to the extent that this Court found the testimony of the experts at the hearing unclear because it sought something akin to a mathematical formula, analogous to some of the statistical evaluation discussed regarding intelligence measures, it is important to note, as Prof. Luckasson and Dr. Tasse explain in their attached declarations, the exercise of clinical judgment in this respect is not reducible to an algorithm. See Luckasson, Ex. D at ¶11; Tasse, Ex. E at 29. Accordingly, Mr. Wilson asks the Court to hear testimony from Prof. Luckasson and Dr. Tasse on this topic, too.

followed by this Court. See Luckasson, Ex. D at ¶12; Tasse, Ex. E at ¶27-29. Put simply, contrary to the approach followed by this Court, the intellectual functioning element is not determined exclusively by resort to IQ scores, with their inherent imprecision. See Luckasson, Ex. D at ¶9. Instead, IQ scores are but one factor to be considered, in the exercise of clinical judgment, along with the full range of clinically relevant information, including, especially, adaptive functioning evidence, to determine whether a person has significant limitations in intellectual functioning. See Luckasson, Ex. D at ¶9; Tasse, Ex. E at ¶ 30.

This approach is even more emphatically endorsed under the new DSM-5, which represents "a paradigm shift in the American Psychiatric Association's conceptualization of intellectual disability and its diagnostic criteria." Tasse, Ex. E at ¶ 31; see also Luckasson, Ex. D at ¶10. While maintaining the traditional diagnostic elements, the DSM-5's new formulation of the diagnostic criteria emphatically underscores a shift away from any suggestion that IQ scores predominate and toward a concurrent assessment of both elements: "Intellectual disability … includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." Tasse, Ex. E at ¶32 (quoting DSM-5; page 33). Indeed, the shift suggests a new preeminence for the adaptive functioning element. As Dr. Tasse explains:

> This major paradigm shift is further iterated in the DSM-5 abandoning IQ levels as the basis for determining the severity level of intellectual disability in favor of adaptive functioning level.  The DSM-5 clearly states the intention of this shift when they state "The various levels of severity [mild, moderate, severe, and profound] are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range [i.e., IQs < 40]". (DSM-5; page 33).

Tasse, Ex. E at ¶ 31.

Moreover, and as has been described, this Court's approach — its refusal to consider evidence of adaptive function, its treatment the intellectual functioning and adaptive functioning elements as distinct and sequential, determined exclusively by IQ scores, and its rejection of the accepted practices and standards of the scientific community — was squarely rejected in <u>Hall</u>. "It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." 134 S. Ct. at 2001.

Hall involved, like Mr. Wilson's case, 9 IQ test administrations, with scores ranging from 60 to 80, although the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80. 134 S. Ct. at 1992. That range of scores (higher than Mr. Wilson's) required resort to additional evidence, including adaptive functioning evidence, to determine intellectual functioning.

> This awareness of the IQ test's limits is of particular importance when conducting the conjunctive assessment necessary to assess an individual's intellectual ability. See American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports 40 (11th ed. 2010) ("It must be stressed that the diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination").

> Intellectual disability is a condition, not a number. See DSM–5, at 37. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability. See APA Brief 17 ("Under the universally accepted clinical standards for diagnosing intellectual disability, the court's determination that Mr. Hall is not intellectually disabled cannot be considered valid").

Id. at 2000-01. Given the imprecision of IQ scores, and the accepted practices of the medical community, the Court, "agree[ing] with the medical experts," held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id.

If Mr. Hall's range of scores required consideration of additional evidence, including adaptive behavior, then *a fortiori* so, too, do Mr. Wilson's lower scores. Both parties' experts agreed at the hearing. See also McGrew at ¶7-10.

Accordingly, Mr. Wilson asks this Court to take additional evidence, from Prof. Luckasson and Drs. Tasse and McGrew, on the issues described above, as representing the accepted standards and practices of the scientific community. In addition, because of the Court's misapprehension of the position of the parties, and in light of the new standards of the DSM-5, which the hearing experts had no opportunity to discuss, Mr. Wilson asks that the Court take supplemental testimony from Drs. Shapiro, Olley, James, and Woods, on "exactly how the adaptive functioning prong interacts with the intellectual functioning prong," considering the particular facts of Mr. Wilson's case.

At the conclusion of the new evidence, Mr. Wilson requests an opportunity to further brief the issues.

g.   *"Clinical Judgment" Has an Exact and Rigorous Meaning in the Professional Community — a Meaning at Odds with How This Court Applied the Concept*

This Court, in rejecting Mr. Wilson's claim that he is a person with intellectual disability, emphasized "the clinical judgment" of the individuals who had previously personally administered IQ tests to Mr. Wilson (in contrast to Dr. James, who had not): "The clinicians best situated to interpret Wilson's IQ tests are the individuals who

22

actually administered the tests."[5] Given this assumption, this Court found noteworthy "two important points": (1) "not one of the clinicians who administered an IQ test to Wilson concluded at the time that he suffered from mental retardation; and (2) most of the test administrators believed that Wilson's observed IQ scores represented an *under* estimate of his true intelligence." *Id.* at 360-361.

As discussed above, however, neither intellectual functioning nor the ultimate question of whether a person has intellectual disability can be determined, even by a clinician, solely on the basis of IQ score. See Luckasson, Ex. D at ¶ 9-13. The appropriate exercise of clinical judgment requires "specialized training and experience, specific knowledge of the person and his/her environments, *extensive data*, and use of critical thinking skills," Luckasson, Ex. D at ¶ 19 (quoting Schalock & Luckasson, 2014, p. 1), and "extensive data" includes "not only . . . tests, scales, and measures, but also  . . . social, medical, and educational records and history." Luckasson, Ex. D at ¶ 20-22. Proper clinical judgment in assessing intellectual disability requires the clinician to "conduct or access a thorough social, medical, and educational history," Luckasson, Ex. D at ¶ 20,22 (quoting Schalock & Luckasson, 2014, pp. 26-32). The extensive data required for the proper exercise of clinical judgment also includes an inquiry into the existence of risk factors, identified by the AAIDD, which may cause or contribute to the disability. See Luckasson, Ex. D at ¶ 23, 24.

---

[5] Indeed, in support of this reliance, the Court quoted two statements from Dr. James's testimony: that "the best person to assess . . . what the intelligence is of an individual, is a person administering that test," and that "there's nothing like actually seeing how [the examinee] answers a question." Mr. Wilson respectfully urges that the Court has misapprehended Dr. James's testimony on this point and asks that the Court take additional testimony from Dr. James to permit her to correct the misunderstanding.

And the subjective determination that Mr. Wilson's IQ scores underestimate his intellectual functioning — even when made by the individual administering the IQ test — is not a proper exercise of clinical judgment, as that phrase is understood and used in the scientific community. IQ scores, though recognized to be imprecise, flawed measures, are of "considerable significance" in the assessment of intellectual functioning in the context of intellectual disability. Hall, 134 S. Ct. at 2001. The test administrator may determine that an administration did not conform to the test's protocols and was, therefore, not a valid administration; notably, none of the test administrators at issue here did so. But having determined that the test is valid, it is not a proper exercise of clinical judgment to discount or adjust the obtained scores based on the subjective belief that the examinee could have done better. See Manly, Ex. C at ¶ 20-22. IQ scores compare the examinee to the general US population. See Manly, Ex. C at ¶ 22.

Dr. Reschly, in his declaration, reviews some of the history of school evaluations, including the legal, political, and popular pressures exerted at the time Mr. Wilson was of school age, which may account for the administrators' reluctance to label Mr. Wilson with the disfavored diagnosis of mental retardation  and/or their willingness to discount his obtained IQ scores. See Reschly.

Accordingly, Mr. Wilson requests this Court to take additional evidence, on the improper exercise of clinical judgment from Professor Luckasson and Drs. Manly and Reschly, as representing the accepted standards and practices of the scientific community, and at the conclusion of that hearing to permit further briefing from the parties on these critical issues.

> h. *Clinical Judgment Anticipates Multi-Disciplinary Input, and Nothing Requires a Single Clinician to Conduct Every Test or Every Possible Aspect of the Diagnosis*

This Court observed that "only three experts—Dr. James, Dr. Denney, and Dr. Mapou—conducted a robust analysis of Wilson's intellectual (as opposed to adaptive) functioning" and that Dr. James "did not address Wilson's adaptive functioning in the analysis she conducted in her expert report, other than simply to express agreement with the opinions of Wilson's other experts." 922 F. Supp. 2d at 365-366.

Dr. James's reliance on the work of others who evaluated Mr. Wilson's adaptive functioning, however, is not inconsistent with accepted clinical judgment. As Professor Luckasson is prepared to testify, "Clinical judgment anticipates multidisciplinary input; there is absolutely no requirement that a single clinician conduct every test or every possible aspect of the diagnosis." Luckasson, Ex. D at ¶ 25.

> i. *Remaining Issues*.

In the event that this Court denies Mr. Wilson's request to submit supplemental evidence in light of <u>Hall v. Florida</u>, undersigned counsel respectfully request the opportunity to submit complete briefing on all of these issues and any other issues under <u>Hall</u> that arise from the evidence that has already been submitted.

V.      **Conclusion.**

In light of this Court's assessment at the end of the evidence that the case was "close," the errors set out above, singly or in combination, clearly could tip the balance. This is particularly true given Mr. Wilson's IQ scores, which even under the improper averaging analysis employed by the Court put Mr. Wilson *less than a single IQ point*

*above 70*: "the bottom end of the 95 percent confidence intervals . . . the median of the bottoms ends is 71.11, and their average is 70.75." 922 F. Supp. 2d at 359.

Of course, the traditional formulation of the diagnostic element is "*approximately* two standard deviations below the mean [70]," and neither the AAIDD nor the new DSM-5 permit resort to a fixed cutoff score. Moreover, properly accounting for the species of practice effects known as progressive error and deducting 3 points for each of the 7 tests administered to Mr. Wilson after he turned 11 (and discounting, because of Mr. Wilson's youth, the two scores from when he was 6 and 9) would, obviously, significant lower the scores individually and cumulatively.

Finally, as set out in his post-hearing briefs, the evidence at introduced at the hearing overwhelmingly established that Mr. Wilson suffers significant limitation in adaptive functioning, confirming, when properly considered, that he also suffers significant limitations in intellectual functioning. Dr. Olley testified at length about his findings concerning the different domains, and a 58-page summary of historical records cataloguing Mr. Wilson's adaptive functioning deficits in in evidence (Adaptive Fx Investigation Chart, item 7 in defense Exhibit A [Dr. Shapiro's binder]). The government's own experts, Drs. Denney and Mapou, conceded deficits, although they disagreed about the import of those deficits. The evidence confirms that Mr. Wilson suffers significant impairments in intellectual functioning and, simultaneously, satisfies the second diagnostic element of significant deficits in adaptive behavior, as

well as the third element that the disability originates before age 18.  As such, this

Court should hold that he is not eligible to be sentenced to death.

Respectfully Submitted,


/s/ David Stern
DAVID STERN
Rothman, Schneider, Soloway & Stern, LLC
100 Lafayette Street, Ste 501
New York, NY 10013
*Attorney for Mr. Wilson*

September 2, 2014                    MICHAEL BURT
                                    Law Office of Michael Burt
                                    1000 Brannan Street
                                    Suite 400
                                    San Francisco, California
                                    415-522-1508
                                    *OF COUNSEL*

27