1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ---------------------------------------x
     UNITED STATES OF AMERICA,
3                     Plaintiff,

                                           04-CR-1016
4                                            (NGG)

5            versus                United States Courthouse
                                   Brooklyn, N.Y.  11201
6    RONELL WILSON,

7                     Defendant.
     ---------------------------------------x
8
                                   November 28, 2012
9                                  9:00 A.M.

10                       ***VOLUME IV***

11          TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
              Before HON. NICHOLAS G. GARAUFIS,
12               UNITED STATES DISTRICT JUDGE

13                  A P P E A R A N C E S:
     ATTORNEYS FOR GOVERNMENT:
14
     LORETTA LYNCH, ESQ.
15   United States Attorney - Eastern District of New York
     271 Cadman Plaza East
16   Brooklyn, New York  11201
     BY:  JAMES G. MCGOVERN, ESQ.
17        CELIA COHEN, ESQ.
     Assistant United States Attorneys
18

19   ATTORNEY FOR DEFENDANT:

20   ROTHMAN, SCHEIDER, SOLOWAY & STERN, P.C.
     Attorney for the Defendant
21   100 Lafayette Street - Suite 501
     New York, New York 10013
22
     BY: DAVID STERN, ESQ.
23

24

25

```
 1    LAW OFFICE OF MICHAEL BURT
      Attorney for the Defendant
 2    1000 Brannan Street - Suite 400
      San Francisco, California 94103
 3
      BY: MICHAEL N. BURT, ESQ.
 4

 5

 6    LAW OFFICE OF COLLEEN QUINN BRADY
      Attorney for the Defendant
 7    99 Hudson Street - 8th Floor
      New York, New York 10013
 8
      BY: COLLEEN QUINN BRADY, ESQ.
 9

10

11    ALSO PRESENT:

12    SPECIAL AGENT KELTAR MUI

13    VERONICA RAMIREZ - PARALEGAL

14    MAYERLIN ULERIO - PARALEGAL

15

16

17

18    Court Reporter:  Judi Johnson, RPR, CRR, CLR
      Official Court Reporter
19    Telephone: (718) 613-2582
      Facsimile: (718) 613-2480
20    E-mail: Judi_Johnson@nyed.uscourts.gov
      Proceedings recorded by computerized stenography.  Transcript
21    produced by Computer-aided Transcription

22

23                         *******

24

25
```

Proceedings

1  (In open court.)

2  (Defendant present in open court.)

3  COURTROOM DEPUTY:  All rise.  The United States

4  District Court for the Eastern District of New York is now is

5  session.  The Honorable NICHOLAS G. GARAUFIS is now presiding.

6  (Honorable NICHOLAS G. GARAUFIS takes the bench.)

7  COURTROOM DEPUTY:  Calling CRIMINAL CAUSE FOR

8  HEARING in Docket No. 04-CR-1016, United States of America

9  against Ronell Wilson.

10  Counsel, please note your appearances for the

11  record.

12  MR. McGOVERN:  For the United States of America,

13  Assistant United States Attorney Celia Cohen and James

14  McGovern.  With us is Special Agent Keltar Mui and Veronica

15  Ramirez.

16  Good morning, Your Honor.

17  MR. BURT:  Michael Burt, Colleen Quinn Brady and

18  David Stern for the defendant.  With us is Mayerlin Ulerio a

19  paralegal from our office.

20  THE COURT:  Please be seated, everybody.  Good

21  morning everyone.

22  Anything before we proceed with the next witness?

23  MR. BURT:  Your Honor, just in terms of scheduling.

24  The government assured me last night that they're going to be

25  probably the entire day after I do the direct examination.  We

Proceedings

1   have another witness sort of waiting in the wings, but he's

2   not present in the courtroom.  So if for some reason the

3   government doesn't go all day, we're going to discuss with

4   them at some point in time when we'll get our witness here so

5   that the next witness will be here.  But we anticipate this

6   witness probably will take the entire session.

7              MR. McGOVERN:  That's my expectation as well.  His

8   direct, I'm told, is going to go to the lunch hour.

9              THE COURT:  Yeah, I think that was basically -- that

10  was the sense that I got from Mr. Burt.

11             MR. McGOVERN:  So I think we'll be able to fill the

12  hours after that.  But if I get the sense that I'm not, I'll

13  immediately --

14             THE COURT:  We're going till seven.

15             MR. BURT:  Yes.

16             THE COURT:  So we need to fill the time.

17             MR. McGOVERN:  Okay.

18             THE COURT:  And if by some unfortunate circumstance

19  we're lagging toward the end of next week, we'll just do seven

20  days instead of six.  I'm just going to get it done.  I've got

21  to get it done.  I really do appreciate everyone's help in

22  moving this along.

23             MR. McGOVERN:  That's great.

24             THE COURT:  I just wanted to let you know about

25  that.  The sense of urgency has been transmitted, and I know

Proceedings

1   the message has been received.  And you're working hard to get

2   things done, so I appreciate that.

3           MR. BURT:  Sure.

4           THE COURT:  Let's get going then.

5           Mr. Burt, you may call your next witness.

6           MR. BURT:  That would be Dr. Gregg Olley.  And, your

7   Honor, I have had premarked a binder relevant to Dr. Olley's

8   testimony.  It's Exhibit F.  A copy for the Court.  (Handing.)

9           THE COURT:  Thank you very much.

10           Step up sir, please.

11           COURTROOM DEPUTY:  Sir, please raise your right

12   hand.

13   JOHN GREGORY OLLEY, having first been duly sworn, was examined

14   and testified as follows:

15           THE COURT:  Good morning, sir.  Please be seated.

16           COURTROOM DEPUTY:  Please state your name and spell

17   it for the record.

18           THE WITNESS:  John Gregory Olley.  Last name is

19   spelled O-L-L-E-Y.

20           THE COURT:  Very well.  You may inquire.

21           MR. BURT:  Thank you very much, Your Honor.

22   DIRECT EXAMINATION

23   BY MR. BURT:

24   Q    Good morning, sir.

25   A    Good morning, Mr. Burt.

Olley - Direct/Burt

1   Q    Could you tell us your business or occupation?

2   A    I am a psychologist at the University of North Carolina

3   at Chapel Hill.  My primary work responsibilities are at the

4   Carolina Institute for Developmental Disabilities, which is an

5   institute within the school of medicine.  And my academic

6   appointment is in the department of allied health sciences,

7   where I have a rank of clinical professor.

8   Q    Doctor, next to you is a binder of material that's been

9   marked as Defendant's F.  It's the smaller of the two binders

10  there.

11  A    Yes.

12  Q    Are you familiar with the contents of that binder?

13  A    Yes.

14  Q    Does that have material that is relating to your

15  testimony in these proceedings?

16  A    Yes, sir.

17  Q    Could you just briefly tell us what's in that binder?

18  A    Well, I may need some refreshing.  It is a copy of the

19  slides that we are planning to present this morning, a copy of

20  my curriculum vitae, the raw data from my adaptive behavior

21  evaluation of Mr. Wilson and the one-page table summarizing

22  the IQ scores.

23  Q    And a copy of your report as well?

24  A    Yes, sir.

25  Q    Would you turn to the tab with your CV in it, please.  I

Olley - Direct/Burt

1    think it's the second tab.

2    A     Yes.

3    Q     Is that CV an accurate and complete listing of your

4    qualifications and publications?

5    A     Yes, it is up until the date that's indicated.

6    Q     August 2012?

7    A     Well, actually, this one says January 2012.

8    Q     Okay.

9              And can you briefly tell us what it is you do on a

10   daily basis in your profession?

11   A     Well, over the years, my focus has been almost entirely

12   on developmental disabilities, meaning autism, what used to be

13   called mental retardation we now call intellectual

14   disabilities and related chronic disabilities in children and

15   adults.

16             What I do right now, as I'm knocking on the door of

17   retirement, is to complete my obligation in Atkins cases that

18   are ongoing.  I supervise a forensic psychology intern.  And I

19   have release time from the University to chair our state's,

20   North Carolina's Commission for Mental Health Developmental

21   Disabilities and Substance Abuse Services.  So that pretty

22   much takes up my time.

23   Q     And the institute where you practice in North Carolina,

24   can you describe what that is?

25   A     Yes.  It is funded by many sources but is primarily

Olley - Direct/Burt

1    identified as the state's university center for excellence in

2    developmental disabilities, education, research and training.

3    That's a long-winded description, I know.  But throughout the

4    country, there are 67 of such designated university centers,

5    and this is the one for North Carolina.  It is also a --

6    several things, because there was a merger a few years ago.

7    It is a program that is funded to provide training and

8    leadership, education in neurodevelopmental disorders.  It is

9    also a basic research program, a bench science research

10   program in many basic sciences related to disabilities.

11   Q    And these university centers throughout the country, are

12   they funded through a common source, or is it a state-by-state

13   source?

14   A    They are funded primarily by the -- it also changed its

15   name just recently, but what has been described as the

16   administration on developmental disabilities, which is a

17   federal source.

18   Q    And is the function of these centers just teaching, or do

19   you also work with clients, patients?

20   A    Yes.  Well, several things.  It is said that this long

21   name is centers for education, research and training.  So we

22   have a clinic.  We have outreach activities that are

23   contracted for a variety of services with schools, with

24   residential programs and doing a lot of training for

25   professionals around the state.  And there is research,

437
Olley - Direct/Burt

1    although the part of it that is part of the university center

2    certainly has a very focus on practical issues.  For example,

3    there's a large focus on autism and other, you know, related

4    identifiable disorders, such as fragile X syndrome.

5    Q    And how about intellectual disability, how much of your

6    work at the centers is involved with people with intellectual

7    disabilities?

8    A    Well, I've been there since 1988, and so my focus has

9    been almost entirely on individuals with developmental

10   disabilities, primarily intellectual disability and at various

11   ages.

12   Q    When you say your focus, is that a clinical focus, is it

13   a research focus or is it both?

14   A    Both.  And a training focus.  But, you know, for many

15   years, I worked in the clinic, and so we saw regular

16   appointments of children and adults who had presented with a

17   variety of developmental problems.

18   Q    And was part of your function in that clinical setting to

19   diagnosis people with intellectual disabilities?

20   A    It was primarily to do assessment.  Now, the purpose of

21   assessment can be diagnosis, as I understand it to be in an

22   Atkins case and other clinical settings.  It has less to do

23   with the label that's put on a person and more to do with the

24   kinds of services that would be appropriate.  So identifying

25   that person's individual profile of strengths and weaknesses

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    and hoping to design appropriate services, you know,

2    educational, therapeutic, otherwise.

3          It's a center, by the way -- although I'm a

4    psychologist, it's a center with many disciplines on people.

5    Some people have come and gone over the years, but there's

6    roughly 10 different disciplines that work together to provide

7    training with the focus being on training leaders for the

8    future who are familiar with not just their field in which

9    they've gotten a degree, but in all of the related fields that

10   provide services to people with disabilities.

11   Q    And does the training function of these centers focus on

12   training psychologists and other professionals how to assess

13   for intellectual disabilities?

14   A    Yes.

15   Q    And what is your role in that regard, the training

16   function?

17   A    Well, as I said, right now, because I'm moving in the

18   direction of retirement, it is less than it used to be.  I'm

19   currently supervising one forensic psychology intern, and

20   there are other interns in developmental disabilities that are

21   scheduled to work with me in the near future.  But I've pulled

22   back from my direct work in the clinic because I have an

23   obligation to these forensic cases.

24   Q    Okay.

25          And you said in the clinic, you've been working

Olley - Direct/Burt

1    there since?

2    A    1988.

3    Q    And what did you do before 1988?

4    A    I briefly was clinical director of a program located in

5    southeastern Massachusetts and also in Rhode Island that

6    was -- that provided residential services for people, mostly

7    coming out of institutions.  The attempt was to get people

8    with what we were calling them, mental retardation and severe

9    behavior problems and also psychiatric disorders, out of

10   institutions and living in more community-based settings.

11           Before that, I was at the University of North

12   Carolina in another role as the training director for the

13   statewide program on autism.

14   Q    And could you give the court a brief overview of your

15   educational background?

16   A    Yes.  I received a bachelor's degree in psychology from

17   the College of William and Mary and a master's degree in

18   general experimental psychology from Wake Forest University

19   and a Ph.D in psychology with an emphasis in what we then

20   called mental retardation from George Peabody College, which

21   is now -- it has merged with Vanderbilt University.  My

22   clinical psychology internship was at the University of Kansas

23   Medical Center at Kansas City.

24   Q    And are you licensed anywhere as a psychologist?

25   A    Yes.  I'm licensed in North Carolina.

Olley - Direct/Burt

1   Q     Okay.

2           Now, since you graduated from school, did you at

3   some point in time have some research and writing interest in

4   the area of intellectual disability?

5   A     Yes.  I have had that interest since I've been in

6   graduate school, and I've tried to do some of several things,

7   doing clinical work and teaching and research and writing.

8   Q     Okay.

9           Looking at your CV in the binder there, under

10  research and publications, when was the first time you

11  published something in the area of intellectual disability?

12  A     That's a good quiz question, because I have to look.  I

13  think it's approximately 1970, but I have to look.

14          1971.

15  Q     Is that the article that's entitled "Behavioral

16  Comparisons of Mongoloid and Non-Mongoloid Retarded Persons, a

17  Review"?

18  A     Yes, it is.

19  Q     And that was published in the American Journal of Mental

20  Deficiency?

21  A     Yes.

22  Q     Does the field of intellectual disability have

23  specialized journals that people publish --

24  A     Yes.

25  Q     -- articles in the field?

Olley - Direct/Burt

1    A    Yes, definitely.

2    Q    And what are the main journals in the field?

3    A    The American Association on Intellectual and

4    Developmental Disabilities, which, as you know, the Court

5    knows, has previous titles, has two primary journals, which

6    are the research journal, which this was the earlier -- the

7    one you mentioned is the earlier name for it.  It's now The

8    American Journal on Intellectual and Developmental

9    Disabilities.  And the other journal that they published that

10   is more applied research is simply called "Intellectual and

11   Developmental Disabilities."

12   Q    Okay.  And --

13   A    Pardon me, if I can finish.

14   Q    Sure.

15   A    There are other organizations and other professional

16   journals that publish things related to disabilities.  I think

17   the chief one is an international organization focused on

18   research on intellectual disabilities, and it publishes two

19   journals as well.

20   Q    You have a section in your CV which is entitled

21   "Editorial Work."

22   A    Yes.

23   Q    What do you do in connection with editing journals, the

24   journals that are listed there?

25   A    Currently, I'm a consulting editor on two journals, which

442

Olley - Direct/Burt

1    means that I'm regularly sent manuscripts that have been

2    submitted to those journals for publication, and I review them

3    and make my recommendation to the chief editor of about

4    whether they should be published and what kind of revisions

5    would be appropriate for them.  And then occasionally I'm

6    asked to review articles on other -- from other journals, ones

7    that I'm not on their regular roster of reviewers.

8    Q    Do you know something called "Division 33"?

9    A    Yes, sir.

10   Q    And what is Division 33?

11   A    Well, it's a division of the American Psychological

12   Association.  The American Psychological Association has, I

13   believe, 54 divisions.  So there are a great many specialties

14   within psychology.  And Division 33 is the division on

15   intellectual and developmental disabilities, formerly the

16   division on mental retardation.

17   Q    How long have you been affiliated with that division?

18   A    Oh, I think as long as I've been a member of the American

19   Psychological Association, which would be the early '70s.

20   Q    Have you ever held any position in that organization?

21   A    Yes.  I'm a fellow in the division, and I am a past

22   president of the division.

23   Q    And for what years were you the president of the

24   Division 33?

25   A    It was two or three years ago.  I don't remember the

Olley - Direct/Burt

 1    exact dates.

 2    Q     Now, are you familiar with the United States Supreme

 3    Court's decision in Atkins versus Virginia?

 4    A     Yes, sir.

 5    Q     And at some point in your career, did you begin writing

 6    about Atkins-related issues?

 7    A     Yes, sir.

 8    Q     And can you tell us what publications you have in that

 9    particular area?

10    A     Well, I believe that they're noted on my CV.

11    Division 33, I believe, in 2005, formed a committee on what we

12    then called mental retardation and the death penalty.  And I

13    was appointed chair of that committee by the then president,

14    and I've remained chair of that group since.

15    Q     What is the function of that group?

16    A     The function is to provide information that -- I guess

17    the most succinct way to say it is to provide valid

18    information to the courts in order to implement the Atkins

19    decision.  Now, that can be done in a variety of ways by

20    conducting evaluations and testifying as I am today, but also

21    research and other publications, giving presentations at

22    professional organization, such as the American Psychological

23    Association.

24    Q     And in connection with your work with that group, the

25    death penalty working group --

Olley - Direct/Burt

1    A    Yes.

2    Q    -- have you published articles which attempt to instruct

3    other professionals on how to do Atkins type of assessments?

4    A    Yes.  Soon after that committee was formed, the members

5    of that committee began publishing things in the publication

6    of Division 33, and first an article on the general issue,

7    what is Atkins all about, and then it was followed by a series

8    of three articles that I wrote on the assessment of adaptive

9    behavior in forensic settings.  And that was followed by other

10   related publications.

11   Q    Would it be fair to say that your writings in the Atkins

12   area have focused on the adaptive behavior prong of the Atkins

13   decision?

14   A    Yes, sir.

15   Q    All right.  You have in front of you there a binder of

16   material, Exhibit B, the blue binder.

17   A    Yes.

18   Q    And there's a tab in the binder that says "Olley

19   Division 33."  Could you turn to that.

20        Do you have it?

21   A    Yes.

22   Q    Could you tell us what this is?

23   A    Well, this is a copy of the publications that I mentioned

24   that were published in Psychology in Mental Retardation and

25   Developmental Disabilities, and I believe it is that

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    three-part series on the assessment of adaptive behavior in

2    adult forensic cases.

3    Q    And was the purpose of this article to set some standards

4    about how these assessments get done?

5    A    In a sense.  Although, you have to the word "standards"

6    with caution because the American Psychological Association is

7    very careful about what it lends its name to.  So people are

8    free to publish things that they perceive to be best practice,

9    but that does not mean that it has gone through the rigorous

10   process that the American Psychological Association goes

11   requires in order to call something a standard.

12   Q    Okay.

13        In that same binder, there is a tab called

14   "Everington Olley 2008."

15        Do you see that?

16   A    Yes.

17   Q    And is that an article entitled "Implications of Atkins

18   versus Virgina, Issues in Defining and Diagnosing Mental

19   Retardation," published in the Journal of Forensic Psychology

20   Practice in 2008?

21   A    Yes, it is.

22   Q    Did you coauthor that article?

23   A    Yes, I did.

24   Q    And who was the other author?

25   A    Caroline Everington is an educator who is, I believe, an

Olley - Direct/Burt

1   associate dean at Winthrop College in South Carolina.

2   Q    And is this an article exploring issues in defining and

3   diagnosing mental retardation?

4   A    Yes.

5   Q    As it was called at the time?

6   A    Yes.

7   Q    Okay.

8         Right behind that is another tab, which says "Olley

9   Chapter 20."

10        Do you see that?

11  A    Yes, sir.

12  Q    And is that an article entitled "Assessment of Adaptive

13  Behavior in Adult Forensic Cases:  The Use of the Adaptive

14  Behavior Assessment System-II"?

15  A    Yes.  It's a book chapter on a book by the -- edited by

16  the authors of the ABAS.  And --

17  Q    ABAS is one of the instruments you used in this case?

18  A    Yes.  Yes.  The adaptive behavior assessment system,

19  second edition, and this was a book that was published to just

20  provide more information about the uses of this instrument.

21  And this chapter is a reworking of that three-part series that

22  you mentioned earlier to sort of bring together in one place a

23  discussion of doing adaptive behavior assessments in Atkins

24  cases.

25  Q    And this book in which this chapter is contained was

Olley - Direct/Burt

1    published in 2008?

2    A    Yes.

3    Q    Okay.

4         Then the next tab of that binder is something called

5    an article -- appears to be a chapter called "The Death

6    Penalty, the Courts and What We Have Learned About

7    Intellectual Disability."

8    A    Yes.

9    Q    And where is that published, if it is?

10   A    It is published in an edited book, and I don't remember

11   the exact name of it.  It has something to do with high-risk

12   individuals with intellectual disabilities.

13   Q    And when was that published?

14   A    This year, 2012.

15   Q    Now, you have other papers in the same general area that

16   are outlined in your CV, correct?

17   A    Yes, sir.

18   Q    Now, have you ever testified in an Atkins hearing before

19   today?

20   A    Yes, I have.

21   Q    Approximately how many times?

22   A    Approximately 19 times.

23   Q    Have you ever -- have you ever been retained and

24   testified for the government in an Atkins hearing?

25   A    Yes, I have.

Olley - Direct/Burt

1    Q    And where and when?

2    A    Where is in Trumbull County, Ohio.  And when is

3    approximately 2007.

4    Q    And did you actually testify in an Atkins hearing for the

5    government and opine that the client in that case was not

6    mentally retarded?

7    A    Yes, I did.

8    Q    Did you work for that same prosecutor in another case?

9    A    Yes, I did.

10   Q    Did you testify in that case?

11   A    I did not testify.  I did an evaluation and I wrote a

12   report and I went to court.  And the defendant in that case,

13   against his attorney's advice, stated that he did not have

14   mental retardation, and he did not want to go forward with the

15   case.  So the case was decided by the judge on the available

16   evidence.  And so there was no testimony.

17   Q    Were you prepared in that case to go forward at a hearing

18   at which you were going to testify the client was not mentally

19   retarded?

20   A    Yes.  I was sitting in court at the time and was

21   surprised at the outcome of it.

22   Q    Okay.

23        Now, have you also testified on the other side, for

24   the defense in Atkins hearings?

25   A    Yes.

449

Olley - Direct/Burt

1   Q     And how many times for the defense?

2   A     Well, the other 18 times, I suppose.

3   Q     Now, have you been involved in Atkins cases where -- for

4   the defense, where you have not testified; in other words,

5   where you've been consulted and rendered opinions to the

6   lawyers that basically you couldn't help them on the issue and

7   you didn't testify?

8   A     Yes.  I've done evaluations and given the opinion that

9   the person did not qualify to have mental retardation; and,

10  therefore, I did not testify.  And I've been in cases in which

11  I've done an evaluation and written a report, and the case was

12  settled before it went to court.

13  Q     Now, you're familiar with a subpoena that I told you the

14  government issued for certain financial records of yours?

15  A     Yes.

16  Q     And let me ask you the questions that are addressed in

17  that subpoena.  Number one, how much income did you derive

18  from forensic-testimony-related sources in 2001?

19  A     The nature of my contract with the school of medicine and

20  the common contract for faculty members in the school of

21  medicine is that any clinical work is billed to the

22  university.  So the answer to that is zero.  No money went

23  directly to me as a result of that work.

24  Q     And how about after 2001?

25  A     The answer would be the same.

Olley - Direct/Burt

1  Q    In other words, your income, whatever money is derived

2  from your work in these cases goes to the university?

3  A    Yes.  I'm a salaried state employee, and that income does

4  not alter as a result of my doing this work.

5  Q    Okay.  You said you're a licensed psychologist in the

6  state of North Carolina?

7  A    Yes.

8  Q    Have you ever had any sort of a disciplinary action

9  involving any issue?

10 A    Yes, one.  I've been licensed since 1974.  So I guess

11 that's 38 years.  And during that time, I had one infraction.

12 Q    And what was the infraction for?

13 A    North Carolina, like most states, requires that

14 masters-level psychologists be supervised in order to retain

15 their license.  So it was a circumstance in which I was

16 working with a woman who was a masters-level psychologist who

17 was not actually practicing psychology at the time but wished

18 to retain her license.  And so because I had occasion to meet

19 with her anyway, I met with her to fulfill that responsibility

20 of supervision.  At a later time, my records for supervision

21 were audited and found that I did not provide sufficient

22 detail in my notes of what we talked about in each supervision

23 session.  And so as a result, there was an infraction in which

24 I paid a fine, and I engaged in continuing education in the

25 area of record keeping.

451

Olley - Direct/Burt

1   Q    You entered into a consent order of admitting that you

2   had "failed to maintain a clear and accurate record of your

3   supervision of Ms. R that was consistent with board

4   requirements"?

5   A    Yes.  That refers to the psychology board of North

6   Carolina.

7   Q    And that was in 2007?

8   A    Yes.

9   Q    Have you had any other write-ups or disciplinary

10  infractions?

11  A    No.

12          MR. BURT:  Your Honor, at this time, I would offer

13  Dr. Olley as an expert in intellectual disability.

14          MR. McGOVERN:  Your Honor, may I have a very brief

15  voir dire?

16          THE COURT:  Yes, you may.

17  VOIR DIRE EXAMINATION

18  BY JAMES G. MCGOVERN:

19  BY MR. McGOVERN:

20  Q    James McGovern, Assistant United States Attorney.

21          Doctor, I'm trying to get a grip on your clinical

22  experience.  You testified that you've had some clinical

23  experience prior to getting involved in the Atkins litigation

24  work.  Could you describe that for me?  What is your actual

25  clinical work?

Olley - Direct/Burt

1    A    I began and where my interest in this area began was my

2    first year in graduate school in 1966, in which I had an

3    assistanceship working in what was called the development

4    evaluation clinic.  So we saw children with a variety of

5    disabilities and did testing and related assessment,

6    interviewing the parents and so on.  And that got my interest

7    started, which then led to my going into a doctoral program to

8    specialize in mental retardation.  And during that time in

9    graduate school, I did more testing and evaluation, and I've

10   continued to do that at various amounts in whatever setting I

11   have been since.

12           The assessment that I mentioned in our clinic, in

13   our institute where I've been since 1988, had regular

14   appointments of children and adults who presented with a

15   variety of problems, almost always involving some degree of

16   mental retardation, for which I administered IQ tests and

17   other kinds of tests and interviewed parents and worked with

18   other disciplines to make recommendations.

19   Q    And are you still doing that?

20   A    I am not.  As I mentioned, in my pathway to trying to get

21   myself retired, I have withdrawn from doing that currently in

22   order to finish up the Atkins cases to which I'm already

23   obligated.

24   Q    So your primary focus of your work right now is working

25   on Atkins cases?

Olley - Direct/Burt

1    A    Yes.  That and chairing the mental health commission for

2    the state.

3    Q    Just focusing on the Atkins cases for a moment.  Those

4    are all cases in which you've been retained to evaluate

5    prisoners or people who are alleged to have committed capital

6    crimes and determine whether or not they are mentally

7    retarded?

8    A    Yes.  There are some related sorts of matters, such as

9    competence to stand trial.  There are several cases.  But the

10   majority of them are Atkins cases.

11   Q    Okay.

12        And so as you sit here today, you don't really do

13   any clinical work?

14   A    Not outside of Atkins cases.

15   Q    And I don't want to understate that.  Essentially Atkins

16   cases are clinical work because you're doing evaluations,

17   correct?

18   A    Yes.

19   Q    I'm trying to be fair.

20        But your work with the institute where you were

21   evaluating people clinically, how long ago would you say that

22   you were doing that outside of Atkins casework?

23   A    I would say that ended maybe five years ago.  Again, it

24   gradually diminished, and I have done few of those kinds of

25   cases --

454

Olley - Direct/Burt

1    Q    Okay.

2    A    -- in the last five years.

3    Q    And then you used a word with Mr. Burt there,

4    "assessments."  And I'm not sure.  Were you distinguishing

5    that from evaluations?  Can you explain that?

6    A    That's probably not a distinction worth making.  I think

7    the broad notion of assessment is to find out all of the

8    related information and related to the presenting question,

9    and that may take the form of standardized tests or a variety

10   of other things.

11   Q    And based on your experience and the work that you've

12   done as a clinician up until, I guess, 2007, your testimony is

13   that you're fully familiar with the standard of care for

14   evaluating people with intellectual disability or mental

15   retardation?

16   A    Yes, I believe so.

17   Q    Okay.  And you stated that the vast amount of your work

18   has been working for defense attorneys; is that right?

19   A    That's true.

20   Q    In the Atkins area.

21        But that you did actually do a case for the

22   government somewhere in Ohio or somewhere?

23   A    Yes.

24   Q    And where is Trumbull County, Ohio?

25   A    It is in northeastern Ohio, sort of north of Youngstown.

Olley - Direct/Burt

1    It's about halfway between Cleveland and Pittsburgh.

2    Q    And you did a couple of cases for the prosecutor out

3    there?

4    A    Yes.

5    Q    Who was that?

6    A    I'll think of it when I'm not thinking of it.

7    Q    That's fine.

8    A    I'm not being evasive.  I remember the clients.  I don't

9    remember the prosecutor's name right off my head.

10   Q    All right.

11        And the year of that was 2007?

12   A    Yes.  I believe the first one was 2007, and then the

13   second one was, oh, maybe two years later.

14   Q    Okay.

15        MR. McGOVERN:  I have no objection to the doctor.

16   Thank you.

17        THE COURT:  All right.  Motion is granted.  The

18   witness is deemed an expert in intellectual disability, also

19   known as mental retardation.

20        MR. BURT:  Thank you.

21   CONTINUED DIRECT EXAMINATION

22   BY MR. BURT:

23   Q    Dr. Olley, what were you asked to do in this case?

24   A    Most concisely stated, I was asked to evaluate or assess

25   Mr. Wilson's adaptive functioning in childhood and as near as

Olley - Direct/Burt

1   possible to the time of the crime for which he has been

2   convicted.

3   Q    And you understand, as we're going to assess in a minute

4   there are different prongs to the Atkins test, correct?

5   A    Yes, sir.

6   Q    Were you retained and were you focused in this case

7   primarily on the second prong, that is, the adaptive

8   functioning prong?

9   A    Yes.  I did not conduct any evaluation of intellectual

10  functioning.

11  Q    Okay.  You, however, reviewed the intellectual

12  functioning scores, I believe, that were compiled in a list or

13  a chart?

14  A    Yes.

15  Q    And that is in the binder that you have?

16  A    Yes, I believe so.  This is similar to what was in his

17  and Dr. James' report.

18  Q    Okay.

19        As a result of your evaluation, did you write the

20  report that is, again, pages contained in your exhibit volume

21  there?

22  A    Yes.

23  Q    Okay.

24        Now, did you, as sort of the framework for

25  discussing what you did in this case, prepare some slides?

Olley - Direct/Burt

1   A    Yes, I did.

2   Q    And could you just briefly outline some of the

3   definitions you're going to use in your testimony, which I

4   believe the third slide, I believe, starts with?

5   A    Yes.  And I believe try to be concise and respectful of

6   the judge's request that we move things along and relate these

7   things as much as possible to the current case.

8        The definition that we see here is the one that I

9   believe the Court is familiar with from the American

10  Association of Intellectual and Developmental Disabilities.

11  It is that three-part definition that you mentioned.  The

12  current one for adaptive behavior by the AAIDD emphasizes

13  significant impairment in one of these three areas that are

14  noted here, conceptual, social and practical skills.

15       The other thing that's of great emphasis there is

16  that last line, "in their everyday lives," because this is

17  part of the history of the concept of adaptive behavior.  This

18  is how this condition was identified generations ago, before

19  there were IQ tests.  It was because people, in their everyday

20  lives, were unable to perform those responsibilities that were

21  expected of people their age.  So, of course, hundreds of

22  years ago, we didn't have formal scales, but this condition

23  was skill recognized by impairments in adaptive behavior.  And

24  that's why I believe it's very important.

25  Q    All right.  And in terms of the standard, the next slide,

Olley - Direct/Burt

1   slide four, do you -- in this case, did you apply this

2   standard to the information that you reviewed, that is,

3   significant limitations?

4   A    Yes.  And I think that that is -- that phrase

5   "significant limitations" is an important part of the slide,

6   because, of course, we all have disabilities in the sense that

7   we do things poorly from time to time.  So what we are looking

8   for here in order to come to a conclusion about an evaluation

9   is whether the disability is a significant one in at least one

10  of those areas and that it manifests itself in the person's

11  everyday life.

12  Q    All right.

13       The next slide, slide five.  Is there a way that the

14  AAIDD quantifies the standard that is to use and did you use

15  that standard in this case?

16  A    Yes.  There are several -- this is a bit of a wordy

17  slide, but there are several important things in there early

18  on, mentioning the use of standardized adaptive behavior

19  measures, which I did do and which Dr. Denney did as well.

20  And then again, the mention of identifying significant

21  limitations.  And that significant limitation is defined,

22  similarly as it is for impairments in intelligence, to be two

23  standard deviations below the mean.  And what is meant there

24  when it says "below the mean" is the population mean.  That is

25  to say that the individual is compared with all individuals in

Olley - Direct/Burt

1    the United States of his or her age.

2            Then it goes on to point out that, again, the

3    impairment is in at least one of these three areas.  Or what

4    is listed as B there is a second criterion, which would be a

5    significant impairment in an overall score that takes into

6    consideration all three of these areas.

7            Then the last part -- as I mentioned, it's a busy

8    slide; there's a lot on there, but it's important -- that

9    similar to IQ tests, again, the instrument must take into

10   consideration the standard error of measurement or any other

11   factors that might qualify what that score is.  And this is

12   particularly important in this case or in most any Atkins case

13   because the focus is on the developmental period and the time

14   of the crime, which in Mr. Wilson's situation is 10 years or

15   more ago.  And so there is a lot of care, caution,

16   qualifications that have to be implemented.  And this is

17   mentioned in the AAIDD manual.  And so although they emphasize

18   the use of a standardized adaptive behavior measure, there's a

19   lot of caution about using that properly to come to a

20   conclusion.

21   Q    And when the AAIDD says the instrument's standard error

22   of measure must be considered, is there a metric similar to

23   what's used with the IQ scores in terms of the range of scores

24   that you're looking for?

25   A    Yes.  And when tests are scored, they yield a confidence

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    interval similar to IQ tests so that you can look at a range

2    of scores.  And, you know, again, similar to IQ tests, if it's

3    at the 95 percent confidence interval, then you can be

4    95 percent confident that this range encompasses that

5    individual's functioning.

6    Q    Now, you testified in the Davis case in Maryland, right?

7    A    I did, yes.

8    Q    And I think in that case, you said that the sort of

9    target score was a 70.  Is that the score you're looking for?

10   A    Well, a standard -- two standard deviations below the

11   mean of a test that has a standard deviation of 15 would be

12   70.  You know, in the Davis case, all the scores were at or,

13   as I recall, below 70.  So I don't recall that the discussion

14   ever came up in Davis about standard error of measurement.

15   However, certainly that concept would have applied there as

16   well.

17   Q    So in the intellectual functioning prong, I think there's

18   some language that we've been through with Dr. Shapiro which

19   says that because of the standard error of measurement, scores

20   up to 75, around 75, approximately 75, would qualify.  Is that

21   same metric applied in the adaptive behavior area?

22   A    Yes.  That's the AAIDD standard.

23   Q    Now, you mentioned Dr. Denney.  Did you review the

24   reports in this case that were written by other experts, both

25   the defense experts and the government experts?

Olley - Direct/Burt

1    A    Yes.

2    Q    And who were the government expert reports that you

3    reviewed?

4    A    Dr. Denney and Dr. Mapou.  I hope I'm saying his name

5    directly.

6    Q    And was there a report by a Dr. Patterson as well?

7    A    I don't recall Dr. Patterson.

8    Q    Okay.  And of the reports by Dr. Mapou and Dr. Denney

9    that you reviewed, did they -- did either of those gentlemen

10   perform adaptive functioning testing similar to what you did?

11   A    Yes, Dr. Denney did.

12   Q    Okay.

13         And how about Dr. Mapou, did he?

14   A    He made -- no.  He made reference to Dr. Denney's

15   evaluation.  The reason I was hesitating is because a portion

16   of that was a standardized evaluation of academic performance.

17   But I believe that that was done by Dr. Denney and referenced

18   by Dr. Mapou.

19   Q    And what test did Dr. Denney apply in the adaptive

20   behavior area?

21   A    He applied two different tests.  And I've been trying to

22   figure out the rationale for them.  And I think that the

23   rationale is that when evaluating a person retrospectively and

24   using an adaptive behavior scale, it's important to identify

25   what age the person was when the reporter is making these

Olley - Direct/Burt

 1 | ratings.  That's important because it's a norm-based

 2 | instrument, similar to IQ tests, and the person is being

 3 | compared to other people of his age.  So you have to know what

 4 | age you're talking about in order to generate a score.

 5 |        My understanding is that when the respondents were

 6 | talking about Mr. Wilson when he was below 16 years of age,

 7 | that Dr. Denney used the Vineland adaptive behavioral scale.

 8 | When the respondents were referring to Mr. Wilson's

 9 | functioning when he was older than 16, he used the adaptive

10 | behavior assessment system, which is the same instrument I

11 | used.

12 | Q    And you use the adaptive behavior assessment system test

13 | instrument for all the people that you administer tests to?

14 | A    Yes.

15 | Q    Each of those tests is a standardized test in the sense

16 | that it has a manual, such as the one I'm holding up, ABAS-II

17 | manual?

18 | A    Yes.  All of these instruments have a manual.

19 | Q    And there's a Vineland adaptive behavior second, second

20 | edition manual.  This is the instrument that Dr. Denney used?

21 | A    Yes.

22 | Q    You're familiar with both instruments?

23 | A    I'm more familiar with the adaptive behavior assessment

24 | system because I've used if more frequently.

25 | Q    But you've written about both these instruments; is that

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    correct?

2    A    Yes, briefly.

3    Q    The strengths and weaknesses of each?

4    A    Yes.

5    Q    Okay.

6         In terms of the specific deficits that you looked

7    for in this case, slide six, is this the standard you used in

8    terms of the conceptual social and practical areas that you

9    looked at?

10   A    Yes.  This is a brief description of what is meant by

11   each of these categories.  I say brief because it is explained

12   a good bit more thoroughly in the users guide to the 11th

13   edition manual that the AAIDD published this year.  But this

14   is -- this is the brief version.

15   Q    Okay.

16        And is there some language in the manual which is

17   contained on the next slide, slide number seven, about

18   situations where instruments can't be used and what you should

19   do in that situation?

20   A    Yes.  Well, two parts to that.  First, I guess assessing

21   whether it's appropriate to use a particular instrument and

22   many other qualifying questions associated with that.  And

23   then if the decision after that investigation is that the

24   instrument would not be appropriate to use or, more commonly,

25   that a person, the potential respondent would not be an

Olley - Direct/Burt

1    appropriate respondent to provide that information, then you

2    want to emphasize, well, the point that should be present

3    regardless, and that is that the decision about functioning of

4    adaptive behavior should be based upon broad sources of

5    information.

6            And by "broad" I mean, in contrast to an IQ test

7    that can be administered in an hour and a half or so and you

8    have a score, the assessment of adaptive functioning looks at

9    the individual's functioning during the developmental period,

10   because that's part of the definition of intellectual

11   disability.  And you want information that comes from

12   different people who have known that person at different times

13   of his life under different circumstances at school, at home

14   and at play, relatives, friends, teachers, anyone who knew the

15   person -- well, there's another slide, and that gets on to the

16   matter of qualifications of the respondent.

17           But I should be more concise that the point of this

18   slide is that there is other information that we should rely

19   upon more than simply reporting a score.

20   Q    And you used the framework, the AAIDD.  Did you also use

21   the framework in this case that is set forth in the DSM, which

22   talks about finding deficits in at least two of 10 of the

23   areas set forth in this slide?

24   A    Yes.  And because it's important to present the

25   information as -- you know, in the form that the Court finds

Olley - Direct/Burt

1   most valid, I wanted to make sure that all of this information

2   is available.

3           In the current DSM, the criterion is a significant

4   impairment in two these 10 areas that are mentioned.  This

5   list is also the one that was used by the AAIDD predecessor at

6   the time of the Atkins decision.  So it's not clear what a

7   particular court might find is the standard.  So I wanted to

8   use both standards.  And fortunately, the adaptive behavior

9   assessment system gives scores that can be used in both

10  standards.  There are definitions of each of these 10 areas,

11  and they're included in my report.  But I think that these are

12  pretty much intuitively obvious what these are getting at in

13  each of these areas.

14  Q   Go back for a minute to slide number six.  Could you

15  summarize your conclusions in this case in terms of what, if

16  any, areas of deficit Mr. Wilson had?  And I'm just asking for

17  a summary conclusion at this point.

18  A   Well, with regard to conceptuals, I believe that he did

19  have significant impairment.  And we will discuss that

20  further, I'm sure.  Similarly, with social, he did have, yes,

21  significant impairments in practical, although those are areas

22  that are different.  And I really know haven't talked about

23  what each of these means.  But practical is different in the

24  sense that it is -- these are skills that are learned not

25  through abstract concepts, but they're learned through

Olley - Direct/Burt

1    experience and through repetition.  So they're things, such as

2    daily living skills, that you don't have to understand how the

3    electric toothbrush works, you just have to be able to use it.

4    And one would expect that a person of low intelligence would

5    be able to function better in the area of practical skills

6    because they don't require any kind of abstract analysis.

7    Q    Okay.  So in this case, did you reach a conclusion as to

8    the practical domain for Mr. Wilson?

9    A    Yes.  Although his skills are stronger in the practical

10   domain, I believe they still represent a significant

11   impairment.

12   Q    So your opinion is he has deficits in all these of these

13   domains, conceptual, social and practical?

14   A    That's my opinion, yes.

15   Q    And then skip ahead to the slide numbered eight.  What is

16   your opinion in this case as to which these categories, the 10

17   set forth in the DSM, that he shows deficits in?

18   A    My opinion, as expressed in my report, is that he has

19   significant impairment in eight of these 10 areas.  And in the

20   other two areas, which are self-care and use of community

21   resources, what I described was mixed information; that is to

22   say, he had some competencies and some problems.  But holding

23   to the standard of significant impairment, I did not feel that

24   he met that standard in those two areas.

25   Q    Okay.  Now, the next slide talks about the sources of

Olley - Direct/Burt

1    information that you're supposed to be using to assess

2    adaptive functioning, correct?

3    A    Yes.

4    Q    And in this case, did you have -- what was your

5    information base?

6    A    This is listed in one of the later slides.  But in

7    general, I reviewed the documents that you provided to me,

8    which includes, well, many things that are listed in my

9    report.  School records and many other records.  I interviewed

10   Mr. Wilson and I interviewed 12 other individuals, who are

11   individuals who have known Mr. Wilson well during his

12   developmental period.

13   Q    And did you interview the 12 individuals once or more

14   than once?

15   A    Some of them, I interviewed more than once.

16   Q    And what was the purpose of the reinterviews?

17   A    For clarification.  This appears in a later slide, so

18   forgive me.  But part of the importance of doing adaptive

19   behavior assessment that involves a standard scale is the

20   determination of whether the reporter is -- meets the

21   qualification to be able to provide valid information.

22          Now, you held up earlier the manuals for two of

23   these adaptive behavior scales, and they state pretty

24   extensively what the qualifications are for a person to be

25   able to validly provide information.  And this is an even more

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

468

Olley - Direct/Burt

1   challenging standard, as I mentioned, because it's

2   retrospective, so the person has to be able to remember the

3   person's functioning some years ago.

4           In addition -- I'm not sure if we're going the same

5   direction here.  But my evaluation was to look at those 13

6   people, including the defendant, and make a determination

7   whether those people were -- met that criterion stated in

8   these manuals, also stated in the AAIDD manual and the

9   criteria that I stated in my report.  It was my conclusion

10  after interviewing these people that four of those 13 people

11  would be able to provide information that would be useful in

12  an adaptive behavior scale.

13          And I don't want to keep -- I think I'm rambling a

14  little bit.

15  Q    Four of the 13 you interviewed, you actually administered

16  the instruments to.  And did you obtain information from the

17  other folks?

18  A    Yes.  And because the person cannot recall the

19  information that would be a valid response to well over a

20  hundred items on an adaptive behavior scale does not mean that

21  the person does not have valid or useful information to

22  provide.  So those other individuals, or at least most of

23  them, I felt had useful information for me and could describe

24  some circumstances of their living with Mr. Wilson.  That was

25  very informative about areas where he may have deficits, even

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    though they could not give me a standardized score.  This

2    comes back to the point earlier about get information from

3    many sources and then use clinical judgment to determine from

4    all of those sources what a conclusion would be.

5    Q    In the next slide -- does the manual recognize that these

6    instruments you're talking about are imperfect measures of

7    adaptive functioning?

8    A    Yes.  I think that the second bullet on this slide

9    indicates that clearly.

10   Q    And therefore, that you have to look at these other

11   services, medical history, school records, et cetera, correct?

12   A    Yes.

13   Q    Okay.

14         Are there certain key points that you applied in

15   this case to your analysis of Mr. Wilson's adaptive

16   functioning?

17   A    Yes.  And I can say these, I think, succinctly because

18   they come from the AAIDD manual.  But there are some of them

19   that are particularly germane to Mr. Wilson's situation.

20         The first one is very important, and that is that

21   the concept of adaptive functioning is about a person's

22   typical community functioning.  And typical means what he does

23   on several occasions across time.  It does not mean picking

24   out an area where he was either impaired or doing well in

25   isolation and giving that more validity than it deserves.  So

Olley - Direct/Burt

1    this is the reason to gather information over time, the point

2    of view of many people under different circumstances, and also

3    to rely upon records for that purpose.

4    Q    And when you say "gather information over time," I have

5    an exhibit here that --

6              MR. BURT:  Your Honor, I'm referring to Government

7    Exhibit 51.  I do not believe it's been moved into evidence.

8              THE COURT:  Yes, it has.

9              MR. McGOVERN:  Thank you.

10             MR. BURT:  Thank you.  May I approach the witness?

11             THE COURT:  Sure.

12             MR. BURT:  Thank you.

13   BY MR. BURT:

14   Q    I have a chart here that the government compiled, which,

15   to orient you, shows the periods of time in Mr. Wilson's life

16   when he was incarcerated.

17   A    Yes, I see.

18   Q    Up to the present time.

19   A    Yes.  I have not seen this before, but I understand.

20   Q    And when you say "gather information across time," you

21   notice that the chart does not include zero to 10.  It sort

22   ever starts at 10 years.  Is this period that's not on the

23   chart an important period of time for assessing adaptive

24   behavior functioning?

25   A    Yes.  By definition, functioning in the developmental

Olley - Direct/Burt

1  period, meaning birth to 18, is necessary to assess.

2  Q    Is that typically the focus; in other words, what is the

3  typical behavior in that developmental period?

4  A    Yes, definitely.

5  Q    Okay.

6           What were the other key points that you used in this

7  case?

8  A    The second one, that adaptive skill limitations coexist

9  and are not outweighed by strengths.  You know, we are all

10  human, and we have our relative strengths and weaknesses.

11  Indeed, people with mild intellectual disabilities aren't the

12  same.  The point about not being outweighed is that the

13  assessment of adaptive deficits is an assessment of deficits.

14  In other words, if you find that the person has a deficit and

15  in a typical setting over the developmental period, not an

16  isolated circumstance, then you can draw a conclusion about

17  that that deficit exists.  If the person has some other

18  relative strength that doesn't -- it doesn't outweigh -- in

19  other words, it's not like a basketball game or who gets more

20  points wins.  If the person has identified deficits, then --

21  and they meet the standards that we have just talked about,

22  then they would qualify under the standard.

23  Q    Okay.

24           And the third key point that you used in this case?

25  A    The context of community environment is not custodial

Olley - Direct/Burt

1    environments is to say that typical community functioning

2    means the community, which is to say where the people of the

3    individual's same age would live and work and play and have

4    friends and so on.  Whereas custodial environments are, by

5    definition, limited in the person's options to engage in

6    adaptive functioning.

7            Now, this is not to say that one can't learn

8    something valuable from looking at those custodial

9    environments.  And, you know, as indicated in this document --

10   Q    "This document" being Exhibit 51?

11   A    Yes, sir.

12           -- Mr. Wilson was in residential programs, and we

13   have records from those residential programs.  But the focus

14   is on how one typically functions in his or her community.

15   Q    Let me give you a hypothetical.  Say someone's in a

16   custodial or a residential setting, and they do extremely

17   well, no problems.  Does that tell you anything about how they

18   adapt in the free world, the open community?

19   A    I don't know that I would say it tells you nothing.  You

20   would have to be extremely cautious.  The purpose of a

21   therapeutic program, of course, is to create the environment

22   in which the individual would function at his best or at least

23   improved.  So if a person goes to a therapeutic setting and

24   performs well, then the therapeutic setting is doing the job.

25   But it does not mean that the person would not have a typical

Olley - Direct/Burt

1    impairment if he were in a community setting.

2    Q     And how about on the other side of the equation, which is

3    the person is in a residential or custodial setting and they

4    don't do well.  Does that tell you anything about how they are

5    going to operate on the outside?

6    A     Well, I think that's more informative, if, for example, a

7    person with intellectual disability typically functions better

8    a setting that has structure.  And what I mean by "structure"

9    is clear expectations, and the expectations are reasonable

10   ones within that person's skill area.  So if they are in such

11   a setting that's structured and individualized and has demands

12   that are reasonable for that person and the individual still

13   exhibits deficits, then that's noteworthy.

14   Q     And how about in this case, can you give me an example

15   where that applies, either side of the spectrum?

16   A     Well, I think that the two that come to mind is when

17   Mr. Wilson was at Elmhurst, which is a residential psychiatric

18   setting, he certainly had some problems noted in his records,

19   but he also had experiences of doing well.  I mean, he learned

20   some things.  You know, he was taught basic self-care skills

21   and other things.  And that's the purpose of a setting like

22   that.  So I think that that's informative, to look at his

23   records.

24         Later in his teenage years, when he was at

25   Brookwood, which is not -- my understanding of its function is

Olley - Direct/Burt

 1   not, you know, purely a punitive incarceration, but it also

 2   has a good strong therapeutic element to it.  When he was at

 3   Brookwood, he did learn some things, and he showed improved

 4   behavior in some areas.

 5           So both of those times, although they were places

 6   where his behavior was limited -- you know, you can't live on

 7   word and learning to take the bus.  Nevertheless, we can learn

 8   some useful things by looking at his records from this period.

 9   Q    Okay.

10           Now, how about the fourth key point that you relied

11   on in this case?

12   A    Self-reporting.  There is a substantial body of research

13   literature on interviewing people with intellectual disability

14   and their self-report.  And in a nutshell, it's easy to get

15   the wrong information or invalid or misleading information by

16   self-report.  So it should be engaged in quite cautiously.

17   Similarly, the information from family members should be

18   viewed with caution.  That's not to say they should not be

19   interviewed, because I think they have valuable information.

20   But this is where clinical judgment, which is a procedure that

21   is described quite fully in the AAIDD manual -- where clinical

22   judgment comes into play is taking all of this information and

23   determining a valid conclusion.

24   Q    Okay.

25           Now, within each of those four key points that you

Olley - Direct/Burt

1  relied on here, those are all backed up by language in the

2  manual, correct?

3  A    Yes.  I tried to present them concisely here.

4  Q    The next slide just is what's in the manual about this

5  concept of typical, not maximum, behavior.  That is, what the

6  person typically does rather than what the individual could do

7  or could -- can do or could do is what you're looking at.

8  A    Yes.  And I think that that last section about rather

9  than what the individual can do or could do is important in

10 any case but especially important in Mr. Wilson's case,

11 because this statement and others from AAIDD clearly indicate

12 that adaptive behavior is about behavior.  It's about

13 performance.  It's about what the person does, their typical

14 performance.  It is not about potential.  It's not about what

15 he might do or what he could have done under other

16 circumstances or what he would be expected to do because other

17 children are doing it.  And that kind of speculation does

18 exist in Mr. Wilson's record, and I think that it should be

19 identified and looked at very cautiously when teachers or

20 people doing psychological evaluations say, well, you know,

21 his score really should be higher because he's got more

22 potential.  That is not the way an adaptive behavior

23 assessment is done according to these standards.

24          MR. McGOVERN:  Objection.

25          THE COURT:  What's the objection?

Olley - Direct/Burt

1      MR. McGOVERN:  The objection is to the response --

2  I'm sorry, to the question.  He's talking about matters of

3  potential and comments from people in the record about the

4  potential of this person to do better.  And the question was

5  phrased in the area of adaptive functioning, and the answer

6  was totally unresponsive.  It was talking about the IQ

7  intellectual prong.

8      THE COURT:  Was it your intention to discuss the IQ

9  prong of the analysis or are you -- or was it your intention

10  to discuss in that answer the adaptive functioning prong of

11  the analysis?

12      THE WITNESS:  Thank you, Mr. McGovern.  I should

13  limit it to -- I mean, the comments were made in both

14  contexts.  My answer should be limited to comments about his

15  potential adaptive functioning.

16      THE COURT:  All right.  I'll allow it for that

17  purpose.

18      MR. BURT:  Thank you.

19      THE COURT:  Thank you very much.

20      MR. McGOVERN:  Thank you.

21  BY MR. BURT:

22  Q    And Doctor, you're referencing various notations in the

23  record at various points in time where somebody says he has

24  potential or he's capable of more?

25  A    That was my reference, yes.

Olley - Direct/Burt

1   Q    And one thing to contrast your perspective from the

2   people who were writing those comments.  Some of those were

3   made when he was as young as six years old, correct?

4   A    Yes.

5   Q    And those folks didn't have the advantage of seeing how

6   it played out after Mr. Wilson left their custody or

7   confinement, right?

8   A    Yes.  I think my caution and I think the AAIDD caution

9   has to do with speculations about how the person would do

10  under other circumstances.

11  Q    And similarly, if you're administering one of these

12  instruments, is the focus when you're asking -- the

13  instruments, which we'll get into, have various questions

14  asking somebody to assess behavior, right?

15  A    Yes.

16  Q    Is the focus of those instruments what Mr. Wilson was

17  capable of doing?  Is that the way the instruments are framed?

18  A    No.

19  Q    How are they -- just as an example, how is the inquiry

20  framed?

21  A    The statements in any of these adaptive behavior measures

22  are statements of a particular action and perhaps at a certain

23  level.  For example, reads and comprehends material at at

24  least the fourth-grade level would be an example.  And then

25  the respondent is to indicate whether, in fact, the individual

Olley - Direct/Burt

1    did that, not whether he would be potentially capable of doing

2    it.

3    Q    All right.  And is that an important distinction in

4    assessing not only your adaptive functioning testing but also

5    Dr. Denney's?

6    A    Yes.

7    Q    And why is that in this particular case?

8    A    Well, because I think one has to be very careful in how

9    the information is presented to the respondents to assure that

10   it is presented as objectively as possible and that there is

11   no hint of responding to it in terms of potential but simply

12   in terms of did he do this at the age that we're talking

13   about.

14   Q    Not whether he could have done it?

15   A    Correct.

16   Q    Okay.

17        The next slide, 13, just restates, I think, the

18   point you've already made.  Significant limitations are not

19   outweighed by potential strengths, correct?

20   A    Yes.

21   Q    And the next slide is a little bit different, which is in

22   those three areas that you talked about, conceptual, practical

23   and social, there are various things listed within each of

24   those domains, correct?

25   A    Yes.

Olley - Direct/Burt

1    Q      Like five or six different things to look at?

2    A      Yes.

3    Q      If someone has a limitation in a couple of those

4    sub-areas but has strength necessary others within that

5    domain, what is the decision in terms of whether the person

6    would still qualify as being limited?

7    A      Well, coming back to what we said earlier, it would be a

8    significant impairment.  Looking at, for example, conceptual.

9    Looking at the broad category of things that fall under

10   conceptual, does the person have a significant impairment as

11   determined -- as identified by two standard deviations below

12   the mean.

13   Q      For instance, in that social category you have, the

14   language encompasses interpersonal skills, social

15   responsibility, self esteem, follows rules, obeys rules,

16   avoids being victimized and social problem solving.  Do you

17   need deficits in every one of those in order to qualify for a

18   social deficit?

19   A      No.  But that's where a thorough evaluation and the use

20   of an adaptive behavior scale can be helpful.

21   Q      And the manual on the slide 14 says "individuals may have

22   capabilities and strengths that are independent of their ID,

23   for example, strengths in one aspect of an adaptive skill in

24   which they otherwise show an overall limitation."

25   A      Yes.  And people with disabilities, you know, it's well

Olley - Direct/Burt

1   documented to have isolated skills that are quite impressive.

2   I think of a young man who I evaluated in our clinic some

3   years ago who was amazingly good -- and there are other people

4   who have this skill as well -- at finding his way from place

5   to place.  So for example, our clinic was in the hospital, and

6   I walked him to the cafeteria one way, through all the

7   labyrinth of hallways.  We came back from the cafeteria in

8   another route.  And later that afternoon, he took his mother

9   on exactly the same route and remembered it after having seen

10  it once.  Now, this child had a very low IQ.  So that skill,

11  remarkable though it was, did not offset his significant

12  impairment in other areas.

13  Q    In the next slide, do people, especially at the higher

14  end of the IQ scale, who nevertheless qualify as intellectual

15  disabled, tend to have more strengths than, say, people who

16  are moderately impaired?

17  A    Yes.  And this term, persons who have ID -- persons with

18  ID who have higher IQ scores is, quite honestly, an attempt by

19  AAIDD to avoid using the term "mild intellectual disability,"

20  because mild -- you know, Dr. Shapiro may have discussed this.

21  But mild certainly can be misleading because it's still a

22  significant impairment.  So here you're talking about people

23  who are similar to Mr. Wilson in that their disability is not

24  readily identifiable.  And that's the important reason for

25  doing a thorough evaluation, because he is not like a person

Olley - Direct/Burt

1  with a syndrome, where if you saw that person in the grocery

2  store, you would immediately recognize their disability.

3  That's not the case for individuals with higher IQ scores.

4  Q    Such as Mr. Wilson?

5  A    Such as Mr. Wilson.

6  Q    Okay.

7        And is there a recognition of people who were above,

8  say, 75 -- around 75?  Did those people who were above that

9  mark used to be called borderline?

10  A    Yes.

11  Q    And next slide, 16, is there any clear delineation in

12  terms of adaptive behavior between somebody's who is

13  characterized as borderline, that is, who's above, higher

14  scores than 75, and people who are below?

15  A    Well, there are differences.  I suppose that's why we

16  have Atkins hearings, that people who are the defendants in

17  Atkins hearings fall into this area where the scores are not

18  so obvious, and it requires a more thorough evaluation to make

19  that distinction.  But I think the importance of this slide

20  and the statement by the AAIDD is that there is a great deal

21  of overlap.

22  Q    Okay.  The next slide, 17, just gets at this idea, does

23  it not, that we're looking at community environments, not

24  custodial environments?

25  A    Yes.  And it gives some examples there toward the end of

Olley - Direct/Burt

1    what are meant by that, homes, neighborhoods, schools and so

2    on.

3    Q      Slide 18, is there a more specific sort of guideline on

4    custodial behavior?

5    A      Yes.  There are a couple -- brief though this slide is,

6    there are a couple of important points here.  One is, the

7    first that's mentioned, not based on the person's street

8    smarts.  And I think that's important to mention because I

9    believe the term was used in Dr. Denney's report.  And street

10   smarts, of course, is not a term that has any scientific

11   definition or validity.  And I think it's important to clarify

12   it because I don't want -- I'm not sure this is what

13   Dr. Denney intended, but it certainly seems the implication in

14   his report that, okay, he does have these impairments which we

15   can see, but they're somehow outweighed by his street smarts

16   and whatever that might be.  And what it doesn't mean is

17   adaptive criminal behavior is shown here, because by the AAIDD

18   standards, that is a contradiction because in order to have an

19   impairment in the social area of adaptive functioning, one of

20   the standards is not violating rules and laws.  And a person

21   who does that by engaging in criminal activity can't then be

22   considered to be doing some adaptive.  So that's why there's a

23   lot of useful information in the slide.  The others, of

24   course, excluding the person's performance in jail or prison.

25   Q      So I think there was a question yesterday about, well,

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    couldn't Mr. Wilson -- wasn't he employed -- I forget the

2    exact terminology, but it was something along the lines of

3    well, what if somebody sells drugs, doesn't that indicate that

4    they have some work skills.

5    A    Well, work is one of those 10 areas that was in an

6    earlier slide that was identified as the DSM criteria.  And I

7    think that work is a very important and interesting area to

8    examine for Atkins clients.  But, as you know, work in this

9    context involves a lot things.  It involves being able to have

10   the will -- the experienced to give yourself work skills, and

11   it involves identifying something about your work interests

12   and capabilities.  It involves the skill to be able to seek

13   out work in an employable setting that, you know, is suitable

14   to the individual.  It involves the skills of being able to

15   fill out an application, go for a job interview and present

16   yourself successfully.  All of these things leading up to

17   actually performing the work.  All of these things that I

18   mentioned are things Mr. Wilson had been demonstrating

19   repeatedly during the developmental period not to be able to

20   do.

21        So if you simply hand the person a job and say do

22   it, it doesn't test for any those other skills that I

23   mentioned that are the things that would be necessary in order

24   to obtain a job in a community setting.

25        All that, of course, doesn't -- you know, was in

Olley - Direct/Burt

1    addition to the main concern that work in a custodial or a

2    restricted setting would have all the limitations of trying to

3    adapt -- assess any adaptive functioning in any restricted

4    setting.

5    Q    You said that one of the key points you're relying on in

6    this case was to view self-reports and reports of family with

7    caution.   Is that because people generally are biased in

8    trying to make themselves look retarded?  And this is slide

9    19.

10   A    Well, it's a couple of things.  The first thing to which

11   I was referring is that due to the communication and social

12   and communication -- social communication limitations of a

13   person with low intelligence, communication can be confusing

14   and misleading under any circumstances.  So you have to be

15   really careful in how you ask the question.

16        Several of Mr. Wilson's relatives pointed out how

17   you have to break the question down in its components and

18   simplify the question in order to get accurate information.

19   So part of the problem is how you ask the question, and how

20   you ask the question can lead to accurate or to misleading

21   responses.

22        Then the second part is the one to which you

23   referred, and that is the well-documented characteristic of

24   people of low intelligence to want to present themselves as

25   positively as possible.  A person with very low intelligence

Olley - Direct/Burt

1    would not be sophisticated enough to recognize how different

2    he is from the people around him and to be embarrassed by

3    that.  Mr. Wilson, on the other hand, is sophisticated enough

4    to recognize his own limitations, especially his academic

5    limitations and, as reported to others, his embarrassment

6    about those things.  So there is certainly a motivation.  And

7    one could argue it either way, as I think you were implying,

8    that the well documented cloak of competence, which is what's

9    referred to in this slide, would argue for a person with

10   intellectual disabilities to want to look good.

11            And I emphasize this book because it's a classic in

12   our field, even though it was done several years ago.

13   Dr. Edgerton is a very well-known anthropologist, who studied

14   a large number of people with mild intellectual disability

15   living in the community and how they coped with that.  I mean

16   he discovered a number of things that are still quite valid

17   today.  This rather artful term "the cloak of competence" that

18   he used refers to this desire to look good, to put on a cloak

19   of competence so that you appear to be capable to others.  And

20   I think that there are many examples in my interviews of

21   Mr. Wilson's desire to do this.

22   Q    And how about in your -- you interviewed Mr. Wilson

23   yourself, correct?

24   A    Yes.

25   Q    And just in general, did he present a picture of someone

Olley - Direct/Burt

1  who is trying to establish himself as mentally retarded or

2  intellectual disabled?

3  A    No, not at all.  In my opinion -- and this is what I said

4  a moment ago, that the bias that you referred to could go

5  either way.  And the logical, from our point of view, as

6  people of presumably greater intelligence, we would say that,

7  of course, a person would have want to present himself as

8  impaired in order to avoid the death penalty.  And that was

9  certainly argued in the minority opinion of Atkins, and it's

10  certainly quite logical that one would do that.  The cloak of

11  competence is a reminder that the desire to look like a normal

12  person is a very, very strong one, even in the face of the

13  death penalty.

14         And my impression when talking to Mr. Wilson is when

15  I said, now, I want you to tell me the truth and I want you to

16  do your best on anything they ask you, he took that literally,

17  and he was compliant with that.  He was not, in my opinion,

18  faking in any way.  And I believe that in Dr. Denney's

19  evaluation, he administered some instruments which were

20  intended to identify faking or malingering.  And by that

21  standard, he did not appear to be faking bad either.

22  Q    How does the cloak of competency -- cloak of competence

23  concept apply to family members, if it does?

24  A    I believe that it does because, you know, in talking to

25  family members, again, I always have a bit of an introductory

Olley - Direct/Burt

1   discussion about the importance of accurate information and

2   that the -- that what is sought is the truthful information as

3   they remember it.  And I have not -- there's only one instance

4   in which I can recall a person faking bad, and that was in

5   that one case that I testified for the prosecution in Ohio.

6   In other instances, I find family members, they're proud of

7   their family.  They don't want to embarrass their family.

8   They certainly don't want the newspapers to say this person

9   has mental retardation.  So I think they tend to answer

10  honestly.

11  Q    Next slide.  Does the manual recognize that there is a

12  tendency on the part of family members to -- not to establish

13  but rather to attempt to avoid the diagnosis of intellectual

14  disability because of the stigma attached to it?

15  A    Yes.  That is the -- both of those statements there

16  address that point.

17  Q    In this case, did you get any sense that the family

18  members and friends of Mr. Wilson were attempting to over

19  paint a picture of him being disabled for the purpose of

20  convincing you that he was intellectually disabled?

21  A    No, they did not.

22  Q    Was it just the opposite tendency?  How would you

23  characterize it?

24  A    I think it was an honest tendency.  I think that the

25  family members, of course, were not all the same.  And they

Olley - Direct/Burt

1    remembered people -- they remembered Mr. Wilson at different

2    times and under different circumstances.  So some of them

3    honestly pointed out how they just didn't remember or they

4    hadn't spent enough time with Mr. Wilson or, for whatever

5    reason, they couldn't render a judgment, and they basically

6    said, no, I saw him playing, he was a child, and I didn't see

7    anything unusual about that.  And then in other instances,

8    they gave specific examples which I noted in my report of

9    areas of deficit.

10   Q    Would you go to slide 23, which is right there.

11           In this case yesterday and I'm sure today, there's

12   going to be a lot of questioning about Mr. Wilson's verbal

13   behavior, possibly his criminal behavior.  What is the

14   relevance of that to your opinions in this case?

15   A    I have tried to conduct evaluations and come to an

16   opinion with the AAIDD standards in mind.  And therefore, this

17   standard to not consider past criminal behavior or verbal

18   behavior is one that I used in my decision making.

19   Q    Now, in this case, you -- have you been informed that

20   there are approximately 7,000 pages of E-mails that involve

21   Mr. Wilson corresponding with other people while he was

22   incarcerated?

23   A    Yes, I have.

24   Q    And have you also been informed that there is a DVD of

25   recorded telephone calls that involve Mr. Wilson's

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    communications while he's -- since he's been arrested?

2    A    Yes, I'm aware of that.

3    Q    Have you reviewed or placed any weight on that material

4    at all?

5    A    I've reviewed some of the E-mails because they were made

6    available to me.  But I do not place weight on either of those

7    sources because they are not in keeping with this standard for

8    what is valid sources of information assessing adaptive

9    functioning.

10   Q    Okay.

11            In the area of intellectual functioning, that prong,

12   there is a concept in the next slide, 24, about dual

13   diagnosis.  Are you familiar with that concept?

14   A    Yes.

15   Q    And that's set forth here.  There is no exclusion

16   criteria.  Make the diagnosis regardless of and in addition to

17   the presence of another disorder?

18   A    Yes.  And that is important because it is a common

19   dispute in Atkins cases as to whether the diagnosis of some

20   other condition would be incompatible with the diagnosis of

21   intellectual disability, and the standard clearly makes the

22   point that a person can have an intellectual disability and

23   have any other disability that is in the DSM at the same time.

24   Q    Let me give you an example.  And this can affect your

25   evaluation of adaptive behavior, correct?

Olley - Direct/Burt

1        Bad question.  Let me rephrase it.

2        Say someone has two disorders, intellectual

3   disability and antisocial personality disorder.  You're

4   familiar with those two disorders, right?

5   A    Yes.

6   Q    Okay.

7        A symptom of both disorders is misbehavior, can be,

8   correct?  Failure to follow rules --

9   A    Okay.

10  Q    -- of society?

11  A    Yes.

12  Q    That is associated with the intellectual disability?

13  A    Yes.  In that it is one of the criteria for impairment

14  under the area of social behavior.

15  Q    Okay.  And it could also be a symptom of another

16  disorder, antisocial personality disorder, conduct disorder

17  and things like learning disabilities, correct?

18  A    There are overlaps, yes.

19  Q    Okay.

20       So what you do -- when you're assessing adaptive

21  behavior and you see failure to follow rules, can you say,

22  well, that failure to follow rules can be attributed to a

23  conduct disorder or some other disorder and, therefore, we

24  don't count it as part of adaptive deficits?

25  A    No, it doesn't work that way this.  There's no need to

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1  attribute anything.  An intellectual disability is simply a

2  category.  And we look at impaired functioning in the

3  designated areas.  And if that impaired functioning is

4  present, then we can say this individual falls into this

5  category.  But as it is with, you know, any aspect of the

6  diagnosis, you don't have to have a cause for it.  And to say

7  that it's caused by this diagnosis rather than intellectual

8  disability, they are not incompatible.

9  Q    Okay.  Next slide.  Is it recognized that your adaptive

10  functioning can be influenced by a lot of factors, personality

11  factors, motivation factors?

12  A    Yes.

13  Q    Next slide, 26.  Is there some recognition that one's

14  culture can influence one's behavior?

15  A    Yes.  With some caution that I believe is noted there.

16  Certainly, evaluations are done for many purposes, and a more

17  common purpose of an evaluation is to be able to design

18  appropriate services for that person.  And appropriate

19  services, of course, should happen in a cultural context

20  that's appropriate for that individual.  Another purpose and

21  the one that is appropriate to Atkins cases and which is noted

22  in the AAIDD manual is diagnosis, which is more of a

23  black-and-white does he meet the criteria or does he not.  And

24  in that case, as this comment indicates, it's important to not

25  be looking at cultural factors as if they somehow would wipe

Olley - Direct/Burt

1    out the significance of impaired functioning.

2    Q    Let me ask you a hypothetical.  Say someone comes from a

3    particular culture.  We'll use the African-American cultural

4    context just as an example.  And you interview people and they

5    say, well, this individual's behavior is not abnormal within

6    our culture.  Maybe according to the guidance of another

7    culture, but within our culture, it is not abnormal.  How do

8    you judge that situation when you are assessing adaptive

9    behavior?  Is that an example of you must consider the

10   cultural context?

11   A    When you use the term "abnormal," I think that might take

12   us into a slightly different direction than what we intend.

13   Abnormal implies a psychiatric disorder.  What we're looking

14   for is a deficit in performance.

15   Q    Right.

16   A    And as I noted at the very beginning of this discussion,

17   the standard in the norm-based evaluation is everyone in the

18   United States who is of similar age to that person.  So in

19   that case, we would be taking into consideration how the

20   person functions relative to others in the United States, not

21   relative to any other people of a particular culture or -- you

22   know, some people have made comparisons to other inmates and

23   said, well, he's not impaired relative to inmates on his cell

24   block.  Well, that's an extremely small norm base to make any

25   comparisons to.  The appropriate base is the individuals in

Olley - Direct/Burt

1    the United States of the same age.

2    Q    And in the people that you interviewed in this case, was

3    the general -- was anybody giving you the message that, well,

4    Mr. Wilson's behavior is normal behavior within our culture?

5    A    I never heard that stated.

6    Q    Was it, in fact, just the opposite, that even within our

7    culture, we recognize that he had limitations?

8    A    Yes.  And that -- of course, that's the framework that a

9    family member would have.  They don't know all of the

10   children, all the 10-year-olds in the United States.  They

11   know the other children that they know in their family or when

12   my other child was 10 years old.  And that's their framework.

13   So when they say he was slower to acquire certain skills, I

14   take that to mean that relative to other children I have

15   known, he was slower, and presumably that means other children

16   that I have known within my culture.

17   Q    I take it the purpose of this language in the manual is

18   to avoid a situation where somebody is saying, well, the

19   deficits he had are because he comes from a ghetto or because

20   he's an African-American kid, the standards are different?

21   You're not supposed to -- is that a correct --

22   A    Well, yes.  And the danger is that it would overshadow or

23   minimize an actual disability.  In other words, if the purpose

24   of our evaluation is to get appropriate services for the

25   person, then we would fail to identify that person as someone

Olley - Direct/Burt

1    in need of services, which would not be doing justice to that

2    individual.

3    Q    Now, have you been involved in Atkins cases, or read

4    about them, where experts are saying, well, we'll giving a

5    correction in his score on the adaptive behavior scale because

6    of his race or culture?

7    A    Yes.

8    Q    Is that, slide 27, an appropriate thing to do?

9    A    It is not.  And in the particular case that comes to mind

10   when you mention that, the judge strongly spoke against the

11   expert who advocated doing that, and that particular expert

12   later was reprimanded by his state psychology board for

13   engaging in such practice and was prohibited from using such

14   practices in the future.  So I think it's a well-established

15   standard that you don't get some kind of extra points for

16   being from a minority culture.

17   Q    And did this issue come up in the Davis case?  This is

18   the next slide?

19   A    Yes.  It was put forth by Dr. Antell, who was the expert

20   for the government in the case.

21   Q    And basically what was the response?

22   A    The response of the court is on the next slide.  That

23   it's simply incorrect, that the DSM states that the diagnostic

24   criteria do not include an exclusion criteria.

25   Q    Now, Doctor, in this case, you reviewed what's called the

Olley - Direct/Burt

1   GOV binders, the 10,500 pages of social history records?

2   A    I cannot promise that I read every word of those 10,500

3   pages, but yes, I reviewed them.

4   Q    It was made available?

5   A    It was made available.  That's a better phrase.

6   Q    And did you use your judgment in terms of what you

7   focused on and what you considered important?

8   A    Yes.

9   Q    Are there some standards in the profession for what are

10  the sources you should be relying on?

11  A    Yes, indeed.

12  Q    And slide 30.  Is there a hierarchy in terms of what is

13  considered the most reliable and the things you'd like to look

14  at in order to make assessments and which you used in this

15  case?

16  A    The hierarchy that are on these slides is the Gregg Olley

17  hierarchy.  And I need to recognize that, but numbering these

18  is a matter of my making my point, although I think it's well

19  supported.  But I don't mean to imply that these numbers would

20  not be something that would be debated by others.  It's merely

21  a convenience to go through these, and I'll try not to dwell

22  upon them.

23        But the standard as we discussed earlier in adaptive

24  functioning assessment is to gather information from many,

25  many sources.  But not all sources are equally valid.  So when

Olley - Direct/Burt

1    all of this information is available, it's important to be

2    able to exercise clinical judgment to conclude what is valid

3    and what is not.  So I mention all of these because they will

4    probably -- many of them will come out in our discussions

5    today, and I'd like to put forth what I believe are the best

6    standards.

7    Q    Best sources and what weight you put on those sources?

8    A    Yes, sir.

9    Q    Now, in some cases that you've worked on, is the

10   documentation better than in others?

11   A    Oh, yes.

12   Q    And in this case, how would you characterize the extent

13   of documentation of Mr. Wilson's deficits prior to the age of

14   18?

15   A    I think that they are extensive from several sources,

16   which makes me more confident in rendering a decision about

17   them.

18   Q    All right.  And let's look at the sources.  First of all,

19   school records.  Did you have available school records?  And

20   what was the importance of those in terms of how much weight

21   you placed on them?

22   A    Yes.  And immediately above that on the slide, it

23   indicates that archival information may be seen as more

24   objective.  And the reason for mentioning that is that

25   archival information, such as school records, were gathered at

1   an earlier time, certainly prior to the time of the crime,

2   that the person who entered these records presumably had no

3   bias, and it was done as reasonably objectively as possible.

4   So when we look at records from childhood, they tend to be

5   important.  So as you mentioned, there are school records.

6           And the reason it says in parenthesis "may require

7   interpretation from a local school official" is that I have

8   read and I'm sure many of you have read, many, many school

9   records, and they are very different.  The nomenclature that's

10  used in one school system or even one school or one teacher

11  can be different.  So it's useful to be able to interpret

12  those to say, for example, if this person is in a special

13  education class and gets a B on his report card, is that the

14  same standard as a B if he were not in a special education

15  class.  So there are many of those qualifications that are

16  necessary.

17          But the things that are further bulleted there are

18  things that are available in this case.  Achievement testing.

19  His grades in school.  The IEP for special education is useful

20  because it lists the goals and objectives, which is to say

21  these are the things that the person is now working on.  So

22  that's a good objective standard for school achievement.

23  Teacher comments can be helpful and sometimes misleading, I

24  suppose.  Whether he was engaged in extracurricular

25  activities, which is not very present in Mr. Wilson's case.

Olley - Direct/Burt

1  But all of these are worthy of taking a look at.

2  Q    And of these sources, what did you have available in this

3  case?  What did you learn from them that was helpful to your

4  analysis?

5  A    I think in general -- and this is actually stated, I

6  believe, in Dr. Denney's and Dr. Mapou's report as well, so I

7  think it's an area of not disagreement.  And that is that

8  Mr. Wilson started out in kindergarten below others of his age

9  academically and that over the course of time, throughout the

10  developmental period, he became further behind relative to the

11  performance of his peers.  And that's supported by all of

12  these -- with the exception of extracurricular activities, I

13  think that that conclusion is supported by all of these

14  sources.

15  Q    And do the records document that he was placed in special

16  education at a certain age and kept there for a period of

17  time?

18  A    I believe that he was referred for special education in

19  first grade, which is unusual in my experience, and stayed in

20  special education throughout his school history.

21  Q    Now, in assessing the significance of those placements,

22  do you place a lot of weight in whether the person was

23  actually determined to be intellectually disabled within the

24  school system?

25  A    You mean if they were classified that way as opposed to

Case 1:04-cr-01016-NGG   Document 1530   Filed 02/09/16   Page 71 of 363 PageID #: 16504

1    classified another way?

2    Q    Right.  In other words, say you have somebody who's in

3    special education and they were not classified as

4    intellectually disabled.  In terms of your assessment of

5    adaptive behavior, does that make a difference?

6    A    I think I would want to have more information.  Bearing

7    in mind that the school evaluation is different from the

8    evaluation that is being discussed here today.  The purpose of

9    the school evaluation is to put the person, the student in the

10   most individually appropriate curriculum.  And, you know, in

11   my view, there is considerable influence about what -- what

12   curriculum the person -- or what label the curriculum would

13   have that may be quite independent of the person's

14   functioning.  And if I may elaborate on that.

15   Q    Sure.

16   A    I think that the concise story, which in Mr. Wilson --

17   Dr. Shapiro may have made reference to yesterday, so I'll try

18   to be concise.  But since perhaps the early '70s, the number

19   and proportion of students who were in classes for what used

20   to be called educable mentally handicapped, which is roughly

21   equivalent to mild intellectual disability, that number has

22   gone down.  At the same time, the number of and proportion of

23   students classified as learning disabled has gone up.  There

24   have been considerable pressures -- and I'm not just talking

25   about New York, I'm talking about the United States -- to not

Olley - Direct/Burt

1    categorize children from minority backgrounds as having mental

2    retardation.  A mental retardation label, as we discussed

3    earlier, is widely regarded as a pejorative term.  So I think

4    that it's well documented that many school systems find that

5    they can fulfill the requirements of the federal law and

6    provide an individualized education but use the term "learning

7    disability," which is a far less pejorative term than mental

8    retardation.

9         Now, this is not something that I made up.  There's

10   substantial research to this effect.  And to the extent that

11   that may have influenced the placement for Mr. Wilson, it's

12   important to be aware of.

13   Q    Okay.

14        Was there achievement testing records in this case

15   in terms of his academic achievement?

16   A    Yes.

17   Q    And what picture came out of that for you?

18   A    That Mr. Wilson was impaired in all areas of his academic

19   functioning.  Now, in some areas more than others.  Clearly,

20   his reading has been focused upon a great deal.  But if you go

21   through his educational records, whether it's report cards or

22   achievement testing, you are hard pressed to find an area in

23   which he's not impaired to some degree.  So this is a more

24   characteristic picture of a person with a mild intellectual

25   disability.  And that's why I think it's important to focus on

Olley - Direct/Burt

1    it.

2    Q    And in terms of the numbers of areas he's impaired in,

3    how does his profile differ from someone with, say, a learning

4    disability?

5    A    I have several thoughts on that.  One comes back to what

6    we were discussing about the purpose of doing an evaluation.

7    What's noted in the AAIDD manual and in all textbooks is the

8    first thing is to identify what the question is.  So for me

9    the question was:  Does Mr. Wilson have a significant

10   impairment in adaptive functioning?  That means I did not do

11   evaluations nor focus on the various other problems or

12   categories of problems that he might experience.

13        I do not consider myself an expert on learning

14   disabilities.  In the last 50 years, the classification

15   criteria for mental retardation, this three-part definition

16   that we're familiar with, has changed very little.  Fifty

17   years ago, there was no concept of learning disabled or maybe

18   it was called minimal brain dysfunction or one of the various

19   other labels.  And over the years, there have been many

20   changes in how experts view a learning disability.

21        I believe Dr. Mapou's report made reference to the

22   standards in the DSM and how he was using different standards.

23   Well, the standards changed.  To me, it's a slippery concept,

24   and I don't purport to be the person to say this is a learning

25   disability.  My task was to identify deficits in adaptive

1    functioning.

2    Q    And your opinion, just looking at the achievement testing

3    and the other school records, was impairments across the

4    board?

5    A    Yes, sir.

6    Q    Okay.

7              He also had IEP records --

8    A    Yes.

9    Q    -- in his files?

10   A    Yes.

11   Q    And are those records typically ones where goals are set?

12   A    Yes.

13   Q    And how do you read those records in terms of whether

14   Mr. Wilson was surpassing -- meeting or surpassing the goals

15   set for him, even within special education?

16   A    Again, I think that they are useful.  Some of the IEP

17   goals are not written very properly.  In other words, they're

18   too general.  They say things like will improve in this or

19   will improve in that.  The better goal is a more specific one

20   identifying the area that is targeted and then, within that

21   area, specific measurable objectives.

22              So to answer your question, those goals and

23   objectives in Mr. Wilson's IEP indicated to me that he was

24   substantially below the expected performance for a person of

25   his age and that, as mentioned earlier, the gap between his

Olley - Direct/Burt

1    performance and that of others of his age simply widened over

2    time.

3    Q    All right.

4         Now, moving on to the next slide in your hierarchy

5    of records, you say work records or Social Security records

6    are important to you, correct?

7    A    Yes.  I mentioned earlier that I think it's valuable to

8    look at work because it reveals a lot about the individual's

9    capabilities.  In the case of Mr. Wilson, his work records, I

10   don't believe there are any formal work records.  I believe

11   the temp agency that he worked for briefly is out of business,

12   or at least that was my understanding, that no records could

13   be found.  His Social Security records indicate a total

14   earnings of $38 and some change.  So it's really very --

15   Q    That's for his entire life?

16   A    Yes.  So his work -- aside from work that was sort of

17   planned for him as part of an education program, he did not

18   have, as I mentioned earlier, all of the skills that lead up

19   to working, the work search skills, finding a job.  Gosh, he

20   had several people diligently helping him.  I mean, he went to

21   live with his cousin Vanessa when he was 16 or 17 years old.

22   She took him to look for jobs and fill out job applications.

23   Her, and I think then fiance did the same.  His mother,

24   Cheryl, did the same.  His girlfriend Monica did the same.  I

25   think that there were others.  His sister Depetra did the

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    same.  Each time helping him fill out job applications, and

2    each time he struggled to understand the things that were

3    written and to understand his responsibilities in getting a

4    job.  The job history that he does have was manual labor of

5    cleaning up one of the areas that was destroyed in the 9/11

6    disaster.  I believe that he worked there for three days.  And

7    the way that he portrayed it and the way that Ms. Cook

8    portrayed it was that the temp agency didn't call him back

9    after the third day.

10          He reported having another job, I believe from the

11   same temp agency, although it doesn't show in his Social

12   Security records, in which he worked loading and unloading a

13   truck on a loading dock for one day and was not called back to

14   do that anymore.

15          So that's an extraordinarily thin formal work

16   experience.

17   Q    I think the question was asked yesterday, well, since he

18   hasn't worked how do we know he has a deficit in work skills?

19   A    A deficit is behavior.  It's not potential.  It's what he

20   has done, and he has not -- he's resisted seeking a job, as

21   reported by his relatives who helped him because he found it

22   embarrassing.  The whole process of trying to get a GED and

23   leading to a job, this had been quite a record of this being

24   difficult for him.

25   Q    Is part of job skills getting paid, knowing how to cash a

Olley - Direct/Burt

1    check, put the money in the bank, things of that sort?

2    A    Yes.  Certainly related skills, yes.

3    Q    Did you have some information about that in Mr. Wilson's

4    case?

5    A    Yes.  It was differing from what Mr. Wilson told me and

6    Ms. Cook told me.  But I think Ms. Cook is a good reporter.

7    Mr. Wilson stated to me that he was upset because his check

8    was only for $19 after doing all this work and there was stuff

9    taken out of it that he didn't understand.  And then Monica

10   took him to a check cashing place, and they wanted to charge

11   him something like a $15 fee to cash the $19 check.  So he

12   refused, and they went home and hung it up on the wall as a

13   reminder of his first check.

14        When I asked Ms. Cook about the same experience, she

15   gave an entirely different story, in which he earned well over

16   $100, that the check-cashing place only charged 2 or $3 to

17   cash the check.  They did cash the check.  They didn't hang it

18   on the wall.  He had to be shown how to endorse the check

19   because he didn't know how to do that.

20        So, you know, in answer to your question, there were

21   a lot of things associated with work that Mr. Wilson

22   demonstrated that he did not have that skill.

23   Q    All right.  Now, the third thing you've got listed here

24   are records in the way of earlier adaptive behavior

25   assessments.  Did you have those records in this case?

Olley - Direct/Burt

1    A    Well, what's striking in this case is that I don't

2    believe there was -- at least in the records that I have had

3    available to me, I don't believe that there has been a

4    thorough assessment of adaptive behavior carried out

5    previously.  There are some checklists and self-report and so

6    on in some of the programs that he attended.  That certainly

7    would not qualify as a thorough or systematic or norm-based

8    adaptive behavior assessment.  So part of the importance of

9    doing one in this case is that that information had never been

10   systematically gathered in the past.

11   Q    Is that part of the standard of your practice in Atkins

12   cases to do both the intellectual functioning and the adaptive

13   behavior assessments?

14   A    Yes.  It's part of the definition of intellectual

15   disability.

16   Q    Were part of the records you reviewed Dr. Drob's records,

17   the psychologist who was retained by the original trial team?

18   A    Yes.  Although that focus was on intellectual assessment,

19   as I recall.

20   Q    Well, that's my question.  Was there anything in his

21   records indicating that he did or directed or had someone else

22   do an adaptive behavior assessment?

23   A    Not that I recall.

24   Q    Okay.  The next group of documents -- and this is again

25   you're listing the order in which you think most reliable to

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1   less reliable, correct?

2   A    Yes.  Subjectively.

3   Q    Interviews with family, friends, neighbors, teachers,

4   et cetera.  You did that in this case?

5   A    Yes.  And that is indicated in the AAIDD manual, that

6   that's a supplementary source of information in addition to

7   using the adaptive behavior scale.

8   Q    Is there some attention paid to the number of people

9   you're interviewing and whether the information you're

10  receiving from various sources is consistent in terms of its

11  reliability?

12  A    Yes.  And to the extent that more people are available,

13  it is beneficial to talk to them, which is not to say that the

14  information that they provide is necessarily valid

15  information.  But if there are people who know the person well

16  and are reasonably available to talk to, then talking to more

17  people and, as you said, looking for some pattern of

18  consistency is a good practice.

19  Q    Below the interview -- interviews of family and other

20  people, you have on the next slide, 33 -- go back one, I'm

21  sorry -- 32, administering the instruments retrospectively.

22  A    Yes.

23  Q    Okay.

24       And the type of instruments we're talking about are

25  the three listed here?

Olley - Direct/Burt

1    A    Yes.   I listed them because they are the most commonly

2    used current instruments.   The third one, the scales of

3    independent behavior revised is probably the least frequently

4    used.   Its norms are getting a bit out of date.   But it is one

5    that I have used in the past.   The other two are widely used.

6    The AAIDD standard or manual indicates that an adaptive

7    behavior scale that addresses the three areas of conceptual,

8    social and practical skills should be used.   And to my

9    knowledge, the adaptive behavior assessment system is the only

10   one that does that.   So that has been -- for that and other

11   reasons, has been my referred instrument.

12   Q    When you talk about them doing retrospectively, you used

13   them and Dr. -- is it true that both you and Dr. Denney used

14   them in the sense that it's now 2012, and you're asking

15   someone to think back to when they knew Mr. Wilson back in his

16   developmental period, correct?

17   A    Yes.

18   Q    And you're picking out a specific -- as I understood your

19   testimony before, you're asking them to remember him at a

20   specific age as opposed to a period?

21   A    Yes.   And that is because, with all due appropriate

22   cautions to the use of these instruments retrospectively, in

23   order to take advantage of the norms that are associated with

24   the test, one has to identify the age that you're talking

25   about, because that's how the test is normed.   So just, for

Olley - Direct/Burt

1   example, saying that this is how he functioned when he was 10

2   years old enables you to look at the norms for other

3   10-year-olds and to make a decision about how he functions

4   relative to all the 10-year-olds in the United States.  So if

5   we were to just talk generally about how did he do when he was

6   growing up, that would be useful, but it would not allow us to

7   use the norms.

8   Q    So I guess one question I have is:  If you have

9   contemporary -- contemporary school records, say, showing how

10  he did at age six -- right?

11  A    Yes.

12  Q    -- and those records were made by people at the time

13  they're observing him, what is the usefulness of asking

14  somebody in 2012 to think back on how Mr. Wilson was at age

15  six and remember and tell me on these scales what you remember

16  him at age six to be in terms of what weight you're going to

17  give to the score on the test versus the contemporaneous

18  records?

19  A    The adaptive behavior scale, any of these three that are

20  listed here, for example, cover a lot of topics, corresponding

21  to, you know, the standards of our profession.  Some of those

22  topics can be verified by other sources.  As you mentioned,

23  school records.  Many of them cannot.  So if we want to get a

24  broad picture of whether there is significant impairment,

25  significant enough to say that the individual has a

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

510

Olley - Direct/Burt

1   significant impairment in adaptive functioning generally, then

2   we want to use an instrument that is broad enough, systematic

3   enough and has norms that would generate a number, with a

4   great deal of caution.  Cautions, part of which you implied in

5   talking about asking someone to use their memory in the case

6   of Mr. Wilson for events that occurred more than 10 years ago.

7   So part of the process for assuring that you have as valid

8   information as possible is assuring that you have a respondent

9   who is able to answer these things.

10           I think the next slide refers to that.

11  Q    Next slide.  So this is a standard you're using to

12  determine whether somebody has enough knowledge to be able to

13  actually give you information on these scales or tests?

14  A    Yes.  And this, as you can see, comes directly from the

15  AAIDD.  In addition, as you mentioned earlier, the manuals for

16  the scales are pretty specific about identifying people who

17  have the experience and the knowledge and the memory to be

18  able to answer these scales accurately.

19           And also in my report, I have a fairly lengthy quote

20  about what those standards are for choosing someone.  As we

21  mentioned earlier, of the 13 people I interviewed, I

22  administered the ABAS to four people, and I judged that they

23  would meet those criteria.

24           THE WITNESS:  Are we getting a nod from the judge

25  that we should do something?

Olley - Direct/Burt

1          THE COURT:  Well, I'm indicating by sign language

2   that we should take a ten-minute break.  Let's take a break.

3          MS. BRADY:  Your Honor, Mr. Wilson had only an apple

4   this morning.

5          THE COURT:  Yeah, I'm going to get the marshals to

6   permit you to get something for Mr. Wilson to have.  Once

7   they've looked at it and it's acceptable, you can hand it to

8   him.  Thank you.

9          (Whereupon, a break was taken at 11:21 a.m.)

10          (Time noted: 11:50 a.m.)

11          THE COURT:  The witness should retake the stand,

12   please.

13          Are we all set for Mr. Wilson's food?

14          MR. BURT:  Yes.  Thank you.

15          THE COURT:  Please be seated, everyone.

16          A couple of things before we return to the direct

17   examination.

18          First of all, any lay witnesses that anybody has

19   can't be in the courtroom until they're testifying.  You

20   understand that?

21          MR. BURT:  Yes.

22          THE COURT:  Since I don't know who the lay witnesses

23   are, you'll have to keep an eye on things.

24          MR. BURT:  Yes.

25          THE COURT:  Second, I've been thinking about the way

Olley - Direct/Burt

1    we're handling direct examination.  And the Court's already

2    reviewed all of the expert reports.  So I would prefer if the

3    only direct examination you engage in, after this witness, is

4    to -- if you need to examine the witness to supplement what

5    has been placed in the expert report or to clarify something

6    based on the testimony of another witness or to comment on

7    another witness's later comments or conclusions that would

8    inform the Court in connection with the testifying witness's

9    expert report.  That way, we won't -- we really don't need to

10   restate everything in the expert reports here in court, and

11   you have an opportunity to update on direct examination.  And

12   then we go into cross, and then we go into redirect.  And I

13   think that will speed things along.  And also, it will just --

14   I think it will flow better.  So that's the way I'd like to

15   handle it from this point forward.

16            Do you have any problem with that?

17            MR. BURT:  When the Court says from this point

18   forward, you mean excluding this witness?

19            THE COURT:  Excluding this witness.  I'm not going

20   to have you change your plan in the middle of a witness.  I'm

21   just saying for future witnesses.  And you have two more

22   experts, right?

23            MR. BURT:  Yes.

24            THE COURT:  And you have several experts?

25            MR. McGOVERN:  We have three experts, Your Honor,

Olley - Direct/Burt

1    and whether we call them all, I don't know.

2              THE COURT:  Well, that's up to you.

3              MR. McGOVERN:  Thank you.

4              THE COURT:  But if they've made submissions, which

5    they have, those submissions are being taken and are being

6    considered, and we don't need to hear from them about what

7    they said in their submissions unless there's something more

8    that needs to be added based on circumstances since they wrote

9    their submissions.

10             MR. McGOVERN:  Well, the only thing I would ask Your

11   Honor is with respect to some of the experts -- like for

12   instance off the top of my head, Dr. Patterson comes to mind

13   for us.  He did an hour-and-a-half interview with the

14   defendant in which he summarized the interview in his report,

15   but it's really his description of that interview as a witness

16   I believe would give the Court a sense of how it was that he

17   was able to, just in his interactions with the defendant, come

18   to an understanding that the defendant was not mentally

19   retarded.  That certainly would be supplementing the report.

20             THE COURT:  And that would go for the other side as

21   well, that if there's something that isn't delineated in

22   excruciating detail in the report that you think is important

23   for me to know, then you should by all means examine your

24   witness about that particular discrete issue --

25             MR. McGOVERN:  Thank you.

514

Olley - Direct/Burt

1          THE COURT:  -- or subject matter.  So I'm not

2   limiting you.  I'm not cutting you off, but I think redundancy

3   is not really that helpful.

4          MR. McGOVERN:  Agreed.

5          THE COURT:  Okay?

6          MR. BURT:  Sure.

7          THE COURT:  All right.  Are we ready?

8          MR. McGOVERN:  Yes.

9          THE COURT:  We'll go till one, and then we'll take a

10  break.

11          I remind the witness that he is still under oath.

12  BY MR. BURT:

13  Q    Dr. Olley, in terms of this issue that we were discussing

14  before we broke, the use of assessing whether you've got

15  knowledgeable informants, was there a difference between you

16  and Dr. Denney on this issue?

17  A    Yes.

18  Q    And could you characterize it for the Court and then

19  explain it?

20  A    Well, I think there are a couple of aspects, and they

21  concern me a lot.  And this is an awkward thing to say as

22  Dr. Denney has been in the courtroom throughout, but I have

23  great concerns with what I learned about Dr. Denney's use of

24  adaptive behavior scales.

25          First is with reference to this slide that's still

Olley - Direct/Burt

1    up here.  There are very clear criteria for who would be an

2    appropriate respondent.  As I mentioned, I administered the

3    adaptive behavior assessment system to four people, and think

4    I got, you know, some consistency, some differences.  But I

5    think they were valuable people.  Dr. Denney interviewed about

6    the same number of people and administered the adaptive

7    behavior scale to almost all of them.  And I would contend

8    that most of these people were not in a position to provide

9    valid information on an adaptive behavior scale, and that

10   should have been readily apparent to him.  And that if he did

11   administer them, that he would have noted in his report that

12   this was a mistake and that this person was not a valid

13   reporter.

14           Second, you asked earlier about my returning to

15   reinterview some of these individuals, and they were -- part

16   of my concern was that there were such discrepancies between

17   the things that appeared on the adaptive behavior scale that I

18   administered and that Dr. Denney had administered.  And in

19   talking to these folks, I wanted to get a sense of that.  I

20   wanted to be very careful not to bias them in what I was

21   looking for.  And so I tried to ask general questions, such as

22   do you recall that you met with Dr. Denney, and they said that

23   they did.  And so I just said something general like, well,

24   how did it go with Dr. Denney?  And I received an alarming

25   array of statements independently from each of these folks

Olley - Direct/Burt

1    indicating how uncomfortable they were with Dr. Denney and how

2    he pushed them to give answers that would push the score

3    upward.

4         Now, I say this with great caution.  I've never said

5    this before.  I've never encountered this before, and I do not

6    like making such a serious accusation to a colleague.  But it

7    was very disturbing to me.  I took notes.  I've shared my

8    notes with Mr. McGovern, so I'm sure he's well aware of what

9    I'm talking about.

10        This was -- this appeared in everyone that I spoke

11   to, I guess, with the exception of Corey Barnes, who neither

12   of us administered an adaptive behavior scale to, and he was

13   clear that he did not have enough exposure to Mr. Wilson to do

14   that.  But other people, such as Mr. Wilson's aunt, Pat Hogan,

15   she gave very high scores.  She didn't say that she was

16   coerced in any way, but she did say that it was over the

17   phone, which is not a common accepted way to administer it.

18   She said, oh, I just moved, and I was taking a lot of

19   medication, and I think I just answered however was easiest.

20   Those should be red flags to Dr. Denney --

21        MR. McGOVERN:  Your Honor, I'm going to object to

22   this testimony and move to strike some of the answers because

23   some of these folks that Dr. Olley is referencing were only

24   really made available to the government via the phone.  So the

25   fact that Dr. Denney was limited in his ability to speak to

517

Olley - Direct/Burt

1    these folks was in large part because of the representations

2    from the defense team that these folks were unwilling to

3    travel and that they would only be able to deal with

4    Dr. Denney over the phone.  So I understand and I think it's

5    relevant that the doctor here is saying that somehow these

6    interviews were deficient, but it's an unfair characterization

7    of Dr. Denney's conduct to say that somehow he did less than

8    the best efforts here because the defense really kind of stood

9    in the way of us getting to these folks or making them

10   available to us.

11          MR. BURT:  Your Honor, I think --

12          THE COURT:  I think it's outside the scope of this

13   person's expertise to comment on hearsay.  This is not -- I'm

14   not going to take hearsay from the witness.  He should talk

15   about -- you can have him talk about his conclusions and his

16   report and his examinations.  But, you know, if you want to

17   bring in these folks as witnesses to talk about how they were

18   treated by somebody, to inform the Court about the value of

19   some other witness's report, well, you can do that.  Go get a

20   subpoena.  I'm striking the last answer.

21          Next.

22          MR. BURT:  Okay.

23   BY MR. BURT:

24   Q    Dr. Olley, the next slide lists some -- again, some other

25   records that you relied on in this case, correct?

518

Olley - Direct/Burt

1    A    Yes.

2    Q    And records of therapeutic programs, what programs did

3    you have available on that issue in this case?

4    A    I mentioned briefly earlier that there is a value to

5    therapeutic programs, such as the time that Mr. Wilson spent

6    at Elmhurst and Brookwood, which are somewhat different

7    programs, but both have a therapeutic aspect to them.  They

8    provided an educational program and they identified the areas

9    of deficiency and they identified the areas in which new goals

10   and targeted instructional periods for Mr. Wilson.

11   Q    All right.

12        And what did you learn from those records that was

13   important to your evaluation?

14   A    Well, there are many individual statements and anecdotes.

15   They identified the problem behavior of Mr. Wilson, which is

16   also documented well in Dr. Denney's report.  What they also

17   told me that I think was more informative was not simply that

18   he engaged in behavior that was inappropriate in school or in

19   therapeutic programs, but what is the standard now for

20   assessment and treatment of such problem behavior is what's

21   referred to as a functional behavior analysis, which is to

22   say, what is the function of this behavior.  So rather than

23   simply to say, you know, he engaged in this and some

24   implication that he's a bad boy, look at the underlying

25   antecedents that lead to problem behavior.  And these are

Olley - Direct/Burt

1    better dealt in these therapeutic programs, which is much to

2    their credit.  But it helps to identify that from the earliest

3    time in school, Mr. Wilson ran into the academic demands of

4    school and the social demands of school, both of which he had

5    a terribly hard time dealing with.  And he dealt with them

6    both by what we would consider inappropriate acting out

7    behavior, but he readily got classified as a child with a

8    behavior disorder or severe emotional disturbance and was

9    placed in programs appropriate for such individuals.

10            Underlying that, however, was these significant

11   difficulties in coping with academic demands that were clearly

12   beyond his ability and social demands in which he encountered

13   other students who made fun of him or in some way or other

14   challenged him, and he did not have the social skills to be

15   able to -- you know, to deal with the taunting.

16            And plus, from the reports of, for example,

17   Dr. Giglio, who not only tested him but was his counselor and

18   therapist when he was at Brookwood, he just missed a lot of

19   the social cues.  And that's a very important aspect of

20   identifying significant impairment in the adaptive behavior

21   area of social.  A lot of social behavior is pretty subtle,

22   understanding was the person joking or not.  Was it really an

23   insult, all of this was he dissing me kind of conflict that

24   Dr. Giglio described.  So seeing that in a therapeutic program

25   he could do better in these things in the sense that the

Olley - Direct/Burt

1    therapists helped him to articulate what was the conflict,

2    what was it that you perceived in the social situation that

3    got you into a fight.

4           And he had -- Mr. Wilson had a great deal of

5    difficulty articulating these things.  Not only to Dr. Giglio,

6    but other therapists comment on his difficulty putting into

7    words what these things were all about.

8           So the therapeutic programs were providing useful

9    information about how if he were in a living and educational

10   setting that made reasonable academic and social demands on

11   him, that he was around people who were understanding and

12   supportive of him, that he could make progress.  But when he

13   returned to a standard public school setting and living in his

14   community, his behavior deteriorated quite a bit.

15   Q    And you made reference to Mr. Wilson being teased.  Was

16   that documented in the records?

17   A    Yes.

18   Q    And what was the nature of the teasing?  Did it have any

19   significance in terms of intellectual disability?

20   A    Yes.  The one that was mentioned most frequently by

21   family members was that his older brother, Isaiah, called him

22   a spesh, for special education, and retard and various

23   derogatory terms like that, which led to lots of fights with

24   his brother.  And the same flavor of derogatory comments about

25   his problems with his schoolwork, derogatory comments about

Case 1:04-cr-01016-NGG   Document 1530   Filed 02/09/16   Page 93 of 363 PageID #: 16526

1    his mother being a crack head, which got him into fights, you

2    know, these are, yes, as you indicated, documented.

3    Q    And does that information go to the social domain or is

4    it a conceptual issue or is it a practical issue?  Or is it

5    all of the above?

6    A    Well, I think it's an overlapping conceptual and social,

7    but there are conceptual aspects of social, in the sense that

8    you have to be able to make some inferences, and apparently,

9    Mr. Wilson was quite -- had quite a difficult time in

10   understanding accurately.  Even when he was 19 or 20 years old

11   and living with Ms. Cook.  She said, you have to explain

12   everything to him so carefully because he takes things the

13   wrong way.  You give him a compliment, and he gets upset

14   because he didn't understand that it was a compliment.  So I

15   suppose there is a conceptual aspect to this social problem.

16   Q    Now, the next thing you have listed in the hierarchy of

17   things to consider are medical records, correct?

18   A    Yes.

19   Q    What of significance did you have in the way of medical

20   records in this case?

21   A    Well, the importance of medical records, I expect that

22   Dr. Shapiro spoke to yesterday.  To the extent that medical

23   records indicate some illness or injury that might have

24   implications, I think the thing that's mentioned most

25   frequently in this context is the meningitis that he was

Olley - Direct/Burt

1    hospitalized for about 20 months of age.  Medical records also

2    contain other references to evaluations that were done.  Some

3    of them are just -- I thought, a very interesting one in his

4    Brookwood file was his physician said that he had been

5    vomiting for two weeks because he was drinking milk, to which

6    he was allergic.  And why didn't he just use common sense and

7    not drink milk?  Well, that was in the records of medical -- a

8    physician made that comment, but it spoke to Mr. Wilson's poor

9    judgment about maintaining his own health.  So medical

10   records, you know, sometimes are a lot of routine things that

11   don't bear on the issue of intellectual disability, but

12   they're certainly important to look at.

13   Q    All right.

14        Earlier criminal justice records you have listed

15   there.  Were there records here that you relied on; and if so,

16   what was the significance?

17   A    Yes.  Well, the significance to me was mostly in his

18   Brookwood records which were Department of Corrections

19   records.  That was more informative than, you know, the fact

20   that he had been arrested for various things in his youth.

21   And I think I made reference to some of the information about

22   the Brookwood records and the therapeutic program there.

23   Q    Interviews of the defendant?

24   A    I think most people would agree that it's important to

25   meet the defendant, get to know him and to interview him.  I

Olley - Direct/Burt

1    mentioned earlier some of the cautions associated interviewing

2    because characteristics of people of low intelligence to be

3    susceptible to leading questions and to answer questions in a

4    way that would want to please the examiner.  And there are a

5    lot cautions associated with that.  But I think it's useful to

6    get the defendant's perspective on a lot of things, on his

7    history, his family, his school, his relationships with other

8    people.  Even his relationships with his attorneys.  And

9    what's his perspective on how well he did in school and in

10   other aspects of growing up.  Now, they have that information.

11   It has to be taken in judgment of -- in context of other

12   information as to whether it's congruent.  But certainly you

13   wouldn't want to make a judgment about impairment in adaptive

14   functioning without at least meeting the client.

15   Q    Did you in this case administer an adaptive behavior test

16   to Mr. Wilson?

17   A    No, I did not.

18   Q    Did Dr. Denney?

19   A    Yes, he did.

20   Q    And why didn't you administer an adaptive behavior test

21   to Mr. Wilson?

22   A    I believe it's incredibly inappropriate to ask the

23   defendant to be able to report, especially using the adaptive

24   behavior scale.  I've spoken to Dr. Oakland, who is one of the

25   authors of the adaptive behavior assessment system, who agrees

1   that it's an inappropriate use of the test.  There is no one

2   in prison who is in the norm group for the test.  I think it's

3   going to result in exactly what it did for Dr. Denney, which

4   means spuriously high scores that are simply a reflection that

5   the defendant wants to present himself in a positive way.

6   Q    Does the manual contain a caution about that?

7   A    It does.

8   Q    And what does it say?

9   A    Well, it essentially says that such things should be -- I

10  don't think it's a strong enough caution.  But it says that

11  the use of such instruments should be done with extreme

12  caution.

13  Q    You, yourself don't think it should be done at all?

14  A    That's my view.

15  Q    Okay.  However, the last thing you have listed here,

16  tests of the defendant's performance, is that different than

17  using an adaptive behavior assessment?

18  A    Yes.  Although, it's Number 10 on my list, so it's

19  getting down low in the sense that adaptive behavior is about

20  behavior.  That is performance.  Now, there are not very many

21  things that you can test performance in in prison.  I did some

22  things that I don't place a great deal of weight on.  But

23  things such as being able to use a ruler to measure, which

24  Mr. Wilson was not able to do.  And that tells me, well, if

25  he's not able to do it now, he probably was not able to do it

Olley - Direct/Burt

1    early in his life.  And using a ruler is a very small issue in

2    the grand scheme of adaptive behavior.  But it was, I think,

3    worth trying.

4         He had some ability to use a telephone book, for

5    example.  He understood that the telephone book was in

6    alphabetical order, but he didn't use the categories very

7    effectively.  He had difficulty finding things on a map, for

8    example.  And these are tests of performance, but they're not

9    norm-based tests.  And again, they have to be used with a lot

10   of caution.  I wouldn't generalize greatly from them.

11   Q    Okay.

12        Did you administer any other test to Mr. Wilson when

13   you interviewed him?

14   A    I think the one that comes to mind is not a complete

15   test.  It's a subtest of the Stanford-Binet intelligence

16   scale, in fact, a much older version of it.  The subtest is no

17   longer used.  But I find it very useful in getting a feel for

18   the individual's understanding of orally expressed concepts.

19   It's called -- the subtest is called verbal absurdities.  I

20   mentioned it in my report, so I will not dwell on it here.

21   But it's basically a series of statements about things that

22   don't make any sense.  And then it is to ask the individual,

23   does it make sense?  If not, explain why it doesn't make

24   sense.  And there were things -- I think the very first thing

25   was -- I'm paraphrasing here -- something to the effect if the

526

Olley - Direct/Burt

1    man had the flu twice, the first time it killed him, but the

2    second time he got well quickly.  And Mr. Wilson didn't see

3    any problem with that and didn't see anything that needed

4    explaining.  It is an age scale, beginning with age eight.

5    And now these are old norms.  So again, taken with great

6    caution.

7              But he failed that subtest at the year eight level.

8    So he went on to pass some other things at higher levels.  But

9    in general, he had difficulty with orally expressed concepts

10   that are generally mastered by young children.  And since

11   conceptual adaptive behavior is one of the areas that we want

12   to look at, I thought it was informative that he was easily

13   confused by statements that most children are able to explain.

14   Q    And did you do anything else with him in the way of

15   performance testing?

16   A    Not that I can recall.  But if we go through my report,

17   I'm sure I'll spot something.

18   Q    Okay.

19             The verbal absurdities test is in the tab marked

20   "Olley Raw Data" in the exhibit there.

21   A    Would you like me to look at it?

22   Q    Yeah.  Just to make sure.

23   A    This is the --

24   Q    The big one, yes.  That's Exhibit F.  The Bates number, I

25   believe, is GOV 10717.

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1  A    I don't see it.  Okay.  Thank you.  Sorry for my delay.

2  Q    Is that the test you were referring to?

3  A    Yes, sir.

4  Q    Okay.

5        Now, one of the things that you don't have listed

6  here is reports of correctional officers, correct?

7  A    Yes.

8  Q    And can you give us 36.

9        Are those things that you rely on in doing your

10  assessment?

11  A    If it's available to talk to correction officers, I would

12  certainly do that.  I have inquired about it in this case; and

13  for whatever reason, they were not available.  In this case, I

14  did not.  Although, now we have moved to another slide that's

15  titled "More Questionable Sources of Adaptive Behavior

16  Information," and that's because these things are things that

17  generally are not listed in the AAIDD manual as valid sources

18  of valid information.

19        I -- for example, in Dr. Denney's report, he did, if

20  I remember correctly, interview a correction officer and

21  asked:  Would you be surprised to find that this man had

22  mental retardation?  Now, to me that's an inappropriate

23  question, because the correction officer is not in a position

24  to diagnosis mental retardation under any circumstances, but

25  particularly by observing him, the defendant, in the

Olley - Direct/Burt

1    restricted environment of the prison.  This is drawing upon

2    invalid information.

3    Q    Okay.

4         Did you consider -- the next slide is 37 -- facts

5    regarding Mr. Wilson's crime or his past criminal behavior?

6    A    I did not.

7    Q    And explain why.

8    A    Because it's clearly stated in the AAIDD standards manual

9    that facts of the crime or past criminal behavior are not

10   valid sources of information.  It's further clear from the

11   standard that under social adaptive behavior, following rules

12   or laws is considered appropriate social behavior, and

13   violating laws is considered inappropriate social behavior.

14   So noting that he -- anything more than that he did violate

15   laws would not shed more light on that diagnosis -- not the

16   diagnosis, but the question of significant impairment in

17   social.

18   Q    Now, the sources in this case is slide 39.  Does this

19   slide list when you interviewed various people in the case?

20   A    Yes.  This lists the 13 people who I interviewed and the

21   dates.

22   Q    And you interviewed Mr. Wilson twice?

23   A    Yes.

24   Q    Lillian Barnes, you interviewed twice, correct?

25   A    Yes, sir.

Olley - Direct/Burt

1    Q    Who is she?

2    A    She is Mr. Wilson's cousin on his father's side.

3    Q    Monica Cook, you interviewed, looks like three times?

4    A    Yes.

5    Q    And who is she?

6    A    She was Mr. Wilson's girlfriend at the time that the

7    crime was committed, and he lived with her most of the two

8    years leading up to the time of the crime.

9    Q    You interviewed Patricia Hogan on April 17th and

10   November 17th?

11   A    Yes.

12   Q    Who is she?

13   A    She is Mr. Wilson's aunt on -- aunt by marriage on his

14   father's side.

15   Q    Vanessa Lindley, you interviewed on June 24th and

16   November 14th?

17   A    Yes.

18   Q    And who is she?

19   A    She's Mr. Wilson's cousin.

20   Q    The next slide.

21   A    Older cousin.

22   Q    Summer Wilson, you interviewed on June 23rd, 2012?

23   A    Yes.

24   Q    Who is she?

25   A    She is Mr. Wilson's maternal cousin.

530

Olley - Direct/Burt

1  Q    Depetra McMaster, you interviewed on June 26th and

2  November 11th?

3  A    Yes.

4  Q    And could you identify who she is?

5  A    She is Mr. Wilson's older sister.

6  Q    Cheryl Hadden on June 26 and November 11?

7  A    She is Mr. Wilson's mother.

8  Q    Now, typically in these cases, is the client's mother a

9  valuable source of information as to the developmental period?

10  A    Yes.  I mean, that is noted in manuals of use of adaptive

11  behavior scales, that mothers are probably the most frequently

12  interviewed people for adaptive functioning information.

13  Q    In this case, was the mother a valuable source of

14  information?

15  A    Yes.

16  Q    And were there some cautions about her involvement with

17  Mr. Wilson that restricted or didn't restrict the information

18  you had available from her?

19  A    Yes.  It certainly was a caution, because as well

20  documented, she was quite negligent of her children when they

21  were young.  She was engaged in, you know, illegal drug

22  activity.  She was an alcoholic.  She had a criminal record.

23  She basically was unavailable for her children.  And at a

24  later time, she stopped using drugs and alcohol and became

25  more available.  So she is a better reporter now.  But

1   certainly in interviewing her to look back on Mr. Wilson's

2   growing up, she was largely absent.

3   Q    And when you say "absent," do you mean physically absent?

4   A    She was physically absent but when she was around, other

5   relatives reported that she wasn't much help for anything.

6   Q    Who was the person who had the most contact with

7   Mr. Wilson during his developmental period in terms of a

8   caregiver?

9   A    Between the ages about five and 14, he was with his, as

10  he referred to, Aunt Lou, Lillian Barnes.  So she was with him

11  along then.

12  Q    Does Ms. Barnes appear in the record as someone who was

13  bringing Mr. Wilson into these various therapeutic settings?

14  A    She did, yes.

15  Q    And do the records indicate whether or not she was a

16  reliable historian as to his deficits?

17  A    She was not by the record and after interviewing her.

18  She was able -- she is a good example of someone who sort of

19  spent much time with Mr. Wilson at critical periods of his

20  development.  She was certainly caring for him, but I found

21  her to be a difficult person to interview.  She gave useful

22  anecdotes demonstrating her points, that Mr. Wilson was slow

23  to learn many things growing up.  I did not administer an

24  adaptive behavior scale to her.  And I think even in

25  Dr. Denney's report, he noted that it was hard to keep her on

Olley - Direct/Burt

1   topic, and I would certainly agree with that.  So I did not

2   feel she was a valid person to administer a scale to.

3   Q    Why was she hard to keep on topic?

4   A    You ask her about one thing, and she answers something

5   else and goes off in another direction, and you have to steer

6   her back to the question that you were originally asking

7   about.

8   Q    So you made the clinical judgment that you couldn't

9   administer a valid instrument to her?

10  A    I did make that judgment, yes.

11  Q    Okay.  Robert Earl Barnes, you interviewed on June 28,

12  2012?

13  A    Yes.

14  Q    Who is he?

15  A    He is Mr. Wilson's father.

16  Q    Now, typically in these cases, are fathers a good source

17  of adaptive behavior information?

18  A    Yes, with all the cautions that we've stated before, that

19  there could be biases or -- if a father is largely absent,

20  then that father would not be a good source of information

21  either.

22  Q    How about in this case?

23  A    In this case, Mr. Barnes was largely absent.  He was at

24  least as absent as Mr. Wilson's mother was.  He has a history

25  of mental illness and alcoholism.  I did interview him.  He

Olley - Direct/Burt

1   was cooperative and did not have much information and quickly

2   acknowledged that he simply was not around very much to know

3   what was going on when Mr. Wilson was growing up.

4   Q    Annie Louise Barnes, did you interview her on June 28th,

5   2012?

6   A    Yes.

7   Q    Who is she?

8   A    She is Robert Barnes' mother and Mr. Wilson's

9   grandmother.

10  Q    All right.  The next slide.  Did you interview Lillian

11  Barnes on June 28th and November 12th of 2012?

12  A    Yes.

13  Q    And is she the aunt you mentioned earlier who had primary

14  responsibility in Mr. Wilson's earlier years?

15  A    Yes, she is.

16  Q    Corey Barnes, did you interview him on November 14th,

17  2012?

18  A    Yes.

19  Q    And who is he?

20  A    He is Mr. Wilson's cousin on his father's side.

21  Q    Did you administer an instrument to him?

22  A    I did not.

23  Q    And why not?

24  A    Because on interviewing him, he made clear to me and

25  apparently to Dr. Denney as well, that he had only very

534

Olley - Direct/Burt

 1   limited contact with Mr. Wilson, and it was several years ago,

 2   and that they basically enjoyed playing together when they got

 3   together on holidays; but beyond that, he did not have enough

 4   information to answer, as I mentioned earlier, the well over

 5   100 questions on an adaptive behavior scale.

 6   Q    Did Dr. Denney administer an instrument to him?

 7   A    He did not.

 8   Q    Carla Drezner, did you interview her on April 16th, 2012?

 9   A    Yes.

10   Q    And who is she?

11   A    She was a -- well, I say a school psychologist.  I'm not

12   sure that she was -- I think she eventually became certified

13   as a school psychologist.  She didn't actually have a degree

14   in psychology.  She was a teacher who had taken some courses

15   in order to be able to fulfill the role of a school

16   psychologist.  She administered one of the intelligence tests

17   and made other comments on a report about Mr. Wilson's

18   development.

19   Q    Did you question her at all about how she administered

20   the intelligence test?

21   A    Yes, I did.

22   Q    And what information, if any, did you learn?

23   A    She administered quite a few instruments which turned out

24   to be, I would refer to, as boilerplate or a standard battery

25   that every everybody gets it.  So that's off of appropriate

Olley - Direct/Burt

1    standards in the sense, as I mentioned earlier, first you have

2    to determine what the question is and then choose the

3    instruments to fit the question.  And so I think it was common

4    among school psychologists that everybody got the same battery

5    of tests.  So she certainly was not the only one to do that.

6            She made comments about that he needed

7    encouragement.  And I asked further about what you mean by

8    that, and she gave some examples that when he had difficulty

9    with an item, that she would encourage him to try or praise

10   him when he tried.  And, I mean, this is marginal, I suppose,

11   but it's not exactly the way the tests are supposed to be

12   administered.  They adhere to a rather rigid standard about

13   what you can say by way of encouragement.

14           And then in her report, she said something to the

15   effect -- this comes back to our point earlier about

16   potential.  And I don't know.  I think it was sort of

17   generals.  I don't know if it was academic potential or

18   intellectual potential.  But I asked about that, and she said,

19   well, that's something that we wrote in all the reports from

20   children coming from this background.  And that comes back to

21   your earlier question about is it appropriate to give a

22   special, I don't know, extra points or boost or something to

23   people because of their ethnic or socioeconomic background,

24   and apparently she felt that was a standard thing to do.  And

25   I don't think that that would be considered an acceptable

Olley - Direct/Burt

1    practice today.

2            If I could quickly mention, one other thing is that

3    she substituted one of the performance items from the

4    intelligence test, and I asked her why.  Because the customary

5    thing is if you -- if the test is spoiled, which is to say it

6    was administered wrong or something was done that you say that

7    one is not going to work, then there's a substitute one.  But

8    she said no, she substituted another test because it went

9    quicker and the children enjoyed it more, which is -- you

10   know, I can understand school psychologists are under time

11   pressure, but that would not be an appropriate reason.

12           So that was about all that I delved into looking at

13   how adaptive -- how intelligence tests were administered.  But

14   she happened to be available, and she was a nice lady who

15   willingly answered my questions, so I spoke with her.

16   Q    I assume in your work, you have reviewed lots of school

17   psychology reports.  Would that be true?

18   A    Yes.

19   Q    Is it uncommon in the school psychology context for a

20   school psychologist to comment favorably on someone's

21   potential, to say that this person has potential in the

22   future?

23   A    I don't think it's uncommon.  I don't think that -- going

24   back to the AAIDD standards that we mentioned, I don't think

25   that it's appropriate because it's not based on any

Olley - Direct/Burt

1   verifiable, valid evidence-based standard.  It's being nice to

2   the child, but I don't think that it any validity.

3   Q    Now, the people that you administered an instrument to,

4   the ABAS-II are listed on this slide, correct?  Monica Cook,

5   Vanessa Lindley, Depetra McMaster and Cheryl Hadden?

6   A    Yes.

7   Q    And did you administer the test properly?

8   A    I believe so, yes.

9   Q    Did you score the test?

10  A    Yes, I did.

11  Q    And on the next and last slide, is this a summary of your

12  scores?

13  A    Yes.

14  Q    Can you explain what is on the slides and what your

15  conclusions from the testing as to whether these scores

16  qualified to allow you to render an opinion that Mr. Wilson

17  met the adaptive behavior deficit prong of the Atkins test?

18  A    Yes.  And clarifying that, of course, this is only one

19  source, which is the standard scores, and that we gathered --

20  I gathered information from many other sources.  But I was

21  trying to pull this together in some way that would be

22  reasonable to explain.  In the earlier slides, we talked about

23  that there are three different ways to qualify these scores.

24  So the first column is the four individuals whom you mentioned

25  who responded.

Olley - Direct/Burt

1        The next column is the DSM-IV and the AAMR 1992

2   standard, which is the standard of two out of 10 areas of

3   significant impairment.  So if we include work, which was not

4   actually filled out in my or Dr. Denney's use of these scales

5   because there was not sufficient work history to comment on,

6   assuming, because of that, that there would be a significant

7   impairment in work, then we're looking for two out of 10; and

8   so, going down that column, each of those reporters indicated

9   a significant impairment in at least two out of 10 of those

10  areas.  So using that standard, the two out of 10 DSM

11  standard, these reporters showed a significant impairment.

12       The next column is the AAIDD one-out-of-three

13  standard that we talked about, one out of conceptual, social

14  or practical, on us getting a score below 75, taking into

15  consideration the standard area of measurement.  And then that

16  column indicates that each of the reporters indicated a

17  significant impairment in at least one out of those three

18  areas.

19       The third column is the AAIDD's criterion of a

20  composite score with a significantly impaired score, in this

21  case, below 75, taking into consideration the standard error

22  of measurement.  And again, all four of the reporters gave a

23  composite score that met that standard.

24       So, regardless of which of the three standards we go

25  by, that criterion, those criteria are met for significant

539

Olley - Direct/Burt

1    impairment in adaptive functioning using just the scores on

2    the adaptive behavior scale.

3    Q    And did you confine the basis of your opinion just to

4    these stores?

5    A    No, I did not.

6    Q    What else did you fact or into your opinion?

7    A    Information from records and information from the

8    interviews that I conducted.

9    Q    Okay.

10        And in your report, did you actually go through each

11   of the 10 areas in the DSM and the three areas in the AAIDD

12   manual and summarize the factual basis for your opinion as to

13   each area?

14   A    Yes, I did.

15   Q    Could you just briefly walk through those areas and tell

16   us why you concluded that Mr. Wilson met the criteria within

17   each area or the ones that you concluded that he did meet?

18   A    Yes.  I will try to be respectful of the judge's request

19   not to just read the report back.  If there's some concise way

20   that we can address it, I would be glad to.

21   Q    Sure.  I guess the best way to address it would be to

22   turn to Page 14 of your report, where you begin to list the 10

23   areas, the DSM areas, correct?

24   A    Yes.

25   Q    And this report was written at a point in time when you

Olley - Direct/Burt

1   had not seen Dr. Denney's report, correct?

2   A    Yes.

3   Q    And as I understand it, you continued to conduct

4   interviews in the case after this report was written?

5   A    Yes.

6   Q    Okay.

7            So it might be helpful to go through the domains

8   here and indicate what information, especially the information

9   that you learned that is not reflected in the report, that you

10  are using as a basis for your opinions.  And also with

11  reference to Dr. Denney's report, how that factored in or

12  didn't factor into your opinion on each of these domains.

13           So first of all with respect to communication, why

14  did you conclude that he had a deficit in communication?

15  A    I interviewed several family members and received quite

16  congruent information about difficulties in communication from

17  an early age up through the time of the crime.  They were slow

18  in talking and putting words together, but more importantly,

19  difficulty in communication.  It was frequently reported you

20  had to say things to him several times to get him to

21  understand or you had to simplify your language or that his

22  younger sister, Sharise, would pick up on things more readily

23  than he would or that Sharise would have to explain things to

24  him even though she was a year younger.  And similar examples

25  continuing up to examples given with Ms. Cook and some of

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Direct/Burt

1    which I made reference to earlier, that when they were living

2    together, that you had to tell him things repeatedly.  You had

3    to give him instructions one at a time because he couldn't

4    remember several of them.

5          So these were examples that cut across his receptive

6    language, which is to say he didn't understand accurately

7    things he was told, and his expressive language, where he

8    spoke seldom in sentences but in sentence fragments and

9    phrases and brief explanations for things.  I found this to be

10   a consistent pattern among all of the informants I spoke to.

11   Q    Is there a sort of a mental equivalency benchmark that

12   you look to or sort of use in determining, you know, what

13   level of language or communication achievement someone reaches

14   when they have an intellectual disability but they're at the

15   higher end of the range?

16   A    Yes, although I have to say that it's not politically

17   correct these days to use mental age in the way that it was

18   done many years ago.  And the caution for that is, of course,

19   it's an oversimplification.  If someone is 30 years old and if

20   you say he has a mental age of nine or 10 or whatever, that

21   doesn't mean he's exactly like a 10-year-old.  But there are

22   some comparisons that are worthwhile, and the general cutoff

23   in mental age that has been recognized for many years for an

24   intellectual disability is about 11 or 12 years of age.  So I

25   think it is useful when looking at communication or any of

Olley - Direct/Burt

1   these other adaptive behavior areas to think as a kind of

2   metric, how well does an 11- or 12-year-old communicate.  And

3   of course, we know that they can communicate in a quite

4   sophisticated way.

5   Q    Okay.

6        And can one with an intellectual disability improve

7   their communication skills, depending upon the kind of support

8   or information that they are getting from their environment?

9   A    Yes.  Especially someone who, you know, has a mild

10  impairment.

11  Q    Now, you conclude that Mr. Wilson had a deficit in the

12  communication area?

13  A    I did.

14  Q    If, as I'm sure will happen on cross-examination, you're

15  confronted with recorded telephone calls by Mr. Wilson in a

16  custodial setting, which shows his language, the back and

17  forth between him and a girlfriend, for instance, is that

18  going to be information that's going to be useful to you in

19  determining whether or not your opinion is correct or not?

20  A    I don't believe so because that is information gathered

21  in, as you mentioned, a custodial setting, which is not

22  acceptable using the AAIDD standard.

23  Q    Is it necessarily a contradiction if his language skills

24  sound improved in 2012 in terms of whether he had a deficit

25  back in -- back at the time of the crime in this case, in

Olley - Direct/Burt

1  2003?

2  A    It's certainly possible that one's communication skills

3  could improve.  It's also difficult to determine if a

4  particular E-mail or a particular telephone call represented

5  typical community behavior.  So, if you choose something that

6  sounds rather sophisticated, is it typical and is it relevant

7  because it happens so long after the time of the crime?

8  Q    Okay.

9        And can you give us an example from the records or

10  from your interviews of what you mean by a communication

11  deficit?  Why do you say that he had that deficit in his

12  developmental years?

13  A    Based upon the interviews that I just discussed, I found

14  many examples of his having difficulty in both receptive and

15  expressive language.  And even I mentioned earlier and you

16  pointed out in the records, the administration of the verbal

17  absurdities subtest.  That was a difficulty he had in

18  receptive language.  He did not understand and could not

19  explain language using concepts that would be readily

20  understood by a younger child.

21  Q    Did you attempt to get him to communicate with you when

22  you met with Mr. Wilson, either in writing or the back and

23  forth between the two of you?  And if you did, what were your

24  conclusions?

25  A    Well, certainly in conversation, I did.  And I spoke with

Olley - Direct/Burt

1   him twice.  And as I noted in my report, the second time, he

2   seemed to be having a hard time about something.  He was less

3   forthcoming.  It required more urging to get him to engage

4   with me, to answer my questions, which he eventually did.

5   But, you know, the expression "like pulling teeth."  It was a

6   little bit at a time, and you had to ask over and over again

7   to get information.

8           And the first time that I met with him -- and this

9   might fall more in the area of functional communication.  But

10  as we know, there's a lot of overlap between these categories.

11  I asked him to write a letter.  And as I noted in my report,

12  he was very reluctant to do that and gave many reasons why he

13  can't just sit down and write a letter; but then with some

14  urging, was asked if he would just write about what did we do

15  today, and he wrote instead about what he did before coming to

16  our interview.  And it was very brief, and it was -- it was

17  spelled correctly.  It didn't have much punctuation.  But it

18  was a brief and intact letter.

19  Q    And --

20  A    It wasn't a letter really, it was just a description.

21  Q    Did that letter and your other communications with him in

22  2012 indicate that he did not have a communication deficit or

23  that he did?

24  A    I don't think that my conversation with him would qualify

25  as a thorough evaluation of his current communication skills

Olley - Direct/Burt

1    because we know that people with mild intellectual

2    disabilities can carry on rather superficial conversations

3    with relative ease.  The reason that -- I don't mean to put

4    too much emphasis on it, but the reason for giving those

5    verbal absurdities was because it requires him to do some

6    analysis of concepts rather than just repeating information.

7            Most of my interview, and I think other people's

8    interviews, is often tell me factual things.  Tell me your

9    name.  Where were you born?  Who is in your family?  Where did

10   you go to school?  Things that you were interested in doing

11   growing up.  This is repeating factual information, which a

12   person with mild intellectual disability should be able to do

13   just fine.  So before you could really do a good assessment of

14   current communication skills, you'd have to do a lot more

15   testing, you know, along the lines of the verbal absurdities

16   to get at something more than casual conversation.

17   Q    And of course, what you're trying to look at is

18   communication deficits in the developmental period?

19   A    Yes.  And near the time of the crime.

20   Q    And you're interviewing him in 2012 in a very special

21   context, right?  He knows when you're interviewing him that

22   you're there to assess whether he is intellectual disabled for

23   the purpose of ruling him in or out of the Atkins test?

24   A    I believe so.  I believe his attorneys have discussed

25   that with him.

Olley - Direct/Burt

1   Q    Is it possible that he could be minimizing his language

2   skills when he talks with you or someone else in order to fake

3   back, to try to make it seem like he doesn't have the deficit

4   when in fact -- try to make it seem like he has a deficit

5   when.  In fact, he doesn't?

6   A    Is it possible?  Yes, it's possible.

7   Q    Is that one of the reasons why you looked to whether he

8   had a deficit during the developmental period that is

9   documented by the record?

10  A    Yes.

11  Q    Are there examples in the developmental period where he

12  is in situations where he is trying to communicate or a

13  teacher or someone who's writing the record says it's notable

14  that he is mute or he is not communicating?

15  A    Yes.  There were circumstances in school and in testing

16  and in therapy situations in which he refused to speak.  He

17  did not speak.  "Refused" reads into it more than I should.

18  Q    When you say in the testing situation, do you recall, for

19  instance, reading an evaluation by Mitchell Frank, where he

20  was assessing Mr. Wilson's verbal abilities and his

21  communication deficits?

22  A    Yes.

23  Q    Was that significant information to you in assessing

24  whether he had a deficit in the communication area?

25  A    That would be one piece of information to take into

Olley - Direct/Burt

1    consideration.

2    Q    Okay.

3          In the school context, you said there were other

4    documentation of his inability to communicate?

5    A    Well, he didn't -- he dealt with his academic and social

6    difficulties with what I would consider and apparently

7    teachers considered poor coping.  So he acted out in a variety

8    of ways that are mentioned, and some of that was simply

9    refusing to cooperate with whatever the activity was.

10   Q    Okay.

11         Now, on Page 16 of your report, you address the

12   secondary, which is self-care.  What was your --

13         THE COURT:  Can I ask a question about

14   communication?

15         MR. BURT:  Sure.

16         THE COURT:  Did you provide the witness with a copy

17   of the KEL recordings on the night of the murders to review in

18   terms of his ability to communicate at the time of the

19   murders?

20         MR. BURT:  I didn't get the first part of the

21   Court's question.

22         THE COURT:  Did you provide the witness with copies

23   of the recordings, the KEL recordings on the night of the

24   murder in connection with the question of the defendant's

25   ability to communicate at the time of the murders?

Olley - Direct/Burt

1          MR. BURT:  I understand.  No, we did not, Your

2     Honor.

3          THE COURT:  And why not?

4          MR. BURT:  Frankly, I'm not sure I had those

5     available to me.

6          THE COURT:  Well, they were available at the last

7     trial.  And if this witness is going to comment on

8     communication skills, it would seem that there are -- there is

9     documentary evidence of his ability or inability to

10    communicate at the time of the murders, which I would imagine

11    might be of interest to an expert witness who's commenting on

12    the ability of the defendant to communicate in a rational and

13    sophisticated way.

14         MR. BURT:  I think it's a good point, Your Honor,

15    and I don't think any expert on either side has been provided

16    or commented upon that material.

17         THE COURT:  Well, you know, I'd say that that's a

18    real deficit in the evidence or the analysis here.

19         Go ahead.

20    BY MR. BURT:

21    Q    Okay.  Now, on Page 16 of your report is the area of

22    self-care, correct?

23    A    Yes.

24    Q    What was your conclusion with respect to that area?

25    A    My conclusion, I used the expression or the term "mixed,"

Olley - Direct/Burt

1    which is to say that there certainly -- Mr. Wilson was slow to

2    acquire self-care skills.  I'm reluctant to say that there

3    would be a significant impairment, because self-care is such

4    an easy standard to meet.  Most seven- or eight-year-olds

5    surely would be able to do the things that are required here.

6    It's basic hygiene and so on.

7         The reason it's mentioned is that Mr. Wilson had a

8    certain odd history of these things.  When he was living with

9    Aunt Lou, she taught him these things, and she emphasized that

10   she did, and it took a lot of repetition for him to learn

11   self-care skills.  But then when he went to Elmhurst, for

12   example, he seemed to not be good at these things and had to

13   be taught them all over again.  And then he left Elmhurst, and

14   he was back in public schools.  And then later he was at

15   Brookwood, and then again, they commented that he had such

16   poor self-care skills.  And so they had to teach him those

17   things again, and he eventually met criterion for these very

18   basic skills.  And he left Brookwood; and at a later time, he

19   was at in prison at Rikers.  And then he went to live with

20   Monica Cook.  And she commented that when he arrived, he had

21   poor hygiene, and he didn't own a toothbrush and didn't seem

22   to care about how he was dressed.  She had to teach him those

23   things all over again.  So it's a very puzzling pattern of

24   learning something that is definitely a practical skill.  It's

25   not something that requires any kind of sophisticated

 1    understanding.  And yet he'd remember it; and then he'd just

 2    quit doing it, and he had to be taught again.  I think it's

 3    odd.  I mean, I described it as mixed because eventually he

 4    did learn these things, and I think he does not have problems

 5    with these things today.  But I thought it was a peculiar

 6    pattern over his developmental period.

 7    Q    And just to be clear, when you say it was mixed, do you

 8    mean by that that you are not rendering an opinion that he has

 9    a significant deficit in that area because the evidence is

10    mixed?

11    A    That's correct.

12    Q    How about the third area, home living, which is

13    summarized, what that concept means on Page 16 of your report.

14    What was your conclusion with regard to that area of...

15    A    My conclusion was significant impairment in home living.

16    Q    And why?

17    A    Home living, of course, has a certain meaning for adults,

18    to be able to have all of the skills and the judgment to be

19    able to live independently.  And the expectations for children

20    are different, depending upon the person's age.  But we expect

21    someone to show progress toward those skills.  And in fact,

22    there was a specific course at Brookwood on home living, which

23    I'm not sure that Mr. Wilson ever passed.  But anyway, he did

24    have training on these things; and yet by the time that he

25    left Brookwood and again he was living with Monica Cook, she

Olley - Direct/Burt

1    was noting that he had inadequate skills in the common things

2    of maintaining a household, you know, cooking and cleaning and

3    certainly moving in the direction of being able to -- be able

4    to financially manage a household.  So these are sort of a

5    combination of the practical skills to know what money is

6    about and spend money and the conceptual skills of being able

7    to plan ahead and have a budget and so on.

8             So I think there are other -- I was just

9    summarizing, but I think there are other examples there of

10   which Mr. Wilson had the opportunity for instruction in home

11   living and yet never demonstrated the age-appropriate skills.

12   Q    So your conclusion here is that he did have severe

13   deficits?

14   A    Yes.

15   Q    The fourth area is social, as defined at Page 17 of your

16   report.  What were your conclusions with respect to that area?

17   A    My conclusion was that Mr. Wilson had at that time a

18   significant impairment in the area of social.

19   Q    And could you explain why?

20   A    I mentioned earlier, for example, that the social aspects

21   of school were difficult for Mr. Wilson and that he responded

22   to conflict in not good coping by getting into fights.  And

23   there were mixed information about his making friends.  But I

24   should point out that the standard for social is more than

25   that were friendly or that you have some friends, but rather

 1    that you develop an age-appropriate ability to recognize

 2    social cues and to respond to them appropriately.

 3            So I'm repeating some things from earlier that I

 4    don't really want to do.  But in his IEP at different ages and

 5    comments from therapists, it's noted that he has significant

 6    difficulties in social interaction.  He seemed to get along

 7    best with adults who were friendly and not making big demands

 8    upon him.  But he exhibited remarkably bad social judgment in

 9    his choice of friends in that he had opportunities to be

10    friends with other students; and his choice of friends was

11    continually, whenever he had the opportunity, to go to

12    Staplewood and to hang out with kids who were getting in

13    trouble.  He was counseled repeatedly about the risks of this.

14    There were comments, several comments in his Brookwood files

15    about the standard that is not included in any of the adaptive

16    behavior scales, which is the naivety or gullibility that is

17    associated with the social area.  He is someone, his sister

18    Depetra said you could talk about him into anything.  He could

19    be easily persuaded, and he had a poor social judgment to

20    choose friends who engaged in criminal behavior.  So I think

21    that one factor alone is pretty persuasive about his poor

22    social judgment.

23    Q    So at this point, you've already identified three areas

24    where you believe he's deficient, significantly limited?

25    A    Yes.

Olley - Direct/Burt

1   Q    So even if the Court's point about the conversation at

2   the time of the crime, even if that led you to believe he had

3   excellent communication skills, would he still qualify under

4   the standards for significant limitations, just based on the

5   two you've discussed other than communication?

6   A    Yes.

7   Q    Okay.

8        And you found other deficits besides the three that

9   we've discussed, correct?

10  A    Yes.

11  Q    For instance, Number 5, community use?

12  A    Yes.  Actually, community use was one of the ones in

13  which I had concluded that there was mixed information.

14  Community use is a mix of being able to find your way around

15  your community and being able to take advantage of the

16  community activities and functions.  Mr. Wilson had to be

17  repeatedly shown how to get to places.  Ms. Cook gave examples

18  of how her young children assisted him in finding his way to

19  get from place to place.  He did not drive until he was much

20  older, and then he -- Depetra commented, if you see Ronell

21  somewhere, there's always somebody with him.  So he needed

22  somebody to get him from place to place.  Yet with repetition,

23  he did learn how to use the subway and how to get from one

24  borough to the other.  He did not engage in sophisticated use

25  of his community.  He went to the boys club, I think, once,

Olley - Direct/Burt

554

1    Shanell mentioned, and then he felt socially awkward about

2    being there with a bunch of people he didn't know, and he

3    didn't go back.  So I would say that's a picture that's mixed.

4    It's not that he couldn't find his way around.  It just took

5    him a long time to learn how to do it.

6              MR. BURT:  Your Honor, would this be a good place?

7              THE COURT:  Yes, this would be a good place to break

8    for lunch.

9              I'm really troubled by that conclusion based on the

10   evidence that was adduced at the murder trial.  And I really

11   think that before we get a definitive statement from this

12   witness about his ability to find his way around, that means

13   the defendant's ability to find his way around, this witness,

14   despite your valiant effort to validate what he said without

15   listening to the tape recordings -- this witness should hear

16   the tape recordings.  Because in the tape recordings, he had

17   absolutely no difficulty finding his way around and ordering

18   people around as to where they should go and how to get there

19   at the time of the murders.  And so for this witness to sit

20   here in my courtroom and say that he had mixed abilities to

21   find his way around is an absurdity.  Do you understand that,

22   Mr. Burt?  It's an absurdity.  And I'm not going to sanction

23   it.  If he wants to reach that conclusion, he first needs to

24   hear the tapes.

25             MR. BURT:  Your Honor, I believe --

555

Olley - Direct/Burt

1           THE COURT:  Let me finish.

2           MR. BURT:  I apologize.

3           THE COURT:  You've had a lot of time to put this

4    together.  I've given you a lot of latitude.  It's cost a lot

5    of money with experts.  But when I raise an issue, for you to

6    sort of brush it off with a simple question, well, even if, I

7    think that that's unfair to the interest of justice, frankly.

8           MR. BURT:  Yes, Your Honor.

9           THE COURT:  Unfair to the interest of justice.  And

10   then when we have this discussion about the ability to find

11   your way around.  Have you listened to those tapes, Mr. Burt?

12          MR. BURT:  The tapes the --

13          THE COURT:  The KEL tapes on the night of murders.

14          MR. BURT:  As I said to the Court --

15          THE COURT:  You ought to listen to the KEL tapes and

16   then have this witness listen to the KEL tapes.  And if he'd

17   like to make, and I would any that he make, an additional

18   submission as to whether that in any way affects his

19   conclusions.  And if not, that's fine.  If so, that's fine.

20   But I don't think that the record is complete without

21   consideration of the documentary evidence on the night of the

22   murders.

23          MR. BURT:  I understand.  Your Honor, could I

24   clarify one point?

25          THE COURT:  No.  Not until after lunch.  I have to

Olley - Direct/Burt

1    do a sentencing.  We'll see you after lunch, sir.  We'll take

2    an hour for lunch.  Thank you.

3               (Whereupon, a break was taken.)

4               (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Olley - Direct/Burt

1      AFTERNOON SESSION

2      (Honorable Nicholas G. Garaufis takes the bench.)

3              THE COURT:  All right.  Be seated, please.  We'll

4      get the witness in a moment.  That's fine.  A couple of

5      things; Mr. Burt, you went through a list of people that the

6      witness spoke to and their relationships with the defendant.

7      Where is the defendant?  We'll wait.

8      (Defendant is in the courtroom.)

9              THE COURT:  All right.  Mr. Burt -- the defendant is

10     present.  You went through a list of group of individuals that

11     the witness interviewed and the relationship with the

12     defendant, whether it was a family relationship or another

13     friendship relationship.  Would you give me a list of all

14     those people, just a separate list.  I know it's all covered

15     in the report, but just list the names and the identifying

16     relationships.

17             MR. BURT:  Oh, certainly.  Sure.

18             THE COURT:  If you can put it up on ECF, I would

19     appreciate that.

20             The other thing is the point I was making earlier is

21     when you are speaking about certain skills that the defendant

22     may or may not have the ability to find his way around, the

23     ability to communicate with others and leadership skills, for

24     instance, what happened on the night of the murders may be

25     instructive, but may not be.  But at least if I have a

558

Proceedings

1    question of the witness, of an expert, about the expert's

2    conclusions, I might ask:  Does this inform your judgement in

3    any way?  If it does, tell me how.  If it doesn't, tell me

4    why.  And that's really what the point the Court was making.

5              MR. BURT:  Sure.

6              THE COURT:  And then you said you wanted to make a

7    point, so why don't you make your point.

8              MR. BURT:  Well, the point I was going to make,

9    first of all, the Court's point is a good one.  And over the

10   lunch hour we did have someone go to Mr. Stern's office and

11   retrieve the tape.  Dr. Olley started to listen to it, but we

12   ran out of time.  We certainly will have him review the entire

13   tape as soon as we get a chance to do that, so he's in a

14   position to answer whatever questions may come up either from

15   the Court or from the government.

16             And I apologize to the Court, it was a defect on my

17   part in not recognizing the importance of that tape.  I wish I

18   had done so.

19             THE COURT:  Well, I was at the trial, so it had

20   obviously -- I was aware of it.  And when the witness started

21   talking about the ability to find his way around, the

22   defendant's ability to find his way around, his ability to

23   communicate and so forth, that struck a note with me.

24             MR. BURT:  Sure.

25             THE COURT:  Based upon what the evidence at the

Proceedings

1   trial and whether or not it would inform his conclusions

2   regarding the defendant's adaptive status in all the

3   categories, I don't know, but I'd like to hear about it from

4   the witness.  And it doesn't have to be -- it doesn't have to

5   be in court, it can be in writing and subject to questioning

6   by the other side, okay?

7           MR. BURT:  Thank you.

8           THE COURT:  Anything from you, Mr. McGovern?

9           MR. McGOVERN:  No, your Honor.

10          THE COURT:  And that goes for all the witnesses.

11  I'm not talking about just this witness.  Anyone that is going

12  to talk about these issues should at least have had the

13  opportunity to have heard the documentary evidence that might

14  effect their views on the defendant's adaptive skills.

15          MR. BURT:  Sure.  And it's not a problem with the

16  other witnesses, we'll make sure they view that material

17  before they testify.

18          THE COURT:  All right.  Good.  Let's bring the

19  witness back.

20  (Witness retakes the witness stand.)

21          THE COURT:  Okay.  I remind the witness he is still

22  under oath.  You may inquire.

23  CONTINUED DIRECT EXAMINATION

24  BY MR. BURT:

25  Q    Okay.  Dr. Olley, the point I wanted to clarify with you

MARY AGNES DRURY, RPR
Official Court Reporter

Olley - Direct/Burt

1   as a witness, this area of community use, I think you said the

2   evidence there was mixed in the sense that there are some

3   indications that he didn't have that skill, others that he

4   gained it.  And was your conclusion from the fact that it was

5   mixed that you could not, with confidence, conclude that he

6   had a deficit in community use?

7   A    That's true.  I concluded that he did not have a

8   significant deficit in community use.  He certainly knew his

9   way around his immediate neighborhood, as defined as the

10  Stapleton area.  It took him a long time to learn his way from

11  longer, other distances, but by the time of the crime he had

12  achieved that.

13  Q    And the point is you are going through each of these

14  domains and looking and trying to weigh the evidence and

15  trying to make a clinical judgement in terms of whether you

16  feel confident to say he had a significant limitation?

17  A    Yes, sir.

18  Q    And in your report when you say the evidence is mixed you

19  are concluding that there is just not enough there for me to

20  say with confidence he is deficient in this particular area?

21  A    Yes, not enough to say that it's a significant

22  impairment.

23  Q    Okay.  But the communication one, the first one we talked

24  about, you do think there is significant impairment, correct?

25  A    Yes.

561

Olley - Direct/Burt

1    Q    And you had begun to listen to this tape that the Judge

2    referred to?

3    A    Yes.

4    Q    And you'll be prepared either by tomorrow morning, if

5    you're still here, or to submit a written supplement

6    addressing that issue?

7    A    Yes.

8              THE COURT:  Thank you.

9    Q    So let's move on then to the next category, which I think

10   is at page 20 of your report, and it's in the manuals it's

11   called self-direction, but what is the gist of that adaptive

12   behavior skill?  What is it that you are looking for?

13   A    Could you remind me of the page number?

14   Q    Page 20.

15   A    Okay.  Self-direction, and it's explained more fully in

16   the AAIDD user's guide, is, in many ways, just what it says.

17   Relative to other people his age, does the individual make

18   appropriate decisions about his own life.  By the time we

19   would consider Mr. Wilson, at the time of the crime, because

20   he was 21 or almost 21, the standard would be that he would be

21   making some decisions about what he wants his life to be like,

22   what kind of place he wants to live, who are the important

23   people in his life, does he have long-range goals, those sorts

24   of things.

25              So looking at that, you know, at that age of 20 and

Case 1:04-cr-01016-NGG   Document 1530   Filed 02/09/16   Page 134 of 363 PageID #: 16567

1  immediately before asking people in his family and people who

2  knew him, did he have self-direction, did he make decisions,

3  reasonable decisions about his own behavior, take

4  responsibility for himself and his own behavior, and the

5  answers were uniformly that he did not.  Comments such as he

6  -- I forget, I'll try not to quote if I cannot exactly

7  remember, but the comments from family members were no,

8  essentially he lived day-to-day, he was impulsive, he didn't

9  have any sense of money and planning for what is -- how he was

10 going to organize his life.

11          So it might have those related things and scores on

12 the self-direction or the adaptive behavior system.  I did

13 include that he had a significant impairment in

14 self-direction.

15 Q    And self-direction is not the same skill as the ability

16 to give directions, being able to direct people or give

17 directions; is this a different concept?

18 A    Yes, it is a different concept, indeed.  It says here,

19 skills related to making choices.  So making choices about

20 your life, using good judgement.

21 Q    And how does it play into that domain if the choices are

22 bad choices?  And by that I mean, somebody could say well, he

23 made a choice to kill somebody or he made a choice to engage

24 in criminal behavior?  That would be a choice.  Is that what

25 this skill area is talking about or do they have to be good

Olley - Direct/Burt

1   choices as defined by society?

2   A     I think they have to be good choices as defined by

3   society.   And this is an area of some research on decision

4   making, problem solving.   That is to say, when a person

5   encounters a problem defined as something new, something they

6   don't have a routine answer for, how they go about making a

7   decision about what is the best way to proceed.

8         And there are programs for teaching decision making

9   and problem solving skills, there is a professor here at

10  Columbia who has worked extensively on that area, because it's

11  a common area for people who have low intelligence, that they

12  don't make good decisions, they engage in what Steven

13  Greenspan refers to as foolish actions.

14        And, of course, we all have foolish actions at

15  sometimes, but we try not to make the same mistake too many

16  times.   It's more of a difficulty for people with intellectual

17  inability.

18  Q     So were you focusing your interviews with family and

19  friends, members on what kinds of foolish actions to summarize

20  it was Mr. Wilson's typical behavior?

21  A     Yes.   Typically when he had to make a decision, did he --

22  how did he go about it?   Was it an impulsive decision, which

23  it often was.   And it's documented in his school record that

24  he got into difficulty because he had, for example, in a

25  social realm, he had a disagreement with another student and

564

Olley - Direct/Burt

1  instead of some kind of reasonable resolution to the problem,

2  he got into fights.  When he was at Brookwood, he got into

3  more fights than the average student, according to Mr. Giglio,

4  and these are indications that he's not making good decisions.

5  Q     So your conclusion here is that there was a significant

6  deficit?

7  A     Yes, sir.

8  Q     How about in the seventh area, health and safety, what is

9  that trying to get at in terms of the domain you are looking

10 at?

11 A     Well, again, it's all relative to the expectations to a

12 person's age.  Has the person learned the expected behaviors

13 and responsibilities in maintaining health and avoiding

14 dangerous situations?

15        The examples that were given by family members had

16 to do with what Mr. Wilson would do as a child.  He would do

17 dangerous things, particularly if someone would dare him to do

18 it, he would climb up into high places that he could easily

19 fall.  He was never regarded as safe in the kitchen.  Comments

20 were made in his school IEP that he didn't use knives in the

21 kitchen safely, that was about ten years of age, I believe.

22 So I think there are examples like that throughout his

23 history.

24        I gave the example earlier about the physician that

25 said he wasn't using common sense to avoid milk, even though

565

Olley - Direct/Burt

1  he knew that milk would make him throw up.  Now, when living

2  with someone else, of course parents and caretakers with

3  children make a lot of those kinds of decisions about when to

4  go to the doctor and so on for the individual, so you have you

5  to look at what's relative to what's expected of the person's

6  age.

7  Q    So what was your conclusion on that?

8  A    My conclusion was that he does have a significant

9  impairment on health and safety.

10 Q    And the eighth area of functioning academics; what does

11 that mean?

12 A    Most of our information about academics, and there is a

13 great deal of it has to do with either his school performance

14 or his performance on formal academic achievement tests, such

15 as the Woodcock-Johnson or the Wechsler Individual Achievement

16 Test.  Although these are certainly relevant and should be

17 taken into consideration, functional academics, the functional

18 part of that expression is what does the person use that

19 information for in everyday life.

20         So you would look at -- well, I'll give the example

21 of in a kitchen that there were comments on Mr. Wilson's IEP

22 that he did not, you know, he couldn't measure, he couldn't

23 apply reading and math to everyday life, whether it's reading

24 a menu or whether it's being able to complete a job

25 application.  If you think of all of the areas in which we

Olley - Direct/Burt

1    apply school skills, in Mr. Wilson's case carried over to

2    everyday life, that is difficulties in academic skills.  I

3    gave him a significant impairment in everyday functioning.

4    Q     And when you mentioned the test, I think you said the

5    Woodcock-Johnson and the second one was a Wechsler test,

6    that's not an IQ test, that's an academic achievement test?

7    A     That's correct.  I believe Dr. Denney administered the

8    Woodcock-Johnson achievement test and Dr. James administered

9    the Wechsler Scale, not to be confused with the intelligence

10   scale, the Wechsler Individual Achievement Test, and they

11   yielded roughly comparable results; although, it's hard to say

12   that, because you can't make a direct comparison.

13            Dr. James reported grade equivalence, which is to

14   show that even in this very recent testing, that Mr. Wilson's

15   academic skills are below sixth grade, which is generally what

16   we think of as the upper limits of what a person with mild

17   intellectual disabilities would accomplish.  And the grade

18   equivalents were more in the second to sixth grade level with

19   some lower, particularly in reading and language skills.  As I

20   recall, the report of the Woodcock-Johnson by Dr. Denney

21   reported standard exposures did not report grade equivalence,

22   so we can't really know what the grade equivalence were;

23   although, I suspect that they were comparable to what

24   Dr. James found.

25   Q     And these grade equivalences are in relation to when he

Olley - Direct/Burt

1    was tested; in other words, when did Dr. James conducted her

2    testing?

3    A    Well, recently within the past few months.

4    Q    And her testing is designed to show what his grade level

5    was at the time she tested 2012?

6    A    Yes.  So currently, and I think both of the testing --

7    both the testing by both experts was done in about the same

8    timeframe, and both showed that he was quite -- current,

9    continued to be quite low in academic skills.  Although, the

10   argument has been made that since he's been incarcerated, he's

11   had more opportunities for learning, that he has improved

12   somewhat in his academic skills.

13   Q    And you're saying that this does not just depend on

14   scores on achievement tests, but looks at how someone in daily

15   living applies academic concepts to real world problems?

16   A    Absolutely.  That's what is meant by functional

17   academics.

18   Q    And here again you conclude?

19   A    I concluded that he did in childhood and at the time of

20   the crime have a significant impairment in functional

21   academics.

22   Q    The ninth area is leisure.  What was your conclusion in

23   regard to that area?

24   A    My conclusion was that Mr. Wilson had a significant

25   impairment in this area as well, which is a bit surprising;

568

Olley - Direct/Burt

1     again, in that the expectations for this area are not terribly

2     high.

3          Mr. Wilson had some interest in, I guess, a

4     continuing interest in basketball.  I think he played some

5     other sports when he was younger, but when you look at the

6     idea, I think if you could have a central point to this area,

7     it is how do you use your free time?  Do you use it in some

8     constructive way?  That is to say, do you have an interest or

9     a hobby that you pursue or do you stand on the street corner

10    and do nothing or, you know, the equivalent of wasting your

11    time.

12         And many people, for example, Monica Cook reported

13    that Mr. Wilson really liked to play games with her children,

14    who at that time were under 12 years of age, I believe, and he

15    liked to play the games that they liked to play and he enjoyed

16    playing at that level.  And I asked her, well, did he like to

17    do that just because that's what you do when you are with

18    children, you know, you play the games that children like to

19    play in order to entertain them.  And she said no, I think

20    that was his level and he enjoyed it because he was right at

21    the level of these children.

22         And when I asked him about it, about his leisure

23    interests, he made an interesting distinction.  He said that

24    he didn't like to play what he called mind games, he liked to

25    play things that involved manipulation of objects.  And that's

Olley - Direct/Burt

569

1    a pretty good description because -- and I asked Ms. Cook

2    about this and she said yeah, he didn't like the kind of games

3    that require a lot of thinking and abstract planning and

4    thought he liked things that he could manipulate, and she gave

5    some examples of children's games.

6          I think there was some differences of view about

7    video games.  And Ms. Cook -- and again, I refer to her

8    because she's the best source right before the time of the

9    crime, said that he really didn't have interest in video games

10   and he had the opportunity to play them and didn't.  And then

11   I think the other source for this was Corey, his cousin, and

12   they played together some, and Corey said this was, I guess

13   when they were about ten years old, that they did play video

14   games, but they were at that time sort of the more rudimentary

15   Nintendo video games that did not require a lot of

16   sophisticated problem solving.

17         So anyway, I'm rambling about this too much.  In

18   general, Mr. Wilson did not pursue his leisure time

19   creatively.  He didn't show an interest in gaining new leisure

20   skills.  He didn't use his leisure as way of expanding his

21   knowledge.

22   Q    I think there was mention yesterday that there was a

23   notation in the custodial records, I believe it was Brookwood,

24   maybe some other institution, of a notation that Mr. Wilson

25   spent his time in part playing chess.  How does that weigh

Olley - Direct/Burt

1    into your opinion, if it does, that activity in a custodial

2    setting?

3    A    I don't know anymore about it than what you just said.

4    If we come back to the middle age cutoff for mental

5    retardation being 11 or 12, 11 or 12 years olds can play chess

6    and his performance of chess, I really don't know.  People say

7    they play chess and they are sort of moving the pieces around.

8    I don't have a way of assessing how sophisticated that was.

9    Q    Okay.  And then I guess the last area is the work area.

10   What was your conclusion, what does that involve and what was

11   your conclusion?

12   A    Well, we discussed this a fair amount earlier.  My

13   conclusion was that Mr. Wilson has or had and growing up at

14   the time of the crime, a significant impairment in the

15   adaptive behavior area of work.

16   Q    And could you explain why?

17   A    Yes.  In brief, I mentioned earlier that work involves a

18   lot of things; including all of those skills leading up to

19   work that I listed earlier.

20        And then in the area of the actual performance of

21   work, once someone has found a job is what is the level of

22   sophistication of the job.  So, for example, people with mild

23   mental retardation often have an excellent work history when

24   it comes to showing up for work, carrying out their routine

25   activities, very reliably.  And I say routine activities,

Olley - Direct/Burt

1    because it's more likely to be successful if it is a job that

2    does not require a lot of decision making.

3           I mentioned a moment ago common deficits in decision

4    making and judgement and problem solving.  On the other hand,

5    if it is a job that has a predictable, routine activities that

6    can be anticipated, not a lot of judgement that has to be used

7    and people with mild intellectual disability can be quite

8    successful.

9           The jobs that Mr. Wilson had that, you know, the

10   documented paid jobs involved manual labor, which certainly

11   would have been within the realm of somebody with mild

12   intellectual ability.

13   Q    Now, you assessed all ten of those areas by using the

14   information from your interviews and the information you got

15   from your records?

16   A    Yes.

17   Q    And then did you also weigh into the balance of your

18   decision making the scoring on the adaptive behavior test that

19   you administered before?

20   A    Yes, and that was information that was summarized in the

21   last slide that we showed.

22   Q    Okay.  And based on all of that information, do you have

23   an opinion to a reasonable degree of psychological certainty

24   as to whether Mr. Wilson is intellectually disabled?

25   A    Are you referring to intellectual disability or are you

Olley - Direct/Burt

1  referring does he have a significant impairment in adaptive

2  functioning?

3  Q    Well, let's start first with adaptive functioning.

4  A    Yes.  All the information that we just reviewed led me to

5  the conclusion that he has a significant impairment in

6  adaptive functioning as he was growing up and at the time of

7  the crime.

8  Q    And did you form any opinion overarching issue whether he

9  was intellectually disabled?

10 A    I did, and to be clarifying, I did not, as I mentioned

11 earlier, do any evaluation of intellectual functioning myself,

12 I relied upon Dr. James' analysis, her testing.  She didn't do

13 an IQ test, but her analysis is of the previous testing.

14 Q    Is there anything else other than the specific areas that

15 we have discussed which you think is important to understand

16 in your opinion?

17 A    I think the only thing that we might have only touched

18 lightly on, because it is not mentioned in the standard

19 adaptive behavior scales, is that the emphasis upon a person

20 being naive, gullable and influenced by others.  And I think

21 that many people described Mr. Wilson as not a leader, but a

22 follower and that he -- you know, as I mentioned earlier, I

23 think I quoted his sister Depetra, you could talk him into

24 anything.  The area of naivety with regard to social

25 relationships is something worth mentioning.

573

Olley - Direct/Burt

1   Q    Are you familiar with the part of the manual which

2   discusses the characteristics of people with intellectual

3   disability who have higher IQ's?

4   A    There is a table, actually two tables in the -- actually,

5   I have it here, the user's guide by AAIDD.  That, I think,

6   very well summarizes the kind of deficits that Mr. Wilson has.

7   Q    And what is the -- this is slide 93 from Dr. Shapiro's

8   PowerPoint, which is Exhibit A in evidence.  And is this the

9   table from the chapter that you just referenced?

10  A    Yes.

11  Q    What is this table based on, is there a research basis

12  for these characteristics?

13  A    Yes.  I believe that all of them can be found somewhere

14  in the literature related to intellectual ability.

15  Q    Is this an attempt to sort of capture what a person at

16  the higher end of the disability spectrum looks like in terms

17  of characteristics?

18  A    Yes, that's exactly what it is.

19  Q    How, if at all, does Mr. Wilson fit within this profile?

20  A    I believe looking at this table what's labeled as table

21  3-1, 3.1, all of these things apply and we have discussed each

22  of them in some fashion or other today.

23  Q    Okay.  And then is there -- on page 94 of that same

24  PowerPoint slide there is a second table which sort of breaks

25  down within each domain the characteristics of someone at

Olley - Direct/Burt

1   higher IQ levels who nevertheless would still be

2   intellectually impaired.  Are you familiar with that table

3   from the Green Book?

4   A    Yes.  I think I made reference to this earlier when I

5   said there is a more detailed description of what is meant by

6   each of these three areas, and this is the table to which I

7   was referring.

8   Q    And how does Mr. Wilson fit or not fit within this sort

9   of contemplation of what the profile looks like?

10  A    I think that -- I mean, we could take the time to go

11  through each one of these, but as I said, I think we've pretty

12  much discussed them, but I think nearly all of them are

13  directly applicable to Mr. Wilson's situation.

14          MR. BURT:  Thank you.  That's all I have, Doctor.

15          Your Honor, I would move into evidence Exhibit F,

16  which is the binder.

17          THE COURT:  Any objection?

18          MR. McGOVERN:  No objection.

19          THE COURT:  All right.  Exhibit F is received in

20  evidence without objection.  You may cross-examine.

21          MR. McGOVERN:  Thank you.

22          (Defendant's Exhibit F received in evidence.)

23  CROSS-EXAMINATION

24  BY MR. McGOVERN:

25  Q    Good afternoon Dr. Olley.

575
Olley - Cross/McGovern

1    A    Good afternoon, Mr. McGovern.

2    Q    How are you?

3    A    I'm hanging in there.

4    Q    All right.  Dr. Olley, I want to talk to you a little bit

5    about your retention in this case.  There came a time earlier

6    in this year where you were retained by Mr. Burt to provide an

7    expert evaluation of Ronell Wilson; is that right?

8    A    Yes.

9    Q    Can you tell me when that happened?  Not the specific

10   date; was it in 2012, was it 2011 or something else?

11   A    I think it was early 2012.

12   Q    And you are familiar with Mr. Burt, correct?

13   A    Yes.

14   Q    You worked with Mr. Burt in the past?

15   A    On one other case, yes.

16   Q    Do you have any other cases with Mr. Burt?

17   A    No.

18   Q    So the only case the case you have with Mr. Burt is the

19   Davis case in Maryland; is that right?

20   A    That's true.

21   Q    And the case in Maryland was successful for Mr. Burt, was

22   it not, Mr. Davis was deemed to be mentally retarded by a

23   District Court Judge in Maryland; is that right?

24   A    Yes.

25   Q    And you worked with the same team of experts that are

Olley - Cross/McGovern

1   present in this case; is that right?

2   A    Yes.

3   Q    Ms. James or Dr. James?

4   A    Yes.

5   Q    And Dr. Shapiro?

6   A    Yes.

7   Q    And Dr. Woods from California?

8   A    Yes.  I worked -- if I may, work with is -- Dr. Shapiro I

9   only crossed paths with enough to say hello to in that case;

10  the others I worked more closely.

11  Q    Okay.  And worked with may not be a fair assessment,

12  would you prefer that you all testified at the same hearing

13  with the same defense attorney asking you all questions?

14  A    Yes.  Although, just for clarification, all of the

15  experts were sequestered in that case, so we were not present

16  in the courtroom ever at the same time.

17  Q    Okay.  But for clarification, you all reviewed each

18  other's reports before you testified, correct?

19  A    Yes.

20  Q    So you were fully aware of what the other folks' opinions

21  were before you sat on the witness stand, right?

22  A    Yes.

23  Q    And when you were contacted about this case, you knew

24  Mr. Burt and he asked you to take a look at the Wilson case,

25  correct?

Olley - Cross/McGovern

1    A    Yes.

2    Q    Did you understand him to be representing Mr. Wilson

3    already?

4    A    Actually, I didn't meet with Mr. Burt at that time, I met

5    with Ms. Brady.  And I think my first contact was with

6    Ms. Brady who told me about this case.

7    Q    So it was Ms. Brady who called you up and said, I'd like

8    to retain your services to take a look at the Ronell Wilson

9    case?

10   A    No.  I was introduced to Ms. Brady by Ms. Greenman, whom

11   I had known previously.

12   Q    And who does Ms. Greenman work for?

13   A    She works for the Federal Defenders office in Maryland.

14   Q    Is that a Capital Defenders or?

15   A    I believe so, yeah.

16   Q    When you were asked to participate in the case, what

17   information were you provided with?

18   A    That there was a case in New York, that it involved the

19   killing of two police officers, that there was likely to be

20   access to witnesses that would be helpful to me in making a

21   decision, and that they were hopeful that there would be

22   sufficient adaptive behavior information to be helpful in that

23   case.

24   Q    Okay.  And you agreed to get involved in the case,

25   correct?

Olley - Cross/McGovern

1    A    I gave it some thought and -- yes, I agreed.

2    Q    Well, you gave it some thought because you have so many

3    other Atkins cases going on at the current time?

4    A    Because as I mentioned earlier, I'm trying albeit

5    unsuccessfully, to retire, and you can't retire if you keep

6    taking new cases; however, I did agree to take this case.

7    Q    Let me see if I understand that correctly.  You can't

8    retire until you finish all of the Atkins cases; is that

9    right?

10   A    Well, if I'm in the middle of a case that I've obligated

11   myself to, I think that would be my responsibility to see it

12   through, rather than stopping in the middle.

13   Q    Oh, I see what you are saying.  Have you obligated the

14   university to these cases, is that what the obligation is?

15   A    Well, in a sense I'm the only person there that does

16   these cases; although, it's really the university, it's the

17   university with which the government contracts or, you know,

18   whatever entity contracts.  There is still an expectation that

19   it's still my services that they want.

20   Q    But I'm quite sure the University of North Carolina

21   Chapel Hill is not particularly interested in advancing the

22   cause of Atkins defense; is that right?

23   A    I don't think that they have a position on that.

24   Q    Okay.  All right.  So when you enter a new case as a

25   professor at the university as you described with Mr. Burt,

Olley - Cross/McGovern

1   your contract is really with the university, and the

2   university contracts with whoever the attorneys are that you

3   are working for; is that right?

4   A    That's true.

5   Q    So if you signed up for a case while working for UNC you

6   can't just retire from UNC without complicating the situation

7   with the representation of the case, because money, the money

8   that's supposedly being paid by the defense attorneys are

9   being paid to the university; is that right?

10  A    I didn't see it as primarily a matter of money, it's a

11  matter of completing something that I had obligated myself to

12  do.

13  Q    Well, when you say you are going to retire, you are

14  suggesting that you are never going to do Atkins work after

15  you retire?

16  A    I guess -- I don't know.  I'll take that as it comes.

17  What I'd like to do is finish the cases to which I am

18  obligated and see how my life unfolds.  I might want to work

19  part-time in the future, I haven't decided that yet.

20  Q    Okay.  So you are leaving the option open of doing

21  forensic work as a psychological expert in Atkins work after

22  you leave the university, right?

23  A    No, I -- well, I mean, that's theoretically possible, but

24  that's not my intention.  My intention is to keep working for

25  the university.  And if it turns out that I have only enough

Olley - Cross/McGovern

 1 | work to keep me busy half the time, I'll be a half-time

 2 | employee.

 3 | Q    Did I misunderstand you when you say you are retiring?

 4 | Are you retiring from the university or are you retiring from

 5 | work in general?

 6 | A    I hope both eventually, but...

 7 | Q    Well, I hope so too.  But what I'm asking you:  If you

 8 | are going to retire from the university, that means I don't

 9 | work at the university anymore, right?

10 | A    Yes.

11 | Q    But you just said I might be a part-time and I might be

12 | with the university.  Are you leaving the university or not

13 | leaving the university?

14 | A    I don't have a concrete plan for a date.  I guess my hope

15 | would be -- I've never discussed this in public before, my

16 | hope would be to slowly, you know, wind down so I'm not doing

17 | this all the time.

18 | Q    Okay.

19 |         THE COURT:  I'm hoping to finish this hearing before

20 | I have to retire, so could we move along.

21 |         MR. McGOVERN:  No, I'm moving along.

22 |         THE COURT:  Okay.

23 | Q    So when you were presented with the possibility of

24 | getting involved in this case, you were told that there were

25 | witnesses available who could potentially help you with

Olley - Cross/McGovern

1   adaptive functioning, correct?

2   A    Sure.

3   Q    Sure.  Isn't that what you just said?

4   A    Yes.

5   Q    Okay.  So were you presented with information about what

6   Mr. Wilson's IQ was?

7   A    No, not that I recall, because the function that -- the

8   discussion would be could I do an adaptive functioning

9   evaluation.

10  Q    Well, was it your understanding somebody already jumped

11  past prong one or evaluated him and ascertained that prong one

12  of the standard test for mental retardation had been met?

13  A    Calling it prong one assumes there is a sequence.  I see

14  adaptive functioning being the most important part.

15  Q    Okay.  Well, it's a very important part.  But if you

16  don't satisfy prong one or prong A or the first prong.  You

17  are not going to be found to be mentally retarded or

18  intellectually disabled, right?

19  A    Right.

20  Q    So when you took on the case, did you have an

21  understanding whether somebody had determined whether or not

22  Mr. Wilson met the requirements of the intellectual deficit

23  prong?

24  A    My understanding was the attorneys had access to that

25  information and they felt that that information was

582

Olley - Cross/McGovern

1    sufficiently strong and there were merits to have an Atkins

2    hearing.

3    Q    Okay.  And that's obviously not a determination that you

4    made, correct?

5    A    Correct.

6    Q    Now, ultimately as we see in your report you reach that

7    determination, correct?

8    A    Yes.

9    Q    Okay.  But when you are brought into the case, you're

10   just -- you're being -- you're being told that that prong is

11   going to be satisfied, correct?

12   A    The attorneys were obviously optimistic that it would.

13   Q    Okay.  When the attorneys brought this case to you, did

14   they advise you that somebody had ever diagnosed Mr. Wilson,

15   the defendant here, with mental retardation?

16   A    I'm sure at some point in our decision that was raised.

17   Q    Okay.  And I'm sure -- I think you said on direct that's

18   of no moment to you that prior professional psychologists have

19   never diagnosed him with mental retardation, right?

20   A    I wouldn't say it's of no moment, I would say there are

21   certainly instances in which -- and this is also written about

22   widely, that people reach adulthood and are functioning at a

23   level of a person with retardation and have never been so

24   diagnosed.

25   Q    Just so the record is clear, you -- when did you agree to

Olley - Cross/McGovern

1    actually work on this case and do the evaluation of

2    Mr. Wilson's adaptive functioning?

3    A    Well, I first saw him in April, so I think, you know, it

4    was probably a month or two before that, that I made a

5    decision to work on it.

6    Q    Okay.  So the timeline is clear, I believe there was a

7    letter sent -- did you know that there was a letter sent by

8    the defense to the Court saying you were going to be one of

9    the experts in this case back in March of this year?  Does

10   that sound right to you?

11   A    That sounds right.  If I saw him in April, then March

12   would make sense.

13   Q    So during that period of time, in March and April, you

14   were reviewing information relating to Mr. Wilson's case?

15   A    Yes.

16   Q    And what types of things would you have been reviewing?

17   A    School records.  I mean, it's hard to say, because lots

18   of things kept coming in over time, and I continued to be

19   reviewing records.  We noted earlier 12,000 or whatever pages

20   is a lot of records, so I think the school records, the

21   Brookwood records.  I don't recall exactly which ones came

22   along first.

23   Q    And among the information that you were reviewing, you

24   undoubtedly were presented with or had the opportunity to

25   review the reports that were prepared by Dr. Drob, Dr. Sanford

584

                    Olley - Cross/McGovern

1   Drob and Dr. Kathy Yates, correct?

2   A    Yes.  Although, the information from Ms. Yates wasn't

3   labeled as being from her, but I was later told that's where

4   it originated.

5   Q    Do you remember how you were presented with this

6   information with the Drop reports and the Yates information,

7   in writing or did somebody tell you about these things

8   verbally first?

9   A    In writing.

10  Q    Okay.  Were you exchanging E-mails with the defense team

11  about what your proposed testimony was going to be?

12  A    What my proposed testimony was going to be?  My exchange

13  with them more had to do with logistic things, when can we

14  schedule this and so on.

15  Q    But you've never E-mailed any of the people at the

16  defense table about matters related to your testimony here,

17  correct, at any time?

18  A    I E-mailed them with regard to preparation of my report

19  when was it due and so on, and the preparation for my

20  testimony was, you know, very recently.

21  Q    Okay.  So you've never -- you never had those types of

22  communications?

23  A    Those types of communications is a broad statement.

24  Q    Okay.  Those types of communications that are related to

25  your testimony.  I want to confirm that; it was at issue here.

Olley - Cross/McGovern

1    A    Of course I talked to them about what my testimony would

2    be, like, in preparation for being here today.

3    Q    Okay.  With respect first Dr. Sanford Drob, you said at

4    some point you had an opportunity to review his report,

5    correct?

6    A    Yes.

7    Q    Okay.  And Dr. Drob evaluated the defendant not long

8    after he was arrested for killing two New York City police

9    detectives execution style?

10   A    Yes.

11   Q    And at that time when Dr. Drob was doing his evaluation

12   of the defendant, did you know that the Richmond County

13   district attorney's office was contemplating seeking the death

14   penalty against the defendant?

15   A    Did I know at that time?

16   Q    Did you know when Dr. Drob did his analysis or evaluation

17   of the defendant that one of the things that was hanging in

18   the balance when Dr. Drob was doing his evaluation was whether

19   or not William Murphy, the district attorney for Staten Island

20   was going to seek to have the defendant executed?

21   A    I assumed that the -- well, because it was an Atkins

22   case, which is a capital case, I assumed when I heard about

23   it, that that was known.

24        Now, the exact sequence of when the decision was

25   made for it to be a capital case, I was not aware of.

Olley - Cross/McGovern

1   Q    Okay.  Well, taking your assumption, you understood that

2   when Dr. Drob was being asked to evaluate the defendant, he

3   was doing so with an eye towards seeking, let's just call it

4   Atkins --

5           MR. BURT:  I'm going to object to that.  There is no

6   foundation he knows what Dr. Drob was doing or why he was

7   doing it.

8           MR. McGOVERN:  I think he should and I think that

9   it's relevant to his testimony.  If he's going to toss aside

10  Dr. Drob's report as being not something he could rely on to

11  the fullest extent, then he should be able to answer questions

12  as to why Dr. Drob's report is unreliable.

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  I'm not sure that -- I lost track of

15  the question.

16  Q    I'll help you out.  Dr. Sanford Drob evaluated the

17  defendant in 2003 and determined him not to be mentally

18  retarded.  You understand that, right?

19          MR. BURT:  I object to that, there is no foundation

20  for the question in the evidence.

21          MR. McGOVERN:  Are you suggesting that his report is

22  not in evidence?  I thought you put it in.

23          THE COURT:  It's not in?

24          MR. BURT:  The report is in, but the question is

25  that he determined that he is not mentally retarded.  I don't

Olley - Cross/McGovern

1    think there is a factual foundation for that.  The report

2    simply does not address that issue or that he -- what he did

3    determine or did not determine.  It indicates that he had a

4    learning disability, but it does not say he ruled out mental

5    retardation or that he did adaptive functioning testing.

6              MR. McGOVERN:  I'm sorry, let me see if I'm wrong

7    about that.

8    BY MR. McGOVERN?

9    Q    You understood that Dr. Drob gave the defendant an IQ

10   test, correct?

11   A    Yes.

12   Q    And he determined the full scale IQ to be 76 points?

13   A    Yes.

14   Q    You understand that Dr. Drob did not apply the Flynn

15   Effect to that score, correct?

16   A    Correct.

17   Q    And you understand that Dr. Drob said that the defendant

18   was intellectually functioning in the borderline range?

19   A    If that's what it said.  I agree, I don't recall exactly

20   what his wording was.

21   Q    Okay.  Does that have meaning to you, intellectually

22   functioning in the borderline range?

23   A    Yes.  It means an IQ score that is above the customary

24   cutoff for mental retardation.

25   Q    The customary cutoff.  So he is basically saying I don't

Olley - Cross/McGovern

1   think he's mentally retarded, I'm reducing it to writing, and

2   I think he's actually in the borderline range, which is above

3   a finding of mental retardation, correct?

4   A    Yes.

5   Q    Okay.  And Dr. Drob also concluded that he actually

6   thought the defendant's IQ score was depressed because his IQ

7   score was being compromised by learning disabilities and other

8   neuropsychological factors, correct?

9   A    Earlier you objected to my making that kind of statement

10  about an IQ test.  If you'd like me to proceed with it now

11  with the understanding that my function is not to analyze the

12  IQ test but to do adaptive behavior assessment --

13  Q    Let me see if I can straighten this out for you.

14       Doctor, you're here testifying in a capital case

15  that that man is mentally retarded, correct?

16  A    Yes.

17  Q    You're relying on prong one that says he has intellectual

18  disabilities, correct?

19  A    I'm relying on Dr. James' interpretation of the prior IQ

20  scores.

21  Q    So do you not believe it.  Do you not believe that he

22  satisfied prong one?

23  A    I do believe it, but I'm telling you where I got that --

24  where I made that decision.  I made it trusting Dr. James'

25  review and interpretation of those scores.

Olley - Cross/McGovern

1   Q    But you're opining that he satisfies prong one, correct?

2   A    Yes.  And I want to be clear as to what basis I make that

3   decision.

4   Q    Okay.  But I'm here.  My little job here is to ask you

5   questions about your opining.  And so if you're opining that

6   he satisfies prong one, I'm going to ask you questions about

7   that.  Do you understand that?

8   A    Yes.

9   Q    Okay.  So I just asked you a prong one question, which is

10  Dr. Drob said that this Defendant has a depressed IQ score

11  related to prong one.  That is -- because his score is being

12  compromised by his learning disabilities and other

13  neuropsychological factors.  Can you answer that?  Is it true

14  that he said that?

15  A    It's true that he said that.

16  Q    Okay.  Did you have that report in your possession or

17  have you -- did you review that report before you wrote your

18  report?

19  A    Yes.  And I said in my report that I looked at Dr. Drob's

20  findings and I relied upon Dr. James' interpretation of that

21  and previous IQ scores.

22  Q    Okay.  And putting that in plain English, you did not

23  credit Dr. Drob's findings as much as you credited Dr. James',

24  correct?

25  A    Yes.  And that statement that you read earlier is related

Olley - Cross/McGovern

1   to what I said quite some time earlier in the day about not

2   stating what the person's potential is; but rather, going with

3   the facts.  I am skeptical of when people administer a score

4   and then say well, after the fact it should have been higher

5   for this and that reason.

6   Q    I understand.  I think I understand.  So you are saying

7   -- well, I think what you've said earlier today was in the

8   context of adaptive functioning, right?

9   A    Yes.

10  Q    And adaptive functioning, your articles are replete with

11  references to the fact it's not what you might be able to do,

12  it's what you are actually doing, right?

13  A    Yes, sir.

14  Q    So now back on prong one, you're saying you are skeptical

15  of people that say his IQ might be higher than this, because

16  you don't like to talk about potential abilities, you want to

17  know what is the actual IQ, you want it firm, right?

18  A    I want a score that's based upon the best scientific

19  knowledge of what that score should be.

20  Q    Okay.  So, just to finish with Dr. Drob so we can move

21  on, you did not credit Dr. Drob's findings, correct, as much

22  as you did Dr. James'?

23  A    I credited them in the context of Dr. James'

24  interpretation of scores that take into account the Flynn

25  Effect and other factors that you are familiar with.

Olley - Cross/McGovern

1   Q    And this Dr. Drob that you were not credited as much as

2   Dr. James was a clinical professor at New York University,

3   correct, of psychology?

4   A    Yes.

5   Q    And at some point you came into contact with the results

6   of an analysis by Kathy Yates, correct?

7   A    Yes.

8   Q    And Dr. Yates is a Columbia PhD.  We're hitting all the

9   local New York schools here.  And she did a full academic

10  review of the defendant's academic records, right?

11  A    Yes.

12  Q    And she did a full review of all of his medical records,

13  right?

14  A    Yes.

15  Q    And then she offered her findings in the case, correct?

16  A    I believe so.

17  Q    And she didn't find him to be mentally retarded either,

18  did she?

19  A    Apparently not.

20  Q    In fact, she said that his problems with learning were

21  the result of a profound learning disability.  Does that sound

22  correct to you?

23  A    Yes.

24  Q    And that he never received a diagnosis of mental

25  retardation, the combination of emotional disturbance and ADHD

592

Olley - Cross/McGovern

1   led to underachieving potential which led to self esteem

2   problems.  Does that sound right?

3   A     That sounds like what she said.  I wouldn't necessarily

4   agree, again, it's the speculating what his potential is.

5   Q     I apologize.  That was a bad question.  Is that what she

6   said?

7   A     Is that what she said?

8   Q     Is that what she said?  Do you think I read that

9   correctly?  Does that sound like what you remember her saying?

10   A     I'm taking your word for it, because I read it awhile

11   back.

12   Q     Okay.  Well, in the interest of moving along, I'm sure

13   Mr. Burt is looking at it, so we'll -- you can assume that I

14   read it correctly.

15          And she also made some comments in that report if

16   you recall about the defendant having a higher potential than

17   his records or his history were showing, that he had higher

18   intellectual potential than maybe his scores were showing.

19   Does that sound right to you?

20   A     It sounds wrong, but it sounds like what she wrote.

21   Q     Okay.  So you are certainly not crediting Dr. Yates,

22   correct?

23   A     Not in that regard.

24   Q     So you understood that Dr. Yates had evaluated the

25   defendant at the request of the Capital Defenders here in New

Olley - Cross/McGovern

1   York after he was arrested and facing the death penalty,

2   correct?

3   A    Yes.

4   Q    And you also understood in reviewing her reports that

5   there is really no ambiguity about what she was trying to do

6   because her report is labeled at the top of each page of the

7   academic report, "Lens Toward Meeting the Criteria For Mental

8   Retardation."  You read that?

9   A    Yes.

10  Q    And so on the top of the report of each page of

11  Dr. Yates, it says, "Here's my point, I'm looking at all of

12  this stuff, all of his academic records with a lens toward

13  meeting the criteria for mental retardation."  So we know she

14  was actually trying to do the exact same thing you were trying

15  to do or that you did?

16  A    Yes.

17  Q    And she came up -- she didn't meet the criteria?

18  A    Yes.

19  Q    In fact, she said some things that you now disagree with,

20  which are to the extent that he's not a high performing

21  intellect, that the reasons for that have something to do with

22  the fact that other factors like his learning disabilities and

23  his ADHD?

24  A    Yes.

25  Q    Okay.  And you reviewed her report before you prepared

Olley - Cross/McGovern

1    yours?

2    A    Yes.

3    Q    And I'm not going to burden you with going through every

4    single other psychologist or neuropsychologist who has ever

5    sat down to talk to the defendant in this case, but we would

6    agree that none of those other people looking through the lens

7    of mental retardation or not ever deemed him to be mentally

8    retarded, correct?

9    A    That's correct.

10         THE COURT:  Can we just take a break?  Don't move.

11   I want to talk to the court reporter.

12         (Pause.)

13         THE COURT:  Okay.  We'll continue.

14         MR. McGOVERN:  Thank you, your Honor.

15   Q    Now, on your direct examination you were questioned by

16   Mr. Burt about the fact that Dr. Drob did not do any adaptive

17   functioning testing as part of his evaluation, correct?

18   A    Yes.

19   Q    And have you interviewed Dr. Drob?

20   A    No.

21   Q    And do you know why Dr. Drob didn't do any evaluation of

22   his adaptive functioning?

23   A    No, I don't.

24   Q    But you're critical of that, correct?

25   A    I pointed out as making it impossible to make a decision

Olley - Cross/McGovern

595

1    about the mental retardation.

2    Q    Okay.  If the -- if Dr. Drob determined that the

3    defendant's IQ standing alone did not indicate the necessity

4    of adaptive functioning testing, would you agree with that or

5    disagree with that?

6    A    I think certainly that's a legitimate decision to make in

7    that if in his professional opinion this IQ could not be

8    interpreted as, you know, in light of the other factors that

9    we've since talked about, such as the Flynn Effect, if he in

10   his professional decision found that there was no way that

11   this could be interpreted as mental retardation, he would be

12   justified in not having to do an adaptive behavior assessment.

13   Q    Okay.  So if he didn't use the Flynn Effect in his daily

14   practice and didn't apply it to the 76, you would disagree

15   with that interpretation of the 76?  In other words -- I'll

16   withdraw that.

17            Do you think that that 76 should have been Flynn

18   Effected?

19   A    I think it should have been looked at in terms of --

20   well.  Just as Dr. James did.  Which is the practice effect I

21   believe that he had, gosh, something like eight Wechsler

22   scales between the time that he was 6 and 21, so...

23   Q    Different variations of that, right?

24   A    Yes, but they all have similar features that experts

25   practice effect would regard as something to take into

Olley - Cross/McGovern

1   consideration.

2   Q    Well, if that's true, then you would have expected his IQ

3   scores to go up over time, correct, based on practice effects,

4   correct?

5   A    Well, that's one factor that would influence IQ scores.

6   There's simply a lot, when you are talking about people with

7   low IQ's, there is a lot of variability from one

8   administration to another, and that can be due to a number of

9   factors.  And, you know, given Dr. Drob's qualifications, as

10  you mentioned, I think he was aware of all the things that he

11  might have influenced the IQ score in his judgement, he stood

12  by it.  And Dr. James' review of it, she found that it would

13  come within the standard that we now accept for being held for

14  mental disability.

15  Q    So you respect or you credit Dr. Drob's opinion in 2003,

16  not to seek adaptive functioning or do adaptive functioning at

17  that time, is that your testimony?

18  A    I respect his decision based on the information that he

19  had.

20  Q    Fair enough.  Because you actually have said in the past

21  when you were questioned about -- about when adaptive

22  functioning is called for, you've said that you wouldn't waste

23  court resources in a case where a person's IQ score was

24  substantially over 70, right?

25  A    I don't recall saying that, but it makes sense.

Olley - Cross/McGovern

1    Q    Well, let's see if I can --

2    A    -- what substantially means.

3    Q    I can refresh your recollection.  You testified in the

4    Umana case in North Carolina a couple of year ago, correct?

5    A    Yes.

6    Q    And that was on November 30, 2009?

7    A    I don't remember the date, but I'm sure that's correct.

8    Q    I'm more doing it for the record.  It was before

9    Honorable Robert J. Conrad who is a United States Federal

10   Judge down there in Charlotte, right?

11   A    Yes.

12   Q    Do you remember that case?

13   A    I do.

14   Q    That was a case where you testified in an Atkins hearing

15   attesting to the fact that Mr. Umana was mentally retarded,

16   correct?

17   A    Yes.

18   Q    And on cross-examination in that case at page 121 you

19   were asked the question:  "But for this IQ score that

20   Dr. Waynestein (phonetic) came up with of 66, you'd not be

21   giving an opinion of mental retardation without that score

22   would you, based on this data?"  And your answer was "I think

23   as a practical matter of efficiently using the Court's

24   resources, if someone came to me and said, here is a person

25   with an IQ that is -- we talked about earlier about the

Olley - Cross/McGovern

1    standard of error of measurement of a score -- a score that's

2    substantially above 70, I would say I don't think it's worth

3    the resources to go looking for adaptive behavior problems;

4    but with a lower score, then yes, it would be."  Does that

5    sound like I read that correctly?

6    A    Yes.

7    Q    And so in that testimony you were saying if somebody had

8    a score that was substantially over a 70, you wouldn't seek

9    adaptive functioning, right?

10   A    Yes, and it hinges upon the word "substantially".

11   Q    I'm sure you'll have the opportunity on re-direct to

12   explain to us what the word substantially means.  But you

13   would agree that that same type of analysis is what informed

14   Dr. Drob when he made the decision not to seek adaptive

15   functioning; is that correct?

16            MR. BURT:  Objection to that.

17            THE COURT:  Sustained.

18   Q    Is that analysis consistent with what you see in

19   Dr. Drob's evaluation of the defendant?

20   A    In that we both looked at what we consider to be too high

21   an IQ score to merit going ahead with adaptive functioning

22   assessment, yes.

23   Q    And when did the defense team actually let you in on what

24   the actual IQ scores were?

25   A    I don't recall.

599

Olley - Cross/McGovern

1   Q    Do you know now?  I mean, you knew at the time of your

2   report, didn't you?

3   A    Well --

4        THE COURT:  You can't over speak over each other.

5   I'm sorry.

6        THE WITNESS:  I do know what the scores are now, but

7   I don't recall when they were brought to my attention.

8   Q    Did you start your adaptive functioning evaluation prior

9   to finding out what the IQ scores were?

10  A    I don't recall.  I mean, I had enough information from

11  the defense team that the IQ scores were in the range that

12  would be defensible in court; and exactly when I looked at

13  which scores, I do not recall.

14  Q    We're going to talk a lot about this during the course of

15  this cross-examination, and it has to do with what good

16  practice is.

17       Is that good practice to undertake an evaluation of

18  somebody's adaptive functioning without knowing what their IQ

19  score is?  Is that is that what everybody is doing out in

20  private practice in the psychological world?

21  A    I think it's reasonable to have an idea what the scores

22  are, as you said, to feel justified in conducting an adaptive

23  behavior testing.  I don't recall exactly when those, the list

24  of scores, particularly with discussion of how those scores

25  might be interpreted was brought to my attention.

MARY AGNES DRURY, RPR
Official Court Reporter

Olley - Cross/McGovern

1    Q    So is it -- assuming what you just told us before is
2    right, that you didn't -- that you were taking the defense
3    team's word for what the IQ's were, is it good practice as a
4    licensed psychologist to start an evaluation of somebody's
5    adaptive function, evaluating them for the presence of mental
6    retardation without having a clear understanding of what their
7    IQ actually is; be it in one test or nine tests?
8    A    A clear idea?  I think part of what this process is, is
9    to determine what a clear idea is.  I think it was obviously
10   clear enough in my mind to feel that it was justified to do an
11   adaptive behavior assessment.
12   Q    What is the -- you just said what this process is.  I'm
13   asking you about what good clinical practice is, and you
14   responded about what the process is.  Are you referring to the
15   process of Atkins litigation?
16   A    Yes.
17   Q    And so you hold yourself out as a little bit of an expert
18   on -- not just being an expert on neuropsychology and all of
19   your multiple accomplishments, but you are an expert at Atkins
20   litigation?
21   A    I'm not an expert in neuropsychology, and I'm not an
22   attorney, so I wouldn't claim to be an expert in Atkins
23   litigation.
24   Q    Well, you write article on top of article on top of
25   article about Atkins and how one testifies, prepares,

Olley - Cross/McGovern

1   evaluates and otherwise communicates information related to

2   Atkins litigation; is that right?

3   A    From the point of view from a psychologist, yes.

4           (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

602

Olley - Cross/McGovern

1   BY MR. McGOVERN:

2   Q    Yeah.  So you write quite a bit about Atkins, right?

3   A    Yes.

4   Q    You actually testified on direct quite a bit about your

5   understanding of Atkins and how the rules of the DSM and the

6   AAIDD apply to Atkins, correct?

7   A    How I hope they would apply to Atkins, which is to say to

8   rely upon these kinds of accepted standards.

9   Q    I'm going to jump ahead for a second.  I'm sorry.  You

10  just said that you -- you were going to -- testifying about

11  how you hope that these standards would apply to Atkins,

12  correct?

13  A    Yes.

14  Q    Okay.  And on direct, you testified that you were the

15  chair of a committee that was formed to inform the judiciary

16  and the -- your constituency in the psychology world about

17  Atkins, correct?

18  A    Yes.

19  Q    And your slides that you have used as demonstrative

20  evidence here during this presentation, refer to the 2010

21  standard from the AAIDD, and but also mention the DSM, right?

22  A    Yes.

23  Q    But you're really advocating for the use of the 2010

24  manual, right?

25  A    I think that's probably the best standard that we have

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1    available at this time.

2    Q    Okay.  And you have written about this, right?

3    A    Yes.

4    Q    Right.  And one of the articles that Mr. Burt handed to

5    us this morning was your 2008 "Implications of Atkins versus

6    Virginia issues in defining and Diagnosing Mental

7    Retardation," right?

8    A    Yes.

9    Q    And in article that you coauthored with Dr. Everington,

10   you talked about the standard that should be applied, correct?

11   A    Yes.

12   Q    You have been -- in all of your cases that you have had,

13   you've testified that the standard that should be used is the

14   standard that is adopted by the AAIDD, right?

15   A    Yes.

16   Q    And you would agree that that standard has actually been

17   evolving over time, correct?

18   A    Yes.

19   Q    Right?  First it was the 1992, when it was the AAMR, and

20   then in 2002, they came out with a new set of guidelines, then

21   we have a 2010 manual, correct?

22   A    Yes.

23   Q    And you would agree that as that manual evolves and as

24   that organization issues new guidelines, there's greater

25   flexibility within those guidelines for diagnosing people with

Olley - Cross/McGovern

1   intellectual disability.  Is that correct or incorrect?

2   A    Greater flexibility?  I think that would be fair to say.

3   Q    Okay.  And just so we're clear, when we say greater

4   flexibility, it used to be in the DSM that you had to have two

5   deficits out of ten, I believe, is that right?

6   A    Yes.

7   Q    Then that was something that was -- the AAMR had

8   advocated for that?  That was consistent with their standard?

9   A    Yes.

10  Q    And then after that, the manual -- I'll refer to as the

11  green book -- the green book actually said you don't need two

12  deficits anymore.  You actually only need one deficit in one

13  of the three domains, is that right?

14  A    That's right.  Although the three domains were not the

15  same as the ten.

16  Q    Yeah.  Sure.  But two is still more than one, right?

17  A    Yes.

18  Q    Okay.  And so you could diagnose somebody with mental

19  retardation based on finding one deficit rather than two,

20  correct?

21  A    Yes.

22  Q    And that you said, today -- and if I'm putting words in

23  your mouth, please, tell me.

24       Your hope is that this Court will adopt the standard

25  of the whatever the most current manual is, the 2010 or the

605

Olley - Cross/McGovern

1    2011, whatever supplement, right?

2    A     Yes.

3    Q     Okay.  But the truth of the matter is, Doctor, you have

4    in the past, you have actually testified that in Atkins

5    litigation only the 1992 manual should apply, isn't that

6    right?

7    A     I don't recall that, but you can refresh my memory.

8    Q     I will.  Do you remember this morning when we talked

9    about your state court case?

10   A     My state court case?  No.  Which case would that be?

11   Q     The case of -- I guess the People of the State of Ohio

12   versus Danny Lee Hill?

13   A     I recall that.

14   Q     And in that case, you testified for the government?

15   A     Yes.

16   Q     And you testified before a judge of a Court of Common

17   Pleas in Trumble County, is that right?

18   A     Yes.

19   Q     And you testified in a matter that is somewhat similar to

20   this case, in that it involved a defendant who was convicted

21   of capital murder, right?

22   A     Yes.

23   Q     And he was convicted of capital murder for some heinous

24   crime involving killing a 12 year-old-boy and raping him and

25   doing all sorts of stuff to him and then murdering him, right?

Olley - Cross/McGovern

1    A    Yes, in conjunction with another person.

2    Q    Yeah.  And at that -- you didn't testify at that trial,

3    right?

4    A    No.

5    Q    In fact, you testified in not 2007, as you said this

6    morning, but in 2004, right?

7    A    I don't recall the date, but --

8    Q    In October of 2004?  You're testified on October 7th and

9    it's October 8th of 2004 in that case?  Does that sound right?

10   A    Yes.

11   Q    And in that case, you testified that Mr. Hill did not

12   have mental retardation, right?

13   A    Yes.

14   Q    And that you were referred to him this morning I believe

15   during your direction as a "real faker"?

16   A    I'm doubt that I used exactly those words, but I did

17   indicate that he was the only person I have evaluated who I

18   believed was genuinely malingering.

19   Q    If I'm overstating it, you could tell me, but I think you

20   said he was a faker, but if that doesn't jibe with your

21   recollection, that's fine.

22        So at page 681 of the Hill transcripts, you were

23   asked this question, question, "Did I understand you to say

24   that you think Atkins locks you or requires you to apply the

25   1992 Edition of the AAMR?"

Olley - Cross/McGovern

1          And your answer is, "That is what's cited in

2     Atkins."

3          Question:  "Sure."

4          Answer:  "And Atkins came out in the same month that

5     the 2002 AAMR Manual came out.  So there really wasn't any

6     opportunity in timing for those people who are arguing Atkins

7     to include reference to the 2002 AAMR."

8          Do you recall that testimony?

9     A    Well, I don't recall the testimony, but it's a true

10    statement.

11    Q    And it was a true statement that you said that you

12    believed that the applicable standard for Atkins litigation

13    that you write so vastly about was the 1992 manual?

14         MR. BURT:  Excuse me, could you lay a foundation as

15    to time the statement was made?  I may have missed it.

16         MR. McGOVERN:  It was October 7th and 8th.  I

17    believe that testimony was on October 7th of 2004, two years

18    after Atkins.

19         MR. BURT:  Thank you.

20         THE COURT:  Go ahead.

21    BY MR. McGOVERN:

22    Q    So it was your position at that time that the 1992 manual

23    should apply, despite the fact that the 2002 manual had

24    already been issued?

25    A    It was my interpretation of that, of Atkins when I also

1  recall and it may not have been an exact same time, is that

2  the defense attorney objected and said that I was not

3  qualified to become be commenting on Atkins.  I don't know if

4  that was exactly the same time.

5  Q    I don't know if that was an answer to my question.

6         My question was, did you say that your opinion was

7  in 2004 that the applicable standard should be 1992 manual,

8  yes or no?

9  A    Yes.  If you read it in the transcript, I trust that it's

10  correct.

11  Q    Okay.  Do you remember being at the hearing?

12  A    Yes.

13  Q    Okay.  And do you remember being asked questions?

14  A    Yes, sir.

15  Q    Okay.  So this is -- you don't believe that I'm reading

16  this wrong, do you?

17  A    No.

18  Q    Okay.  But now, we'll hear -- you have told us about the

19  2010 manual on multiple occasions, and we'll talk a little bit

20  more about that.

21         With respect to your involvement in Atkins

22  litigation, you didn't get involved in evaluating MR cases

23  forensically or for criminal courts until 2001, is that right?

24  A    No, actually, it was a little bit before that.

25  Q    In 2001, the North Carolina legislature passed a statute

Olley - Cross/McGovern

1    that was actually forward-thinking, correct?

2    A     Yes, I believe so.

3    Q     And they were six months ahead of the Supreme Court in

4    determining that it was cruel and unusual or passed the

5    statute saying, we're outlawing the execution of the mentally

6    retarded, is that right?

7    A     Yes.

8    Q     Okay.  And prior to that time, when you were working at

9    the University of North Carolina, you didn't do as much expert

10   forensic work as you do now, right?

11   A     That's true.

12   Q     And you did some expert work from time to time, is that

13   right?

14   A     Yes.

15   Q     But most of it involved Social Security cases, is that

16   right?

17   A     No, most of it included special education cases.

18   Q     So you did cases where you testified in state court about

19   whether somebody was getting -- a child was getting the

20   appropriate services that they were due to from the state,

21   correct?

22   A     Yes.

23   Q     And you testified in Social Security cases as well, is

24   that right?

25   A     I don't recall that.

Olley - Cross/McGovern

1    Q    Well, you testified at the Hill case at page 727 to that.

2    I'll refresh your recollection.  All right.  I believe it's --

3    excuse me for a moment.  (Peruses document.)  I won't bother

4    with it.

5              Prior to that, if you did work in Social Security

6    work, you don't remember that, is that right?

7    A    Correct.

8    Q    Okay.  And you did guardian cases, is that right?

9    A    I did at least one.  I mean, those are hearings before

10   the clerk to, you know, establish whether someone needs a

11   guardian who would be the appropriate guardian.

12   Q    Did you testify in federal court prior to that, prior to

13   2001?

14   A    Not that I recall.

15   Q    And were you known as an expert in the area of mental

16   retardation at that time?

17   A    I was -- I had been active in the field for a good many

18   years.

19   Q    Mostly on a sort of provincial business, you were known

20   in North Carolina, is that right?

21   A    Yes, I suppose so.

22   Q    Did you testify outside of North Carolina prior to 2002,

23   when Atkins came down?

24   A    No.

25   Q    But since that time, you have been involved in Atkins

Olley - Cross/McGovern

1    litigation all over the country, correct?

2    A    In several states, yes.

3    Q    Your literature is widely read and highly regarded right

4    now among the Atkins bar, is that right?

5    A    I hope it's highly regarded, but it's certainly out

6    there.

7    Q    Okay.  And most of your time, as you said before, is

8    spent doing Atkins cases right now, right?

9    A    Yes.

10   Q    So the issuance of the Atkins decision actually made a

11   big difference for you professionally, is that right?

12   A    Yes.

13   Q    And when you -- when you switched over from being a local

14   person to being a larger figure in the Atkins world, did that

15   change your relationship with the university?

16   A    No.

17   Q    Okay.  Well, you said that during your direct examination

18   that you don't take any compensation for the expert testimony

19   that you provide in these cases, is that right?

20   A    I don't take any additional compensation.  I take my

21   salary.

22   Q    Okay.  Well, the university receives a fair amount of

23   money as a result of your Atkins work, is that right?

24   A    Yes.

25   Q    And that benefits you, doesn't you?

612

Olley - Cross/McGovern

1    A    Indirectly, yes.

2    Q    Because they allowed to you go on a leave and basically

3    not do anything that a professor at a university does anymore,

4    right?

5    A    No.  I mean, without getting too lengthy about this,

6    universities are very much in the business of bringing in

7    money these days, which I'm sure you know, for their own

8    survival.

9         So faculty members are expected to generate funds

10   either through research grants or through contracts or through

11   clinical billing or whatever their talents might allow, and I

12   have done all those things at different times, and currently,

13   I'm billing through Atkins cases.

14   Q    And you never testified today about this, but how many

15   Atkins cases have you been involved in since 2002?

16   A    Involved in?  If that means, you know, anything more than

17   a phone call, I would say 35.

18   Q    And is it fair to say that that has generated hundreds of

19   thousands of dollars for the university?

20   A    I've never counted, but it's probably over a hundred

21   thousand dollars, yes.

22   Q    And your relationship with the university has improved in

23   that you have been given an opportunity to go off and do your

24   Atkins work without keeping regular office hours or teaching

25   classes like every other professor at the university?

613

Olley - Cross/McGovern

```
1    A    I wasn't regularly teaching classes before that, anyway,

2    but yes, I have the freedom to do this rather than to work in

3    the clinic.

4    Q    So there are benefits that you derive from testifying in

5    these cases, is that right?

6    A    You know, yes.  It's a benefit in that I -- this is

7    something that I have chosen to do because I think that it's

8    important.  So it allows me to pursue something that is

9    important to me.

10   Q    Okay.

11   A    And I believe it's important to justice.

12   Q    Okay.  In your clinical experience, have you worked with

13   people in the prison population on a regular basis?

14   A    No.

15   Q    When you were working as a -- you have never been in

16   private practice as a clinician, correct?

17   A    True.

18   Q    You have told me during the voir dire earlier this

19   morning that you have done clinical work and assessments over

20   the years, correct?

21   A    Yes.

22   Q    But you haven't worked directly with people who are in

23   prison, right?

24   A    Correct.

25   Q    And you don't have a vast amount of experience other than
```

614

Olley - Cross/McGovern

1   your Atkins cases working with criminals, is that fair?

2   A    True.

3   Q    All right.  And the criminals that you have Atkins

4   cases -- have committed the most presumably the worst crimes

5   that the criminal justice system recognizes, but those are the

6   only ones that you have exposure to, right?

7   A    Primarily.  I mean, I have done other evaluations locally

8   for people whom defense attorneys believed had a disability,

9   and who you were accused of other noncapital crimes.

10  Q    And you have had access to studies about what the

11  intellectual makeup is of the prison population in the United

12  States, correct?

13  A    Yes.

14  Q    You have actually written on these topics, correct?

15  A    Yes.

16  Q    I think you and Dr. Karen Salekin, I guess you call it a

17  white paper from one of your groups, provided information to

18  the tune of that more than 40 percent of the people currently

19  incarcerated in the United States have an IQ of less than 86,

20  is that right?

21  A    Yes.

22  Q    And does that number that -- you still think to be

23  correct?

24  A    I don't have any newer information.

25  Q    Okay.  And that's 40 percent of presumably millions -- a

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1  couple million people who are incarcerated in the United

2  States?

3  A    Yes.

4  Q    And 40 percent of those people have more or almost one

5  standard deviation lower than the average IQ of what we have

6  been told is one hundred in this country, is that right?

7  A    Yes.

8  Q    So the pool of people who are in prison, by definition or

9  by those -- your statistics or statistics that you put out --

10 is a group have folks who across the board are not operating

11 or functioning at the mean level of average -- or mean

12 functioning of the average person in the United States, right?

13 A    Yes.

14 Q    And you would agree that one standard deviation, that's a

15 big deal, right?  That's a large chunk of points of IQ points?

16 A    Yes.

17 Q    That's not something that is like, oh, one or two.

18 That's a very big number?

19 A    Yes.

20 Q    And that's why you put it in your report, right, to make

21 the point -- or your article to make the point that, look,

22 we're dealing with -- incarcerated folks aren't really a fair

23 representation of what the average person in the United States

24 is operating at, right?

25 A    Yes.

616

Olley - Cross/McGovern

1  Q    Okay.  And we have talked a little bit about learning

2  disabilities during your direct examination.  Do you recall

3  that testimony?

4  A    Yes.

5  Q    And we -- and you have opined about learning disabilities

6  in a limited way.  You said that you were an not an expert,

7  right?

8  A    Yes.

9  Q    And that you are cognizant of the fact that the defendant

10 had been diagnosed throughout his youth and up until Sanford

11 Drob, apparently, with having a learning disability, is that

12 right?

13 A    Yes.  Yes -- well, no.  He was diagnosed as having severe

14 emotional disturbance until he went to Brookwood, and I

15 believe that was the first time he was diagnosed as having a

16 learning disability.

17 Q    Did you read Dr. Mapou?

18 A    Yes.

19 Q    Did Dr. Mapou conclude that this defendant had suffered

20 from learning disabilities?

21 A    Yes.

22 Q    Would you agree that Dr. Mapou is an expert in the area

23 of learning disabilities?

24 A    I believe so, from his credential.  I don't know him

25 personally.

Olley - Cross/McGovern

1   Q    He's written books on learning disabilities.

2   A    Yes.

3   Q    I suspect that you're exposed to the testimony that's

4   occurring in this courtroom on a daily basis, is that right?

5   You have some familiarity with what Dr. Shapiro was saying

6   here yesterday?

7   A    Very little.  I purposely stayed out of the courtroom.

8   Q    Well, Dr. Shapiro, yesterday afternoon, testified that

9   Mr. Wilson here could potentially be learning disabled and

10  mildly mentally retarded at the same time.  Would that be

11  surprising to you?

12  A    I have heard -- would it be surprising that such a thing

13  could occur or would it be surprising that that applies to

14  Mr. Wilson.

15  Q    Well, let's unpack that a little bit.  Would it surprise

16  you that that was said in this courtroom yesterday?

17  A    No.

18  Q    Because you heard that that was said here yesterday, is

19  that right?

20  A    I believe I did, yes.

21  Q    And you don't agree with that, right?

22  A    I don't have a position on that, because I didn't do an

23  evaluation of learning disability, and I don't consider myself

24  to be an expert in learning disability.

25  Q    But you know that it's virtually impossible to be

Olley - Cross/McGovern

1    learning disabled and mentally retarded at the same time, is

2    that right?

3    A    Many people have asserted that that is possible.  I have

4    not really looked into it.

5    Q    Well, let's deal with the concrete then.  Do you believe

6    that the defendant is learning disabled and mentally retarded

7    at the same time?

8    A    I don't know.

9    Q    Do you agree with Dr. Shapiro that he has a learning

10   disability and he's mentally retarded at the same time?

11   A    I don't have an opinion on that.  I didn't do an

12   evaluation of learning disability.  I'm not an expect on

13   learning disability.  I haven't discussed it with Dr. Shapiro.

14   I don't know.

15   Q    But Doctor, that's relevant to your opinion, is it not?

16   I mean, your saying that he is mentally retarded, right?

17   A    Yes.

18   Q    And you want this Court to believe that he's mentally

19   retarded?

20   A    Yes.

21   Q    And somebody else has testified that he has a learning

22   disability, and that he could be mentally retarded and have a

23   learning disability at the same time?

24   A    Yes.

25   Q    You say you can't answer that question, right?

Olley - Cross/McGovern

1   A    I can't answer that question specifically with regard to

2   Mr. Wilson.

3   Q    Well, you're an expert in mental retardation.  So I guess

4   I'll ask you.  Do you believe that it's possible to have a

5   learning disability and be mentally retarded at the same time?

6   A    No, I commented earlier that the definition of learning

7   disability seems to change frequently.  The -- so I guess it

8   depends on what definition of learning disability one is

9   currently embracing.

10  Q    Well, in the Davis case that you testified for

11  Mr. Burt -- excuse me, testified in response to Mr. Burt's

12  questions -- you were asked this very question.  Do you recall

13  that?

14  A    No.

15  Q    Well, at page 182 of the Davis transcript, the bottom of

16  page 182, the question was, "Can a learning disability coexist

17  with mild mental retardation?"

18       And your answer was, "Well, that's a dispute and

19  whereas the definition of mental retardation has been pretty

20  standard for a good many years, the definition of learning

21  disability has been more up for debate.  But in general,

22  learning disability is an individual of average intelligence,

23  who has a deficit in one narrow area that has implications for

24  academic purposes, whereas mental retardation is someone with

25  significantly impaired general intelligence.  So you're

Olley - Cross/McGovern

1    looking at a broader impairment across many areas.  I'm not

2    sure if I answered the question."

3              So they posed it again to you:  "In this case, is it

4    accurate to say that Mr. Davis should be diagnosed with a

5    learning disorder, but not mild mental retardation?"

6              Answer:  "Well the DSM indicates that you can't have

7    both.  So that's one authoritative point of view of that.  You

8    can imagine it would be very hard to have both, because if you

9    have say an IQ of 70, the learning disability has been

10   typically defined as a discrepancy between intelligence and

11   performance on an academic scale.  So a person with an IQ over

12   70, the usual discrepancy is that it's been cited over the

13   years is 15 points or one standard deviation.  So to have a

14   learning disability and an IQ of 70, academic skills would

15   have to be at about a 55.  Now, Mr. Davis doesn't have that

16   big of a discrepancy, so it doesn't fit that he had -- that he

17   doesn't have average intelligence."

18             Do you remember giving that testimony?

19             MR. BURT:  Excuse me?

20             MR. McGOVERN:  Do you want the witness to finish.

21             MR. BURT:  You left out the end of the answer, which

22   I think is important.

23             MR. McGOVERN:  It was important to Davis. I'll read

24   it.

25

Olley - Cross/McGovern

1  BY MR. McGOVERN:

2  Q    "Davis doesn't have that big of a discrepancy, so it

3  doesn't fit that he -- he doesn't have average intelligence

4  and he doesn't have a discrepancy between intelligence and

5  academic functioning of a standard deviation.  So that by that

6  definition of learning disability, he doesn't fit it."

7        Do you recall giving that testimony?

8  A    Yes.

9  Q    So given that testimony and what I presume you've read in

10  the DSM, isn't it extremely rare or you say never, to have a

11  learning disability coexisting with mental retardation?

12  A    If you embrace that definition that you just described --

13  Q    With due respect, that you just described?

14  A    If we embrace that definition, then yes, I would agree

15  with that; however, Dr. Mapou, for example, rejected the DSM

16  and acknowledged, as you said that he is an expert, that he

17  has a different definition of learning disability.  So my

18  point is simply it depends on which definition you are using.

19  Q    No, Doctor, with all due respect, Dr. Mapou didn't make a

20  determination about coexistence or co-morbidity.  He said he's

21  not mentally retarded, referring to the defendant.  So that

22  has nothing to do with whether or not you can be mental

23  retarded and the learning disabled at the same time, right?

24  A    Right.

25  Q    Dr. Mapou said he's learning disabled and operating in a

Olley - Cross/McGovern

1   below average to borderline range, right?

2   A     Yes.

3   Q     And so Dr. Shapiro's statement that the defendant could

4   have a learning disability and mild mental retardation is

5   borderline absurd, correct?

6   A     I was not present for his testimony, but if he's

7   embracing a different definition than the one I said and that

8   you quoted from then, as I said, I'm not an expert in learning

9   disabilities, and newer definitions may incorporate or may be

10  such that the two could coexist.

11  Q     Okay.  Well, just for the record and for your

12  edification, I'll read it, and ask if this sounds right to you

13  from the DSM.

14          At page 47 of the DSM, which we have quoted at

15  length in this case, "A learning disorder or communication

16  disorder can be diagnosed" --

17          THE COURT:  Slowly, please?

18          MR. McGOVERN:  I apologize.

19  BY MR. McGOVERN:

20  Q     "A learning disorder or communication disorder can be

21  diagnosed in an individual with mental retardation, if the

22  specific deficit is out of proportion to the severity of the

23  mental retardation."

24          That sounds a lot like what you said in the Davis

25  case, doesn't it?

Olley - Cross/McGovern

1   A     Out of proportion?  Yes, it does --

2   Q     There you go.

3   A     -- if that was your question.  Out of proportion, I think

4   has room for interpretation.

5   Q     Certainly.  Doctor, did you agree with the proposition

6   that if you are unable or if a diagnosis does not satisfy the

7   first prong of the definition of mental retardation, that is,

8   a person operating or functioning at either a below a 70 or

9   for the manual purposes, more than approximately two standard

10  deviations below the mean, if you don't satisfy that, that the

11  analysis of mental retardation is over?

12  A     Yes, because you have to have all three of the, as you're

13  referring to them, prongs.

14  Q     So in this case, if the IQ of the defendant is not

15  demonstrated credibly to be within that range of 70 to 75 or

16  even the more flexible range of the manual, there's no need

17  for adaptive functioning, correct?

18  A     Correct.

19  Q     There's no diagnosis of mental retardation, correct?

20  A     Yes.

21  Q     There may be a diagnosis of learning disabilities, right?

22  A     Again, I don't -- the definition -- current definition of

23  learning disability is not something I should be speaking to.

24  Q     And nor should I.  Would you agree he's got some other

25  problem other than being mental retarded, if his IQ is not in

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   the range that it needs to be in, right?

2   A    Yes.  That's pointed out in AAIDD and other sources that

3   one may have a significant impairment in adaptive functioning,

4   but not meet the intellectual disability or the intellectual

5   deficit requirement, and thus not have a formal diagnosis of

6   intellectual disability.

7   Q    Okay.  And so they're not mentally retarded or whatever

8   term is less pejorative?

9   A    Yes.

10  Q    I apologize if I'm offending you by using the mentally

11  retarded thing.  It's just what the Supreme Court says.

12  A    Yes.

13  Q    So you reviewed the IQ tests that were done in this case,

14  correct?

15  A    Yes.

16  Q    At some point?

17  A    Yes.

18  Q    When would you say they let you in on what the actual IQ

19  data was?  Within the past couple weeks or was it before the

20  report?

21  A    Well, if you mean the actual IQ data, taking into

22  consideration all these factors that we talked about, such as

23  the Flynn Effect and Practice Effect and so on, then, yes,

24  within the last few weeks.

25  Q    I think, just so you and I are clear going forward, the

LISA SCHMID, CCR, RMR
Official Reporter

625

Olley - Cross/McGovern

1    Practice Effect, are you saying that the Practice Effect is a

2    reason to adjust scores?

3    A    I don't like the word "adjust."  A score should be

4    interpreted in light of the Practice Effect.

5    Q    It should be interpreted in light of Practice Effect of.

6    Does that mean like interpreted in the course of using your

7    clinical judgment?

8    A    Yes, and in light of what the presenting question is.

9    Q    So the Practice Effect should be the component of the

10   clinician's decision about whether to, let's say, order up

11   some adaptive functioning testing, correct?

12   A    Yes.

13   Q    Right?

14   A    Yes.

15   Q    But in your view, it's not a reason to artificially

16   reduce a score, right?  Like an IQ score?  You wouldn't

17   artificially reduce a score, right?

18   A    Artificially reduce implies that you're sort of secretive

19   about what the original score had been.

20   Q    Let's be less secretive about it.  You wouldn't reduce an

21   IQ score because of a Practice Effect, right?

22   A    You would -- I'm sorry.  I don't mean to sound like I'm

23   being evasive.  You would, depending upon the question, take

24   it into consideration.  The question here is one of diagnosis

25   and it's a life or death matter.  So one wouldn't want to rush

Olley - Cross/McGovern

1    to make a decision.  One would want to consider everything.

2           There might be other matters in which, for example,

3    rules would tie your hands to not be able to consider all of

4    these factors, in which case you have to operate under the

5    rules of the circumstances that you're working in.

6    Q    So you don't reduce IQ scores because of Practice

7    Effects, right?

8    A    Well, the Practice Effect isn't something even -- it

9    isn't as precise as, for example, the Flynn Effect, because

10   the Practice Effect is known to inflate scores, but there's no

11   formula that says if you take this test, this often, this much

12   time in between tests, that it will inflate the score by this

13   number of points.  It's much more, as you said, a matter of

14   judgment.

15   Q    Okay.  And so I'm going to ask the question again, and I

16   apologize for doing this.  Do you reduce IQ scores because of

17   Practice Effects?

18   A    No.  You take them into consideration.  You can offer it

19   as an alternative score, as the what might have been -- how

20   the Practice Effect might have affected a score.

21   Q    All right.  How about this?  Has Dr. James reduced IQ

22   scores in this case, under her analysis, based on Practice

23   Effect?

24   A    My understanding is that she has offered an

25   interpretation in light of the IQ scores -- excuse me, in

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1    light of the Practice Effect.

2    Q    And but you don't advocate for reducing the score based

3    on Practice Effect, right?

4    A    No, it's not that simple.  Yes, you're right.  I wouldn't

5    just say, take away this number of points.

6    Q    Because it's very difficult to quantify, correct?

7    A    Yes.

8    Q    Right?  Some Practice Effect might affect one person more

9    than it affects somebody else, right?

10   A    Yes.

11   Q    Just like that Flynn Effect and we'll get to later.

12            The Flynn Effect, that changes from country to

13   country, right?

14   A    There are -- the data are different in different

15   countries, different times, different tests.

16   Q    Okay.  Well, let's -- I just want to talk to you about

17   these IQ tests first.  And if I may, I think this was

18   admitted.  This is your last entry in your binder of Exhibit

19   F, which is the list of IQ scores for the defendant.

20            THE COURT:  It's going to be on the screen.

21            THE WITNESS:  Thank you.

22   BY MR. McGOVERN:

23   Q    See that?

24   A    Yes.

25   Q    Dr. Olley, and you have seen this document before,

Olley - Cross/McGovern

1    correct?

2    A    Yes.

3    Q    And this is this is Dr. James' accounting of the IQ

4    scores that the defendant had as part of his academic and

5    medical history, correct?

6    A    Yes.

7    Q    And you understand that yesterday in this courtroom,

8    there were some adjustments made to this data, but for our

9    purposes, this looks like the document that you relied on when

10   you were opining about the defendant's mental retardation,

11   right?

12   A    Yes.

13   Q    All right.  I don't want to get into the nitty-gritty

14   with you on this, so I'm just going to put a highlighter right

15   down the middle.  All right?  And that's the full scale IQs.

16   You see that?

17   A    Yes, I do.

18   Q    All right.  Now, that's before Flynn, right?

19   A    Yes.

20   Q    That's before Practice Effect considerations, right?

21   A    Yes.

22   Q    That's -- those are the -- those are the IQs that,

23   assuming that everybody followed the rules that Wechsler

24   promulgated, those are the scores that the protocols produced

25   when the defendant was tested with IQ, correct?

Olley - Cross/McGovern

1    A    Yes.

2    Q    And you saw these scores at some point before you wrote

3    your report, right?

4    A    Yes.

5    Q    And you would agree, looking at these scores, that but

6    for that score in December of 1994, Mr. Wilson doesn't appear

7    to satisfy prong one of this -- of this mental retardation

8    analysis.  Would you agree with that?

9    A    That would be one's first impression, looking at the

10   scores that you highlighted.

11   Q    And was that your impression when you saw these scores,

12   when they were finally revealed to you?

13   A    Well, I think that they were finally revealed to me -- I

14   don't recall.  It was in light of discussions of these other

15   factors.  So I -- my expectation was that these scores would

16   be interpreted to give more, as you said, flexibility to the

17   diagnosis of intellectual disability.

18        MR. BURT:  Could we clarify that when the question

19   and the answer, "referring to these scores," he's referring to

20   the highlighted scores, the unadjusted scores?

21        MR. McGOVERN:  That's fine.

22        THE COURT:  That the Court's understanding.

23        MR. BURT:  Thank you.

24   BY MR. McGOVERN:

25   Q    So the unadjusted appear -- it's only 1994 that would put

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1    you in the mental retardation range, right?

2    A    Yes.  Although I have worked in other jurisdictions in

3    which scores, such as the 76 by Dr. Drob, would have been

4    regarded as an acceptable score.  And that was the score that

5    was closest to the time of the crime, so that one caught my

6    eye, as well.

7    Q    You worked in jurisdictions that apply a different set of

8    rules than the DSM and the manual?

9    A    No.  For example, in California, to -- a 75 is, well,

10   essentially the same thing as being argued by Dr. James, that

11   75 is the cutoff and if you take into consideration the

12   Practice Effect and any other --

13   Q    Adjustments down that you might want to apply, right?

14   A    -- that's your wording and not mine, but I understand

15   what you're saying.

16   Q    Okay.  But that California rule, is that by statute,

17   right?

18   A    I think that's just the interpretation of the courts as

19   has been explained to me by attorneys there.

20   Q    You have testified in federal court about a 76 being good

21   enough for mental retardation?

22   A    No, that's a case that's still pending.

23   Q    But you must have been a little concerned when you saw

24   these IQ scores, right?  When you started your adaptive

25   functioning analysis, they finally give you the IQ data and

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   this, you would agree, is not a very strong case for meeting

2   prong one, right?

3            MR. BURT:  Object to the --

4            THE COURT:  Sustained.

5   BY MR. McGOVERN:

6   Q    You would agree, sir, that those scores there -- and we

7   can leave off the one on the bottom because that's

8   Dr. Denney's -- but the scores from 1989 to 2003 do not make a

9   very compelling case for a person suffering from mental

10  retardation, correct?

11  A    Those scores, as you know, the scores in the highlighted

12  column, the original scores, do not make a compelling case.

13  Q    But -- or excuse me, not even the 71 is not even that

14  compelling, because you have to employ a band of competence on

15  that 71 to put you into the mental retardation range, right?

16  A    Yes.

17  Q    And by that, so the record is clear, I'm talking about a

18  71, standing alone, you would agree is not indicative of

19  mental retardation, right?

20  A    No, but what attracted me to participate in this case is

21  that when the IQ scores are close, to me, it's worth while

22  taking a look at adaptive functioning.

23  Q    That may well be true as to why you were interested.  I'm

24  just saying to you, a 71, until you put a band of competence

25  around it, doesn't get you into MR range.  Is that right or

1  wrong?

2  A    Well, it's wrong in a sense that you earlier invoked

3  standard practice or best practice, and using competence

4  intervals is best practice.  It's part of what is generated on

5  the protocol for the test.

6  Q    And did you employ that best practice of using band of

7  competence when you testified in the Danny Hill case that left

8  Mr. Hill on death row?

9  A    I think that the agreement was that he did have a

10 significant impairment in intelligence, that the judge offered

11 that opinion.

12 Q    My question was, did you imply a band of competence when

13 you testified in that case?

14 A    I don't recall, because Mr. Hill's tested IQ was in the

15 fifties, so he was known to -- really wasn't necessary.

16 Q    Well, let me see if I can refresh your recollection,

17 then.  At page 548 of the Hill transcript, the Court, the

18 judge, asked you, "That's why I said spread.  So in other

19 words, if it was at 70, if you put it, if you took six points,

20 for example, it would be 73 or 67?"

21       And you answered, "Yes."

22       The Court said, "What happens if it's a 67 on the

23 Stanford-Binet?"

24       And you answered, "Well, that would then fall below

25 the cutoff for mental retardation."  Because for the cutoff

Olley - Cross/McGovern

1    for mental retardation is 68 on the Stanford-Binet, correct?

2    A    On that version of the Stanford-Binet.

3    Q    Getting back to the transcript.  You again:  "But we're

4    talking and this is a distinction that's important when you do

5    evaluations for the purpose of designing services for people,

6    because we don't look for an absolute cutoff.  We look for the

7    big picture of what services does this person need.  Atkins

8    does not, in my understanding of it, address the standard of

9    error of measurement.  In other words, it doesn't say that you

10   can take and obtain a score and then put a band of competence

11   around it.  So that's something for us to decide, whether

12   that's acceptable or not."

13        Question:  "Now, is it fair to state that what we

14   know now with all the records that we have, that it would be a

15   pure speculation to go and say Danny Hill's a 70, is a 73 or a

16   67.  There's no way of knowing, is there."

17        And your answer was, "No."

18        Do you recall that testimony?

19   A    Yes.

20   Q    All right.  And so, I don't want to unfairly summarize

21   that, Doctor, but when you were looking at Danny Hill's 70 on

22   the Stanford-Binet -- do you recall that?

23   A    Yes.

24   Q    Right?  Am I misrecalling (sic) that he had a 70 on the

25   Stanford-Binet?

Olley - Cross/McGovern

1   A     That was an earlier score.  It wasn't the one that --

2   Q     It was in 1973, right?

3   A     I don't recall the exact date.  I'm just distinguishing

4   it between the testing that was done at the time of that

5   hearing versus an earlier score.

6   Q     You advocated -- testified at this hearing that a band of

7   competence -- placing a band of competence around his score of

8   a 70 was appropriate.  Correct or incorrect?

9   A     I don't recall doing that, but if that's what the

10  report -- that what's the transcript indicates, then I did.

11  Q     So you've testified in the past that all of these things

12  on the entire right side of this chart, band of competences

13  are -- amount to pure speculation, correct?

14  A     Did I say pure speculation?

15  Q     Let me be fair.  549 again.  Question:  "Now, is it fair

16  to state that what we know in all the records that we have,

17  that it would be pure speculation to go and say, Danny Hill's

18  70 is a 73 or a 67.  There's no way of knowing, is there."

19        Answer:  "No."

20        MR. BURT:  Well there's two questions there, so I

21  don't think that question is --

22        THE COURT:  You can argue it.

23        MR. BURT:  Sure.

24        THE WITNESS:

25  A     I regret having -- I'm agreeing it's poor --

Olley - Cross/McGovern

1    BY MR. McGOVERN:

2    Q    Don't apologize to me.  Apologize to Mr. Hill, who is on

3    the row.

4              THE COURT:  Just let him answer the question,

5    please.

6              Go ahead, Doctor.

7    A    You know, part of the reason we engage in these things is

8    to continue to learn, and I think that I have learned things

9    from previous cases and learned things from my colleagues.  I

10   don't know that I would at this time, regard standard error

11   are measurement or statistics derived from it as speculation.

12   Q    Doctor, that was in 2004, right?

13   A    Yes.

14   Q    You think you have learned since then?

15   A    Certainly hope so, yes.

16   Q    You think you've learned by 2010?

17   A    You mean on this specific topic?

18   Q    Yes.

19   A    Yes, I believe so.

20   Q    You were deposed in 2010 in the Danny Hill case, were you

21   not?

22   A    Yes.

23   Q    Presumably, you had learned all about this band of

24   competence, correct?

25   A    Yes.

Olley - Cross/McGovern

1   Q    Did you correct your testimony during that deposition?

2   A    No, I don't recall during that deposition that there was

3   discussion of IQ at all.  It was about adaptive functioning,

4   because there was agreement that Mr. Hill met the IQ standard

5   for intellectual disability.

6   Q    And you know that the reason that deposition was held was

7   because of an affidavit you filed in that case, correct?

8   A    Yes.

9   Q    And in that affidavit, you said there were other certain

10  other things you would have liked to have considered before

11  you had rendered your position -- your opinion in 2004,

12  correct?

13  A    Yes.

14  Q    You didn't mention anything in that affidavit about your

15  misapplication of the standard of error?

16  A    No.  My focus on that was about his adaptive functioning.

17  Q    So if --

18           MR. McGOVERN:  Does Your Honor want to take a break

19  or I can keep going?

20           THE COURT:  Keep going for a few more minutes, if

21  you will.

22  BY MR. McGOVERN:

23  Q    All right.  So back to the IQ, looking at those IQs in

24  the full scale column, Doctor, you would agree that the

25  December 1994 is the most significant number as it relates to

Olley - Cross/McGovern

1   potentially offering a diagnosis of mental retardation,

2   correct.

3   A    Yes.  You did say December?

4   Q    Did I?  I'm sorry.

5   A    No, it is.  I think it is December.  I misheard you, I

6   think you said September, but we're talking about the same

7   thing.

8   Q    Okay.  As it turns out, in your report and in reports of

9   all your colleaguing, this December of 1994 is really the only

10  IQ score that you want to rely on or that you rely on, is that

11  right or relied so heavily on?

12  A    I'm not prepared to testify in any detail about the IQ

13  scores.  My understanding strictly from Dr. James' record is

14  that that score and the 2003 score are the ones that she has

15  relied upon most heavily, and she has obtained consultation

16  from other experts in order to make that decision.

17  Q    Respectfully, Doctor, you dedicated pages of your report

18  in this case to why the 1994 test should be honored and

19  credited, and why the other IQ tests, such as the one done by

20  Dr. Drezner or -- Kara Drezner should not be credited, right?

21       MR. BURT:  I'm going to object to that.  Misstates

22  the report.  Page eight has one paragraph on this issue.

23       THE COURT:  You may answer.

24  A    Agree that I think I discussed it very little.  (Peruses

25  document.)

Olley - Cross/McGovern

 1   BY MR. McGOVERN:

 2   Q    Page eight dedicates the entire page to assessment of IQ.

 3   Am I right or am I wrong?  I'll ask the witness.

 4   A    (Peruses document.)  Yes.

 5   Q    And you say that you were not prepared to offer us an

 6   opinion about what the applicable IQ score should be?

 7   A    I'm testifying that I have I -- the information that I

 8   have is what's indicated in my report, and that I relied most

 9   heavily upon Dr. James' opinion.

10   Q    In doing so, you reviewed the IQ scores, right?

11   A    Yes.

12   Q    And you analyzed the IQ scores?

13   A    To the extent that it appears in this report.

14   Q    Well, let's go out -- let's not look at the report.

15        You sat here this morning -- and correct me if I'm

16   wrong -- and told the whole story about you going to meet with

17   Kara Drezner, right?

18   A    Yes.

19   Q    Kara Drezner did not offer any adaptive functioning

20   information about the defendant, did she?

21   A    No.

22   Q    No.  Her entire interview was about the way that she

23   administered that IQ score in 1991 that gave the defendant a

24   full scale IQ of 78, right?

25   A    Yes.

Olley - Cross/McGovern

1    Q    And you threw out her entire or invalidated her IQ score,

2    is that right?

3    A    I wouldn't say I threw it out or I invalidated it.  I

4    just pointed out these are areas that should be taken into

5    consideration.

6    Q    All right.  So that testimony, you would agree, is

7    extremely relevant to the question of whether or not this

8    defendant satisfies prong 1, prong A, prong C, call it

9    whatever you want, that he has an actual intellectual deficit,

10   right?

11   A    It is relevant to her score, yes.

12   Q    So that was testimony related to the IQs, right?

13   A    Yes.

14   Q    Okay.  So when you sit here and tell me that you're not

15   prepared to testify about IQs, that's not really true, right?

16   A    I testified to the extent that I know about it, about her

17   IQ score.  She happened to be available in the day that I was

18   there, and I spoke to her.  I did not speak to the other

19   individuals who conducted IQ testing.

20   Q    Okay.  So if we're going to -- if I can reduce your

21   testimony on prong one, is that you're here and you're opining

22   that the defendant is mentally retarded, right?

23   A    Yes.

24   Q    And that you don't know really too much of anything about

25   whether or not he satisfies prong one of the mental

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1    retardation analysis, right?

2    A    That's a strong way of stating it.  I'll just restate

3    that in addition to the information that is on page eight, I

4    relied upon Dr. James' judgment.

5    Q    I don't -- I'm not asking you whether or not you relied

6    on her judgment.  I'm asking you as a professor of the

7    University of North Carolina, as a guy who professes to know a

8    ton about Atkins litigation and these cases, and that you have

9    done all of this clinical work, are you prepared to offer an

10   opinion whether or not that defendant has an intellectual

11   deficit?

12   A    Yes.  I have opined such.

13   Q    Okay.  So would it be okay with you if I asked you some

14   more questions about whether or not you consulted these IQ

15   scores before you offered that opinion?

16            MR. BURT:  The question is argumentative.

17            THE COURT:  I'm sorry?

18            MR. BURT:  The question is argumentative.

19            THE COURT:  Just ask the questions.  If there is an

20   objection, I'll deal with it.

21   BY MR. McGOVERN:

22   Q    Are you prepared to answer some questions about these IQ

23   scores?

24            THE COURT:  Just ask your questions.

25            MR. McGOVERN:  Yes?  I'll ask my question.

641

Olley - Cross/McGovern

1    BY MR. McGOVERN:

2    Q    Doctor, would you agree that the only person who

3    administered an IQ test to the defendant and found or --

4    excuse me.  I'll withdraw that.

5         Would you agree that the only person who noted a

6    reason not to trust the IQ score in their IQ test was

7    Dr. Nagler in 1994?

8    A    No.  I'm -- not to trust the score?  I think the other

9    was Dr. Giglio, because there was a large discrepancy between

10   verbal and performance.

11   Q    Well, that's a DSM issue.  I'm talking about as a matter

12   of behavior in actually taking the test, that it was only

13   Dr. Nagler in December of 2000 -- December of 1994, who said

14   there may be some reason not to trust this score.  Do you

15   agree with that or not?

16   A    Yes, I think the other statement like that were in the

17   opposite direction of people saying he has more potential.  So

18   there were other comments to distrust the score, but they were

19   in the opposite direction.

20         (Continued on the next page.)

21

22

23

24

25

Olley - Cross/McGovern

1    Q    Okay.  Well these my next question.  Wouldn't you agree

2    that everybody else who gave this gentleman an IQ score said

3    that he actually had more potential than his IQ was --

4    reflected?

5    A    They did say that.

6    Q    That's not an unusual thing, correct?  If somebody is

7    suffering from learning disabilities, hypothetically, and they

8    have a problem reading, they're going to have a lower verbal

9    score; is that right?

10   A    I don't think that that's an absolutely firm pattern; but

11   then again, I'm deferring to others' expertise on learning

12   disabilities.

13   Q    Would you agree that if somebody has functional academic

14   problems, or academic problems, that their verbal IQ may be

15   adversely affected by that?  Correct?

16   A    I don't -- no, I don't think that's the way labels work.

17   They're just -- well, again, there's so much disagreement

18   within the learning-disabilities field; and for quite a few

19   years in our center, there were people whose primary interest

20   was learning disabilities.  I wasn't one of them, but I'm

21   close enough to know the disputes that exist there.

22        And to say it's because of a learning disability --

23   I think it's just a description of what later then gets

24   labeled as a learning disability.

25   Q    So do you agree or disagree with the nine -- I'm trying

Olley - Cross/McGovern

1    to count them -- the eight -- excuse me.

2              Do you agree with -- disagree with everybody on that

3    list who says that the defendant's intellectual potential was

4    being understated by his IQ score?

5    A    I believe that that is not a statement that can be

6    verified in any scientific way.  That's the opinion of the

7    person that was administering the test.  And presumably there

8    was something in that person's demeanor or something that made

9    the person administering the test feel that the person's best

10   performance was not being obtained.

11   Q    And would you agree with the premise that if you're

12   legitimately diagnosed as being mentally retarded, the

13   possibility of growing out of mental retardation is virtually

14   zero?

15   A    Growing -- if you mean by that, simply passage of time

16   and maturation, that is -- I wouldn't say zero, but it is

17   unlikely.  The most likely scenario that's noted by the AAIDD,

18   and others, is that people learn, if they are in an

19   appropriate services; and particularly in the area of adaptive

20   behavior, people can improve their adaptive behavior such that

21   they would become more independent and would no longer

22   technically meet the criteria for diagnosis.

23   Q    So if I understand that correctly, you're saying their IQ

24   shouldn't change, correct?

25   A    Well, their IQ does change; and you can see the

Olley - Cross/McGovern

1    variability in these scores --

2    Q    Well, that's a good question.

3    A    -- due to a lot of factors.

4         There are several factors that affect the repeated

5    scores.  And this is important in Atkins cases because, like

6    Mr. Wilson, many Atkins cases have people who have variable

7    scores, some above or below a cutoff; and, therefore, there is

8    a process such as we're doing today to try to resolve what a

9    proper diagnosis should be.

10   Q    Would you agree that, theoretically, a person's IQ should

11   stay the same throughout their lifetime?

12   A    Only theoretically, in the sense that there are theories

13   of the nature of intelligence but IQ scores are measures of

14   actual human behavior over time and they would be expected to

15   vary.

16   Q    Looking at these IQ scores here, without Flynn affecting

17   them and bands of confidence, you would agree that other than

18   that 1994 score where he posted a 71, his IQ scores, his

19   full-scale IQ score, is relatively consistent, as a high 70's

20   to low 80's?

21   A    Well, if you throw out the highest scores and the lowest

22   scores, that's what you would wind up with.

23   Q    And without any more manipulation, that -- those numbers

24   there, putting aside the 71, would not satisfy the prong --

25   the prong for intellectual deficits, right?

Olley - Cross/McGovern

1   A    If you took them strictly at face value, as you said

2   before, how the score that you would obtain if you used a --

3   the scoring manual for a Wechsler scale, then these results

4   would look, to me, too high for a diagnosis of mental

5   retardation.

6   Q    And if I were to tell you that in the *Hill* case, you

7   testified four separate times that IQ should theoretically

8   stay the same throughout one's life, would you -- would you

9   agree with that, or would you like me to read you each and

10  every instance?

11  A    No.  As I said, theoretically, IQ is a very stable trait.

12  In reality, it can vary.  The score -- I mean, IQ is a score

13  on a test.  Intelligence is a trait of the person.  And

14  intelligence, in theory, should remain a stable trait.

15  Q    And that in a typical circumstance, you would expect that

16  mental retardation is a condition that would continue

17  throughout your life?

18  A    In most circumstances, that's true.

19  Q    So in this circumstance, you would expect that if the

20  defendant was mentally retarded when he was 12, he would be

21  mentally retarded when he was 20, mentally retarded when he's

22  30, correct?

23  A    Well, unless he falls in that category that I was

24  mentioning earlier of a person who has appropriate

25  opportunities to improve adaptive functioning, and the score

Olley - Cross/McGovern

1  would go above whatever the cutoff is, the person would

2  technically no longer meet the criteria.

3  Q    But that's -- he doesn't even have that problem because

4  but for the 71, all of his scores would be outside of the

5  mental retardation range, correct?

6  A    Just using the scores that you have highlighted, that's

7  true.

8  Q    Okay.

9         And, Doctor, you understand that Dr. Nagler is

10  deceased, correct?

11  A    Yes.

12  Q    All right.

13         And, therefore, she was unable to be interviewed

14  for -- in preparation for this case, correct?

15  A    Yes.

16  Q    All right.

17         And you went out and you interviewed, you said

18  Dr. Drezner.  Did you interview any of these other doctors?

19  A    I did not.

20  Q    Now, you went to go see Dr. Drezner because you wanted

21  find out how she got that score?

22  A    To be honest, I think it was a matter of convenience that

23  she was available.  I would have talked to other people; but I

24  was thinking, Well, my focus is really not on IQ, but because

25  she was available, I would speak to her.

Olley - Cross/McGovern

1  Q    Well, did the -- did the defense team provide you with

2  the results of her IQ test before you went to go visit her?

3  A    Yes.

4  Q    All right.

5  A    I had her report.

6  Q    So at least at that time, you had an indication that she

7  had rated the defendant to be a 78, right?

8  A    Yes.

9  Q    And with respect to Dr. Nagler, all you had to review was

10 her report, right?

11 A    Yes.

12 Q    Okay.

13       And I think on direct you said something about

14 school psychologists, and psychologists that -- that there's

15 user error or that they potentially make errors that have to

16 be addressed by other professionals?

17 A    I don't -- I mean, I think that's a true statement.  I'm

18 not sure that I testified to that.  I think that was in

19 Dr. James' report, that there are studies showing how

20 frequently tests are misadministered and scored.

21 Q    All right.

22       And you would agree that school psychologists, or

23 any psychologist, should be afforded the respect to believe

24 that they discharged their duty of giving an IQ test

25 appropriately and that they reported the results accurately,

Olley - Cross/McGovern

1    correct?

2    A    I think in most cases, that's quite true; that we don't

3    have the resources to do what's been done in this case and go

4    examining the raw data and interviewing people and so on; that

5    that as a matter of -- in customary practice, we assume that

6    people are doing their job properly.

7    Q    You take their results on faith, right, that they're

8    doing their job correctly, right?

9    A    Yes.  And we would only question it unless, in a case of

10   an Atkins case, the stakes are so high that if you can look

11   further, it's worth examining.

12   Q    I think I would like to examine that statement, Doctor.

13   You've made a number of references here to the stakes being so

14   high.  What do you mean by that?

15   A    I mean that if the finding is that the defendant has an

16   intellectual disability, he cannot be executed.

17   Q    So do you view your role in this case as being the

18   arbiter of whether or not the defendant is found to be

19   mentally retarded or not?

20   A    No.  The judge is that arbiter.

21   Q    Well, do you understand your role in this case is to

22   provide an expert opinion that is consistent with the

23   standards of practice, and that's it?

24   A    Yes.

25   Q    So when you say the stakes are so high, that's actually

Olley - Cross/McGovern

1   irrelevant to what it is that you're testifying about,

2   correct?

3   A    I made that comment because in Atkins cases, we have the

4   resources to look more closely; and we do.   In an ideal world,

5   that same thoroughness would be applied to other

6   circumstances.

7   Q    Doctor, you're testifying as an expert in psychology,

8   correct?

9   A    Yes.

10  Q    You're applying the standard of practice, correct?

11  A    Yes.

12  Q    Whether or not this defendant ends up getting executed

13  has no bearing on your opinion; yes or no?

14  A    That's -- that's true.   I am not here to make that

15  decision or to advocate.

16  Q    Well, are you adjusting your science because you feel

17  that the stakes are so high?

18  A    No.   I'm saying a thorough job is possible because the

19  stakes are high.

20  Q    Well, you've said it in other instances during your

21  testimony here today.   You've mentioned that this could --

22  that your testimony could have some, you know, serious

23  effects, or the stakes being so high.

24       I'm asking you, are you applying a different

25  standard to this case than you would to a case where somebody

Olley - Cross/McGovern

1   walks into Chapel Hill and says, "Look, I think I'm mentally

2   retarded.  Can you tell me if I am"?

3   A    No.  If I had the resources to do all of the

4   investigation in this case, I would do it in that case as

5   well.

6   Q    Okay.

7           Did you read Dr. Nagler's report?

8   A    I did sometime ago.

9   Q    Okay.

10          In Dr. Nagler's report where she gives him a 71 --

11  we've mentioned this yesterday, and it's already in evidence.

12  I'll just read it to you.  The report says, "Earl," the

13  defendant, "squirmed and placed his fingers in his mouth.  He

14  yawned continuously.  He blurted out responses and generally

15  utilized a careless, impulsive approach during the course of

16  his WISC-III test that turned out 71."

17          Did you read that?

18  A    Yes.

19  Q    And was that significant to you?

20  A    In -- in Dr. Nagler's opinion, if that behavior detracted

21  from his performance so significantly as to invalidate the

22  test, she would have mentioned it in her report that it was an

23  invalid score.

24  Q    She -- well, first of all, we'll never know what she

25  meant, right?

Olley - Cross/McGovern

```
 1   A     Right.

 2   Q     All right.

 3         We have to -- we have to make an assessment because,

 4   unfortunately, Dr. Nagler is unavailable, right?

 5   A     Yes.

 6   Q     You would agree that this note here is of some

 7   significance, correct?

 8   A     Yes.  She chose to -- to mention it as a description of

 9   his behavior during testing, which is a standard thing to do.

10   Q     Okay.

11         And she didn't mention it -- or we can only assume

12   that she didn't mention it because she didn't think it was a

13   big deal, right?

14   A     I'm sorry.  I didn't fully catch that.

15   Q     Well, I'll rephrase that.

16         She mentioned it because she believed it was

17   significant, right?  That's what you put in the "behavioral

18   observations" notes portion, are the significant things,

19   right?

20   A     Yes, significant for whatever purpose.

21   Q     Okay.

22         But for you to -- to question her score, you would

23   need more than this note, right?

24   A     I believe so.  I would love to see what else she wrote to

25   say -- either -- either she would have stopped the
```

Olley - Cross/McGovern

1    administration, and not continued it, because she felt that it

2    was invalid; or if she didn't make that decision until she was

3    nearly finished, she would have indicated in her report that

4    the test was given, but the score was invalid.

5    Q    So that's what you would have needed to invalidate that

6    71?  You would have needed a statement from Dr. Nagler on this

7    report, saying, "Don't pay attention to this 71 because I'm

8    invalidating it," right?

9    A    That would be convincing certainly.

10   Q    Okay.

11        But you rely on this report as being sort of like

12   a -- the touchstone or the main proof that the defendant meets

13   the intellectual-deficit problem, right?

14   A    Yes.

15   Q    You would agree that this is a pretty strong asterisk

16   being placed on that report, right?

17   A    Wechsler IQ tests are pretty -- what they refer to as

18   "robust."  In other words, if you get a good score, even in

19   the face of typical childhood fidgetiness and so on -- if what

20   she meant by this was he's a fidgety child, that's one

21   interpretation.  If what she meant by this is that it impaired

22   his ability to obtain a valid score, then that would be noted

23   in her report.

24   Q    But that's not what it said, right?  It's not saying that

25   he's a fidgety child.  It's saying that he was -- squirmed, he

Olley - Cross/McGovern

1   placed his fingers in his mouth, he yawned continuously, he

2   blurted out responses, and that he generally utilized a

3   careless manner and impulsive approach.

4           I mean, that's -- that's not what you just said, is

5   it?  I mean, that's a little bit more.

6   A    It is a little bit more.

7   Q    Let me -- let me ask this:  We would agree that's an

8   asterisk on this report, right?  It's not a total

9   invalidation.  It's an asterisk on the report, correct?

10  A    I would look to see -- as you mentioned, there's

11  typically a section on behavioral observations.  There's

12  typically conclusions that would be the point at which she

13  would note that this test has yielded an invalid score.

14          In other words, you've said it's an asterisk.  I

15  would look for the asterisk, coming from her, to say that it

16  was compromised.

17  Q    But it is coming from her.  She's saying this in her

18  "observations" portion of the report.  She's saying, "Here's

19  the way the defendant was when I was giving him this test,"

20  okay?  That's what she's saying.

21  A    Yes.

22  Q    I agree with you:  She doesn't write on this report,

23  "Nobody pay attention to this IQ score," right?

24  A    Yes.

25  Q    And as long as she says, "Nobody pay attention to this,"

Olley - Cross/McGovern

1    you're not going to invalidate it, right?  Because it's a 71,

2    right?

3    A    Yes.

4    Q    Okay.  Now, in *Hill* you were asked whether or not you'd

5    honor an asterisk on a report.  Do you remember that?

6    A    No.  But I'll listen.

7    Q    Okay.  Page 742.  "QUESTION:  It seems here we have

8    reason to depart from that custom due to her deficits and lack

9    of involvement with school life.  Is that fair to say?

10           "ANSWER:  The report -- the school psychologist's

11   report indicated that caution -- and I am respectful of that

12   examiner's decision to essentially put an asterisk after the

13   score and say, 'We don't trust it fully.'"

14           MR. BURT:  I'm sorry.  The last word?

15           MR. McGOVERN:  "And we don't trust it fully."

16           MR. BURT:  Thank you.

17   BY MR. McGOVERN

18   Q    ""QUESTION:  As Dr. Darnel, same?

19           "ANSWER:  Dr. Schmidt Goessling.

20           "QUESTION:  Dr. Darnel did it January 10, '84?

21           "ANSWER:  Yes.

22           "QUESTION:  Go ahead.

23           "ANSWER:  Both of the low scores, the examiners

24   expressed their caution about whether that was an acceptable

25   score.  And that's certainly appropriate for the examiner to

Olley - Cross/McGovern

1   indicate.  The examiners didn't say, 'Disregard it altogether.

2   This is invalid.  Pretend that it didn't exist.'  They said,

3   'Look at it closely'" -- "'Look at it closely, at this,

4   because it's suspect.'"

5           "QUESTION:  Pretty highly suspect, isn't it?

6           "ANSWER:  In their view, it was."

7           Do you remember giving that testimony?

8   A    I'm -- yes.  I don't -- I mean, we'd have to compare the

9   wording in one and the wording in the other.

10          But I understand your point, that we respect those

11  statements that are made by the examiner at the time because

12  that person was there to observe, and I'm not.

13  Q    Yeah.  And that person was there, and that person put

14  observations that she took the time to write out.

15          And you would agree, I think, that these school

16  psychologists, either be it Dr. Nagler or Dr. Drezner -- they

17  wrote lengthy commentaries about the defendant as part of

18  their evaluations of his IQ, correct?

19  A    Yes.  Ms. Drezner, who is not Dr. Drezner, wrote some

20  things that I would disagree with.  I think they were not

21  based upon the kind of standards that we would say are

22  evidence-based today.

23  Q    But she said some really nice things about the defendant,

24  didn't she?

25  A    Yes.

Olley - Cross/McGovern

1   Q    I mean, these folks appear to be very caring

2   professionals, right?

3   A    That was my impression when I met with her.

4   Q    Right?  Isn't this the -- isn't Ms. Drezner or -- well, I

5   don't know what her -- what her title was.

6   A    She's not a doctoral-level person.

7   Q    All right.

8        Well, I mean, she -- she said things about him that

9   were remarkably kind and caring, correct?

10  A    Yes.

11  Q    Stuff like -- it's within the Drezner -- excuse me -- the

12  Nagler report that's already in evidence.  "Beneath the boy's

13  gruff facade is a lonely, vulnerable boy hungering for love

14  and acceptance."

15       She wrote that, right?

16  A    Yes.

17  Q    This doesn't appear to be somebody who is taking their

18  duties lightly, does it?

19  A    No.  I didn't imply that she takes them lightly, although

20  I disagree with some of her interpretations.

21  Q    Sir -- but my question is, these -- these psychologists,

22  the school psychologist, did their ethical best, in your

23  estimation, to get this right, correct?

24  A    Yes.  I don't believe it's a manner of being unethical to

25  disagree with the findings.

Olley - Cross/McGovern

1  Q    Well, they either got it wrong or they lied, right?

2  A    No.  I don't think those are the only -- well, if they

3  got it -- yes.  If she got it wrong, I think she got it wrong.

4  That doesn't mean she didn't have really good intentions about

5  her students.

6  Q    And so -- you say "her students."  She's the school

7  psychologist.  She's not his teacher, right?

8  A    Well, she -- she was a teacher, and then she took some

9  courses to get a certification.  In those days it was much

10 easier to become a school psychologist without having --

11 actually having a degree in psychology.

12 Q    Is this Ms. Drezner or Ms. Nagler?

13 A    Ms. Drezner.  Ms. Nagler is a -- Dr. Nagler, I believe.

14 Q    Yeah.

15       We're talking about Dr. Nagler.

16 A    Oh, excuse me.  I'm sorry.

17 Q    I apologize.

18       Dr. Nagler was the one who prepared the 1994 report?

19 A    Yes.

20 Q    Okay.

21       When she makes behavioral observations about the way

22 that this defendant at the age of 12 took this test, would you

23 agree that we should honor and respect -- or take, as you

24 said -- honor that asterisk that she put on this test?

25 A    Yes, although how we honor it, I don't know, because she

Olley - Cross/McGovern

1    didn't give more information than that.

2    Q    Well, Doctor, just in applying common sense, moving out

3    of the area of psychology, every single one of these test

4    scores is essentially the same except for hers, right?

5    A    Close to that, yes.

6    Q    And every single one of those professionals said that

7    this gentleman's intellectual capacity, or potential, is

8    understated by those scores, correct?

9    A    I don't know if it's everyone, but that was a frequent

10   comment, yes.

11   Q    Okay.

12        And Nagler, Dr. Nagler, the one that you're relying

13   on as evidence of prong one, tells us from, unfortunately, the

14   grave that he sat there and was careless and blurted out

15   answers and took this test in a careless manner.

16        And that's the one you're asking this Court to rely

17   on?

18   A    Yes, unless she elaborated to say that that was an

19   invalid score or that -- even to say that it meant that he

20   could have done better.

21   Q    Is this another area that you've learned since the *Hill*

22   case?  Right?  Because in the *Hill* case, you said unless -- in

23   the *Hill* case, you said you would honor and respect if

24   somebody put an asterisk on a report, right?

25   A    I honor her statements.  I don't quite know how to

Olley - Cross/McGovern

1    interpret them; but I will defer to your statement that it is

2    there and that the others, other reports, have a more

3    optimistic statement about his potential.

4    Q     Okay.

5          Well, you've got four experts -- as you understood,

6    you had four experts who were working on this evaluation,

7    correct?

8    A     Yes.

9    Q     Nobody gave the defendant an IQ test when you-all got

10   retained, right?

11   A     Yes.

12   Q     Isn't the WAIS-IV like the gold standard in determining

13   whether or not somebody has an intellectual deficit at this

14   point?

15   A     At this point is several years after the time of the

16   crime, and my understanding is that our responsibility is to

17   assess his functioning in the developmental period and around

18   the time of the crime.

19   Q     Well, let me restate it.

20         At this point in humanity, that -- in civilization,

21   the WAIS-IV is currently the gold standard for testing

22   somebody's intellectual deficits, correct?

23   A     I think either that or the Stanford-Binet are both

24   acceptable.

25   Q     And if you gave him the WAIS-IV yourself, or one of your

                    Olley - Cross/McGovern

1    colleagues, you could come in and testify as to how he did on

2    that test, correct?

3    A    How he did on the test at the time that it was

4    administered, yes.

5    Q    And you've testified multiple times that IQ should stay

6    the same, right?

7    A    Intelligence stays the same; IQ scores can vary.

8    Q    But, theoretically, an IQ score should stay the same,

9    much like we're seeing here, much like the 84, the 78, the 80,

10   the 84, the 76, the 80, right?

11   A    Well, we're -- we're parsing words here.  But I think

12   it's a reasonable distinction that the -- that intelligence is

13   a theoretical trait that we have.  IQ scores is our best

14   effort at measuring that, and IQ scores vary.

15   Q    And there would've been absolutely no harm, to the Court

16   anyway, for you to have just given the defendant an IQ test,

17   just like anybody -- any other psychologist would have, if

18   they were asked to evaluate the defendant's intellectual

19   deficit?

20   A    That could've been done by Dr. James.  That was her call,

21   and not mine, because I wasn't asked to work in that area.

22   Q    And you didn't tell her to do that, right?

23   A    I did not.

24   Q    I mean, because if you got another 80, that certainly

25   would have caused even further question of the 71, right?

Olley - Cross/McGovern

1    A    It would have, and it has.

2              THE COURT:  All right.  Let's take a ten-minute

3    break.

4              (Whereupon, a break was taken at 4:41 p.m.)

5              (Time noted: 5:00 p.m.)

6              THE COURT:  Be seated, please.

7              (Defendant present in open court.)

8              THE COURT:  The defendant is present.

9              Mr. McGovern, how much more do you have for this

10   witness?

11             MR. McGOVERN:  I'll be going through the rest of the

12   session and -- and potentially a little bit more.

13             THE COURT:  I'm just asking.

14             MR. McGOVERN:  Okay.

15             THE COURT:  We'll go until 7:00, and then we'll

16   resume tomorrow at 9:00 with either your continued cross or

17   redirect, whichever.

18             MR. McGOVERN:  Thank you very much.

19             THE COURT:  Okay.  Let's proceed, then.

20   BY MR. McGOVERN

21   Q    Good afternoon again, Dr. Olley.

22             THE COURT:  I remind the witness that he is still

23   under oath.

24             THE WITNESS:  Thank you, sir.

25

Olley - Cross/McGovern

1    BY MR. McGOVERN

2    Q    When we left off, Dr. Olley, we were obviously talking

3    quite a bit about Dr. Drezner's 1994 IQ that revealed a score

4    of a 71, right?

5    A    Dr. Nagler's.

6    Q    Dr. Nagler's.  I'm sorry.

7    A    I'm sorry -- I'm confused too.

8    Q    All right.  So Dr. Nagler's score that revealed a 71.

9         I want to switch gears here for a moment and talk to

10   you about an IQ test that was done in January of 2000 by

11   Dr. Popp.  Have you seen that one?

12   A    Yes.

13   Q    Okay.

14        And that was done when the defendant was 17 years

15   old and 8 months, correct?

16   A    Yes.

17   Q    And according to that score, he achieved a full-scale

18   score of an 84, correct?

19   A    Yes.

20   Q    And you would agree that -- putting aside Dr. Nagler's

21   score, that 84 is relatively consistent his other scores,

22   correct?

23   A    Well, it's certainly on the high end.  There's one other

24   84 but that was when he was very young and I would not put a

25   lot of trust in that.

Olley - Cross/McGovern

1    Q    Okay.

2         But it's also consistent with the -- with the

3    finding that the defendant's verbal IQ is -- has a discrepancy

4    with his performance IQ, correct?

5    A    Yes.

6    Q    Okay.  By "discrepancy" I think the DSM defines that as

7    about a standard deviation, right, about 15 points?

8    A    That's a common way of describing it, yes.

9    Q    And Dr. Popp's IQ appears to be a perfectly fine IQ test,

10   right?

11   A    I don't recall more about it than what I'm seeing on this

12   slide.

13   Q    Well, it's -- it's done when he's just about 18 years

14   old, correct?

15   A    Yes.

16   Q    I mean, that would be heartland of an evaluation of a

17   person for mental retardation before the age of 18, correct?

18   A    Yes.

19   Q    It was done in the New York City school system, correct?

20   A    Oh, yes, it was.

21   Q    Right?

22        It was the first time that he took the WAIS-III, so

23   he probably had limited practice effects, right?

24   A    There are some -- there are some practice effects, at

25   least in the judgment of Dr. Kaufman, who is the person that's

Olley - Cross/McGovern

1    written most about this, that continues across all of the

2    Wechsler scales, because of their similarity.  And, you know,

3    what I don't -- well, stop me if this isn't --

4    Q    Well, it's actually not answering my question, so we can

5    stop there.

6    A    Okay.  I'll start over again.

7             THE COURT:  Excuse me.  I believe it is answering

8    his question.  He may not like the answer, but I believe it's

9    responsive.

10            MR. McGOVERN:  Okay.

11            THE COURT:  Well, has it been answered?

12   BY MR. McGOVERN

13   Q    Is there something that you would like to add about

14   Dr. Kaufman's take on practice effects and how that they span

15   all of WAIS and WISC testing?

16   A    Only that there are similarities across all of the

17   Wechsler scales that could contribute.

18            What I was about to say -- and you can strike that,

19   if you think it's inappropriate.

20            THE COURT:  I can strike it if I think it is

21   inappropriate.

22            THE WITNESS:  Sorry.  I'm aiming at the wrong

23   person.

24   A    Or you can challenge me if it's not appropriate.

25            THE COURT:  Right.  Go ahead.

Olley - Cross/McGovern

1    A    There are data of the earlier versions, going from the

2    WISC-R to the WAIS-R where scores artificially jumped up.

3    Now, I don't know if the same thing is true going from the

4    WISC-III to the WAIS-III.  So that's why I said -- you know,

5    I'm not giving you a specific reference, so that may not be --

6    that's not something I have firmly researched.

7    Q    That's a fair amount of speculation, correct?

8    A    Yes.  It's based upon the earlier versions of the WISC

9    and the WAIS.

10   Q    Yeah.

11        And even if you were to go crazy putting a practice

12   effect decrease on Dr. Popp's score, you would have to bring

13   it down by 14 points to get it to a 70, right?

14   A    Yes, if we're just talking about the practice effect.

15   Q    And that's what we just talked about, right?

16   A    If my other speculation is not true.

17   Q    Okay.

18        And Dr. Popp's test was properly administered, as

19   far as you know?

20   A    As far as I know.

21   Q    So why, then, don't we just stop this hearing and end

22   with the 84 from Dr. Popp that was taken on -- just short of

23   the defendant's 18th birthday and call it on whether or not

24   he's mentally retarded?

25   A    Because there's another test that is closer to the time

JUDI JOHNSON, RPR, CRR, CLR
Official Court Reporter

Olley - Cross/McGovern

 1   of the crime that gives a different finding.

 2   Q    But if he's got an -- if the third prong is that he has

 3   to have an onset before the age of 18, I would think -- and

 4   you're the expert.  Wouldn't the IQ test that is taken just as

 5   he's exhausting those 18 years, be the most dispositive of the

 6   question?

 7   A    What is required is that the condition exists before the

 8   age of 18.  It is not required that a particular kind of test

 9   be administered before the age of 18.

10   Q    That's fair.

11        However, wouldn't it be very, very strong evidence

12   that he doesn't have mental retardation if he scored an 84 on

13   prong one, or the test for prong one, just before his 18th

14   birthday?

15   A    Well, now that we know that there was another test close

16   to the time of the crime that is more -- one that Dr. James

17   relies upon, I don't think it would be reasonable to toss out

18   that information and say, in retrospect, there should've been

19   no more IQ tests after his 18th birthday.

20   Q    Are you suggesting to the Court that the test that was

21   taken in 2003 is more reliable for the question of whether or

22   not he was mentally retarded as a clinical matter -- is more

23   reliable -- that that 2003 test is more reliable than

24   Dr. Popp's test?

25   A    No.  I'm saying it should be kept in the mix because --

Olley - Cross/McGovern

1    you know, why would you toss it out?  We now have it, and it's

2    informative.

3    Q    Okay.  But it's really informative, right?  It's an IQ

4    test that was done right before his 18th birthday.  The cutoff

5    for the onset of the condition is his 18th birthday.  That

6    would make it certainly in the mix with everything.

7    A    Yes.

8    Q    It would be a very, very, very important piece of the

9    mix, would it not?

10   A    I think the value of this slide is that it presents all

11   of the IQ scores and we get to have this conversation about

12   all of them rather than just some.

13   Q    And this is actually even further evidence of why you

14   should have done an IQ test when you were brought into this

15   case, right?  We could've put your IQ test into the mix too,

16   right?

17   A    Or Dr. James' IQ test.

18   Q    But that was not done, right?

19   A    It was not done.

20   Q    Do you know what you did in the *Hill* case, when you got

21   brought into the case, about IQ testing?

22   A    Yes.

23   Q    Okay.  Do you remember that in the *Hill* case -- where the

24   defendant, much like this defendant, had been in jail since

25   the age of 19, in 1985 -- you showed up, I don't know, almost

Olley - Cross/McGovern

1   20 years later, and the first thing that you and your fellow

2   experts did was give him an IQ test?  Do you remember that?

3   A    I remember the circumstances of it as well, which were

4   unusual --

5   Q    But whether or not they're unusual --

6            MR. BURT:  Excuse me.  I don't think he's finished.

7            THE COURT:  You can finish.

8   A    The IQ test was done because the judge gave what, I

9   thought, was an interesting, and perhaps very worthwhile,

10  instruction to the -- there were three experts involved in

11  that case and -- one for the state, one for the defense, and

12  one for the Court.  And we were instructed to come to some

13  agreement about what that evaluation would look like and to do

14  that evaluation jointly, and so that was a compromised

15  decision among all three experts to do one IQ test.

16  BY MR. McGOVERN

17  Q    Okay.  And you agreed with that, right?

18  A    I did.

19  Q    Okay.

20            And so you agreed that in a case that is much like

21  the defendant's case, where he has been incarcerated for most

22  of his adult life, that the first thing that you did, when

23  this gentleman was in his mid-30's, to assess whether or not

24  he was mentally retarded, was give him a Wechsler WAIS-III

25  test, right?

Olley - Cross/McGovern

1   A    The judge in that case required us to render an opinion

2   about his current functioning, which is a different set of

3   marching orders than in our current situation.

4   Q    Is that entirely correct, Dr. Olley?  Isn't it true that

5   in that case you testified that Mr. Hill was mentally retarded

6   currently, which would've been 2004, but also testified that

7   he was not mentally retarded at the time of the crime in 1985?

8   Am I right --

9   A    Yes.

10  Q    Or am I wrong?

11  A    Yes.

12  Q    Okay.

13       So when you testified in the *Hill* case, you opined

14  in little Trumbull County, much like you're doing here today,

15  that the defendant was not mentally retarded at the time of

16  the crime, correct?

17       MR. BURT:  Excuse me.  Much like you're doing here

18  today?

19       MR. McGOVERN:  Well, sitting in a witness chair.

20       THE COURT:  Yeah, it's confusing.

21       MR. McGOVERN:  I apologize.

22       THE COURT:  I agree.  Restate the question, please.

23

24       (Continued on the next page.)

25

Olley - Cross/McGovern

1           THE COURT:  Restate the question.

2     CONTINUED CROSS-EXAMINATION

3     BY MR. McGOVERN:

4     Q     In the Hill case, you testified that the defendant was

5     not mentally retarded, correct?

6     A     Yes.

7     Q     You testified that he was not mentally retarded at the

8     time of the crime or at the time -- or excuse me, not or, and

9     at the time that you appeared at the hearing, correct?

10    A     Yes.

11    Q     So when that determination was being made or those

12    evaluations on Hill were being conducted, one of the first

13    things that you and your colleagues did was administer a

14    WAIS-III test to Mr. Hill, correct or incorrect?

15    A     Correct.

16    Q     All right.  And as an aside, you did not apply the Flynn

17    Effect to that WAIS-III, did you?

18    A     No.

19    Q     Because the Flynn Effect in that case would have brought

20    down his score.  He posted a 58, correct?

21    A     Yes.

22    Q     And the Flynn Effect, because it was 2004, it would have

23    brought down his score a couple of points, because you normed

24    the WAIS-III in 1997, right?

25    A     Yes.

Olley - Cross/McGovern

1   Q    But in this case with this defendant, you and your

2   colleagues and/or I'll just say Dr. James decided not to do a

3   WAIS-IV IQ test on this defendant, correct?

4   A    Yes.  May I comment further on the Danny Hill situation?

5   Q    You'll have time for that on re-direct.  We are trying to

6   get through this.

7         Do you know why you're not crediting Dr. Popp?

8   A    I really don't recall, because it's been awhile since

9   I've read each of these reports, so fill me in.

10   Q    You have no good reason as you sit here to say that

11   Dr. Popp's score is in any way invalid, correct?

12   A    I don't, based upon what I recall about his

13   administration.

14   Q    Has the defense team informed you how they're knocking

15   down that 84?

16   A    I believe so, but I don't recall.  This was back when I

17   was writing the report and I was, as I said, relying upon

18   Dr. James' interpretation.

19   Q    Well, assuming the ethics and professionalism that you

20   afford other psychologists, you as you sit here, have no

21   reason to question it, right?

22   A    Not that I can recall.

23   Q    What if I told you that Dr. Popp prorated that score,

24   that he prorated some of the subtests in got him that score,

25   would that be a big problem for you?

Olley - Cross/McGovern

1    A    It would certainly be something to bear in mind.

2    Q    And is that a reason to invalidate a standard IQ test

3    like that WAIS-III that was given in 2000?

4    A    If he gave fewer than all of the subtests, it would be.

5    And again, there are circumstances when prorating is

6    appropriate, but I don't know that I would toss it out, but

7    that would be something to bear in mind.

8    Q    Okay.  So prorating, you don't have a problem, there are

9    circumstances where it's fine, correct?

10   A    I do have a problem with it, and it's typically done for

11   screening purposes or for when the standard administrations

12   are -- have been invalidated for some reason.

13   Q    But I just want to be clear so the record is clear, as

14   you sit here today, Dr. Popp's 84 in January 2000, the

15   defendant was just shy of 18 years, as far as you're

16   concerned, is a valid score?

17   A    Well, now that you reminded me that it was prorated, then

18   I would revise that statement to say that I would have concern

19   about it.

20   Q    Oh, so you're concerned about Dr. Popp now because of the

21   prorating?

22   A    I would want to bear that in mind when looking at all of

23   this.

24   Q    What about if I told you that Dr. Nagler actually

25   prorated her score, too?

Olley - Cross/McGovern

```
1   A    Then I would want to bear that in mind as well.

2   Q    That would be a big problem, wouldn't it be, for

3   Dr. Nagler's score?

4   A    It's your words "big problem."  I want to look at each of

5   those.  And as I said now, had I known that I was going to be

6   cross-examined on the IQ scores rather than the adaptive

7   behavior, I would have refreshed my memory on all of these

8   things.

9   Q    You told us on direct examination that you were very

10  troubled by the way that Dr. Drezner did her IQ of the

11  defendant, correct?

12  A    If I used "very troubled" then you may have it in front

13  of you, I don't know that I would say it that strongly.  I

14  said there were some things that she revealed to me that would

15  make me cautious about her score.

16  Q    And that was that she encouraged the defendant in the

17  course of the test, right?

18  A    Yes.  And that she gave -- she substituted one of the

19  subtests for a reason that appeared to be more to make the

20  test easier for the testee.

21  Q    Did she say "easier" or "more interesting"?

22  A    She said kids generally like it better and it's easier to

23  administer.

24  Q    So it doesn't make it easier, it's just more attractive

25  to children, correct?
```

Olley - Cross/McGovern

1    A    Yes.  I can't tell whether it was easier for this

2    individual or not.

3    Q    And you find both of these things to be problematic,

4    correct?

5    A    More things to be examined in the context of all the

6    other things we've been discussing.

7    Q    So when you were administering your test of Danny Hill in

8    2004, you encouraged him too, didn't you?

9    A    Actually, I was not the one who did the testing.  I was

10   present, one of the other experts was the one that did the

11   actual testing.

12   Q    You did administer tests during your meeting with

13   Mr. Hill; is that right?

14   A    I did administer some things, I don't recall which ones,

15   but I do recall that I did not administer the IQ test.

16   Q    On page 616 of the transcript, it is a long answer but

17   I'll just start with the point you are going to get into --

18           THE COURT:  This is which transcript?

19           MR. McGOVERN:  The Hill transcript.

20   Q    At 616 in your answer you say, "At that point Mr. Hill

21   became very upset, put his head down and started crying.  And

22   I think I had -- I would have to consult my report for the

23   better estimate of what was said, I believe he said 'this

24   stuff is hard.'  And then when I encouraged him to go on, he

25   said, 'my head won't work no more.'"

Olley - Cross/McGovern

1          MR. BURT:  Your Honor, might I be given a copy of

2     whatever is being referenced here so I can keep up on it?  I

3     don't have a copy of this.

4          MR. McGOVERN:  You don't have a copy of this?

5          MR. BURT:  I don't.

6          MR. McGOVERN:  Well, we'll provide a copy and I can

7     -- I don't know if I have one here.

8     BY MR. McGOVERN:

9     Q    But in the meantime, Doctor, does that sound familiar?

10    A    Yes, that was with the administration, not of an IQ test,

11    but of an academic achievement test.  And at that point he was

12    ready to give up and stop, and I wanted to make sure that he

13    had given his reasonable effort too, and I think that's a

14    different matter than an IQ test.

15    Q    You encouraged him, did you not?

16    A    I did.

17    Q    And he was taking a standardized test, correct?

18    A    Yes.

19    Q    And there's nothing wrong with encouraging somebody to

20    try and finish the test, correct?

21    A    I think it's a different matter for an educational

22    achievement test.  This was, you know, math skills and so on,

23    and he was discouraged because it was hard for him, and I

24    wanted him to continue to make an effort so I could tell if he

25    could really do these things or if he was just giving up

Olley - Cross/McGovern

1   because he was discouraged.

2   Q    And would Dr. Drezner, in her report, actually in your

3   report, you said that her encouragement was inappropriate in

4   some way, correct?

5   A    I said it had potential to increase his performance.

6   Q    But you acknowledge now, whether it's a different matter

7   or not, that in the Hill case you actually provided

8   encouragement to somebody that was giving up on a

9   psychological test and encouraged them to carry it out, right?

10  A    A different kind of test, but yes.

11  Q    And then in the Hill case you also -- you gave a more

12  interesting test to do as well; is that right?  Do you recall

13  that?

14  A    I don't recall what other things I did.

15  Q    Page 617.  Question:  9:00, 10:00, what time?  Answer:

16  Between 9 and 10:00.  Question:  Okay.  Answer:  So Mr. Hill

17  continued to weep for five to ten minutes.  And I concluded at

18  that time that he wasn't going to get back to this particular

19  task with his best effort, so we shifted gears in order to do

20  some other things that we thought might get him interested

21  again."

22         Does that sound right?

23  A    Yes.

24  Q    And is that exactly what Ms. Drezner was doing, she was

25  giving alternative tests that would get him -- get the

Olley - Cross/McGovern

1   defendant interested or keep the interest level of the student

2   up?

3   A    He had not, as far as I know, in Ms. Drezner's test, not

4   refused to participate.  And I don't recall, you may have

5   information about what the other test was, if it was

6   presumably something that I was planning to administer anyway,

7   then shifting gears to try to -- okay, he's not doing this

8   one, let's do this other one that we're planning to do anyway,

9   it seems like a reasonable plan.

10  Q    But you agree that you gave Mr. Hill a test that you

11  thought would be more interesting for him at that time; yes or

12  no?

13  A    If I could get him to engage more instead of going back

14  to the Judge to say we couldn't do it; then yes, that's fine.

15  Q    And the tests that were replaced by Ms. Drezner in place

16  of a less interesting test, it tested essentially the same

17  types of intellectual capabilities, right?

18  A    It was an alternative on the performance scale, so it was

19  a different kind of a -- it was mazes, which it's just what

20  the title indicates, it's being able to take a pencil and make

21  your way through a maze.

22  Q    But the other test was object assembly, right, which is

23  taking a bunch of items and building it into something,

24  correct?

25  A    No, it's putting puzzles together, which it takes longer.

Olley - Cross/McGovern

1   Q    Would you agree that they're both visual spacial tests?

2   A    Yes.

3   Q    I guess the point here, Doctor, would you agree that if

4   you wanted to, you could go back to any IQ test that was given

5   to anybody over time and nitpick, right?

6   A    If by nitpick means -- well, let me rephrase it.  I think

7   you can -- you could probably find fault in many things.

8   Q    And that's why you've testified that you afford school

9   psychologists or psychologists the respect that they're doing

10  their jobs correctly to the best of their ability, right?

11  A    Yes.

12  Q    And it's not a useful practice to go back and take these,

13  all of these tests apart to try and find some flaw in them,

14  it's -- is that right?

15  A    Well, using your term "nitpick" that implies that the

16  thing that you would find is inconsequential, in which case I

17  would certainly agree with you if you found substantial

18  scoring errors or something that was administered

19  inappropriately, then it's valuable.

20  Q    Well, in the Hill case at 755 when you were questioned

21  about testing and these matters, the question was:  So had you

22  seen, you would have been able to sit here and tell us if you

23  detected any obvious flaws in any of these reports, right?

24  And your answer was:  I think that I testified that if we

25  wanted to find imperfections in reports, we probably could

Olley - Cross/McGovern

1  find something in most of the historical records, but that

2  taking it as a whole, I think it would be foolish to take

3  something that looks obvious and try to nitpick it to death,

4  so I'm trying not to do that."

5          Do you recall giving that testimony?

6  A    Yes.

7  Q    Have you reviewed your notes of Dr. Drezner's interview?

8  A    Yes.  Not today, but I have.

9  Q    During your testimony you said that Dr. Drezner told you

10 that it was a routine practice at her school P9 to say that

11 everybody there had higher intellectual potential than their

12 IQ scores were reported?

13 A    I'm not sure to say higher IQ scores, but whatever that

14 phrase was that was in her report, she said, I thought I put

15 that in all the reports.

16 Q    Okay.  I think in her -- in your notes of that interview

17 she said something to the effect, and your handwriting may

18 limit my ability to read this, "All P9 reports said some

19 conclusion about scores depressed by upbringing."

20          Does that sound a little more about what she said?

21 A    If that's what my notes say, sure.

22 Q    And that's a factor that would be important to know if

23 you were in a school that was dealing with a group of people

24 who had a certain level of cultural or socioeconomic

25 depravation; is that right?

Olley - Cross/McGovern

1    A    No.  I think that that violates the standard that we were

2    talking about earlier of altering scores on the basis of

3    socioeconomic status.

4    Q    But with all due respect, Doctor, nobody altered any

5    scores, right?

6    A    Right.

7    Q    Right.  Apparently Dr. James is the only one who is

8    altering scores for this defendant.  These women or these

9    professions wrote down what the score was and didn't alter it,

10   right?

11            MR. BURT:  Objection, he's got a statement an

12   insertion there, not a question.

13            THE COURT:  Sustained.

14            MR. BURT:  Thank you.

15   Q    You read these reports, correct?

16   A    Yes.

17   Q    You're testifying that this defendant meets prong one,

18   correct?

19   A    Yes.

20   Q    In those reports you have no indication that the

21   administrators of these reports altered the numbers, right?

22   A    Yes.

23   Q    So when you say that people are violating, which is a

24   pretty heavy allegation, violating some rule about altering

25   scores based on cultural depravation, socioeconomic matters,

Olley - Cross/McGovern

1    they weren't doing that, were they?

2    A    They were encouraging that that factor, if not literally

3    altering scores, be viewed as something that had artificially

4    suppressed the score.  I think the question is, is there a

5    scientific basis for how scores are interpreted?  And you can

6    argue that about Dr. James' interpretation of scores for any

7    of these individuals, did she have a scientific basis for the

8    conclusions that she drew and she can answer that better than

9    I can.

10   Q    But she didn't alter the scores, that's all I'm saying?

11   A    Mr. Drezner didn't alter.

12   Q    Drezner didn't alter the scores?

13   A    Ms. Drezner did not alter the score.  She had a standard

14   statement indicating that scores had been, as I interpreted,

15   artificially depressed because of socioeconomic factors.

16   Q    And that doesn't violate any rule, does it?

17   A    It doesn't violate a rule to say it, but if it's -- I

18   think it is a misleading statement.

19   Q    Well, that's an application of her clinical judgement,

20   isn't it?

21   A    Yes.  And it endangers the responsibility of taking away

22   from what could be an actual disability by writing it off to a

23   socioeconomic factor.

24   Q    But she's just noting it in her reports.  You said

25   something during your direct to the effect that they put these

Olley - Cross/McGovern

1    notes in there to make the children feel good, to make people

2    feel good, right?  Do you remember saying that?

3    A    Yes.

4    Q    Who's feeling good with this report by Ms. Drezner?  Did

5    you have any indication that this was given to the defendant

6    for him to try and read it?

7    A    The feeling good has to do with the encouraging

8    statements that she made, so I apologize if I gave a confusing

9    response to that.

10   Q    By the way in your report -- you went further, and I have

11   to deal with this because the report was offered in evidence,

12   in the report you went further and you invalidated

13   Ms. Drezner's findings in the IQ test by saying she went over

14   the top with the encouragement saying, "that's a good answer",

15   "I like that one."  Do you recall that?

16   A    I don't believe I used over the top, but words to that

17   effect.

18   Q    You understand that she disputes having said that?

19   A    Yes.

20   Q    And your notes have some mention of that statement in

21   there; however, there is no indication that such a statement

22   was made to this defendant, right?

23   A    Right.

24   Q    And there is further no indication in your notes that

25   that statement was made or a statement like that was made

MARY AGNES DRURY, RPR
Official Court Reporter

                        Olley - Cross/McGovern

1    during the course of IQ testing, right?

2    A    To the extent that she said it was a standard thing to

3    say, then I would assume that it was said to this defendant.

4    Q    That's an assumption, correct?

5    A    I think that's a reasonable assumption.

6    Q    Doctor, I'm going to move to a new area.

7             You've spoken during your examination as it relates

8    to IQ about the Flynn Effect.  Do you recall that?

9    A    Yes.

10   Q    And the Flynn Effect is essentially a theory promulgated

11   by Dr. Flynn in New Zealand that says that the general

12   population of the United States gets smarter at 0.3 points per

13   year, IQ points per year; and therefore, we should decrease IQ

14   scores by the amount of years times 0.3 for the time that the

15   test was normed or the difference between the time the test

16   was normed and the time the test was taken.  Does that sound

17   right?

18   A    That's a summary, but that's a very lengthy one.  So to

19   use your words, I might have to deconstruct it a bit.

20   Dr. Flynn has an academic appointment in New Zealand, he's

21   actually from the United States, and the data you are

22   referring to are from the United States.

23            Whether he advo -- well, two points.  One, is this a

24   scientifically valid finding?  You refer to it as a theory,

25   and of course theory has a certain meaning in science.  The

Olley - Cross/McGovern

1   way you phrased it makes it sound like it's trivializing it,

2   and I think it is a valid and well-substantiated scientific

3   finding.  And the one issue is the validity of its findings.

4          And the second issue is what do you do with that

5   information in an Atkins hearing.  So Dr. Flynn, as you

6   indicated, has advocated and many other people have advocated

7   that a more accurate estimate of current IQ could be obtained

8   by taking the Flynn Effect into account in the way you

9   described.

10  Q    And that being the 0.3 per year for each year that passes

11  after the test was normed, right?

12  A    Yes.  And that 0.3 was arrived at by many studies and not

13  all of them are exactly 0.3, that's an average of many

14  studies.

15  Q    And you've never used the Flynn Effect in your -- you've

16  never been in private practice, but in your clinical practice

17  you've never used the Flynn Effect, right?

18  A    I have not.  I have not done that for several years, so

19  the Flynn Effect has become much more front and center in the

20  scientific community as a result of that Davis hearing.

21  Q    In the Davis case you testified that Flynn was not used

22  as far as you understood in a clinical setting, correct?

23  A    I think it was not customary at that time to use it.

24  Q    So in 2009 it's been more customary for people in the

25  clinical setting to employ the Flynn Effect, right?

Olley - Cross/McGovern

1   A    Well, it's hard to say, because it's mostly written about

2   in the context of the Atkins hearings.  Dr. Flynn has written

3   about it in other contexts and urge that it be taken into

4   consideration, I don't have any data on how widely that's been

5   done.

6   Q    And you haven't been in a clinical setting for more than

7   five years, right?

8   A    Right.

9   Q    So your representation that it's becoming more prevalent

10  in the clinical setting isn't based on too much data, right?

11  A    Well, it's only based on it's being written about in more

12  context besides Atkins, so one of the criticisms of it years

13  ago was it wasn't done in clinical settings because people

14  didn't know about it.  I think people know about it more now,

15  so I'm hoping that it is at least taken into consideration.

16  Q    You're hoping that the Flynn Effect gets more

17  consideration?

18  A    Yes, in a setting, because I think it is a valid

19  scientific finding.

20  Q    You know, Dr. Flynn, as of his very important article,

21  "Tethering the Elephant," do you know that?

22  A    Yeah.

23  Q    He actually said in that article at page 174 that he took

24  some issue with what a California court said when he cited

25  "People versus Superior Court in California.  It goes further

Olley - Cross/McGovern

1    than I would in asserting that the Flynn Effect seems to be

2    generally accepted in the clinical field."

3           Did you read that in Dr. Flynn's article?

4    A    Yes, and also his 2012 book I think does advocate for

5    much broader application of that.

6    Q    So he's advocating for a broader application of the

7    autonomous rule that he has created, correct?

8    A    Yes.

9    Q    And he testifies regularly, does he not?

10   A    He does.

11   Q    Just like yourself, right?

12   A    Yes.

13   Q    He's all over the United States testifying in Atkins

14   hearings, correct?

15   A    That, I don't know.  He lives in New Zealand and comes

16   back and forth, so how much and where he testifies, I really

17   don't know.

18   Q    Okay.  But he's certainly advocating for the use of Flynn

19   Effect in a more clinically based setting, correct?

20   A    Yes.

21   Q    But I think we can agree that even in the vast amount of

22   time that's passed since the Davis case, that the standard of

23   practice in the clinical setting is not to apply the Flynn

24   Effect, correct?

25   A    I think we just discussed this and the answer is I don't

Olley - Cross/McGovern

1   know.

2   Q    Okay.  So that's a perfectly fine answer.  Are you

3   familiar with an article that was written by an Eric Drogin?

4   A    Can you tell me more.

5   Q    Adjusting IQ scores for the Flynn Effect consistent with

6   standard of practice question mark?

7   A    Yes, there are other authors of that as well, are there

8   not?

9   Q    Leigh Hagan.

10  A    Yes.

11  Q    From the Virginia Commonwealth University.  I think he's

12  a board certified psychologist?

13  A    Yes.

14  Q    And Thom Guilmette from Providence College and Eric

15  Drogin from Harvard Medical School, you're familiar with that

16  article?

17  A    Yes, I am.

18  Q    This is one of the articles that you reviewed and

19  considered in formulating your opinions in this case and a

20  multitude of other cases you've been involved in, right?

21  A    Yes.

22  Q    What these psychology professionals set out to do was to

23  take a broad-based survey of people who were actually involved

24  in the clinical field and determine whether or not that Flynn

25  Effect is something that is being utilized in practice, right?

Olley - Cross/McGovern

1    A    Yes.

2    Q    All right.  And without jumping too far ahead, their

3    conclusion was that the Flynn Effect actually does not

4    represent the standard of practice in the United States,

5    right?

6    A    That was their conclusion in 2008 or whenever it was when

7    they did the survey.

8    Q    And the survey involved interviewing and surveying

9    doctoral program directors, right?

10   A    Yes.

11   Q    And diplomates of school psychologists?

12   A    Yes.

13   Q    And by diplomat, that's a board certified folks, right?

14   A    Yes, essentially it is.

15   Q    Board certified has a meaning in your profession, does it

16   not?

17   A    Yes.

18   Q    It means that you've had to submit to judgment of your

19   expertise as to whether your practice is consistent with these

20   standard of practice for your individual discipline; is that

21   right?

22   A    Yes.

23   Q    And are you board certified?

24   A    There is no such thing as board certification in

25   developmental disabilities.

Olley - Cross/McGovern

1    Q    I don't mean any harm, but these other folks here that I

2    talked about, at the very least, Leigh Hagan is a board

3    certified psychologist, right?

4    A    Yes.

5    Q    And they -- beyond just speaking to the people who ran

6    doctoral programs in this country and beyond speaking to board

7    certified school psychologists or people who are board

8    certified in school psychology, they actually reviewed the

9    testing instruments and the protocols, and determined from

10   those documents and materials that the Flynn Effect was not

11   recognized as a valid reason to alter an IQ score; is that

12   right?

13   A    May I comment on that?

14   Q    Sure.

15   A    Leigh Hagan is the primary person who testifies in

16   Virginia for the prosecution in Atkins cases, so just to put

17   that on the record.

18   Q    Who does Mr. Flynn testify for?  I bet he doesn't do much

19   for the government, does he?

20   A    I'm just --

21   Q    You're just saying.

22   A    I'm just mentioning that for you.

23   Q    I know.

24   A    That article and a rejoinder that they wrote to an

25   article critical of that by Tesse and Cunningham, plus a

Olley - Cross/McGovern

1   letter to the editor in the Division 33 Publication are the

2   only published articles that I know of that take that

3   position.

4        There was a presentation at the American

5   Psychological Association last -- was it last year or the year

6   before last that reviewed over 100 articles on the Flynn

7   Effect, and it was very few -- these ones that you mentioned

8   are the only ones that advocated against the application of

9   the Flynn Effect.

10       I'm not sure that's a really valid scorekeeping, but

11   you pull out this one article and I just want to make it known

12   that it's not the only point of view, and I believe it's a

13   minority point of view of people writing in this area.

14  Q   Doctor, during your direct examination there were

15   articles mentioned on a multiple of occasions standing for

16   different propositions that you were representing in this

17   courtroom, right?

18  A   Yes.

19  Q   Is it fair to say that there may be other positions and

20   other articles that run contrary to the views you've been

21   espousing here today?

22  A   I think if you are referring to articles having to do

23   with standards of practice, in Atkins cases particularly,

24   those things cited in the AAIDD manual, I think you'd be hard

25   pressed to find articles that say no, you shouldn't take the

Olley - Cross/McGovern

1    practice effects into consideration or no, you shouldn't use

2    confidence intervals or a variety of other things.

3         I do think well, it's not some people say this and

4    some people say that.  What I want to represent here is a

5    standard that's well accepted throughout our field, and I

6    don't want to cast it as Greg Olley thinks it's this way and

7    there are other opinions, so they're all equal.  I think I'm

8    doing my best to represent what I think is, as you said, good

9    practice.

10   Q    Okay.  The problem with what you just said is that I

11   don't -- this article that I just presented or discussed with

12   you is only answering the question whether or not the Flynn

13   Effect is consistent with standard practice, not with whether

14   or not it should be used in Atkins cases or anywhere else.

15   The answer to the question is, it's not being used in standard

16   clinical practice, and you don't appear to disagree with that,

17   do you?

18   A    At the time of that survey and for the people who

19   responded to it, that's a valid finding.

20   Q    Well, and ten minutes ago or five minutes ago you told me

21   you have no reason to believe that your statements in the

22   Davis case where you said that the Flynn Effect is not used in

23   clinical practice, you have no reason to believe that is valid

24   or reason to believe that that has changed?

25   A    I don't know that that has changed in clinical practice,

Olley - Cross/McGovern

1    which is of course a different setting than Atkins cases.

2         THE COURT:  Excuse me, could you just identify the

3    date and the publication which that was found on the record?

4         MR. McGOVERN:  The article is "Adjusting IQ Scores

5    for the Flynn Effect Consistent With the Standard of

6    Practice?"  It is in the professional -- it's in the

7    Professional Psychology Research and Practice, 2008, volume

8    39, number six.  619 through 625, and I will provide the Court

9    with a copy of it.

10         THE COURT:  Well, I think that would require to all

11    these applications.  I think it's important with the

12    possibility, first of all, for the Court and also the

13    possibility for appellate review that a copy be made part of

14    the record.  It does not mean that that validates the

15    statements or invalidates statements, but I do think that

16    since we're going into such technical detail in this hearing,

17    that we have the actual documents as part of the record.  Is

18    there an objection to that?

19         MR. BURT:  None whatsoever.  I agree.

20         THE COURT:  So at the end of the hearing you can put

21    it altogether, give it numbers and we'll make it part of the

22    record.

23         MR. BURT:  Thank you.

24         THE COURT:  Thank you very much.  Go on.

25    BY MR. McGOVERN:

Olley - Cross/McGovern

1  Q    So, Doctor, moving away from articles that offer opposing

2  views to other articles that you've read that advocate for the

3  Flynn Effect, I want to follow-up on something you said again,

4  which is that this is becoming -- the Flynn Effect is becoming

5  the standard in Atkins cases, right?

6  A    I think it's moving in that direction from the

7  information that I know.

8  Q    Okay.  Is there a discipline in medicine called Atkins

9  cases?

10 A    No, sir.

11 Q    Bear with me, I'm not a medical professional.  I'm asking

12 you questions about what the standard of care is as a

13 psychologist, as a developmental disability specialist, and on

14 occasion you're giving me answers about what the standard of

15 care is in Atkins cases.

16      Are you perceiving some difference here that says

17 death penalty litigation in the forensic context has one set

18 of rules and everybody else who's practicing psychology,

19 licensed, board certified, whatever have a different set of

20 rules?  If that's the case, just tell me.

21 A    No.  What I'm saying, and I think it's very important, is

22 that Atkins cases have forced our profession to look carefully

23 at some things and articulate some things that are important

24 to bring to the court, in order to have the most valid

25 information for the court to make its decisions, and that's a

Olley - Cross/McGovern

1    good thing.

2            It means that the field changes by looking at

3    something like the Flynn Effect, which I believe prior to the

4    attention that it's gotten, because of Atkins cases was

5    regarded as a valid but somewhat obscure psychometric finding,

6    now we look more closely at the Flynn Effect and we look at

7    other factors that could influence why IQ scores such as these

8    vary over time.  They look -- they have forced us to look more

9    carefully at things such as the retrospective administration

10   of scales of adaptive behavior.  I mean, these are good things

11   in the sense that it pushes our field to look at questions

12   that we might not have looked at so closely in the past.

13           I don't think it's an -- to answer your question, I

14   don't think it's a different standard of practice, I think

15   it's helping us to clarify our standard of practice.

16   Q    So despite the fact that you don't know of any evidence

17   of anybody actually using the Flynn Effect in clinical

18   practice, you believe that it's still part of standard of

19   practice; yes or no?

20   A    No, I didn't say that.  I'm saying I don't know, because

21   I guess if Dr. Hagan does another survey and maybe surveys a

22   broader sample of psychologists, he might get another

23   response.  But as you point out, there is a distinction

24   between does everybody do it versus is it valid.  And what you

25   are arguing is you want me to say it's not commonly done, and

695

Olley - Cross/McGovern

1  that's Dr. Hagan's argument as well, but it can still be valid

2  even though it's not widely done.

3  Q    Well, you know that the publishers of the WAIS test say

4  that it shouldn't be done, right?

5  A    Yes, I was going to mention that earlier.  They have a

6  considerable financial stake in their product.

7  Q    Well --

8  A    You don't really expect them to say well, we spent all of

9  this money to develop the test, but it's gradually becoming --

10  the norms are gradually become invalid.

11  Q    So you acknowledge that the people who make the Wechsler

12  test the gold standard of IQ testing in this country, that

13  they do not recognize the Flynn Effect, right?

14  A    Oh, I think they do recognize it.  I mean, the mere fact

15  that they have to keep re-norming their test is a passive

16  admission that the Flynn Effect exists.

17          The question as I understood it was should one take

18  that into consideration in interpreting individual scores.

19  Q    Doctor, the folks at Wechsler Adult Intelligence or

20  whatever it is psychology or Pearson --

21  A    Pearson.

22  Q    -- they wrote a direct response to Dr. Flynn's Tethering

23  the Elephant article and said, don't reduce IQ scores based on

24  this theory, right?

25  A    Yes.

Olley - Cross/McGovern

1    Q    All right.  And you've seen their statements, have you

2    not?

3    A    I haven't looked at it recently, but I have seen it, yes.

4    Q    Their statement said adjusting data to fit theory is an

5    inappropriate scientific method regardless of how well the

6    theory may have been in previous studies.  You've heard them

7    -- you remember that?

8    A    That's their view.

9    Q    Do you remember their view being still there is no

10   scientific justification for adjusting data to fit theory as

11   the publisher of Wechsler series of tests, Pearson Education

12   does not endorse the recommendation made by Flynn to adjust

13   WAIS-III scores.  Do you remember reading that?

14   A    Yes.

15            THE COURT:  When was that?

16            MR. McGOVERN:  That was in 2008, and that was a

17   document that I'll provide to the Court, it was a WAIS

18   technical report.

19            THE COURT:  Has the defense seen that document?

20            MR. McGOVERN:  I have copies of it.

21            THE COURT:  I think everybody should have the same

22   information.  The witness is familiar with it, but I think

23   it's important for everyone to have it.

24            MR. McGOVERN:  I'm sure Mr. Burt has seen that.

25            THE COURT:  Let's give it an exhibit number.

MARY AGNES DRURY, RPR
Official Court Reporter

Olley - Cross/McGovern

1          MR. McGOVERN:  We're going to mark it 65.

2          THE COURT:  65.

3          MR. McGOVERN:  And offer it, your Honor.

4          THE COURT:  Any objection?

5          MR. BURT:  No objection.

6          THE COURT:  All right.  Government Exhibit 65 is

7    received in evidence without objection.

8          (Government's Exhibit 65 received in evidence.)

9    BY MR. McGOVERN:

10   Q    And so you're familiar with the statement by Lawrence

11   Weiss ever Pearson, correct?

12   A    Is he the author of the statement you just referenced?

13   Q    Yes.

14   A    Yes.

15   Q    Okay.  And basically the statement was there is no

16   scientific justification to adjust data to fit theory, right?

17   A    That was -- yes, that's the basis of that statement.

18   Q    I suspect you disagree with that, right?

19   A    In this area I am very influenced by all the people who

20   weighed in on it and who might weigh in on what I believe is

21   an objective fashion.  And I think there are others -- there

22   are certainly others who also are very knowledgeable about the

23   psychometric basis of tests and they don't have a financial

24   stake in the outcome who would agree that it's valid to alter

25   scores or reinterpret scores in light of the Flynn Effect.

Olley - Cross/McGovern

1  Q    All right.  But your testimony here is we should apply

2  the Flynn Effect in this case, right?

3  A    Yes.

4  Q    So you disagree with what the makers of the test have

5  said about the Flynn Effect, right?

6  A    Yes.

7  Q    And that was -- I don't want to oversimplify it,

8  adjusting data, that means scores to fit theory is not

9  appropriate, right?

10 A    That's what they said.

11 Q    Okay.  And you've actually written about this concept

12 before.  You have a chapter, chapter 20 that I think you're

13 relatively proud of in the Assessment of Adaptive Behavior

14 Manual?

15 A    Yes.

16 Q    That's the book that I believe was written by Mr. Oakland

17 or Dr. Oakland?

18 A    Yes.

19 Q    The person who you spoke about before?

20 A    Yes.

21 Q    And that chapter is all about assessing adoptive

22 functioning, right?

23 A    Yes.

24 Q    And in the -- and by the way this is -- the name of the

25 article chapter is "Assessment of Adaptive Behavior in Adult

                    Olley - Cross/McGovern

1    Forensic Cases:  The use of adaptive behavior acceptance two,"

2    that's the ABAS that we were talking about before, right?

3    A     Yes.

4    Q     And it's authored by Greg Olley and Cox, right?

5    A     Yes.

6    Q     And you talk about in that chapter about the same concept

7    that Dr. Weise talks about in his rejection of the Flynn

8    Effect.  If I can, at page 395 of your article under the

9    heading of clinical judgement you write, "However, alteration

10   of scores without scientific basis is not acceptable practice.

11   Adjustments and that raise or lower scores to make them fit

12   one's clinical judgement or to count for possible influences

13   e.g. poverty, lack of experience with test taking, limiting

14   the test taking opportunities are improper and should not be

15   used."

16          Is that a fair reading of what you wrote in your

17   article?

18   A     Yes.

19   Q     And what you're saying there is while there may be valid

20   theories for the adjustment or the assessment by the clinician

21   about the value of an individual IQ score, the data itself

22   should not be adjusted; is that right?

23   A     I don't think that was my intention.  My intention was

24   that any interpretation on the case score should be done in

25   light of scientifically validated findings is not the position

Olley - Cross/McGovern

1   about the effects of those factors that you noted.

2   Q    Okay.  So specifically the factors that you're talking

3   about in your article that you wrote in 2008, you're talking

4   about factors that have been scientifically recognized that

5   would depress somebody's IQ score, right?

6   A    I'm not sure that I follow.

7   Q    Well, in your article, the examples that would tend to

8   depress somebody's IQ score would be poverty, lack of

9   experience with test taking or limited educational

10  opportunities.  Those would all be factors that could

11  potentially decrease one's IQ score, right?

12  A    Well, I think this is the context of talking about

13  adaptive behavior scores and yes, those factors could reduce

14  one's performance and that performance is what we're concerned

15  about when assessing adaptive functioning.

16  Q    And yet, you do not want IQ scores to be adjusted upward

17  based on such factors, right, you think that that's wrong?

18  A    I think that it's -- it's a matter of what factors can be

19  scientifically validated and then taking them into account

20  appropriately.

21  Q    It sounds like you agree to a certain extent with what

22  Wechsler is saying about the application of the Flynn Effect

23  to bring down scores, am I wrong?

24  A    I'm not sure that I follow your question.  I don't agree

25  with Pearson with --

Olley - Cross/McGovern

1   Q    What you just said is that you don't think that it's good

2   to start adjusting IQ scores up based on theories and factors,

3   correct?

4   A    On things that cannot be scientifically validated, yes.

5   Q    And that is similar to what Dr. Weiss over at Pearson is

6   saying about the Flynn Effect, which adjusts data downward

7   based on scientific theory.  Am I right or am I wrong?

8   A    Yes, I see your analogy.

9   Q    Okay.  Because you do recognize that are there biases in

10  the test, right?

11  A    What do you have in mind?

12  Q    Well, you agree that these tests have a bias against

13  African Americans, right?

14  A    No.  African Americans are represented in standardization

15  sample of the Wechsler scales, for example.  In the -- to the

16  portion that they exist in the United States population.  So

17  they're being compared to everyone in the United States

18  population, which includes people who are African American

19  race.

20  Q    We'll go back to Hill again at page 545.  Question:  And

21  I believe in court he admitted that his affidavit was a

22  mistake to suggest to the Court in that case by way of an

23  affidavit that an IQ test that was given -- let me sure I have

24  the right thing.  Excuse me -- that an IQ test that was given

25  would mean because of racial factors that the 77 could be

Olley - Cross/McGovern

 1   lower because of AAMR evidence, and he admitted that the

 2   evidence is that it's the other way.  A black individual at

 3   77, if there was a racial bias and there is evidence from the

 4   AAMR that blacks will test lower than what they actually are,

 5   do you agree with that?  Your answer was:  I think if I can be

 6   as concise as possible about the point underlying this, if

 7   there is a racial bias in tests, it is likely to make a

 8   person's score lower, not higher.  So I'm agreeing with the

 9   correction that Dr. Hammer (phonetic) made as you described it

10   to me.  Question:  Which would be mean if there is racial

11   bias, a black individual score actually should be higher?

12   Answer:  True.  Question:  So if there were racial bias on the

13   Stanford-Binet test where he scored 70, if that existed,

14   assume it did, the score would be, should be 71, 72 or

15   something higher?  Your answer was:  Well, the same could be

16   said for any test; if there is a racial bias it would work to

17   suppress or lower the score.  Question:  Do we know from

18   evidence in your discipline that there has been some cultural

19   racial bias in the past dealing with black individuals?

20   Answer:  This is probably the most contentious issue in the

21   accomplishments of psychology for the last 100 years as to

22   whether this really represents bias or not.  What can be said

23   clearly is that there are differences in scores.  There are

24   racial differences in the scores; whether that's attributable

25   to bias on a test or other kinds of bias, we can argue

Olley - Cross/McGovern

1    endlessly."  Do you recall giving that testimony?

2    A    Yes.

3    Q    And that testimony is making the observation and agreeing

4    with the observation that the test may well be biased against

5    African Americans; is that right?

6    A    No.  It said if there were bias.  In fact there was an

7    earlier test.  For example, when I first tested, I learned to

8    administer was the Stanford-Binet and it had no black people

9    in the standardization sample, so it was something that would

10   never be allowed today.

11            Currently, the people who develop IQ tests are

12   extraordinarily conscientious about this factor, and I think

13   the key word is if there were bias on the test.

14   Q    Well, in your final statement, if I can read it, you say,

15   "What can be said clear is that there are differences in

16   scores; there are racial differences in the scores.  Whether

17   it's attribute to the bias on the test or some other kind of

18   bias, we can argue endlessly."

19            So my question to you is not whether this testimony

20   establishes your belief that there is a racial basis on the

21   test, my question is:  Didn't you testify in this case that

22   unfortunately, African Americans perform less well on these

23   standardized tests than the general population?

24   A    That gap has -- still exists, although it is narrowing

25   substantially, and I don't know what the exact figure is for,

Olley - Cross/McGovern

1    you know, for this year for the Wechsler scale, there still is

2    a gap.  And as stated in that quote, attributable to what

3    sources of bias, I do not know, but there is a gap and it's

4    perhaps due to improved education or whatever, the gap is

5    narrowing.

6    Q    Okay.  And we hope that it works all the way out.

7    However, in the meantime, the short answer to your question is

8    that you do recognize a performance problem in that subsection

9    of the community, correct?

10   A    Well, there is lower scores for the population as a whole

11   on IQ tests.  If that's what you are asking, yes.

12   Q    The population, the African American population?

13   A    The African American population compared to Caucasian

14   population throughout the United States.

15   Q    Okay.  And the test that you want or the one that you

16   highlight in your report is a test that was normed in 1989 or

17   1991, chose whatever date you want, correct?

18   A    Yes.

19   Q    The Dr. Nagler test was normed 20 some years ago?

20   A    Yes.

21   Q    And you testified in this case in 2004?

22   A    Yes.

23   Q    Doctor, I'd like to move to a new area.

24         You told us that you met with the defendant at some

25   point, correct?

Olley - Cross/McGovern

1    A    Yes.

2    Q    And you said that doing ABAS testing with the defendant

3    is verboten to you, correct?

4    A    In my opinion, yes.

5    Q    And that means you won't do it because it's fraught with

6    potential unreliable outcomes, correct?

7    A    I believe so.

8    Q    You got the cloak of confidence, correct?  Right, that

9    the defendant -- that the person who is taking it could --

10   taking the test could, you know, act more knowledgeable than

11   they are or more functioning than they are, right?

12   A    Yes.

13   Q    But on the other side they could malinger, right?

14   A    That's true.

15   Q    And you also testified that you go in to meet with a

16   person who's facing a capital case using a great deal of

17   caution, correct?

18   A    Yes.

19   Q    And the reason you use caution is because this person

20   could potentially be malingering, correct?

21   A    Or misrepresenting in whatever way.

22   Q    And, you know, as you point out on a number of occasions,

23   the stakes are so high that a person would certainly have a

24   motivation to malinger, correct?

25   A    Yes.

Olley - Cross/McGovern

1    Q    And you've done these types of interviews in all of your

2    Atkins cases, correct?

3    A    Yes.

4    Q    And the reason you do the interviews is you want to get

5    in there and get a feel for the person, correct?

6    A    That's one way to put it, yes.

7    Q    And the reason you're doing this is because you want to

8    get a sense of a face-to-face meeting and see if there is

9    anything obviously wrong with a face-to-face meeting, correct?

10   A    Yes.  I want to know other things as well.  I want to

11   know, for example, if the person is an accurate reporter of

12   even factual information.  So, for example, when I say factual

13   information, I generally start out with very factual things I

14   expect the person can answer:  When were you born, how old are

15   you, what are the names of people in your family, and so on,

16   because if the person can't do those things, they are either

17   malingering or they have a pretty significant memory problem.

18   Q    So on your direct examination you said that you don't --

19   you don't give too much significance to this meeting; is that

20   right?

21   A    Well, no, I think the trouble with it is it relies very

22   heavily on clinical impressions or clinical judgement and less

23   on objective scores.

24   Q    Okay.  And so -- but when you are doing the -- when you

25   are having the meeting, you are actually administering maybe

Olley - Cross/McGovern

1   not formal adaptive functioning tests, but you are giving your

2   own little test to test the general performance of the person,

3   correct?

4   A    To some extent, yes.  It's mostly conversation, but yes.

5   Q    And you did this in this case, correct?

6   A    Yes.

7   Q    And you went in and you actually -- you met with the

8   defendant on a couple of occasions, right?

9   A    Yes.

10  Q    And we'll talk about that couple of occasions, but I want

11  to treat them as a group right now and take the information

12  that you derived from the interviews and talk about that.  Do

13  you understand?

14  A    Yes.

15  Q    You went in and you talked to Mr. Wilson about his job at

16  the prison, correct?

17  A    Yes.  That was on, I believe, my second interview.

18  Q    And you just wanted to find out if he was working over

19  there?

20  A    Yes, and if he could describe what it was about.

21  Q    And he told you that he was working in the kitchen at the

22  time?

23  A    Yes.

24  Q    And that he had some measure of responsibility within the

25  work crew he was working, right?

Olley - Cross/McGovern

```
 1   A     Yes.

 2   Q     Was that significant to you?

 3   A     Well, within the caution that this is work in prison,

 4   which is not work in the community setting.  It told me some

 5   things about how he spent his time and how well he did it from

 6   his report.

 7   Q     You certainly didn't do any follow-up to see if what he

 8   told you about his job and his performance in his job and the

 9   performance of his colleagues was accurate, right?

10   A     No.  As I testified earlier, I did not have the

11   opportunity to interview folks at the prison.

12   Q     Okay.  And you asked him about three different areas and

13   I'll take you through them.  The first thing that you -- or

14   one of the things that you did, because I don't know the

15   order, one of the things that you did is you showed him a map;

16   is that right?

17   A     Yes.

18   Q     And on the map you asked him to identify the continents;

19   is that right?

20   A     Yes, I showed him obviously a map of the world.

21   Q     And he had some problems identifying the continents,

22   right?

23   A     Yes.

24   Q     He said something like South Africa was a continent?

25   A     Yes.
```

Olley - Cross/McGovern

1    Q    And China was a continent?

2    A    Yes.

3    Q    And Russia was a continent?

4    A    If you are reading from my report?

5    Q    I'm reading from your report.

6    A    Okay.  Thank you.

7    Q    And when you asked him what the furthest south continent

8    was he said, "it's Argentina or something or some "A" word,"

9    right?

10   A    Yes.

11   Q    Which was close, right, the furthest south is Antarctica,

12   right?

13   A    Yes.

14   Q    And he knew north, south, east and west, right?

15   A    Yes.

16   Q    And he was able to identify the United States on the

17   world map?

18   A    Yes.

19   Q    And he was able to find New York?

20   A    Yes.

21   Q    All right.  He found New York; but otherwise, did not

22   have a strategy for finding locations on the map.  That was

23   your assessment, right?

24   A    Yes.  I also showed him, and I'm not sure if it's clear

25   in the report, a map of the United States.  So I started big

Olley - Cross/McGovern

1    with the world, and then the United States to ask him if he

2    could find north, south, east and west, and Atlantic and

3    Pacific Ocean and several other things that I think I noted in

4    my report.

5    Q    That's right.  And he identified the Pacific Ocean and

6    the Atlantic Ocean as well?

7    A    Yes.

8    Q    And you gave -- and you report this in your report,

9    right?

10   A    Yes.

11   Q    And even though you've testified that this was a matter

12   of questionable significance, you dedicated three pages of

13   your report to your interview of Mr. Wilson, right?

14   A    I think you're demeaning the value of it a little bit

15   more than I would, but yes, I wanted to identify that I spent

16   portions of two days with him, I think it's worth describing

17   it.

18   Q    Okay.  So it is significant that you met with him and it

19   is significant that he provided you with this information,

20   correct?

21   A    Yes, part of the big picture.

22   Q    And this big picture needs to have information about how

23   the defendant is functioning right now when you meet with him

24   in jail, right?

25   A    No.  Because I'm not assessing and I'm not opining with

Olley - Cross/McGovern

1   regard to his current functioning, I'm trying to find out some

2   things that may be relevant to his functioning historically,

3   could he tell me about his functioning historically.  And as I

4   mentioned as an example, if there is something -- I think I

5   gave the example that he could not use a ruler to measure, and

6   if he could not do that if he was 29 years old or 30, he was

7   about 30 at the time, then it's likely that he continued to

8   not master that skill since he was in school.  Because that's

9   the caution, I'm not being asked about his current

10  functioning, I'm being asked about his earlier functioning.

11  Q     Okay.  And so you tested him on geography to find out if

12  he had intellectual deficits or intellectual problems, right?

13  That was the purpose, albeit stated very plainly?

14  A     Yes, I guess -- yes, geography is a tiny part of

15  academic.

16  Q     And for a guy who actually wasn't available for

17  education, he did okay on that test, right?

18  A     No.  I think you're giving a caution to say well, because

19  he wasn't very available for education, that would mean to

20  minimize whatever I found.  And I think again, adaptive

21  functioning is functioning.  He either knows it or he doesn't.

22        I did also mention that knowledge is not necessarily

23  the most valid form of information, because he knows where

24  something is doesn't necessarily means that he could use it in

25  a useful way, like find his way there.

Olley - Cross/McGovern

1   Q     Well, doctor -- withdrawn.

2           Americans are not very good at geography, correct?

3   A     I don't know what the standards are.

4   Q     Well, for instance, in 2006 the National Geographic

5   Society tested a broad range of Americans between the age of

6   18 and 24 years old, and they found that 50 percent of those

7   Americans couldn't identify New York on the map.  Are you

8   familiar why that statistic?

9           MR. BURT:  I'm going to object to that.  He's

10  testifying, it's not a question.

11          THE COURT:  Well, I'll allow it, but you do have to

12  restate in order to put it in.  Sustained.

13  Q     Doctor, are you familiar with a study that was conducted

14  by the National Geographic Society in 2006 of Americans

15  between the ages of 18 and 24 that revealed that 50 percent of

16  those people surveyed couldn't find New York on a map?

17  A     I'm not familiar with that information.

18  Q     Are you similarly or are you also or maybe not, but I'll

19  ask you, are you familiar with the statistic that said that

20  that same group, two out of every ten of them couldn't

21  identify the Pacific Ocean?

22  A     I'm not familiar with that.

23  Q     But Mr. Wilson was able to identify the Pacific Ocean and

24  he was able to identify New York, correct?

25  A     Yes, you are identifying the things that he could do.

Olley - Cross/McGovern

```
1   Q    But he wasn't able to identify the continents, right?

2   A    Yes.

3   Q    And he wasn't able to identify some of the other things

4   that you listed in your report, like -- maybe you could tell

5   me.

6   A    He couldn't find Florida on the map, which is a pretty

7   distinctive place.  He couldn't find Texas on the map, which

8   was a pretty distinctive place.  He could only find California

9   when he started on the east coast until he found every state

10  and found one that began with "C" and speculated that must be

11  California.

12  Q    Now, do you have any reason to believe that other than

13  Staten Island, Queens and Riker's Island and Terra Haute,

14  Indiana, that this defendant has been outside New York City?

15  A    No.

16  Q    You know, Doctor, you've -- I mentioned that you've done

17  this same geography quiz in other cases.

18       Do you recall in the Umana case that you did a

19  couple of years ago you interviewed Umana that was facing the

20  death penalty?

21  A    Yes.

22  Q    And you asked Umana when you were representing or you

23  were retained by the defense to demonstrate that he was

24  mentally retarded, you asked Umana to see if he could identify

25  Charlotte, North Carolina on a map.  Do you remember that?
```

Olley - Cross/McGovern

1    A    Yes.

2    Q    And do you similarly remember that you testified that you

3    had absolutely no information that Umana, who was from El

4    Salvador had ever set foot in Charlotte, North Carolina other

5    than his incarceration?

6    A    He lived in Charlotte, North Carolina when he arrested.

7    Q    Let me see if I can find that for you, Doctor.  The Umana

8    transcript, 106.  Question:  You asked him to identify El

9    Salvador and the United States and Charlotte.  Answer:  Yes, I

10   showed him a map of the world and he was able to find El

11   Salvador.  He was able to find the United States; although, he

12   was not able to find Charlotte, the approximate location of

13   Charlotte within the United States.  Question:  All right.

14   Now, you don't have any reason, you don't have any independent

15   knowledge that the defendant ever lived in Charlotte, do you?

16   Answer:  No.

17          Is that a little bit different than what you just

18   told me?

19   A    My recollection was he lived in Charlotte, but I suppose

20   I'm not correct.

21   Q    Okay.  Well, how about this one when you were in the

22   Davis case where you were working with Mr. Burt.  You did

23   another one of these interviews where you were evaluating

24   somebody who you later testified was mentally retarded.  And

25   in Mr. Davis' situation, you understood him to be illiterate,

Olley - Cross/McGovern

1   correct?

2   A    I don't recall.  He certainly had difficulty in --

3   academic difficulty.  Whether he was illiterate, I don't

4   recall.

5   Q    Didn't he tell you that he was illiterate?

6   A    I don't remember.

7   Q    Well, in your report in the Davis case at page ten, and

8   I'm quite sure Mr. Burt has this report, the bottom of page

9   ten, "He reports in the interview he still cannot read and is

10  a great source of embarrassment to him."

11           Does that sound like I'm reading that correctly,

12  Doctor?

13  A    That sounds fine.

14  Q    So if Mr. Davis who is illiterate, you decide to do the

15  map test with him as well, didn't you?

16  A    I believe so.

17  Q    For him you told him that you needed him to point out

18  Baltimore, right?

19  A    Yes.

20  Q    Okay.  And Mr. Davis did not perform well on that test,

21  did he?

22  A    I don't recall.  I do recall that we started this

23  conversation minimizing the importance of this, and that's now

24  become very important in your view, so I'd just like to

25  clarify that the importance of this is being pushed way out of

MARY AGNES DRURY, RPR
Official Court Reporter

Olley - Cross/McGovern

1    proportion.

2    (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Olley - Cross/McGovern

1  BY MR. McGOVERN:

2  Q    Is that your answer to my question about whether or not

3  you administered this test to Mr. Davis?

4  A    I said, again, by saying I don't recall, I gave it to

5  him.  Whether I asked him about Baltimore or Washington is

6  just where he grew up.  I do not recall.

7  Q    Well, maybe I could help.  He did not perform well.  Do

8  you recall that he pointed to Bloomington, right?

9  A    I don't recall.

10  Q    And you remember that the reason that he pointed to

11  Bloomington was because it started with a "B" and he can't

12  read, right?

13  A    That sounded like a reasonable assumption.

14  Q    Okay.  Well, you did the match test or the geography

15  test, if you will, when you were helping out the government in

16  the Hill case.  Do you remember that?

17  A    Yes.

18  Q    Okay.  So now it's a different situation, right?  You're

19  not working with the prosecutor in Trumble County?

20  A    Yes.

21  Q    You do the map test there.  When you were working with

22  the prosecutor to determine whether or not this death row

23  inmate was mentally retarded, you gave him a map of his

24  hometown, isn't that right?

25  A    Yes, my custom is in each of these cases is to give, I

718

Olley - Cross/McGovern

1    mean, it's not uniform.

2    Q    Obviously.

3    A    The world, the United States and your hometown.  And in

4    fact, I gave Mr. Wilson a map of New York.

5    Q    You gave Mr. Hill a map of Warren, Ohio, and asked him if

6    he could point out landmarks, isn't that right?

7    A    Yes.

8    Q    All right.  By the way, Mr. Wilson, you asked him to use

9    the phone book.  That's part of your standard of practice as

10   well?

11   A    Yes.

12   Q    And okay.  And you were critical of his ability to use

13   the phone book, because you asked him to look up a lawyer, is

14   that right?

15   A    I think I was descriptive.  I don't know that I would say

16   I was critical.

17   Q    Okay.  Well, your description included reference to the

18   fact that you asked him to look up a lawyer in the phone book

19   and he was didn't do so well in that, right?

20   A    He looked at "L" for lawyer instead of "A" for attorney.

21   Q    And that would be something we should consider when we

22   mix the pot about whether or not he's mentally retarded?

23   A    In a very small way.

24   Q    Okay.  And to be fair, you gave the illiterate Mr. Davis

25   the phone book test, too, right?

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   A   Probably.  I don't recall.

2   Q   Would you agree or is it your recollection that he

3   performed abysmally on that, right?

4   A   I believe you.  It would fit, but I don't recall.

5   Q   Because it's hard, you agree, to read a phone book if

6   you're illiterate, right?

7   A   That's part of what's being demonstrated.

8   Q   Indeed.  So, you were asked to look at the adaptive

9   functioning for this defendant, and you agreed to do so, is

10  that right?

11  A   Yes.

12  Q   All right.  And we have shown you this chart or at least

13  Mr. Burt has shown you this chart.  And this chart is

14  Government Exhibit 51.  And it indicates that the defendant,

15  Ronell Wilson, was incarcerated for most of his adult life, is

16  that right?

17  A   Yes.

18  Q   All right.  And if we look at the chart, there appears to

19  be a period that he was in the juvenile facility, right?

20  A   Yes.

21  Q   And you have given some testimony about your

22  understanding of that facility as being a therapeutic facility

23  or a correctional facility?  I don't remember.

24  A   Both.

25  Q   Okay.  But you would agree that it's a secure facility,

Olley - Cross/McGovern

1   right?

2   A     Yes.

3   Q     And that you cannot go and -- come and go as you like?

4   A     Yes.

5   Q     It would be a very structured environment, much like

6   those environments you said we should not consider in adaptive

7   functioning, correct?

8   A     Yes.

9   Q     He was out for a little while after that, right?  He

10  popped out in November of 1999 and was out until April, is

11  that right?

12  A     Yes.

13  Q     So that's about four or five months of community time?

14  A     Yes.

15  Q     All right.  And then again, he came out.  He went to

16  Rikers Island for a while and then he popped out again in

17  March of 2001, and was out for about, I don't know, 18 months

18  or so until he got arrested in the fall of 2002.  You see

19  that?

20  A     Yes.

21  Q     Okay.  Now, other than that, there's -- he exits jail in

22  Redding, Pennsylvania, November 2002, and then by March of

23  that year, he's been locked up and he remains looked up 'til

24  today, after committing this -- the crime that you have

25  considered in this case, right?

721

Olley - Cross/McGovern

1   A     Yes, sir.

2   Q     Okay.  You would agree that given that time line, that

3   this is a very challenging case for you, right?

4   A     I don't know that the time line makes it a challenging

5   case in any specific way, but I'll be glad to answer more

6   questions on that.

7   Q     Well, it's challenging because you're being asked to make

8   an assessment of somebody's adaptive functioning in the

9   community when they haven't really been in the community for

10  that long of a period of time?

11  A     Up until his 18th birthday.

12  Q     That's 15, sir.

13  A     I'm considering that up until his 18th birthday as a

14  developmental period --

15  Q     Okay.

16  A     -- which is when we would want to assess.  He was in the

17  community most of that time, with the exception of those

18  periods during his adolescence that you have indicated there.

19          From zero, of course, as Mr. Burt pointed out, zero

20  to ten is not indicated on this chart.  So if you look at zero

21  to 18, most of his time was in the community.

22  Q     And that's right.  Zero to ten is not on this chart,

23  right?

24  A     Yes.

25  Q     So up until his 15th -- 'til he went to Brookwood at 15,

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   you could do an adaptive functioning analysis of all of that

2   time, right?

3   A     If I were present that time and had a good respondent,

4   yes.

5   Q     And you have done with, retrospectively, correct?

6   A     Yes.

7   Q     And would you agree that that period of time from zero to

8   ten that we neglected to put on this chart is not particularly

9   informative of adaptive functioning for some of these

10  categories like working and self-care and home improvement or

11  whatever that one was, home living?

12  A     It's not germane to work, for sure.  Work is usually not

13  included at that age in -- well, it's not included in adaptive

14  behavior scales below a certain age.

15            For the other things, they are all relative to other

16  people of his age, so they're quite pertinent.

17  Q     And but you would agree that that age, that time period

18  from zero to ten and even up to 15, has limitations as it

19  relates to, you know, some of those categories that I

20  discussed, like home living and work and some of the other

21  ones that are more considerate of older people?

22  A     No.  I think that while I agree with you and the test

23  developers would agree with you with regard to work, in other

24  respects, the test is standardized at a certain age and it

25  compares him to other people of the same age.

Olley - Cross/McGovern

1      And all of those things, such as home living are

2  adjusted for the expectations of someone who is of that age.

3  I gave the example of self-care, in which most of the

4  acquisition of those skills happens before age ten.

5  Q    Okay.  So your testimony is that when you were assessing

6  the defendant's adaptive functioning in the community, you're

7  using all of the time from zero up until 18 or 15?

8  A    Excuse me.  For the developmental period, it would be up

9  to age 18, and the benefit of getting information from many

10  people and many sources is to get a general picture about

11  whether we can assess his typical behavior in community

12  environments.

13  Q    Okay.

14  A    And that's why it's more valid to get information from

15  several sources than, for example, to give one test to one

16  person at one age point.

17  Q    Okay.  And you are unwilling to or you're unwilling in

18  this case to do any adaptive functioning analysis of any time

19  when the defendant was incarcerated, correct?

20  A    Of his functioning at the time that he is incarcerated?

21  Yes, that's true.

22  Q    On direct examination, you have slides dedicated to this,

23  that adaptive functioning in a custodial environment is

24  meaningless, right?

25  A    Meaningless -- I think there are things we can learn from

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   it, but they would not be the basis for -- primary basis for

2   assessing adaptive functioning.

3   Q    And you didn't assess it in this case, right?

4   A    Right.

5   Q    You didn't assess his adaptive functioning for all that

6   time that he was in jail?  You did not assess his adaptive

7   functioning?

8   A    Well, I did in this sense that I looked at his Brookwood

9   records, which is a big chunk of that time in adolescence.

10  And as I mentioned earlier, it is both a correction facility

11  and a therapeutic facility.  I think this is useful

12  information.

13         For example, Dr. Giglio -- Mr. Giglio provided good

14  information about he how he was functioning in a setting that

15  was therapeutic, meaning he should have done well, and to the

16  extent that he was responsive to the structure, as you

17  pointed, it's structure in the sense that you can't leave the

18  grounds, but it's intended to be therapeutic structure, as

19  well.

20  Q    Do you have some knowledge of Brookwood, that it's not

21  like an incarceratory facility?

22  A    My information is from the records and from speaking to

23  Mr. Giglio.

24  Q    But you would agree that are records that could fill half

25  of this room related to Mr. Wilson while he's at the MDC and

Olley - Cross/McGovern

1    while he's at Terre Haute, while he was at Rikers and while

2    he's back at the MDC, right?

3    A    Yes.

4    Q    You didn't even look at those records at all?

5    A    I did look at those records.

6    Q    So they informed you on his adaptive functioning?

7    A    They informed me, yes, in some aspects of his adaptive

8    functioning.  For example, while he was at Terre Haute, he was

9    preparing to take the GED, which he never accomplished to do.

10   So I thought that was significant with regard to his academic

11   skills.

12   Q    But you never went and spoke to any of the people who

13   know him from these facilities and gave them ABAS testing or

14   binder test?

15   A    Excuse me.  I didn't mean to interrupt.

16   Q    You never gave a formal assessment to find out how he's

17   actually doing in jail, to determine whether or not he's

18   functioning at a level that's beyond that of a person who's

19   mentally retarded?

20   A    I would have welcomed the opportunity to interview people

21   who knew him in that situation, but giving the Adaptive

22   Behavior Assessment System or any other standardized test

23   would have been very inappropriate.

24   Q    In the Davis case, you testified that your experience is

25   that defendants want to talk about adaptive functioning in the

Olley - Cross/McGovern

1    community, while the government wants to focus on adaptive

2    functioning in the jails or wants to be able to use evidence

3    that's collected from prisons, is that right?

4    A     That's often the case.

5    Q     In fact, the question was, "How do you characterize that

6    different approach?"

7              And your answer was, "In my experience that position

8    has been one most embraced by the defense that being -- that

9    in Atkins hearing, you only use community adaptive functioning

10   and the position of the prosecution has more typically been to

11   assess the individual's functioning while incarcerated,

12   right?"

13             And the next question was, "So this is an issue

14   you've confronted in the past?"

15             And your answer was, "Yes."

16             THE COURT:  Where were you reading from?

17             MR. McGOVERN:  From the Davis transcript.

18             THE COURT:  What page?

19             MR. McGOVERN:  Pages 132 to 133.

20             THE COURT:  All right.

21             MR. McGOVERN:  I apologize, Your Honor.

22   BY MR. McGOVERN:

23   Q     You remember giving that testimony?

24   A     Yes.

25   Q     And that testimony seems to be a commentary on strategy.

                        Olley - Cross/McGovern

1    Would you agree?

2    A     Yes.

3    Q     And that in your experience in the Atkins litigation

4    world, that the strategy is that the government wants to focus

5    on how the defendant is doing while he's incarcerated, while

6    the defendant wants to focus on how he's doing in the

7    community, right?

8    A     Often, that's true.

9    Q     Okay.  But -- and you understand the foundation of that

10   strategy, do you not?

11   A     (No response.)

12   Q     I'll withdraw that.

13         You would agree that the government would have much

14   more access to information about a defendant when he's

15   incarcerated than when he's on the street?  Do you understand

16   that?

17   A     I understand what you're saying.  I'm not sure that

18   that's true.

19   Q     Okay.  You would understand that a defendant, if he were

20   to attempt to prove his adaptive functioning in the community,

21   could rely on family members to prove up that adaptive

22   functioning, correct?

23   A     That would be one good source, usually.

24   Q     I'm sorry.  I don't want to interrupt.

25   A     That's okay.

Olley - Cross/McGovern

1    Q    That's exactly what happened in this case, correct?

2    A    That I may made use of the access to family members?

3    Q    Yes.

4    A    Yes.

5    Q    And you interviewed -- the vast majority of the people

6    that you interviewed were folks that were either related to

7    the defendant or people who had dated him like Ms. Cook,

8    correct?

9    A    Yes.

10   Q    And those four tests that you asked the Court to rely on

11   or you posit on are the best ABAS-2 tests are from Monica

12   Cook, his ex-girlfriend, right?

13   A    Yes.

14   Q    His mother, right?

15   A    Yes.

16   Q    His older cousin?

17   A    Yes.

18   Q    And his sister?

19   A    Yes.

20   Q    And you would agree that those are folks who have an

21   interest in seeing that their loved one does not get executed,

22   correct?

23   A    I assume that they have his -- yes, that they would like

24   him not to be executed.

25   Q    Okay.  I mean, it seems like you're struggling with that

Olley - Cross/McGovern

1    answer.  Is that a hard thing for you to wrap your head around

2    or is it fairly obvious that they don't want their loved one

3    to be executed?

4    A    No, I think that's fairly obvious.

5    Q    Did anyone during these interviews say, you know what?  I

6    don't want to do this.  I would happy to see him executed?

7    A    No.

8    Q    And the government, as you said in Davis, tends to

9    talk -- want to interview people who are -- who know him in

10   the custodial setting, is that right?

11   A    Yes.

12   Q    And you said during your direct examination that you

13   treat the adaptive functioning interviews with caution, right?

14   A    Yes.

15   Q    All right.  And the reason is because of what we just

16   said, that there's potential for bias, right?

17   A    Yes.

18   Q    And that in this case, you graded each one of these ABAS

19   evaluations and you -- did you say that you don't believe they

20   were biased at all?

21   A    I don't think that I could ever absolutely guarantee

22   that.  I think that I took considerable steps to protect

23   against bias.

24   Q    All right.  I mean, do you realize that for instance,

25   Monica Cook or did you know as a result of your interview with

Olley - Cross/McGovern

1    Monica Cook, that she still has romantic feelings about the

2    defendant?

3    A    I did not perceive romantic feelings.  She certainly

4    still cares about his welfare.

5    Q    Okay.  And that she, despite what she said in these

6    interviews, that she has communicated with him that he left

7    her when she needed him most.

8    A    I don't recall words to that effect.

9    Q    Okay.  Do you realize that she drove out to Terre Haute

10   to go visit it him?

11   A    I'm not sure.  I don't believe that I recall that.

12   Q    Do you have any reason to believe that recently, she got

13   a tattoo of RR on her body?

14   A    I have seen that tattoo.  So yes, it exists.

15   Q    Do you know who RR is?

16   A    Well, she has a tattoo that says "Ronell" on her arm.

17   Q    Okay.  And RR is "Rated R", and which happens to another

18   moniker that the defendant likes to go by.

19   A    Okay.

20   Q    Do you know that?

21   A    No, I did not know that.

22   Q    That would be something that you might want to consider

23   when you're considering whether or not these witnesses are

24   bias, right?  That like, she still has feelings about him,

25   right?

Olley - Cross/McGovern

1   A    I assume that all the people in the family have feelings

2   about him, and taking that into consideration to emphasize

3   getting objective information.  Sure.  That's important.

4   Q    Okay.  Another question about adaptive functioning is it

5   a challenge for you to apply these nationally norm standards

6   in the defendant's case?

7   A    A challenge/

8   Q    Yeah.

9   A    I'm not sure.

10  Q    Well, I mean, you have a life here that's been captured

11  on this board, unfortunately, where you have a person who was

12  in special education all of their life, right?

13  A    (No response.)

14  Q    Yes?

15  A    Yes.

16  Q    That even within the confines of the special education

17  system, did not perform particularly well, correct?

18  A    Correct.

19  Q    If what these folks are saying about ADD and learning

20  disabilities exist, he wasn't really available for too much

21  education, correct?

22  A    Tell me more what you mean about available.

23  Q    Well, how about this?  He certainly didn't do very well

24  on your little meeting test, right?  Your maps and your phone

25  book, right?

Olley - Cross/McGovern

1  A    Correct.

2  Q    So he's not exactly the most educated person that you've

3  ever come across, correct?

4  A    Correct.

5  Q    And basically, from the time he that was an adolescent,

6  he's been in and out of different forms of incarceration,

7  correct?

8  A    Yes.

9  Q    You would agree that his life growing up in those

10  projects in Stapleton, in an apartment where he was at a very

11  young age living with 13 other children in a project, in an

12  apartment, that his life does not compare well with the people

13  for whom your ABAS-2 tests are normed?

14  A    Those factors and all the factors associated with poverty

15  have been acknowledged for many, many years to be major

16  contributors to mental retardation.  So to the extent that

17  those factors have impaired his opportunities, they contribute

18  to his having a condition of mental retardation.

19  Q    And you are absolutely against using any sort of other

20  way or like some other standard for assessing his adaptive

21  functioning other than these standardized tests, correct?

22  A    (No response.)

23  Q    In other words -- I'll withdraw that.

24       You made a comment in this courtroom earlier today,

25  that Dr. Denney had made reference to street smarts, right?

Olley - Cross/McGovern

1    A    Yes.

2    Q    You remember that?  And that I don't want to quantify,

3    but you objected to that, right?

4    A    Yes.  I thought that that was not appropriate term to

5    use.

6    Q    Yeah.  That's not the type of information that you, in

7    your professional capacity, would use to test somebody's

8    adaptive functioning, right?

9    A    Yes.  And it's specifically mentioned in the AAIDD Manual

10   as an inappropriate concept in this -- for this purpose.

11   Q    Okay.  And you have dedicated two slides to this point.

12   I don't have their number -- but just would you agree that you

13   give us two slides in your presentation.  One is the

14   definition of diagnosis of ID is not based on a person's

15   street smarts, right?

16   A    Yes.

17   Q    And you quote the AAIDD 2012.  That's the supplemental

18   manual, right?

19   A    Yes.

20   Q    Still want to -- going to use the 2012 for that premise.

21   And then on another slide, you say test of current knowledge

22   administered to defendant, for example, street survival skills

23   questionnaires is no good, right?

24   A    Which is probably unnecessary, because that test was not

25   used in this case.  It's just an example of a kind of test

LISA SCHMID, CCR, RMR
Official Reporter

Olley - Cross/McGovern

1   that can be yielding misleading information.

2   Q    Yeah.  And what happens is sometimes, government-type

3   psychologists want to go in and test a defendant's street

4   smarts, because they made -- that defendant may not have been

5   as available for education smarts because have their

6   upbringing, right?

7   A    I don't understand what -- well, if by street smarts,

8   we're creating another concept of a kind of intelligence or a

9   kind of adaptive behavior and trying to substitute that for

10  the most customary methods of assessing adaptive behavior,

11  then I don't agree with that.

12  Q    Okay.  You were very clear about it.  You have two

13  slides, right?

14  A    Yes.

15  Q    Your article also says -- your chapter in that adaptive

16  functioning book says, for example, "Tests that require an

17  oral answer or pointed to the right answer or pointing to a

18  picture of the right answer are likely to be inadequate

19  indicators of actual community functioning, correct?

20  A    Yes.

21  Q    What you're talking about is the Street Survival Skills

22  Manual, right?

23  A    Yes.

24  Q    Or questionnaire?

25  A    Questionnaire, yes.

Olley - Cross/McGovern

1  Q    And so that's an inappropriate way to assess adaptive

2  functioning, to even talk about street smarts, right?

3  A    That -- well, it doesn't say street smarts, but it has a

4  similar sort of notion that it's getting at practical skills.

5  And indeed, to the extent that it touches that adaptive

6  behavior, it's almost entirely derived from practical skills.

7  Q    Okay.  And you're against that --

8             THE COURT:  List him finish.

9             MR. McGOVERN:  Oh, I'm sorry.

10 A    As I indicated, a test of knowledge.

11            Now, I've used it in the past in other settings.

12 I've come to the conclusion that it's out of date and not

13 appropriate for this purpose.

14 Q    Okay.  You mean in the Hill case?

15 A    Yes.

16 Q    Because that's exactly what did you when you were working

17 for the government, right?

18 A    (No response.)

19 Q    You gave Mr. Hill this Street Survival Skills

20 questionnaire, right?

21 A    I did.

22 Q    All right.  That's the test that we talked about, where

23 you point to things and it's not verbal -- excuse me.  It's

24 not a written test, correct?

25 A    Right.  It's pointing at pictures.

736

Olley - Cross/McGovern

1    Q    And you did it to assess his adaptive functioning,

2    correct?

3    A    In part.  And because now, certainly, looking back at

4    that, there are other things that I would do differently, but

5    in part, because the judge's order was to assess adaptive

6    behavior in prison.

7    Q    But Doctor, you're saying that the Street Survival Skills

8    questionnaire is not a valid indicator of adaptive

9    functioning, right?

10   A    Yes.

11   Q    Right?

12   A    Yes.

13   Q    That's what you quote the manual for.  That's what you

14   quote -- that's what you're saying in your learned articles,

15   right?

16   A    Yes.

17   Q    So when the judge says to you, test out his adaptive

18   functioning, you turn to the Street Survival Skills

19   questionnaire.  Am I wrong?

20   A    No.  You're absolutely right, and that it was in 2004.  I

21   have not used it since.

22   Q    So this is another instance where you have learned since

23   2004, that you wouldn't do this and you wouldn't do this

24   again, right?

25   A    That's true.

737

Olley - Cross/McGovern

1    Q    Right?  Because you actually violated in 2004, when you

2    were working for the government, you actually violated the

3    rule that you write about to all these psychologists out here

4    who want to get on the Atkins train -- or excuse me, the

5    Atkins forensic list -- you write to these people and tell

6    them, I'm writing this article.  Don't do this questionnaire,

7    because it's not good science, right?

8              MR. BURT:  Question is argumentative.

9              THE COURT:  No, it's not.

10             You may answer.

11   BY MR. McGOVERN:

12   Q    Right?

13   A    That's certainly been my position since 2004.  I felt

14   that it was not helpful in Hill, and I regret having --

15   Q    And in 2010 --

16             THE COURT:  Let him finish.

17             Are you done, sir?

18             THE WITNESS:  No, I was just --

19             THE COURT:  Are you finished with your answer is my

20   question.

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Okay.  Next?

23   BY MR. McGOVERN:

24   Q    And 2010, when you sat for that lengthy deposition about

25   the Hill case, you didn't say, oh, I shouldn't have given him

Olley - Cross/McGovern

1    the Street Survival Skills questionnaire, right?

2    A    I don't recall having that come up.

3    Q    Okay.  And when you filed that affidavit that led to

4    Mr. Hill having that deposition, you didn't raise the Street

5    Survival Skills questionnaire, right?

6    A    I did not.

7    Q    In fact, what you did raise in that questionnaire --

8    excuse me, in that affidavit -- was that you would have liked

9    the opportunity to find out additional information from other

10   death row inmates -- and I'll mark this, if you'd like -- from

11   other death row inmates to be relevant, that I would have

12   considered.  It would have been useful for me to talk to these

13   individuals, had they been made available to you.  Do you

14   recall that being in your affidavit?

15   A    Yes.

16   Q    Okay.  And that would have been additional information

17   that you would have wanted to have considered in the adaptive

18   functioning area from other inmates in the facility, correct?

19   A    Yes.

20   Q    Okay.  And that is information that you assert in this

21   courtroom would be not credible adaptive functioning, right?

22   A    It was on the list that I called questionable sources of

23   information.  So I didn't say that one should never talk to

24   people, but I think the interpretation of it would be

25   difficult.

Olley - Cross/McGovern

1  Q    So in 2010, you were comfortable relying on or desirous

2  to rely on questionable sources of information; is that right?

3  A    No.  I was looking at how much information had been

4  gathered in 2004.  And looking back on it and thinking of

5  things that I could have done to supplement.

6  Q    Okay.

7         In the 2004 case, in the Hill case, you actually did

8  a full adaptive functioning analysis for Mr. Hill as it

9  related to his life in prison, correct?

10 A    It was not -- well, it did focus a lot on his life in

11 prison because that's what the judge requested.  I, with the

12 wisdom of hindsight, I would have hiked to have like people

13 who knew him in community settings.

14 Q    I have to ask you a question based on that.  Does the

15 judge's order about about when he wants the assessment to be

16 made about what the date of the assessment is, does that, in

17 your view, affect the credibility of the testing method?

18 A    Yes, I think it was compromised.

19 Q    What was compromised, your standards, because of his

20 order?

21 A    You know, I relied on, -- I didn't rely on it very

22 strongly but I did use the street survival skills

23 questionnaire, which was not a good decision.  And I put

24 lot -- got a lot of information from correction officers who

25 knew Mr. Hill because of -- and talked to them about his

                                                                740
                        Olley - Cross/McGovern

1   functioning in prison.  This was -- and again, as I mentioned

2   earlier, it was required that the three experts collaborate

3   and come up with a mutually agreed upon plan to do the

4   evaluation.  And I wish now that I had argued more strongly

5   for other methods, but that was what I agreed for.

6   Q    Is that true, you were arguing more strongly for other

7   methods?

8   A    I said I wished I had argued more strongly.

9   Q    I want to wrap this idea up with you.

10        If what you are saying here in court is to be

11  credited, you're saying that we should look at Mr. Wilson's

12  adaptive functioning from way back here at zero years old up

13  until 23 years old to determine whether or not he was mentally

14  retarded on that date, right?

15  A    On what date?

16  Q    On the date of March 10th, 2003.

17  A    Up until he was 21, I think, so yes.

18  Q    Twenty.

19  A    Was he 20?  He was born in --

20  Q    '82.  May 6th, 1982.

21  A    Okay.  So he was almost 21.

22  Q    Okay.  He was almost 21.  But what you're saying is, is

23  you're going to make this assessment about his mental

24  retardation on this date based on all this information that

25  you collected from zero to 20?

Olley - Cross/McGovern

1   A    No.  I'm saying that all that time period is relevant.

2   Q    Okay.

3        But the ABAS testing that you did and the numbers

4   that you rely on for your findings --

5   A    Yes.

6   Q    -- on the ABAS Standardized Testing deal with zero up

7   until about 19 years old?

8   A    Yes.

9   Q    Right.  So in the Hill case, you're asked to assess

10  whether Mr. Hill is mentally retarded at 37 years old, right?

11  A    Yes.

12  Q    But you didn't use the information that occurred in his

13  life from zero to 19 years old in the adaptive functioning

14  context to make that determination, right?

15  A    Yes.  That's an example of when I said I wish I had the

16  opportunity to do more of the kinds of things that I've done

17  in this case.

18  Q    In Hill you interviewed six staff members at the

19  facility, right?

20  A    I interviewed several.  I don't remember if it was six.

21  But that sounds right.

22  Q    You interviewed zero here, right?

23  A    Yes.

24  Q    At the MDC, zero?

25  A    Yes.

742

Olley - Cross/McGovern

1   Q    All right.  You've made some statement that the -- nobody

2   at the MDC was available to you, right?

3   A    I said I inquired about their availability and I was, you

4   know, I don't know what the problem was.  But they -- I don't

5   know if it was scheduling or what it was, but I didn't see

6   anyone.

7   Q    I'm going to violate a cardinal rule of my own practice.

8        Who did you inquire about?  Who did you make that

9   inquiry of?

10  A    I made that inquiry of Mr. Hill's defense team.

11  Q    This is Mr. Wilson.  Mr. Wilson's defense team?

12  A    Excuse me.  Mr. Wilson.

13  Q    And they told you that corrections officers are

14  unavailable, is that it?

15  A    Yes.

16  Q    These folks, which one, was it Ms. Brady?

17  A    Most likely Ms. Brady, yes.

18  Q    You understand that some of these folks are over at that

19  MDC at multiple days a week basis and they're telling you that

20  there are no CO's that you could talk to?

21  A    I don't recall the circumstances.  I recall that I

22  inquired about it, it never happened.

23  Q    Would you be surprised that they were interviewing CO's

24  on their own?

25  A    I don't know anything about that.

Olley - Cross/McGovern

1    Q    Okay.

2         But if they were and they didn't make them available

3    to you, that would make -- that would be something that you

4    would not be pleased about because you wanted talk to CO's,

5    right?

6    A    Yes.  Of course I was in North Carolina most of that

7    time, so there are practical considerations.  But yes, I would

8    have liked to.

9    Q    Are the practical considerations that you're referencing

10   basically that in all likelihood you weren't going to

11   interview any CO's anyway?

12   A    I never concluded that.  I put in the request.

13   Q    Orally, I suspect?

14   A    Yes.

15   Q    I have a new area from your report.

16        THE COURT:  How much time on the new area do you

17   think is going to take?

18        MR. McGOVERN:  This one I'll be discreet and quick.

19        THE COURT:  Well, quick?  Can we be more specific

20   since we're talking about specificity all day here?

21        MR. McGOVERN:  I think we should break for the day.

22        THE COURT:  Thank you very much.

23        Before we conclude.  Can I get a sense of about how

24   much more you have on cross overall?

25        MR. McGOVERN:  Overall, I will say maybe another

Olley - Cross/McGovern

1    hour and a half.

2              THE COURT:  Another hour and a half.  And then on

3    redirect?

4              MR. BURT:  I can probably do it within an hour.  Now

5    I'm wondering an hour and a half at the first estimate ended

6    up being five or six.  And I'm concerned about schedule.

7              THE COURT:  We're doing better than nine, aren't we?

8              MR. BURT:  I'm not going to comment on that because

9    last time I did I overstepped myself.

10             THE COURT:  You did it three times.

11             MR. BURT:  I know and the court was right and I

12   apologize.

13             THE COURT:  That's all right.  I'm not asking or

14   apologies.  I get the point the first time, as you can tell.

15             MR. BURT:  I know and you were right.

16             THE COURT:  About an hour?

17             MR. BURT:  About an hour for for me.

18             THE COURT:  And then what?  It's really where I'm

19   going is, what should the court be preparing for with your

20   next witnesses?

21             MR. BURT:  We're going to have Dr. Drob here.  So

22   he'll go first after Dr. Olley.  Then we're going to have

23   Depetra, his sister.  After that -- and we are trying to line

24   up beyond that Kathy Yates, who is the neuro psychologist who

25   is not on our witness list, but in view of the

Proceedings

 1   cross-examination today, we're going to have to call her

 2   concerning the nature of the evaluation that she conducted.  I

 3   don't anticipate that's going to be a lengthy examination but

 4   we are going to have to call her.  And then beyond that we

 5   have Dr. James lined up.  And I think that will more than fill

 6   the day for us.

 7          THE COURT:  That's all of that in one day?

 8          MR. BURT:  Well, I don't think we'll get to all of

 9   it in one day, but that's certainly what's coming in the

10   future.

11          THE COURT:  How long is Dr. Drob on direct?

12          MR. BURT:  I think the direct for him will take

13   maybe an hour.

14          THE COURT:  And the cross?

15          MR. McGOVERN:  Probably an hour.

16          THE COURT:  All right.  So we will get to Dr. Drob

17   and then we'll get beyond Dr. Drob.  And who would be next?

18          MR. BURT:  That would be Depetra Wilson and she's

19   probably going to be another hour, hour and a half direct.

20          THE COURT:  And on cross?

21          MR. McGOVERN:  Oh, I don't know.  Probably a half an

22   hour.

23          THE COURT:  All right.  That's about as far as we're

24   going to get tomorrow, probably.  But if we get really lucky,

25   who's after that?

Proceedings

```
 1           MR. BURT:  We would either try and do Ms. Yates

 2    because I anticipate she'll be fairly short.  Or if she's not

 3    available, we would start with Dr. James.

 4           THE COURT:  All right.

 5           MR. McGOVERN:  I have just one comment on Dr. Yates.

 6    We don't have a problem with Dr. Yates being called for the, I

 7    guess, to testify about the scope of her retainer.  There are

 8    a couple of problems, however.  One, I don't know if the

 9    court's resolved the issue about Dr. Yates' notes and the

10    discoverability of those notes that we talked about a while

11    ago.  And then Dr. Yates has not been noticed as an expert.

12    So I'd be extremely, I guess, --

13           THE COURT:  Weary.

14           MR. McGOVERN:  Weary of her coming up here and

15    offering a medical opinion because she's not an expert.  She's

16    never been noticed and I think it would be highly improper at

17    this stage.

18           MR. BURT:  It's been suggested twice in

19    cross-examination, once with this witness, once, I believe,

20    with Dr. Shapiro that she did a full evaluation of Mr.

21    Wilson's mental retardation.  She did not.  She never met him.

22    There was no evaluation done.   The government knows that

23    because they interviewed her.  So we're going to have to

24    establish that factually because that appears to be an issue

25    of dispute here.
```

Proceedings

1        THE COURT:  That's an issue of fact.

2        MR. McGOVERN:  I think we can actually stip that

3   out.  I mean we would stipulate that Dr. Yates never met with

4   the defendant nor that she conducted an extensive

5   neuropsychological evaluation.

6        MR. BURT:  Well, I'll meet and confer.

7        THE COURT:  Why don't you talk about that and see if

8   you can resolve it by stipulation.

9        MR. BURT:  Yes, your Honor.  And as I understand the

10  Court's ruling on both Dr. James and Dr. Woods, we're not

11  going to do direct other than along the parameters the court

12  suggested.

13       THE COURT:  Right.

14       MR. BURT:  So that will go a lot quicker just for

15  the court's planning.

16       THE COURT:  Okay.  Thank you very much.

17       MR. McGOVERN:  And I have one final request, your

18  Honor.  I think it's standard.  I would ask that Mr. Burt not

19  be in contact with the witness while on cross-examination.

20       THE COURT:  Not be in contact with this witness?

21       MR. McGOVERN:  This witness.  During Dr. Shapiro's

22  testimony on cross-examination, he admitted that he spent the

23  overnight working with Mr. Burt to prove the correct date for

24  the normative data.  Look, I'm not saying it's improper, but

25  I'd ask that the court direct limited contact with this

Proceedings

 1  witness while he's on cross-examination.

 2          MR. BURT:  I don't see anything inappropriate with

 3  talking to the witness.  If the court does, then so be it.

 4          THE COURT:  I don't have any problem with you

 5  talking to the witness.  He's an expert witness.  You can

 6  cross him on what he discussed with counsel --

 7          MR. McGOVERN:  Sure.

 8          THE COURT:  -- overnight if that would cast some

 9  light on any late breaking testimony.

10          MR. McGOVERN:  Okay.  Thank you.

11          MR. BURT:  Judge, in terms of the transcripts that

12  were referenced, I have Davis and the other one.  But I don't

13  have this Hill transcript so I would appreciate at some point

14  getting copies so I can follow along.

15          THE COURT:  Yes, I'd like the copies of the

16  transcripts that you're going to utilize.  I don't need them

17  until you use them.  In other words, you don't have to produce

18  them in advance of your cross-examination.  But for purposes

19  of cross-examination, it's important that we be able to read

20  along.

21          MR. McGOVERN:  Okay.  I will bring copies tomorrow.

22          MR. STERN:  Can I ask you to authorize a copy of the

23  transcript to be sent to my office.  I think only Mr. Burt is

24  getting it.

25          THE COURT:  Okay, that's fine.  You can also have

Proceedings

1    one copy.  One copy for Mr. Burt over at the Marriott and one

2    copy for you wherever you are.

3              MR. STERN:  I'm going to have it at my office, not

4    my home, if that's okay.

5              THE COURT:  Anything further?

6              MR. McGOVERN:  No, your Honor.

7              MR. BURT:  No, your Honor.

8              THE COURT:  Thank you very much.  We'll see you

9    tomorrow morning at 9:00 a.m.

10             Have a good evening.

11             (Time noted 7:02 p.m.)

12

13   (Whereupon, the matter was adjourned to November 29, 2012 at

14   9:00 a.m.)

15

16                  CERTIFICATE OF REPORTER.

17   I certify that the foregoing is a correct transcript of the

18   record of proceedings in the above-entitled matter.

19

20   _____

21   Judi Johnson, RPR, CRR, CLR
     Official Court Reporter

22

23

24

25

1                          **I N D E X**

2      **WITNESSES:**                                    **PAGE**

3      Direct/Burt     ........................433
       Cross/McGovern  ........................574
4      VOIR DIRE EXAMINATION:

5      Olley                                    451

6

7      **DEFENDANT'S EXHIBITS MARKED IN EVIDENCE**

8

9                      F ........................574

10

11     **GOVERNMENT'S EXHIBITS MARKED IN EVIDENCE**

12

13                      65 ........................697

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [1] 505/16
**$15** [1] 505/11
**$19** [2] 505/8 505/11
**$3** [1] 505/16
**$38** [1] 503/14

**'**

**'70s** [2] 442/19 499/18
**'82** [1] 740/20
**'84** [1] 654/20
**'Disregard** [1] 655/1
**'Look** [2] 655/3 655/3
**'my** [1] 674/25
**'this** [1] 674/23
**'til** [2] 720/23 721/25
**'We** [1] 654/13

**-**

--------------------------------------x [1]
429/2 429/7

**0**

**0.3** [4] 683/14 684/10 684/12
684/13
**0.3 points** [1] 683/12
**04-CR-1016** [2] 429/3 431/8

**1**

**10** [22] 438/6 459/14 464/22
465/4 465/10 466/16 466/19
470/21 470/22 483/5 493/12
509/1 510/6 524/18 538/2 538/7
538/9 538/10 539/11 539/22
541/20 654/20
**10,500** [2] 495/1 495/2
**10-year-old** [1] 541/21
**10-year-olds** [3] 493/10 509/3
509/4
**100** [3] 429/21 534/5 690/6
**100 years** [1] 702/21
**1000** [1] 430/2
**10013** [2] 429/21 430/7
**1016** [2] 429/3 431/8
**106** [1] 714/8
**10717** [1] 526/25
**10:00** [2] 676/15 676/16
**10th** [1] 740/16
**11** [6] 504/5 530/6 541/24 542/2
570/5 570/5
**11201** [2] 429/5 429/16
**11:21** [1] 511/9
**11:50** [1] 511/10
**11th** [2] 463/12 530/2
**12** [7] 467/10 467/13 541/24
570/5 605/24 645/20 657/22
**12 years** [2] 568/14 570/5
**12,000** [1] 583/19
**12-year-old** [1] 542/2
**121** [1] 597/18
**12th** [1] 533/11
**13** [7] 468/5 468/10 468/15
478/17 510/21 528/20 732/11
**132** [1] 726/19
**133** [1] 726/19
**14** [4] 479/21 531/9 539/22
665/13
**14th** [2] 529/16 533/16
**15** [7] 460/11 620/13 663/7
721/12 721/25 722/18 723/7
**15th** [1] 721/25
**16** [7] 462/6 462/9 481/11
503/21 547/11 548/21 550/13

**16th** [1] 534/8
**17** [7] 464/20 470/22 521/15
662/14
**174** [1] 685/23
**17th** [1] 529/9 529/10
**18** [16] 449/2 471/1 482/3
496/14 663/13 663/17 666/3
666/5 666/8 666/9 712/6 712/15
720/17 721/21 723/7 723/9
**18 years** [1] 672/15
**182** [2] 619/15 619/16
**18th** [7] 665/23 666/13 666/19
667/4 667/5 721/11 721/13
**19** [6] 447/22 484/9 521/10
667/25 741/7 741/13
**1966** [1] 452/2
**1970** [1] 440/13
**1971** [1] 440/14
**1973** [1] 634/2
**1974** [1] 450/10
**1982** [1] 740/20
**1985** [2] 667/25 669/7
**1988** [4] 437/8 439/2 439/3
452/13
**1989** [2] 631/8 704/16
**1991** [2] 638/23 704/17
**1992** [7] 538/1 603/19 605/5
606/25 607/13 607/22 608/7
**1994** [10] 629/6 629/25 636/25
637/9 637/18 641/7 641/13
644/18 657/18 662/3
**1997** [1] 670/24
**1999** [1] 720/10

**2**

**20** [12] 446/9 521/10 522/1
561/10 561/14 561/25 645/21
668/1 698/12 704/19 740/19
740/25
**2000** [4] 641/13 662/10 672/3
672/14
**2001** [6] 449/18 449/24 608/23
608/25 610/13 720/17
**2002** [8] 603/20 607/5 607/7
607/23 610/22 612/15 720/18
720/22
**2003** [8] 543/1 586/17 596/15
631/8 637/14 666/21 666/23
667/10
**2004** [17] 606/6 606/8 606/9
607/17 608/7 635/12 636/11
669/6 670/22 674/8 704/21
736/20 736/23 737/1 737/13
739/4 739/7
**2005** [1] 443/11
**2006** [2] 712/4 712/14
**2007** [6] 448/3 451/7 454/12
455/11 455/12 606/5
**2008** [8] 445/14 445/20 447/1
603/5 688/6 692/7 696/16 700/3
**2009** [2] 597/6 684/24
**2010** [10] 602/20 602/23 603/21
604/25 608/19 635/16 635/20
737/15 737/24 739/1
**2011** [2] 575/10 605/1
**2012** [22] 429/8 435/6 435/7
447/14 508/14 509/14 529/22
532/12 533/5 533/11 533/17
534/8 542/24 544/22 545/20
567/5 575/10 575/11 686/4
733/17 733/20 749/13
**21** [6] 561/20 561/20 595/22
740/17 740/21 740/22

**23** [2] 488/10 740/13
**24** [2] 489/12 712/15
**24 years** [1] 712/6
**2480** [1] 430/19
**24th** [1] 529/15
**2582** [1] 430/19
**26** [2] 491/13 530/6
**26th** [1] 530/1
**27** [1] 494/8
**271** [1] 429/15
**28** [2] 429/8 532/11
**28th** [2] 533/4 533/11
**29** [1] 749/13
**29 years** [1] 711/6

**3**

**3-1** [1] 573/21
**3.1** [1] 573/21
**30** [6] 495/12 541/19 597/6
645/22 711/6 711/7
**30's** [1] 668/23
**32** [1] 507/21
**33** [9] 442/8 442/10 442/14
442/24 443/11 444/6 444/19
507/20 690/1
**35** [1] 612/17
**36** [1] 527/8
**37** [2] 528/4 741/10
**38** [1] 450/11
**39** [2] 528/18 692/8
**395** [1] 699/8

**4**

**40 percent** [3] 614/18 614/25
615/4
**400** [1] 430/2
**47** [1] 622/14
**4:41** [1] 661/4

**5**

**50** [1] 501/14
**50 percent** [2] 712/6 712/15
**501** [1] 429/21
**51** [3] 470/7 472/10 719/14
**54** [1] 442/13
**545** [1] 701/20
**548** [1] 632/17
**549** [1] 634/15
**55** [1] 620/15
**58** [1] 470/20
**5:00** [1] 661/5

**6**

**613-2480** [1] 430/19
**613-2582** [1] 430/19
**616** [2] 674/16 674/20
**617** [1] 676/15
**619** [1] 692/8
**625** [1] 692/8
**65** [5] 697/1 697/2 697/6 697/8
750/13
**66** [1] 597/20
**67** [5] 436/4 632/20 632/22
633/16 634/18
**68** [1] 633/1
**681** [1] 606/22
**6th** [1] 740/20

**7**

**7,000** [1] 488/20
**70** [19] 460/9 460/12 460/13
596/24 598/2 598/8 620/9 620/12
620/14 623/8 623/15 632/19

**633/15 633/21 633/24 634/8
634/18 635/3 712/1**
**70's** [1] 644/19
**71** [16] 631/13 631/15 631/18
631/24 644/18 644/24 646/4
650/10 650/16 652/6 652/7 654/1
660/25 662/4 662/8 702/14
**718** [2] 430/19 430/19
**72** [1] 702/14
**727** [1] 610/1
**73** [3] 632/20 633/15 634/18
**742** [1] 654/7
**75** [11] 460/20 460/20 460/20
481/8 481/8 481/14 538/14
538/21 623/15 630/9 630/11
**755** [1] 678/20
**76** [6] 595/14 595/15 595/17
630/3 630/20 660/10
**76 points** [1] 587/12
**77** [2] 701/25 702/3
**78** [3] 638/24 647/7 660/9
**7:00** [1] 661/15
**7:02** [1] 749/11
**7th** [3] 606/8 607/16 607/17

**8**

**80** [3] 660/9 660/10 660/24
**80's** [1] 644/20
**84** [9] 660/9 660/10 662/18
662/21 662/24 665/22 666/12
671/15 672/14
**86** [1] 614/19
**8th** [3] 430/7 606/9 607/16

**9**

**9/11** [1] 504/5
**93** [1] 573/7
**94** [1] 573/23
**94103** [1] 430/2
**95 percent** [2] 460/3 460/4
**99** [1] 430/7
**9:00** [5] 429/9 661/16 676/15
749/9 749/14

**A**

**a.m** [5] 429/9 511/9 511/10
749/9 749/14
**AAIDD** [38] 457/12 458/14
459/17 459/21 460/22 463/13
464/20 465/5 468/8 469/18
474/21 475/11 477/8 480/19
481/20 482/17 488/16 491/22
501/7 507/5 508/6 510/15 527/17
528/8 536/24 538/12 539/11
542/22 561/16 573/5 602/6
602/21 603/14 624/2 643/17
690/24 733/9 733/17
**AAIDD's** [1] 538/19
**AAMR** [8] 538/1 603/19 604/7
620/25 607/5 607/7 702/1 702/4
**ABAS** [13] 446/16 446/17
462/16 510/22 537/4 699/2 705/2
725/13 728/11 729/18 732/13
741/3 741/6
**ABAS-2** [2] 728/11 732/13
**ABAS-II** [2] 462/16 537/4
**abilities** [3] 546/20 554/20
590/16
**ability** [23] 516/25 519/12 525/4
547/18 547/25 548/9 548/12
552/1 554/12 554/13 555/10
557/22 557/23 558/21 558/22
558/22 562/15 571/12 573/14

**A**

ability... [4] 652/22 678/10
679/18 718/12
able [56] 432/11 466/3 466/5
467/21 467/25 468/2 468/11
483/9 483/12 483/14 483/19
491/17 496/2 497/11 510/9
510/12 510/18 513/17 517/3
519/15 521/8 523/23 524/23
524/24 524/25 524/25 526/13
531/18 534/15 545/12 549/5
550/18 550/19 551/3 551/3 551/6
553/14 553/15 562/16 565/24
586/11 590/11 626/3 677/20
678/22 709/16 709/19 712/23
712/24 713/1 713/3 714/10
714/11 714/12 726/2 748/19
abnormal [4] 492/5 492/7
492/11 492/13
about [359]
above [11] 481/7 481/8 481/13
496/22 521/5 587/23 588/2 598/2
644/7 646/1 749/18
above-entitled [1] 749/18
absent [7] 531/2 531/3 531/3
531/4 532/19 532/23 532/24
absolute [1] 633/6
absolutely [8] 534/17 567/16
642/10 660/15 714/3 729/21
732/19 736/20
abstract [3] 465/25 466/6 569/3
absurd [1] 622/5
absurdities [5] 525/19 526/19
543/17 545/5 545/15
absurdity [2] 554/21 554/22
Abuse [1] 435/21
abysmally [1] 719/3
academic [33] 434/5 461/16
485/4 500/15 500/18 519/3
519/11 520/10 535/17 547/5
565/14 566/2 566/6 566/15 567/9
567/12 567/15 591/9 591/10
593/7 593/12 619/24 620/11
620/14 621/5 628/4 642/13
642/14 675/11 683/20 711/15
715/3 725/10
academically [1] 498/9
academics [5] 565/10 565/12
565/17 567/17 567/21
accept [1] 596/13
acceptable [8] 511/7 535/25
542/22 630/4 633/12 654/24
659/24 699/10
acceptance [2] 656/14 699/1
accepted [4] 516/17 602/8 686/2
691/5
access [5] 577/20 581/24 614/10
727/14 728/2
accomplish [1] 566/17
accomplished [1] 725/9
accomplishments [2] 600/19
702/21
according [4] 475/23 492/6
564/3 662/17
account [3] 590/24 684/8 700/19
accounting [1] 628/3
accurate [9] 435/3 451/2 484/18
484/20 487/1 620/4 684/7 706/11
708/9
accurately [4] 510/18 521/10
541/6 647/25
accusation [1] 516/6
accused [1] 614/9
achievement [15] 497/18 497/22
500/14 500/15 500/22 502/2
541/13 565/14 565/15 566/6
566/8 566/10 567/14 675/11
675/22
acknowledge [2] 676/6 695/11
acknowledged [3] 533/2 621/16
732/15
acquire [2] 493/13 549/2
acquisition [1] 723/4
across [9] 469/23 470/20 502/3
541/5 615/10 620/1 664/1 664/16
732/3
act [1] 705/10
acted [1] 547/7
acting [1] 519/6
action [2] 450/8 477/22
actions [3] 563/13 563/14 563/19
active [1] 610/17
activities [7] 436/22 497/25
498/12 553/16 570/25 570/25
571/5
activity [4] 482/21 530/22 547/9
570/1
actual [13] 451/24 493/23
570/20 590/17 598/24 624/18
624/21 639/9 644/14 674/11
681/22 692/17 734/19
actually [60] 435/7 448/4 450/17
454/21 468/15 483/17 498/5
498/23 510/13 534/13 538/4
539/10 553/12 573/4 573/4 577/4
583/1 588/2 588/5 590/12 593/14
596/20 598/23 600/7 602/4
603/16 604/11 604/12 605/4
608/24 609/1 611/10 614/14
641/12 642/3 648/25 657/11
664/4 667/13 672/24 674/9 676/2
676/7 683/21 685/23 687/23
688/3 689/8 694/17 698/11 702/4
702/11 706/25 707/7 711/16
725/17 737/1 737/2 739/7 747/2
adapt [2] 472/18 484/3
adaptive [196] 434/20 444/8
444/12 445/1 446/12 446/13
446/18 446/23 455/25 456/7
457/12 457/17 457/23 458/18
459/18 460/21 461/10 461/19
461/24 462/7 462/9 462/12
462/19 462/23 464/4 464/8 465/8
467/2 467/18 467/23 468/12
468/20 469/7 469/15 469/21
470/23 471/8 471/13 472/6
475/12 475/22 476/5 476/10
476/15 477/21 478/4 479/20
482/22 484/3 489/8 489/25
490/20 490/24 491/9 492/8 494/5
495/23 499/5 501/10 501/25
505/24 506/4 506/8 506/12
502/7 507/7 508/6 508/9 509/19
510/1 514/24 515/3 515/6 515/9
515/17 516/12 519/20 523/3
523/15 523/20 523/23 523/25
524/17 524/19 525/2 526/11
527/15 528/11 530/10 530/12
531/24 532/17 534/5 536/13
537/17 539/1 539/2 542/1 552/15
559/2 559/14 561/11 562/12
570/15 571/18 572/1 572/3 572/6
572/19 577/22 581/1 581/8
581/14 583/2 587/5 588/12 590/8
590/22 595/16 596/16 596/21
595/12 596/16 596/16 596/21
598/3 598/9 598/14 598/21 599/8
599/18 599/22 600/5 600/11
623/17 624/3 625/11 630/24
631/22 636/3 636/16 638/19
643/19 643/20 645/25 673/6
694/10 698/13 698/25 699/1
700/13 700/15 707/1 711/20
719/8 720/6 721/8 722/1 722/9
722/13 723/6 723/18 723/23
724/2 724/5 724/6 725/6 725/7
725/21 725/25 726/1 726/9
727/20 727/21 729/13 731/4
732/20 733/8 734/9 734/10
734/15 735/1 735/5 736/1 736/5
736/8 736/17 738/17 738/21
739/8 740/12 741/13
add [2] 664/13 731/19
added [1] 513/8
addition [6] 468/4 484/1 489/16
507/6 510/15 640/3
additional [4] 555/17 611/20
738/9 738/16
address [6] 487/16 539/20
539/21 547/11 587/2 633/8
addressed [2] 449/16 647/16
addresses [1] 508/7
addressing [1] 561/6
adduced [1] 554/10
ADHD [2] 591/25 593/23
adhere [1] 535/12
adjourned [1] 749/13
adjust [4] 625/2 625/3 696/12
697/16
adjusted [3] 699/22 700/16
723/2
adjusting [7] 649/16 687/5
692/4 696/4 696/10 698/8 701/2
adjustment [1] 699/20
adjustments [3] 628/8 630/13
699/11
adjusts [1] 701/6
administer [20] 462/13 515/11
516/17 523/15 523/20 525/12
531/23 532/2 532/9 533/21 534/6
537/7 590/3 670/13 673/23
674/12 674/14 674/15 677/6
703/8
administered [28] 452/16 464/7
468/15 486/19 510/22 515/2
515/6 515/18 515/18 516/12
534/16 534/19 534/23 535/12
536/6 536/13 537/3 566/7 566/8
571/19 638/23 641/3 660/4
665/18 666/9 678/18 717/3
733/22
administering [6] 477/11 507/21
643/7 643/9 647/7 706/25
administration [7] 436/16
543/16 596/8 652/1 671/13
675/10 694/9
administrations [1] 672/11
administrators [1] 680/21
admission [1] 695/16
admitted [4] 627/18 701/21
702/1 747/22
admitting [1] 451/1
adolescence [2] 721/18 724/9
adolescent [1] 732/5
adopt [1] 604/24
adopted [1] 603/14
adoptive [1] 698/21
adoptive [1] 698/21
695/19 698/25 719/15
adulthood [1] 582/22
adults [5] 435/15 437/16 452/14
550/17 552/7
advance [1] 748/18
advancing [1] 578/21
advantage [3] 477/5 508/23
553/15
adversely [1] 642/15
advice [1] 448/13
advise [1] 582/14
advo [1] 683/23
advocate [4] 627/2 649/15 686/4
693/2
advocated [6] 494/11 604/8
634/6 684/6 684/6 690/8
advocating [3] 602/23 686/6
686/18
affect [4] 489/24 627/8 644/4
739/17
affected [2] 626/20 642/15
affecting [1] 644/16
affects [2] 555/18 627/9
affidavit [8] 636/7 636/9 636/14
701/21 701/23 738/3 738/8
738/14
affiliated [1] 442/17
afford [2] 671/20 678/8
afforded [1] 647/23
Africa [1] 708/24
African [9] 492/3 493/20 701/13
701/14 701/18 703/5 703/22
704/12 704/13
African-American [2] 492/3
493/20
after [32] 431/25 432/12 444/4
449/24 463/23 468/10 477/6
480/9 504/9 505/8 512/3 531/17
540/4 543/7 555/25 556/1 579/14
579/21 585/8 590/4 593/1 604/10
607/18 654/12 659/15 666/19
684/11 720/9 720/24 744/22
744/23 745/25
afternoon [6] 480/8 557/1
574/25 575/1 617/8 661/21
again [44] 453/23 456/20 458/20
459/2 459/9 460/2 486/25 502/16
506/24 517/24 525/9 526/5
538/22 544/6 549/13 549/15
549/17 549/23 550/2 550/25
564/11 567/18 568/1 569/7 592/4
620/3 623/22 626/15 633/3
634/15 642/11 642/17 661/21
664/6 672/5 676/21 693/3 701/20
711/20 717/4 720/15 720/16
736/24 740/1
against [10] 431/9 448/13
494/10 585/14 690/8 701/12
703/4 729/23 732/19 735/7
age [56] 457/21 459/1 461/25
462/3 462/4 462/6 472/3 478/12
492/18 493/1 496/13 498/8
498/16 502/25 503/1 508/20
508/24 509/10 509/14 509/16
522/1 526/4 526/4 540/17 541/17
541/20 541/23 541/24 550/20
551/11 552/1 561/17 561/25
564/12 564/21 565/6 568/14
570/4 657/22 663/17 666/3 666/8
666/9 667/25 712/5 722/13
722/14 722/16 722/17 722/24

**A**

age... [6] 722/25 723/2 723/4
723/9 723/16 732/11
age-appropriate [2] 551/11
552/1
agency [3] 503/11 504/8 504/11
AGENT [2] 430/12 431/14
ages [4] 437/11 531/9 552/4
712/15
ago [24] 436/6 442/25 453/21
453/23 457/18 457/22 459/15
468/3 480/3 485/12 486/4 501/17
510/6 534/1 541/18 571/3 597/4
650/8 685/13 691/20 691/20
704/19 713/19 746/11
agree [72] 522/24 532/1 578/6
582/25 587/19 592/4 594/6 595/4
598/13 603/16 603/23 615/14
616/22 617/21 618/9 621/14
623/5 623/24 629/5 629/8 631/1
631/6 631/18 636/24 637/24
639/6 641/2 641/5 641/15 642/1
642/13 642/25 643/2 643/11
644/10 644/17 645/9 647/22
651/6 652/15 653/7 653/22
655/15 657/23 662/20 669/22
677/10 678/1 678/3 678/17
686/21 692/19 697/24 700/21
700/24 701/12 702/5 719/2 719/5
719/25 721/2 722/7 722/17
722/22 722/23 724/24 727/1
727/13 728/20 732/9 733/12
734/11
agreed [8] 514/4 577/24 578/1
668/17 668/20 719/9 740/3 740/5
agreeing [3] 634/25 702/8 703/3
agreement [3] 632/9 636/4
668/13
agrees [1] 523/25
ahead [11] 466/15 548/19 551/7
598/21 602/9 607/20 609/3 635/6
654/22 664/25 688/2
aided [1] 430/21
aiming [1] 664/22
alarming [1] 515/24
albeit [2] 578/4 711/13
alcohol [1] 530/24
alcoholic [1] 530/22
alcoholism [1] 532/25
all [211] 431/3 432/3 438/9
444/7 444/15 453/4 454/7 455/10
455/17 457/25 458/6 458/12
458/25 459/6 460/12 462/13
462/18 465/1 466/12 469/4 471/9
474/22 475/1 476/16 478/3 480/6
483/16 483/17 483/25 484/2
486/3 487/25 489/4 493/9 493/10
495/25 496/1 496/3 496/18
496/18 498/1 498/11 498/13
500/18 501/7 503/3 503/18 505/8
505/23 508/21 509/4 511/13
511/18 512/2 513/1 513/23 514/7
515/7 518/11 519/23 520/7 521/5
522/13 524/13 532/18 533/10
534/19 535/19 536/12 538/22
540/13 541/10 549/13 549/23
550/18 557/3 557/9 557/13
557/14 558/9 559/2 559/10
559/18 563/14 564/11 565/25
570/18 571/13 571/22 572/4
573/13 573/19 573/21 574/12
574/14 574/19 575/4 576/12

576/13 576/14 576/17 578/8
578/24 581/15 585/12 590/2
593/11 593/12 595/24 596/10
600/18 603/12 605/25 610/2
611/1 612/12 614/3 621/19
623/12 624/22 626/3 626/21
628/13 628/15 628/18 633/14
633/20 634/11 634/16 635/23
636/3 636/23 637/9 639/6 640/9
646/4 646/12 646/16 647/4 647/9
647/21 650/3 650/24 651/2 656/7
659/9 661/2 662/8 664/1 664/15
664/16 667/10 667/12 668/15
670/16 672/4 672/22 673/7 674/5
678/13 679/15 679/18 680/4
681/10 684/13 686/13 688/2
691/7 692/10 692/12 695/8 696/1
697/6 697/19 698/1 698/21
700/10 704/6 706/1 709/21
714/13 718/8 719/12 719/18
720/15 722/1 722/15 723/1 723/7
724/5 725/4 726/20 729/15
729/20 729/24 731/1 731/12
732/14 735/22 737/3 740/24
741/1 742/1 743/10 743/20
744/13 745/7 745/8 745/16
745/23 746/4
allegation [1] 680/24
alleged [1] 453/5
allergic [1] 522/6
allied [1] 434/6
allow [5] 476/16 509/6 537/16
612/11 712/11
allowed [2] 612/2 703/10
allows [1] 613/8
almost [10] 435/11 437/9 452/15
515/7 561/20 615/4 667/25 735/6
740/21 740/22
alone [3] 552/21 595/3 631/18
along [14] 432/22 457/6 483/2
512/13 531/11 545/15 552/6
580/20 580/21 583/22 592/12
747/11 748/14 748/20
alphabetical [1] 525/6
already [9] 452/22 478/18 512/1
552/23 577/3 581/10 607/24
650/11 656/12
also [46] 430/11 436/5 436/9
436/14 436/19 439/5 439/9
443/20 448/23 455/18 464/20
465/5 468/8 470/2 473/19 474/1
478/4 488/24 490/15 502/7
510/19 512/13 518/16 518/16
522/1 540/10 543/3 571/17
582/21 588/5 592/15 593/4
602/21 607/25 663/2 669/6
676/11 686/4 692/12 697/22
705/15 709/24 711/22 712/18
734/15 748/25
alter [8] 450/4 680/9 681/10
681/11 681/12 681/13 689/11
697/24
alteration [1] 699/9
altered [2] 680/4 680/21
altering [4] 680/2 680/8 680/24
681/3
alternative [3] 626/19 676/25
677/18
although [26] 437/1 438/3 445/5
459/17 465/21 466/9 474/5
495/18 504/11 506/18 524/18
527/14 541/16 565/16 566/11
566/23 587/9 576/14 578/16

584/2 604/14 630/2 656/19
605/3 673/16 714/1
altogether [2] 655/1 692/21
always [3] 452/15 486/25 553/21
am [20] 434/2 442/21 443/20
452/20 579/17 590/3 633/24
638/3 638/3 649/14 650/2 654/11
669/8 669/10 687/17 697/19
700/23 701/7 701/7 736/19
amazingly [1] 480/3
ambiguity [1] 593/5
AMERICA [3] 429/2 431/8
431/12
American [16] 440/19 441/3
441/8 442/11 442/12 442/18
443/22 445/6 445/10 457/9 492/3
493/20 690/4 701/18 704/12
704/13
Americans [8] 701/13 701/14
703/5 703/22 712/2 712/5 712/7
712/14
among [5] 535/4 541/10 583/23
611/4 668/15
amount [6] 454/17 570/12
611/22 613/25 634/13 665/7
683/14 686/21
amounts [1] 452/10
analogy [1] 701/8
analysis [22] 466/6 469/15 476/9
476/11 498/4 518/21 545/6
548/18 572/12 572/13 585/16
591/6 598/13 598/18 623/11
626/22 629/8 630/25 640/1 722/1
723/18 739/8
analyze [1] 588/11
analyzed [1] 638/12
and/or [1] 671/2
anecdotes [2] 518/14 531/22
Annie [1] 533/4
another [36] 432/1 439/12 446/8
448/8 464/15 480/8 489/17
490/15 491/20 492/6 499/1
504/10 512/6 512/7 527/14 532/5
536/8 557/12 563/25 596/8 606/1
658/21 660/24 665/25 666/15
694/21 694/22 714/23 730/17
731/4 733/21 734/8 736/22
743/25 744/2 745/19
answer [9] 449/22 449/25
476/5 476/10 476/14 487/9
502/22 505/20 510/9 510/18
517/20 523/3 534/4 544/4 558/14
563/6 586/11 586/13 589/13
597/22 607/1 607/4 608/5 618/25
619/1 619/18 620/6 620/21
629/19 633/17 634/19 635/4
637/23 640/22 654/10 654/19
654/23 654/23 655/6 664/8
674/16 674/20 676/15 676/16
678/24 681/8 682/14 686/25
687/2 691/15 694/13 702/5
702/12 702/15 702/20 704/7
706/14 714/9 714/16 717/2 721/5
726/7 726/15 729/1 734/17
734/17 734/18 737/10 737/19
answered [6] 516/19 536/15
620/2 632/21 632/24 664/1
answering [3] 664/4 664/7
691/12
answers [6] 516/2 516/22 532/4
562/5 658/15 693/14
Antarctica [1] 709/11
antecedents [1] 518/25

Antell [1] 494/19
anti [3] 490/1 490/1 511/1
anti-social [1] 511/1
anticipate [3] 432/5 745/3 746/2
anticipated [1] 571/6
antisocial [2] 490/3 490/16
any [95] 442/20 449/21 450/8
450/9 451/9 453/13 456/9 459/10
459/12 465/16 466/6 475/10
477/21 481/11 482/10 483/22
484/3 484/3 484/14 486/18
487/17 489/3 489/23 491/5
492/21 492/24 503/10 509/19
511/18 512/16 516/16 520/18
525/12 525/22 526/3 527/24
534/22 536/25 537/2 541/25
548/15 549/25 552/15 555/17
555/18 558/3 562/9 572/8 572/11
574/17 575/16 584/15 584/17
594/16 594/21 607/5 611/18
611/20 614/24 630/12 637/12
638/19 643/6 644/23 646/18
647/23 660/17 671/11 678/4
678/23 678/23 680/4 681/6
681/16 682/5 685/4 689/1 694/16
697/4 699/24 702/16 708/7
713/12 714/14 714/14 721/5
723/18 723/18 725/12 725/22
730/12 732/19 743/11 748/4
748/9
anybody [5] 493/3 511/18
660/17 678/5 694/17
anymore [5] 504/14 570/3 580/9
604/12 612/3
anyone [4] 464/14 559/11 729/5
742/6
anything [23] 431/22 472/17
473/4 486/16 488/7 491/1 506/20
526/3 526/14 528/14 531/5
552/18 559/8 572/14 572/24
612/3 612/16 636/14 639/24
706/9 742/25 748/2 749/5
anyway [8] 450/19 550/23
569/17 613/1 660/16 677/6 677/8
743/11
anywhere [2] 439/24 691/14
apart [1] 678/13
apartment [2] 732/10 732/12
apologies [1] 744/14
apologize [13] 555/2 558/16
592/5 622/18 624/10 626/16
635/2 635/2 657/17 669/21 682/8
726/21 744/12
apparent [1] 515/10
apparently [7] 521/8 533/25
535/24 547/6 591/19 616/11
680/7
appear [8] 485/19 486/21
531/12 629/6 629/25 656/1
656/17 691/16
appearances [1] 431/10
appeared [4] 515/17 516/10
670/9 673/19
appears [6] 447/5 467/17 638/13
663/9 719/18 746/24
appellate [1] 692/13
apple [1] 511/3
applicable [4] 574/13 607/12
608/7 638/6
application [7] 483/15 565/25
681/19 686/5 686/6 690/8 700/22
applications [3] 503/22 504/1
692/11
applied [7] 441/10 460/15

**A**

applied... [5] 460/21 461/21
469/14 603/10 649/5
applies [3] 473/15 567/15
617/13
apply [20] 458/1 461/19 486/23
565/23 566/1 573/21 587/14
595/14 602/6 602/7 602/11 605/5
606/24 607/23 630/7 630/13
670/16 686/23 698/1 731/5
applying [3] 649/10 649/24
658/2
appointed [1] 443/13
appointment [2] 434/6 683/20
appointments [2] 437/16 452/14
appreciate [4] 432/21 433/2
557/19 748/13
approach [4] 470/10 650/15
653/3 726/6
appropriate [36] 437/24 438/1
442/5 463/21 463/24 464/1
491/18 491/18 491/20 491/21
492/25 493/24 494/8 499/10
508/21 515/2 519/9 528/12
534/25 535/21 536/11 536/25
551/11 552/1 561/18 609/20
610/11 634/8 643/19 645/24
654/25 664/24 672/6 698/9 733/4
735/13
appropriately [3] 552/2 647/25
700/20
approximate [1] 714/12
approximately [7] 440/13
447/21 447/22 448/3 460/20
488/20 623/9
April [6] 529/9 534/8 583/3
583/11 583/13 720/10
April 16th [1] 534/8
April 17th [1] 529/9
arbiter [2] 648/18 648/20
archival [2] 496/23 496/25
are [368]
area [72] 440/4 440/11 443/9
444/12 447/15 450/25 452/1
454/20 460/21 461/20 466/5
469/24 473/10 476/5 481/17
482/19 483/7 489/11 490/14
498/7 500/22 502/20 502/21
519/21 538/15 539/13 539/17
542/12 544/9 546/24 548/21
548/24 550/9 550/12 550/14
551/15 551/16 551/18 552/17
560/1 560/10 560/20 562/25
563/3 563/10 563/11 564/8
565/10 567/22 567/23 567/25
568/1 568/6 570/9 570/9 570/15
570/20 572/24 610/15 616/22
619/23 643/19 658/3 658/21
660/21 683/6 690/13 697/19
704/23 738/18 743/15 743/16
areas [47] 457/13 458/10 459/3
459/6 463/8 464/23 465/4 465/10
465/13 465/16 465/21 466/19
466/20 466/24 468/25 474/4
478/22 479/4 480/12 483/5 488/9
491/3 500/18 500/19 501/2 504/5
508/7 518/8 518/9 526/11 538/2
538/10 538/18 539/11 539/11
539/15 539/23 539/23 542/1
552/23 565/25 571/13 572/14
574/6 620/1 639/4 708/12
aren't [3] 471/11 615/22 744/7

Argentina [1] 709/8
argue [4] 486/7 485/13 680/22
681/6 702/25 703/18
argued [4] 486/9 630/10 740/4
740/8
arguing [3] 607/6 694/25 740/6
argument [2] 567/10 695/1
argumentative [3] 640/16
640/18 737/8
arm [1] 730/16
around [2] 436/25 460/20
481/8 485/2 520/11 531/4 533/2
553/14 554/4 554/12 554/13
554/17 554/18 554/21 555/11
557/22 558/21 558/22 560/9
570/7 631/25 633/11 634/7
659/17 729/1
array [1] 515/25
arrested [6] 489/1 522/20 585/8
593/1 714/6 720/18
arrived [2] 549/20 684/12
artful [1] 485/17
article [31] 440/15 444/6 445/3
445/17 445/22 446/2 446/12
447/5 600/24 600/24 600/25
603/9 615/21 685/20 685/23
686/3 687/3 687/16 689/24
689/25 690/11 691/11 692/4
695/23 698/25 699/8 699/17
700/3 700/7 734/15 737/6
articles [16] 440/25 442/6 444/2
444/8 590/10 603/4 687/18 690/2
690/6 690/15 690/20 690/22
690/25 693/1 693/2 736/14
articulate [2] 520/1 693/23
articulating [1] 520/5
artificially [6] 625/15 625/17
625/18 665/2 681/3 681/15
as [356]
ascertained [1] 581/11
aside [5] 503/16 586/9 644/24
662/20 670/16
ask [30] 449/16 484/15 484/19
484/20 486/16 492/2 513/10
515/21 523/22 525/22 532/4
544/6 547/13 558/2 589/4 589/6
619/4 622/12 626/15 638/3
640/19 640/24 640/25 653/7
710/1 712/19 739/14 747/18
747/25 748/22
asked [45] 442/6 455/23 455/24
504/17 505/14 515/14 527/21
535/7 535/18 536/4 544/11
544/14 568/16 568/22 569/1
576/24 577/16 586/2 589/9
597/19 606/23 608/13 619/12
632/18 640/13 654/4 660/18
660/21 708/12 708/18 709/7
711/9 711/10 713/22 713/24
714/8 717/15 718/5 718/8 718/13
718/18 719/8 721/7 728/10 741/9
asking [20] 465/16 477/12
477/14 508/14 508/19 509/13
510/5 532/6 562/1 576/13 580/7
600/13 640/5 640/6 649/24
658/16 661/13 693/11 704/11
744/13
aspect [5] 479/23 491/5 518/7
519/19 521/15
aspects [5] 514/20 521/7 523/10
551/20 725/7
assembly [1] 677/22
assert [1] 738/20

asserted [1] 618/3
assess [20] 438/12 455/24 456/3
467/1 471/1 477/14 484/3 545/22
659/17 668/23 721/16 723/11
724/3 724/5 724/6 726/11 735/1
736/1 736/5 741/9
assessed [1] 571/13
assessing [18] 463/20 470/23
478/4 489/8 490/20 492/8 498/21
514/14 546/20 546/23 570/8
698/21 700/15 710/25 723/5
724/2 732/20 734/10
assessment [49] 437/20 437/21
444/8 445/1 446/12 446/14
446/18 452/5 452/12 454/7
462/10 462/12 462/23 464/8
465/9 467/19 471/13 471/13
475/23 495/24 499/4 506/4 506/8
506/18 506/22 508/9 515/3
518/20 523/25 524/17 527/10
545/13 576/11 588/12 595/12
598/22 600/11 638/2 651/3
698/13 698/25 699/20 709/23
721/8 725/16 725/22 739/15
739/16 740/23
assessments [8] 444/3 445/4
446/23 454/4 495/14 505/25
506/13 613/19
assistanceship [1] 452/3
Assistant [3] 429/17 431/13
451/20
assisted [1] 553/18
associate [1] 446/1
associated [8] 463/22 490/12
505/21 508/23 523/1 523/5
552/17 732/14
Association [9] 441/3 442/12
442/12 442/19 443/23 445/6
445/10 457/10 690/5
assume [8] 536/16 592/13 648/5
651/11 683/3 702/14 728/23
731/1
assumed [2] 585/21 585/22
assumes [1] 581/13
assuming [4] 538/6 600/1 628/23
671/19
assumption [1] 586/1 683/4
683/5 717/13
assure [1] 478/9
assured [1] 431/24
assuring [2] 510/7 510/8
asterisk [9] 652/15 653/8 653/9
653/14 653/15 654/5 654/12
657/24 658/24
Atkins [105] 435/17 437/22
443/3 443/6 443/18 444/3 444/7
444/11 444/12 445/17 446/23
447/18 447/24 448/4 448/24
449/3 451/23 452/22 452/25
453/3 453/10 453/14 453/15
453/22 454/20 456/4 459/12
465/6 481/16 481/17 483/8 486/9
489/19 491/21 494/3 506/11
537/17 545/23 578/3 578/8
578/22 579/14 579/21 582/1
585/21 586/4 597/14 600/15
600/19 600/22 600/25 601/2
602/2 602/5 602/6 602/7 602/11
602/17 603/5 605/4 606/24 607/2
607/4 607/6 607/12 607/18
607/25 608/3 608/21 610/23
610/25 611/4 611/8 611/24

611/14 611/23 612/13 612/15
613/11 628/9 644/3 644/7 644/8
644/5 644/6 648/10 649/3 684/5
685/2 685/12 686/13 689/16
690/23 691/14 692/1 693/5 693/8
693/15 693/22 694/4 706/2 726/9
727/3 737/4 737/5
Atkins-related [1] 443/6
Atlantic [2] 710/2 710/6
attached [1] 487/14
attempt [7] 439/7 444/2 480/18
487/13 543/21 573/15 727/20
attempting [1] 487/18
attended [1] 506/6
attention [7] 507/8 599/7 599/25
652/7 653/23 653/25 694/4
attesting [1] 597/15
attorney [12] 429/15 429/19
429/20 430/1 430/6 431/13
451/20 576/13 585/19 600/22
608/2 718/20
attorney's [2] 448/13 585/13
attorneys [2] 429/13 429/17
454/18 523/8 545/24 579/2 579/8
581/24 582/12 582/13 614/8
630/19
attracted [1] 631/20
attractive [1] 673/24
attributable [2] 702/24 704/2
attribute [2] 491/1 703/17
attributed [1] 490/22
audited [1] 450/21
August [1] 435/6
August 2012 [1] 435/6
aunt [6] 516/14 529/13 529/13
531/10 533/13 549/9
author [2] 445/24 697/12
authored [1] 699/4
authoritative [1] 620/7
authorize [1] 748/22
authors [3] 446/16 523/25 687/7
autism [3] 435/12 437/3 439/13
autonomous [1] 686/7
availability [1] 742/3
available [36] 448/15 465/2
489/6 495/4 495/5 496/1 496/19
497/18 498/2 506/3 507/12
507/16 516/24 517/10 518/3
527/11 527/13 530/18 530/25
536/14 548/5 548/6 580/25 603/1
639/17 646/23 646/25 711/16
711/19 731/20 731/22 734/5
738/13 742/2 743/2 746/3
average [10] 564/3 615/5 615/11
615/12 615/23 619/22 620/17
621/3 622/1 684/13
avoid [5] 480/19 486/8 487/13
493/18 564/25
avoiding [1] 564/13
avoids [1] 479/16
aware [7] 489/2 500/12 516/8
558/20 576/20 585/25 596/10
away [3] 627/5 681/21 693/1
awhile [1] 592/10 671/8
awkward [2] 514/21 554/1

**B**

bachelor's [1] 439/16
back [43] 438/22 465/14 469/2
479/7 480/7 501/5 504/8 504/13
507/20 508/15 508/15 509/14
531/1 532/6 535/15 535/20
536/24 539/19 542/16 542/25

back... [23] 542/25 543/22 546/3
549/14 554/3 559/19 570/4 583/9
590/14 592/11 633/3 636/23
671/16 676/18 677/13 678/4
678/12 686/16 701/20 725/2
736/3 739/4 740/12
backed [1] 475/1
background [3] 439/15 535/20
535/23
backgrounds [1] 500/1
bad [7] 486/21 487/4 490/1
518/24 552/8 562/22 592/5
balance [2] 571/17 585/18
Baltimore [2] 715/18 717/5
band [9] 631/14 631/24 632/6
632/12 633/10 634/6 634/7
634/12 635/23
bands [1] 644/17
bank [1] 505/1
bar [1] 611/4
Barnes [9] 516/11 528/24
531/10 531/12 532/11 532/23
533/4 533/11 533/16
Barnes' [1] 533/8
base [3] 467/5 492/24 492/25
based [41] 439/10 454/11 462/1
464/4 482/7 492/17 506/7 512/6
513/8 525/9 536/25 537/1 543/13
553/4 554/9 558/25 571/22
573/11 590/18 596/3 596/18
597/22 604/19 626/22 627/2
655/21 655/22 665/8 671/12
680/25 685/10 685/11 686/19
687/23 695/23 700/17 701/2
701/7 733/14 739/14 740/24
basic [5] 436/9 436/10 473/20
549/6 549/18
basically [12] 432/9 449/6 488/5
494/21 525/21 530/23 534/2
587/25 612/2 697/15 732/5
743/10
basis [18] 435/10 539/3 539/12
540/10 573/11 589/2 613/13
617/4 680/2 681/5 681/7 697/17
697/23 699/10 703/20 724/1
724/1 742/19
basketball [2] 471/19 568/4
Bates [1] 526/24
battery [2] 534/24 535/4
be [400]
bear [6] 522/11 672/1 672/7
672/22 673/1 693/11
bearing [2] 499/6 649/13
became [4] 498/10 530/24
534/12 674/21
because [193] 436/6 438/17
438/22 440/12 445/6 450/18
453/16 457/16 457/19 458/6
459/13 460/19 461/15 462/1
462/24 463/11 464/10 464/24
466/6 468/1 468/18 469/17
474/19 475/11 475/16 475/21
478/8 480/20 480/21 480/25
482/8 482/12 482/17 482/18
484/7 485/11 486/24 487/14
489/5 489/7 489/18 493/19
493/19 494/5 496/3 497/20 503/8
504/21 505/7 505/19 508/1
508/21 508/25 516/22 517/1
517/8 521/12 521/14 522/5 523/2
527/16 527/23 528/8 530/19

533/24 535/23 536/4 536/8
537/25 538/6 539/6 539/18 547/1
550/2 552/7 552/11 552/12
543/7 545/1 545/5 549/3 550/3
550/9 554/16 561/19 563/10
563/24 566/12 568/17 568/20
569/1 569/8 571/1 572/18 578/2
578/4 579/7 581/7 583/17 585/21
588/6 589/11 590/15 592/10
593/6 596/20 612/2 613/7 617/18
617/22 620/8 623/12 625/21
626/6 626/9 626/16 627/6 631/7
631/14 632/14 632/25 633/6
636/4 636/7 641/9 642/22 644/5
646/3 646/20 646/24 649/3
649/16 649/18 651/3 651/12
651/16 652/1 652/7 654/1 655/4
655/11 657/25 658/22 660/21
660/24 662/1 665/25 666/25
668/8 670/19 670/22 670/23
671/8 672/20 673/25 676/1
681/15 682/11 685/1 685/13
685/18 694/4 694/20 701/9
701/25 702/1 705/5 705/19 706/7
706/16 708/14 710/25 711/8
711/18 711/23 717/11 718/13
719/5 721/7 729/15 733/24 734/4
734/5 735/16 736/3 736/5 737/1
737/7 739/11 739/19 739/25
743/4 744/8 746/2 746/15 746/23
746/24
become [6] 608/3 643/21 657/10
684/19 695/10 715/24
becoming [4] 685/9 693/4 693/4
695/9
been [116] 432/25 433/1 433/13
434/8 435/11 436/15 437/8 437/9
438/25 440/5 442/1 442/17
442/18 447/23 449/3 449/5
449/10 450/10 452/11 452/13
453/4 454/18 456/1 460/18
461/21 470/7 483/18 488/19
488/24 489/1 494/3 499/24
500/20 501/19 504/23 506/3
506/9 508/10 508/11 511/25
512/5 514/22 515/10 522/4
522/20 541/23 548/15 567/10
567/10 571/11 581/12 582/23
583/16 590/4 595/17 595/19
603/12 603/16 607/24 608/1
610/17 610/25 612/15 612/23
613/15 615/6 616/10 619/19
619/21 620/9 620/12 625/19
626/19 630/3 630/19 630/23
648/3 660/15 660/20 664/11
666/18 667/24 668/21 669/6
671/8 672/12 674/6 678/22
681/14 684/16 684/24 685/4
685/6 687/20 690/20 696/6 700/4
702/18 713/14 720/23 721/9
725/23 726/8 726/10 731/10
732/6 732/15 734/4 737/13
738/12 738/13 738/16 739/3
746/11 746/16 746/18
before [56] 429/11 431/22 439/3
439/11 447/18 449/12 457/18
470/19 508/19 511/16 514/14
516/5 516/5 532/18 544/15
545/13 554/11 559/17 562/1
569/8 571/19 576/18 576/21
580/15 580/19 583/4 589/17
593/25 597/8 600/1 605/16
608/24 610/9 611/7 613/1 624/19
627/25 628/18 628/20 629/2

636/10 640/15 645/2 647/2
660/22 666/7 666/10 667/3
667/4 690/6 698/12 698/19 699/2
723/4 743/23
began [4] 444/5 452/1 452/1
713/10
begin [2] 443/5 539/22
beginning [2] 492/16 526/4
begun [1] 561/1
behavior [142] 434/20 439/9
444/9 444/12 445/1 446/13
446/14 446/18 446/23 457/12
457/17 457/23 458/18 459/18
460/21 461/20 461/24 462/10
462/12 462/19 462/23 464/4
465/8 467/19 467/23 468/12
468/20 470/24 471/3 474/4 474/6
475/5 475/12 475/12 475/22
477/14 477/21 479/20 481/12
482/4 482/17 488/13 488/13
488/17 488/18 489/25 490/14
490/21 491/14 492/5 492/9 493/4
493/4 494/5 499/5 504/19 505/24
506/4 506/8 506/13 506/22 507/7
508/3 508/7 508/9 509/19 514/24
515/3 515/7 515/9 515/17 516/12
518/15 518/18 518/20 518/21
518/22 518/25 519/7 519/8
519/20 519/21 520/14 523/15
523/20 523/24 523/25 524/17
524/19 524/20 525/2 526/11
527/15 528/5 528/9 528/11
528/12 528/13 530/11 531/24
532/17 534/5 537/17 539/2 542/1
543/5 552/16 552/20 561/12
562/3 562/4 562/12 562/24
563/20 570/15 571/18 572/19
577/22 588/12 595/12 598/3
599/23 600/11 641/12 643/20
643/20 644/14 650/20 651/9
673/7 694/10 698/13 698/25
699/1 700/13 722/14 723/11
725/22 734/9 734/10 735/6 736/6
behavioral [5] 440/15 462/7
651/17 653/11 657/21
behaviors [1] 564/12
behind [2] 446/8 498/10
being [78] 438/7 455/8 462/2
471/12 472/10 479/6 479/16
483/9 483/14 487/19 494/16
499/8 504/23 513/5 513/5 520/15
521/1 524/23 537/1 551/3 551/6
553/14 553/15 554/2 562/16
565/24 570/5 572/20 579/8 579/9
581/14 582/10 582/10 584/3
585/2 586/2 586/10 588/7 589/11
596/13 600/18 608/11 608/13
611/13 611/14 623/25 625/23
630/10 630/20 643/4 643/10
652/11 652/16 656/24 670/11
670/12 675/2 677/20 684/10
685/11 687/25 691/15 696/9
701/17 711/9 711/10 715/25
719/7 719/22 721/7 726/8 738/14
744/6 746/6
belief [1] 703/20
believe [97] 442/13 443/10
443/11 444/25 445/25 454/16
455/12 456/12 456/16 457/4
457/4 457/5 457/9 457/24 461/17
465/18 466/10 470/7 482/9
486/18 486/24 491/15 496/5

498/6 498/18 501/21 503/10
503/13 504/5 504/12 506/5 506/6
507/23 508/5 508/15 509/1 510/6
513/16 523/22 526/25 537/8
542/20 545/24 545/24 552/24
553/2 554/25 564/21 566/7
568/14 569/23 573/13 573/20
577/15 583/6 588/21 588/21
588/23 591/16 595/21 604/5
606/14 607/17 608/15 609/2
610/2 613/11 616/15 616/24
617/20 618/5 618/18 619/4
635/19 643/5 647/23 651/24
656/24 657/13 664/7 664/8
671/16 674/23 682/16 690/12
691/21 691/23 691/24 694/3
694/18 697/20 698/16 701/21
705/7 707/17 713/12 715/16
719/4 729/19 730/11 730/12
746/19
believed [4] 606/18 607/12 614/8
651/16
below [19] 458/23 458/24 460/10
460/13 462/6 479/11 481/14
498/8 502/24 507/19 538/14
538/21 566/15 622/1 623/8
623/10 632/24 644/7 722/14
bench [3] 431/6 436/9 557/2
benchmark [1] 541/11
Beneath [1] 656/12
beneficial [1] 507/13
benefit [2] 613/6 723/9
benefits [2] 611/25 613/4
besides [2] 553/8 685/12
best [22] 445/8 472/22 486/16
496/5 496/7 517/8 539/21 552/7
563/7 569/8 590/18 602/25 632/3
632/4 632/6 643/9 656/22 660/13
676/19 678/10 691/8 728/11
bet [1] 689/18
better [15] 466/5 473/7 476/4
495/5 496/10 502/19 512/14
519/1 519/25 530/25 658/20
673/22 674/23 681/8 744/7
between [20] 455/1 481/12
502/25 514/15 515/16 531/9
542/17 543/23 544/10 595/22
620/10 621/4 626/12 634/4 641/9
676/16 683/15 694/24 712/5
712/15
beyond [8] 519/12 534/3 689/5
689/6 725/18 744/24 745/4
745/17
bias [21] 486/4 497/3 515/20
701/12 702/3 702/7 702/11
702/12 702/16 702/19 702/22
702/25 702/25 703/6 703/13
703/17 703/18 704/3 729/16
729/23 730/24
biased [3] 484/7 703/4 729/20
biases [2] 532/19 701/9
big [16] 526/24 552/7 611/11
615/15 615/18 620/16 621/2
633/7 651/13 671/25 673/2 673/4
709/25 710/21 710/22 724/9
billed [1] 449/21
billing [2] 612/11 612/13
binder [14] 433/7 434/8 434/12
434/17 440/9 444/15 444/16
444/18 445/13 447/4 456/15
574/16 627/18 725/14
binders [2] 434/9 495/1
Binet [9] 525/15 632/23 633/1
633/2 633/22 633/25 659/23

Case 1:04-cr-01016-NGC    Document 1530    Filed 02/09/07    Page 1 of 1    Page ID #: 16761

**B**

Binet... [2] 702/13 703/8
birth [1] 471/1
birthday [7] 665/23 666/14
666/19 667/4 667/5 721/11
721/13
bit [24] 458/16 463/12 468/14
478/21 486/25 508/4 520/14
544/6 567/25 575/4 600/17 602/2
602/4 608/19 608/24 616/1
617/15 653/5 653/6 661/12 662/3
683/19 710/14 714/17
black [5] 491/23 702/2 702/11
702/19 703/8
black-and-white [1] 491/23
blacks [1] 702/4
block [1] 492/24
Bloomington [2] 717/8 717/11
blue [1] 444/16
blurted [3] 650/14 653/2 658/14
board [15] 451/3 451/5 494/12
502/4 615/10 687/12 688/13
688/15 688/23 688/24 689/2
689/6 689/7 693/19 731/11
body [2] 474/12 730/13
boilerplate [1] 534/24
book [20] 446/15 446/15 446/15
446/25 447/10 485/11 525/4
525/5 574/3 604/11 604/11 686/4
698/16 718/9 718/13 718/18
718/25 719/5 731/25 734/16
books [1] 617/1
boost [1] 535/22
borderline [7] 481/9 481/13
587/18 587/22 588/2 622/1 622/5
born [3] 545/9 706/14 740/19
borough [1] 553/24
both [32] 437/13 437/14 460/24
462/22 462/25 465/8 465/9 474/5
476/13 487/15 490/7 506/12
508/13 518/7 519/4 519/6 543/14
567/6 567/7 567/7 567/8 580/6
598/20 620/7 620/8 654/23
659/23 674/3 678/1 719/24
724/10 747/10
bother [1] 610/3
bottom [3] 619/15 631/7 715/8
boy [3] 518/24 605/24 656/13
boy's [1] 656/12
boys [1] 553/25
BRADY [9] 430/6 430/8 431/17
577/5 577/6 577/7 577/10 742/16
742/17
brain [1] 501/18
Brannan [1] 430/2
break [12] 484/17 511/2 511/2
511/9 514/10 554/7 556/3 594/10
636/18 661/3 661/4 743/21
breaking [1] 748/9
breaks [1] 573/24
brief [10] 459/14 451/14 463/10
463/11 463/14 482/5 541/9
544/16 544/18 570/17
briefly [8] 434/17 435/9 439/4
457/2 463/2 503/11 518/4 539/15
bring [7] 446/22 517/17 559/18
665/12 693/24 700/23 748/21
bringing [2] 531/13 612/6
broad [9] 454/7 464/4 464/6
479/9 509/24 510/2 584/23
687/23 712/5
broad-based [1] 687/23
broader [4] 620/1 686/5 686/6
694/22
broke [1] 514/14
Brooklyn [2] 429/5 429/16
Brookwood [19] 473/25 474/3
518/6 519/18 522/4 522/18
522/22 549/15 549/18 550/22
550/25 552/14 564/2 569/23
583/21 616/14 721/25 724/8
724/20
brother [2] 520/21 520/24
brought [8] 582/9 582/13 599/7
599/25 667/14 667/21 670/19
670/23
brush [1] 555/6
budget [1] 551/7
building [1] 677/23
bullet [1] 469/8
bulleted [1] 497/17
bunch [2] 554/2 677/23
burden [1] 594/3
BURT [34] 430/1 430/3 431/17
432/10 433/5 433/25 454/3
554/22 555/11 557/5 557/9
559/24 575/6 575/12 575/14
575/16 575/18 575/21 576/24
577/4 578/25 592/13 594/16
603/4 619/11 696/24 714/22
715/8 719/13 721/19 747/18
747/23 748/23 749/1
Burt's [1] 619/11
bus [1] 474/7
business [4] 434/1 503/11
610/19 612/6
busy [2] 459/7 580/1

**C**

Cadman [1] 429/15
cafeteria [2] 480/6 480/7
California [8] 430/2 576/7 630/9
630/16 685/24 685/25 713/8
713/11
call [14] 433/5 435/13 445/11
504/8 513/1 543/4 586/3 612/17
614/16 639/8 660/20 665/23
745/1 745/4
called [25] 435/13 439/20
441/10 442/8 443/12 445/13
446/5 447/4 447/5 452/3 481/9
494/25 499/20 501/18 504/13
520/21 525/19 525/19 561/11
568/24 577/7 596/22 693/8
738/22 746/6
calling [3] 431/7 439/8 581/13
calls [2] 488/25 542/15
came [14] 460/14 480/7 500/17
575/5 583/21 591/5 593/17
597/20 597/24 603/20 607/4
607/5 610/23 720/15
can [127] 435/9 435/24 437/21
441/13 443/8 443/19 454/5 460/1
460/3 464/7 465/9 469/17 471/16
473/14 474/7 475/7 475/9 479/20
480/21 482/15 484/13 484/20
487/4 489/22 489/24 490/7
490/21 490/22 491/4 491/10
491/14 497/11 497/23 500/5
509/22 510/14 511/7 517/15
517/19 524/21 526/16 527/8
535/13 536/10 537/14 539/20
542/3 542/6 543/9 545/2 547/13
557/18 559/5 570/5 571/6 571/7
573/13 579/9 584/13 588/13

broader [4] 620/1 686/5 686/6
589/13 590/20 592/13 594/10
594/11 596/5 596/12 596/20
620/8 621/22 622/16 622/20
626/18 631/7 632/16 633/10
634/22 636/19 639/20 643/5
643/20 643/25 645/12 648/10
650/2 651/11 660/7 664/4 664/18
664/20 664/24 668/7 671/22
675/2 675/6 678/7 681/5 681/8
681/9 686/21 687/4 692/20 695/1
699/8 700/18 702/5 702/22
702/25 703/14 703/15 703/18
706/14 714/7 723/11 723/25
734/1 743/19 743/23 744/4
744/14 747/2 747/8 748/5 748/14
748/22 748/25
can't [19] 463/18 472/7 474/6
482/21 511/19 544/13 566/12
566/22 578/5 578/7 579/6 599/4
618/25 619/1 620/6 674/1 706/16
717/11 724/17
cannot [8] 468/18 495/2 509/23
562/6 648/16 701/4 715/9 720/3
capabilities [4] 479/22 483/12
503/9 677/17
capable [4] 476/24 477/17 478/1
485/19
capacity [2] 658/7 733/7
capital [9] 453/5 577/14 585/22
585/25 588/14 592/25 605/21
605/23 705/16
capture [1] 573/15
captured [1] 731/10
card [1] 497/13
cardinal [1] 742/7
cards [1] 500/21
care [15] 454/13 459/15 466/20
473/20 547/12 548/22 549/2
549/3 549/11 549/16 549/22
693/12 693/15 722/10 723/3
career [1] 443/5
careful [4] 445/7 478/8 484/15
515/20
carefully [3] 521/12 693/22
694/9
caregiver [1] 531/8
careless [4] 650/15 653/3 658/14
658/15
cares [1] 730/4
caretakers [1] 565/2
caring [3] 531/20 656/1 656/9
Carla [1] 534/8
Carolina [21] 434/2 434/4
435/23 436/5 439/12 439/25
446/1 450/6 450/13 451/6 578/20
597/4 608/25 609/9 610/20
610/22 640/7 713/25 714/4 714/6
743/6
Carolina's [1] 435/20
Caroline [1] 445/25
carried [2] 506/4 566/1
carry [2] 545/2 676/9
carrying [1] 570/24
case [210] 437/22 446/17 448/5
448/8 448/10 448/12 448/15
448/15 448/17 449/11 454/21
455/23 456/6 456/25 457/7 458/1
458/15 459/12 459/12 460/6
460/8 460/12 460/24 463/7
464/21 465/15 466/7 466/16
467/4 469/15 471/7 471/24
473/14 474/11 475/10 475/10
478/7 481/3 484/6 487/5 487/17

488/11 488/14 488/19 491/24
494/20 494/25 495/15 496/12
497/18 497/25 498/3 500/14
503/9 505/4 505/25 506/1 506/9
507/4 510/5 517/25 518/3 521/20
523/15 527/12 527/13 528/18
528/19 530/13 532/22 532/23
538/21 540/4 542/25 566/1 575/5
575/15 575/18 575/18 575/19
575/21 576/1 576/9 576/15
576/23 576/24 577/6 577/9
577/16 577/18 577/23 577/24
578/6 578/10 578/24 579/5 579/7
580/24 581/20 582/9 582/13
583/1 583/9 583/14 585/22
585/22 585/25 588/14 591/15
594/5 596/23 597/4 597/12
597/14 597/18 605/9 605/10
605/10 605/11 605/14 605/20
606/9 606/11 610/1 619/10 620/5
622/15 622/25 623/14 624/13
626/4 626/22 630/22 631/1 631/9
631/12 631/20 632/7 632/13
635/20 636/7 637/18 645/6
646/14 648/3 648/9 648/10
648/17 648/21 649/25 649/25
650/4 650/4 658/22 658/22
658/23 667/15 667/20 667/21
667/23 668/11 668/20 668/21
669/1 669/5 669/13 670/4 670/19
671/1 676/7 676/11 678/16
678/20 684/21 686/22 687/19
691/22 693/20 698/2 699/24
701/22 703/21 704/21 705/16
707/5 713/18 714/22 715/7
723/18 724/3 725/24 726/4 728/1
729/18 731/6 733/25 735/14
737/25 739/7 739/7 741/9 741/17
cases [66] 435/17 438/23 445/2
446/13 446/24 449/3 449/10
450/2 452/22 452/25 453/3 453/4
453/9 453/10 453/14 453/16
453/25 455/2 489/19 491/21
494/3 496/9 506/12 530/8 532/16
575/16 578/3 578/6 578/8 578/14
578/16 579/17 603/12 608/22
609/15 609/17 609/18 609/23
610/8 611/8 611/19 612/13
612/15 613/5 614/1 614/4 635/9
640/8 644/5 644/6 648/2 649/3
687/20 689/16 690/23 691/14
692/1 693/5 693/9 693/15 693/22
694/4 699/1 706/2 713/17 717/25
casework [1] 453/22
cash [4] 504/25 505/11 505/17
505/17
cashing [2] 505/10 505/16
cast [2] 691/6 748/8
casual [1] 545/16
catch [1] 651/14
categories [8] 463/11 466/16
501/12 525/6 544/10 559/3
722/10 722/19
categorize [1] 500/1
category [6] 479/9 479/13 491/2
491/5 561/9 645/23
Caucasian [1] 704/13
caught [1] 630/5
cause [4] 429/11 431/7 491/6
578/22
caused [2] 491/7 660/25

**C**

caution [25] 445/6 459/15 459/19 474/18 477/8 477/8 484/7 491/15 510/4 516/4 524/6 524/10 524/12 525/10 526/6 530/19 541/18 654/11 654/24 705/17 705/19 708/3 711/9 711/18 729/13
cautions [6] 508/22 510/4 523/1 523/5 530/16 532/18
cautious [2] 472/20 673/15
cautiously [2] 474/16 475/19
CELIA [2] 429/17 431/13
cell [1] 492/23
center [7] 436/1 437/1 438/3 438/4 439/23 642/19 684/19
centers [6] 436/4 436/11 436/18 436/21 437/6 438/11
central [1] 568/6
certain [14] 449/14 469/14 477/22 493/13 498/16 549/8 550/17 557/21 636/9 679/24 683/25 700/21 722/14 722/24
certainly [54] 437/2 460/15 473/18 480/21 482/13 485/6 486/9 486/10 487/8 491/16 497/1 505/2 506/6 513/19 522/12 523/12 527/12 530/19 531/1 531/20 532/1 535/5 543/2 543/25 549/1 551/3 557/17 558/12 560/8 565/16 571/10 582/21 592/21 595/6 611/5 623/5 635/15 652/9 654/25 660/24 662/23 667/6 672/1 678/17 686/18 697/22 705/23 708/7 715/2 730/3 731/23 736/3 737/13 745/9
certainty [1] 571/23
CERTIFICATE [1] 749/16
certification [2] 657/9 688/24
certified [9] 534/12 687/12 688/13 688/15 688/23 689/3 689/7 689/8 693/19
certify [1] 749/17
cetera [2] 469/11 507/4
chair [5] 435/19 443/13 443/14 602/15 669/19
chairing [1] 453/1
challenge [3] 664/24 731/5 731/7
challenged [1] 519/14
challenging [4] 468/1 721/3 721/4 721/7
chance [1] 558/13
change [6] 503/14 512/20 611/15 619/7 643/24 643/25
changed [5] 436/14 501/16 501/23 691/24 691/25
changes [3] 501/20 627/12 694/2
Chapel [3] 434/3 578/21 650/1
chapter [12] 446/9 446/15 446/21 446/25 447/5 573/9 698/12 698/12 698/21 698/25 699/6 734/15
characteristic [2] 484/23 500/24
characteristics [5] 523/2 573/2 573/12 573/17 573/25
characterization [1] 517/6
characterize [4] 487/23 496/12 514/18 726/5
characterized [1] 481/13
charge [1] 505/10
charged [1] 505/16
Charlotte [9] 597/10 713/25

714/4 714/6 714/9 714/12 714/13 714/15 714/17 714/19
chart [12] 456/13 470/14 470/21 470/23 634/12 719/12 719/13 719/13 719/18 721/20 721/22 722/8
check [9] 505/1 505/7 505/10 505/11 505/13 505/16 505/17 505/17 505/18
check-cashing [1] 505/16
checklists [1] 506/5
Cheryl [3] 503/24 530/6 537/5
chess [4] 569/25 570/5 570/6 570/7
chief [2] 441/17 442/3
child [10] 480/10 488/6 493/12 519/7 537/2 543/20 564/16 609/19 652/20 652/25
childhood [4] 455/25 497/4 567/19 652/19
children [26] 435/14 437/16 452/4 452/14 475/17 493/10 493/11 493/14 493/15 500/1 526/10 526/13 530/20 530/23 535/20 536/9 550/19 553/18 565/3 568/13 568/18 568/22 568/21 673/25 682/1 732/11
children's [1] 569/5
China [1] 709/1
choice [5] 552/9 552/10 562/23 562/23 562/24
choices [6] 562/19 562/19 562/21 562/22 563/1 563/2
choose [3] 535/2 543/5 552/20
choosing [1] 510/20
chose [2] 651/8 704/17
chosen [1] 613/7
chronic [1] 435/14
chunk [2] 615/15 724/9
circumstance [5] 432/18 450/15 471/16 645/15 645/19
circumstances [17] 464/13 468/24 470/2 475/16 477/10 484/14 488/2 513/8 527/24 546/15 626/5 645/18 649/6 668/3 672/5 672/9 742/21
cited [4] 607/1 620/12 685/24 690/24
City [4] 439/23 585/8 663/19 713/14
civilization [1] 659/20
claim [1] 600/22
clarification [3] 467/17 576/14 576/17
clarify [7] 482/11 512/5 555/24 559/25 629/18 694/15 715/25
clarifying [2] 537/18 572/10
class [2] 497/13 497/15
classes [3] 499/19 612/25 613/1
classic [1] 485/11
classification [1] 501/14
classified [5] 498/25 499/1 499/3 499/23 519/7
cleaning [2] 504/5 551/2
clear [24] 451/2 465/6 473/9 481/11 515/1 516/13 528/10 533/24 550/7 582/25 583/6 589/2 600/6 600/8 600/9 600/10 604/3 624/25 631/17 672/13 672/13 703/15 709/24 734/12
clearly [7] 469/9 475/11 489/21 500/19 519/11 528/8 702/23
clerk [1] 610/10

Cleveland [1] 455/1
client [7] 530/8
clients [3] 436/19 455/8 483/8
climb [1] 564/18
clinic [9] 436/22 437/15 438/22 438/25 452/4 452/12 480/2 480/5 613/3
clinical [45] 434/7 437/12 437/18 437/22 439/4 439/22 440/7 449/21 451/21 451/22 451/25 453/13 453/16 469/3 474/20 474/21 496/2 532/8 560/15 591/2 600/13 612/11 613/12 613/19 625/7 640/9 666/22 681/19 684/16 684/22 684/25 685/6 685/10 685/13 686/2 686/23 687/24 691/16 691/23 691/25 694/17 699/9 699/12 706/22 706/22
clinically [2] 453/21 686/19
clinician [3] 454/12 613/16 699/20
clinician's [1] 625/10
cloak [57] 485/8 485/17 485/18 486/10 486/22 486/22 705/8
close [5] 631/21 642/21 658/5 666/15 709/11
closely [5] 576/10 649/4 655/3 694/6 694/12
closely' [1] 655/3
closer [1] 665/25
closest [1] 630/5
CLR [2] 430/18 749/21
club [1] 553/25
co [1] 621/20
CO's [4] 742/20 742/23 743/4 743/11
co-morbidity [1] 621/20
coast [1] 713/9
coauthor [1] 445/22
coauthored [1] 603/9
coerced [1] 516/16
coexist [3] 471/8 619/16 622/10
coexistence [1] 621/20
coexisting [1] 621/11
cognizant [1] 616/9
COHEN [2] 429/17 431/13
collaborate [1] 740/2
colleague [1] 516/6
colleagues [5] 635/9 660/1 670/13 671/2 708/9
colleaguing [1] 637/9
collected [2] 726/3 740/25
COLLEEN [3] 430/6 430/8 431/17
College [4] 439/17 439/20 446/1 687/14
Columbia [2] 563/10 591/8
column [8] 537/24 538/1 538/8 538/12 538/16 538/19 631/12 636/24
combination [2] 551/5 591/25
come [19] 438/5 458/8 459/19 469/18 473/16 488/15 494/17 496/4 513/17 558/14 570/4 596/13 660/1 668/12 720/3 732/3 735/12 738/2 740/3
comes [15] 464/11 469/2 474/22 492/2 493/19 494/9 501/5 510/14 513/12 525/14 535/15 535/20 570/24 579/16 686/15
comfortable [1] 739/1

coming [9] 439/7 479/7 535/20 540/14 558/8 635/16 651/3 745/9 746/14
comment [15] 491/24 512/6 517/13 520/6 522/8 536/20 538/5 548/7 649/3 658/10 671/4 689/13 732/24 744/8 746/5
commentaries [1] 655/17
commentary [1] 726/25
commented [5] 548/16 549/15 549/20 553/20 619/6
commenting [2] 548/11 608/3
comments [19] 476/3 476/13 476/14 477/2 497/23 512/7 520/24 520/25 534/17 535/6 552/5 552/14 552/14 562/5 562/7 564/19 565/21 592/15 641/18
commission [2] 435/20 453/1
committed [3] 453/5 529/7 614/4
committee [5] 443/11 443/13 444/4 444/5 602/15
committing [1] 720/24
common [14] 436/12 449/20 489/18 491/17 516/17 522/16 535/3 551/1 563/11 564/25 571/3 605/16 658/2 663/8
commonly [3] 463/24 508/1 694/25
Commonwealth [1] 687/11
communicate [11] 542/2 542/3 543/21 546/12 547/4 547/18 547/25 548/10 548/12 557/23 558/23
communicated [1] 730/6
communicates [1] 601/1
communicating [1] 546/14
communication [28] 484/11 484/12 484/12 484/13 540/13 540/14 540/16 540/19 541/13 541/25 542/7 542/12 543/2 543/10 544/9 544/22 544/25 545/14 545/18 546/21 546/24 547/14 548/8 553/3 553/5 560/23 622/15 622/20
communications [5] 489/1 544/21 584/22 584/23 584/24
community [39] 439/10 466/20 469/22 471/25 472/1 472/2 472/14 472/18 473/1 481/23 483/24 485/15 520/14 543/5 553/11 553/12 553/14 553/15 553/16 553/25 560/1 560/6 560/8 684/20 704/9 708/4 720/13 721/9 721/9 721/17 721/21 723/6 723/11 726/1 726/9 727/7 727/20 734/19 739/13
community-based [1] 439/10
comparable [2] 566/11 566/23
compare [2] 655/8 732/12
compared [4] 458/25 462/3 701/17 704/13
compares [1] 722/25
comparison [1] 566/12
comparisons [4] 440/16 492/22 492/25 541/22
compelling [3] 631/9 631/12 631/14
compensation [2] 611/18 611/20
competence [15] 453/9 485/8 485/17 485/19 486/11 486/22 631/14 631/24 632/3 632/7 632/12 633/10 634/7 634/7 635/24

**C**

competences [1] 634/12
competencies [1] 466/22
competency [1] 486/22
compiled [2] 456/12 470/14
complete [5] 435/3 435/17
525/14 555/20 565/24
completing [1] 579/11
compliant [1] 486/17
complicating [1] 579/6
compliment [2] 521/13 521/14
component [1] 625/9
components [1] 484/17
composite [2] 538/20 538/23
comprehends [1] 477/23
compromised [6] 588/7 589/12
653/16 668/14 739/18 739/19
Computer [1] 430/21
Computer-aided [1] 430/21
computerized [1] 430/20
concept [16] 457/17 460/15
469/21 475/5 486/23 489/12
489/13 501/17 501/23 550/13
562/17 562/18 698/11 699/6
733/10 734/8
concepts [6] 465/25 525/18
526/9 543/19 545/6 567/15
conceptual [14] 457/14 463/8
466/13 478/22 479/8 479/10
508/7 521/4 521/6 521/7 521/15
526/11 538/13 551/6
conceptuals [1] 465/18
concern [4] 484/1 514/21 515/16
672/18
concerned [5] 630/23 672/16
672/20 700/14 744/6
concerning [1] 745/2
concerns [1] 514/23
concise [6] 457/5 464/17 499/16
499/18 539/19 702/6
concisely [2] 455/24 475/3
conclude [7] 496/2 540/14
542/11 560/5 567/18 616/19
743/23
concluded [8] 539/16 539/17
553/13 560/7 567/19 588/5
676/17 743/12
concluding [1] 560/19
conclusion [31] 458/8 459/20
465/17 466/7 468/9 469/4 471/16
474/23 498/13 548/24 548/25
550/14 550/15 551/12 551/17
554/9 554/23 560/4 564/5 565/7
565/8 567/22 567/24 570/10
570/11 570/13 572/5 679/19
688/3 688/6 735/12
conclusions [11] 465/15 512/7
517/15 537/15 543/24 551/16
555/19 558/2 559/1 653/12 681/8
concrete [2] 580/14 618/5
condition [7] 457/18 457/22
489/20 645/16 666/7 667/5
732/18
conduct [6] 456/9 488/15 490/16
490/23 517/7 540/3
conducted [7] 539/8 567/1
639/19 670/12 712/13 745/2
747/4
conducting [2] 443/20 599/22
confer [1] 747/6
confidence [7] 459/25 460/3
560/5 560/20 644/17 691/2 705/8

confident [3] 460/4 496/16
560/16
confine [1] 539/3
confinement [1] 477/7
confines [1] 731/16
confirm [1] 584/25
conflict [3] 519/23 520/1 551/22
confronted [2] 542/15 726/14
confused [3] 526/13 566/9 662/7
confusing [3] 484/13 669/20
682/8
congruent [2] 523/12 540/16
conjunction [1] 606/1
connection [4] 441/23 443/24
512/8 547/24
Conrad [1] 597/9
conscientious [1] 703/12
consent [1] 451/1
consider [15] 488/17 492/9
501/13 519/6 521/17 528/4 547/6
561/19 598/20 617/23 626/1
626/3 718/21 720/6 730/22
considerable [4] 499/11 499/24
695/6 729/22
considerate [1] 722/21
consideration [20] 459/6 459/10
492/19 538/15 538/21 547/1
555/21 565/17 596/1 624/22
625/24 626/18 630/11 639/5
685/4 685/15 685/17 691/1
695/18 731/2
considerations [3] 628/20 743/7
743/9
considered [14] 459/22 482/22
495/7 495/13 513/6 528/12
533/13 535/25 547/7 636/10
687/19 720/25 738/12 738/17
considering [2] 721/13 730/23
consistency [2] 507/18 515/4
consistent [13] 451/3 507/10
541/10 598/18 604/8 644/19
648/22 662/21 663/2 687/5
688/19 691/13 692/5
constituency [1] 602/16
constructive [1] 568/8
consult [1] 674/22
consultation [1] 637/15
consulted [2] 449/5 640/14
consulting [1] 441/25
contact [7] 531/6 534/1 577/5
591/5 747/19 747/20 747/25
contacted [1] 576/23
contain [2] 522/2 524/6
contained [3] 446/25 456/20
463/17
contemplating [1] 585/13
contemplation [1] 574/9
contemporaneous [1] 509/17
contemporary [2] 509/9 509/9
contend [1] 515/7
contentious [1] 702/20
contents [1] 434/12
context [18] 471/25 483/9
491/19 492/4 492/10 521/25
523/11 536/19 545/21 547/3
590/8 590/23 674/5 685/2 685/12
693/17 700/12 741/14
contexts [2] 476/14 685/3
continent [4] 708/24 709/1 709/3
709/7
continents [3] 708/18 708/21
713/1
continually [1] 552/11

continue [4] 594/13 635/8
637/20 719/5
continued [16] 452/10 455/21
540/3 556/4 559/23 567/9 583/18
601/4 641/20 652/1 661/16
669/24 670/2 676/17 711/7 716/2
continues [1] 664/1
continuing [3] 450/24 540/25
568/4
continuously [2] 650/14 653/1
contract [3] 449/19 449/20
579/1
contracted [1] 436/23
contracts [4] 578/17 578/18
579/2 612/10
contradiction [2] 482/18 542/23
contrary [1] 690/20
contrast [2] 464/6 477/1
contribute [2] 664/17 732/17
contributors [1] 732/16
convenience [2] 495/21 646/22
conversation [7] 543/25 544/24
545/16 553/1 667/11 707/4
715/23
conversations [1] 545/2
convicted [3] 456/2 605/20
605/23
convincing [2] 487/20 652/9
Cook [18] 504/7 505/6 505/6
505/14 521/11 529/3 537/4
540/25 549/20 550/25 553/17
568/12 569/1 569/7 728/7 728/12
729/25 730/1
cooking [1] 551/2
cooperate [1] 547/9
cooperative [1] 533/1
coped [1] 485/15
copies [5] 547/22 696/20 748/14
748/15 748/21
coping [2] 519/11 547/7 551/22
copy [16] 433/8 434/18 434/19
434/23 444/23 547/16 675/1
675/3 675/4 675/6 692/9 692/13
748/22 749/1 749/1 749/2
Corey [4] 516/11 533/16 569/11
569/12
corner [1] 568/9
correct [207] 447/16 453/17
456/4 463/1 467/2 469/11 475/2
477/3 478/15 478/19 478/24
485/23 489/25 490/8 490/17
493/21 503/6 507/1 508/16
517/25 521/17 527/6 528/24
537/4 539/23 540/1 541/17
542/19 548/22 550/11 553/9
560/24 566/7 575/12 576/18
576/25 577/25 581/1 582/4 582/5
582/7 582/11 584/1 584/17 585/5
587/10 587/15 587/16 588/3
588/8 588/15 588/18 589/1
589/24 590/21 591/3 591/6
591/15 591/22 592/22 593/2
594/8 594/9 594/17 594/24 596/3
596/4 597/4 597/7 597/16 598/15
602/6 602/12 602/17 603/10
603/17 603/21 604/1 604/20
608/10 609/1 609/21 610/7 611/1
613/16 613/20 613/24 614/12
614/14 614/23 622/5 623/17
623/18 623/19 624/14 625/11
627/6 628/1 628/5 628/25 631/10
633/1 634/8 634/13 635/24 636/1
636/7 636/12 637/2 638/15 642/6

642/15 643/24 645/22 646/5
648/20 648/25 649/6 649/3
649/10 651/7 653/9 655/18 656/9
656/23 658/8 659/7 659/22 660/2
662/15 662/18 662/22 663/4
663/14 663/17 663/19 665/7
669/4 669/16 670/5 670/9 670/14
670/15 670/20 671/3 671/11
672/9 673/11 673/25 674/4
675/17 675/20 676/4 677/24
680/15 680/18 683/4 684/22
686/7 686/14 686/19 686/24
697/11 701/3 704/9 704/17
704/25 705/3 705/6 705/8 705/17
705/20 705/24 706/2 706/5 706/9
707/3 707/5 707/16 710/20 712/2
712/24 714/20 715/1 720/7 722/5
723/19 727/22 728/1 728/8
728/22 731/17 731/18 731/21
732/1 732/3 732/4 732/7 732/21
734/19 735/24 736/2 738/18
739/9 747/23 749/17
correction [7] 494/5 527/11
527/20 527/23 702/9 724/10
739/24
correctional [2] 527/6 719/23
corrections [2] 522/18 742/13
correctly [10] 527/20 544/17
578/7 592/9 592/14 598/5 643/23
648/8 678/10 715/11
corresponding [2] 488/21
509/20
cost [1] 555/4
could [100] 434/1 434/17 439/14
444/19 444/22 451/24 457/2
465/14 468/23 469/1 475/6 475/7
475/7 475/9 475/15 478/14 485/7
486/4 490/15 503/12 514/18
519/25 520/12 530/4 532/19
536/2 539/15 543/3 543/18
545/13 546/1 551/19 552/18
552/18 555/23 560/5 561/13
562/22 564/18 568/6 569/4
570/16 572/23 574/10 580/20
580/25 581/8 586/10 595/7
595/11 604/18 606/19 607/14
617/9 617/13 618/22 622/3
622/10 629/18 649/21 649/22
658/20 660/1 664/17 675/24
675/25 677/13 678/4 678/7
678/25 681/22 684/7 692/2 694/7
700/10 700/13 701/25 702/15
705/9 705/10 705/13 705/20
707/20 710/2 711/3 711/5 711/6
711/24 712/25 713/4 713/8
713/24 717/7 718/6 722/1 724/24
727/21 729/21 739/5 742/20
could've [2] 660/2 660/15
couldn't [14] 449/6 483/1 488/5
532/8 541/3 554/4 565/22 565/22
677/14 712/7 712/16 712/20
713/6 713/7
counsel [2] 431/10 748/6
counseled [1] 552/13
counselor [1] 519/17
count [3] 490/24 643/1 699/12
counted [1] 612/20
countries [1] 627/15
country [8] 436/4 436/11 611/1
615/6 627/12 627/13 689/6
695/12
County [6] 448/2 454/24 585/12
605/17 669/14 717/19

Case 1:04-cr-01016-NGC Document 1538-17 Filed 02/09/16 Page 831 of 363 880243 8540500 2/500 7764

**C**

couple [16] 455/2 479/3 482/5 482/6 484/10 511/16 514/20 557/4 597/4 615/1 624/19 670/23 707/8 707/10 713/19 746/8
course [29] 457/21 458/6 472/21 482/10 482/24 483/25 486/7 487/25 491/19 493/8 498/9 537/18 541/18 542/3 545/17 550/17 550/22 563/14 565/2 585/1 599/14 625/6 650/15 673/17 683/1 683/25 692/1 721/19 743/6
courses [2] 534/14 657/9
court [26] 429/1 430/18 430/18 431/1 431/2 431/4 433/8 439/14 441/4 448/12 448/20 449/12 457/9 464/25 465/7 494/22 512/8 512/10 512/17 513/16 514/18 517/18 555/14 558/4 558/15 558/16 559/5 575/23 583/8 594/11 596/23 599/12 604/24 605/9 605/10 605/16 609/3 609/18 610/12 618/18 624/11 630/20 632/17 632/22 658/16 660/15 661/7 666/20 668/12 685/24 685/25 692/8 692/12 693/24 693/25 696/17 701/21 701/22 728/10 740/10 744/11 744/19 747/11 747/25 748/3 749/21
court's [10] 443/3 512/1 547/21 553/1 558/9 597/23 629/22 746/9 747/10 747/15
Courthouse [1] 429/5
courtroom [13] 432/2 511/19 514/22 554/20 557/8 576/16 617/4 617/7 617/16 628/7 690/17 732/24 738/21
courts [4] 443/18 447/6 608/23 630/18
cousin [8] 503/21 529/2 529/19 529/21 529/25 533/20 569/11 728/16
cover [1] 509/20
covered [1] 557/14
Cox [1] 699/4
CR [2] 429/3 431/8
crack [1] 521/1
crazy [1] 665/11
create [1] 472/21
created [1] 686/7
creating [1] 734/8
creatively [1] 569/19
credential [1] 616/24
credibility [1] 739/17
credible [1] 738/21
credibly [1] 623/15
credit [4] 519/2 589/23 590/21 596/15
credited [6] 589/23 590/23 591/1 637/19 637/20 740/11
crediting [2] 592/21 671/7
crew [1] 707/25
crime [28] 456/1 459/14 497/1 528/5 528/9 529/7 529/8 540/17 542/25 543/7 545/19 553/2 560/11 561/19 567/20 569/9 570/14 572/7 605/24 630/5 659/16 659/18 666/1 666/16 669/7 669/16 670/8 720/24
crimes [3] 453/6 614/4 614/9

criminal [14] 429/11 431/7 482/10 482/16 488/15 488/17 522/14 528/5 528/9 530/22 552/20 562/24 608/23 614/5
criminals [2] 614/1 614/3
criteria [17] 468/9 483/6 489/16 490/13 491/23 494/24 494/24 501/15 510/23 515/1 538/25 539/16 593/7 593/13 593/17 643/22 646/2
criterion [6] 459/4 465/3 468/7 538/19 538/25 549/17
critical [5] 531/19 594/24 689/25 718/12 718/16
criticisms [1] 685/12
cross [20] 512/12 542/14 574/20 574/23 597/18 599/15 661/16 670/2 673/6 743/24 745/1 745/14 745/20 746/19 747/19 747/22 748/1 748/6 748/18 748/19
cross-examination [12] 542/14 574/23 597/18 599/15 670/2 745/1 746/19 747/19 747/22 748/1 748/18 748/19
cross-examine [1] 574/20
cross-examined [1] 673/6
crossed [1] 576/9
CRR [2] 430/18 749/21
cruel [1] 609/4
crying [1] 674/21
cues [2] 519/19 552/2
cultural [7] 491/19 491/25 492/3 492/10 679/24 680/25 702/18
culture [11] 491/14 492/3 492/6 492/7 492/7 492/21 493/4 493/7 493/16 494/6 494/16
Cunningham [1] 689/25
current [16] 457/7 457/12 465/3 508/2 544/25 545/14 567/8 578/3 604/25 623/22 669/2 669/3 684/7 711/1 711/9 733/21
currently [10] 438/19 441/25 452/21 567/6 612/12 614/18 619/9 659/21 669/6 703/11
curriculum [4] 434/20 499/10 499/12 499/12
custodial [14] 471/25 472/4 472/8 472/16 473/3 481/24 482/4 484/1 542/16 542/21 569/23 570/1 723/23 729/10
custody [1] 477/6
custom [2] 654/8 717/25
customary [7] 536/4 587/23 587/25 648/5 684/23 684/24 734/10
cut [1] 541/5
cutoff [11] 541/22 570/4 587/24 587/25 630/11 632/25 632/25 633/6 644/7 646/1 667/4
cutting [1] 514/2
CV [6] 434/25 435/3 440/9 441/20 443/10 447/16

**D**

daily [5] 435/10 466/2 567/14 595/13 617/4
danger [1] 493/22
dangerous [2] 564/14 564/17
Danny [8] 605/12 632/7 633/15 633/21 634/17 635/20 671/4 674/7
dare [1] 564/17
Darnel [2] 654/18 654/20

data [20] 434/20 526/20 597/22 620/22 627/24 628/3 630/25 648/4 665/1 683/21 685/4 685/10 696/4 696/10 697/16 698/8 699/21 701/6 747/24
date [16] 435/5 508/4 575/10 530/14 597/7 606/7 634/3 692/3 704/17 735/12 739/16 740/14 740/15 740/16 740/24 747/23
dated [1] 728/7
dates [2] 443/1 528/21
DAVID [2] 429/22 431/18
Davis [27] 460/6 460/12 460/14 494/17 575/19 575/22 619/10 619/15 620/4 620/15 620/23 621/2 622/24 684/20 684/21 686/22 691/22 714/22 715/7 715/14 715/20 717/3 718/24 725/24 726/17 729/8 748/12
Davis' [1] 714/25
day [13] 431/25 432/3 504/9 504/13 562/8 562/8 590/1 639/17 743/20 743/21 745/6 745/7 745/9
day-to-day [1] 562/8
days [7] 432/20 504/6 541/17 612/7 657/9 710/16 742/19
deal [15] 481/20 500/20 510/4 517/3 519/15 520/4 524/22 565/13 615/15 618/5 640/20 651/13 682/11 705/16 741/6
dealing [4] 519/5 615/22 679/23 702/19
dealt [3] 519/1 519/5 547/5
dean [1] 446/1
death [15] 443/12 443/25 447/5 486/8 486/13 585/13 593/1 625/25 632/8 679/3 693/17 713/20 717/22 738/10 738/11
debate [1] 619/21
debated [1] 495/20
deceased [1] 646/10
December [7] 629/6 636/25 637/3 637/5 637/9 641/13 641/13
December 1994 [1] 636/25
decide [2] 633/11 715/14
decided [3] 448/15 579/19 671/2
decision [38] 443/3 443/19 444/13 463/23 464/3 465/6 479/5 488/18 496/16 509/3 563/3 563/7 563/8 563/21 563/22 571/2 571/3 571/18 577/21 582/16 583/5 585/24 588/24 589/3 594/25 595/6 595/10 596/18 598/14 611/10 625/10 626/1 637/16 649/15 652/2 654/12 668/15 739/23
decisions [8] 561/18 561/21 562/2 562/3 563/12 564/4 565/3 693/25
deconstruct [1] 683/19
decrease [2] 665/12 683/13 700/11
dedicated [4] 637/17 710/12 723/22 733/11
dedicates [1] 638/2
deemed [3] 455/18 575/22 594/7
defect [1] 558/16
defendant [106] 429/7 429/19 429/20 430/1 430/6 431/2 431/18 448/12 468/6 513/14 513/17 513/18 522/23 522/25 523/23 524/5 527/25 548/12 557/6 557/7 557/8 557/9 557/12 557/21

582/15 585/7 585/12 585/14 587/9 587/17 589/10 592/16 592/25 594/5 598/19 605/20 616/9 616/19 618/6 621/21 622/3 623/14 627/19 628/4 628/25 638/20 638/23 639/8 639/22 640/10 641/3 645/20 647/7 648/15 648/18 649/12 650/13 652/12 653/19 655/17 655/23 657/22 659/9 660/16 661/7 661/8 662/14 667/24 667/24 669/15 670/4 671/1 671/3 672/15 673/11 673/16 677/1 680/8 680/17 682/5 682/22 683/3 704/24 705/2 705/9 707/8 710/23 713/14 714/15 719/9 719/14 723/19 727/5 727/6 727/14 727/19 728/7 730/2 730/18 733/22 734/4 747/4
defendant's [22] 434/9 523/6 524/16 547/24 554/13 558/22 559/2 559/14 574/22 588/6 591/10 595/3 628/10 643/3 660/18 663/3 665/23 668/21 723/6 731/6 734/3 750/7
defendants [2] 481/16 725/25
Defenders [3] 577/13 577/14 592/25
defense [26] 448/24 449/1 449/4 454/18 460/25 517/2 517/8 576/13 578/22 579/8 583/8 584/10 584/16 598/23 599/11 600/2 608/2 614/8 647/1 668/11 671/14 696/19 713/23 726/8 742/10 742/11
defensible [1] 599/12
defer [1] 659/1
deferring [1] 642/11
deficiency [2] 440/20 518/9
deficient [3] 517/6 552/24 560/20
deficit [35] 465/16 471/14 471/17 479/18 488/9 492/14 504/18 504/19 537/17 540/14 542/11 542/24 543/11 543/11 544/22 546/3 546/4 546/8 546/24 548/18 550/9 560/6 560/8 564/6 581/22 604/12 604/19 619/23 622/22 624/5 639/9 640/11 652/13 659/13 660/19
deficits [27] 463/6 464/22 466/12 466/17 468/25 471/13 471/13 471/20 473/13 479/17 490/24 493/19 496/13 501/25 531/16 545/18 546/21 551/13 553/8 571/3 573/6 604/5 604/12 644/25 654/8 659/22 711/12
defined [7] 458/21 551/15 560/9 563/1 563/2 563/5 620/10
defines [1] 663/6
defining [3] 445/18 446/2 603/6
definitely [3] 441/1 471/4 549/24
definition [23] 457/8 457/11 464/10 470/25 472/5 482/11 501/15 506/14 615/8 619/6 619/8 619/19 619/20 621/6 621/12 621/14 621/17 621/18 622/7 623/7 623/22 623/22 733/14
definitions [3] 457/3 465/10 622/9
definitive [1] 554/11
degree [8] 438/9 439/16 439/17 452/15 500/23 534/13 571/23

**D**

degree... [1] 657/11
delay [1] 527/1
delineated [1] 513/21
delineation [1] 481/11
delved [1] 536/12
demands [7] 473/11 519/3 519/4
519/11 519/12 520/10 552/7
demeaning [1] 710/14
demeanor [1] 643/8
demonstrate [1] 713/23
demonstrated [4] 505/22 551/11
623/15 719/7
demonstrating [2] 483/18
531/22
demonstrative [1] 602/19
Denney [28] 458/19 460/23
461/4 461/8 461/11 461/17
461/19 462/7 462/20 482/13
508/13 514/16 514/22 515/5
515/18 515/22 515/24 516/1
516/20 516/25 517/4 523/18
524/3 533/25 534/6 566/7 566/20
732/25
Denney's [14] 461/14 478/5
482/9 486/18 498/6 514/23 517/7
518/16 527/19 531/25 538/4
540/1 540/11 631/8
depart [1] 654/8
department [2] 434/6 522/18
depend [1] 567/13
depending [3] 542/7 550/20
625/23
depends [2] 619/8 621/18
Depetra [8] 503/25 530/1 537/5
552/18 553/20 572/23 744/23
745/18
deposed [1] 635/20
deposition [5] 636/1 636/2 636/6
737/24 738/4
depravation [2] 679/25 680/25
depress [2] 700/5 700/8
depressed [4] 588/6 589/10
679/19 681/15
derive [2] 449/17 613/4
derived [4] 450/1 635/11 707/12
735/6
derogatory [3] 520/23 520/24
520/25
describe [4] 435/24 451/24
468/23 707/20
described [11] 436/15 466/21
474/21 519/24 550/3 572/21
578/25 621/12 621/13 684/9
702/9
describing [2] 663/8 710/16
description [9] 436/3 463/10
513/15 544/20 569/1 574/5
642/23 651/8 718/17
descriptive [1] 718/15
deserves [1] 469/25
design [2] 438/1 491/17
designated [2] 436/4 491/3
designed [1] 567/4
designing [1] 633/5
desire [3] 485/18 485/21 486/11
desirous [1] 739/1
despite [4] 554/14 607/23 694/16
730/5
destroyed [1] 504/5
detail [4] 450/22 513/22 637/12
692/16

detailed [1] 574/5
detect [1] 482/1
detectives [1] 585/9
deteriorated [1] 520/14
determination [7] 467/20 468/6
582/3 582/7 621/20 670/11
741/14
determine [12] 453/6 469/3
510/12 535/2 543/3 587/3 587/3
600/9 687/24 717/22 725/17
740/13
determined [8] 479/11 498/23
581/21 586/17 586/25 587/12
595/2 689/9
determining [5] 474/23 541/12
542/19 609/4 659/12
detracted [1] 650/20
develop [3] 552/1 695/9 703/11
developers [1] 722/23
development [3] 452/3 531/20
534/18
developmental [35] 434/4
435/12 435/20 436/2 436/16
437/9 437/17 438/20 441/4 441/8
441/11 442/15 444/25 457/10
459/13 464/9 467/12 470/25
471/3 471/15 483/19 498/10
508/16 530/9 531/7 543/12
545/18 546/8 546/11 550/6
659/17 688/25 693/13 721/14
723/8
deviation [6] 460/11 615/5
615/14 620/13 621/5 663/7
deviations [2] 458/23 460/10
479/11 623/10
diagnose [1] 604/18
diagnosed [10] 582/14 582/19
582/24 616/10 616/13 616/15
620/4 622/16 622/21 643/12
diagnosing [4] 445/18 446/3
603/6 603/25
diagnosis [25] 437/19 437/21
487/13 489/13 489/16 489/19
489/20 491/6 491/7 491/22
527/24 528/15 528/16 591/24
623/6 623/19 623/21 624/5
625/24 629/17 637/1 643/22
644/9 645/4 733/14
diagnostic [1] 494/23
did [303] 439/3 440/2 443/5
445/22 445/23 448/4 448/7 448/8
448/9 448/10 448/11 448/11
448/13 448/14 449/9 449/10
449/17 450/21 452/5 452/9
454/21 455/2 456/9 456/19
456/24 456/25 457/1 458/1
458/14 458/19 458/19 460/7
460/23 461/9 461/9 461/10
461/11 461/13 461/19 464/20
465/18 465/20 466/7 466/23
467/4 467/13 468/16 474/3 478/1
478/12 480/11 481/8 485/25
481/22 487/17 487/21 494/17
495/6 496/19 498/2 498/3 501/10
503/17 503/23 503/24 503/24
503/25 503/5 505/17 505/22
505/25 506/21 507/4 509/5
509/10 513/13 515/10 515/23
515/24 516/13 516/16 517/7
518/2 518/12 519/14 520/18
521/19 523/9 523/15 523/17
523/18 523/19 524/3 524/21
525/12 526/14 527/14 527/19

528/4 528/6 528/14 531/14
533/1 533/4 533/10 533/16
533/21 533/22 534/3 534/6 534/7
534/8 534/19 534/21 534/22
537/7 537/9 537/10 539/3 539/5
539/6 539/10 539/14 539/17
540/14 542/13 543/18 543/21
543/23 543/25 544/4 544/14
544/15 544/21 544/22 544/23
545/9 546/17 547/16 547/22
548/1 549/10 550/4 550/23
551/12 553/19 553/23 553/24
558/10 560/7 562/2 562/2 562/5
562/12 563/21 563/22 565/22
566/21 567/1 567/19 568/16
569/13 569/15 569/18 571/17
572/8 572/10 572/10 577/2 578/6
580/3 581/20 582/13 582/25
583/7 584/7 585/12 585/15
585/16 585/16 587/2 587/3 587/5
587/14 589/16 589/17 589/22
590/21 590/22 591/9 591/12
591/18 593/15 594/16 595/3
595/20 598/23 599/8 606/11
606/16 606/23 608/6 609/12
609/18 610/5 610/8 610/9 610/12
610/22 611/14 616/17 616/19
617/20 623/5 632/6 632/9 632/12
634/10 634/14 636/1 637/3 637/4
638/19 638/20 639/18 642/5
646/18 646/19 647/1 647/1 650/7
650/8 650/17 654/20 656/22
660/1 660/3 660/23 667/20 668/2
668/18 668/22 670/13 670/16
670/17 673/10 673/21 674/9
674/10 674/12 674/14 674/15
675/15 675/16 676/14 681/7
681/13 682/4 686/3 688/7 702/14
707/5 708/5 708/10 708/14
708/15 709/21 711/17 711/22
713/18 714/22 715/20 715/21
717/7 717/14 724/6 724/8 725/5
729/5 729/19 729/25 730/3
730/21 731/17 735/16 735/21
736/1 736/6 738/7 739/7 739/10
739/22 741/3 742/8 742/8 744/9
744/10 746/20 746/21
didn't [89] 449/7 457/22 477/5
488/3 488/6 504/8 505/9 505/17
505/19 516/15 521/14 522/6
523/20 525/6 526/2 526/3 530/17
534/13 540/12 541/6 544/17
547/5 547/20 549/21 549/21
554/2 554/3 560/3 562/8 564/20
568/24 569/2 569/9 569/10
569/19 569/20 572/12 577/4
579/10 591/17 593/17 594/21
595/13 595/14 599/2 600/2 606/2
608/22 609/9 617/22 618/11
621/19 636/14 651/11 651/12
651/12 651/14 652/2 655/1 655/2
655/24 656/19 657/4 658/1
660/22 674/8 680/9 681/10
681/11 681/12 685/14 694/20
703/21 708/7 715/5 715/15
718/19 724/3 724/5 725/4 725/15
731/23 737/25 738/4 738/23
739/21 741/12 742/5 743/2
differ [1] 501/3
difference [5] 499/5 514/15
611/11 683/15 693/16
differences [7] 481/15 515/4

569/6 702/23 702/24 703/15
different [54] 438/6 456/4
461/21 464/12 464/12 464/13
465/22 465/23 470/2 478/21
479/1 485/1 488/1 488/2 492/12
493/20 497/9 497/11 499/7
501/22 505/15 518/6 524/16
537/23 550/20 552/4 562/17
562/18 595/23 612/12 621/17
622/7 627/14 627/14 627/15
627/15 630/7 649/24 666/1 669/2
675/14 675/21 676/6 676/10
677/19 690/16 692/1 693/19
694/14 708/12 714/17 717/18
726/6 732/6
differently [1] 736/4
differing [1] 505/5
difficult [7] 504/24 521/9 531/21
543/3 551/21 627/6 738/25
difficulties [5] 519/11 540/16
547/6 552/6 566/2
difficulty [13] 520/5 520/6 525/7
526/9 535/8 540/19 543/14
543/17 554/17 563/16 563/24
715/2 715/3
diligently [1] 503/20
diminished [1] 453/24
diplomat [1] 688/13
diplomates [1] 688/11
dire [4] 451/15 451/17 613/18
750/4
direct [33] 431/25 432/8 433/22
438/22 455/21 511/16 512/1
512/3 512/11 559/23 562/16
566/12 582/17 594/15 598/11
602/4 602/14 611/17 616/2
647/13 671/5 673/9 681/25
690/14 695/22 706/18 723/22
729/12 745/11 745/12 745/19
747/11 747/25
directed [1] 506/21
direction [15] 438/18 468/5
492/12 532/5 551/3 561/11
561/15 562/2 562/12 562/14
562/15 606/15 641/17 641/19
693/6
directions [2] 562/16 562/17
directly [5] 449/23 461/5 510/14
574/13 613/22
director [2] 439/4 439/12
directors [1] 688/9
disabilities [49] 434/4 435/12
435/14 435/14 435/21 436/2
436/10 436/16 437/7 437/10
437/19 438/10 438/13 438/20
441/4 441/9 441/11 441/16
441/18 442/15 444/25 447/12
452/5 457/10 458/6 471/11
479/25 485/10 490/17 501/14
545/2 566/17 588/7 588/18
589/12 593/22 616/2 616/5
616/10 616/23 617/1 622/9
623/21 642/7 642/12 642/18
642/20 688/25 731/20
disability [79] 437/5 437/10
440/4 440/11 440/22 447/7
451/13 454/14 455/18 458/9
464/11 473/7 474/13 480/19
480/23 481/2 485/14 487/14
489/21 489/22 489/23 490/3
490/12 491/1 491/8 493/23
499/21 500/7 500/25 501/4

Case 1:04-cr-01016-NGC  Document 1330  Filed 02/13/13  Page 333 of 363 PageID #: 28766

**D**

disability... [49] 501/20 501/25
506/15 520/19 522/11 541/14
541/24 542/6 545/12 571/7
571/25 573/3 573/16 587/4
591/21 596/14 604/1 614/8
616/11 616/16 617/23 617/24
618/10 618/12 618/13 618/22
618/23 619/5 619/7 619/8 619/16
619/21 619/22 620/9 620/14
621/6 621/11 621/17 622/4
623/23 624/4 624/6 629/17 636/5
642/22 642/24 648/16 681/22
693/13
disabled [17] 480/15 486/2
487/19 487/20 498/23 499/4
499/23 501/17 545/22 571/24
572/9 581/18 617/9 618/1 618/6
621/23 621/25
disagree [11] 593/19 595/5
595/14 642/25 643/2 655/20
656/20 656/25 691/16 697/18
698/4
disagreement [3] 498/7 563/25
642/17
disaster [1] 504/6
discharged [1] 647/24
disciplinary [2] 450/8 451/9
discipline [3] 688/20 693/8
702/18
disciplines [3] 438/4 438/6
452/18
discouraged [2] 675/23 676/1
discoverability [1] 746/10
discovered [1] 485/16
discreet [1] 743/18
discrepancies [1] 515/16
discrepancy [8] 620/10 620/12
620/16 621/2 621/4 641/9 663/3
663/6
discrete [1] 513/24
discuss [4] 432/3 465/19 476/8
476/10
discussed [19] 480/20 495/23
499/8 500/2 543/13 545/24 553/5
553/9 570/12 572/15 573/21
574/12 580/15 618/13 637/24
686/25 691/11 722/20 748/6
discusses [1] 573/2
discussing [4] 456/25 501/6
514/13 674/6
discussion [8] 446/23 460/13
487/1 492/16 555/10 581/8
599/24 636/3
discussions [2] 496/4 629/14
disorder [14] 489/17 490/3
490/16 490/16 490/16 490/23
490/23 492/13 519/8 620/5
622/15 622/16 622/20 622/20
disorders [6] 436/8 437/4 439/9
490/2 490/4 490/7
dispositive [1] 666/5
dispute [3] 489/19 619/18
746/25
disputes [2] 642/21 682/18
dissing [1] 519/23
distances [1] 560/11
distinction [7] 454/6 478/3
481/19 568/23 633/4 660/12
694/23
distinctive [2] 713/7 713/8
distinguishing [2] 454/4 634/3

district [9] 429/1 429/1 429/12
429/15 431/1 431/1 585/3
585/13 585/19
distrust [1] 641/18
disturbance [3] 519/8 591/25
616/14
disturbing [1] 516/7
division [14] 442/8 442/10
442/11 442/14 442/14 442/16
442/17 442/21 442/22 442/24
443/11 444/6 444/19 690/1
Division 33 [5] 442/24 443/11
444/6 444/19 690/1
divisions [1] 442/13
do [278] 431/25 432/19 432/21
435/9 435/16 436/18 437/20
437/22 437/23 439/3 440/6
441/23 441/23 442/8 444/3
444/20 445/15 446/10 447/11
452/10 453/12 454/21 455/23
458/1 458/7 458/19 463/19 470/7
472/16 473/4 475/6 475/7 475/7
475/9 475/9 475/15 475/16 476/4
477/9 477/9 478/12 479/16
480/13 483/20 483/21 485/21
486/10 486/16 489/6 490/20
492/7 494/8 494/24 498/15
498/22 501/10 501/13 502/13
504/14 504/18 505/19 506/12
506/22 509/5 510/25 512/16
515/22 516/5 516/13 517/19
519/25 524/24 524/25 524/25
526/14 527/12 531/3 531/15
535/5 535/24 543/11 544/12
544/14 545/5 545/12 545/13
545/14 546/18 549/5 550/7 552/4
554/5 554/21 556/1 558/13
560/24 562/25 564/16 564/16
564/16 564/17 565/13 568/7
568/7 568/8 568/9 568/10 568/17
568/17 571/22 572/11 572/12
575/16 579/12 579/14 579/17
581/8 583/1 584/5 584/13 588/12
588/21 588/21 588/23 589/7
590/11 592/8 593/5 593/14
593/15 593/21 594/16 594/21
594/21 595/12 595/17 596/16
597/12 597/13 599/1 599/6
599/13 599/15 600/10 605/8
607/8 608/11 608/13 608/16
609/9 609/10 612/3 612/23 613/2
613/7 616/2 617/22 618/5 618/9
618/11 619/4 619/12 620/18
620/20 621/7 621/22 626/16
628/17 631/8 631/12 633/4
633/18 633/22 641/14 642/25
643/2 648/3 648/14 648/17
648/21 649/4 650/3 650/4 651/9
654/5 655/7 660/22 661/9 667/20
667/23 668/2 668/13 668/15
671/2 671/7 672/10 674/15
675/25 676/12 676/12 676/19
677/8 677/8 677/14 679/4 679/5
682/2 682/7 682/15 683/8 684/4
684/4 685/21 687/22 689/18
690/22 691/3 691/17 692/15
694/24 695/13 695/14 696/9
696/13 700/16 701/9 701/11
702/5 702/17 703/1 704/3 704/8
705/5 706/4 706/16 707/12 708/7
711/6 712/11 712/25 713/12
713/18 713/25 714/2 714/15
715/14 715/22 717/6 717/7

717/16 717/21 718/19 719/9
720/23 720/23 724/14 725/5
727/10 727/15 729/6 729/24
730/9 730/12 730/15 730/20
731/23 736/4 736/23 736/23
737/6 738/13 740/3 741/16
743/16 744/4 746/1 747/11
dock [1] 504/13
Docket [1] 431/8
doctor [37] 434/8 451/21 455/15
476/22 494/25 517/5 565/4
574/14 588/14 605/3 618/15
621/19 623/5 633/21 635/6
635/12 636/24 637/17 641/2
646/9 648/12 649/7 658/2 675/9
678/3 680/4 683/6 690/14 693/1
695/19 704/23 712/1 712/13
713/16 714/7 715/12 736/7
doctoral [4] 452/7 656/6 688/9
689/6
doctoral-level [1] 656/6
doctors [1] 646/18
document [10] 472/9 472/10
498/15 610/3 627/25 628/9
637/25 638/4 696/17 696/19
documentary [3] 548/9 555/21
559/13
documentation [3] 496/10
496/13 547/4
documented [11] 480/1 484/23
485/8 500/4 518/16 520/16 521/2
530/20 546/9 563/23 571/10
documents [4] 467/7 506/24
689/10 692/17
does [101] 434/14 438/11 440/22
445/9 450/3 468/20 468/21 469/5
469/22 469/23 470/21 472/17
472/25 473/4 475/6 475/13
475/17 479/10 481/22 482/14
482/21 486/22 486/23 486/24
487/11 491/23 491/23 499/5
501/3 501/9 504/4 508/10 521/3
524/6 524/7 524/8 525/23 528/18
531/12 542/2 550/4 558/2 558/3
561/17 561/23 562/21 565/8
565/10 565/18 567/13 569/25
570/1 570/10 571/2 572/1 573/19
574/8 577/12 578/15 583/9 587/2
587/4 587/21 591/21 592/2 592/9
592/19 598/4 606/9 612/3 614/22
623/1 623/6 625/6 633/7 633/8
636/18 643/25 656/18 675/9
676/22 679/20 681/16 683/16
686/4 686/9 686/10 688/3 688/15
689/18 689/19 692/14 694/21
694/24 696/12 715/11 728/21
732/12 739/14 739/16 748/3
doesn't [42] 432/3 471/18
471/18 482/16 483/3 483/22
483/25 490/25 504/11 525/23
541/21 546/3 546/5 558/3 559/4
559/4 606/20 611/25 620/15
620/16 620/17 621/2 621/3 621/3
621/4 621/6 622/25 629/6 631/25
633/9 646/3 653/22 656/17 657/4
666/12 673/24 681/16 681/17
689/18 711/21 711/24 735/3
doing [59] 436/24 440/7 446/23
450/4 452/19 452/21 453/16
453/22 467/18 469/24 472/24
473/19 475/17 475/20 477/17
478/1 480/25 482/22 494/1
494/11 501/6 505/8 506/9 508/12

527/9 545/10 550/2 579/20
529/22 579/18 583/18 586/22
586/6 586/7 590/12 597/8 599/19
605/25 611/8 626/16 634/9
638/10 644/8 648/6 648/8 669/14
669/17 676/24 677/7 678/9 681/1
691/8 705/2 706/7 706/24 725/17
727/5 727/6 744/7
dollars [2] 612/19 612/21
domain [7] 466/8 466/10 479/5
521/3 562/21 564/9 573/25
domains [7] 466/13 478/24
540/7 540/12 560/14 604/13
604/14
don't [218] 442/25 447/10
453/12 453/15 455/8 460/13
461/7 466/2 466/6 468/13 472/19
473/4 482/12 487/7 487/8 490/24
491/6 493/9 494/15 495/19
501/24 503/10 506/1 506/3
511/22 512/9 513/1 513/6 522/11
521/10 524/13 524/22 525/22
527/1 527/5 535/16 535/17
535/22 535/25 536/23 536/23
536/24 537/2 542/20 544/24
545/3 548/15 552/4 555/20 558/7
559/3 563/6 563/12 570/3 570/6
570/8 578/23 579/16 580/8
580/14 581/16 583/21 586/25
587/19 587/25 590/16 594/10
594/23 596/25 597/7 598/2
598/25 599/7 599/10 599/23
604/11 605/7 606/7 607/9 608/3
608/5 608/15 609/25 610/6
611/18 611/20 613/25 614/24
616/24 617/21 617/22 617/23
618/8 618/11 618/14 623/10
623/22 625/3 625/22 626/6 627/2
628/13 629/14 632/14 633/6
633/20 634/3 634/9 634/21 635/2
635/10 636/2 639/24 640/5
642/10 642/16 642/16 647/17
648/2 652/7 654/13 654/15 655/8
656/5 656/24 657/2 657/25 658/9
658/25 663/11 664/3 665/3
665/21 666/17 667/25 668/6
671/8 671/12 671/16 672/6 672/8
673/13 674/14 675/3 675/4 675/5
675/7 676/14 677/4 682/16 685/4
686/15 686/17 686/25 689/1
691/6 691/11 691/16 691/25
694/13 694/14 694/16 694/20
695/8 695/23 697/23 698/7
699/23 700/24 701/1 703/25
706/18 706/19 708/14 712/3
714/14 714/14 715/2 715/3 715/6
715/22 717/4 717/9 718/15 719/1
719/4 719/23 720/17 721/4
727/24 729/2 729/6 729/19
729/21 730/8 730/11 732/3
733/12 734/7 734/11 737/6 738/2
741/20 742/4 742/4 742/21
742/25 745/3 745/8 745/21 746/6
746/8 747/7 748/2 748/4 748/12
748/16 748/17
done [59] 432/20 432/21 433/2
443/19 445/4 449/8 449/11
453/24 454/12 461/17 475/15
475/23 478/14 485/12 491/16
497/3 504/20 522/2 524/11
524/13 536/6 541/18 558/18
567/7 612/12 613/19 614/7
624/13 634/4 637/19 640/9 648/3

# D

done... [27] 658/20 660/20
662/10 662/14 663/13 663/19
667/4 667/14 667/18 667/19
668/8 672/10 684/18 685/5
685/13 694/25 695/2 695/4
699/24 706/1 713/16 722/5
724/15 737/17 739/5 741/16
746/22
door [1] 435/16
doubt [1] 606/16
down [19] 484/17 499/22 524/19
538/8 544/13 573/25 580/16
594/5 597/10 610/23 628/15
630/13 665/13 670/20 670/23
671/15 674/21 680/9 700/23
downward [1] 701/6
Dr [52] 433/7 455/23 456/17
460/18 461/4 461/6 461/7 461/8
461/11 461/13 461/18 480/20
498/6 499/17 501/21 508/13
513/12 516/23 517/24 521/22
523/24 527/19 584/1 603/9
616/19 616/22 621/25 646/9
654/19 654/20 657/13 658/12
660/20 661/21 662/2 666/16
667/17 669/4 671/7 694/21 702/9
744/22 745/5 746/3 746/5 746/6
746/9 746/11 746/20 747/3
747/10 747/21
Dr. [188] 433/6 451/13 458/19
460/23 461/4 461/8 461/14
461/17 461/19 462/7 462/20
478/5 482/9 482/13 485/13
486/18 494/19 498/6 506/16
508/13 514/13 514/16 514/22
514/23 515/5 515/18 515/22
515/24 516/1 516/20 516/25
517/4 517/7 518/16 519/17
519/24 520/5 523/18 524/3
531/25 533/25 534/6 538/4 540/1
540/11 558/11 559/25 566/7
566/8 566/13 566/20 566/24
567/1 572/12 573/7 574/25 575/4
576/3 576/5 576/7 576/8 583/25
583/25 585/3 585/7 585/11
585/16 585/18 586/2 586/6
586/10 586/12 586/16 587/9
587/14 587/17 588/5 588/19
588/24 589/10 589/19 589/20
589/23 589/23 590/20 590/21
590/22 590/23 591/1 591/2 591/8
592/21 592/24 593/11 594/16
594/19 594/21 595/2 595/20
596/9 596/12 596/15 597/20
598/14 598/19 614/16 616/17
617/5 617/8 618/9 618/13 621/15
621/19 622/3 626/21 627/25
628/3 630/3 630/10 631/8 637/13
637/20 638/9 640/4 641/7 641/9
641/13 646/18 646/20 647/9
647/19 650/7 650/10 650/20
651/4 652/6 654/18 655/16
655/16 655/19 657/15 657/18
662/3 662/5 662/6 662/8 662/11
662/20 663/9 663/25 664/14
665/12 665/18 665/22 666/24
671/2 671/11 671/18 671/23
672/14 672/20 672/24 673/3
673/10 676/2 679/7 679/9 680/7
681/6 683/11 683/20 684/5 685/2
685/20 686/3 695/1 695/22

698/17 699/7 701/5 704/19
724/10 724/15 744/1 745/10
745/16 745/17 747/10
Dr. Antell [1] 494/19
Dr. Darnel [1] 654/18
Dr. Denney [27] 458/19 460/23
461/4 461/8 461/17 461/19 462/7
462/20 482/13 508/13 514/16
514/22 515/5 515/18 515/22
515/24 516/1 516/20 516/25
517/4 523/18 524/3 533/25 534/6
566/7 566/20 732/25
Dr. Denney's [13] 461/14 478/5
482/9 486/18 498/6 514/23 517/7
518/16 531/25 538/4 540/1
540/11 631/8
Dr. Drezner [8] 637/20 646/18
646/20 655/16 655/19 673/10
676/2 679/9
Dr. Drezner's [2] 662/3 679/7
Dr. Drob [24] 583/25 585/7
585/11 585/16 585/18 586/2
586/6 587/9 587/14 587/17 588/5
589/10 590/20 591/1 594/16
594/19 594/21 595/2 598/14
630/3 744/21 745/11 745/16
745/17
Dr. Drob's [9] 506/16 586/10
586/12 589/19 589/23 590/21
596/9 596/15 598/19
Drogin [2] 687/3 687/15
Drop [1] 584/6
drove [1] 730/9
drug [1] 530/21
drugs [2] 483/3 530/24
DSM [22] 464/21 465/3 466/17
483/6 489/23 494/23 501/22
538/1 538/10 539/11 539/23
602/5 602/21 604/4 620/6 621/10
621/15 622/13 622/14 630/8
641/11 663/6
DSM-IV [1] 538/1
dual [1] 489/12
due [11] 484/11 508/21 584/19
596/8 609/20 621/13 621/19
644/3 654/8 680/4 704/4
duly [1] 433/13
during [29] 450/11 452/8 464/9
467/11 483/19 531/7 546/8
583/13 599/14 602/20 606/15
611/17 613/18 616/2 636/1 636/2
649/20 650/15 651/9 674/12
679/9 681/25 683/1 683/7 690/14
721/18 729/5 729/12 747/21
duties [1] 656/18
duty [1] 647/24
DVD [1] 488/24
dwell [2] 495/21 525/20
dysfunction [1] 501/18

# E

E-mail [2] 430/20 543/4
E-mailed [1] 584/15 584/18
E-mails [3] 488/20 489/5 584/10
e.g [1] 699/13
each [33] 450/22 462/15 463/3
463/11 465/10 465/13 465/23
474/25 478/23 504/1 504/2
515/25 538/8 538/16 539/10
539/13 539/17 540/12 560/13
573/21 573/25 574/6 574/11
576/17 593/6 593/10 599/4 645/9
671/9 673/4 684/10 717/25
729/18
Earl [2] 532/11 650/12

# D

Dr. Edgerton [1] 485/13
Dr. Flynn [5] 683/11 683/20
684/5 685/2 685/20
Dr. Flynn's [2] 686/3 695/22
Dr. Giglio [5] 519/17 519/24
520/5 641/9 724/13
Dr. Gregg [1] 433/6
Dr. Hagan's [1] 695/1
Dr. James [11] 566/8 566/13
566/24 567/1 576/3 591/2 595/20
626/21 630/10 671/2 680/7
Dr. James' [15] 572/12 588/19
588/24 589/20 589/23 590/22
590/23 596/12 628/3 637/13
638/9 640/4 647/19 671/18 681/6
Dr. Karen [1] 614/16
Dr. Kaufman [1] 663/25
Dr. Kaufman's [1] 664/14
Dr. Mapou [3] 616/17 621/15
621/19
Dr. Nagler [10] 641/7 641/13
647/9 651/4 652/6 655/16 657/15
657/18 672/24 704/19
Dr. Nagler's [8] 650/7 650/10
650/20 662/5 662/6 662/8 662/20
673/3
Dr. Oakland [1] 698/17
Dr. Olley [7] 451/13 514/13
558/11 559/25 574/25 575/4
627/25
Dr. Popp [4] 662/11 665/22
671/23 672/20
Dr. Popp's [6] 663/9 665/12
665/18 666/24 671/11 672/14
Dr. Sanford [2] 583/25 585/3
586/16
Dr. Shapiro [3] 576/5 576/8
617/5 617/8 618/9 618/13
Dr. Shapiro's [2] 573/7 622/3
Dr. Waynestein [1] 597/20
Dr. Weise [1] 699/7
Dr. Weiss [1] 701/5
Dr. Woods [2] 576/7 747/10

Dr. Yates [4] 591/8 592/21
draw [1] 471/16
drawing [1] 528/1
dressed [1] 549/22
drew [1] 681/8
Drezner [23] 534/8 637/20
637/20 638/17 638/19 646/18
646/20 655/16 655/19 655/19
656/4 656/11 657/12 657/13
673/10 676/2 676/24 677/15
679/9 681/11 681/12 681/13
682/4
Drezner's [4] 662/3 677/3 679/7
682/13
drink [1] 522/7
drinking [1] 522/5
drive [1] 553/19
Drob [28] 583/25 584/1 585/3
585/7 585/11 585/16 585/18
586/2 586/6 586/16 587/9 587/14
587/17 588/5 589/10 590/20
591/1 594/16 594/19 594/21
595/2 598/14 616/11 630/3
744/21 745/11 745/16 745/17
Drob's [9] 506/16 586/10 586/12
589/19 589/23 590/21 596/9
596/15 598/19
Drogin [2] 687/3 687/15
Drop [1] 584/6
drove [1] 730/9
drug [1] 530/21
drugs [2] 483/3 530/24
DSM [22] 464/21 465/3 466/17
483/6 489/23 494/23 501/22
538/1 538/10 539/11 539/23
602/5 602/21 604/4 620/6 621/10
621/15 622/13 622/14 630/8
641/11 663/6
DSM-IV [1] 538/1

earlier [63] 441/6 441/7 446/22
462/3 466/7 487/17 483/10 497/3
497/1 500/3 502/25 503/7 503/18
505/24 510/15 510/21 515/14
518/4 522/14 523/1 533/13
533/14 534/4 535/1 535/15
535/21 537/22 541/1 543/15
551/20 552/3 557/20 564/24
570/12 570/17 570/19 572/11
572/22 574/4 575/5 578/4 583/19
588/9 589/25 590/1 590/7 597/25
613/18 619/6 632/2 634/1 634/5
645/24 665/1 665/8 680/2 695/5
703/7 708/10 711/10 724/10
732/24 740/2
earliest [1] 519/2
early [6] 442/19 458/17 499/18
525/11 540/17 575/11
earned [1] 505/15
earnings [1] 503/14
ease [1] 545/3
easier [6] 657/10 673/20 673/21
673/22 673/24 674/1
easiest [1] 516/19
easily [3] 526/12 552/19 564/18
east [4] 429/15 709/14 710/2
713/9
EASTERN [3] 429/1 429/15
431/4
easy [2] 474/14 549/4
ECF [1] 557/18
Edgerton [1] 485/13
edification [1] 462/12
edited [2] 446/15 447/10
editing [1] 441/23
edition [4] 446/19 462/20 463/13
606/25
editor [3] 441/25 442/3 690/1
Editorial [1] 441/21
educable [1] 499/20
educated [1] 732/2
education [24] 436/2 436/8
436/21 450/24 497/13 497/14
497/19 498/16 498/18 498/20
499/3 500/6 502/15 503/17
520/22 609/17 696/11 704/4
711/17 711/19 731/12 731/16
731/21 734/5
educational [7] 438/2 439/15
500/21 518/8 520/9 675/21 700/9
educator [1] 445/25
effect [72] 500/10 525/25 535/15
559/14 587/15 590/25 595/9
595/13 595/20 595/25 624/23
624/23 625/1 625/1 625/4 625/5
625/9 625/21 626/8 626/9 626/10
626/20 626/23 627/1 627/3 627/8
627/11 627/12 628/20 630/12
665/12 665/14 670/17 670/19
670/22 679/17 681/25 682/17
683/8 683/10 684/8 684/15
686/1 686/19 686/24 687/5
687/25 688/3 689/10 690/7 690/9
691/13 691/22 692/5 693/3 693/4
694/3 694/6 694/17 695/13
695/16 697/25 698/2 698/5 699/8
700/22 701/6 730/8
Effected [1] 595/18
effectively [1] 525/7
effects [9] 596/3 626/7 626/17
649/23 663/23 663/24 664/14
691/1 700/1

**E**

efficiently [1] 597/23
effort [5] 554/14 660/14 675/13 675/24 676/19
efforts [1] 517/8
eight [10] 466/15 466/19 526/4 526/7 549/4 595/21 637/22 638/2 640/3 643/1
eight-year-olds [1] 549/4
eighth [1] 565/10
either [26] 461/9 469/24 473/15 485/7 486/5 486/21 489/6 532/21 543/22 548/15 558/14 561/4 565/13 591/17 612/10 623/8 651/25 651/25 655/16 657/1 659/23 661/16 706/16 711/21 728/6 746/1
El [3] 714/3 714/8 714/10
elaborate [1] 499/14
elaborated [1] 658/18
electric [1] 466/3
element [1] 474/2
Elephant [1] 685/21 695/23
Elmhurst [4] 473/17 518/6 549/11 549/13
else [14] 506/21 526/14 532/5 539/6 546/2 565/2 572/14 575/10 618/21 627/9 642/2 651/24 691/14 693/18
embarrass [1] 487/7
embarrassed [1] 485/2
embarrassing [1] 504/22
embarrassment [2] 485/5 715/10
embrace [2] 621/12 621/14
embraced [1] 726/8
embracing [2] 619/9 622/7
emotional [3] 519/8 591/25 616/14
emphasis [4] 439/19 457/15 545/4 572/19
emphasize [4] 459/17 464/2 485/11 731/2
emphasized [1] 549/9
emphasizes [1] 457/12
employ [3] 631/14 632/6 684/25
employable [1] 483/1
employed [1] 483/1
employee [2] 450/3 580/2
enables [1] 509/2
encompasses [2] 460/4 479/14
encountered [2] 516/5 519/12
encounters [1] 563/5
encourage [1] 535/9
encouraged [5] 673/16 674/8 674/24 675/15 676/9
encouragement [5] 535/7 535/13 676/3 676/8 682/14
encouraging [1] 675/19 681/2 682/7
end [9] 432/19 480/14 481/25 541/15 573/16 620/21 662/23 665/21 692/20
endangers [1] 681/21
ended [2] 453/23 744/5
endlessly [2] 703/1 703/18
endorse [2] 505/18 696/12
ends [1] 649/12
engage [8] 472/5 512/3 544/3 553/24 562/23 563/12 635/7 677/13
engaged [7] 450/24 474/16 497/24 518/18 518/23 530/21

552/20
engaging [3] 482/21 530/3
English [1] 589/22
enjoyed [4] 534/2 536/9 568/15 568/20
enough [19] 485/1 485/3 488/4 509/25 510/2 510/3 510/12 516/13 524/10 534/3 560/19 560/21 576/9 579/25 596/20 599/10 600/10 630/21 642/21
enter [1] 578/24
entered [2] 451/1 497/2
entertain [1] 568/19
entire [8] 431/25 432/6 503/15 558/12 634/12 638/2 638/22 639/1
entirely [5] 435/11 437/9 505/15 669/4 735/6
entitled [5] 440/15 441/20 445/17 446/12 749/18
entity [1] 578/18
entry [1] 627/18
environment [6] 471/25 472/21 528/1 542/8 720/5 723/23
environments [7] 472/1 472/4 472/9 481/23 481/24 720/6 723/12
equal [1] 691/7
equally [1] 495/25
equation [1] 473/2
equivalence [3] 566/13 566/21 566/22
equivalences [1] 566/25
equivalency [1] 541/11
equivalent [2] 499/21 568/10
equivalents [1] 566/18
Eric [2] 687/3 687/14
error [10] 459/10 459/21 460/14 460/19 538/21 598/1 633/9 635/10 636/15 647/15
errors [2] 647/15 678/18
especially [6] 475/10 480/13 485/4 523/23 540/8 542/9
espousing [1] 690/21
ESQ [6] 429/14 429/16 429/17 429/22 430/3 430/8
essentially [9] 453/15 524/9 562/8 630/10 654/12 658/4 677/16 683/10 688/14
establish [4] 486/1 487/12 610/10 746/24
established [1] 494/14
establishes [1] 703/20
esteem [2] 479/15 592/1
estimate [3] 674/23 684/7 744/5
estimation [1] 656/23
et [2] 469/11 507/4
et cetera [1] 507/4
ethical [1] 656/22
ethics [1] 671/19
ethnic [1] 535/23
evaluate [4] 453/4 455/24 586/2 660/18
evaluated [6] 480/2 581/11 585/7 586/16 592/24 606/17
evaluates [1] 601/1
evaluating [6] 453/21 454/14 461/23 600/5 608/22 714/23
evaluation [50] 434/21 448/11 449/11 452/4 452/9 456/9 456/19 458/8 461/15 461/16 468/5 479/19 480/25 481/18 486/19 489/25 491/17 492/17 493/24

499/7 499/8 499/9 501/6 518/13 519/25 557/7 Pages 33519/6
581/9 583/1 585/11 585/16
585/18 594/17 594/21 598/19
599/8 599/17 600/4 617/23
618/12 659/6 663/16 668/13
668/14 740/4 745/2 746/20
746/22 747/5
evaluations [14] 443/20 449/8
453/16 454/5 475/20 488/15
491/16 501/11 522/2 614/7 633/5
655/18 670/12 729/19
evasive [2] 455/8 625/23
even [35] 467/25 468/25 485/12
486/12 493/6 497/10 502/15
521/10 523/8 531/24 540/24
543/15 553/1 553/2 555/6 564/25
566/14 623/16 626/8 631/13
631/13 646/3 652/18 658/19
660/25 665/11 667/13 686/21
695/2 706/12 710/11 722/18
725/4 731/16 735/2
evening [1] 749/10
events [1] 510/6
eventually [5] 534/12 544/4
549/17 550/3 580/6
ever [17] 442/20 447/18 447/23
447/23 450/8 460/14 470/22
550/23 576/16 582/14 594/4
594/7 697/11 714/4 714/15
729/21 732/3
Everington [3] 445/14 445/25
603/9
every [10] 479/17 495/2 534/25
594/3 612/25 645/10 658/3 658/6
712/20 713/9
everybody [11] 431/20 534/25
535/4 599/19 628/23 642/2 643/2
679/11 693/18 694/24 696/21
everyday [7] 457/16 457/19
458/11 565/19 565/23 566/2
566/3
everyone [7] 431/21 492/17
511/15 516/10 658/9 696/23
701/17
everyone's [1] 432/21
everything [4] 512/10 521/12
626/1 667/6
evidence [37] 448/16 470/7
537/1 548/9 548/18 550/9 554/10
555/21 558/25 559/13 560/2
560/14 560/18 573/8 574/15
574/20 574/22 586/20 586/22
602/20 650/11 655/22 656/12
658/13 666/11 667/13 682/11
694/16 697/7 697/8 702/1 702/2
702/3 702/18 726/2 750/7 750/11
evidence-based [2] 537/1 655/22
evolves [1] 603/23
evolving [1] 603/17
ex [1] 728/12
ex-girlfriend [1] 728/12
exact [8] 443/1 447/11 483/2
585/24 593/14 608/1 634/3
703/25
exactly [17] 480/9 524/3 535/11
541/21 562/6 573/18 583/21
587/19 599/12 599/23 606/16
608/4 676/24 684/13 728/1 732/2
735/16
examination [32] 431/25 433/22
451/17 455/21 511/17 512/1
512/3 512/11 542/14 559/23

574/23 594/15 597/18 599/15
638/20 672/6 673/7 673/8
690/14 706/18 723/22 729/12
745/1 745/3 746/19 747/19
747/22 748/1 748/18 748/19
750/4
examinations [1] 517/16
examine [5] 483/8 512/4 513/23
574/20 648/12
examined [3] 433/13 673/6
674/5
examiner [3] 523/4 654/25
655/11
examiner's [1] 654/12
examiners [2] 654/23 655/1
examining [2] 648/4 648/11
example [47] 437/2 473/6 473/14
477/19 477/23 477/24 479/8
479/23 480/5 489/24 492/4 492/9
497/12 509/1 509/20 519/16
525/5 525/8 527/19 531/18 543/9
549/12 551/20 563/24 564/24
565/20 568/12 570/22 621/15
626/2 626/9 630/9 632/20 701/15
703/7 706/11 706/12 711/4 711/5
723/3 723/15 724/13 725/8
733/22 733/25 734/16 741/15
examples [15] 481/25 485/20
488/8 535/8 540/24 540/25 541/5
543/14 546/11 551/9 553/17
564/15 564/22 569/5 700/7
excellence [1] 436/1
excellent [2] 553/3 570/23
except [1] 658/4
exception [3] 498/12 516/11
721/17
exchange [1] 584/12
exchanging [1] 584/10
excluding [3] 482/24 512/18
512/19
exclusion [1] 489/15 494/24
excruciating [1] 513/22
excuse [22] 607/14 610/3 619/11
620/19 626/25 631/13 641/4
643/1 656/11 657/16 664/7 668/6
669/17 670/8 692/2 701/24 723/8
725/15 735/23 737/4 738/8
742/12
executed [7] 585/20 648/16
649/12 728/21 728/24 729/3
729/6
execution [2] 585/9 609/5
exercise [1] 496/2
exhausting [1] 666/5
exhibit [17] 433/8 444/16 456/20
470/5 470/7 472/10 526/20
526/24 573/8 574/15 574/19
574/22 627/18 696/25 697/6
697/8 719/14
Exhibit 51 [1] 470/7
Exhibit A [1] 573/8
Exhibit F [1] 574/15
exhibited [1] 552/8
exhibits [3] 473/13 750/7 750/11
exist [4] 475/18 642/21 701/16
731/20
exist.' [1] 655/2
existed [1] 702/13
exists [5] 471/17 666/7 695/16
703/24 730/14
exits [1] 720/21
expanding [1] 569/20
expect [8] 466/4 521/21 550/20

Case 1:04-cr-01016-NGG   Document 1006-1   Filed 09/14/15   Page 337 of 363 PageID #: 8769

# E

expect... [5] 618/12 645/15
645/19 695/8 706/14
expectation [3] 432/7 578/18
629/15
expectations [6] 473/9 473/9
550/19 564/11 568/1 723/2
expected [8] 457/21 475/16
502/24 564/12 565/5 596/2 612/9
644/14
experience [16] 451/22 451/23
454/11 466/1 498/19 501/12
504/16 505/14 510/17 613/12
613/25 699/13 700/9 725/24
726/7 727/3
experienced [1] 483/10
experiences [1] 473/19
experimental [1] 439/18
expert [37] 451/13 455/18 461/2
494/11 494/11 494/19 501/13
512/2 512/5 512/9 512/10 548/11
548/15 558/1 575/7 579/21
600/17 600/18 600/19 600/21
600/22 609/9 609/12 610/15
611/18 616/6 616/22 617/24
619/3 621/16 622/8 648/22 649/7
666/4 746/11 746/15 748/5
expert's [1] 558/1
expertise [3] 517/13 642/11
688/19
experts [23] 460/24 460/25
460/25 494/4 501/20 512/22
512/24 512/25 513/11 555/5
567/7 575/25 576/15 583/9
595/24 637/16 659/5 659/6 668/2
668/10 668/15 674/10 740/2
explain [13] 454/5 514/19
521/11 525/23 526/13 528/7
537/14 537/22 540/23 543/19
551/19 570/16 598/12
explained [3] 463/11 561/15
630/19
explaining [1] 526/4
explanations [1] 541/9
exploring [1] 446/2
exposed [1] 617/3
exposure [2] 516/13 614/6
exposures [1] 566/21
expressed [4] 466/18 525/18
526/9 654/24
expression [3] 544/5 548/25
565/18
expressive [1] 541/7 543/15
extensive [2] 496/15 747/4
extensively [2] 467/24 563/10
extent [14] 496/12 500/10
507/12 521/22 586/11 593/20
638/13 639/16 683/2 700/21
707/4 724/16 732/16 735/5
extra [2] 494/15 535/22
extracurricular [2] 497/24
498/12
extraordinarily [2] 504/15
703/12
extreme [1] 524/11
extremely [6] 472/16 472/20
492/24 621/10 639/7 746/12
eye [3] 511/23 586/3 630/6

# F

facade [1] 656/13
face [7] 486/12 645/1 652/19
706/8 706/8 706/9 706/9
face-to-face [1] 706/9
facilities [1] 725/13
facility [10] 719/19 719/22
719/22 719/23 719/25 724/10
724/11 724/21 738/18 741/19
facing [3] 593/1 705/16 713/19
Facsimile [1] 430/19
fact [28] 477/25 493/6 516/25
522/19 525/16 539/6 546/4 546/5
550/21 560/4 590/4 590/11
591/20 593/19 593/22 594/16
597/15 606/5 607/23 616/9
694/16 695/14 703/6 718/4
718/18 726/5 738/7 747/1
factor [7] 540/12 552/21 596/5
679/22 681/2 681/23 703/12
factored [1] 540/11
factors [30] 459/11 491/10
491/11 491/11 491/25 588/8
589/13 590/25 593/22 595/8
596/9 624/22 626/4 629/15 644/3
644/4 681/15 694/7 700/1 700/2
700/4 700/10 700/13 700/17
700/18 701/2 701/25 732/14
732/14 732/17
facts [3] 528/4 528/9 590/3
factual [7] 539/12 545/8 545/11
587/1 706/12 706/12 706/13
factually [1] 746/24
faculty [2] 449/20 612/9
fail [1] 493/25
failed [2] 451/2 526/7
failure [3] 490/8 490/21 490/22
fair [19] 444/11 453/19 570/12
576/11 596/20 604/2 611/22
612/18 614/1 615/22 633/13
634/15 634/15 654/9 665/7
666/10 690/19 699/16 718/24
fairly [4] 510/19 729/2 729/4
746/2
faith [1] 648/7
fake [1] 546/2
faker [2] 606/15 606/20
faking [4] 486/18 486/20 486/21
487/4
fall [6] 479/9 481/17 544/9
564/19 632/24 720/18
falls [2] 491/4 645/23
familiar [25] 434/12 438/8 443/2
449/13 454/13 457/9 462/22
462/23 489/13 490/4 501/16
573/1 574/2 575/12 590/25 675/9
687/3 687/15 696/22 697/10
712/8 712/13 712/17 712/19
712/22
familiarity [1] 617/5
family [27] 474/17 484/6 486/23
486/25 487/6 487/7 487/7 487/12
487/17 487/25 493/9 493/11
507/3 507/19 520/21 523/7
540/15 545/9 557/12 562/1 562/7
563/18 564/15 706/15 727/21
728/2 731/1
far [8] 500/7 665/19 665/20
672/15 677/3 684/22 688/2
745/23
fashion [2] 573/22 697/21
father [3] 532/15 532/19 532/20
father's [3] 529/2 529/14 533/20
fathers [1] 532/16
fault [1] 678/7
favorably [1] 536/20

features [1] 595/24
February [1] 430/17
feces [1] 505/11
fee [1] 505/11
feel [11] 466/23 525/17 532/2
560/16 599/22 600/10 643/9
649/16 682/1 682/2 706/5
feeling [2] 682/4 682/7
feelings [4] 730/1 730/3 730/24
731/1
fellow [2] 442/21 668/1
felt [6] 468/23 535/24 554/1
581/25 652/1 737/13
few [8] 436/6 453/24 534/23
567/3 624/24 636/20 642/18
690/7
fewer [1] 672/4
fiance [1] 503/23
fidgetiness [1] 652/19
fidgety [2] 652/20 652/25
field [12] 438/8 440/22 440/25
441/2 485/12 610/17 642/18
686/2 687/24 691/5 694/2 694/11
fields [1] 438/9
fifties [1] 632/15
Fifty [1] 501/16
fight [1] 520/3
fights [5] 520/23 521/1 551/22
564/2 564/3
figure [3] 461/22 611/14 703/25
file [1] 522/4
filed [2] 636/7 738/3
files [2] 502/9 552/14
fill [8] 432/11 432/16 483/15
503/22 504/1 671/9 724/24 745/5
filled [1] 538/4
final [2] 703/14 747/17
finally [3] 629/12 629/13 630/25
financial [3] 449/14 695/6
697/23
financially [1] 551/4
find [42] 454/7 465/7 471/14
487/6 500/4 500/22 525/17
527/21 553/14 554/4 554/12
554/13 554/21 555/10 557/22
558/21 558/22 591/17 646/21
674/3 678/7 678/13 678/16
678/25 679/1 690/25 707/18
709/19 710/2 711/1 711/11
711/25 712/16 713/6 713/7 713/8
714/7 714/10 714/11 714/12
725/16 738/9
finding [18] 464/22 480/4
503/19 525/7 553/18 554/17
588/3 599/9 604/19 648/15 663/3
666/1 683/24 684/3 685/19
691/19 694/5 709/22
findings [9] 589/20 589/23
590/21 591/15 656/25 682/13
684/3 699/25 741/4
finds [1] 464/25
fine [14] 450/24 455/7 545/13
555/19 555/19 557/4 606/21
629/21 663/9 672/9 677/14 687/2
715/13 748/25
fingers [2] 650/13 653/1
finish [22] 441/13 452/22 555/1
578/8 579/17 580/19 590/20
620/20 668/7 675/20 735/8
737/16
finished [3] 652/3 668/6 737/19
firm [2] 590/17 642/10
firmly [1] 665/6

features [1] 595/24
first [48] 433/13 440/10 444/6
456/15 458/13 459/20 469/8
482/7 484/10 496/18 498/19
501/8 505/13 511/18 514/25
525/24 526/1 535/1 537/24
540/13 544/8 547/20 554/23
558/9 560/23 572/3 577/5 581/16
583/3 583/22 584/8 585/3 603/19
616/15 623/7 627/17 629/9
650/24 663/22 668/1 668/22
670/12 692/12 703/7 708/13
744/5 744/14 744/22
fit [13] 535/3 573/19 574/8
574/8 620/16 621/3 621/6 696/4
696/10 697/16 698/8 699/11
719/4
five [10] 453/23 454/2 458/13
479/1 531/9 676/17 685/7 691/20
720/13 744/6
flags [1] 516/20
flavor [1] 520/24
flaw [1] 678/13
flaws [1] 678/23
flexibility [4] 603/25 604/2 604/4
629/16
flexible [1] 623/16
Floor [1] 430/7
Florida [1] 713/6
flow [1] 512/14
flu [1] 526/1
Flynn [55] 587/14 590/24 595/9
595/13 595/17 624/23 626/9
627/11 627/12 628/18 644/16
670/16 670/19 670/22 683/8
683/10 683/11 683/20 684/5
684/8 684/15 684/17 684/19
684/21 684/25 685/2 685/16
685/20 686/11 686/18 686/21
687/5 687/24 688/3 689/10
689/18 690/6 690/9 691/12
691/22 692/5 693/3 693/4 694/3
694/6 694/17 695/13 695/16
696/12 697/25 698/2 698/5 699/7
700/22 701/6
Flynn's [2] 686/3 695/22
focus [25] 435/11 437/2 437/3
437/8 437/12 437/12 437/13
437/14 438/7 438/11 452/24
459/13 471/2 472/13 477/12
477/16 500/25 501/11 506/18
636/16 646/24 726/1 727/4 727/6
739/10
focused [5] 441/17 444/12 456/6
495/7 500/20
focusing [2] 453/3 563/18
folks [21] 468/17 477/5 515/19
515/25 516/23 517/1 517/2 517/9
517/17 615/10 615/22 656/1
688/13 689/1 695/19 708/11
728/6 728/20 731/19 742/16
742/18
folks' [1] 576/20
follow [8] 490/8 490/21 490/22
693/3 700/6 700/24 708/7 748/14
follow-up [2] 693/3 708/7
followed [3] 444/7 444/9 628/23
follower [1] 572/22
following [1] 528/11
follows [2] 433/14 479/15
food [1] 511/13
foolish [4] 563/13 563/14 563/19
679/2
foot [1] 714/4

# F

forced [2] 693/22 694/8
foregoing [1] 749/17
forensic [13] 435/18 438/19
438/23 444/9 445/2 445/19
446/13 449/18 579/21 609/10
693/17 699/1 737/5
forensic-testimony-related [1]
449/18
forensically [1] 608/23
Forest [1] 439/18
forget [2] 483/1 562/6
forgive [1] 467/18
form [4] 454/9 464/25 572/8
711/23
formal [7] 457/22 503/10 504/15
565/14 624/5 707/1 725/16
formed [3] 443/11 444/4 602/15
formerly [1] 442/15
forms [1] 732/6
formula [1] 626/11
formulating [1] 687/19
forth [10] 464/21 464/23 466/17
489/15 494/19 496/5 542/17
543/23 558/23 686/16
forthcoming [1] 544/3
fortunately [1] 465/8
forward [6] 448/14 448/17
512/15 512/18 609/1 624/25
forward-thinking [1] 609/1
found [22] 450/21 503/13
504/21 531/20 541/9 543/13
553/8 566/24 570/21 573/13
581/17 595/10 596/12 641/3
648/18 678/17 692/3 709/21
711/20 712/6 713/9 713/10
foundation [5] 586/6 586/19
587/1 607/14 727/9
four [13] 458/1 468/10 468/15
474/25 510/22 515/3 537/24
538/22 645/7 659/5 659/6 710/13
728/10
fourth [3] 474/10 477/24 551/15
fourth-grade [1] 477/24
fragile [1] 437/4
fragments [1] 541/8
framed [2] 477/17 477/20
framework [5] 456/24 464/20
464/21 493/8 493/12
Francisco [1] 430/2
Frank [1] 546/19
frankly [2] 548/4 555/7
fraught [1] 705/5
free [3] 445/8 472/18 568/7
freedom [1] 613/2
frequent [1] 658/9
frequently [8] 462/24 508/3
520/20 521/25 530/11 540/19
619/7 647/20
friendly [1] 551/25 552/7
friends [11] 464/14 472/4
487/18 507/3 551/23 551/25
552/9 552/10 552/10 552/20
563/19
friendship [1] 557/13
front [3] 444/15 673/12 684/19
fulfill [3] 450/19 500/5 534/15
full [10] 587/12 591/9 591/12
628/15 636/24 638/24 644/19
662/17 739/8 746/20
full-scale [2] 644/19 662/17
fullest [1] 586/11

fully [6] 454/13 474/21 561/15
577/20 651/16 745/25
fully.' [1] 654/13
fun [1] 519/13
function [13] 436/18 437/18
438/11 438/16 443/15 443/16
466/5 472/22 473/25 518/22
581/7 588/11 600/5
functional [7] 518/21 544/9
565/17 565/17 567/16 567/20
642/13
functioned [1] 509/1
functioning [135] 455/25 456/8
456/10 456/12 460/5 460/17
461/10 462/9 464/3 464/8 464/9
467/2 468/3 469/7 469/16 469/21
469/22 470/24 470/25 472/1
472/6 476/5 476/10 476/15 478/4
482/19 484/3 489/9 489/11 491/2
491/3 491/10 492/1 495/24
499/14 500/19 501/10 502/1
506/12 510/11 523/14 530/12
539/1 565/10 566/3 572/2 572/3
572/6 572/11 581/1 581/8 581/14
582/22 583/2 587/5 587/18
587/22 590/8 590/10 594/17
594/22 595/4 596/16 596/16
596/22 598/9 598/15 598/21
599/8 599/18 615/11 615/12
621/5 623/8 623/17 624/3 625/11
630/25 631/22 636/3 636/16
638/19 645/25 659/17 669/2
698/22 700/15 705/11 707/1
710/23 711/1 711/2 711/3 711/10
711/10 711/21 711/21 719/9
720/7 721/8 722/1 722/9 723/6
723/18 723/20 723/23 724/2
724/5 724/7 724/14 725/6 725/8
725/18 725/25 726/2 726/9
726/11 727/20 727/22 729/13
731/4 732/21 733/8 734/16
734/19 735/2 736/1 736/9 736/18
738/18 738/21 739/8 740/1
740/12 741/13
functions [15] 472/14 473/7
492/20 509/3 553/16
funded [4] 435/25 436/7 436/12
436/14
funds [1] 612/7
further [14] 465/20 497/17
498/10 528/10 535/7 648/11
660/25 667/13 671/4 682/10
682/12 682/24 685/25 749/5
furthest [2] 709/7 709/11
future [7] 438/8 438/21 494/14
512/21 536/22 579/19 745/10

# G

gained [1] 560/4
gaining [1] 569/19
game [1] 471/19
games [10] 568/13 568/15
568/18 568/24 569/2 569/5 569/7
569/9 569/14 569/15
gap [5] 502/25 703/24 704/2
704/3 704/4
GARAUFIS [4] 429/11 431/5
431/6 557/2
gather [4] 470/1 470/4 470/20
495/24
gathered [6] 496/25 506/10
537/19 537/20 542/20 739/4
gave [35] 488/8 505/15 516/15

531/21 535/8 538/22 544/12
540/24 550/16 567/25 568/4 577/1
578/2 587/9 638/23 642/2 659/9
659/25 668/8 672/4 673/18
676/11 677/10 682/8 710/8 711/5
717/4 717/23 718/4 718/5 718/24
723/3 725/13 725/16 735/19
gears [3] 662/9 676/19 677/7
GED [2] 504/22 725/9
general [20] 439/18 444/6
447/15 467/7 485/25 493/3 498/5
502/18 515/21 515/23 526/9
541/22 569/18 580/5 619/21
619/25 683/11 703/23 707/2
723/10
generalize [1] 525/10
generally [11] 484/7 509/5 510/1
526/10 527/17 566/15 650/14
653/2 673/22 686/2 706/13
generals [1] 535/17
generate [3] 462/4 510/3 612/9
generated [2] 612/18 632/4
generations [1] 457/18
gentleman [2] 642/2 668/23
gentleman's [1] 658/7
gentlemen [1] 461/9
genuinely [1] 606/18
Geographic [2] 712/4 712/14
geography [5] 711/11 711/14
712/2 713/17 717/14
George [1] 439/20
germane [2] 469/19 722/12
get [73] 432/4 432/12 432/20
432/21 433/1 433/4 439/7 445/4
451/21 452/20 469/2 474/14
477/13 484/18 487/17 493/24
494/15 504/22 509/23 511/5
511/6 515/19 517/19 522/25
523/6 540/20 543/21 544/3 544/7
545/16 547/20 552/6 553/17
553/19 553/22 553/23 554/11
554/18 557/4 558/13 564/9
577/24 608/22 627/11 628/13
631/25 652/18 656/23 657/9
665/13 667/11 671/6 674/17
676/18 676/20 676/25 676/25
677/13 694/22 706/4 706/5 706/8
723/10 723/14 728/21 737/4
743/23 744/14 745/8 745/16
745/17 745/24 745/24 745/24
gets [9] 464/15 471/19 481/22
497/13 521/13 534/25 642/23
683/12 685/16
getting [24] 451/23 465/12 504/3
504/25 508/4 510/24 517/9
524/19 525/17 538/14 542/8
551/22 552/12 580/24 609/19
609/19 612/5 633/3 649/12 723/9
731/3 735/4 748/14 748/24
ghetto [1] 493/19
Giglio [8] 519/17 519/24 520/5
564/3 641/9 724/13 724/13
724/23
girlfriend [4] 503/24 529/6
542/17 728/12
gist [1] 561/11
give [31] 439/14 469/1 472/15
473/14 483/10 489/24 509/17
510/13 513/16 516/2 521/13
527/8 535/21 541/3 543/9 557/13
562/16 562/16 565/20 629/16
630/25 658/1 668/2 668/24
675/12 692/21 696/25 706/19

717/25 723/15 733/13
734/8 738/2 738/18 747/17
564/15 596/9 612/23 621/9 652/4
660/16 672/3 675/1 675/13 678/4
682/5 701/23 701/24 719/21
721/2 737/25
gives [4] 465/9 481/25 650/10
666/1
giving [22] 443/21 469/25 493/3
494/4 545/4 597/21 620/18 621/7
647/24 653/19 655/7 665/5
675/25 676/8 676/25 679/5
693/14 703/1 707/1 711/18
725/21 726/23
glad [2] 539/20 721/5
go [63] 432/3 432/8 448/14
448/17 465/14 483/15 486/4
488/10 495/21 500/20 507/20
512/12 512/12 513/20 514/9
515/24 517/19 521/3 526/16
548/19 552/11 554/3 554/18
558/10 563/6 563/22 565/4
574/10 596/3 598/3 607/20 612/2
612/23 623/2 633/15 634/17
635/6 638/14 646/1 646/20 647/2
648/3 654/22 661/15 664/25
665/11 674/24 678/4 678/12
692/24 701/20 705/15 720/3
720/3 730/10 730/18 734/3
744/22 747/14
goal [1] 502/19
goals [7] 497/20 502/11 502/14
502/17 502/22 518/9 561/23
goes [7] 445/10 450/2 459/2
472/23 532/5 559/10 685/25
Goessling [1] 654/19
going [92] 431/24 432/3 432/8
432/14 432/20 433/4 448/18
452/7 456/3 457/3 468/4 473/5
488/12 509/16 511/5 512/19
516/21 517/14 524/3 533/3 536/7
536/23 538/8 542/18 542/18
548/7 554/22 558/8 559/11
560/13 562/10 578/3 579/13
579/14 580/8 581/17 582/11
583/8 584/11 584/12 585/20
586/5 586/9 589/6 590/2 594/3
594/3 598/21 599/14 602/9
602/10 624/25 626/15 627/20
628/14 636/19 636/20 637/21
638/16 639/20 642/8 654/1
661/11 665/1 665/3 673/5 674/17
676/18 677/13 683/6 692/16
695/5 697/1 712/9 733/20 740/23
742/7 743/10 743/17 744/8
744/19 744/21 744/22 745/1
745/3 745/4 745/19 745/24
746/23 747/11 748/16 749/3
gold [3] 659/12 659/21 695/12
gone [4] 438/5 445/9 499/22
499/23
good [62] 431/16 431/20 433/15
433/24 433/25 440/12 463/12
474/2 480/3 485/10 485/18
497/22 505/6 507/18 531/18
532/16 532/20 545/13 548/14
549/12 551/22 554/6 554/7 558/9
559/18 562/20 562/25 563/2
563/12 564/4 569/1 574/25 575/1
599/15 599/17 600/3 600/13
610/17 619/20 630/20 644/2
652/18 657/4 661/21 671/10

## G

good... [17] 682/1 682/2 682/4
682/7 682/14 691/8 694/1 694/10
701/1 712/2 722/3 724/13 727/23
733/23 737/7 739/23 749/10
gosh [2] 503/19 595/21
got [35] 432/10 432/20 452/6
475/21 505/23 514/14 515/4
519/7 520/3 521/1 526/2 534/2
535/4 563/24 564/2 564/2 571/14
588/23 623/24 646/21 657/1
657/3 657/3 657/3 659/5 659/9
660/24 666/2 667/20 671/24
680/11 705/8 720/18 730/12
739/24
gotten [2] 438/9 694/4
GOV [2] 495/1 526/25
government [28] 429/13 431/24
432/3 447/24 448/5 449/14
454/22 460/25 461/2 470/6
470/14 494/20 516/24 558/15
578/17 605/14 689/19 697/6
717/15 719/14 726/1 727/4
727/13 729/8 734/2 735/17 737/2
746/22
Government's [2] 697/8 750/11
government-type [1] 734/2
grade [10] 477/24 498/19 566/13
566/15 566/17 566/18 566/21
566/22 566/25 567/4
graded [1] 729/18
grades [1] 497/19
gradually [3] 453/24 695/9
695/10
graduate [3] 440/6 452/2 452/9
graduated [1] 440/2
grand [1] 525/2
grandmother [1] 533/9
granted [1] 455/17
grants [1] 612/10
grave [1] 658/14
great [14] 432/23 442/13 457/15
481/20 500/20 510/4 514/23
516/4 520/4 524/22 526/5 565/13
705/16 715/10
greater [4] 486/6 603/24 604/2
604/3
greatly [1] 525/10
green [3] 574/3 604/11 604/11
Greenman [2] 577/10 577/12
Greenspan [1] 563/13
Greg [2] 691/6 699/4
Gregg [2] 433/6 495/16
GREGORY [2] 433/13 433/18
grew [1] 717/6
grip [1] 451/21
gritty [1] 628/13
grocery [1] 481/1
grounds [1] 724/18
group [11] 443/14 443/15
443/24 443/25 506/24 524/2
557/10 615/10 679/23 707/11
712/20
groups [1] 614/17
growing [11] 509/6 523/10 531/2
531/23 533/3 545/11 570/13
572/6 643/13 643/15 732/9
gruff [1] 656/13
guarantee [1] 729/21
guardian [3] 610/8 610/11
610/11
guess [21] 443/16 450/10 454/12
463/20 509/8 516/11 539/21
567/9 567/16 567/25 580/15
580/14 605/11 614/16 619/3
619/7 678/3 694/21 711/14 746/7
746/12
guidance [1] 492/6
guide [3] 463/12 561/16 573/5
guideline [1] 482/3
guidelines [3] 603/20 603/24
603/25
Guilmette [1] 687/14
gullable [1] 572/20
gullibility [1] 552/16
guy [2] 640/7 711/16

## H

had [167] 433/7 437/16 440/5
450/8 450/11 450/18 451/2 451/9
451/22 452/2 452/13 465/16
466/22 468/23 473/18 473/19
480/10 483/18 493/7 493/19
497/2 502/7 503/20 504/23
505/18 506/2 506/9 506/21 511/3
515/18 519/4 520/4 520/4 521/9
522/4 522/20 525/4 525/7 526/1
526/9 527/21 530/18 530/22
531/6 533/13 533/25 534/14
535/8 540/1 540/14 540/20
540/21 541/2 541/2 542/11
542/24 543/11 543/17 544/6
546/8 546/24 548/4 549/7 549/12
549/15 549/16 549/20 549/22
550/2 551/1 551/10 551/17 552/9
552/11 552/19 553/2 553/13
553/16 554/16 554/20 555/3
558/18 558/19 559/12 560/6
560/11 560/16 561/1 562/13
563/21 563/24 563/25 564/15
567/11 567/24 568/3 569/10
570/13 571/9 577/11 579/11
581/12 581/21 581/24 582/14
583/24 584/13 584/21 585/4
587/3 592/17 592/24 595/21
596/19 598/7 599/10 603/12
604/4 604/7 607/23 610/17 614/8
614/10 616/10 616/19 620/16
625/19 628/4 633/24 635/23
636/11 642/3 647/5 647/6 647/7
647/9 650/3 659/6 663/23 667/24
673/5 674/22 675/13 676/5 677/3
678/6 679/11 679/24 681/3
681/13 681/14 688/18 703/8
707/24 708/21 711/12 714/3
714/4 715/2 722/3 728/7 732/25
738/13 739/3 740/4 740/8 741/15
Hadden [2] 530/6 537/5
hadn't [1] 488/4
Hagan [4] 687/9 689/2 689/15
694/21
Hagan's [1] 695/1
half [10] 464/7 513/13 580/1
580/1 724/24 744/1 744/2 744/5
745/19 745/21
half-time [1] 580/1
halfway [1] 455/1
hallways [1] 480/7
Hammer [1] 702/9
hand [5] 433/12 483/21 485/3
511/7 571/4
handed [1] 603/4
handicapped [1] 499/20
Handing [1] 433/8
handle [1] 512/15
handling [1] 512/1
handwriting [1] 679/17
hang [2] 505/17 552/12
hanging [2] 575/3 585/17
happen [2] 491/19 542/14
happened [6] 536/14 557/24
575/9 639/17 728/1 742/22
happens [5] 543/7 632/22 723/4
730/17 734/2
happy [1] 729/6
hard [14] 433/1 500/22 519/5
531/25 532/3 544/2 566/11
583/17 620/8 675/23 685/1
690/24 719/5 729/1
hard.' [1] 674/24
harm [2] 660/15 689/1
Harvard [1] 687/15
has [146] 432/25 433/1 435/11
436/15 437/2 437/8 437/22
439/21 441/5 441/5 442/12 445/9
447/11 454/18 456/1 460/11
462/16 466/12 466/18 468/2
470/8 471/14 471/17 471/20
473/8 473/11 474/2 476/23 477/9
478/8 479/3 479/4 482/10 487/9
490/2 499/21 499/23 500/20
501/16 504/18 504/20 504/20
506/3 508/10 508/11 508/24
509/25 510/3 510/12 511/18
512/5 514/22 523/11 532/24
536/21 541/20 541/23 542/9
546/4 548/15 550/8 550/17 552/5
563/10 564/12 565/13 567/10
567/11 570/13 570/21 571/5
571/6 572/5 573/6 588/17 589/10
594/4 599/15 603/16 612/18
612/22 618/9 618/21 618/21
619/19 619/21 619/23 619/23
620/9 621/17 621/22 623/4
626/21 626/24 630/19 637/14
637/15 637/22 639/9 640/10
641/17 642/13 645/24 648/15
649/13 653/13 659/13 661/1
663/3 664/11 666/2 668/21
671/14 682/7 683/20 683/25
684/6 684/19 685/2 686/7 688/15
691/24 691/25 693/17 696/19
696/24 702/18 703/24 713/14
715/8 719/13 722/18 726/8
726/10 730/1 730/6 730/16
730/24 735/3 746/11
hasn't [1] 504/18
Haute [4] 713/13 725/1 725/8
730/9
have [493]
haven't [7] 465/22 579/19
613/22 618/13 685/6 696/3 721/9
having [22] 433/13 480/9 500/1
504/10 543/14 544/2 592/16
595/12 606/6 616/11 616/13
616/15 634/25 657/10 657/11
682/18 690/22 706/25 732/18
737/14 738/2 738/4
he [568]
He made [1] 461/14
he'd [3] 550/1 550/1 555/16
he'll [1] 744/22
he's [63] 432/1 475/21 476/2
476/24 489/1 489/1 492/23
493/20 500/23 501/2 504/20
516/8 518/24 524/25 541/21
552/24 558/13 564/4 567/10
567/10 586/9 588/1 588/2 593/20
621/25 622/6 623/24 629/19
645/21 652/20 652/25 663/13
665/24 666/2 666/5 668/6 677/7
680/11 683/20 686/6 686/13
686/18 687/11 712/9 718/22
720/23 724/25 725/1 725/2
725/16 725/17 727/5 727/6
727/14 727/15 732/2 732/6 748/1
748/5
head [6] 455/9 513/12 521/1
674/21 674/25 729/1
heading [1] 699/9
health [7] 434/6 435/20 453/1
522/9 564/8 564/13 565/9
hear [5] 513/6 554/15 554/24
559/3 608/18
heard [6] 493/5 559/13 585/22
617/12 617/18 696/6
hearing [20] 429/11 431/8
447/18 447/24 448/4 448/17
576/12 580/19 582/2 597/14
608/11 634/5 634/6 665/21 670/9
684/5 684/20 692/16 692/20
726/9
hearings [6] 448/24 481/16
481/17 610/9 685/2 686/14
hearsay [2] 517/13 517/14
heartland [1] 663/16
heavily [4] 637/11 637/15 638/9
706/22
heavy [1] 680/24
heinous [1] 605/23
held [4] 442/20 467/22 596/13
636/6
hello [1] 576/9
help [6] 432/21 449/6 531/5
580/25 586/16 717/7
helped [2] 504/21 520/1
helpful [8] 479/20 497/23 498/3
514/3 540/7 577/20 577/22
737/14
helping [4] 503/20 504/1 694/15
717/15
helps [1] 519/2
her [88] 450/18 450/19 450/19
459/1 472/14 503/23 529/7
530/16 530/18 530/20 530/23
531/1 531/17 531/21 531/22
531/24 531/25 532/4 532/6 532/9
533/4 534/8 534/19 535/14 536/4
536/15 553/18 567/1 567/4
568/13 568/16 569/7 572/12
572/13 584/3 591/15 592/9 593/4
593/6 593/25 626/22 638/22
639/1 639/1 639/11 639/16
639/18 640/6 646/25 647/2 647/2
647/5 647/10 650/22 651/22
652/3 652/23 653/15 653/17
653/17 654/8 656/3 656/5 656/5
656/20 657/5 657/6 658/25
660/20 660/22 672/25 673/10
673/15 676/2 676/3 679/10
679/14 679/16 681/19 681/24
730/7 730/13 730/16 745/1 745/4
746/7 746/14 746/23
here [89] 432/4 432/5 453/12
457/8 457/14 458/8 468/5 470/5
470/14 475/1 475/3 480/22 482/6
482/17 489/15 499/8 505/23
507/25 509/20 512/10 515/1
517/5 517/8 522/15 524/15

# H

here... [64] 525/20 525/25 527/6 540/8 548/18 549/5 551/12 554/20 561/5 562/18 563/9 564/5 567/18 573/5 582/15 584/16 584/25 585/2 588/14 589/4 589/4 591/9 592/25 597/24 602/20 617/6 617/9 617/18 625/24 638/15 639/14 639/21 644/16 648/13 649/14 649/21 651/6 654/7 660/9 660/11 662/9 669/14 669/17 671/10 671/20 672/14 675/2 675/7 678/3 678/22 689/1 690/21 691/4 693/16 698/1 731/10 737/3 740/10 740/12 741/22 743/20 744/21 746/14 746/25

Here's [2] 593/11 653/18

hers [1] 658/4

hesitating [1] 461/15

hierarchy [5] 495/12 495/16 495/17 503/4 521/16

high [17] 447/11 516/15 524/4 564/18 568/2 593/20 598/20 644/19 645/4 648/10 648/14 648/25 649/17 649/19 649/23 662/23 705/23

high-risk [1] 447/11

higher [19] 475/21 480/13 480/18 481/3 481/13 526/8 541/15 573/3 573/16 574/1 590/4 590/15 592/16 592/17 679/11 679/13 702/8 702/11 702/15

highest [1] 644/21

highlight [1] 704/16

highlighted [4] 629/10 629/20 631/11 646/6

highlighter [1] 628/14

highly [4] 611/3 611/5 655/5 746/16

hiked [1] 739/12

Hill [50] 434/3 578/21 605/12 606/11 606/22 610/1 632/7 632/8 632/17 635/2 635/20 636/4 645/6 650/1 654/4 658/21 658/22 658/23 667/20 667/23 669/5 669/13 670/4 670/12 670/14 671/4 674/7 674/13 674/19 674/20 676/7 676/11 676/16 677/10 678/20 701/20 717/16 718/5 735/14 735/19 737/14 737/25 738/4 739/7 739/8 739/25 741/9 741/10 741/18 748/13

Hill's [5] 632/14 633/15 633/21 634/17 742/10

him [157] 480/6 485/2 487/19 488/6 502/15 503/17 503/20 503/22 504/1 504/8 504/21 504/24 505/10 505/11 508/19 509/13 509/16 511/8 515/10 517/15 519/13 519/14 519/17 520/1 520/11 520/12 521/12 521/1 521/12 521/13 522/25 522/25 525/13 526/1 526/14 527/25 531/10 531/20 532/25 533/16 533/21 533/24 534/6 535/9 535/10 540/20 540/20 540/24 541/2 541/3 542/17 543/21 544/1 544/3 544/8 544/11 544/21 544/24 545/5 545/20 545/21 545/23 545/25 549/9 549/10 549/16 549/22 552/8 552/18 553/18 553/21 553/22 555/15 558/1 560/19 562/7 564/17 565/1 566/3 568/22 572/23 577/2 581/11 582/19 583/3 583/11 586/17 591/17 594/7 605/24 605/25 605/25 606/14 616/24 635/4 650/10 653/19 656/8 659/25 668/2 668/24 671/24 674/8 674/24 675/15 675/23 675/24 676/20 676/25 677/11 677/13 682/6 708/12 708/15 708/18 708/20 709/7 709/24 710/1 710/16 710/18 710/23 711/11 714/8 714/10 714/25 715/10 715/15 715/17 715/17 715/17 717/5 717/5 717/23 718/5 718/8 718/13 718/18 722/25 725/13 725/21 728/7 728/24 729/6 729/9 730/6 730/7 730/10 730/24 731/2 735/8 737/16 737/25 739/13 745/12 746/21 748/6

himself [4] 486/1 486/7 524/5 562/4

hindsight [1] 739/12

hinges [1] 598/10

hint [1] 478/11

his [288] 432/7 448/13 456/16 459/1 461/4 462/3 464/13 466/9 467/11 472/14 472/22 473/18 473/22 473/24 474/6 474/8 475/21 476/14 480/4 480/8 480/11 482/14 482/15 485/4 485/4 485/5 488/13 492/23 494/5 494/6 494/12 497/13 497/19 498/8 498/11 498/20 500/15 500/18 500/20 500/21 501/3 502/9 502/25 502/25 503/1 503/9 503/13 503/15 503/16 503/21 503/23 503/24 503/25 504/3 504/11 504/21 505/7 505/13 506/20 508/15 513/14 513/15 513/17 515/11 516/25 517/15 517/15 517/16 519/12 519/17 520/6 520/13 520/14 520/21 520/24 520/25 520/25 521/1 522/3 522/4 522/9 522/17 522/20 523/6 523/7 523/7 523/7 523/8 523/8 523/9 525/1 528/5 529/2 529/13 531/7 531/9 531/16 531/19 533/20 540/21 541/5 541/7 542/16 542/23 543/11 543/14 544/25 545/24 546/1 546/20 547/4 547/5 547/18 548/9 550/6 551/23 552/4 552/9 552/10 552/14 552/17 552/21 553/18 553/25 554/4 554/12 554/12 554/13 554/17 554/21 555/18 557/22 558/21 558/22 558/22 559/1 560/8 560/9 560/10 561/17 561/18 561/21 561/23 562/1 562/3 562/4 562/10 563/23 564/20 564/22 565/13 565/14 567/4 567/12 568/20 568/22 569/11 569/18 569/20 569/20 569/25 570/6 572/23 585/4 585/11 585/16 585/18 586/9 586/21 587/20 588/6 589/11 589/12 590/15 591/12 591/20 592/4 592/17 592/17 592/18 593/12 593/22 593/23 594/17 594/22 595/7 595/10 595/13 596/2 596/11 596/18 616/10 616/24 622/6 623/25 628/4 634/7 632/20 636/3 643/14 644/7 644/18 646/4 650/13 650/13 650/16 650/21 651/9 652/22 653/1 653/1 655/18 657/7 659/3 659/17 662/21 663/4 664/8 666/13 666/19 667/4 667/5 668/22 668/23 669/2 670/20 670/23 671/12 674/21 675/13 676/5 676/19 685/20 686/4 699/7 701/21 707/15 708/5 708/6 708/8 708/8 708/8 708/9 711/1 711/2 711/3 711/9 711/10 711/25 714/5 717/23 718/12 719/15 721/11 721/13 721/18 721/21 721/25 722/16 723/11 723/20 724/5 724/6 724/8 725/6 725/7 725/10 727/20 728/12 728/14 728/16 728/18 728/23 730/4 732/9 732/12 732/17 732/18 732/20 736/1 736/17 739/9 739/10 739/19 739/25 740/23 741/12 744/23

historian [1] 531/16

historical [1] 679/1

historically [2] 711/2 711/3

history [13] 457/17 469/11 495/1 498/20 504/4 523/7 532/24 538/5 529/8 564/23 570/23 592/17 628/5

hitting [1] 591/8

hobby [1] 568/9

Hogan [2] 516/14 529/9

hold [1] 600/17

holding [2] 462/16 466/22

holidays [1] 534/3

home [12] 464/13 505/12 550/12 550/15 550/17 550/22 551/10 722/10 722/11 722/20 723/1 749/4

homes [1] 482/1

hometown [2] 717/24 718/3

HON [1] 429/11

honest [2] 487/24 646/22

honestly [3] 480/18 487/10 488/3

honor [35] 431/16 431/23 433/7 433/21 451/12 451/14 470/6 511/3 512/25 513/11 516/21 517/11 548/2 548/14 554/6 554/25 555/8 555/23 559/9 574/15 594/14 636/18 654/5 657/23 657/24 657/25 658/23 658/25 671/5 697/3 726/21 747/9 747/18 749/6 749/7

Honorable [4] 431/5 431/6 557/2 597/9

honored [1] 637/18

hope [11] 461/4 580/6 580/7 580/14 580/16 602/7 602/11 604/24 611/5 635/15 704/6

hopeful [1] 577/21

hoping [4] 438/1 580/19 685/15 685/16

hospital [1] 480/5

hospitalized [1] 522/1

hour [16] 432/8 464/7 513/13 556/2 558/10 744/1 744/2 744/4 744/5 744/16 744/17 745/13 745/15 745/19 745/19 745/22

hour-and-a-half [1] 513/13

hours [2] 432/12 612/24

household [2] 551/2 551/4

how [126] 437/5 437/5 438/12 438/21 438/25 447/24 447/24 449/17 449/24 453/21 457/18 461/13 466/2 472/14 472/17 473/2 473/4 473/14 474/10 477/5 477/9 477/19 477/19 478/8 484/15 484/16 484/19 484/19 485/1 485/15 485/22 486/22 487/22 488/3 492/7 492/19 496/12 496/20 501/3 501/20 501/22 502/13 504/18 504/25 505/18 505/19 508/25 509/1 509/3 509/5 509/9 509/14 513/16 515/24 516/1 516/1 517/17 520/9 523/9 532/22 534/19 536/13 536/13 540/11 542/2 549/22 550/12 553/17 553/18 553/23 553/23 554/5 554/18 558/3 562/9 562/21 563/6 563/22 564/8 567/14 568/7 569/25 570/8 573/19 574/8 575/2 579/18 584/5 587/13 596/25 602/5 602/7 602/11 612/14 626/19 626/21 645/2 646/21 647/19 657/25 658/25 660/1 660/3 661/9 664/14 671/14 681/5 685/4 686/16 696/5 706/14 708/5 708/5 710/22 714/21 724/14 725/16 726/5 727/5 727/6 731/23 739/3 743/16 743/23 745/11

however [12] 456/11 460/15 516/19 519/10 524/15 578/6 621/15 666/11 682/21 699/9 704/7 746/8

Hudson [1] 430/7

human [2] 471/10 644/14

humanity [1] 659/20

hundred [3] 468/20 612/20 615/6

hundreds [2] 457/21 612/18

hung [1] 505/12

hungering [1] 656/13

hygiene [2] 549/6 549/21

hypothetical [2] 472/15 492/2

hypothetically [1] 642/7

# I

I'd [11] 496/5 512/14 548/17 559/3 577/7 579/17 704/23 715/24 746/12 747/25 748/15

I'll [39] 432/12 455/6 476/16 495/21 499/17 526/17 562/6 565/20 579/16 580/1 586/16 595/15 604/10 610/2 619/4 620/23 622/12 638/3 640/2 640/20 640/25 641/4 650/12 651/15 654/6 661/11 664/6 671/2 674/17 696/17 708/13 712/11 712/18 721/5 727/12 732/23 738/10 743/18 747/6

I'm [187] 432/8 432/12 432/20 435/16 438/3 438/17 438/18 439/25 441/25 442/1 442/5 442/7 442/21 450/3 451/21 452/22 453/19 454/4 455/6 455/8 461/4 462/16 462/23 465/16 465/20 468/4 468/13 470/6 476/2 482/12 488/11 489/2 497/8 499/24 499/25 507/20 511/1 511/5 512/19 512/20 514/1 514/2 516/8 516/9 516/21 517/13 517/20 525/25 526/17 534/11 542/14 548/4 549/2 550/23 552/3 554/9

**I**

I'm... [131] 554/22 559/11
569/17 575/3 578/4 578/10
578/15 578/20 580/7 580/16
580/19 580/21 582/16 582/17
586/5 586/14 587/6 587/6 588/1
588/19 588/23 589/4 589/6
592/10 592/12 593/11 594/3
597/7 597/8 598/11 599/5 600/12
600/21 600/21 602/9 602/9
604/22 606/16 606/19 608/15
612/7 612/13 618/12 620/1 622/8
624/10 625/22 625/22 626/15
628/14 631/17 631/23 634/3
634/25 637/4 637/12 637/21
638/7 638/15 640/5 640/6 640/17
641/8 641/11 642/11 642/20
642/25 647/17 649/18 649/24
650/1 651/14 652/7 654/14 655/8
655/12 657/16 661/13 662/6
662/7 662/7 663/11 664/22 665/5
666/25 679/4 679/13 681/10
683/6 685/15 689/20 689/22
690/10 691/7 693/11 693/11
693/21 694/20 696/24 700/6
700/24 702/8 709/5 709/24
710/25 710/25 711/1 711/9
711/10 712/9 712/17 712/22
714/20 715/8 715/11 721/13
727/17 727/24 730/11 731/9
735/9 737/6 741/1 742/7 744/5
744/6 744/8 744/13 744/18
747/24 749/3

I've [29] 432/20 437/8 438/21
440/5 440/6 442/18 443/14 449/8
449/10 449/11 450/10 452/9
452/13 461/21 462/24 489/5
511/25 516/4 516/5 516/7 523/24
555/4 578/10 580/15 612/20
671/9 735/11 735/12 741/16
ID [4] 479/22 480/17 480/18
733/14
idea [6] 481/22 568/6 599/21
600/8 600/9 740/9
ideal [1] 649/4
identifiable [2] 437/4 480/24
identified [11] 436/1 457/18
471/20 475/19 479/11 483/6
518/8 518/9 518/15 552/23 710/5
identify [20] 461/24 486/20
493/25 501/8 501/25 508/24
519/2 530/4 692/2 708/18 709/16
710/15 712/7 712/21 712/23
712/24 713/1 713/3 713/24 714/8
identifying [9] 437/24 458/20
483/11 502/20 510/16 519/20
557/15 708/21 712/25
IEP [7] 497/19 502/7 502/16
502/23 552/4 564/20 565/21
II [3] 446/14 462/16 537/4
III [10] 650/16 663/22 665/4
665/4 668/24 670/14 670/17
670/24 672/3 696/13
illegal [1] 530/21
illiterate [6] 714/25 715/3 715/5
715/14 718/24 719/6
illness [2] 521/23 532/25
imagine [2] 548/10 620/8
immediate [1] 560/9
immediately [4] 432/13 481/2
496/22 562/1
impaired [15] 469/24 480/16

486/8 491/2 491/3 492/1 492/23
500/18 500/25 501/25 507/20
574/2 619/25 652/21 732/17
impairment [44] 457/13 459/3
459/5 465/4 465/19 466/11
466/19 466/23 473/1 479/8
479/10 480/12 480/22 482/19
490/13 501/10 509/24 510/1
519/20 523/13 528/16 538/3
538/7 538/9 538/11 538/17 539/1
542/10 549/3 550/15 551/18
560/22 560/24 562/13 565/9
566/3 567/20 567/25 570/14
572/1 572/5 620/1 624/3 632/10
impairments [5] 457/23 458/22
465/21 482/14 502/3
imperfect [1] 469/6
imperfections [1] 678/25
implement [1] 443/18
implemented [1] 459/16
implication [2] 482/13 518/24
implications [4] 445/17 521/24
603/5 619/23
implied [1] 510/4
implies [3] 492/13 625/18 678/15
imply [3] 495/19 632/12 656/19
implying [1] 485/7
importance [9] 467/18 481/19
487/1 496/20 506/8 521/21
558/17 715/23 715/25
important [52] 457/24 458/5
458/17 459/8 459/12 461/24
462/1 464/24 469/20 470/23
475/9 475/10 478/3 480/24 482/6
482/8 482/11 483/7 489/18
491/24 495/7 496/1 497/5 500/12
500/25 503/6 513/22 518/13
519/19 522/12 522/24 561/22
572/15 581/14 581/15 613/8
613/9 613/11 620/22 620/23
633/4 644/5 667/8 679/22 685/20
692/11 693/21 693/23 696/23
715/24 731/3 748/19
importantly [1] 540/18
impossible [2] 594/25 617/25
impression [4] 486/14 629/9
629/11 656/3
impressions [1] 706/22
impressive [1] 480/1
improper [3] 699/14 746/16
747/24
improve [6] 502/18 502/19 542/6
543/3 643/20 645/25
improved [6] 472/23 474/3
542/24 567/11 612/22 704/4
improvement [1] 722/10
impulsive [4] 562/8 563/22
650/15 653/3
inability [3] 547/4 548/9 563/17
inadequate [2] 551/1 734/18
inappropriate [14] 518/18 519/6
523/22 524/1 527/22 528/13
664/19 664/21 676/3 696/5
725/23 733/10 735/1 748/2
inappropriately [1] 678/19
incarcerated [13] 470/16 488/22
567/10 614/19 615/1 615/22
668/21 719/15 723/19 723/20
726/11 727/5 727/15
incarceration [3] 474/1 714/5
732/6
incarceratory [1] 724/21
include [5] 470/21 494/24 538/3

562/13 607/7
609/17 718/17 722/13 722/13
includes [2] 467/8 701/18
including [2] 468/6 570/18
income [3] 449/17 450/1 450/3
incompatible [2] 489/20 491/8
inconsequential [1] 678/16
incorporate [1] 622/9
incorrect [4] 494/23 604/1 634/8
670/14
increase [1] 676/5
incredibly [1] 523/22
indeed [5] 471/11 495/11 562/18
719/8 735/5
independent [5] 479/22 499/13
508/3 643/21 714/14
independently [2] 515/25 550/19
Indiana [1] 713/14
indicate [11] 475/11 477/25
483/3 503/13 521/23 531/15
540/8 544/22 595/3 606/17 655/1
indicated [14] 435/5 472/9
502/23 507/5 521/2 538/8 538/16
638/8 652/3 654/11 684/6 721/18
721/20 735/10
indicates [10] 469/9 491/24
496/23 508/6 538/16 587/3 620/6
634/10 677/20 719/14
indicating [4] 506/21 511/1
516/1 681/14
indication [5] 647/6 680/20
682/5 682/21 682/24
indications [2] 560/3 564/4
indicative [1] 631/18
indicator [1] 736/8
indicators [1] 734/19
Indirectly [1] 612/1
individual [26] 437/25 458/25
472/22 473/12 475/6 475/9
477/25 483/14 491/4 491/20
494/2 509/25 518/14 525/22
561/17 565/4 565/15 566/10
619/22 622/21 674/2 688/20
695/18 699/21 702/2 702/11
individual's [7] 460/5 464/9
472/3 492/5 503/8 525/18 726/11
individualized [2] 473/11 500/6
individually [1] 499/10
individuals [18] 437/9 447/12
458/25 467/10 467/11 467/13
468/22 479/21 481/3 492/25
515/15 519/9 537/24 557/10
639/19 681/7 702/19 738/13
inferences [1] 521/8
inflate [2] 626/10 626/12
influence [4] 491/14 499/11
596/5 694/7
influenced [5] 491/10 500/11
572/20 596/11 697/19
influences [1] 699/12
inform [5] 512/8 517/18 558/2
559/1 602/15
informants [2] 514/15 541/10
information [142] 443/16
443/18 446/20 454/8 458/2 464/1
464/5 464/11 464/18 464/25
465/1 466/21 467/1 467/5 467/21
467/25 468/11 468/16 468/19
468/21 468/23 469/2 470/1 470/4
470/20 474/15 474/15 474/17
474/19 474/22 478/9 482/23
484/18 487/1 487/2 489/8 495/24

496/1 496/23 496/25 499/6 505/3
505/7 508/6 508/7 508/7 510/15
510/8 510/13 515/9 520/9 521/3
522/21 523/10 523/12 527/16
527/18 528/2 528/10 530/9
530/12 530/14 530/17 532/17
532/20 533/1 534/4 534/22
540/20 539/7 539/7 540/8 540/8
540/16 542/8 542/18 542/20
544/7 545/6 545/11 546/23
546/25 551/23 553/13 565/12
565/19 571/14 571/14 571/20
571/22 572/4 577/17 577/22
581/5 581/25 581/25 583/14
583/23 584/2 584/6 584/6 596/18
599/10 601/1 614/17 614/24
638/7 638/20 640/3 658/1 666/18
677/5 684/5 693/7 693/25 696/22
706/12 706/13 707/11 710/19
710/22 711/23 712/17 714/3
723/9 723/14 724/12 724/14
724/22 727/14 731/3 733/6 734/1
738/9 738/16 738/20 738/23
739/2 739/3 739/24 740/24
741/12
informative [9] 468/25 473/6
473/22 518/17 522/19 526/12
667/2 667/3 722/9
informed [6] 488/19 488/24
598/13 671/14 725/6 725/7
infraction [3] 450/11 450/12
450/23
infractions [1] 451/10
injury [1] 521/23
inmate [1] 717/23
inmates [5] 492/22 492/23
738/10 738/11 738/18
inquire [3] 433/20 559/22 742/8
inquired [1] 527/12 742/3
742/22
inquiry [3] 477/19 742/9 742/10
insertion [1] 680/12
instance [11] 479/13 487/3
513/12 542/17 546/19 553/11
557/24 645/10 712/4 729/24
736/22
instances [4] 487/6 488/7 582/21
649/20
instead [5] 432/20 544/15 564/1
677/13 718/20
institute [5] 434/4 434/5 435/23
452/13 453/20
institution [1] 569/24
institutions [2] 439/7 439/10
instruct [1] 444/2
instructed [1] 668/12
instruction [2] 551/10 668/10
instructional [1] 518/10
instructions [1] 541/3
instructive [1] 557/25
instrument [14] 446/20 459/9
462/2 462/10 462/13 462/20
463/21 463/24 508/11 510/2
532/9 533/21 534/6 537/3
instrument's [1] 499/2
instruments [20] 446/17 462/18
462/22 462/25 463/18 468/16
469/6 477/12 477/13 477/16
477/17 486/19 507/21 507/24
508/2 508/22 524/11 534/23
535/3 689/9
insult [1] 519/23
intact [1] 544/18

# I

intellect [1] 593/21
intellectual [87] 435/13 437/5
437/6 437/10 437/19 438/13
440/4 440/11 440/22 441/3 441/8
441/10 441/18 442/15 447/7
447/12 451/13 454/14 455/18
456/9 456/11 457/10 460/17
464/10 471/11 473/7 474/13
476/7 480/14 480/19 485/10
485/14 486/2 487/13 489/11
489/21 489/22 490/2 490/12
491/1 491/7 499/21 500/24
506/12 506/14 506/18 520/19
522/11 535/18 541/14 541/24
542/6 545/1 545/12 545/22
563/16 566/17 571/7 571/12
571/25 572/11 573/2 573/14
581/22 588/17 592/18 604/1
614/11 624/4 624/4 624/6 629/17
636/5 639/9 640/10 643/3 644/25
648/16 652/13 658/7 659/13
659/22 660/18 677/17 679/11
711/12 711/12
intellectual-deficit [1] 652/13
intellectually [9] 487/20 498/23
499/4 571/24 572/9 574/2 581/18
587/18 587/21
intelligence [28] 458/22 466/4
484/13 484/24 484/25 486/6
523/2 525/15 534/16 534/20
536/4 536/13 563/11 566/9
619/22 619/25 620/10 620/17
621/3 621/4 632/10 644/13
645/13 645/14 660/7 660/12
695/19 734/8
intend [1] 492/12
intended [3] 482/13 486/20
724/18
intention [6] 476/8 476/9 579/24
579/24 699/23 699/23
intentions [1] 657/4
interaction [1] 552/6
interactions [1] 513/17
interest [16] 440/3 440/5 452/1
452/6 548/11 555/7 555/9 568/3
568/4 568/8 569/9 569/19 592/12
642/19 677/1 728/21
interested [5] 545/10 578/21
631/23 676/20 677/1
interesting [8] 483/7 522/3
568/23 668/9 673/21 676/12
677/11 677/16
interests [2] 483/11 568/23
intern [2] 435/18 438/19
international [1] 441/17
interns [1] 438/20
internship [1] 439/22
interpersonal [1] 479/14
interpret [2] 497/11 659/1
interpretation [15] 497/7 588/19
588/25 589/20 590/24 595/15
607/25 623/4 626/25 630/18
652/21 671/18 681/6 699/24
738/24
interpretations [1] 656/20
interpreted [9] 595/8 595/11
599/25 625/4 625/5 625/6 629/16
681/5 681/14
interpreting [1] 695/18
interrupt [2] 725/15 727/24
interval [1] 460/3

intervals [2] 632/4 691/2
intervene [2] 467/15 469/15
interviewer [4] 543/15 543/16
492/4 507/19 513/13 513/14
513/15 522/25 527/20 531/21
532/25 533/4 533/10 533/16
534/8 544/16 545/7 638/22
646/18 679/7 679/16 707/17
708/11 710/13 715/9 725/20
729/9 729/25 743/11
interviewed [34] 452/17 467/9
467/10 467/15 468/15 474/19
485/22 493/2 510/21 515/5
525/13 528/19 528/20 528/22
528/24 529/3 529/9 529/15
529/22 530/1 530/12 532/11
540/15 557/11 594/19 646/13
646/17 713/19 728/5 728/6
741/18 741/20 741/22 746/23
interviewing [13] 452/6 468/10
474/13 507/9 523/1 531/1 531/17
533/24 545/20 545/21 648/4
688/8 742/23
interviews [19] 485/20 507/3
507/19 517/6 522/23 539/8 540/4
543/10 543/13 545/8 563/18
571/14 706/1 706/4 707/12
714/23 729/5 729/13 730/6
introduced [1] 577/10
introductory [1] 486/25
intuitively [1] 465/12
invalid [10] 474/15 528/2 650/23
652/2 652/4 653/13 655/2 658/19
671/11 695/10
invalidate [4] 650/21 652/5
654/1 672/2
invalidated [4] 639/1 639/3
672/12 682/12
invalidates [1] 692/15
invalidating [1] 652/8
invalidation [1] 653/9
investigation [2] 463/23 650/4
invoked [1] 632/2
involve [3] 488/20 488/25
570/10
involved [19] 437/6 449/3
451/23 494/3 568/25 571/10
577/18 577/24 580/24 605/20
608/22 609/15 610/25 612/15
612/16 668/10 687/20 687/23
688/8
involvement [3] 530/16 608/21
654/9
involves [7] 467/19 483/9 483/9
483/11 483/12 483/14 570/17
involving [3] 450/9 452/15
605/24
IQ [166] 434/22 452/16 457/19
459/9 459/23 460/1 460/2 462/2
464/6 476/6 476/8 480/10 480/14
480/18 481/3 566/6 572/13 574/1
581/6 587/9 587/12 587/23 588/6
588/6 588/10 588/12 588/19
589/10 589/21 590/15 590/17
595/3 595/7 596/2 596/5 596/11
596/23 597/19 597/25 598/21
598/24 599/9 599/11 599/18
600/7 614/19 615/5 615/15 620/9
620/11 620/14 623/14 623/25
624/13 624/18 624/21 625/16
625/21 626/6 626/16 626/21
626/25 627/17 627/19 628/3
628/25 630/24 630/25 631/21
632/14 636/3 636/4 636/4 636/11

637/10 637/12 637/19 638/2
638/2 638/16 638/18 638/23
638/24 639/1 639/17 639/19
640/14 640/22 641/3 641/6 641/6
642/2 642/3 642/14 643/4 643/23
643/25 644/10 644/13 644/16
644/18 644/19 645/7 645/11
645/12 646/24 647/2 647/24
652/17 653/23 655/18 659/9
660/5 660/7 660/8 660/13 660/14
660/16 662/3 662/10 663/3 663/4
663/9 663/9 666/4 666/19 667/3
667/11 667/14 667/15 667/17
667/21 668/2 668/8 668/15 671/3
672/2 673/6 673/10 674/15
675/10 675/14 678/4 679/12
679/13 682/13 683/1 683/8
683/13 683/13 684/7 687/5
689/11 692/4 694/7 695/12
695/23 699/21 700/5 700/8
700/11 700/16 701/2 701/23
701/24 703/11 704/11
IQ's [3] 573/3 596/7 600/3
IQs [5] 628/15 628/22 636/23
639/12 639/15
irrelevant [1] 649/1
is [1046]
Isaiah [1] 520/21
Island [5] 439/5 585/19 713/13
713/13 720/16
isn't [16] 513/21 581/3 605/5
621/10 626/8 626/9 655/5 656/4
656/4 659/12 664/3 669/4 681/20
685/10 717/24 718/6
isolated [2] 471/16 480/1
isolation [1] 469/25
issuance [1] 611/10
issue [27] 444/6 449/6 450/9
494/17 513/24 514/13 514/16
518/3 521/4 521/4 522/11 525/1
555/5 561/6 572/8 584/25 587/2
637/22 641/11 684/3 684/4
685/24 702/20 726/13 746/9
746/24 747/1
issued [2] 449/14 607/24
issues [7] 437/2 443/6 445/18
446/2 559/12 603/6 603/24
it [681]
it's [258] 433/8 434/9 435/1
438/3 438/4 440/13 441/7 442/11
446/15 455/1 457/24 459/7 459/8
460/2 461/24 462/1 463/21
464/24 465/6 468/1 470/7 471/19
474/14 475/12 475/13 475/14
479/25 480/21 482/11 484/10
485/11 486/9 491/7 491/24
494/14 494/23 495/18 495/20
496/1 497/11 498/7 500/4 500/11
500/21 500/25 501/23 503/7
503/14 504/19 504/19 506/14
508/14 511/7 513/15 517/4 517/6
517/12 521/6 522/24 523/5
523/12 523/22 524/1 524/2
524/10 524/18 524/18 525/15
525/19 525/21 527/11 528/8
528/10 535/11 536/23 536/25
536/25 537/1 541/16 541/19
543/2 543/3 546/6 546/13 548/14
549/6 549/7 549/23 549/24 550/2
552/5 554/4 554/22 555/4 557/14
559/15 560/21 561/10 561/10
561/15 563/10 563/16 563/23
564/11 565/23 565/24 566/11

571/1 578/16 578/16 578/19
580/23 582/1 583/12 584/11
586/9 586/23 589/15 590/11
590/12 592/4 598/2 599/21 606/9
607/9 608/9 610/2 611/5 611/5
612/20 613/6 613/7 613/11
617/25 619/4 620/12 624/11
625/15 625/25 626/13 627/4
627/6 627/20 629/25 631/21
632/2 632/4 632/22 634/25
642/22 642/23 648/11 650/11
652/24 652/25 653/8 653/9
653/14 654/1 655/4 656/11
656/24 658/9 660/12 662/23
663/2 663/13 663/13 664/4 664/8
664/19 664/24 665/8 667/1 667/3
667/3 669/20 671/8 672/9 672/10
673/4 673/22 673/24 675/21
676/6 677/19 677/20 677/25
678/12 678/14 678/19 681/17
684/1 684/24 685/1 685/1 685/9
685/11 685/11 690/12 690/12
691/3 691/6 691/15 692/6 692/11
693/6 693/21 694/4 694/13
694/14 694/15 694/18 694/25
695/2 695/9 696/23 697/24 699/4
700/18 700/18 701/1 702/2
703/17 704/3 705/5 707/4 709/8
709/24 710/16 711/7 712/10
717/18 718/1 719/5 719/25 721/7
722/12 722/13 723/14 724/17
724/18 724/20 733/9 733/25
735/4 735/6 735/12 735/23
735/23 735/25 737/7 737/9
744/18 746/18 747/18 747/24
748/19
item [1] 535/9
items [3] 468/20 536/3 677/23
its [8] 436/14 445/7 473/25
484/17 507/10 508/4 684/3
693/25
itself [2] 458/10 699/21
IV [6] 429/10 538/1 659/12
659/21 659/25 671/3

# J

jail [6] 482/24 667/24 710/24
720/21 724/6 725/17
jails [1] 726/2
JAMES [21] 429/16 431/13
451/18 451/20 566/8 566/13
566/24 567/1 576/3 576/3 591/2
595/20 626/21 630/10 660/20
666/16 671/2 680/7 745/5 746/3
747/10
James' [17] 456/17 572/12
588/19 588/24 589/20 589/23
590/22 590/23 596/12 628/3
637/13 638/9 640/4 647/19
667/17 671/18 681/6
January [4] 435/7 654/20
662/10 672/14
January 10 [1] 654/20
January 2000 [1] 672/14
jibe [1] 606/20
job [25] 472/24 483/15 483/21
483/24 503/19 503/22 504/1
504/4 504/4 504/10 504/20
504/23 504/25 565/24 570/21
570/22 571/1 571/5 589/4 648/6
648/8 649/18 707/15 708/8 708/8
678/10
jobs [4] 503/22 571/9 571/10
678/10

**J**

JOHN [2]  433/13 433/18
Johnson [7]  430/18 430/20
565/15 566/5 566/8 566/20
749/21
jointly [1]  668/14
joking [1]  519/22
journal [5]  440/19 441/6 441/8
441/9 445/19
journals [10]  440/23 441/2
441/5 441/16 441/19 441/23
441/24 441/25 442/2 442/6
judge [18]  429/12 448/15 492/8
494/10 510/24 561/1 575/23
597/10 605/16 632/10 632/18
648/20 668/8 669/1 677/14
736/17 739/11 748/11
judge's [4]  457/6 539/18 736/5
739/15
judged [1]  510/22
judgement [10]  558/2 560/15
562/20 571/4 571/6 596/11
681/19 699/9 699/12 706/22
judgment [21]  469/3 474/20
474/22 488/5 495/6 496/2 522/9
523/11 523/13 532/8 532/10
550/18 552/8 552/19 552/22
625/7 626/14 640/4 640/6 663/25
688/18
Judi [3]  430/18 430/20 749/21
judiciary [1]  602/15
jump [1]  602/9
jumped [2]  581/10 665/2
jumping [1]  688/2
June [7]  529/15 529/22 530/1
530/6 532/11 533/4 533/11
June 23rd [1]  529/22
June 24th [1]  529/15
June 26 [1]  530/6
June 26th [1]  530/1
June 28 [1]  532/11
June 28th [2]  533/4 533/11
jurisdictions [2]  630/2 630/7
just [144]  431/23 432/19 432/20
432/24 434/17 436/15 436/18
438/8 446/19 453/3 457/2 465/16
466/3 471/21 475/4 477/19
478/17 481/22 485/25 487/22
488/3 492/4 493/6 499/24 502/2
508/25 509/5 512/13 512/21
513/17 515/23 516/18 516/19
519/18 522/3 522/6 526/22 539/1
539/3 539/15 539/19 543/13
544/13 544/14 544/20 545/6
545/13 550/1 550/7 551/8 553/4
554/4 557/14 557/15 559/11
560/19 561/16 567/13 568/17
570/3 572/4 573/9 576/14 579/6
580/11 581/3 582/10 582/25
586/3 589/9 590/20 594/10
595/20 600/1 600/12 600/18
602/10 604/3 621/12 621/13
622/11 624/11 624/25 627/5
627/11 627/16 628/14 630/18
631/24 634/3 635/4 639/4 640/2
640/19 640/24 642/17 642/23
646/6 650/12 653/4 658/2 660/16
660/17 661/13 663/13 665/14
665/15 665/21 665/22 666/4
666/13 667/12 671/2 672/13
672/15 673/24 674/17 675/25
677/19 681/24 686/11 686/25

689/5 689/16 689/20 689/21
689/22 690/1 691/10 691/11
692/2 693/20 697/12 701/1
707/18 714/17 715/24 717/6
729/15 733/12 733/25 737/18
746/5 747/14
justice [6]  494/1 522/14 555/7
555/9 613/11 614/5
justification [2]  696/10 697/16
justified [3]  595/12 599/22
600/10
juvenile [1]  719/19

**K**

Kansas [2]  439/22 439/23
Kara [3]  637/20 638/17 638/19
Karen [1]  614/16
Kathy [3]  584/1 591/6 744/24
Kaufman [1]  663/25
Kaufman's [1]  664/14
keep [12]  468/13 511/23 531/25
532/3 578/5 579/24 580/1 636/19
636/20 675/2 677/1 695/15
keeping [3]  450/25 489/7 612/24
KEL [5]  547/17 547/23 555/13
555/15 555/16
KELTAR [2]  430/12 431/14
kept [3]  498/16 583/18 666/25
key [7]  469/14 471/6 471/24
474/10 474/25 484/5 703/13
kid [1]  493/20
kids [2]  552/12 673/22
kill [1]  562/23
killed [1]  526/1
killing [3]  577/19 585/8 605/24
kind [23]  442/4 466/6 475/17
494/15 517/8 519/23 542/1 542/7
549/25 561/22 564/1 569/2 573/6
588/9 655/21 656/9 666/8 676/10
677/19 703/17 733/25 734/8
734/9
kindergarten [1]  498/8
kinds [8]  437/24 452/17 453/24
563/19 565/3 602/8 702/25
741/16
kitchen [4]  564/19 564/21
565/21 707/21
knew [11]  464/14 508/15 560/8
562/2 565/1 576/23 599/1 709/14
725/21 739/13 739/25
knives [1]  564/20
knocking [2]  435/16 671/14
know [179]  432/24 432/25 436/3
437/3 437/14 438/1 441/4 442/8
460/2 460/12 462/3 464/25
465/22 471/9 472/9 472/19
473/20 474/1 474/6 475/20
479/25 480/20 483/8 483/13
483/25 486/24 491/5 492/22
493/9 493/11 493/11 499/10
504/18 505/19 505/20 507/15
509/21 511/22 513/1 513/23
515/4 517/16 518/23 519/15
521/2 522/10 522/19 522/25
530/21 533/2 535/16 535/17
535/22 536/10 541/12 542/3
542/9 544/5 544/10 545/1 545/15
548/17 551/2 551/5 554/2 557/14
559/3 561/25 565/22 566/22
568/10 568/18 570/3 570/6 571/9
572/22 578/17 579/16 580/16
583/3 583/7 584/20 585/12
585/15 585/16 590/17 593/13

594/21 595/8 596/9 599/1 599/6
608/2 608/16 609/1 613/22 613/25
613/6 616/24 617/25 618/8
618/14 631/11 633/14 634/16
635/7 635/10 636/6 639/16
639/24 640/7 642/21 649/22
650/24 656/5 657/25 658/9
658/25 664/2 665/3 665/4 665/19
665/20 666/15 667/1 667/20
667/25 671/7 672/6 673/13 675/7
675/22 677/3 679/22 685/14
685/14 685/20 685/21 686/15
686/17 687/1 689/23 690/2
691/25 693/7 694/16 694/20
695/3 702/17 703/25 704/1 704/3
705/10 705/22 706/10 706/11
708/14 712/3 713/16 718/15
720/17 721/4 722/19 725/13
729/5 729/9 729/25 730/15
730/20 730/21 739/21 742/4
742/4 742/5 742/25 744/11
744/15 745/21 746/8
knowing [4]  504/25 599/18
633/16 634/18
knowledge [10]  508/9 510/12
510/17 569/21 590/19 711/22
714/15 724/20 733/21 735/10
knowledgeable [3]  514/15
697/22 705/10
known [14]  455/19 464/12
467/11 485/13 493/15 493/16
577/11 585/23 610/15 610/19
626/10 632/15 673/5 690/11
knows [6]  441/5 545/21 586/6
711/21 711/23 746/22

**L**

label [3]  437/23 499/12 500/2
labeled [4]  573/20 584/3 593/6
642/24
labels [2]  501/19 642/16
labor [2]  504/4 571/10
labyrinth [1]  480/7
lack [3]  654/8 699/13 700/8
lady [1]  536/14
Lafayette [1]  429/21
lagging [1]  432/19
landmarks [1]  718/6
language [17]  460/18 463/16
475/1 479/14 493/17 511/1
540/21 541/6 541/7 541/13
542/16 542/23 543/15 543/18
543/19 546/1 566/19
large [5]  473/3 485/14 517/1
615/15 641/9
largely [3]  531/2 532/19 532/23
larger [1]  611/14
last [21]  431/24 433/18 454/2
457/16 459/7 475/8 501/14
517/20 524/15 537/11 548/6
570/9 571/21 624/24 627/18
654/14 690/5 690/5 690/6 702/21
744/9
late [1]  748/9
later [16]  450/20 455/13 467/6
467/17 473/24 480/8 494/12
512/7 530/24 549/14 549/18
584/3 627/11 642/23 668/1
714/24
latitude [1]  555/4
law [3]  430/1 430/6 500/5
Lawrence [1]  697/10
laws [2]  482/20 528/12 528/13

528/15
lawyers [1]  449/6
lay [3]  511/18 511/22 607/14
lead [3]  484/20 503/18 518/25
leader [1]  572/21
leaders [1]  438/7
leadership [2]  436/8 557/23
leading [5]  483/16 504/23 523/3
529/8 570/18
learn [15]  472/7 474/3 474/7
498/3 518/12 531/23 534/22
549/10 550/4 553/23 554/5
560/10 635/8 643/18 723/25
learned [16]  447/6 465/24
465/25 473/19 514/23 540/9
564/12 635/8 635/9 635/14
635/16 635/23 658/21 703/7
736/14 736/22
learning [61]  474/7 490/17
499/23 500/6 501/3 501/13
501/17 501/20 501/24 549/24
567/11 587/4 588/7 589/12
591/20 591/21 593/22 616/1
616/5 616/11 616/16 616/20
616/23 617/1 617/9 617/23
617/24 618/1 618/6 618/9 618/12
618/13 618/21 618/23 619/5
619/6 619/8 619/16 619/20
619/22 620/5 620/9 620/14 621/6
621/11 621/17 621/23 621/25
622/4 622/8 622/15 622/20
623/21 623/23 642/7 642/11
642/18 642/20 642/22 642/24
731/19
learning-disabilities [1]  642/18
least [21]  458/9 459/3 464/22
468/22 472/22 477/24 503/12
506/2 508/3 523/14 532/24 538/9
538/17 557/25 559/12 610/9
647/6 663/25 685/15 689/2
719/12
leave [4]  579/22 612/2 631/7
724/17
leaving [3]  579/20 580/12
580/13
led [7]  452/7 520/23 553/2 572/4
592/1 592/1 738/3
Lee [1]  605/12
left [8]  477/6 549/13 549/18
550/25 620/21 632/7 662/2 730/6
legislature [1]  608/25
legitimate [1]  595/6
legitimately [1]  643/12
Leigh [3]  687/9 689/2 689/15
leisure [5]  567/22 568/22 569/18
569/19 569/20
lends [1]  445/7
length [1]  622/15
lengthy [6]  510/19 612/5 655/17
683/18 737/24 745/3
lens [3]  593/7 593/12 594/6
less [12]  437/22 438/18 500/7
507/1 517/7 544/2 614/19 624/8
625/20 677/16 703/22 706/22
let [22]  432/24 449/16 472/15
489/24 490/1 492/2 555/1 578/7
587/6 588/13 598/23 624/18
632/16 634/15 635/4 653/7 653/7
659/19 678/6 701/23 714/7
737/16
let's [19]  433/4 496/18 511/2
559/18 561/9 572/3 586/3 597/1

**L**

let's... [11] 617/15 618/5 625/10
625/20 627/16 638/14 638/14
661/2 661/19 677/8 696/25
letter [8] 544/11 544/13 544/18
544/20 544/21 583/7 583/7 690/1
level [18] 450/14 450/16 477/23
477/24 526/7 541/13 566/18
567/4 568/16 568/20 568/21
570/21 582/23 615/11 656/6
677/1 679/24 725/18
levels [2] 526/8 574/1
license [2] 450/15 450/18
licensed [6] 439/24 439/25 450/5
450/10 600/4 693/19
lied [1] 657/1
life [27] 458/11 464/13 470/15
503/15 525/11 561/18 561/21
561/23 562/10 562/20 565/19
565/23 566/2 579/18 625/25
645/8 645/17 654/9 668/22
719/15 731/10 731/12 732/9
732/12 739/9 739/10 741/13
lifetime [1] 644/11
light [11] 528/15 595/8 625/4
625/5 625/8 626/25 627/1 629/14
697/25 699/25 748/9
lightly [3] 572/18 656/18 656/19
like [98] 450/13 471/19 473/21
479/1 480/25 486/11 490/17
495/13 496/5 502/18 505/11
512/14 513/11 515/23 516/6
520/23 526/21 529/3 541/21
544/5 546/3 546/4 555/17 559/3
561/21 564/22 568/16 568/18
568/24 569/2 573/16 574/9 577/7
579/17 585/2 588/10 590/16
592/3 592/9 592/20 593/22
595/21 598/5 612/25 615/17
622/24 625/3 625/6 625/16
625/22 627/11 628/9 641/16
644/5 645/9 648/12 652/11
656/11 659/12 660/9 660/9
660/17 664/8 664/13 667/24
668/13 668/20 669/14 669/17
672/3 673/22 677/9 682/15
682/25 684/1 686/11 694/3
700/21 704/23 708/24 711/25
713/4 715/11 715/24 717/13
720/3 720/5 722/10 722/20
724/21 728/7 728/23 728/25
730/24 732/20 738/10 739/12
748/15
liked [8] 568/13 568/15 568/15
568/24 569/4 636/10 738/8 743/8
likelihood [1] 743/10
likely [7] 571/1 577/19 643/17
702/7 711/7 734/18 742/17
likes [1] 730/18
Lillian [3] 528/24 531/10 533/10
limit [2] 476/13 679/18
limitation [4] 458/21 479/3
479/24 560/16
limitations [12] 458/3 458/5
458/21 471/8 478/18 484/2
484/12 485/4 485/5 493/7 553/4
722/18
limited [11] 472/5 474/6 476/14
479/6 516/25 534/1 552/24 616/6
663/23 700/9 747/25
limiting [2] 514/2 699/13
limits [1] 566/16

Lindley [2] 529/15 537/5
line [5] 557/16 711/25 717/4
744/23
lined [1] 745/5
lines [2] 483/2 545/15
list [17] 456/12 465/5 524/18
528/19 539/22 557/5 557/10
557/13 557/14 557/15 599/23
627/19 643/3 735/8 737/5 738/22
744/25
listed [17] 441/24 459/4 467/6
467/8 478/23 505/23 507/25
508/1 509/20 521/16 522/14
524/15 527/5 527/17 537/4
570/19 713/4
listen [5] 555/15 555/16 558/11
561/1 654/6
listened [1] 555/11
listening [1] 554/15
listing [1] 435/3 506/25
lists [3] 497/20 517/24 528/20
literally [2] 486/16 681/2
literature [3] 474/13 573/14
611/3
litigation [12] 451/23 600/15
600/20 600/23 601/2 605/5
607/12 608/22 611/1 640/8
693/17 727/3
little [24] 468/14 478/21 501/16
544/6 575/4 589/4 600/17 608/19
608/24 616/1 617/7 617/15
630/23 637/24 653/5 653/6
661/12 669/14 679/20 707/2
710/14 714/17 720/9 731/24
549/19 550/19 561/22
lived [5] 529/7 562/8 714/6
714/15 714/19
lives [3] 457/16 457/20 686/15
living [21] 439/10 466/2 468/24
485/15 520/9 520/13 521/11
541/1 549/8 550/12 550/15
550/17 550/22 550/25 551/11
565/1 567/15 722/11 722/20
723/1 732/11
loading [2] 504/12 504/13
local [3] 497/7 591/9 611/13
locally [1] 614/7
located [1] 439/4
location [1] 714/12
locations [1] 709/22
locked [1] 720/23
locks [1] 606/24
logical [2] 486/5 486/10
logistic [1] 584/13
lonely [1] 656/13
long [14] 436/3 436/20 442/17
442/18 453/21 543/7 554/5
560/10 561/23 585/7 653/25
614/16 721/10 745/11
long-range [1] 561/23
long-winded [1] 436/3
longer [5] 525/17 560/11 643/21
646/2 677/25
look [59] 440/12 440/13 460/1
468/5 469/10 473/22 479/1 484/8
485/10 485/18 486/11 491/2
495/13 496/18 497/4 498/1 503/8
503/22 509/2 518/24 522/12
526/12 526/21 531/1 541/12
545/17 565/5 565/20 568/5
576/24 577/8 615/21 631/22
633/6 633/6 638/14 645/4 648/10

649/4 650/1 653/10 653/15
668/23/23 693/16 23 Page 6348 of 363 PageID
694/8 694/8 694/11 718/13
718/18 719/8 719/18 721/20
725/4 725/5 740/11 747/24
looked [15] 463/6 463/9 475/19
511/7 546/7 589/19 595/19
598/20 599/12 618/4 694/12
696/3 718/20 720/23 724/8
looking [38] 440/9 458/7 459/24
460/9 472/8 474/8 475/7 479/8
479/9 481/23 491/25 492/13
502/2 507/17 515/21 536/12
538/7 541/25 560/14 561/12
561/25 564/9 573/20 592/13
593/11 594/6 598/3 620/1 629/5
629/9 633/21 636/23 644/16
672/22 694/2 736/3 739/3 739/4
looks [7] 464/8 529/3 567/14
573/16 574/9 628/9 679/3
LORETTA [1] 429/14
lost [1] 586/14
lot [43] 436/24 459/8 459/15
459/19 482/23 483/9 488/12
491/10 498/22 503/8 505/21
509/20 514/21 516/18 519/18
519/21 522/10 523/5 523/6 525/9
544/10 545/14 549/10 555/3
555/4 555/4 565/3 569/3 569/15
570/18 571/2 571/6 583/20 596/6
596/7 599/14 622/24 644/3
662/25 739/10 739/24 739/24
747/14
lots [3] 520/23 536/16 583/17
Lou [2] 531/10 549/9
Louise [1] 533/4
love [2] 651/24 656/13
loved [2] 728/21 729/2
low [12] 466/4 480/10 484/13
484/24 484/25 523/2 524/19
563/11 567/9 596/7 644/20
654/23
lower [10] 566/19 598/4 615/5
642/8 699/11 702/1 702/4 702/8
702/17 704/10
lowest [1] 644/21
lucky [1] 745/24
lunch [6] 432/8 554/8 555/25
556/1 556/2 558/10
LYNCH [1] 429/14

**M**

made [61] 461/14 461/14 476/13
477/3 478/18 489/5 492/22 495/4
495/5 499/17 500/9 501/21
509/12 513/4 516/24 519/13
520/10 520/15 522/8 522/21
532/8 533/24 534/17 535/6 541/1
562/23 562/23 564/20 567/10
568/23 574/4 582/4 583/4 585/25
588/24 588/24 592/15 598/14
607/15 611/10 628/8 643/8
648/13 649/3 655/11 670/11
682/8 682/22 682/25 682/25
692/13 696/12 702/9 728/2
732/24 732/25 734/4 738/13
739/16 742/1 742/10
mail [2] 430/20 543/4
mailed [2] 584/15 584/18
mails [3] 488/20 489/5 584/10
main [3] 441/2 484/1 652/12
maintain [1] 451/2
maintaining [3] 522/9 551/2

564/13
majority [2] 453/10 728/5
make [72] 442/3 452/18 465/1
468/6 481/18 484/8 489/16
492/24 495/14 499/5 509/3
520/12 521/8 523/13 525/22
525/23 525/23 526/22 532/10
546/3 546/4 555/17 557/17 558/6
558/7 558/8 559/16 560/15
561/17 562/2 563/12 563/15
563/21 565/1 565/3 566/12
583/12 589/2 594/25 595/6
615/20 615/21 621/19 626/1
631/8 631/12 637/16 647/15
649/14 651/3 652/2 667/6 673/15
673/19 673/24 675/12 675/24
677/20 682/1 682/1 690/11
692/21 693/25 695/11 699/11
702/7 721/7 740/23 741/14 742/8
743/2 743/3
makers [1] 698/4
makes [6] 489/21 496/16 596/25
657/21 684/1 721/4
makeup [1] 614/11
making [24] 454/6 461/25
488/18 495/18 516/6 517/9
551/23 552/7 557/20 558/4
561/21 562/19 562/19 563/4
563/6 563/8 564/4 571/2 571/4
571/18 577/20 588/9 594/25
703/3
malinger [2] 705/13 705/24
malingering [4] 486/20 606/18
705/20 706/17
man [4] 480/2 526/1 527/21
588/15
manage [1] 551/4
manifests [1] 458/10
manipulate [1] 569/4
manipulation [2] 568/25 644/23
manner [3] 653/3 656/24 658/15
manual [49] 459/17 462/16
462/17 462/18 462/20 463/13
463/16 468/8 469/5 469/18
474/21 475/2 475/4 479/21
487/11 491/22 493/17 501/7
504/4 507/5 508/6 524/6 527/17
528/8 539/12 571/10 573/1
602/24 603/21 603/23 604/10
604/25 605/5 607/5 607/13
607/22 607/23 608/7 608/19
623/9 623/16 630/8 645/3 690/24
698/14 733/9 733/18 734/22
736/13
manuals [5] 467/22 468/8
510/15 530/10 561/10
manuscripts [1] 442/1
many [51] 435/25 436/10 437/14
438/4 442/13 447/21 449/1
463/22 467/8 467/9 469/3 470/2
485/20 491/16 495/24 495/25
496/4 497/8 497/8 497/8 497/15
500/4 501/19 509/23 518/14
524/20 531/23 537/20 541/18
541/23 543/14 544/12 561/16
563/15 568/12 572/21 578/2
610/17 612/14 618/3 619/20
620/1 644/6 678/7 684/6 684/12
684/13 723/9 723/10 732/15
732/15
map [18] 525/7 708/15 708/18
708/20 709/17 709/22 709/25

# M

map... [11] 712/7 712/16 713/6
713/7 713/25 714/10 715/15
717/21 717/23 718/4 718/5
Mapou [10] 461/4 461/8 461/13
461/18 616/17 616/19 616/22
621/15 621/19 621/25
Mapou's [2] 498/6 501/21
maps [1] 731/24
March [6] 583/9 583/11 583/13
720/17 720/22 740/16
March 10th [1] 740/16
marching [1] 669/3
marginal [1] 535/10
mark [4] 481/9 687/6 697/1
738/10
marked [4] 434/9 526/19 750/7
750/11
marriage [1] 529/13
Marriott [1] 749/1
marshals [1] 511/5
Mary [1] 439/17
Maryland [5] 460/6 575/19
575/21 575/23 577/13
Massachusetts [1] 439/5
master [1] 711/8
master's [1] 439/17
mastered [1] 526/10
masters [2] 450/14 450/16
masters-level [2] 450/14 450/16
match [1] 717/14
material [7] 434/8 434/14
444/16 477/23 489/3 548/16
559/16
materials [1] 689/10
maternal [1] 529/25
math [2] 565/23 675/22
matter [21] 464/16 495/18 514/1
579/10 579/11 597/23 605/3
605/19 625/25 626/13 641/11
646/22 648/5 666/22 675/14
675/21 676/6 700/18 710/11
749/13 749/18
matters [6] 453/8 476/2 584/16
626/2 678/21 680/25
maturation [1] 643/16
maximum [1] 475/5
may [53] 433/5 433/20 434/18
451/14 451/16 454/9 468/25
470/10 479/21 480/20 496/23
497/6 499/13 499/14 499/17
500/11 557/22 557/22 557/24
557/25 558/14 559/22 574/20
576/8 576/11 586/13 607/15
608/1 622/9 622/9 623/21 624/3
627/17 631/23 637/23 641/14
642/14 664/8 665/5 671/4 673/12
677/4 677/17 689/13 690/19
696/6 699/19 703/4 711/2 728/2
734/4 737/10 740/20
May 6th [1] 740/20
maybe [13] 453/23 455/13 492/6
501/17 569/24 592/18 694/21
706/25 712/18 713/4 717/7
743/25 745/13
MAYERLIN [2] 430/14 431/18
maze [1] 677/21
mazes [1] 677/19
MCGOVERN [15] 429/16
431/14 451/18 451/20 476/12
516/8 559/8 574/24 575/1 587/8
661/9 670/3 675/8 692/25 697/9

McMaster [2] 530/1 537/5
MDO [6] 741/25 742/3 742/11
742/2 742/19
me [123] 431/24 438/21 441/13
449/16 449/23 451/24 467/7
467/18 468/23 469/1 472/15
473/14 486/15 489/6 489/24
490/1 492/2 496/16 501/8 501/23
502/23 505/5 505/6 505/7 506/3
509/15 513/23 514/21 516/7
518/17 519/23 522/17 524/24
526/21 527/22 533/24 544/4
545/8 545/8 548/5 555/1 557/13
558/3 558/3 558/23 560/19
561/13 572/4 575/9 577/6 577/20
578/7 580/1 587/6 588/10 588/13
597/24 604/23 606/19 607/14
610/3 613/8 613/9 613/18 619/11
620/19 626/25 629/13 630/19
631/13 631/20 631/21 632/16
634/15 635/2 638/15 639/14
641/4 643/1 645/4 645/9 650/2
653/7 653/7 656/11 657/16
659/19 664/3 664/7 664/24 668/6
669/17 670/8 671/9 672/17
673/14 673/15 678/6 687/4
691/20 692/2 693/11 693/14
693/20 694/25 701/23 701/24
702/10 708/4 711/3 713/5 714/7
714/18 723/8 725/7 725/15
731/22 735/23 737/4 738/8
738/12 742/12 744/17
mean [75] 445/9 458/23 458/24
458/24 460/11 464/6 468/20
469/23 472/25 473/8 473/19
476/13 479/12 482/16 485/15
493/14 495/19 498/25 503/20
512/18 530/10 531/3 535/7
535/10 541/21 543/10 545/3
550/3 550/8 562/22 565/11
574/10 579/23 583/17 599/1
599/10 610/9 612/5 614/7 615/11
615/11 618/16 623/10 624/21
625/6 625/22 635/17 643/15
645/12 647/17 648/14 648/15
653/4 653/5 655/8 656/1 656/8
657/4 660/24 663/16 689/1
692/14 694/10 695/14 701/25
702/10 711/19 718/1 725/15
728/25 729/24 731/10 731/22
735/14 747/3
meaning [7] 435/12 471/1
550/17 587/21 683/25 688/15
724/15
meaningless [2] 723/24 723/25
means [21] 442/1 465/23 469/22
472/2 493/15 501/10 513/23
524/4 550/13 554/12 580/8
587/23 597/2 598/12 612/16
678/6 688/18 694/2 698/8 705/5
711/24
meant [9] 458/23 463/10 482/1
494/10 496/3 536/2 569/22
602/21 636/14 651/8 651/11
651/12 682/20 695/5 711/22
mentioned [58] 441/7 444/23
446/22 452/12 452/20 457/11
459/7 459/17 460/23 465/4 468/1
482/7 483/18 483/23 497/5
502/25 503/7 503/18 509/22
510/15 510/21 515/2 518/4
520/20 521/24 523/1 525/20
533/13 534/4 535/1 536/24
537/24 542/21 543/15 547/8

measuring [1] 660/14
measures [4] 458/19 469/6
521/17 521/19 521/21 521/22
522/1 522/7 522/9 591/12 628/5
687/15 693/11 746/15
medication [1] 516/19
medicine [4] 434/5 449/19
449/21 693/8
meet [16] 450/18 471/21 491/23
510/23 522/25 539/17 549/4
577/4 593/17 624/4 638/16
643/22 646/2 705/15 710/23
747/6
meeting [11] 502/14 523/14
593/7 593/13 631/1 634/1 674/2 706/8
706/9 706/19 706/25 731/24
meets [3] 467/20 652/12 680/17
member [2] 442/18 493/9
members [18] 444/4 449/20
474/17 486/23 486/25 487/6
487/12 487/18 487/25 520/21
540/15 562/7 563/19 564/15
612/9 727/21 728/2 741/18
memory [5] 510/5 510/17 605/7
673/7 706/17
meningitis [1] 521/25
mental [85] 435/13 435/20 439/8
439/20 440/19 442/16 443/12
444/24 445/18 446/3 448/14
449/9 452/8 452/16 453/1 454/14
455/19 487/9 500/1 500/2 500/7
501/15 527/22 527/24 532/25
541/11 541/17 541/20 541/23
570/4 570/23 581/12 582/15
582/19 587/4 587/24 588/3
591/24 593/7 593/13 594/7 595/1
595/11 596/14 597/21 600/5
603/6 604/18 606/12 610/15
619/3 619/17 619/19 619/24
620/5 621/11 621/22 622/4
622/21 622/23 623/7 623/11
623/19 623/25 628/10 629/7
630/1 630/21 631/9 631/15
631/19 632/25 633/1 637/1
639/25 643/13 645/4 645/16
646/5 663/17 666/12 732/16
732/18 740/23 746/21
mentally [49] 448/6 448/18
453/6 486/1 499/20 513/18
575/22 581/17 586/17 586/25
588/1 588/15 591/17 594/7
597/15 609/5 617/10 618/1 618/6
618/10 618/16 618/18 618/22
619/5 621/21 624/7 624/10
639/22 643/12 645/20 645/21
645/21 648/19 650/1 665/24
666/22 668/24 669/5 669/7
669/15 670/5 670/7 713/24
714/24 717/23 718/22 725/19
740/13 741/10
mention [14] 458/20 482/8
494/10 496/3 536/2 569/22
602/21 636/14 651/8 651/11
651/12 682/20 695/5 711/22
mentioned [58] 441/7 444/23
446/22 452/12 452/20 457/11
459/7 459/17 460/23 465/4 468/1
482/7 483/18 483/23 497/5
502/25 503/7 503/18 509/22
510/15 510/21 515/2 518/4
520/20 521/24 523/1 525/20
533/13 534/4 535/1 536/24
537/24 542/21 543/15 547/8

549/7 551/20 554/1 566/4 570/17
573/17 575/3 575/18 575/23
578/4 596/10 649/21 650/11
650/22 651/16 653/10 690/7
690/15 711/4 713/16 724/10
733/9 740/1
mentioning [5] 458/18 496/24
572/25 645/24 689/22
menu [1] 565/24
mere [1] 695/14
merely [1] 495/20
merged [1] 439/21
merger [1] 436/6
merit [1] 598/21
merits [1] 582/1
message [2] 433/1 493/3
met [21] 450/19 466/24 468/7
515/22 537/17 538/23 538/25
539/16 543/22 544/8 549/17
577/4 581/12 581/22 636/4 656/3
704/24 707/7 710/18 746/21
747/3
method [2] 696/5 739/17
methods [3] 734/10 740/5 740/7
metric [3] 459/22 460/21 542/2
MICHAEL [3] 430/1 430/3
431/17
mid [1] 668/23
mid-30's [1] 668/23
middle [5] 512/20 570/4 578/10
578/12 628/15
might [34] 459/11 465/7 475/15
482/16 492/11 501/12 521/23
540/7 544/9 548/11 558/2 559/13
562/11 572/17 579/18 580/11
580/11 590/11 590/15 596/11
599/25 612/11 626/2 626/19
626/20 627/8 630/13 675/1
676/20 683/19 694/12 694/22
697/20 730/22
mild [17] 471/11 480/19 480/20
480/21 485/14 499/21 500/24
542/9 545/1 545/12 566/16
570/22 571/7 571/11 619/17
620/5 622/4
mildly [1] 617/10
milk [4] 522/5 522/7 564/25
565/1
million [1] 615/1
millions [1] 614/25
mind [13] 473/16 488/16 494/9
499/7 513/12 525/14 568/24
600/10 672/1 672/7 672/22 673/1
701/11
mine [2] 630/14 660/21
minimal [1] 501/18
minimize [2] 493/23 711/20
minimizing [2] 546/1 715/23
minority [4] 486/9 494/16 500/1
690/13
minute [4] 456/3 465/14 511/2
661/2
minutes [4] 636/20 676/17
691/20 691/20
misadministered [1] 647/20
misapplication [1] 636/15
misbehavior [1] 490/7
misheard [1] 637/5
misleading [7] 474/15 480/21
484/14 484/20 497/23 681/18
734/1
misrecalling [1] 633/24
misrepresenting [1] 705/21

**M**

missed [2] 519/18 607/15
Misstates [1] 637/21
mistake [3] 515/12 563/15
701/22
misunderstand [1] 580/3
Mitchell [1] 546/19
mix [6] 553/14 666/25 667/6
667/9 667/15 718/22
mixed [12] 466/21 548/25 550/3
550/7 550/10 551/23 553/13
554/3 554/20 560/2 560/5 560/18
moderately [1] 480/16
moment [8] 453/3 486/4 557/4
571/3 582/18 582/20 610/3 662/9
money [13] 449/22 450/1 505/1
551/5 551/6 555/5 562/9 579/7
579/7 579/10 611/23 612/7 695/9
Mongoloid [2] 440/16 440/16
Monica [10] 503/24 505/9 529/3
537/4 549/20 550/25 568/12
728/11 729/25 730/1
moniker [1] 730/18
month [2] 583/4 607/4
months [6] 522/1 567/3 609/3
662/15 720/13 720/17
morbidity [1] 621/20
more [129] 437/23 439/10
441/10 446/20 452/9 459/15
462/23 462/24 463/12 463/24
464/17 464/19 467/13 467/15
467/25 469/25 471/19 473/6
475/21 476/24 480/15 481/18
482/3 491/16 491/22 496/16
496/23 499/6 500/19 500/23
502/19 507/12 507/16 510/6
512/21 513/7 518/17 522/19
527/15 528/14 528/15 530/25
536/9 540/18 540/22 544/3 544/9
545/14 545/16 546/17 551/24
561/15 563/16 564/3 566/18
567/11 569/14 571/1 574/5
576/10 584/13 597/8 604/16
608/20 612/16 614/18 615/4
619/21 623/9 623/16 626/13
627/8 629/16 636/20 640/14
641/17 642/3 643/21 644/23
649/4 651/23 653/5 653/6 658/1
659/2 661/9 661/12 663/11
666/16 666/19 666/21 666/22
666/23 673/19 673/21 673/24
674/5 676/11 677/11 677/13
679/20 684/7 684/19 684/24
685/6 685/9 685/11 685/14
685/16 686/19 687/4 694/6 694/8
705/10 705/11 710/15 721/5
722/21 723/14 726/10 727/14
731/22 740/4 740/6 740/8 741/16
743/19 743/24 745/5
more.' [1] 674/25
morning [15] 431/16 431/21
433/15 433/24 433/25 434/19
511/4 561/4 603/5 605/8 606/6
606/14 613/19 638/15 749/9
most [50] 443/17 450/13 455/24
459/12 465/1 468/22 495/13
499/10 506/25 508/1 515/8
520/20 521/24 522/24 526/13
529/7 530/11 531/6 545/7 549/4
565/12 581/14 604/25 609/15
609/17 611/7 614/4 636/25
637/15 638/8 643/17 645/18

648/2 664/1 666/5 668/21 679/1
693/17 696/11 705/24 712/13
721/17 721/21 723/3 726/8 730/7
732/2 734/10 742/17 743/6
mostly [5] 439/6 522/17 610/19
685/1 707/4
mother [9] 480/8 503/23 521/1
530/7 530/8 530/13 532/24 533/8
728/14
mothers [1] 530/11
Motion [1] 455/17
motivation [3] 485/6 491/11
705/24
mouth [3] 604/23 650/13 653/1
move [9] 457/6 516/22 561/9
574/15 580/20 590/20 594/10
683/6 704/23
moved [3] 470/7 516/18 527/14
moving [10] 432/22 438/17
503/4 551/3 570/7 580/21 592/12
658/2 693/1 693/6
Mr [129] 432/19 433/25 434/21
454/3 455/25 459/14 462/6 462/8
465/16 466/8 467/10 467/11
468/24 469/15 469/19 470/15
472/12 475/10 475/18 476/12
477/6 477/16 480/23 481/4 481/5
483/1 483/18 485/3 485/22
486/14 487/18 488/1 488/4
488/12 488/21 488/25 493/4
496/13 497/25 499/16 500/11
500/18 501/9 502/23 503/9 505/3
505/5 505/7 505/21 508/15
509/14 510/6 511/3 511/6 511/13
516/13 516/14 518/5 518/10
518/15 519/3 520/4 520/15 521/9
522/8 523/16 523/21 525/12
526/2 528/5 528/22 529/2 529/6
529/13 529/19 529/25 530/5
530/7 530/17 531/1 531/13
531/19 531/22 532/15 532/24
533/3 533/8 533/14 533/20 534/1
534/17 537/16 539/16 542/11
542/15 543/22 546/20 549/1
549/7 550/23 551/10 551/17
551/21 553/16 554/22 555/11
559/24 574/24 587/8 608/22
620/4 620/15 631/25 661/9 670/3
675/8 692/25 697/9 718/4 724/13
740/11 742/11 742/11 742/12
746/20 747/18 747/23 748/23
749/1
Mr. [99] 433/5 473/17 484/16
485/21 498/8 502/14 516/8
524/24 531/7 532/23 557/5 557/9
558/10 559/8 561/19 563/20
564/3 564/16 565/21 566/1
566/14 567/24 568/3 568/13
569/18 569/24 570/13 571/9
571/24 572/21 573/6 573/19
574/8 574/13 575/1 575/6 575/12
575/14 575/16 575/18 575/21
575/22 576/24 577/2 577/4
578/25 581/6 581/22 582/14
583/2 583/14 592/13 594/16
597/15 603/4 606/11 617/9
617/14 619/2 619/11 619/11
629/6 632/8 632/14 635/2 636/4
644/6 669/5 670/14 674/13
674/20 676/16 677/10 681/11
689/18 696/24 698/16 707/15
710/13 712/23 714/22 714/25
715/8 715/14 715/20 717/3 718/5

718/8 718/24 719/13 721/19
720/20 723/4 735/18 738/3
739/8 739/25 741/10 742/10
Mr. Barnes [1] 532/23
Mr. Burt [21] 433/5 557/5 557/9
575/6 575/12 575/14 575/16
575/18 575/21 576/24 577/4
578/25 592/13 594/16 603/4
619/11 696/24 714/22 715/8
719/13 721/19
Mr. Burt's [1] 619/11
Mr. Davis [5] 575/22 715/14
715/20 717/3 718/24
Mr. Davis' [1] 714/25
Mr. Drezner [1] 681/11
Mr. Flynn [1] 689/18
Mr. Giglio [2] 564/3 724/23
Mr. Hill [16] 606/11 632/8 635/2
636/4 669/5 670/14 674/13
674/20 676/16 677/10 718/5
735/19 738/4 739/8 739/25
741/10
Mr. Hill's [2] 632/14 742/10
Mr. McGovern [3] 516/8 559/8
575/1
Mr. Oakland [1] 698/16
Mr. Stern's [1] 558/10
Mr. Umana [1] 597/15
Mr. Wilson [32] 473/17 498/8
502/14 524/24 531/7 561/19
564/16 567/24 568/3 568/13
569/18 569/24 570/13 571/9
571/24 572/21 573/6 573/19
574/8 577/2 581/22 582/14 617/9
617/14 619/2 629/6 644/6 707/15
710/13 712/23 718/8 724/25
Mr. Wilson's [10] 484/16 485/21
563/20 565/21 566/1 566/14
574/13 581/6 583/2 583/14
Ms [3] 728/7 742/16 742/17
Ms. [32] 451/3 504/7 505/6
505/6 505/14 521/11 531/12
540/25 553/17 569/1 569/7 576/3
577/5 577/6 577/7 577/10 577/10
577/12 584/2 655/19 656/4
657/12 657/12 657/13 657/13
676/24 677/3 677/15 681/13
682/4 682/13 746/1
Ms. Barnes [1] 532/23
Ms. Brady [4] 577/5 577/6 577/7
577/10
Ms. Cook [9] 504/7 505/6 505/6
505/14 521/11 540/25 553/17
569/1 569/7
Ms. Drezner [8] 655/19 656/4
657/12 657/13 676/24 677/15
681/13 682/4
Ms. Drezner's [2] 677/3 682/13
Ms. Greenman [2] 577/10
577/12
Ms. James [1] 576/3
Ms. Nagler [2] 657/12 657/13
Ms. R [1] 451/3
Ms. Yates [2] 584/2 746/1
much [54] 433/9 433/21 435/22
437/5 449/17 457/7 465/12
476/19 496/20 519/1 525/16
531/5 531/19 533/1 533/2 544/17
545/4 553/19 569/17 574/12
589/23 590/21 591/1 609/9 612/6
626/11 626/13 639/24 642/17
657/9 660/9 660/9 661/9 661/18
667/24 668/20 669/14 669/17

718/8 718/24 719/13 721/19
739/8 739/25 741/10 742/10
684/19 685/10 686/5 686/16
689/8 697/21 706/10 712/16
727/13 731/20 739/3 743/16
743/22 743/24 747/16 749/8
MUI [2] 430/12 431/14
multiple [5] 600/19 608/19 660/5
690/15 742/19
multitude [1] 687/20
murder [4] 547/24 554/10
605/21 605/23
murdering [1] 605/25
murders [8] 547/17 547/19
547/25 548/10 554/19 555/13
555/22 557/24
Murphy [1] 585/19
must [5] 459/9 459/22 492/9
630/23 713/10
mute [1] 546/14
mutually [1] 740/3
my [148] 432/7 434/3 434/5
434/20 434/20 435/11 435/17
435/22 437/8 438/22 439/21
442/3 443/10 449/19 450/4
450/20 450/22 452/1 452/1 452/6
452/7 452/20 455/9 462/5 465/11
466/14 466/18 466/18 467/8
468/5 468/9 468/9 473/25 476/14
476/25 477/8 485/20 486/3
486/14 486/17 488/8 488/18
493/12 493/16 495/18 495/18
498/19 499/11 501/25 503/12
506/20 508/8 508/11 510/19
513/12 515/14 515/16 516/7
524/14 524/18 525/20 526/16
527/1 536/15 538/4 544/1 544/4
544/11 544/24 545/7 548/25
550/15 551/17 554/20 558/16
565/8 567/24 570/12 577/5
578/11 578/19 579/18 579/24
579/24 580/14 580/15 581/24
584/12 584/12 584/18 584/19
585/1 588/9 588/11 589/4 589/19
593/11 599/7 599/25 600/10
605/7 605/10 607/25 608/5 608/6
611/20 621/17 626/24 629/15
630/5 632/12 633/8 635/9 636/16
637/13 638/8 640/25 642/1
646/24 656/3 656/21 659/16
664/4 665/16 673/7 674/22
679/18 679/21 691/8 699/23
699/23 703/19 703/21 705/4
707/17 709/4 710/4 714/19 717/2
717/25 724/22 726/7 737/13
737/19 742/7 748/23 749/3 749/4
myself [7] 452/21 501/13 572/11
578/11 579/11 617/23 744/9

**N**

N.Y [1] 429/5
Nagler [17] 641/7 641/13 646/9
647/9 651/4 652/6 655/16 656/12
657/12 657/13 657/13 657/15
657/18 658/12 658/12 672/24
704/19
Nagler's [8] 650/7 650/10
650/20 662/5 662/6 662/8 662/20
673/3
naive [1] 572/20
naivety [2] 552/16 572/24
name [11] 433/16 433/18 436/15
436/21 441/7 445/7 447/11 455/9
461/4 545/9 698/24
names [2] 557/15 706/15

**N**

narrow [1] 619/23
narrowing [2] 703/24 704/5
National [2] 712/4 712/14
nationally [1] 731/5
nature [4] 449/19 520/18 644/13 745/2
near [3] 438/21 455/25 545/19
nearly [2] 574/12 652/3
necessarily [5] 507/14 542/23 592/3 711/22 711/24
necessary [5] 471/1 479/4 483/23 497/16 632/15
necessity [1] 595/3
need [15] 432/16 434/18 479/17 490/25 494/1 495/17 512/4 512/9 513/6 604/11 604/12 623/16 637/7 651/23 748/16
needed [7] 526/3 535/6 553/21 652/5 652/6 715/17 730/7
needs [5] 513/8 554/23 610/10 624/1 710/22
neglected [1] 722/8
negligent [1] 530/20
neighborhood [1] 560/9
neighborhoods [1] 482/1
neighbors [1] 507/3
neither [1] 516/11
neuro [1] 744/24
neurodevelopmental [1] 436/8
neuropsychological [3] 588/8 589/13 747/5
neuropsychologist [1] 594/4
neuropsychology [2] 600/18 600/21
never [32] 493/5 506/9 516/4 516/5 551/11 564/19 579/14 580/15 582/19 582/23 584/15 584/21 584/21 591/24 612/14 612/20 613/15 621/10 650/24 684/15 684/16 684/17 703/10 725/9 725/12 725/16 738/23 742/22 743/12 746/16 746/21 747/3
nevertheless [3] 474/7 480/14 574/1
new [36] 429/1 429/15 429/16 429/21 429/21 430/7 430/7 431/4 499/25 518/9 563/5 569/19 577/18 578/6 578/24 585/8 591/2 591/9 592/25 603/20 603/24 663/19 683/6 683/11 683/20 686/15 704/23 709/19 709/21 712/7 712/16 712/24 713/14 718/4 743/15 743/16
newer [2] 614/24 622/9
newspapers [1] 487/8
next [48] 431/22 432/5 432/19 433/5 434/8 447/4 457/25 458/13 463/17 466/25 469/5 475/4 478/17 478/21 480/13 481/11 481/22 487/11 489/12 491/9 491/13 494/18 494/22 503/4 506/24 507/20 510/10 510/11 517/21 517/24 521/16 528/4 529/20 533/10 537/11 538/1 538/12 556/4 561/9 601/4 641/20 642/1 669/24 716/2 726/13 737/22 744/20 745/17
NGG [1] 429/4
nice [3] 536/14 537/1 655/23
NICHOLAS [4] 429/11 431/5

431/6 557/2
night [6] 546/15 547/3 547/24 555/13 555/21 557/24
nine [4] 541/20 600/7 642/25 744/7
Nintendo [1] 569/15
ninth [1] 567/22
nitpick [4] 678/5 678/6 678/15 679/3
nitty [1] 628/13
nitty-gritty [1] 628/13
no [142] 431/8 448/16 449/22 451/11 455/15 461/14 472/17 477/18 478/11 479/19 486/3 487/21 488/6 489/15 490/25 490/25 497/2 501/17 503/12 523/17 524/1 525/16 536/8 539/5 548/1 554/17 555/25 559/9 562/7 568/19 574/18 575/17 577/10 579/23 580/21 581/7 582/18 582/20 586/5 586/19 593/5 594/23 594/23 595/10 605/10 606/4 608/8 608/17 608/24 609/17 610/24 611/16 612/5 613/14 616/13 617/17 619/6 619/14 621/19 623/16 623/19 626/10 626/18 627/4 630/9 630/22 631/20 633/16 633/17 634/18 634/19 636/2 636/16 637/5 638/21 638/22 641/8 642/16 643/21 645/11 646/2 648/20 649/13 649/13 649/18 650/3 654/6 656/19 657/2 660/15 666/19 666/25 670/18 671/10 671/20 674/25 677/12 677/25 680/1 680/20 682/21 682/24 688/24 690/25 691/1 691/21 691/23 693/10 693/21 694/19 694/20 696/9 697/5 697/15 701/14 703/6 703/8 706/21 708/10 710/25 711/18 713/15 714/3 714/16 722/22 727/11 729/4 729/7 730/21 731/13 732/22 733/23 735/18 736/20 737/9 737/18 739/3 741/1 742/20 746/22 749/6 749/7
nobody [5] 653/23 653/25 659/9 680/4 742/1
nod [1] 510/24
nomenclature [1] 497/9
Non [1] 440/16
Non-Mongoloid [1] 440/16
noncapital [1] 614/9
none [2] 594/6 692/19
norm [7] 462/1 492/17 492/24 506/7 524/2 525/9 731/5
norm-based [4] 462/1 492/17 506/7 525/9
normal [2] 486/11 493/4
normative [1] 747/24
normed [8] 508/25 670/23 683/15 683/16 684/11 704/16 704/19 732/13
norming [1] 695/15
norms [7] 508/4 508/23 509/2 509/7 510/3 526/5 695/10
north [23] 434/2 435/20 435/23 436/5 439/11 439/25 450/6 450/13 451/5 454/25 578/20 597/4 608/25 609/9 610/20 610/22 640/7 709/14 710/2 713/25 714/4 714/6 743/6
northeastern [1] 454/25

not [526]
notation [2] 569/23 569/24
notations [1] 476/22
note [5] 431/10 558/23 651/6 651/23 653/13
noted [23] 443/10 457/14 473/18 488/8 491/15 491/21 492/16 501/7 511/10 515/11 530/10 531/25 544/1 544/11 552/5 583/19 641/5 643/17 652/22 661/5 700/1 710/3 749/11
noteworthy [1] 473/13
nothing [4] 472/19 568/10 621/22 675/19
notice [1] 470/21
noticed [2] 746/11 746/16
noting [3] 528/14 551/1 681/24
notion [2] 454/7 735/4
November [11] 429/8 529/10 529/16 530/2 530/6 533/11 533/16 597/6 720/10 720/22 749/13
November 11 [1] 530/6
November 11th [1] 530/2
November 12th [1] 533/11
November 14th [2] 529/16 533/16
November 17th [1] 529/10
November 2002 [1] 720/22
November 30 [1] 597/6
now [98] 431/4 431/5 435/13 435/16 437/20 438/17 439/21 440/2 441/7 443/2 443/19 447/15 447/18 448/23 449/3 449/13 452/24 456/24 460/6 460/23 466/25 467/22 472/7 474/10 474/25 480/10 486/15 488/19 494/3 494/25 496/9 497/21 498/21 500/9 500/19 503/4 505/23 508/14 516/4 518/19 521/16 523/10 524/20 524/25 526/5 527/5 527/14 527/22 528/18 530/8 530/25 532/16 537/3 542/11 547/11 548/21 565/1 571/13 582/6 585/24 588/10 590/14 593/19 594/15 596/13 599/1 599/6 608/18 609/10 611/4 611/8 620/15 628/18 633/13 633/14 634/15 646/20 654/4 665/3 666/15 667/1 672/17 672/20 673/5 676/6 685/14 694/6 707/11 710/23 713/12 714/14 715/23 717/18 720/21 735/11 736/3 740/4 744/4
number [26] 449/17 463/17 465/14 485/14 485/16 499/18 499/21 499/22 507/8 510/3 515/6 524/18 526/24 553/11 561/13 596/8 614/22 615/18 626/13 627/5 636/25 648/13 692/8 696/25 705/22 733/12
numbered [1] 466/15
numbering [1] 495/17
numbers [6] 495/19 501/2 644/23 680/21 692/21 741/3
nutshell [1] 474/14
nyed.uscourts.gov [1] 430/20

**O**

O-L-E-Y [1] 433/19
Oakland [3] 523/24 698/16 698/17
oath [3] 514/11 559/22 661/23
obeys [1] 479/15
object [7] 516/21 586/5 586/19 631/3 637/21 677/22 712/9
objected [3] 588/9 608/2 733/3
objection [14] 455/15 475/24 475/25 476/1 574/17 574/18 574/20 598/16 640/20 680/11 692/18 697/4 697/5 697/7
objective [5] 496/24 497/22 697/21 706/23 731/3
objectively [2] 478/10 497/3
objectives [3] 497/20 502/21 502/23
objects [1] 568/25
obligated [5] 452/23 578/10 578/13 579/11 579/18
obligation [3] 435/17 438/23 578/14
obscure [1] 694/5
observation [2] 703/3 703/4
observations [5] 651/18 653/11 653/18 655/14 657/21
observe [1] 655/12
observing [2] 509/13 527/25
obtain [5] 468/16 483/24 633/10 645/2 652/22
obtained [3] 637/15 643/10 684/7
obvious [6] 465/12 481/18 678/23 679/3 729/2 729/4
obviously [8] 558/20 582/3 582/12 600/9 662/2 706/9 708/20 718/2
occasion [2] 450/18 693/14
occasionally [1] 442/5
occasions [6] 469/23 608/19 690/15 705/22 707/8 707/10
occupation [1] 434/1
occur [1] 617/13
occurred [2] 510/6 741/12
occurring [1] 617/11
Ocean [5] 710/3 710/5 710/6 712/21 712/23
October [5] 606/8 606/8 606/9 607/16 607/17
October 7th [2] 606/8 607/17
odd [2] 549/8 550/3
off [10] 455/9 513/12 514/2 532/5 534/25 555/6 612/23 631/7 662/2 681/22
offending [1] 624/10
offer [7] 451/12 626/18 638/5 638/19 640/9 693/1 697/3
offered [5] 591/15 626/24 632/10 640/15 682/11
offering [2] 637/1 746/15
office [9] 430/1 430/6 431/19 558/10 577/13 585/13 612/24 748/23 749/3
officer [2] 527/20 527/23
officers [5] 527/6 527/11 577/19 739/24 742/13
official [3] 430/18 497/7 749/21
offset [1] 480/11
often [6] 545/8 563/23 570/23 626/11 726/4 727/8
oh [14] 442/18 455/13 496/11

**Q**

oh... [11] 516/18 557/17 578/13 615/17 657/16 663/20 672/20 695/14 735/9 737/25 745/21
Ohio [7] 448/2 454/22 454/24 454/25 487/5 605/11 718/5
okay [217] 432/17 435/8 438/24 440/1 440/8 441/12 445/12 446/7 447/3 448/22 450/5 453/11 454/1 454/17 455/14 456/11 456/18 456/23 461/8 461/12 463/5 463/15 466/7 466/25 469/13 471/5 471/23 474/9 474/24 478/16 481/6 481/22 482/14 489/10 490/6 490/9 490/15 490/19 491/9 500/13 502/6 506/24 507/23 514/5 517/22 524/15 525/11 526/18 527/1 527/4 528/3 532/11 539/9 540/6 542/5 543/8 547/2 547/10 548/21 553/7 559/6 559/21 559/25 560/23 561/15 570/9 571/22 573/23 576/11 576/17 577/24 578/24 579/20 580/18 580/22 581/5 581/15 582/3 582/9 582/13 582/17 583/6 584/10 584/21 584/24 585/3 585/7 586/1 587/21 588/5 589/4 589/9 589/16 589/22 590/20 592/12 592/21 593/25 594/13 595/2 595/13 602/14 603/2 604/3 604/18 605/3 608/11 608/13 608/15 608/18 609/8 610/8 611/7 611/17 611/22 613/10 613/12 614/25 616/1 622/11 624/7 626/15 627/16 630/16 637/8 639/14 639/20 640/13 640/13 642/1 646/8 647/12 650/6 650/9 651/10 651/21 652/10 653/20 654/4 654/7 657/20 658/11 659/4 661/14 661/19 662/13 663/1 663/6 664/6 664/10 665/17 667/3 667/23 668/17 668/19 669/12 672/8 676/16 677/7 679/16 686/18 687/2 691/10 693/8 697/15 698/11 700/2 701/9 704/6 704/15 706/24 708/12 709/6 710/18 711/11 711/17 714/21 715/20 717/14 717/18 718/12 718/17 718/24 719/25 720/21 721/2 721/15 723/5 723/13 723/17 727/9 727/19 727/25 728/25 730/5 730/9 730/17 730/19 731/4 733/11 734/12 735/7 735/14 737/22 738/3 738/16 738/20 739/6 740/21 740/22 741/2 743/1 747/16 748/10 748/21 748/25 749/4
old [21] 477/3 493/12 503/21 509/2 521/10 526/5 541/19 541/21 542/2 569/13 605/24 662/15 663/14 706/14 711/6 712/6 740/12 740/13 741/7 741/10 741/13
older [8] 462/9 520/21 525/16 529/21 530/5 553/20 722/21 728/16
olds [5] 493/10 509/3 509/4 549/4 570/5
Olley [24] 433/6 433/13 433/18 444/18 445/14 446/8 451/13 455/23 495/16 514/13 516/23 517/24 526/20 558/11 559/25 574/25 575/6 621/21 660/21 662/2 669/4 691/6 699/4 744/22
Olley's [1] 433/7
on other [1] 442/6
once [9] 467/13 467/14 467/15 480/10 511/6 553/25 570/21 746/19 746/19
one [209] 434/21 435/7 436/5 438/19 441/7 441/17 446/17 446/22 449/17 450/10 450/11 455/12 455/13 457/8 457/12 457/13 458/9 458/9 459/3 462/16 465/5 466/4 467/6 469/20 471/8 472/7 472/14 477/1 477/11 478/8 479/17 479/23 480/6 482/6 482/19 483/5 484/5 484/22 485/7 486/10 486/12 487/3 487/5 488/18 490/13 491/21 497/10 497/10 497/10 501/5 501/18 502/19 504/5 504/13 506/9 507/20 508/2 508/4 508/10 508/24 509/8 514/9 520/20 522/3 523/24 524/1 525/14 526/11 526/24 527/5 532/4 534/16 535/5 536/2 536/3 536/7 536/7 537/18 538/12 538/13 538/17 541/3 542/6 546/7 546/25 552/21 553/12 553/23 555/24 558/9 560/23 560/23 566/5 574/11 575/15 581/11 581/11 581/13 581/16 583/8 585/17 588/17 588/22 589/1 589/6 589/9 589/11 590/14 596/5 596/7 600/7 600/25 603/4 604/12 604/12 604/16 604/19 610/9 614/17 615/4 615/6 615/14 615/17 619/8 619/23 620/7 620/13 622/7 624/3 625/24 625/25 626/1 627/8 629/7 630/5 631/2 631/7 634/1 637/19 637/22 639/21 639/25 642/20 652/20 655/9 657/18 658/3 658/6 658/12 658/13 658/16 659/25 662/11 662/23 666/13 666/13 666/16 668/11 668/11 668/12 668/15 670/12 673/18 674/9 674/10 674/10 675/7 677/8 677/8 680/7 680/17 682/15 683/18 683/23 684/3 685/12 687/18 690/11 693/17 695/17 704/15 706/6 708/14 708/15 713/10 714/21 714/23 722/11 723/15 723/15 729/2 729/18 733/13 738/23 742/16 743/18 745/7 745/9 746/5 746/8 747/17 748/12 749/1 749/1 749/1
one's [8] 491/13 491/14 543/2 629/9 645/8 699/12 700/11 700/14
one-out-of-three [1] 538/12
one-page [1] 434/21
ones [12] 442/6 473/10 502/11 539/17 553/12 583/21 614/6 637/14 674/14 690/7 690/8 722/21
ongoing [1] 435/18
only [44] 478/4 487/3 505/8 505/16 508/9 511/3 512/3 513/10 516/23 517/3 519/17 520/5 533/25 535/5 537/18 572/17 572/17 575/18 576/9 578/15 579/25 602/14 605/5 606/17 614/6 629/25 637/9 641/2 641/5 657/2 664/16 680/7 685/11 690/2 690/8 690/12 691/12 713/8 726/9 748/23
onset [2] 666/3 667/5
open [5] 431/1 431/2 472/18 579/20 661/7
operate [2] 473/5 626/4
operating [4] 615/10 615/24 621/25 623/8
opine [1] 448/5
opined [3] 616/5 640/12 669/13
opining [6] 589/1 589/5 589/5 628/10 639/21 710/25
opinion [40] 449/8 466/12 466/14 466/16 466/18 486/3 486/9 486/17 488/16 502/2 537/16 539/3 539/6 539/12 540/12 542/19 550/8 570/1 571/23 572/8 572/16 595/7 596/15 597/21 608/6 618/11 618/15 632/11 636/11 638/6 638/9 640/10 640/15 643/6 648/22 649/13 650/20 669/1 705/4 746/15
opinions [6] 449/5 488/14 540/10 576/20 687/19 691/7
opportunities [6] 552/9 567/11 645/25 699/14 700/10 732/17
opportunity [14] 512/11 551/10 552/11 559/13 569/10 583/24 585/4 598/11 607/6 612/23 708/11 725/20 738/9 741/16
opposed [2] 498/25 508/20
opposing [1] 693/1
opposite [4] 487/22 493/6 641/17 641/19
optimistic [2] 582/12 659/3
option [1] 579/20
options [1] 472/5
oral [1] 734/17
orally [3] 525/18 526/9 743/13
order [28] 443/18 445/11 450/14 451/1 452/22 458/8 462/4 479/17 482/18 483/22 484/18 486/8 495/14 506/25 508/23 525/6 534/15 546/2 568/19 625/10 637/16 676/19 693/24 708/15 712/12 736/5 739/15 739/20
ordering [1] 554/17
orders [1] 669/3
organization [4] 441/17 442/20 443/22 603/24
organizations [1] 441/15
organize [1] 562/10
orient [1] 470/15
original [3] 506/17 625/19 631/12
originally [1] 532/6
originated [1] 584/4
other [209] 437/3 437/22 438/12 438/20 441/9 441/15 441/15 442/6 442/6 443/21 444/3 444/9 445/24 447/15 448/23 449/2 449/4 450/1 451/9 452/17 452/18 454/10 457/15 459/10 460/24 462/3 463/22 464/18 466/20 467/9 467/10 468/17 468/22 469/10 471/2 471/6 471/14 471/17 471/19 473/2 473/21 475/15 475/16 477/10 480/3 480/12 483/22 485/3 487/6 488/7 488/21 489/20 489/23 490/23 493/14 493/15 493/23 499/2 501/11 501/19 502/3 502/17 507/19 508/5 508/10 509/2 509/22 513/20 516/14 517/19 517/24 519/13 519/13 520/6 522/2 523/7 523/10 523/11 525/12 526/8 531/4 534/17 536/2 537/20 542/1 544/21 545/7 547/3 551/8 551/9 552/10 553/5 553/8 553/24 557/20 559/6 559/16 560/11 561/17 567/1 568/5 569/11 569/24 571/4 572/14 573/22 575/15 575/16 576/20 578/3 588/7 589/12 590/25 593/22 594/4 594/6 595/8 595/15 599/4 612/25 613/25 614/7 614/9 623/24 623/25 624/2 626/2 629/14 630/2 630/12 632/18 633/9 636/9 636/10 637/16 637/19 639/18 641/8 641/16 641/18 644/17 646/18 646/23 647/16 649/5 649/20 652/18 653/14 655/9 659/2 660/17 662/21 662/23 665/16 671/20 674/6 674/10 676/14 676/20 677/5 677/8 677/22 684/6 685/3 687/7 687/20 689/1 690/19 690/20 691/2 691/7 693/2 694/7 702/2 702/25 703/17 705/13 706/10 710/3 713/3 713/12 713/17 714/4 720/21 722/15 722/15 722/20 722/23 722/25 725/22 732/11 732/19 732/20 732/21 732/23 735/11 736/4 738/9 738/11 738/18 740/5 740/6 747/11 748/12 748/17
other's [1] 576/18
others [20] 475/11 479/4 482/23 485/5 485/19 492/20 495/20 496/10 498/8 500/19 503/1 503/25 557/23 560/3 572/20 576/10 643/18 659/2 697/21 697/22
others' [1] 642/11
otherwise [4] 438/2 479/24 601/1 709/21
ought [1] 555/15
our [31] 431/19 432/4 435/19 452/12 452/13 471/10 480/2 480/5 485/12 486/5 492/6 492/7 493/4 493/6 493/24 496/4 509/21 535/15 544/16 565/12 582/16 628/8 642/19 659/16 660/13 669/3 691/5 693/22 694/11 694/15 744/25
out [108] 439/7 439/9 454/7 455/2 459/2 461/22 469/24 477/6 483/13 483/15 484/16 488/3 492/1 496/4 498/8 500/17 503/11 503/22 504/1 505/9 506/4 508/4 508/18 519/6 534/23 538/2 538/4 538/7 538/9 538/10 538/12 538/13 538/17 543/16 545/23 547/7 551/24 552/12 558/12 570/24 579/25 586/16 587/4 588/13 594/25 599/9 599/19 600/17 603/20 604/5 607/4 607/5 611/5 615/9 617/7 620/21 622/22 623/1 623/3 624/2 637/8 638/14 639/1 639/3 639/4 643/13 644/21 646/17 646/21 650/14 650/16

**Q**

out... [37] 653/2 655/14 658/2
658/14 666/17 667/1 672/6 676/9
687/22 690/11 694/23 704/6
705/22 706/13 707/18 711/1
711/11 712/20 715/17 715/25
717/15 718/6 720/9 720/10
720/10 720/15 720/16 720/17
721/19 725/16 730/9 732/6
735/12 736/17 737/3 738/9 747/3
outcome [2] 448/21 697/24
outcomes [1] 705/6
outlawing [1] 609/5
outline [1] 457/2
outlined [1] 447/16
outreach [1] 436/22
outside [7] 453/14 453/22 473/5
517/12 610/22 646/4 713/14
outweigh [1] 471/18
outweighed [4] 471/9 471/12
478/19 482/15
over [47] 435/11 438/5 468/19
470/1 470/4 471/15 487/18 498/9
501/19 503/1 505/15 516/16
517/4 534/4 544/6 544/6 549/13
549/23 550/6 558/9 566/1 583/18
596/3 596/24 598/8 599/4 599/4
603/17 611/1 611/13 612/20
613/19 620/11 620/12 623/11
644/14 664/6 678/5 682/13
682/16 686/13 690/6 694/8 701/5
707/18 742/18 749/1
overall [4] 459/5 479/24 743/24
743/25
overarching [1] 572/8
overlap [2] 481/21 544/10
overlapping [1] 521/6
overlaps [1] 490/18
overnight [2] 747/23 748/8
Overruled [1] 586/13
overshadow [1] 493/22
oversimplification [1] 541/19
oversimplify [1] 698/7
overstating [1] 606/19
overstepped [1] 744/9
overview [1] 439/14
own [10] 485/4 522/9 549/21
561/18 562/3 562/4 612/7 707/2
742/7 742/24

**P**

P.C [1] 429/20
p.m [3] 661/4 661/5 749/11
P9 [2] 679/10 679/18
Pacific [4] 710/3 710/5 712/21
712/23
page [38] 434/21 539/22 547/11
548/21 550/13 551/15 556/4
561/10 561/13 561/14 573/23
593/6 593/10 597/18 601/4
606/22 610/1 619/15 619/16
622/14 632/17 637/22 638/2
638/2 640/3 641/20 654/7 669/24
674/16 676/15 685/23 699/8
701/20 715/7 715/8 716/2 726/18
750/2
page 94 [1] 573/23
pages [8] 456/20 488/20 495/1
495/3 583/19 637/17 710/12
726/19
paid [6] 450/24 504/25 507/8
571/10 579/8 579/9

paint [1] 487/19
paper [10] 447/1 492/7 492/8
papers [1] 447/15
paragraph [1] 637/22
paralegal [3] 430/13 430/14
431/19
parameters [1] 747/11
paraphrasing [1] 525/25
Pardon [1] 441/13
parenthesis [1] 497/6
parents [3] 452/6 452/17 565/2
parsing [1] 660/11
part [51] 437/1 437/1 437/18
445/1 446/21 457/11 457/17
458/5 459/7 464/10 467/18
484/19 484/22 487/12 490/24
501/15 503/17 504/25 506/8
506/11 506/14 506/16 510/4
510/7 515/15 517/1 547/20
558/17 565/18 569/25 573/1
579/19 580/11 581/14 581/15
594/17 600/8 628/4 632/4 635/7
655/17 692/13 692/17 692/21
694/18 710/21 711/14 718/9
719/7 736/3 736/5
part-time [2] 579/19 580/11
participate [3] 577/16 631/20
677/4
particular [15] 443/9 463/21
465/7 477/22 478/7 492/3 492/21
494/9 494/11 513/24 543/4 543/4
560/20 666/8 676/18
particularly [11] 459/12 469/19
527/25 564/17 566/19 578/21
599/24 643/19 690/23 722/8
731/17
parts [1] 463/20
pass [1] 526/8
passage [1] 643/15
passed [4] 550/23 608/25 609/4
686/22
passes [1] 684/10
passive [1] 695/15
past [17] 442/21 488/17 506/10
508/5 528/5 528/9 567/3 575/14
581/11 596/20 605/4 624/19
634/11 694/12 702/19 726/14
735/11
Pat [1] 516/14
paths [1] 576/9
pathway [1] 452/20
patients [1] 436/19
Patricia [1] 529/9
pattern [5] 507/17 541/10
549/23 550/6 642/10
Patterson [3] 461/6 461/7
513/12
Pause [1] 594/12
pay [3] 652/7 653/23 653/25
Peabody [1] 439/20
Pearson [6] 695/20 695/21
696/11 697/11 700/25 701/5
peculiar [1] 550/5
peers [1] 498/11
pejorative [3] 500/3 500/7 624/8
penalty [9] 443/12 443/25 447/6
486/8 486/13 585/14 593/1
693/17 713/20
pencil [1] 677/20
pending [1] 630/22
Pennsylvania [1] 720/22
people [152] 437/6 437/19 438/4
438/5 438/10 439/6 439/7 440/23

445/7 453/5 453/21 454/14
464/12 468/6 468/7 468/10
468/10 470/2 471/11 472/2
474/13 475/20 476/3 477/2
479/25 480/3 480/13 480/15
480/22 481/7 481/8 481/14
481/16 484/7 484/24 485/2
485/14 486/6 488/1 488/21 492/4
492/21 492/22 493/2 503/20
507/8 507/12 507/17 507/17
507/20 509/12 510/16 510/21
510/22 515/3 515/5 515/6 515/8
516/14 520/11 522/24 523/2
523/8 528/19 528/20 530/12
535/23 537/3 545/1 554/2 554/18
557/5 557/14 561/17 561/23
562/1 562/1 562/16 563/11
563/16 568/12 570/6 570/22
571/7 572/21 573/2 582/22
584/15 590/3 590/15 594/6 596/6
603/25 605/11 607/6 613/13
613/22 614/8 614/18 615/1 615/4
615/8 618/3 633/5 641/17 642/19
643/18 643/20 644/6 646/23
648/4 648/6 679/23 680/23 682/1
684/6 684/24 685/13 685/14
685/25 687/23 689/5 689/7
690/13 691/3 691/4 691/18
695/11 697/19 701/18 703/8
703/11 706/15 712/16 722/16
722/21 722/25 723/10 725/12
725/20 728/5 728/7 729/9 731/1
732/12 737/5 738/24 739/12
people's [1] 545/7
per [3] 683/12 683/13 684/10
perceive [2] 445/8 730/3
perceived [1] 520/2
perceiving [1] 693/16
percent [7] 460/3 460/4 614/18
614/25 615/4 712/6 712/15
perfectly [2] 663/9 687/2
perform [6] 457/20 461/10
703/22 715/20 717/7 731/17
performance [31] 461/16 475/13
475/14 482/24 492/14 498/11
502/24 503/1 524/16 524/20
524/21 525/8 526/15 536/3
565/13 565/14 570/6 570/20
620/11 641/10 643/10 650/21
663/4 676/5 677/18 700/14
700/14 704/8 707/2 708/8 708/9
performed [1] 719/3
performing [2] 483/17 593/20
performs [1] 472/24
perhaps [4] 477/22 499/18 668/9
704/4
period [29] 459/13 464/9 467/12
470/22 470/23 471/1 471/3
471/15 474/8 483/19 498/10
498/16 508/16 508/20 530/9
531/7 545/18 546/8 546/11 550/6
563/13 659/17 719/19 721/10
721/14 722/7 722/17 723/8 741/1
periods [4] 470/15 518/10
531/19 721/18
permit [1] 511/6
person [109] 437/23 449/9
461/23 461/25 462/2 463/25
464/12 464/15 466/4 467/24
468/2 468/18 468/21 471/14
471/17 471/20 472/23 472/25
473/3 473/7 473/12 475/6 475/13

476/4 477/9 479/5 479/10 480/25
483/8 483/23 484/6
484/25 485/9 486/7 486/12 487/4
487/8 489/22 491/18 492/18
492/20 493/25 493/25 497/2
497/12 497/21 498/22 499/9
499/12 500/24 501/24 502/24
507/15 515/12 519/22 531/6
531/21 532/2 536/21 545/12
563/4 564/12 565/18 566/16
572/19 573/15 578/15 582/23
597/24 606/1 606/17 611/14
615/12 615/23 620/11 623/8
627/8 631/9 633/7 641/2 641/5
643/7 643/9 645/13 645/24 646/1
655/12 655/13 655/13 656/6
663/17 663/25 664/23 689/15
698/19 705/9 705/16 705/19
705/23 706/5 706/11 706/14
706/16 707/2 723/16 725/18
731/11 732/2
person's [20] 437/25 458/10
468/3 469/21 472/5 473/10 482/7
482/24 499/13 517/13 550/20
564/12 565/5 590/2 596/23 643/8
643/9 644/10 702/8 733/14
personality [3] 490/3 490/16
491/10
personally [1] 616/25
persons [3] 440/16 480/17
480/17
perspective [3] 477/1 523/6
523/9
persuaded [1] 552/19
persuasive [1] 552/21
pertinent [1] 722/16
Peruses [3] 610/3 637/24 638/4
Ph.D [1] 439/19
PhD [1] 591/8
phone [6] 516/17 516/24 517/4
612/17 718/9 718/13 718/18
718/25 719/5 731/24
phonetic [2] 597/20 702/9
phrase [3] 458/4 495/5 679/14
phrased [2] 476/5 684/1
phrases [1] 541/9
physically [2] 531/3 531/4
physician [3] 522/4 522/8
564/24
pick [1] 540/22
picking [2] 469/23 508/18
picture [11] 485/25 487/19
500/17 500/24 509/24 554/3
633/7 710/21 710/22 723/10
734/18
pictures [1] 735/25
piece [2] 546/25 667/8
pieces [1] 570/7
Pittsburgh [1] 455/1
place [18] 446/22 480/4 480/5
489/6 498/22 505/10 505/16
524/22 553/19 553/19 553/22
553/22 554/6 554/7 561/22
677/15 713/7 713/8
placed [8] 489/3 496/21 498/15
512/5 519/9 650/13 652/16 653/1
placement [1] 500/11
placements [1] 498/21
places [3] 474/5 553/17 564/18
placing [1] 634/7
plain [1] 589/22
plainly [1] 711/13
Plaintiff [1] 429/3

**P**

plan [5]  512/20 551/7 580/14
 677/9 740/3
planned [1]  503/17
planning [6]  434/19 562/9 569/3
 677/6 677/8 747/15
play [15]  464/14 472/3 474/22
 562/21 568/13 568/15 568/15
 568/18 568/19 568/24 568/25
 569/10 569/13 570/5 570/7
played [3]  477/6 568/4 569/12
playing [4]  488/6 534/2 568/16
 569/25
Plaza [1]  429/15
Pleas [1]  605/17
please [16]  431/10 431/20
 433/10 433/11 433/15 433/16
 434/25 511/12 511/15 523/4
 557/3 604/23 622/17 635/5 661/6
 669/22
pleased [1]  743/4
plus [2]  519/16 689/25
point [68]  432/4 440/3 443/5
 459/2 464/2 464/17 465/17 469/2
 470/1 471/12 471/24 474/10
 478/18 486/5 487/16 489/22
 495/18 512/15 512/17 535/15
 539/25 548/14 551/24 552/23
 553/1 555/24 557/20 558/4 558/7
 558/7 558/8 558/9 559/25 560/13
 568/6 582/16 585/4 591/5 593/11
 601/3 615/21 615/21 620/7
 621/18 624/16 629/2 653/12
 655/10 659/14 659/15 659/20
 674/17 674/20 675/11 678/3
 690/12 690/13 694/23 702/6
 704/25 705/22 715/17 718/6
 723/16 733/11 735/23 744/14
 748/13
pointed [11]  484/16 488/3
 543/16 594/25 624/2 639/4 717/8
 717/10 721/19 724/17 734/17
pointing [2]  734/17 735/25
points [23]  469/14 471/6 471/20
 474/25 476/23 482/6 484/5
 494/15 531/22 535/22 587/12
 615/15 615/15 620/13 626/13
 627/5 632/19 663/7 665/13
 670/23 683/12 683/13 683/23
police [2]  577/19 585/8
politically [1]  541/16
pool [1]  615/8
poor [7]  522/8 547/7 549/16
 549/21 552/19 552/21 634/25
poorly [1]  458/7
Popp [5]  662/11 665/22 671/7
 671/23 672/20
Popp's [6]  663/9 665/12 665/18
 666/24 671/11 672/14
popped [2]  720/10 720/16
population [12]  458/24 613/13
 614/11 683/12 701/16 701/18
 703/23 704/10 704/12 704/12
 704/13 704/14
portion [4]  461/15 651/18
 653/18 701/16
portions [1]  710/16
portrayed [2]  504/7 504/8
posed [1]  620/3
posit [1]  728/11
position [13]  442/20 515/8
 527/23 558/14 578/23 607/22

617/22 636/11 690/5 690/25
positions [1]  690/19
positive [1]  524/5
positively [1]  484/25
possession [1]  589/16
possibility [4]  580/23 643/13
 692/12 692/13
possible [16]  456/1 457/7 478/10
 484/25 497/3 510/8 543/2 546/1
 546/6 546/6 579/23 618/3 619/4
 649/18 699/12 702/6
possibly [1]  488/13
posted [2]  644/18 670/20
pot [1]  718/22
potential [30]  463/25 475/14
 475/22 476/3 476/4 476/15
 476/24 478/11 478/19 504/19
 535/16 535/17 535/18 536/21
 536/21 590/2 590/16 592/1 592/4
 592/16 592/18 641/17 642/3
 643/3 658/7 659/3 676/5 679/11
 705/6 729/16
potentially [8]  478/1 580/25
 617/9 637/1 647/15 661/12
 700/11 705/20
poverty [1]  699/13 700/8 732/14
PowerPoint [2]  573/8 573/24
practical [20]  437/2 457/14
 463/8 465/21 465/23 466/5 466/8
 466/9 466/13 478/22 508/8 521/4
 538/14 549/24 551/5 597/23
 735/4 735/6 743/7 743/9
practice [73]  435/23 445/8
 445/20 494/13 506/11 507/18
 536/1 595/14 595/20 595/25
 596/3 599/16 599/17 599/20
 600/3 600/13 613/16 624/23
 625/1 625/1 625/4 625/5 625/9
 625/21 626/6 626/8 626/10
 626/17 626/20 626/22 627/1
 627/3 627/8 628/20 630/12 632/3
 632/3 632/4 632/6 648/5 648/23
 649/10 663/23 663/24 664/14
 665/11 665/14 678/12 679/10
 684/16 684/16 686/23 687/6
 687/25 688/4 688/19 688/20
 690/23 691/1 691/9 691/13
 691/16 691/23 691/25 692/6
 692/7 694/14 694/15 694/18
 694/19 699/10 718/9 742/7
practices [1]  494/14
practicing [2]  450/17 693/18
praise [1]  535/9
precise [1]  626/9
predecessor [1]  465/5
predictable [1]  571/5
prefer [2]  512/2 576/12
premarked [1]  433/7
premise [2]  643/11 733/20
preparation [2]  584/18 584/19
 585/2 646/14
prepare [1]  456/25
prepared [10]  448/17 561/4
 583/25 593/25 637/12 638/5
 639/15 640/9 640/22 657/18
prepares [1]  600/25
preparing [2]  725/9 744/19
presence [2]  489/17 600/5
present [23]  430/11 431/2 432/2
 434/19 464/2 464/24 470/18
 475/3 483/15 484/24 485/25
 486/7 491/4 497/25 524/5 557/10

576/1 576/15 622/6 661/7 661/8
presentation [3]  602/20 690/4
 733/13
presentations [1]  443/21
presented [9]  437/16 452/14
 478/9 478/10 580/23 581/5
 583/24 584/5 691/11
presenting [2]  454/8 625/8
presents [1]  667/10
president [3]  442/22 442/23
 443/13
presiding [1]  431/5
pressed [2]  500/22 690/25
pressure [1]  536/11
pressures [1]  499/24
presumably [8]  486/6 493/15
 497/2 614/4 614/25 635/23 643/7
 677/6
presume [1]  621/9
Pretend [1]  655/2
pretty [16]  435/21 465/12
 467/23 510/16 519/21 552/21
 569/1 574/11 619/19 652/15
 652/17 655/5 680/24 706/17
 713/6 713/8
prevalent [1]  685/9
previous [5]  441/5 572/13
 589/21 635/9 696/6
previously [2]  506/5 577/11
primarily [7]  435/25 436/14
 437/10 437/20 456/7 579/10
 614/7
primary [7]  434/3 441/5 452/24
 533/13 642/19 689/15 724/1
prior [12]  451/23 496/13 497/1
 582/18 588/19 599/8 609/8 610/5
 610/12 610/12 610/22 694/3
prison [16]  482/24 524/2 524/21
 528/1 549/19 613/13 613/23
 614/11 615/8 707/16 708/3
 708/11 736/6 739/9 739/11 740/1
prisoners [1]  453/5
prisons [1]  726/3
private [1]  599/20 613/16
 684/16
probably [21]  431/25 432/6
 454/6 496/4 508/3 524/25 530/11
 583/4 602/25 612/20 663/23
 678/7 678/25 702/20 719/1
 733/24 744/4 745/15 745/19
 745/21 745/24
problem [30]  479/16 484/19
 512/16 518/15 518/20 518/25
 521/15 526/3 559/15 563/4 563/5
 563/9 564/1 569/16 571/4 623/25
 642/8 646/3 652/13 671/25 672/8
 672/10 673/2 673/4 691/10 704/8
 706/17 742/4 746/6 748/4
problematic [1]  674/3
problems [19]  437/17 439/9
 452/15 466/22 472/17 473/18
 501/11 501/12 520/25 550/4
 567/15 591/20 592/2 598/3
 642/14 642/14 708/21 711/12
 746/8
procedure [1]  474/20
proceed [4]  431/22 563/7 588/10
 661/19
proceedings [3]  430/20 434/15
 749/18
process [8]  445/10 504/22 510/7
 600/8 600/12 600/14 600/15

644/8
produced [2]  430/21 628/24
product [1]  695/6
professes [1]  640/7
profession [5]  435/10 495/9
 509/21 688/15 693/22
professional [9]  441/15 443/22
 582/18 595/7 595/10 692/6 692/7
 693/11 733/7
professionalism [1]  671/19
professionally [1]  611/11
professionals [7]  436/25 438/12
 444/3 647/16 656/2 658/6 687/22
professions [1]  680/9
professor [7]  434/7 563/9 578/25
 591/2 612/3 612/25 640/6
profile [4]  437/25 501/3 573/19
 574/9
profound [1]  591/21
program [12]  436/7 436/9
 436/10 439/4 439/13 452/7
 472/21 503/17 518/8 519/24
 522/22 688/9
programs [14]  436/24 472/12
 472/13 506/6 518/2 518/2 518/5
 518/7 518/19 519/1 519/9 520/8
 563/8 689/6
progress [2]  520/12 550/21
prohibited [1]  494/13
project [1]  732/11
projects [1]  732/10
promise [1]  495/2
promulgated [2]  628/24 683/10
prong [39]  444/12 456/7 456/8
 460/17 476/7 476/9 476/10
 489/11 537/17 581/11 581/11
 581/13 581/16 581/16 581/16
 581/23 582/10 588/17 588/22
 589/1 589/6 589/9 589/11 590/14
 623/7 629/7 631/2 639/8 639/8
 639/8 639/21 639/25 644/24
 644/25 658/13 666/2 666/13
 666/13 680/17
prongs [2]  456/4 623/13
proof [1]  652/12
proper [1]  644/9
properly [5]  459/19 502/17
 537/7 648/6 665/18
proportion [6]  499/19 499/22
 622/22 623/1 623/3 716/1
proposed [2]  584/11 584/12
proposition [1]  623/5
propositions [1]  690/16
prorated [4]  671/23 671/24
 672/17 672/25
prorating [3]  672/5 672/8
 672/21
prosecution [3]  487/5 689/16
 726/10
prosecutor [4]  448/8 455/2
 717/19 717/22
prosecutor's [1]  455/9
protect [1]  729/22
protocol [1]  632/5
protocols [2]  628/24 689/9
proud [2]  487/6 698/13
prove [3]  727/20 727/21 747/23
provide [24]  436/7 438/6 438/10
 443/16 443/17 446/20 450/21
 464/1 467/21 467/25 468/11
 468/22 500/6 507/14 515/8
 547/16 547/22 575/6 611/19

## P

provide... [5] 647/1 648/22 675/6
692/8 696/17
provided [9] 439/6 467/7 518/8
548/15 577/17 614/17 676/7
710/19 724/13
Providence [1] 687/14
providing [1] 520/8
provincial [1] 610/19
psychiatric [3] 439/9 473/17
492/13
psychological [12] 442/11
442/12 442/19 443/22 445/6
445/10 475/20 571/23 579/21
599/20 676/9 690/5
psychologist [22] 434/2 438/4
439/24 450/5 450/16 506/17
534/11 534/13 534/16 536/20
594/4 600/4 601/3 647/23 656/22
657/7 657/10 660/17 687/12
689/3 693/13 744/24
psychologist's [1] 654/10
psychologists [18] 438/12 450/14
535/4 536/10 582/18 647/14
647/14 647/22 655/16 656/21
671/20 678/9 678/9 681/11 689/7
694/22 734/3 737/3
psychology [26] 435/18 438/19
439/16 439/18 439/19 439/22
442/14 444/24 445/19 450/17
451/5 494/12 534/14 536/17
536/19 591/3 602/16 649/7
657/11 683/3 687/22 689/8 692/7
693/18 695/20 702/21
psychometric [2] 694/5 697/23
public [3] 520/13 549/14 580/15
publication [4] 442/2 444/5
690/1 692/3
publications [6] 435/4 440/10
443/8 443/21 444/10 444/23
publish [3] 440/23 441/16 445/8
published [14] 440/11 440/19
441/9 442/4 444/2 444/24 445/19
446/19 447/1 447/9 447/10
447/13 463/13 690/2
publisher [1] 696/11
publishers [1] 695/3
publishes [1] 441/18
publishing [1] 444/5
pull [2] 537/21 690/11
pulled [1] 438/21
pulling [1] 544/5
punctuation [1] 544/17
punitive [1] 474/1
pure [4] 633/15 634/13 634/14
634/17
purely [1] 474/1
purport [1] 501/24
purpose [20] 437/20 445/3
467/16 470/3 472/20 473/21
476/17 487/19 491/17 491/20
493/17 493/23 499/8 501/6
545/23 633/5 651/20 711/13
733/10 735/13
purposely [1] 617/7
purposes [5] 491/16 619/24
623/9 628/9 672/11 748/18
pursue [3] 568/9 569/18 613/8
push [1] 516/2
pushed [2] 516/2 715/25
pushes [1] 694/11
put [36] 437/23 485/18 494/19

496/5 496/7 499/9 505/1 545/3
555/3 601/10 621/9
615/20 628/14 629/25 631/15
631/24 632/19 633/10 651/17
654/12 655/13 657/24 658/24
662/24 667/15 674/21 679/14
681/25 689/16 692/20 706/6
712/12 722/8 739/23 743/12
putting [8] 520/6 540/18 589/22
604/22 644/24 662/20 665/11
677/25
puzzles [1] 677/25
puzzling [1] 549/23

## Q

qualification [1] 467/21
qualifications [6] 435/4 459/16
464/16 467/24 497/15 596/9
qualified [2] 537/16 608/3
qualify [11] 449/9 459/11
460/20 471/22 479/6 479/17
480/14 506/7 537/23 544/24
553/3
qualifying [1] 463/22
quantifies [1] 458/14
quantify [2] 627/6 733/2
Queens [1] 713/13
question [107] 440/12 454/8
476/2 476/4 482/25 484/15
484/17 484/18 484/19 484/20
490/1 501/8 501/9 502/22 504/17
505/20 506/20 509/8 527/23
528/16 532/6 534/19 535/2 535/3
535/21 547/13 547/21 547/24
555/6 558/1 586/15 586/20
586/24 589/9 592/5 597/19
606/23 606/23 607/3 608/5 608/6
618/25 619/1 619/12 619/16
620/2 623/3 625/8 625/23 625/24
626/15 629/18 632/12 633/13
634/15 634/21 635/4 639/7
640/16 640/18 640/25 642/1
644/2 648/9 651/22 654/7 654/18
654/20 654/22 655/5 656/21
660/25 664/4 664/8 666/6 666/21
669/22 670/1 671/21 676/15
676/16 678/21 680/12 681/4
687/6 691/12 691/15 694/13
695/17 700/24 701/20 702/10
702/12 702/17 703/19 703/21
704/7 712/10 714/8 714/13 717/2
726/5 726/13 731/4 737/8 737/20
739/14
questionable [4] 527/15 710/12
738/22 739/2
questioned [3] 594/15 596/21
678/20
questioning [2] 488/12 559/5
questionnaire [10] 734/24
734/25 735/20 736/8 736/19
737/6 738/1 738/5 738/7 739/23
questionnaires [1] 733/23
questions [24] 449/16 463/22
477/13 515/21 523/3 523/3 534/5
536/15 544/4 558/14 576/13
586/11 589/5 589/6 608/13
619/12 634/20 640/14 640/19
640/22 640/24 693/12 694/11
721/6
quick [2] 743/18 743/19
quicker [2] 536/9 747/14
quickly [3] 526/2 533/1 536/2
QUINN [3] 430/6 430/8 431/17

quit [1] 550/2
quiz [2] 440/12 713/17
quote [6] 510/19 562/6 704/2
733/17 736/13 736/14
quoted [3] 572/23 622/8 622/14

## R

race [2] 494/6 701/19
racial [10] 701/25 702/3 702/7
702/10 702/12 702/16 702/19
702/24 703/16 703/20
raise [5] 433/11 555/5 699/11
738/4 738/7
raised [1] 582/16
rambling [2] 468/13 569/17
RAMIREZ [7] 430/13 431/15
ran [3] 519/3 558/12 689/5
range [18] 459/23 460/1 460/4
541/15 561/23 587/18 587/22
588/2 599/11 622/1 623/15
623/16 624/1 630/1 631/15
631/25 646/5 712/5
rank [1] 434/7
raping [1] 605/24
rare [1] 621/10
rated [2] 647/7 730/17
rather [17] 475/6 475/8 485/17
487/13 491/7 518/22 535/12
543/6 545/2 545/6 551/25 578/12
590/2 604/19 613/2 667/12 673/6
ratings [1] 462/1
rational [1] 548/12
rationale [2] 461/22 461/23
raw [3] 434/20 526/20 648/4
re [3] 598/11 671/5 695/15
re-direct [2] 598/11 671/5
re-norming [1] 695/15
reach [4] 466/7 554/23 582/6
582/22
reaches [1] 541/13
read [33] 494/3 495/2 497/8
497/8 502/13 539/19 589/25
592/8 592/10 592/14 593/8 598/5
608/9 611/3 616/17 620/23 621/9
622/12 645/9 650/7 650/12
650/17 671/9 679/18 680/15
682/6 686/3 693/2 703/14 715/9
717/12 719/5 748/19
readily [5] 480/24 515/10 519/7
540/22 543/19
reading [13] 500/20 546/19
565/23 565/23 566/19 608/15
642/8 696/13 699/16 709/4 709/5
715/11 726/16
reads [2] 477/23 546/17
ready [2] 514/7 675/12
real [3] 548/18 567/15 606/15
reality [1] 645/12
realize [2] 729/24 730/9
really [47] 432/21 453/12 465/22
475/21 484/15 503/14 512/9
513/15 514/3 516/24 517/8
519/22 544/20 545/13 552/4
554/9 554/10 558/4 566/22
568/13 569/9 570/6 578/16 579/1
593/5 602/3 607/5 615/22 618/4

632/15 637/9 639/15 639/24
675/25 686/16 690/10 695/8
702/22 721/9 731/20 744/18
745/24
realm [2] 563/25 571/11
reason [37] 432/2 461/15 470/1
480/24 488/5 496/24 497/6
527/13 536/11 545/3 545/4 549/7
590/5 625/2 625/15 635/7 636/6
641/6 641/14 654/8 671/10
671/21 672/2 672/12 673/19
689/11 691/21 691/23 691/24
705/19 706/4 706/7 713/12
714/14 717/10 729/15 730/12
reasonable [14] 473/9 473/12
520/10 537/22 562/3 564/1
571/23 599/21 660/12 666/17
675/13 677/9 683/5 717/13
reasonably [2] 497/3 507/16
reasons [4] 508/11 544/12 546/7
593/21
recall [70] 460/13 460/13 461/7
468/18 487/4 506/19 506/23
515/22 526/16 546/18 566/20
581/7 583/21 587/19 592/16
596/25 598/25 599/7 599/10
599/13 599/23 605/7 605/13
606/7 607/8 607/9 608/1 609/25
610/14 616/2 619/12 621/7
629/14 632/14 633/18 633/22
634/3 634/9 636/2 663/11 671/8
671/12 671/16 671/22 674/14
674/15 676/12 676/14 677/4
679/5 682/15 683/8 703/1 713/18
715/2 715/4 715/22 715/22 717/4
717/6 717/8 717/9 719/1 719/4
730/8 730/11 738/2 738/14
742/21 742/21
received [9] 433/1 439/16 515/24
540/15 574/19 574/22 591/24
697/7 697/8
receives [1] 611/22
receiving [1] 507/10
recent [1] 566/14
recently [5] 436/15 567/3 584/20
696/3 730/12
receptive [3] 541/5 543/14
543/18
recognition [2] 481/7 491/13
recognize [12] 469/5 481/2 485/1
485/4 487/11 493/7 495/17 552/1
695/13 695/14 701/9 704/8
recognized [5] 457/23 491/9
541/23 689/11 700/4
recognizes [1] 614/5
recognizing [1] 558/17
recollection [6] 597/3 606/21
610/2 632/16 714/19 719/2
recommendation [2] 442/3
696/12
recommendations [1] 452/18
record [27] 431/11 433/17
450/25 451/2 475/18 476/3
476/23 504/23 530/22 531/12
531/17 546/9 546/13 555/20
563/23 582/25 597/8 622/11
631/17 637/13 672/13 689/17
692/3 692/14 692/17 692/22
749/18
recorded [3] 430/20 488/25
542/15
recordings [6] 547/17 547/23

# R

recordings... [4]  547/23 554/15
554/16 554/16
records [82]  449/14 450/20
467/9 467/9 469/11 470/3 472/13
473/18 473/23 474/8 495/1
496/19 496/19 496/25 497/2
497/4 497/5 497/9 498/15 500/14
500/21 502/3 502/7 502/11
502/13 503/5 503/5 503/5 503/9
503/10 503/12 503/13 504/12
505/24 505/25 506/2 506/16
506/16 506/21 509/9 509/12
509/18 509/23 517/25 518/2
518/12 520/16 521/17 521/20
521/21 521/23 522/1 522/7
522/10 522/14 522/15 522/18
522/19 522/22 531/15 539/7
543/9 543/16 569/23 571/15
583/17 583/19 583/20 583/20
583/21 591/10 591/12 592/17
593/12 633/14 634/16 679/1
724/9 724/22 724/24 725/4 725/5
red [1]  516/20
Redding [1]  720/22
redirect [3]  512/12 661/17 744/3
reduce [9]  625/16 625/17 625/18
625/20 626/6 626/16 639/20
695/23 700/13
reduced [1]  626/21
reducing [2]  588/1 627/2
redundancy [1]  514/2
refer [6]  534/24 569/7 602/20
604/10 652/17 683/24
reference [14]  461/14 476/25
499/17 501/21 514/25 520/15
522/21 540/11 541/1 574/4 607/7
665/5 718/17 732/25
referenced [5]  461/17 573/9
675/2 697/12 748/12
references [3]  522/2 590/11
648/13
referencing [3]  476/22 516/23
743/9
referred [9]  484/23 485/9 486/4
498/18 508/11 518/21 531/10
561/2 606/14
referring [14]  462/8 470/6
484/11 527/2 571/25 572/1 574/7
600/14 621/21 623/13 629/19
629/19 683/22 690/22
refers [4]  451/5 485/18 510/10
563/13
reflected [2]  540/9 642/4
reflection [1]  524/4
refresh [4]  597/3 605/7 610/2
632/16
refreshed [1]  673/7
refreshing [1]  434/18
refused [4]  505/12 546/16
546/17 677/4
refusing [1]  547/9
regard [13]  438/15 465/18
550/14 567/23 572/24 584/18
592/23 595/25 619/1 635/10
711/1 722/23 725/10
regarded [6]  500/3 564/19 611/3
611/5 630/4 694/5
regarding [2]  528/5 559/2
regardless [4]  464/3 489/16
538/24 696/5
regret [1]  634/25 737/14

regular [5]  437/15 442/7 452/13
617/20 661/9
regularly [3]  442/1 613/1 686/9
reinterpret [1]  697/25
reinterview [1]  515/15
reinterviews [1]  467/16
rejected [1]  621/15
rejection [1]  699/7
rejoinder [1]  689/24
relate [1]  457/6
related [25]  435/14 436/10 437/3
438/9 441/16 443/6 444/10
449/18 452/5 453/8 454/8 454/8
505/2 562/11 562/19 573/14
584/16 584/24 589/11 589/25
601/1 639/12 724/25 728/6 739/9
relates [3]  636/25 683/7 722/19
relating [2]  434/14 583/14
relation [1]  566/25
relationship [5]  557/11 557/12
557/13 611/15 612/22
relationships [5]  523/7 523/8
557/6 557/16 572/25
relative [13]  471/10 471/18
492/20 492/21 492/23 493/14
498/10 509/4 545/3 561/17
564/11 565/5 722/15
relatively [3]  644/19 662/21
698/13
relatives [4]  464/14 484/16
504/21 531/5
release [1]  435/19
relevance [1]  488/14
relevant [11]  433/7 517/5 543/6
565/16 586/9 618/15 639/7
639/11 711/2 738/11 741/1
reliability [1]  507/11
reliable [7]  495/13 506/25 507/1
531/16 666/21 666/23 666/23
reliably [1]  570/25
relied [13]  474/10 475/1 517/25
522/15 572/12 589/20 628/9
637/11 637/15 638/8 640/4 640/5
739/21
relies [2]  666/17 706/21
reluctant [2]  544/12 549/2
rely [14]  464/18 470/3 527/9
586/10 602/8 637/10 637/10
652/11 658/16 727/21 728/10
739/2 739/21 741/4
relying [7]  484/5 495/10 588/17
588/19 658/12 671/17 739/1
remain [1]  645/14
remained [1]  443/14
remains [1]  720/23
remarkable [1]  480/11
remarkably [2]  552/8 656/9
remember [41]  442/25 447/10
455/8 455/9 468/2 487/3 488/3
508/19 509/15 509/15 527/20
541/4 550/1 562/7 584/5 592/9
597/7 597/12 605/8 608/11
608/13 610/6 620/18 654/5 655/7
667/23 668/2 668/3 682/2 696/7
696/9 696/13 713/25 714/2 715/6
717/10 717/16 719/23 726/23
733/2 741/20
remembered [3]  480/9 488/1
488/1
remind [4]  514/11 559/21
561/13 661/22
reminded [1]  672/17
reminder [2]  486/11 505/13

render [3]  488/5 537/16 669/1
rendering [2]  496/16 550/8
repeated [1]  644/4
repeatedly [4]  483/19 541/2
552/13 553/17
repeating [3]  545/6 545/11
552/3
repetition [3]  466/1 549/10
553/22
rephrase [3]  490/1 651/15 678/6
replaced [1]  677/15
replete [1]  590/10
report [129]  434/23 448/12
449/11 456/17 456/20 461/6
465/11 466/18 467/9 468/9
474/14 474/16 482/9 482/14
488/8 497/13 498/6 500/21
501/21 506/5 510/19 512/5 512/9
513/14 513/19 513/22 515/11
517/16 517/19 518/16 523/23
525/20 526/16 527/19 531/25
534/17 535/14 539/10 539/19
539/22 539/25 540/1 540/4 540/9
540/11 544/1 544/11 547/11
548/21 550/13 551/16 557/15
560/18 561/10 566/20 566/21
582/6 584/18 585/4 586/10
586/12 586/21 586/24 587/1
589/16 589/17 589/18 589/19
592/15 593/6 593/7 593/10
593/25 599/2 615/20 624/20
629/3 634/10 637/8 637/11
637/22 638/8 638/13 638/14
647/5 647/10 647/19 650/7
650/10 650/12 650/22 652/3
652/7 652/11 652/16 652/23
653/8 653/9 653/18 653/22 654/5
654/10 654/11 656/12 657/18
658/24 671/17 674/22 676/2
676/3 679/14 682/4 682/10
682/11 682/12 696/18 704/16
708/6 709/4 709/5 709/25 710/4
710/8 710/8 710/13 713/4 715/7
715/8 743/15
reported [10]  485/5 504/10
504/21 531/5 540/19 566/13
566/21 568/12 647/25 679/12
reporter [11]  430/18 430/18
461/25 467/20 505/6 515/13
530/25 594/11 706/11 749/16
749/21
reporters [4]  538/8 538/11
538/16 538/22
reporting [2]  464/19 474/12
reports [27]  460/24 461/2 461/8
484/6 484/6 512/2 512/10 519/16
527/6 535/19 536/17 576/18
583/25 584/6 593/4 637/8 659/2
671/9 678/23 678/25 679/15
679/18 680/15 680/20 680/21
681/24 715/9
represent [4]  466/10 688/4 691/4
691/8
representation [3]  579/7 615/23
685/9
representations [1]  517/1
represented [2]  543/4 701/14
representing [3]  577/2 690/16
713/22
represents [1]  702/22
reprimanded [1]  494/12
request [5]  457/6 539/18 592/25

743/12 747/17
require [7]  466/6 497/6 569/3
569/15 571/2 692/10 734/16
required [6]  544/3 549/5 666/7
666/8 669/1 740/2
requirement [1]  624/5
requirements [3]  451/4 500/5
581/22
requires [6]  445/11 450/13
481/18 545/5 549/25 606/24
research [19]  436/2 436/9 436/9
436/21 436/25 437/13 440/3
440/7 440/10 441/6 441/10
441/18 443/21 474/12 500/10
563/3 573/11 612/10 692/7
researched [1]  665/6
residential [7]  436/24 439/6
472/12 472/13 472/16 473/3
473/17
resisted [1]  504/20
resolution [1]  564/1
resolve [2]  644/8 747/8
resolved [1]  746/9
resources [7]  466/21 596/23
597/24 598/3 648/3 649/4 650/3
respect [17]  513/11 540/13
548/24 551/16 585/3 596/15
596/18 608/21 621/13 621/19
647/9 647/23 655/10 657/23
658/23 678/9 680/4
respectful [3]  457/5 539/18
654/11
Respectfully [1]  637/17
respects [1]  722/24
respond [1]  552/2
responded [4]  537/25 551/21
600/14 691/19
respondent [7]  463/25 464/1
464/16 477/25 510/8 515/2 722/3
respondents [3]  462/5 462/8
478/9
responding [1]  478/11
response [12]  468/19 476/11
494/21 494/22 619/11 682/9
694/23 695/22 727/11 731/13
732/22 735/18
responses [3]  484/21 650/14
653/2
responsibilities [4]  434/3 457/20
504/3 564/13
responsibility [8]  450/19 479/15
533/14 562/4 578/11 659/16
681/21 707/24
responsive [2]  664/9 724/16
rest [1]  661/11
restate [6]  512/10 640/2 659/19
669/22 670/1 712/12
restates [1]  478/17
restrict [1]  530/17
restricted [4]  484/2 484/3 528/1
530/17
result [9]  449/23 450/4 450/23
456/19 524/3 591/21 611/23
684/20 729/25
results [6]  566/11 591/5 645/3
647/2 647/25 648/7
resume [1]  661/16
retain [3]  450/14 450/18 577/8
retained [7]  447/23 453/4 456/6
506/17 575/6 659/10 713/23
retainer [1]  746/7
retake [1]  511/11

Case 1:04-cr-01016-NGG Document 1530 Filed 05/05/08 Page 352 of 363 PageID #: 16785

# R

retakes [1] 559/20
retard [1] 520/22
retardation [75] 435/13 439/8
439/20 442/16 443/12 444/24
445/19 446/3 448/14 449/9 452/8
452/16 454/15 455/19 487/9
500/2 500/2 500/8 501/15 527/22
527/24 570/5 570/23 581/12
582/15 582/19 582/23 587/5
587/24 588/3 591/25 593/8
593/13 594/7 595/1 595/11
597/21 600/6 603/7 604/19
606/12 610/16 619/3 619/17
619/19 619/24 620/5 621/11
622/4 622/21 622/23 623/7
623/11 623/19 628/10 629/7
630/1 630/21 631/10 631/15
631/19 632/25 633/1 637/1 640/1
643/13 645/5 645/16 646/5
663/17 666/12 732/16 732/18
740/24 746/21
retarded [52] 440/16 448/6
448/19 453/7 484/8 486/1 513/19
575/22 581/17 586/18 586/25
588/1 588/15 591/17 594/8
597/15 609/6 617/10 618/1 618/6
618/10 618/16 618/19 618/22
619/5 621/21 621/23 623/25
624/7 624/11 639/22 643/12
645/20 645/21 645/21 648/19
650/2 665/24 666/22 668/24
669/5 669/7 669/15 670/5 670/7
713/24 714/24 717/23 718/22
725/19 740/14 741/10
retention [1] 575/5
retire [8] 578/5 578/5 578/8
579/6 579/13 579/15 580/8
580/20
retired [1] 452/21
retirement [2] 435/17 438/18
retiring [3] 580/3 580/4 580/4
retrieve [1] 558/11
retrospect [1] 666/18
retrospective [2] 468/2 694/9
retrospectively [5] 461/23
507/21 508/12 508/22 722/5
return [1] 511/16
returned [1] 520/13
returning [1] 515/14
revealed [6] 629/12 629/13
662/3 662/8 673/14 712/15
reveals [1] 503/8
review [15] 440/17 442/2 442/6
460/23 547/17 558/12 583/25
585/4 588/25 589/17 591/10
591/12 596/12 647/9 692/13
reviewed [21] 456/11 458/2
461/3 461/9 467/7 489/3 489/5
494/25 495/3 506/16 512/2
536/16 572/4 576/17 593/25
624/13 638/10 679/7 687/18
689/8 690/6
reviewers [1] 442/7
reviewing [5] 583/14 583/16
583/19 583/23 593/4
revise [1] 672/18
revised [1] 508/3
revisions [1] 442/4
reworking [1] 446/21
Rhode [1] 439/5
Richmond [1] 585/12

right [420]
rigidity [1] 635/9
rigorous [1] 445/9
Riker's [1] 713/13
Rikers [3] 549/19 720/16 725/1
rise [1] 431/3
risk [1] 447/11
risks [1] 552/13
Robert [3] 532/11 533/8 597/9
robust [1] 652/18
role [5] 438/15 439/12 534/15
648/17 648/21
romantic [2] 730/1 730/3
RONELL [7] 429/6 431/9
553/20 575/7 577/8 719/15
730/16
room [2] 623/4 724/25
roster [1] 442/7
ROTHMAN [1] 429/20
roughly [3] 438/6 499/20 566/11
route [2] 480/8 480/9
routine [6] 522/10 563/6 570/24
570/25 571/5 679/10
row [5] 632/8 635/3 717/22
738/10 738/11
RPR [2] 430/18 749/21
RR [3] 730/13 730/15 730/17
rudimentary [1] 569/14
rule [7] 630/16 680/24 681/16
681/17 686/7 737/3 742/7
ruled [1] 587/4
ruler [3] 524/23 525/1 711/5
rules [14] 479/15 479/15 482/20
490/8 490/21 490/22 528/11
602/5 626/3 626/5 628/23 630/8
693/18 693/20
ruling [2] 545/23 747/10
run [1] 490/10
rush [1] 625/25
Russia [1] 709/3

# S

safe [1] 564/19
safely [1] 564/21
safety [2] 564/8 565/9
said [151] 436/20 438/17 438/25
450/5 460/8 479/7 484/5 486/3
486/15 488/6 492/23 507/17
513/7 515/22 515/23 516/4
516/18 521/11 522/4 535/14
535/18 536/8 547/3 552/18
554/14 555/14 558/6 560/1
564/25 566/4 568/19 568/23
569/2 569/9 569/12 570/3 574/5
574/11 577/7 580/11 581/3
582/17 585/3 587/17 587/19
589/10 589/14 589/15 589/19
590/1 590/7 591/20 592/3 592/6
592/7 592/8 593/19 596/20
596/22 597/24 599/22 600/12
602/10 604/11 604/22 606/5
606/20 607/11 608/2 611/7
611/17 616/6 617/16 617/18
621/16 621/20 621/25 622/7
622/8 622/24 626/13 629/16
632/18 632/22 636/9 637/6
641/13 642/2 645/1 645/11
646/17 647/13 649/20 652/24
653/4 653/14 655/2 655/22 656/8
657/24 658/6 658/22 658/23
665/4 671/17 673/5 673/14
673/22 674/23 674/23 674/25
676/3 676/5 679/9 679/14 679/17

679/18 679/20 681/24 682/18
682/25 683/5 686/4 689/4 690/15
691/10 691/22 693/3 695/23
696/4 698/5 698/10 701/1 702/16
702/22 703/6 703/15 705/2
706/18 708/24 709/8 712/19
717/4 720/6 729/8 729/12 729/16
730/5 740/8 741/15 742/3
salaried [1] 450/3
salary [1] 611/21
Salekin [1] 614/16
Salvador [3] 714/4 714/9 714/11
same [63] 445/13 447/15 448/8
449/25 460/21 462/10 468/4
471/12 472/3 480/9 487/25
489/23 493/1 497/14 499/22
503/23 503/24 503/24 504/1
504/11 505/14 515/6 520/24
535/4 562/15 563/15 567/7
573/23 575/25 576/12 576/13
576/16 593/14 598/13 604/15
607/4 608/1 608/4 617/10 618/1
618/7 618/10 618/23 619/5
621/23 630/10 637/6 644/11
645/8 649/5 654/18 658/4 660/6
660/7 660/8 665/3 677/16 696/21
699/6 702/15 712/20 713/17
722/25
sample [3] 694/22 701/15 703/9
San [1] 430/2
sanction [1] 554/22
Sanford [4] 583/25 585/3 586/16
616/10
sat [5] 576/21 594/5 638/15
658/14 737/24
satisfied [2] 582/11 588/22
satisfies [4] 589/1 589/6 639/8
639/25
satisfy [5] 581/16 623/6 623/10
629/7 644/24
saw [9] 437/15 452/4 481/1
488/6 583/3 583/11 629/2 629/11
630/23
say [155] 437/12 443/17 444/11
453/21 453/23 458/25 463/11
466/22 469/17 470/4 470/20
472/1 472/2 472/7 472/15 472/19
474/18 475/20 480/15 481/8
483/21 486/6 487/8 490/2 490/21
491/4 491/6 492/2 492/5 493/13
497/12 497/20 499/2 501/3
501/24 502/18 503/5 507/13
509/9 509/25 514/21 516/4
516/15 516/16 517/7 518/22
518/23 524/8 531/3 534/11
535/13 536/5 536/6 536/21
540/20 541/6 541/16 541/20
543/11 546/18 548/17 549/1
549/2 550/7 554/3 554/20 560/16
560/18 560/20 560/21 562/22
563/4 566/11 568/8 570/6 570/25
576/9 579/13 580/3 582/20
582/20 583/17 587/4 590/4
590/15 598/2 602/7 604/2 604/3
606/23 608/6 612/17 612/18
618/25 620/4 620/9 621/10
623/18 625/10 627/5 633/9
633/15 634/14 634/17 637/3
638/5 639/3 642/5 642/22 643/16
648/25 651/25 653/15 654/9
654/13 655/1 655/21 657/6
658/18 658/19 664/18 666/18
671/2 671/10 672/18 673/13

673/21 674/20 677/14 679/10
679/16 679/20 681/6 703/13
683/3 685/1 690/19 690/25 691/3
691/4 694/20 694/25 695/3 695/8
703/14 706/12 711/18 718/15
729/5 729/19 733/21 735/3
737/25 738/23 743/25
saying [5] 461/4 493/18 494/4
509/1 512/21 517/5 567/13
578/13 583/8 587/25 590/6
590/14 592/9 596/25 598/7 609/5
617/5 618/16 625/1 630/15
631/24 641/17 643/23 649/18
652/7 652/24 652/25 653/17
653/18 653/20 666/25 681/10
682/22 682/13 682/14 689/21
693/21 694/20 699/19 700/22
701/6 717/4 727/17 731/19 736/7
736/14 740/10 740/11 740/22
741/1 747/24
says [29] 435/7 444/18 446/8
458/24 459/21 460/19 476/23
479/21 497/6 512/17 524/9
524/10 546/13 561/16 562/18
588/17 593/11 624/11 626/11
643/3 650/1 650/12 653/25
683/11 693/16 730/16 734/15
734/16 736/17
scale [34] 461/24 462/7 467/19
468/12 468/20 479/20 480/14
494/5 507/7 508/7 509/19 515/7
515/9 515/17 516/12 523/24
525/16 526/4 531/24 532/2 534/5
539/2 566/9 566/10 587/12
620/11 628/15 636/24 638/24
644/19 645/3 662/17 677/18
704/1
scales [18] 457/22 467/23 508/2
509/15 510/13 510/16 510/18
514/24 530/11 538/4 552/16
572/19 595/22 664/2 664/17
694/10 701/15 722/14
scenario [1] 643/17
schedule [2] 584/14 744/6
scheduled [1] 438/21
scheduling [2] 431/23 742/5
SCHEIDER [1] 429/20
scheme [1] 525/2
Schmidt [1] 654/19
school [70] 434/5 440/2 440/6
449/19 449/20 452/2 452/9
464/13 467/9 469/11 496/19
496/19 496/25 497/5 497/7 497/8
497/10 497/10 497/19 497/22
498/20 498/24 499/7 499/9 500/4
502/3 509/9 509/23 518/18 519/3
519/4 519/4 520/13 523/7 523/9
534/11 534/13 534/15 535/4
536/10 536/16 536/19 536/20
545/10 546/15 547/3 551/21
563/23 564/20 565/13 566/1
583/17 583/20 647/14 647/22
654/9 654/10 655/15 656/22
657/6 657/10 663/19 678/8
679/10 679/23 687/15 688/11
689/7 689/8 711/8
schools [4] 436/23 482/1 549/14
591/9
schoolwork [1] 520/25
science [4] 436/9 449/16 683/25
737/7
sciences [2] 434/6 436/10
scientific [13] 482/10 590/18

**S**

scientific... [11] 643/6 681/5
681/7 684/2 684/20 685/19 696/5
696/10 697/16 699/10 701/7
scientifically [5] 683/24 699/25
700/4 700/19 701/4
scope [2] 517/12 746/7
score [114] 459/5 459/11 460/9
460/9 462/4 464/8 464/19 469/1
475/21 494/5 509/17 516/2 537/9
538/14 538/20 538/20 538/23
587/15 587/23 588/6 588/7
589/10 589/11 590/3 590/18
590/19 596/11 596/23 597/19
597/21 598/1 598/1 598/4 598/8
598/21 599/19 625/3 625/16
625/16 625/17 625/19 625/21
626/12 626/19 626/20 627/2
629/6 630/4 630/4 633/10 634/1
634/5 634/7 637/10 637/14
637/14 638/6 638/23 639/1
639/11 639/17 641/6 641/8
641/14 641/18 642/2 642/9 643/4
644/18 644/19 645/2 645/12
645/12 645/25 646/21 650/23
651/22 652/4 652/18 652/22
653/13 653/23 654/13 654/25
658/19 660/8 662/3 662/8 662/17
662/18 662/21 665/12 670/20
670/23 671/11 671/23 671/24
672/16 672/25 673/3 673/15
680/9 681/4 681/13 689/11
699/21 699/24 700/5 700/8
700/11 702/8 702/11 702/14
702/17
scored [4] 459/25 647/20 666/12
702/13
scorekeeping [1] 690/10
scores [121] 434/22 456/12
459/23 459/23 460/2 460/12
460/19 465/9 480/18 481/3
481/14 481/17 516/15 524/4
537/12 537/15 537/19 537/23
539/1 562/11 567/14 588/20
588/25 589/21 590/24 592/18
596/3 596/5 598/24 599/6 599/9
599/11 599/13 599/21 599/24
599/24 625/2 626/6 626/10
626/16 626/22 626/25 627/19
628/4 628/24 629/2 629/5 629/10
629/11 629/15 629/19 629/20
629/20 630/3 630/24 631/6 631/8
631/11 631/11 631/12 631/21
637/13 638/10 638/12 640/15
640/23 644/1 644/5 644/7 644/13
644/16 644/18 644/21 644/22
646/4 646/6 654/23 658/4 658/8
660/7 660/13 660/14 662/21
665/2 667/11 673/6 679/12
679/13 679/19 680/2 680/5 680/8
680/25 681/3 681/5 681/6 681/10
681/12 681/14 683/14 687/5
692/4 694/7 695/18 695/23
696/13 697/25 697/25 698/8
699/10 699/11 700/13 700/16
700/23 701/2 702/23 702/24
703/16 703/16 704/10 706/23
scoring [3] 571/18 645/3 678/18
screen [1] 627/20
screening [1] 672/11
search [1] 503/19
seated [5] 431/20 433/15 511/15

557/3 661/6
second [20] 448/4 455/10 455/11
456/7 459/4 462/19 462/19 469/8
471/8 484/22 511/25 515/14
526/2 544/1 566/5 566/18 573/24
602/9 684/4 707/17
secondary [1] 547/12
secretive [2] 625/18 625/20
section [3] 441/20 475/8 653/11
secure [1] 719/25
Security [5] 503/5 503/13
504/12 609/15 609/23 610/5
see [42] 445/15 446/10 457/8
470/17 482/15 488/6 490/21
510/14 526/2 526/3 527/1 553/20
556/1 578/7 578/11 578/13
579/10 579/18 581/13 582/6
587/6 588/13 597/1 598/18
627/23 628/16 632/16 643/25
646/20 651/24 653/10 701/8
706/8 708/7 713/24 714/7 720/18
729/6 742/5 747/7 748/2 749/8
seeing [5] 477/5 519/24 660/9
611/5 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6 611/6
611/21 728/21
seek [5] 483/12 585/20 596/16
598/8 598/14
seeking [3] 504/20 585/13 586/3
549/21
seem [4] 546/3 546/4 548/8
549/21
seemed [3] 544/2 549/12 552/6
seems [7] 482/13 619/7 654/7
677/9 686/1 726/25 728/25
seen [12] 470/19 480/9 496/23
540/1 627/25 662/11 678/22
696/1 696/3 696/19 696/24
730/14
seldom [1] 541/8
self [23] 466/20 473/20 474/12
474/14 474/16 479/15 484/6
506/5 547/12 548/22 549/2 549/3
549/11 549/16 561/11 561/15
562/2 562/12 562/14 562/15
592/1 722/10 723/3
self-care [10] 466/20 473/20
474/12 548/22 549/2 549/3
549/11 549/16 722/10 723/3
self-direction [6] 561/11 561/15
562/2 562/12 562/14 562/15
self-report [3] 474/14 474/16
506/5
Self-reporting [1] 474/12
self-reports [1] 484/6
sells [1] 483/3
sense [33] 432/10 432/12 432/25
445/5 458/6 462/15 465/24
487/17 508/14 513/16 515/19
519/25 521/7 522/6 524/19
525/22 525/23 525/24 535/1
560/2 562/9 564/25 578/15
583/12 596/25 632/2 644/12
658/2 694/11 706/8 724/8 724/17
743/23
sent [4] 442/1 583/7 583/7
748/23
sentence [1] 541/8
sentences [1] 541/8
sentencing [1] 556/1
separate [2] 557/14 645/7
September [1] 637/6
sequence [2] 581/13 585/24
sequestered [1] 576/15
series [5] 444/7 445/1 446/21
525/21 696/11

serious [2] 516/6 649/22
seriously [1] 516/6
set [15] 445/3 464/21 464/23
466/17 489/15 502/11 502/15
511/13 603/20 630/7 669/2
687/22 693/17 693/19 714/4
setting [32] 437/18 452/10
471/15 472/16 472/23 472/24
473/1 473/3 473/8 473/11 473/18
473/21 483/13 483/24 484/2
484/4 520/10 520/13 542/16
542/21 570/2 684/22 684/25
685/6 685/10 685/18 686/19
686/23 692/1 708/4 724/14
729/10
settings [7] 437/22 439/10 444/9
531/13 685/13 735/11 739/13
settled [1] 449/12
seven [4] 432/14 432/19 463/17
549/4
seventh [1] 564/8
several [25] 436/6 436/20 440/6
453/9 458/16 458/17 469/23
484/16 485/12 496/15 501/5
503/20 512/24 534/1 540/15
540/20 541/4 552/14 611/2 644/4
659/15 684/18 710/3 723/15
741/20
severe [4] 439/8 519/8 551/12
616/13
severity [1] 622/22
Shanell [1] 554/1
Shapiro [11] 460/18 480/20
499/17 521/22 576/5 576/8 617/5
617/8 618/9 618/13 746/20
Shapiro's [3] 573/7 622/3
747/21
shared [1] 516/7
Sharise [2] 540/22 540/23
she [181] 503/22 505/14 516/15
516/15 516/15 516/16 516/18
521/11 529/1 529/2 529/5 529/6
529/25 530/4 530/5 530/7 530/20
530/21 530/22 530/22 530/23
530/24 530/25 531/2 531/4 531/4
531/5 531/10 531/14 531/15
531/17 531/18 531/18 531/20
531/21 532/2 532/3 532/4 533/7
533/8 533/13 533/15 534/10
534/11 534/12 534/12 534/13
534/14 534/16 534/19 534/23
533/5 535/6 535/8 535/9 535/14
535/18 535/24 536/3 536/8 536/8
536/14 536/14 540/24 540/9
540/9 549/10 549/20 549/22
550/25 567/5 568/19 569/2 569/4
572/12 577/13 591/9 591/12
591/15 591/17 591/18 591/20
592/3 592/5 592/7 592/8 592/15
592/20 593/5 593/13 593/17
593/17 593/19 596/12 626/24
637/14 637/15 638/20 638/22
639/17 646/13 646/21 646/23
646/25 647/6 650/10 650/22
650/24 650/24 651/8 651/11
651/12 651/12 651/16 651/16

651/24 651/25 652/1 652/2 652/2
652/13 652/20 652/24 652/24
653/22 653/25 655/14 655/23
655/24 656/8 656/8 656/15
656/19 657/3 657/3 657/4 657/8
657/8 657/8 657/21 657/24
657/25 658/18 673/14 673/16
673/18 673/18 673/21 673/22
676/24 679/14 679/17 679/20
681/7 681/8 681/8 681/10 681/13
682/8 682/13 682/18 683/2 730/1
730/3 730/5 730/5 730/6 730/7
730/9 730/12 730/16 730/24
745/2 746/20 746/21 746/21
747/4
she'll [1] 746/2
she's [13] 529/19 569/8 653/17
653/18 653/20 656/6 657/6 657/7
681/24 745/18 746/2 746/15
746/15
shed [1] 528/15
shifted [1] 676/19
shifting [1] 677/7
short [3] 665/22 704/7 746/2
should [81] 442/4 463/18 464/2
464/4 464/17 464/18 474/16
474/17 474/18 475/18 475/21
476/12 476/14 491/19 495/10
508/8 510/25 511/2 511/11
513/23 515/10 516/20 517/14
524/9 524/11 524/13 545/12
546/17 551/24 554/15 554/18
559/12 565/16 586/8 586/11
590/4 590/19 595/17 595/19
603/10 603/13 605/5 607/23
608/7 620/4 623/23 623/24 625/3
625/5 625/9 637/18 637/20 638/6
639/4 644/9 644/10 645/7 645/14
647/23 657/23 660/5 660/8
666/25 667/14 683/13 691/14
695/17 696/21 698/1 699/14
699/22 699/24 702/11 702/14
718/21 720/6 724/15 738/23
740/11 743/21 744/19
should've [1] 666/18
shouldn't [5] 643/24 690/25
691/1 695/4 737/25
show [6] 479/24 504/11 550/21
566/14 567/4 569/19
showed [9] 474/3 538/11 567/8
571/21 667/25 708/15 708/20
709/24 714/10
showing [5] 509/9 570/24 592/17
592/18 647/19
shown [5] 482/17 505/18 553/17
719/12 719/13
shows [3] 466/17 470/15 542/16
shy [1] 672/15
sic [1] 633/24
side [10] 448/23 473/2 473/15
513/20 529/2 529/14 533/20
548/15 559/6 634/12 705/13
sign [1] 511/1
signed [1] 579/5
significance [9] 492/1 498/21
520/19 521/19 522/16 522/17
651/7 706/19 710/12
significant [63] 457/13 458/3
458/5 458/9 458/20 458/21 459/5
465/3 465/19 465/21 466/10
466/19 466/23 478/18 479/8
479/10 480/11 480/22 501/9
509/24 509/25 510/1 519/10

S

significant... [40] 519/20 528/16
538/3 538/6 538/9 538/11 538/17
538/25 546/23 549/3 550/9
550/15 551/18 552/5 553/4 560/8
560/16 560/21 560/24 562/13
564/5 565/8 566/3 567/20 567/24
570/14 572/1 572/5 624/3 632/10
636/25 650/19 651/15 651/18
651/20 706/17 708/2 710/18
710/19 725/10
significantly [4] 538/20 552/24
619/25 650/21
similar [14] 456/16 459/9 459/22
460/1 460/2 461/10 462/2 480/23
492/18 540/24 595/24 605/19
701/5 735/4
similarities [1] 664/16
similarity [1] 664/2
similarly [6] 458/22 465/20
474/17 477/11 712/18 714/2
simple [2] 555/6 627/4
simplify [2] 484/18 540/21
simply [16] 441/10 464/19
478/11 483/21 491/1 494/23
503/1 518/17 518/23 524/4 533/2
547/8 587/2 596/6 621/18 643/15
since [29] 437/8 439/1 440/2
440/5 443/14 450/10 452/11
452/13 489/1 499/18 504/17
511/22 513/8 526/10 567/10
595/9 610/25 612/15 635/14
658/21 667/24 671/8 686/22
692/16 711/8 736/21 736/22
737/13 743/20
single [3] 594/4 658/3 658/6
sir [31] 433/10 433/11 433/15
433/24 434/16 434/24 442/9
443/4 443/7 444/14 446/11
447/17 456/5 472/11 496/8 502/5
527/3 528/25 556/1 560/17 564/7
590/13 608/14 631/6 656/21
661/24 693/10 721/1 721/12
737/17 737/21
sister [7] 503/25 530/5 540/22
552/17 572/23 728/18 744/23
sit [8] 453/12 544/13 554/19
639/14 671/10 671/20 672/14
678/22
sitting [2] 448/20 669/19
situation [14] 459/14 463/19
469/19 492/8 493/18 520/2
546/18 574/13 579/6 669/3 671/4
714/25 717/18 725/21
situations [4] 463/18 546/12
546/16 564/14
six [14] 432/20 463/7 465/14
477/3 479/1 509/10 509/15
509/16 609/3 632/19 692/8
741/18 741/20 744/6
sixth [2] 566/15 566/18
skeptical [2] 590/3 590/14
skill [14] 457/23 471/8 473/10
479/23 480/4 480/10 483/12
505/22 549/24 560/3 561/12
562/15 562/25 711/8
skills [65] 457/14 465/24 466/2
466/5 466/9 473/20 479/14 480/1
483/4 483/10 483/14 483/22
493/13 503/18 503/19 504/18
504/25 505/2 508/8 519/14 542/7
542/23 543/2 544/25 545/14

546/2 548/8 549/2 549/11 549/16
549/18 550/5 550/12 550/19
550/24 551/2 551/9 551/22 551/24
551/5 551/6 551/11 553/3 557/21
557/23 559/14 562/19 563/9
566/1 566/2 566/15 566/19 567/9
567/12 569/20 570/18 620/14
675/22 723/4 725/11 733/22
734/21 735/4 735/6 735/19 736/7
736/18 738/1 738/5 739/22
skip [1] 466/15
slide [64] 457/4 457/25 458/1
458/5 458/13 458/13 458/17
459/8 463/7 463/17 463/17
464/15 464/18 464/23 465/14
466/15 466/25 467/17 469/5
469/8 475/4 478/17 478/21
479/21 480/13 481/11 481/19
481/22 482/3 482/5 482/23 483/6
484/8 485/9 487/11 488/10
489/12 491/9 491/13 494/8
494/18 494/22 495/12 496/22
503/4 507/20 510/10 510/11
514/25 517/24 527/14 528/4
528/18 528/19 529/20 533/10
537/4 537/11 571/21 573/7
573/24 663/12 667/10 733/21
slides [11] 434/19 456/25 467/6
495/16 537/14 537/22 602/19
723/22 733/11 733/13 734/13
slightly [1] 492/12
slippery [1] 501/23
slow [3] 531/22 540/17 549/1
slower [2] 493/13 493/15
slowly [2] 580/16 622/17
small [3] 492/24 525/1 718/23
smaller [1] 434/9
smarter [1] 683/12
smarts [10] 482/8 482/10 482/15
732/25 733/15 734/4 734/5 734/7
735/2 735/3
so [398]
social [51] 457/14 463/8 465/20
466/13 478/23 479/13 479/14
479/16 479/18 482/19 484/11
484/12 490/14 495/1 503/5
503/13 504/11 508/8 519/4
519/12 519/14 519/19 519/21
519/21 520/2 520/10 521/3 521/6
521/7 521/15 528/11 528/12
528/13 528/17 538/13 547/5
551/15 551/18 551/20 551/24
552/2 552/6 552/8 552/17 552/19
552/22 563/25 572/24 609/15
609/23 610/5
socially [1] 554/1
society [5] 490/10 563/1 563/3
712/5 712/14
socioeconomic [6] 535/23 679/24
680/3 680/25 681/15 681/23
SOLOWAY [1] 429/20
solving [5] 479/16 563/4 563/9
569/16 571/4
some [168] 432/2 432/4 432/18
434/18 438/5 440/3 440/3 440/6
443/5 445/3 451/22 452/15 453/8
456/25 457/2 460/18 463/16
466/22 466/22 467/15 468/3
468/24 469/18 471/17 473/18
473/20 474/3 474/4 474/8 477/2
480/2 481/25 482/22 483/4
486/19 488/2 489/5 489/19
490/23 491/13 491/15 492/22
494/15 495/9 496/9 500/19

500/23 502/16 503/14 505/3
505/7 505/13 507/8 507/25
513/11 515/4 515/4 515/15
516/22 516/23 517/19 517/24
517/24 518/23 519/13 521/8
521/23 522/2 522/21 523/1
524/21 525/4 526/8 530/16
534/14 535/8 537/21 539/19
540/25 541/22 544/13 545/5
547/8 551/25 552/3 560/2 561/21
563/3 564/1 566/19 568/3 568/4
568/7 569/5 569/6 569/12 569/24
573/22 578/1 578/2 582/16 585/4
590/1 591/5 592/15 593/19
605/23 609/12 617/5 623/24
624/16 625/11 627/8 628/8 629/2
640/13 640/22 641/14 644/7
649/22 651/6 655/19 655/23
656/20 657/8 663/24 663/24
667/12 668/12 671/24 672/12
673/14 674/14 676/4 676/20
678/13 679/18 680/24 682/20
685/24 691/3 691/4 693/16
693/23 693/23 702/18 703/17
704/19 704/24 707/4 707/24
708/4 708/21 709/8 711/1 713/3
719/21 722/9 722/19 722/20
724/20 725/7 732/20 742/1
742/18 748/8 748/13
somebody [31] 476/23 477/14
483/3 493/18 499/2 509/14
510/12 517/18 553/21 553/22
562/22 562/23 571/11 581/10
581/21 582/14 584/7 598/7
604/18 609/19 618/21 627/9
642/6 642/13 649/25 656/17
658/24 659/13 675/19 676/8
714/24
somebody's [8] 481/12 599/18
600/4 659/22 700/5 700/8 721/8
733/7
somehow [4] 482/15 491/25
517/5 517/7
someone [29] 479/3 485/25
490/2 492/2 493/25 501/3 506/21
508/15 510/5 510/20 531/12
531/18 541/13 541/19 542/9
546/2 546/13 550/21 552/17
558/10 564/17 565/2 567/14
570/21 573/25 597/24 610/10
619/24 723/2
someone's [2] 472/15 536/20
something [72] 440/11 442/8
445/11 447/4 447/11 472/8 483/2
483/11 495/20 500/9 505/11
510/25 511/6 512/5 513/7 513/21
515/23 525/25 526/17 532/4
535/14 535/19 535/22 536/6
543/5 544/2 545/16 549/24
549/25 563/5 563/5 572/25
575/10 579/11 586/10 593/21
595/21 595/25 604/7 613/7 613/8
615/17 623/23 626/8 633/11
643/8 643/8 647/13 664/13 665/6
672/1 672/7 677/6 677/23 678/18
679/1 679/17 681/3 681/25
687/25 693/3 694/3 702/15 703/9
708/24 709/8 711/4 711/24
718/21 730/22 743/3
sometime [1] 650/8
sometimes [4] 497/23 522/10
563/15 734/2
somewhat [4] 518/6 567/12

605/19 694/5
son [2] 444/4 558/13
sophisticated [9] 485/1 485/3
542/4 543/6 548/13 549/25
553/24 569/16 570/8
sophistication [1] 570/22
sorry [17] 476/2 507/21 527/1
587/6 599/5 602/9 625/22 637/4
640/17 651/14 654/14 657/16
662/6 662/7 664/22 727/24 735/9
sort [26] 432/1 446/22 450/8
454/25 456/24 460/8 470/21
482/3 503/16 505/1 531/18
535/16 541/11 541/12 551/4
555/6 569/14 570/7 573/15
573/24 574/8 610/19 625/18
652/11 732/19 735/4
sorts [3] 453/8 561/23 605/25
sought [1] 487/2
sound [15] 542/24 583/10
591/21 592/2 592/9 592/19 598/5
606/9 625/22 675/9 676/22
679/20 683/16 684/1 715/11
sounded [1] 717/13
sounds [10] 543/6 583/11 592/3
592/20 592/20 622/12 622/24
700/21 715/13 741/21
source [13] 436/12 436/13
436/17 507/6 530/9 530/12
532/16 532/20 537/19 569/8
569/11 715/10 727/23
sources [30] 435/25 449/18
464/4 466/25 469/3 469/4 489/7
489/8 495/10 495/25 495/25
496/7 496/7 496/15 496/18 498/2
498/14 507/10 509/22 527/15
527/17 528/10 528/18 537/20
624/2 704/3 723/10 723/15
738/22 739/2
south [6] 446/1 708/24 709/7
709/11 709/14 710/2
southeastern [1] 439/5
spacial [1] 678/1
span [1] 664/14
speak [6] 516/25 546/16 546/17
599/4 639/18 646/25
speaking [5] 557/21 623/23
689/5 689/6 724/22
special [16] 430/12 431/14
497/12 497/14 497/19 498/15
498/18 498/20 499/3 502/15
520/22 535/22 545/20 609/17
731/12 731/16
specialist [1] 693/13
specialize [1] 452/8
specialized [1] 440/23
specialties [1] 442/13
specific [16] 463/6 482/3 488/8
502/19 502/21 508/18 508/20
510/16 550/22 572/14 575/9
622/22 635/17 665/5 721/5
743/19
specifically [3] 619/1 700/2
733/9
specificity [1] 743/20
spectrum [2] 473/15 573/16
speculated [1] 713/10
speculating [1] 592/4
speculation [8] 475/17 633/15
634/13 634/14 634/17 635/11
665/7 665/16

**S**

speculations [1] 477/9
speed [1] 512/13
spell [1] 433/16
spelled [2] 433/19 544/17
spend [1] 551/6
spent [9] 488/4 518/5 531/19
569/25 611/8 695/8 708/5 710/15
747/22
spesh [1] 520/22
spoiled [1] 536/5
spoke [12] 494/10 516/10 521/22
522/8 536/15 541/8 541/10
543/25 557/6 639/18 698/19
725/12
spoken [2] 523/24 683/7
sports [1] 568/5
spot [1] 526/17
spread [1] 632/18
spuriously [1] 524/4
squirmed [2] 650/13 652/25
stable [2] 645/11 645/14
staff [1] 741/18
stage [1] 746/17
stake [2] 695/6 697/24
stakes [7] 648/10 648/13 648/25
649/17 649/19 649/23 705/23
stand [5] 453/9 511/11 559/20
568/9 576/21
standard [111] 445/11 454/13
457/25 458/2 458/14 458/15
458/23 459/10 459/21 460/10
460/10 460/11 460/14 460/19
460/22 463/7 465/7 466/23
466/24 467/19 468/1 471/22
479/11 486/21 488/17 489/7
489/22 492/17 494/15 495/23
497/14 497/22 506/11 508/6
510/11 518/19 528/11 534/21
534/24 535/12 535/24 537/1
537/19 538/2 538/2 538/10
538/11 538/13 538/15 538/21
538/23 542/22 549/4 551/24
552/15 561/20 566/21 572/18
581/12 596/13 598/1 602/21
602/25 603/10 603/13 603/14
603/16 604/8 604/24 607/12
608/7 615/5 615/14 619/20
620/13 621/5 623/9 632/3 633/8
635/10 636/4 636/15 649/10
649/25 651/9 659/12 659/21
663/7 672/2 672/11 680/1 681/13
683/2 686/22 687/6 688/4 688/20
691/5 691/13 691/15 692/5 693/5
693/12 693/14 694/14 694/15
694/18 695/12 718/9 732/20
747/18
standardization [2] 701/14
703/9
standardized [12] 454/9 458/18
459/18 461/16 462/15 469/1
675/17 703/23 722/24 725/22
732/21 741/6
standards [30] 445/3 445/5
465/8 465/10 471/21 475/23
482/18 482/20 488/16 493/20
495/9 496/6 501/22 501/22
501/23 509/21 510/20 528/8
535/1 536/24 538/24 553/4 602/8
602/11 648/23 655/21 690/23
712/3 731/5 739/19
standing [3] 595/3 631/18

690/15
Stanford [11] 525/15 533/3
633/14 632/3 632/22 632/25
659/23 702/13 703/8
Stanford-Binet [9] 525/15
632/23 633/1 633/2 633/22
633/25 659/23 702/13 703/8
Stapleton [2] 560/10 732/10
Staplewood [1] 552/12
start [8] 572/3 599/8 660/4
664/6 674/17 701/2 706/13 746/3
started [10] 452/7 498/8 558/11
569/25 614/22 654/21 709/25
713/9 715/22 717/11
starts [2] 457/4 470/22
state [18] 433/16 436/12 436/12
436/25 450/3 450/6 453/2 467/23
494/12 605/9 605/10 605/11
609/18 609/20 633/13 634/16
668/11 713/9
state's [2] 435/19 436/1
state-by-state [1] 436/12
stated [13] 448/13 454/17
455/24 468/7 468/8 468/9 493/5
498/5 505/7 528/8 532/18 704/2
711/13
statement [32] 475/11 481/20
554/11 584/23 588/9 589/25
607/10 607/11 607/15 622/3
641/16 643/5 647/17 648/12
652/6 659/1 659/3 672/18 680/11
681/14 681/18 682/20 682/21
682/25 682/25 696/4 697/10
697/12 697/15 697/17 703/14
742/1
statements [14] 477/21 477/22
487/15 515/25 518/14 525/21
526/13 655/11 658/25 682/8
691/21 692/15 692/15 696/1
Staten [2] 585/19 713/13
states [43] 429/1 429/2 429/5
429/12 429/15 429/17 431/3
431/8 431/12 431/13 443/2
450/13 451/20 459/1 492/18
492/20 493/1 493/10 494/23
499/25 509/4 597/9 611/2 614/12
614/19 615/2 615/12 615/23
683/12 683/21 683/22 686/13
688/4 701/16 701/17 704/14
709/16 709/25 710/1 714/9
714/11 714/13 718/3
statewide [1] 439/13
stating [2] 590/2 640/2
statistic [2] 712/8 712/19
statistics [3] 615/9 615/9 635/11
status [2] 559/2 680/3
statute [3] 608/25 609/5 630/16
stay [4] 644/11 645/8 660/5
660/8
stayed [2] 498/19 617/7
stays [1] 660/7
steer [1] 532/5
stenography [1] 430/20
Step [1] 433/10
steps [1] 729/22
STERN [3] 429/20 429/22
431/18
Stern's [1] 558/10
Steven [1] 563/12
stigma [1] 487/14
still [28] 452/19 466/10 473/12
479/6 480/21 485/16 514/11
514/25 535/3 559/21 561/5 574/1

578/18 578/19 604/16 614/22
630/24 639/7 648/5 685/3
696/9 703/24 704/1 715/9 730/1
730/4 730/24 733/20
stip [1] 747/2
stipulate [1] 747/3
stipulation [1] 747/8
stood [2] 517/8 596/11
stop [4] 664/3 664/5 665/21
675/12
stopped [2] 530/24 651/25
stopping [1] 578/12
store [1] 481/2
stores [1] 539/4
story [3] 499/16 505/15 638/16
straighten [1] 588/13
strategy [4] 709/22 726/25 727/4
727/10
street [22] 429/21 430/2 430/7
482/7 482/9 482/15 568/9 727/15
732/25 733/15 733/22 734/3
734/7 734/21 735/2 735/3 735/19
736/7 736/18 738/1 738/4 739/22
strength [2] 471/18 479/4
strengths [8] 437/25 463/3 471/9
471/10 478/19 479/22 479/23
480/15
strictly [2] 637/13 645/1
strike [3] 516/22 664/18 664/20
striking [2] 506/1 517/20
strong [8] 474/2 486/12 524/10
582/1 631/1 640/2 652/15 666/11
stronger [1] 466/9
strongly [6] 494/10 673/13
739/22 740/4 740/6 740/8
struck [1] 558/23
structure [5] 473/8 473/8 724/16
724/17 724/18
structured [2] 473/11 720/5
struggled [1] 504/2
struggling [1] 728/25
student [4] 499/9 563/25 564/3
677/1
students [6] 499/19 499/23
519/13 552/10 657/5 657/6
studied [1] 485/13
studies [5] 614/10 647/19 684/12
684/14 696/6
study [1] 712/13
stuff [5] 505/8 593/12 605/25
656/11 674/24
style [1] 585/9
sub [1] 479/4
sub-areas [1] 479/4
subject [2] 514/1 559/5
Subjectively [1] 507/2
submission [1] 555/18
submissions [4] 513/4 513/5
513/7 513/9
submit [2] 561/5 688/18
submitted [1] 442/2
subpoena [3] 449/13 449/17
517/20
subsection [1] 704/8
Substance [1] 435/21
substantial [3] 474/12 500/10
678/17
substantially [8] 502/24 596/24
597/2 598/2 598/8 598/10 598/12
703/25
substantiated [1] 684/2
substitute [2] 536/7 734/9
substituted [3] 536/3 536/8

673/18
subtest [1] 525/15 526/7
526/7 543/17
subtests [3] 671/24 672/4 673/19
subtle [1] 519/21
subway [1] 553/23
successful [3] 571/1 571/8
575/21
successfully [1] 483/16
succinct [1] 443/17
succinctly [1] 469/17
such [42] 436/4 437/4 443/22
453/8 462/16 466/1 473/10 481/4
481/5 494/13 494/13 496/25
515/16 515/21 516/6 516/14
518/5 518/20 519/9 524/9 524/11
524/23 549/3 549/15 562/5
565/14 595/9 617/12 622/10
624/22 630/3 637/19 640/12
643/20 644/8 682/21 688/24
692/16 694/7 694/9 700/17 723/1
suffered [1] 616/19
suffering [2] 631/9 642/7
sufficient [3] 450/21 538/5
577/22
sufficiently [1] 582/1
suggest [1] 701/22
suggested [2] 746/18 747/12
suggesting [3] 579/14 586/21
666/20
suitable [1] 483/13
Suite [2] 429/21 430/2
summarize [4] 465/15 539/12
563/19 633/20
summarized [3] 513/14 550/13
571/20
summarizes [1] 573/6
summarizing [2] 434/21 551/9
summary [3] 465/17 537/11
683/18
Summer [1] 529/22
superficial [1] 545/2
Superior [1] 685/25
supervise [1] 435/18
supervised [1] 450/14
supervising [1] 438/19
supervision [4] 450/20 450/20
450/22 451/3
supplement [4] 512/4 561/5
605/1 739/5
supplemental [1] 733/17
supplementary [1] 507/6
supplementing [1] 513/19
support [1] 542/7
supported [3] 495/19 498/11
498/13
supportive [1] 520/12
suppose [7] 449/2 481/15 497/24
521/15 535/10 610/21 714/19
supposed [3] 467/1 493/21
535/11
supposedly [1] 579/8
suppress [1] 702/17
suppressed [1] 681/4
Supreme [3] 443/2 609/3 624/11
sure [58] 433/3 441/14 454/4
465/1 465/20 468/4 470/11
482/12 488/11 497/8 499/15
514/6 516/8 526/17 526/22
534/12 539/21 542/14 547/15
548/4 550/23 557/17 558/5
558/24 559/15 559/16 578/20
581/2 581/3 582/16 582/17

**S**

sure... [27] 586/14 592/12 597/7
598/11 604/16 607/3 612/7 620/2
634/23 647/18 675/12 679/13
679/21 689/14 690/10 696/24
700/6 700/24 701/23 709/24
715/8 722/12 727/17 730/11
731/3 731/9 748/7
sure that [1] 534/12
surely [1] 549/5
surpassing [2] 502/14 502/14
surprise [1] 617/15
surprised [3] 448/21 527/21
742/23
surprising [4] 567/25 617/11
617/12 617/13
survey [5] 687/23 688/7 688/8
691/18 694/21
surveyed [1] 712/16
surveying [1] 688/8
surveys [1] 694/21
survival [9] 612/8 733/22 734/21
735/19 736/7 736/18 738/1 738/5
739/22
susceptible [1] 523/3
suspect [5] 566/23 617/3 655/5
697/18 743/13
suspect.' [1] 655/4
Sustained [4] 598/17 631/4
680/13 712/12
switch [1] 662/9
switched [1] 611/13
sworn [1] 433/13
symptom [2] 490/7 490/15
syndrome [2] 437/4 481/1
system [16] 446/14 446/18
462/10 462/12 462/24 465/9
497/10 498/24 508/9 515/3
523/25 562/12 614/5 663/19
725/22 731/17
System-II [1] 446/14
systematic [2] 506/7 510/2
systematically [1] 506/10
systems [1] 500/4

**T**

tab [7] 434/25 435/1 444/18
445/13 446/8 447/4 526/19
table [10] 434/21 573/4 573/9
573/11 573/20 573/20 573/24
574/2 574/6 584/16
tables [1] 573/4
take [50] 432/6 454/9 459/9
474/7 492/11 493/14 493/17
508/23 511/2 511/2 514/9 517/14
546/25 553/15 556/1 562/3
574/10 576/24 577/8 578/6
579/16 590/24 594/10 595/25
611/18 611/20 611/20 625/23
626/11 626/18 627/5 630/11
633/10 636/18 648/7 657/23
661/2 664/14 677/20 678/12
679/2 687/23 690/2 690/25
695/17 707/11 708/13 725/9
743/17 745/12
taken [16] 505/9 511/9 513/5
523/11 526/5 534/14 556/3
565/17 639/4 661/4 665/22 666/4
666/21 683/16 685/3 685/15
takes [7] 431/6 435/22 459/5
521/12 557/2 656/19 677/23
taking [26] 474/22 492/19 498/1

516/18 538/14 538/21 578/6
580/12 591/4 600/21 638/1
631/22 641/12 656/17 675/17
677/23 679/2 681/21 684/8
699/13 699/14 700/9 700/19
705/9 705/10 731/2
talents [1] 612/11
talk [30] 507/13 507/16 508/12
509/5 517/14 517/15 517/17
527/11 552/18 559/12 572/23
575/4 590/16 594/5 594/11
599/14 608/19 627/16 662/9
699/6 707/10 707/12 725/25
729/9 735/2 738/12 738/23
742/20 743/4 747/7
talked [21] 450/22 465/22
471/21 478/22 537/22 538/13
560/23 585/1 595/9 597/25
603/10 605/8 616/1 624/22
646/23 665/15 689/2 707/15
735/22 739/25 746/10
talking [38] 462/4 462/6 469/6
476/2 476/6 478/12 480/22
486/14 486/24 499/24 499/25
507/16 507/24 508/24 510/5
515/19 516/9 540/18 558/21
559/11 562/25 596/6 631/17
633/4 637/6 641/11 657/15 662/2
665/14 680/2 699/2 700/2 700/3
700/12 734/21 743/20 748/3
748/5
talks [4] 464/22 466/25 546/2
699/7
tape [7] 554/15 554/16 554/16
558/11 558/13 558/17 561/1
tapes [6] 554/24 555/11 555/12
555/13 555/15 555/16
tapes the [1] 555/12
target [1] 460/9
targeted [2] 502/20 518/10
task [2] 501/25 676/19
tattoo [3] 730/13 730/14 730/16
taught [4] 473/20 549/9 549/13
550/2
taunting [1] 519/15
teach [2] 549/16 549/22
teacher [6] 497/10 497/23
534/14 546/13 657/7 657/8
teachers [4] 464/14 475/19
507/3 547/7
teaching [5] 436/18 440/7 563/8
612/24 613/1
team [10] 506/17 517/2 575/25
584/10 598/23 599/11 647/1
671/14 742/10 742/11
team's [1] 600/3
teased [1] 520/15
teasing [1] 520/18
technical [2] 692/16 696/18
technically [2] 643/22 646/2
teenage [1] 473/24
teeth [1] 544/5
telephone [6] 430/19 488/25
525/4 525/5 542/15 543/4
tell [34] 434/1 434/17 435/9
443/8 444/22 472/17 473/4
486/15 509/15 539/15 541/2
545/8 545/8 558/3 558/3 575/9
584/7 604/23 606/19 639/14
645/6 650/2 660/22 674/1 675/24
678/22 687/4 693/20 711/3 713/4
715/5 731/22 737/5 744/14
telling [2] 588/23 742/19

tells [3] 472/19 524/24 658/13
ten [17] 511/2 564/21 569/13
571/13 604/5 604/15 661/2
676/17 691/20 712/20 715/7
715/9 721/20 721/22 722/8
722/18 723/4
ten minutes [1] 676/17
ten-minute [2] 511/2 661/2
tend [4] 480/15 487/9 497/4
700/7
tendency [3] 487/12 487/22
487/24
tends [1] 729/8
term [13] 480/17 480/19 482/9
482/10 485/17 492/11 500/3
500/6 500/7 548/25 624/8 678/15
733/4
terminology [1] 483/2
terms [30] 431/23 457/25 459/23
463/6 463/8 465/15 478/11
478/12 479/5 481/12 495/6
495/12 496/20 499/4 500/15
501/2 502/13 507/10 509/16
514/13 520/19 520/23 531/7
542/24 547/18 560/15 564/9
573/16 595/19 748/11
Terra [1] 713/13
Terre [3] 725/1 725/8 730/9
terribly [2] 519/5 568/1
Tesse [1] 689/25
test [160] 456/4 460/11 461/19
462/12 462/15 464/6 483/22
508/24 508/25 509/17 523/15
523/20 524/1 524/2 524/21
525/12 525/15 526/19 527/2
534/20 536/4 536/5 536/8 537/7
537/9 537/17 545/23 565/16
566/4 566/5 566/6 566/6 566/8
566/10 571/18 572/13 581/12
587/10 588/10 588/12 600/7
626/11 632/5 637/18 641/3 641/6
641/12 643/7 643/9 645/13 647/2
647/24 650/16 650/22 652/4
653/13 653/19 657/22 657/24
658/3 658/15 659/9 660/2 660/3
660/16 662/10 663/9 665/18
665/25 666/4 666/8 666/13
665/15 666/20 666/23 666/24
667/4 667/14 667/15 667/17
668/2 668/8 668/15 668/25
670/14 671/3 672/2 673/17
673/20 674/7 674/15 675/10
675/15 675/14 675/17 675/20
675/22 676/9 676/10 676/12
677/3 677/5 677/10 677/16
677/22 678/4 682/13 683/15
683/15 683/16 684/11 695/3
695/9 695/12 695/15 698/4
699/13 699/14 700/9 701/10
701/23 701/24 702/4 702/13
702/16 702/25 703/4 703/7
703/13 703/17 703/21 704/15
704/16 704/19 705/10 707/2
707/2 711/17 715/15 715/20
717/3 717/14 717/15 717/21
718/25 722/22 722/24 723/15
725/14 725/22 731/24 733/7
733/21 733/24 733/25 734/3
735/10 735/22 735/24 736/17
tested [9] 519/17 567/1 567/5
628/25 632/14 677/16 703/7
711/11 712/5

testee [1] 673/20
testes [1] 673/20
447/24 448/23 449/4 451/22
460/6 487/5 576/12 576/18 597/3
597/14 602/4 602/14 603/13
605/4 605/14 605/16 605/19
606/5 606/8 606/11 609/18
609/23 610/1 612/14 617/8
618/21 619/10 619/11 630/20
632/7 632/13 634/6 634/11
639/16 645/7 647/18 660/5 669/5
669/6 669/13 670/4 670/7 678/8
678/24 684/21 704/21 705/15
708/10 710/11 714/2 714/24
725/24
testifies [4] 600/25 686/9 686/16
689/15
testify [16] 448/4 448/10 448/11
448/18 449/7 449/10 559/17
606/2 610/12 610/22 637/12
639/15 660/1 689/18 703/21
746/7
testifying [12] 443/20 511/19
512/8 588/14 602/10 613/4 638/7
649/1 649/7 680/17 686/13
712/10
testimony [48] 433/8 434/15
448/16 449/18 454/12 457/3
508/19 512/6 516/22 584/11
584/12 584/16 584/20 584/25
585/1 586/9 596/17 598/7 607/8
607/9 607/17 611/18 616/3 617/3
620/18 621/7 621/9 622/6 633/18
636/1 639/6 639/12 639/21
649/21 649/22 655/7 679/5 679/9
698/1 703/1 703/3 703/19 719/21
723/5 726/23 726/25 747/22
748/9
testing [42] 452/5 452/9 461/10
478/4 497/18 500/14 500/22
502/2 526/15 537/15 545/15
546/15 546/18 566/14 567/2
567/4 567/6 567/7 572/12 572/13
587/5 594/17 595/4 599/23
625/11 634/4 639/19 651/9
659/21 664/15 667/21 674/9
674/11 678/21 683/1 689/9
695/12 705/2 725/13 739/17
741/3 741/6
tests [49] 452/16 452/17 454/9
457/19 459/9 459/25 460/1 460/2
461/21 462/2 462/13 462/15
510/13 524/16 525/8 525/9
534/16 535/5 535/11 536/13
565/14 567/14 600/7 624/13
626/12 627/15 627/17 637/19
647/20 652/17 666/19 674/12
676/25 677/15 678/1 678/13
696/11 697/23 701/12 702/7
703/11 703/23 704/11 707/1
728/10 728/11 732/13 732/21
734/16
Tethering [2] 685/21 695/22
Texas [1] 713/7
textbooks [1] 501/7
than [79] 438/18 462/9 464/19
467/14 467/15 469/25 475/6
475/9 480/15 481/14 491/7
492/12 496/10 500/7 500/19
510/6 517/7 518/22 522/19
524/16 528/14 540/23 545/6
545/16 546/17 551/24 553/5
564/3 570/3 572/14 578/12

Case 1:04-cr-01016-NGG Document 1520-7 Filed 02/09/11 Page 357 of 363 PageID #: 16790

# T

than... [48] 590/15 592/16
592/18 604/16 604/19 612/16
613/2 613/25 614/18 614/19
615/5 622/7 623/9 623/25 627/9
630/8 642/3 644/17 649/25
651/23 658/1 663/11 666/23
667/12 669/3 672/4 673/6 675/14
679/11 681/8 685/6 686/1 692/1
702/4 703/23 705/10 705/11
710/15 713/12 714/5 714/17
720/21 723/15 727/15 732/21
744/7 745/5 747/11
Thank [36] 433/9 433/21 455/16
455/20 470/9 470/10 470/12
476/12 476/18 476/19 476/20
511/8 511/14 513/3 513/25 527/1
556/2 559/7 561/8 574/14 574/21
594/14 607/19 627/21 629/23
654/16 661/18 661/24 680/14
692/23 692/24 709/6 743/22
747/16 748/10 749/8
that [2335]
that's [235] 432/7 432/23 434/8
435/5 436/3 437/23 440/12
440/15 450/11 454/6 454/19
455/7 457/15 457/24 460/22
462/1 464/10 466/14 470/22
473/6 473/11 473/13 473/21
473/22 474/18 479/19 480/24
481/3 481/15 482/7 482/8 482/22
489/15 491/20 492/24 493/8
493/12 495/5 497/9 497/22
498/11 500/25 503/15 504/15
506/20 507/6 508/25 512/14
513/2 514/25 519/19 521/24
524/14 526/24 527/14 527/16
527/22 534/25 535/19 542/18
548/17 550/11 554/3 554/3 555/7
555/19 555/19 557/4 558/4 560/7
566/6 566/6 566/7 567/16 568/17
568/25 573/18 574/14 575/20
579/4 579/8 579/23 579/24 582/3
582/17 584/3 587/19 590/18
594/9 595/6 596/2 596/5 597/7
598/1 602/25 604/14 606/21
609/11 614/25 615/14 615/15
615/17 615/18 615/20 617/3
618/15 619/18 620/7 624/2
628/15 628/18 628/20 628/22
629/21 630/14 630/18 630/22
630/22 631/7 632/18 633/4
633/11 633/12 634/9 639/15
640/2 641/11 642/6 642/10
642/16 643/6 643/17 644/2
644/22 645/18 646/3 646/6
647/17 648/2 648/23 648/25
649/14 649/14 651/17 652/5
652/20 652/24 653/4 653/4 653/5
653/7 653/20 654/25 656/12
658/16 663/8 663/25 665/4 665/6
665/7 665/15 666/10 675/13
677/14 678/8 679/21 679/22
681/10 681/19 682/14 683/4
683/5 683/18 683/18 684/13
685/4 686/22 687/2 688/13
690/10 691/5 691/19 693/20
693/25 695/1 696/8 697/17
698/10 698/16 699/2 700/17
702/24 704/11 705/14 706/6
710/5 711/8 715/23 718/9 719/7
720/13 721/12 721/22 723/14

723/21 725/18 726/3 726/4 727/8
727/8 727/18 728/15 729/4 731/8
731/10 733/6 733/17 735/1
735/16 735/22 736/13 736/13
736/14 736/25 737/13 739/11
741/15 744/13 745/3 745/7 745/9
745/23 747/1 748/25 749/4
their [66] 438/8 442/7 450/15
457/16 457/19 457/21 468/24
474/14 475/13 477/6 479/22
480/23 481/2 487/7 487/7 493/11
493/12 510/5 513/7 513/9 519/2
535/23 542/7 542/8 557/6 559/14
570/24 599/18 600/6 604/8 612/7
612/11 641/6 642/14 643/20
643/23 643/25 644/11 647/24
648/6 648/7 648/8 654/24 655/6
655/18 656/17 656/22 664/2
678/10 678/10 679/11 688/2
688/6 695/6 695/15 696/1 696/4
696/8 696/9 728/21 729/2 731/12
733/12 734/5 742/3 742/24
them [77] 432/4 439/8 442/2
442/5 449/6 453/10 461/22
467/15 468/23 469/18 475/3
488/2 494/4 495/3 495/22 496/4
496/17 496/21 498/3 507/13
508/1 508/12 508/13 508/14
508/19 509/23 513/1 513/6 515/7
515/11 515/20 516/2 517/9 518/7
519/5 522/3 525/10 541/4 549/13
552/2 568/19 569/10 573/13
573/22 574/12 574/12 584/13
584/18 585/1 590/23 600/5
623/13 626/18 642/20 643/1
644/17 645/1 656/19 659/1
667/12 676/9 678/13 684/13
695/8 696/6 699/11 700/19
707/11 708/13 712/20 725/13
737/6 739/25 743/2 748/16
748/17 748/18
themselves [2] 484/8 484/24
then [117] 433/4 439/19 442/5
443/12 443/13 444/7 447/4 452/7
454/3 455/12 458/20 459/2 459/7
460/3 463/23 464/1 466/15 469/3
471/16 471/20 471/22 472/24
473/13 477/24 482/21 484/22
488/7 491/4 493/25 502/20
503/23 505/9 507/16 510/1
512/12 512/12 513/23 514/9
514/18 525/22 531/11 532/20
535/2 535/14 536/7 538/7 538/15
544/13 549/11 549/13 549/14
549/15 549/19 550/1 553/20
554/1 555/10 555/16 558/6 561/9
569/10 570/9 570/20 571/17
573/23 583/11 586/11 590/11
591/15 596/2 598/4 603/20
603/20 604/7 604/10 605/25
618/5 621/14 622/8 624/23
632/17 632/24 633/10 634/10
635/14 642/11 642/23 645/3
652/22 657/8 661/15 661/19
665/21 672/17 673/1 673/12
674/24 676/11 677/7 677/14
678/19 683/3 700/19 710/1 711/7
720/15 720/16 720/22 733/21
734/11 744/2 744/18 744/22
745/4 745/17 746/11 748/3
theoretical [1] 660/13
theoretically [6] 579/23 644/10
644/12 645/7 645/11 660/8

theories [3] 644/12 699/20 701/2
727/8
683/24 683/25 695/24 696/4
696/6 696/10 697/16 698/8 701/7
therapeutic [18] 438/2 472/21
472/23 472/24 474/2 518/2 518/5
518/7 518/19 519/1 519/24 520/8
522/22 531/13 719/22 724/11
724/15 724/18
therapist [1] 519/18
therapists [3] 520/1 520/6 552/5
therapy [1] 546/16
there [269] 434/10 436/4 436/6
436/25 437/8 438/20 439/1 440/9
441/15 441/24 442/13 444/15
445/13 448/16 450/23 453/8
453/9 454/3 455/3 456/4 456/21
457/15 457/19 458/13 458/16
458/17 458/17 458/23 459/4
459/8 459/15 459/22 460/15
461/6 463/16 464/18 465/10
469/14 469/18 474/12 478/10
478/23 480/3 481/7 481/11
481/15 481/20 481/25 482/3
482/5 482/6 482/25 485/6 485/20
487/11 487/15 488/10 488/20
488/24 489/12 489/15 490/18
491/13 491/15 495/9 495/12
497/5 497/15 497/17 498/16
499/11 499/23 500/14 501/17
501/19 503/10 503/25 504/6
505/8 505/20 506/2 506/3 506/5
506/20 507/8 507/15 509/24
514/15 514/20 515/1 515/16
518/4 518/14 521/7 521/15
522/15 522/15 522/22 523/4
524/1 524/20 525/24 526/20
530/16 532/19 537/23 538/5
538/6 541/11 541/21 545/22
546/11 546/15 547/3 548/8 548/8
549/1 549/2 550/22 551/8 551/9
551/9 551/23 552/14 553/13
554/2 554/18 560/2 560/2 560/19
560/19 560/24 563/8 563/9 564/5
564/22 565/12 565/21 569/6
569/22 569/22 572/14 573/4
573/11 573/23 573/24 574/5
575/3 575/5 577/18 577/19
577/21 578/15 578/18 580/24
581/13 582/1 582/20 583/6 583/7
586/5 586/19 587/1 593/5 595/10
596/7 597/10 607/5 611/6 613/4
623/2 623/21 626/2 627/14 628/8
630/19 631/6 633/16 634/18
634/20 636/2 636/4 636/9 639/18
640/19 641/9 641/14 641/18
642/19 642/21 643/7 644/4 644/7
644/12 644/24 647/19 655/12
655/13 658/14 659/2 660/15
663/24 663/24 664/5 664/13
664/16 665/1 666/15 666/18
668/10 672/5 672/8 673/14
679/11 680/12 681/4 682/1
682/21 682/21 682/24 687/7
687/7 688/24 690/4 690/14
690/19 691/7 692/18 693/8
694/23 696/9 697/15 697/21
697/21 699/19 699/19 701/9
702/3 702/3 702/7 702/10 702/12
702/16 702/18 702/23 702/23
703/6 703/6 703/13 703/15
703/16 703/20 704/1 704/3
704/10 706/5 706/8 707/19 711/4

711/25 717/21 719/18 721/18
723/5 726/1 740/25 743/17
746/22
there's [36] 437/3 438/5 444/18
459/8 459/18 460/17 462/19
464/15 482/22 487/3 488/11
490/25 500/9 513/7 513/21 536/7
539/19 544/10 553/21 596/6
603/24 623/16 623/19 626/10
633/16 634/18 634/20 642/17
647/14 653/10 653/11 662/23
665/25 675/19 720/21 729/16
therefore [7] 449/10 469/10
488/16 490/23 644/7 646/13
683/13
these [181] 434/15 436/11
436/18 438/11 438/23 445/4
450/2 457/6 457/13 459/3 459/6
461/25 462/18 462/25 463/11
465/4 465/10 465/11 465/12
465/13 465/23 465/24 466/12
466/12 466/16 466/19 467/23
466/8 468/10 469/5 469/10
469/17 475/23 477/11 477/21
482/14 483/16 483/17 495/16
495/17 495/19 495/21 496/3
497/2 497/21 498/1 498/2 498/12
498/13 508/22 509/15 509/19
510/9 510/13 510/18 515/8
515/15 515/19 515/25 516/23
517/1 517/2 517/5 517/9 517/17
518/25 519/1 519/10 519/25
520/5 520/7 521/2 525/8 526/5
527/16 530/8 531/13 532/16
537/15 537/23 538/4 538/11
539/4 540/12 541/5 541/17 542/1
544/10 549/8 549/9 549/12
549/12 550/4 550/5 550/24 551/4
559/12 560/13 564/4 565/16
566/25 568/21 573/12 573/21
574/6 574/11 578/14 578/16
578/12 742/16 742/18
they [194] 436/12 436/14 441/9
442/4 445/8 453/6 459/17 459/25
461/9 466/6 466/10 467/23 469/1
469/18 471/21 471/22 472/16
472/17 473/3 473/4 473/10 474/5
474/18 474/19 477/19 479/24
483/4 485/15 486/16 487/3 487/7
487/8 487/9 487/21 487/25 488/1
488/3 488/3 488/5 488/5 488/8
489/5 489/7 491/8 491/25 492/4
493/9 493/10 493/11 493/13
496/3 496/15 497/4 497/9 498/25
499/3 500/5 502/16 502/18
505/10 505/12 505/17 505/17
507/14 508/1 508/15 510/22

**T**

they... [127] 513/5 513/7 513/8
514/20 515/5 515/15 515/22
515/23 516/1 517/3 517/17 518/7
518/8 518/9 518/15 518/16
523/10 525/9 527/13 530/20
534/2 534/2 535/12 540/17 541/1
541/14 542/3 542/8 548/6 549/15
549/16 554/18 559/16 559/17
562/25 563/2 563/5 563/6 563/11
563/12 566/10 566/23 568/15
569/12 569/13 569/13 569/14
570/7 570/7 577/21 578/19
578/23 581/25 582/14 595/24
599/7 602/7 603/20 609/3 609/20
612/2 620/3 624/18 629/12
629/13 630/25 641/18 642/5
642/7 643/18 643/21 644/14
647/15 647/24 647/25 652/17
655/2 655/16 655/20 657/1 657/1
657/2 660/18 664/14 681/1 681/1
681/2 681/25 688/7 689/5 689/8
689/24 694/8 694/8 695/5 695/13
695/14 695/15 695/22 697/23
698/10 701/16 702/4 705/11
705/11 705/13 706/16 706/17
712/6 721/9 722/15 724/1 725/6
725/7 728/23 728/23 729/2
729/19 732/17 734/4 738/13
742/4 742/13 742/23 743/2 743/2
746/23

they're [25] 431/24 443/10
465/11 465/25 466/1 482/15
487/6 502/17 509/13 511/19
522/12 525/8 541/14 624/7 642/8
642/17 648/7 668/5 671/14 678/1
678/9 691/7 701/17 722/16
742/19

they've [3] 438/9 511/7 513/4

thin [1] 504/15

thing [35] 457/15 477/1 484/10
494/8 501/8 505/23 513/10
514/21 521/16 521/24 524/15
525/24 532/4 535/24 536/2 536/5
557/20 572/17 593/14 617/12
624/11 630/10 637/7 642/6 651/9
665/3 668/1 668/22 678/16 683/2
688/24 694/1 701/24 708/13
729/1

things [143] 433/2 436/6 436/20
440/6 441/16 444/5 445/8 454/10
457/6 457/7 458/7 458/17 466/1
467/8 473/20 473/21 474/3 474/8
478/23 479/1 479/9 483/9 483/16
483/17 483/18 483/23 484/10
485/6 485/16 490/17 495/13
497/17 497/18 497/21 502/18
504/2 505/1 505/21 510/9 511/16
511/23 512/13 515/17 519/25
520/5 520/7 521/12 521/17
522/10 522/20 522/25 523/6
524/21 524/22 524/23 525/7
525/21 525/24 526/8 527/5 527/9
527/16 527/16 531/23 540/20
540/22 540/23 541/2 541/7 541/9
545/8 545/10 549/5 549/8 549/9
549/12 549/17 549/23 550/4
550/5 550/24 551/1 552/3 557/5
561/24 562/11 564/17 568/25
569/4 570/18 573/21 583/16
583/18 584/7 584/13 585/17
593/19 596/10 612/12 634/11

635/7 635/8 635/9 636/10 651/18
655/20 657/16/6 658/1
673/8 673/14 674/3 674/5 674/6
674/14 675/25 676/14 676/20
678/7 690/24 691/2 693/23
693/23 694/9 694/10 701/4
706/10 706/13 706/16 708/5
708/14 708/15 710/3 711/2
712/25 713/3 722/15 723/1
723/25 735/23 736/4 739/5
741/16

think [270] 432/9 432/11 435/1
440/13 441/16 442/18 454/6
455/6 458/4 460/8 460/17 461/22
465/11 468/13 469/8 469/17
473/6 473/16 473/22 474/19
475/8 475/18 477/8 477/8 478/8
478/17 480/2 481/19 482/8
482/11 482/25 483/7 485/7
485/20 487/9 487/24 487/24
492/11 494/14 495/18 496/15
498/5 498/7 498/13 499/6 499/16
500/3 500/25 502/16 503/7
503/23 503/25 504/17 505/6
506/25 508/15 509/14 510/10
512/13 512/14 513/22 514/2
514/20 515/3 515/5 516/19 517/4
517/11 517/12 518/17 521/6
521/24 522/21 522/24 523/5
524/2 524/10 524/13 525/2
525/14 525/24 531/24 534/12
535/3 535/16 535/25 536/23
536/23 536/24 537/2 541/25
542/1 544/24 545/7 548/14
548/15 550/2 550/4 551/8 551/9
552/20 553/25 554/11 555/7
555/20 560/1 560/24 561/9 563/2
564/22 565/25 566/4 566/16
567/6 568/4 568/6 568/19 569/6
569/11 569/22 572/15 572/17
572/20 572/23 573/5 574/4
574/10 574/11 574/12 575/11
577/5 578/11 578/23 582/17
583/3 583/20 586/8 586/8 587/1
588/1 588/2 590/6 590/7 592/8
595/6 595/17 595/19 596/10
597/22 598/2 599/21 600/8 600/9
602/25 604/2 606/19 606/24
613/7 614/16 614/22 620/22
623/3 624/25 627/17 629/13
630/18 632/9 634/21 635/8
635/14 635/16 637/5 637/6
637/24 641/8 641/16 642/10
642/16 642/23 646/22 647/13
647/17 647/18 648/2 648/12
650/1 651/12 655/15 655/20
657/2 657/3 659/23 660/11 663/6
664/19 664/20 666/3 666/17
667/10 668/6 674/22 675/13
675/21 678/6 678/24 679/2
679/16 680/1 681/4 681/18 683/5
684/2 684/23 685/14 685/18
686/4 686/21 686/25 687/11
690/22 690/24 691/3 691/7 691/8
692/10 692/11 692/15 693/6
693/21 694/13 694/14 694/14
695/14 696/21 696/22 697/21
698/12 699/23 700/12 700/17
700/18 701/1 702/5 703/12
706/21 710/3 710/14 710/16
711/4 711/18 711/20 718/15
722/22 723/25 724/11 729/4
729/21 729/22 738/24 739/18

740/17 743/17 743/21 745/5
747/18 748/23

thinking [6] 455/6 511/25 569/3
609/1 646/24 739/4

thinks [1] 691/6

third [8] 457/4 471/24 504/9
505/23 508/2 538/19 550/12
666/2

this [508]

Thom [1] 687/14

thorough [7] 479/19 480/25
481/18 506/4 506/7 544/25
649/18

thoroughly [1] 463/12

thoroughness [1] 649/5

those [121] 442/2 453/3 453/24
457/20 458/10 461/9 462/15
465/21 466/24 468/5 468/7
468/10 468/22 469/4 472/8
472/13 474/5 474/25 475/1 477/2
477/2 477/5 477/16 478/22
478/24 479/3 479/17 481/8 483/5
483/22 485/6 487/15 489/6 490/4
495/2 496/7 496/20 497/12
497/15 498/21 502/11 502/13
502/22 505/25 509/12 509/21
510/20 510/23 513/5 516/20
513/12 527/9 538/8 538/9 538/17
538/25 539/15 545/4 548/4
549/16 549/22 550/21 555/11
557/14 561/23 562/11 565/3
570/18 571/13 584/21 584/23
584/24 588/25 594/6 599/23
599/24 603/25 606/16 607/6
610/9 612/12 614/5 615/4 615/9
628/22 628/22 628/24 631/6
631/11 636/23 644/23 655/10
657/2 657/9 658/6 658/8 666/5
670/11 673/5 680/20 689/10
690/24 700/1 700/10 700/13
706/16 712/6 712/16 720/6
721/17 722/19 723/1 723/4 725/4
725/5 728/10 728/20 732/9
732/14 732/17 746/10

though [8] 469/1 480/11 482/5
485/12 540/24 564/25 695/2
710/11

thought [14] 522/3 526/12 550/5
569/4 578/1 578/2 586/22 588/6
668/9 676/20 677/11 679/14
725/10 733/4

thoughts [1] 501/5

thousand [1] 612/21

thousands [1] 612/19

three [33] 442/25 444/8 445/1
446/21 457/11 457/13 459/3
459/6 478/22 501/15 504/6
507/25 508/7 509/19 512/25
529/3 537/23 538/12 538/17
538/24 539/11 552/23 553/8
574/6 604/13 604/14 623/12
668/10 668/15 708/12 710/12
740/2 744/10

three-part [4] 445/1 446/21
457/11 501/15

threw [2] 639/1 639/3

through [30] 436/12 445/9
460/18 465/25 465/25 466/1
480/6 495/21 500/21 526/16
539/10 539/15 540/7 540/17
557/5 557/10 560/13 574/11
578/12 594/3 594/6 612/10

612/10 612/10 612/13 661/11
663/17 705/10 708/16791

throughout [12] 436/3 436/11
498/9 498/20 514/22 564/22
616/10 644/11 645/8 645/17
691/5 704/14

throw [2] 565/1 644/21

thus [1] 624/5

tie [1] 626/3

till [2] 432/14 514/9

time [183] 432/4 432/16 435/19
435/22 440/3 440/10 446/5
448/20 450/11 450/17 450/20
451/12 452/8 456/1 458/7 458/7
459/13 465/6 469/23 470/1 470/4
470/15 470/18 470/20 470/23
476/23 488/4 489/23 497/1 497/1
498/9 498/17 499/22 503/2 504/1
504/2 509/12 511/10 518/5 519/3
519/5 521/9 526/1 526/2 529/6
529/8 530/24 531/19 536/10
539/25 540/17 541/3 542/25
543/7 544/1 544/2 544/6 544/8
545/19 547/18 547/25 548/10
549/18 550/24 551/17 553/2
554/5 554/19 555/3 558/12
560/10 560/11 561/18 561/19
567/5 567/19 568/7 568/11
568/14 569/8 569/14 569/18
569/25 570/14 572/6 574/10
575/5 576/16 577/4 578/3 579/19
580/1 580/1 580/11 580/17
583/13 583/18 584/17 585/11
585/15 590/1 595/22 596/3
596/17 599/1 603/1 603/17
607/15 607/22 608/1 608/4 609/8
609/12 609/12 610/16 610/25
611/7 616/15 617/10 618/1 618/7
618/10 618/23 619/5 621/23
626/12 630/5 634/4 635/10
643/15 644/14 647/6 655/11
655/14 659/15 659/18 660/3
661/5 663/22 665/25 666/16
669/7 669/15 670/8 670/8 670/9
671/5 676/15 676/18 677/11
678/5 683/14 683/15 683/16
684/23 686/22 691/18 694/8
707/22 708/5 711/7 720/13 721/2
721/4 721/10 721/17 721/21
722/2 722/3 722/7 722/17 723/7
723/18 723/20 724/6 724/9 732/5
741/1 743/7 743/16 744/9 744/14
749/11

timeframe [1] 567/8

timeline [1] 583/6

times [16] 447/21 447/22 449/1
449/2 464/12 474/5 488/2 529/3
540/20 563/16 612/12 627/15
645/7 660/5 683/14 744/10

timing [1] 607/6

tiny [1] 711/14

title [2] 656/5 677/20

titled [1] 527/15

titles [1] 441/5

today [27] 443/20 447/19 453/12
485/17 488/11 496/5 499/8 536/1
544/5 550/5 573/22 585/2 590/7
604/22 612/14 644/8 649/21
655/22 669/14 669/18 672/14
679/8 690/21 703/10 720/24
732/24 745/1

together [10] 438/6 446/22
534/2 534/3 537/21 540/18 541/2

**T**

together... [3] 555/4 569/12
677/25
told [27] 432/8 449/13 505/5
505/6 518/17 541/7 577/6 580/24
582/10 584/3 600/1 608/18
613/18 615/6 638/16 671/23
672/24 679/9 679/9 691/20
704/24 707/21 708/4 708/8
714/18 715/17 742/13
tomorrow [5] 561/4 661/16
745/24 748/21 749/9
ton [1] 640/8
too [19] 502/18 545/4 563/15
569/17 580/7 598/20 612/5
639/24 645/4 662/7 667/15
672/25 674/8 675/13 685/10
688/2 706/19 718/25 731/20
took [18] 480/8 486/16 503/22
505/10 516/7 549/10 554/4
560/10 581/20 632/19 645/1
655/14 657/8 657/22 658/15
663/22 685/23 729/22
toothbrush [2] 466/3 549/21
top [7] 513/12 593/6 593/10
600/24 600/24 682/14 682/16
topic [3] 532/1 532/3 635/17
topics [3] 509/20 509/22 614/14
toss [4] 586/9 666/17 667/1
672/6
total [1] 503/13 653/8
totally [1] 476/6
touched [1] 572/17
touches [1] 735/5
touchstone [1] 652/12
toward [5] 432/19 481/25
550/21 593/7 593/12
towards [1] 586/3
track [1] 586/14
train [1] 737/4
training [12] 436/2 436/7 436/21
436/24 437/14 438/7 438/7
438/11 438/12 438/15 439/12
550/24
trait [4] 645/11 645/13 645/14
660/13
transcript [15] 429/11 430/20
608/9 619/15 632/17 633/3
634/10 674/16 674/18 674/19
714/8 726/17 748/13 748/23
749/17
Transcription [1] 430/21
transcripts [3] 606/22 748/11
748/16
transmitted [1] 432/25
travel [1] 517/3
treat [2] 707/11 729/13
treated [1] 517/18
treatment [1] 518/20
trial [7] 453/9 506/17 548/7
554/10 558/19 559/1 606/2
tried [5] 440/6 475/3 488/15
515/21 535/10
trivializing [1] 684/1
trouble [2] 552/13 706/21
troubled [3] 554/9 673/10
673/12
truck [1] 504/13
true [31] 454/19 508/13 536/17
560/7 575/20 579/4 589/13
589/15 596/2 607/9 607/11
609/11 613/17 614/2 631/23
639/15 645/18 646/7 647/17
648/7 648/7 665/3 666/15 669/1
702/12 705/14 723/21 727/8
727/18 736/25 740/6
Trumble [2] 605/17 717/19
Trumbull [3] 448/2 454/24
669/14
trust [7] 608/9 641/6 641/8
641/14 654/13 654/15 662/25
trusting [1] 588/24
truth [2] 486/15 605/3
truthful [1] 487/2
try [16] 457/5 495/21 499/17
535/9 539/18 546/3 546/4 562/6
563/15 644/8 675/20 677/7
678/13 679/3 682/6 746/1
trying [25] 451/21 452/20
453/19 461/21 484/2 484/8 486/1
504/22 525/3 537/21 545/17
546/12 560/14 560/15 564/9
578/4 593/5 593/14 593/14
642/25 671/5 679/4 711/1 734/9
744/23
tune [1] 614/18
turn [4] 434/25 444/19 539/22
736/18
turned [1] 534/23 650/16
turns [2] 579/25 637/8
Twenty [1] 740/18
twice [5] 526/1 528/22 528/24
544/1 746/18
two [49] 434/9 441/5 441/18
441/25 442/25 455/13 458/22
460/10 461/21 463/20 464/22
465/4 466/20 466/24 467/22
473/16 479/11 490/2 490/4 508/5
512/21 522/5 529/7 538/2 538/7
538/9 538/10 543/23 553/5 573/4
577/19 583/4 585/8 604/4 604/11
604/16 604/19 607/17 615/17
622/10 623/9 634/20 683/23
699/1 710/16 712/20 733/11
733/13 734/12
type [5] 444/3 507/24 598/13
733/6 734/2
types [6] 583/16 584/21 584/23
584/24 677/17 706/1
typical [14] 469/22 469/22 471/3
471/15 472/1 472/25 475/5
475/13 543/5 543/6 563/20
645/15 652/19 723/11
typically [13] 471/2 472/14
473/7 475/6 502/11 530/8 532/16
563/21 620/10 653/11 653/12
672/10 726/10

**U**

ULERIO [2] 430/14 431/18
ultimately [1] 582/6
Umana [8] 597/4 597/15 713/18
713/19 713/22 713/24 714/3
714/7
unable [3] 457/20 623/6 646/13
unadjusted [1] 629/20 629/25
unavailable [3] 530/23 651/4
742/14
UNC [2] 579/5 579/6
uncomfortable [1] 516/1
uncommon [2] 536/19 536/23
under [21] 440/9 464/13 470/2
471/22 475/15 477/10 479/9
484/14 488/2 490/14 514/11
527/24 528/11 536/10 553/3
559/22 568/14 626/4 626/22
602/3 709/16
underachieving [1] 592/1
underlying [3] 518/24 519/10
702/6
understand [48] 437/21 456/3
466/2 470/19 504/2 504/3 505/9
511/20 517/4 521/14 536/10
540/3 540/21 541/6 543/18 548/1
554/21 555/23 572/15 577/2
578/7 586/18 587/14 587/17
589/7 590/6 590/6 606/23 628/7
630/14 643/23 646/9 648/21
655/10 682/18 707/13 727/9
727/15 727/17 727/19 734/7
742/18 747/9
understanding [21] 462/5
473/25 503/12 513/18 519/22
520/11 521/10 525/18 550/1
581/10 581/21 581/24 588/11
600/6 602/5 626/24 629/22 633/8
637/13 659/16 719/22
understate [1] 453/15
understated [2] 643/4 658/8
understood [11] 508/18 525/5
543/20 586/1 587/9 592/24 593/4
659/5 684/22 695/17 714/25
undertake [1] 599/17
undoubtedly [1] 583/24
unethical [1] 656/24
unfair [3] 517/6 555/7 555/9
unfairly [1] 633/20
unfolds [1] 579/18
unfortunate [1] 432/18
unfortunately [4] 651/4 658/13
703/22 731/11
uniform [1] 718/1
uniformly [1] 562/5
UNITED [40] 429/1 429/2 429/5
429/12 429/15 429/17 431/3
431/8 431/12 431/13 443/2
451/20 459/1 492/18 492/20
493/1 493/10 499/25 509/4 597/9
614/11 614/19 615/1 615/12
615/23 683/12 683/21 683/22
686/13 688/4 701/16 701/17
704/14 709/16 709/25 710/1
714/9 714/11 714/13 718/3
universities [1] 612/6
university [38] 434/2 435/19
436/1 436/4 436/11 437/1 439/11
439/18 439/21 439/22 449/22
450/2 578/14 578/16 578/17
578/20 578/25 579/1 579/2 579/9
579/22 579/25 580/4 580/8 580/9
580/12 580/12 580/13 591/2
609/9 611/15 611/22 612/3
612/19 612/22 612/25 640/7
687/11
unless [5] 513/7 645/23 648/9
658/18 658/22
unlikely [1] 643/17
unloading [1] 504/12
unnecessary [1] 733/24
unpack [1] 617/15
unreliable [2] 586/12 705/6
unresponsive [1] 476/6
unsuccessfully [1] 578/5
until [23] 435/5 454/12 511/19
553/19 555/25 578/8 608/23
616/10 616/14 631/24 652/2
661/15 713/9 720/10 720/18
721/11 721/13 721/25 725/7
740/13 740/17 741/7 748/17
741/22 746/19 748/24
642/6 668/4 668/5
unwilling [3] 517/2 723/17
723/17
up [81] 433/10 435/5 435/22
452/22 454/12 460/14 460/20
462/16 467/22 470/18 475/1
483/16 494/17 499/23 500/9
503/18 504/5 505/12 509/6 513/2
515/1 523/10 529/8 531/2 531/23
533/3 540/17 540/22 540/25
545/11 557/18 558/14 564/18
565/1 570/13 570/18 570/24
572/6 577/7 579/5 593/17 596/3
597/20 616/10 619/21 625/10
644/22 649/12 665/2 667/25
675/2 675/12 675/25 676/8 677/2
693/3 701/2 708/7 717/6 718/13
718/18 720/23 720/23 721/11
721/13 721/25 722/18 723/7
723/8 727/21 732/9 738/2 740/3
740/9 740/12 740/17 741/6 744/6
744/24 745/5 746/14
upbringing [2] 679/19 734/6
update [1] 512/11
upon [28] 464/4 464/19 470/3
495/22 500/20 528/1 542/7
543/13 548/16 550/20 552/8
558/25 572/12 572/19 589/20
590/18 598/10 602/8 625/23
637/15 638/9 640/4 655/21 665/8
666/17 671/12 671/17 740/3
upper [1] 566/16
ups [1] 451/9
upset [3] 505/7 521/13 674/21
upward [2] 516/3 700/16
urge [1] 685/3
urgency [1] 432/25
urging [2] 544/3 544/14
us [32] 431/14 431/18 434/1
434/17 435/9 443/8 444/22
492/12 509/6 513/13 516/12
517/9 517/10 527/8 538/14
539/16 543/9 598/12 600/1 603/5
608/18 633/11 638/5 658/13
669/1 673/9 678/22 694/8 694/15
704/24 733/13 745/6
use [69] 446/13 457/3 458/14
458/14 458/18 459/18 462/12
463/21 463/24 464/20 465/8
466/3 466/20 469/3 479/19 492/3
492/11 495/6 500/6 508/22 509/7
510/2 510/5 514/14 514/23 522/6
524/1 524/11 524/23 525/4 525/6
530/10 538/4 541/12 541/17
553/11 553/12 553/14 553/23
553/24 560/1 560/6 560/8 564/20
565/18 568/7 568/7 569/20
595/13 602/23 683/19 684/23
686/18 691/1 699/1 705/19 711/5
711/24 718/8 718/12 726/2 726/9
728/2 733/5 733/7 733/20 739/22
741/12 748/17
used [52] 435/12 438/18 446/17
454/3 459/23 462/7 462/9 462/11
462/20 462/24 463/7 463/18
464/20 465/5 465/9 471/6 471/24
481/9 482/9 485/18 488/18
495/14 497/10 499/19 508/2
508/4 508/5 508/5 508/8 508/12
508/13 525/9 525/17 548/25
571/6 602/19 603/13 604/4

**U**

used... [14] 606/16 645/2 673/12
682/16 684/15 684/17 684/21
691/14 691/15 691/22 699/15
733/25 735/11 736/21
useful [19] 468/11 468/21
468/23 474/8 482/23 497/11
497/19 502/16 509/6 520/8 523/5
525/17 531/21 541/25 542/18
678/12 711/25 724/11 738/12
usefulness [1] 509/13
user [1] 647/15
user's [2] 561/16 573/5
users [1] 463/12
uses [1] 446/20
using [32] 459/19 461/24 467/1
480/19 494/13 501/22 507/7
510/11 523/23 524/17 525/1
530/24 538/10 539/1 540/10
542/22 543/19 562/20 564/25
571/13 597/23 621/18 624/10
625/6 632/3 632/6 646/6 678/15
694/17 705/16 723/7 732/19
usual [1] 620/12
usually [2] 722/12 727/23
utilize [1] 748/16
utilized [3] 650/15 653/2 687/25

**V**

valiant [1] 554/14
valid [38] 443/17 465/1 467/21
468/19 468/21 474/23 485/16
489/8 495/25 496/2 507/14 510/7
515/9 515/12 527/17 527/18
528/10 532/2 532/9 537/1 652/22
672/16 683/24 684/2 685/18
689/11 690/10 691/19 691/23
693/24 694/5 694/24 695/1
697/24 699/19 711/23 723/14
736/8
validate [1] 554/14
validated [3] 699/25 700/19
701/4
validates [1] 692/14
validity [4] 469/25 482/11 537/2
684/3
validly [1] 467/25
valuable [7] 472/8 474/19 503/7
515/5 530/9 530/13 678/19
value [6] 517/18 518/4 645/1
667/10 699/21 710/14
Vanderbilt [1] 439/21
Vanessa [3] 503/21 529/15
537/5
variability [2] 596/7 644/1
variable [1] 644/6
variations [1] 595/23
variety [8] 436/23 437/17 443/19
452/4 452/15 454/9 547/7 691/2
various [13] 437/10 452/10
476/22 476/23 477/13 478/23
501/11 501/18 507/10 520/22
522/20 528/19 531/13
vary [5] 644/15 645/12 660/7
660/14 694/8
vast [4] 454/17 613/25 686/21
728/5
vastly [1] 607/13
verbal [13] 488/12 488/17
525/19 526/19 543/16 545/5
545/15 546/20 641/10 642/8
642/14 663/3 735/23

verbally [1] 584/8
verbatim [1] 505/1
verifiable [1] 537/1
verified [2] 509/22 643/6
VERONICA [2] 430/13 431/14
version [3] 463/14 525/16 633/2
versions [2] 665/1 665/8
versus [9] 429/5 443/3 445/18
509/17 603/5 605/12 634/5
685/25 694/24
very [94] 433/9 433/20 433/21
437/2 445/7 451/14 457/24
468/25 469/20 475/19 476/19
478/8 480/10 483/7 484/25
485/13 486/12 486/12 492/16
497/9 497/25 501/16 502/17
503/14 515/11 515/20 516/7
516/15 519/19 522/3 524/20
525/1 525/6 525/17 525/24 533/2
533/25 544/12 544/16 545/20
549/17 549/23 566/14 570/25
573/6 581/15 584/20 612/6
615/18 617/7 619/12 620/8 627/6
631/1 631/9 637/24 645/11 656/1
661/18 662/24 666/11 666/11
667/8 667/8 667/8 668/9 673/9
673/12 674/21 683/18 685/20
689/2 690/7 692/24 693/21
697/19 697/22 706/13 706/21
711/13 711/19 712/2 715/24
718/23 720/5 721/3 725/23
731/23 732/10 734/12 739/21
743/22 747/16 749/8
via [1] 516/24
victimized [1] 479/16
video [4] 569/7 569/9 569/13
569/15
view [20] 470/2 484/6 486/5
499/11 501/20 524/14 559/16
569/6 601/3 620/7 625/15 648/17
655/6 690/12 690/13 696/8 696/9
715/24 739/17 744/25
viewed [2] 474/18 681/3
views [3] 559/14 690/20 693/2
Vineland [2] 462/7 462/19
violate [4] 528/14 681/16 681/17
742/7
violated [2] 737/1 737/2
violates [1] 680/1
violating [4] 482/20 528/13
680/23 680/24
Virgina [1] 445/18
Virginia [4] 443/3 603/6 687/11
689/16
virtually [2] 617/25 643/13
visit [2] 647/2 730/10
visual [1] 678/1
vitae [1] 434/20
voir [4] 451/15 451/17 613/18
750/4
volume [3] 429/10 456/20 692/7
vomiting [1] 522/5
vulnerable [1] 656/13

**W**

WAIS [17] 659/12 659/21
659/25 663/22 664/15 665/2
665/4 665/9 668/24 670/14
670/17 670/24 671/3 672/3 695/3
696/13 696/17
WAIS-III [8] 663/22 665/4
668/24 670/14 670/17 670/24
672/3 696/13

WAIS-IV [4] 659/12 659/21
659/25 665/4
WAIS-R [1] 665/2
wait [1] 557/7
waiting [1] 432/1
Wake [1] 439/18
walk [1] 539/15
walked [1] 480/6
walks [1] 650/1
wall [2] 505/12 505/18
want [27] 448/14 453/15 464/2
464/11 468/13 482/12 484/24
485/10 486/7 486/15 486/15
487/7 487/8 499/6 509/23 510/2
517/16 523/4 523/13 526/11
552/4 575/4 578/19 579/18
584/25 589/2 590/16 590/17
590/18 594/11 618/18 620/20
625/25 626/1 627/16 628/13
630/13 633/20 636/18 637/10
639/9 662/9 672/13 672/22 673/1
673/4 690/11 691/4 691/6 693/3
694/25 698/7 700/16 704/15
704/17 706/4 706/7 706/10
706/10 707/10 721/16 725/25
727/24 729/2 729/6 729/9 730/6
733/2 733/20 734/3 737/4 740/9
wanted [17] 432/24 465/1 465/7
505/10 515/19 515/20 558/6
559/25 646/20 675/12 675/24
678/4 678/25 707/18 710/15
738/17 743/4
wants [9] 524/5 554/23 561/21
561/22 726/1 726/2 727/4 727/6
739/15
Warren [1] 718/5
was [745]
Washington [1] 717/5
wasn't [18] 483/1 531/5 544/20
564/25 584/2 607/5 613/1 632/15
634/1 642/20 660/21 676/18
685/13 711/16 711/19 713/1
713/3 731/20
waste [1] 596/22
wasting [1] 568/10
way [89] 438/3 443/17 458/13
475/22 477/17 480/4 480/6 485/7
486/5 486/18 490/25 498/25
499/1 504/7 504/7 505/24 511/25
512/9 512/14 516/16 516/17
517/9 519/13 521/13 521/19
523/4 524/5 526/14 535/11
535/13 537/21 539/19 539/21
541/17 542/4 548/13 553/14
553/18 554/4 554/12 554/13
554/17 554/21 555/11 555/18
557/22 558/3 558/21 558/22
560/9 560/10 563/7 568/8 569/20
570/8 595/10 616/6 633/16
634/18 638/22 640/2 642/16
643/6 653/19 657/21 663/8
671/11 673/10 676/4 677/21
682/10 684/1 684/8 691/6 698/24
701/22 702/2 704/6 705/21 706/6
711/25 711/25 715/25 718/8
718/23 721/5 732/20 735/1
740/12
Waynestein [1] 597/20
ways [4] 443/19 537/23 547/8
561/16
we [211] 431/22 431/25 432/5
432/16 434/19 435/13 436/21
436/22 437/15 439/8 439/19

443/11 447/6 450/22 452/4 457/6
464/18 465/19 471/9 471/10
471/21 472/12 474/7 479/7 480/7
481/15 482/14 486/6 490/23
491/2 491/4 492/12 492/19 493/7
493/25 495/23 497/4 500/2 501/6
504/18 509/5 509/23 510/2
510/20 510/24 510/25 511/2
511/13 511/16 512/9 512/9
512/12 512/12 512/25 513/1
513/6 514/7 514/13 514/14 519/6
526/11 526/16 527/14 535/19
536/24 537/19 537/22 538/3
538/13 538/24 539/20 542/3
544/10 544/14 545/1 548/1
550/20 554/11 555/10 558/10
558/11 558/12 558/13 560/23
561/18 563/14 563/15 565/25
566/16 566/22 570/4 570/12
571/21 572/4 572/15 572/17
573/21 574/10 576/15 580/20
582/6 583/19 584/13 590/20
593/13 594/5 594/10 596/13
597/25 598/20 598/20 602/25
603/21 604/3 605/8 615/5 616/1
616/5 621/14 622/14 624/22
629/18 631/6 633/6 633/6 633/13
633/14 634/16 634/16 635/7
648/2 648/5 648/9 649/3 649/4
654/15 655/10 655/21 657/23
657/25 660/13 662/2 662/2 664/4
665/15 665/21 666/15 667/1
667/11 667/15 668/12 671/5
676/19 676/20 677/14 678/24
686/25 692/17 694/6 694/6
694/12 695/8 698/1 699/2 702/17
702/25 703/18 704/6 715/22
718/21 718/21 719/12 719/18
720/6 721/16 722/8 723/11
723/25 729/15 735/22 740/11
743/19 743/21 743/23 744/7
744/23 745/4 745/4 745/16
745/24 746/1 746/3 746/6 746/10
747/2 747/3 748/19
we'd [1] 655/8
we'll [28] 432/4 432/11 432/19
477/13 492/3 494/4 514/9 514/9
556/1 556/1 557/3 557/7 559/16
592/13 594/13 608/18 608/19
627/11 650/24 661/15 661/15
675/6 692/21 701/20 707/10
745/8 745/17 749/8
we're [39] 432/3 432/14 432/19
456/3 468/4 478/12 481/23
492/13 501/16 507/24 512/1
538/7 591/8 599/14 604/3 609/5
615/22 633/8 639/20 644/8
657/15 660/9 660/11 660/11
665/14 677/8 692/16 697/1
700/14 734/8 743/20 744/7
744/21 744/22 745/1 745/23
746/23 747/10
we've [7] 460/18 532/18 553/9
574/11 595/9 650/11 674/6
weaknesses [3] 437/25 463/3
471/10
Weary [2] 746/13 746/14
Wechsler [17] 565/15 566/5
566/9 566/10 595/21 628/23
645/3 652/17 664/2 664/17

# W

Wechsler... [7] 668/24 695/11
695/19 696/11 700/22 701/15
704/1
week [2] 432/19 742/19
weeks [3] 522/5 624/19 624/24
weep [1] 676/17
weigh [4] 560/14 569/25 571/17
697/20
weighed [1] 697/20
weight [7] 489/3 489/6 496/7
496/20 498/22 509/16 524/22
Weise [1] 699/7
Weiss [2] 697/11 701/5
welcomed [1] 725/20
welfare [1] 730/4
well [249] 432/7 433/20 434/18
434/23 435/7 435/11 436/20
437/8 438/17 441/19 442/11
443/10 444/23 449/2 458/19
460/10 460/16 461/6 463/20
464/2 464/15 465/18 467/8
467/11 468/19 469/24 472/17
472/24 473/4 473/6 473/16
473/19 475/20 478/8 479/7
479/25 480/4 481/15 482/25
483/3 483/5 484/10 484/23 485/8
485/13 490/22 492/5 492/23
492/24 493/3 493/18 493/22
494/4 494/14 495/18 498/6 500/4
501/23 504/17 505/15 506/1
506/20 507/15 511/1 513/2
513/10 513/21 514/20 515/23
516/8 517/19 518/14 518/16
521/6 521/21 522/7 522/17 523/9
524/9 524/24 526/2 530/19
533/25 534/4 534/11 535/19
542/2 543/25 547/5 548/6 548/17
555/6 558/8 558/19 562/22
564/11 565/20 567/3 567/25
568/16 570/12 572/3 573/6 578/2
578/10 578/15 579/13 579/23
580/7 581/10 581/15 583/3
585/21 586/1 590/4 590/7 592/12
595/20 596/2 596/5 597/1 599/3
600/24 607/9 609/23 610/1
611/17 611/22 616/13 617/8
617/15 618/5 619/3 619/10
619/15 619/18 620/6 622/11
624/21 626/8 627/16 629/13
630/6 630/9 631/23 632/2 632/16
632/24 634/20 638/14 641/11
642/1 642/17 643/25 644/2
644/21 645/23 646/24 647/1
648/21 649/16 649/20 650/5
650/24 651/15 656/4 656/8 657/1
657/2 657/8 658/2 659/5 659/19
660/11 662/23 663/13 664/3
664/4 664/11 666/15 668/3
669/19 671/19 672/17 673/1
675/6 676/12 678/6 678/15
678/20 681/19 683/23 684/2
685/1 685/11 687/7 691/3 691/5
691/20 692/10 695/1 695/3 695/7
695/8 696/5 700/7 700/12 701/12
702/15 703/4 703/14 703/22
704/10 706/10 706/21 708/3
708/5 710/6 711/18 712/1 712/4
712/11 714/21 715/7 715/15
715/20 717/7 717/7 717/14
718/10 718/17 718/19 721/7
722/13 724/8 724/15 724/19
730/16 731/10 731/17 731/23
731/23 732/12 733/6 734/12
739/10 743/19 745/8 747/6
well-documented [1] 484/23
well-established [1] 494/14
well-known [1] 485/13
well-substantiated [1] 684/2
went [24] 448/12 449/12 449/22
503/20 505/12 526/8 536/8
549/11 549/19 553/25 557/5
557/10 616/14 646/17 646/20
647/2 682/10 682/12 682/13
707/7 707/15 720/15 721/25
725/12
were [222] 439/8 442/23 444/24
448/17 448/18 450/21 453/20
453/22 454/4 455/23 456/6 456/6
456/12 457/19 457/20 457/20
460/12 460/24 461/2 462/5 462/8
468/7 471/6 473/1 474/5 476/13
477/2 477/2 481/7 481/8 485/7
486/19 487/18 487/25 489/5
496/25 497/14 498/25 499/3
499/19 501/6 503/25 504/2
505/20 506/16 509/5 509/12
514/13 515/5 515/8 515/15
515/16 516/1 516/23 517/2 517/6
517/17 519/11 520/7 520/8 520/9
520/11 522/2 522/15 522/18
525/24 527/2 527/13 530/16
530/21 532/6 536/13 540/17
541/1 541/5 543/23 545/9 545/10
546/15 547/3 548/6 551/16
551/21 551/23 551/25 552/7
552/12 552/14 562/5 562/7
563/18 564/15 564/20 565/21
566/18 566/22 566/23 568/14
569/13 569/14 575/6 576/15
576/15 576/20 576/21 576/23
577/16 577/17 577/21 580/23
580/24 580/24 581/5 582/1
582/12 583/8 583/14 583/23
583/24 583/25 584/5 584/10
591/1 591/20 592/17 592/18
593/14 594/15 596/21 597/19
598/7 598/24 599/7 599/9 599/11
600/2 600/3 602/10 602/14
604/14 606/14 606/22 609/3
609/8 609/20 610/15 610/19
613/15 614/9 616/6 619/12
624/13 628/8 628/10 629/12
629/13 631/23 633/21 635/20
635/20 636/9 638/5 641/16
641/18 641/18 642/19 645/6
654/4 655/20 656/9 659/6 660/18
662/2 665/11 667/14 668/3
668/10 668/12 670/12 673/9
679/12 679/23 680/1 681/1 681/2
687/23 690/14 690/16 699/2
702/12 703/6 703/13 706/14
713/22 713/23 714/21 714/22
714/23 717/15 717/21 718/12
719/8 722/3 723/5 726/16 727/19
728/6 728/6 729/20 734/12
735/16 737/2 739/1 740/6 742/23
743/2 744/15 748/10
weren't [2] 681/1 743/10
west [2] 709/14 710/2
what [352]
what's [19] 434/17 459/23 475/4
475/25 485/8 494/25 501/7 506/1
518/20 523/9 565/5 565/5 573/20
607/1 634/10 638/8 648/3 719/7
720/18 731/5
whatever [26] 450/1 452/10
482/16 488/4 527/13 541/20
547/9 558/14 578/18 583/19
604/25 605/1 612/11 624/7 639/9
646/1 651/20 675/2 679/13
693/19 695/20 704/4 704/17
705/21 711/20 722/11
whatsoever [1] 692/19
when [197] 432/4 437/12 440/10
447/13 448/1 448/2 455/6 458/24
459/21 459/25 461/23 461/25
462/5 462/6 462/8 462/9 470/4
470/16 470/20 473/16 473/24
474/2 475/19 477/3 477/12
486/14 486/14 490/20 492/8
492/11 493/11 493/13 494/10
495/25 497/4 503/21 505/14
508/12 508/15 509/1 509/5
512/17 519/18 520/12 521/10
525/12 528/19 530/20 531/3
531/4 533/3 534/2 535/8 535/10
539/25 541/1 541/14 541/25
543/21 545/21 546/2 546/4 546/5
546/18 549/8 549/11 549/20
550/7 555/5 555/10 557/21
558/20 560/18 563/4 563/21
564/2 565/1 565/3 566/4 566/25
567/1 568/5 568/5 568/17 568/22
569/13 570/23 574/4 575/9
576/23 577/16 578/24 579/13
580/3 580/23 581/20 582/9
582/13 582/25 584/13 584/19
585/11 585/16 585/18 585/22
585/24 586/2 590/3 596/6 596/21
596/21 598/14 598/23 599/7
599/12 599/23 603/19 604/3
605/8 607/25 609/8 610/23
611/13 611/13 613/15 624/18
628/9 628/25 629/11 629/12
629/18 630/23 630/24 631/21
632/7 632/12 633/4 633/21
639/14 645/20 645/21 645/21
648/25 653/19 656/3 657/21
659/9 662/2 662/14 662/24
663/13 667/14 667/20 668/22
669/13 670/11 671/16 672/5
672/11 672/22 674/7 674/24
678/20 680/23 685/24 688/6
696/15 700/15 703/7 706/12
706/14 706/24 706/24 709/7
710/23 713/9 713/22 714/6
714/21 717/15 717/21 718/21
721/9 721/16 723/5 723/19
727/14 727/15 730/7 730/23
735/16 736/17 737/1 737/24
738/3 739/15 741/15
whenever [2] 552/11 688/6
where [64] 434/7 435/23 447/9
448/1 448/2 449/3 449/4 449/5
452/1 452/13 453/20 454/24
463/18 468/25 469/24 472/2
473/15 474/6 474/20 474/21
476/23 479/19 481/1 481/17
493/18 494/4 502/11 539/22
541/7 545/9 545/9 546/11 546/12
546/19 552/24 554/18 557/7
575/6 584/3 588/23 588/24
596/23 597/14 609/18 644/18
649/25 650/10 665/2 667/23
668/21 672/9 686/16 691/22
702/13 711/23 714/22 714/23
717/6 726/16 731/11 732/10
733/25 736/22 746/18
whereas [3] 472/4 619/19 619/24
Whereupon [4] 511/9 556/3
661/4 749/13
wherever [1] 749/2
whether [79] 442/4 453/6 458/9
463/21 467/20 468/7 477/25
478/1 478/14 479/5 489/19
497/24 498/22 500/21 502/13
507/9 509/24 510/12 513/1
514/14 523/12 531/15 537/15
542/19 542/24 545/22 546/7
546/24 555/18 557/12 559/1
560/15 565/23 565/24 571/24
572/8 581/21 581/21 585/18
609/19 610/10 621/22 625/10
633/11 639/7 639/25 640/5
640/10 640/14 648/18 649/12
654/4 654/24 659/13 665/23
666/21 668/5 668/23 674/1 676/6
683/23 687/24 688/19 691/12
691/13 702/22 702/24 703/16
703/19 715/3 717/2 717/5 717/22
718/22 723/11 725/17 730/23
740/13 741/10
which [173] 434/4 436/16 438/8
439/20 441/4 441/5 441/6 441/20
441/25 442/19 444/2 446/8
446/25 448/18 449/10 450/15
450/23 452/2 452/7 452/16
452/22 453/4 456/1 457/3 458/19
458/19 459/4 459/14 460/18
462/10 463/16 464/21 466/16
466/20 467/8 470/14 472/2
472/22 473/2 473/17 473/25
474/20 477/13 478/21 479/24
482/14 484/10 484/22 485/8
486/19 487/4 488/8 488/10
491/21 491/22 494/1 495/14
496/16 497/20 497/25 498/19
499/16 499/20 500/7 500/23
504/12 505/15 506/25 507/13
510/4 513/4 513/14 516/17 518/6
518/9 518/15 518/21 519/1 519/4
519/12 520/23 521/1 522/5
522/18 524/3 524/23 534/23
536/5 536/9 537/19 538/2 538/3
538/24 541/1 541/6 542/16
542/21 544/4 545/11 546/16
547/12 548/10 549/1 550/12
550/22 551/10 552/16 553/13
561/9 563/22 565/25 566/13
566/15 567/25 571/10 572/15
573/1 573/8 573/24 574/6 574/16
578/17 579/17 582/21 583/21
585/22 588/2 589/9 592/1 593/20
595/20 599/13 602/7 605/10
612/7 620/21 621/18 622/14
626/2 626/4 627/19 630/3 651/9
653/12 668/3 669/2 669/6 674/14
674/18 677/19 677/22 677/25
678/16 680/23 692/1 692/3 693/4
694/3 701/6 701/18 702/10 708/4
709/11 713/6 713/7 721/16 723/3
724/9 725/9 730/17 733/24
739/23 742/16
whichever [1] 661/17
while [20] 488/21 489/1 579/5
631/21 699/19 720/9 720/16
722/22 724/25 725/1 725/1 725/1
725/8 726/1 726/11 727/5 727/5
746/10 747/19 748/1

Case 1:04-cr-01016-NGC Document 1580-3 Filed 02/05/15 Page 362 of 363 PageID #: 10795

**W**

white [2] 491/23 614/17
who [152] 437/16 438/8 445/24
445/25 450/16 450/16 452/14
453/5 455/5 461/2 464/12 464/14
467/10 467/11 471/19 477/2
480/2 480/3 480/4 480/14 480/15
480/17 480/18 480/23 481/7
481/8 481/12 481/14 481/16
482/21 485/13 486/1 492/18
494/11 494/19 497/2 499/19
504/21 506/17 507/15 510/9
510/16 511/22 515/1 516/11
519/13 519/17 520/11 523/24
523/25 524/2 528/20 529/1 529/5
529/12 529/18 529/24 530/4
531/6 531/6 531/12 531/18
532/14 533/7 533/13 533/19
534/10 534/14 536/14 537/25
542/9 545/9 552/7 552/12 552/20
561/22 562/1 563/10 563/11
568/14 573/3 574/1 577/6 577/7
577/12 580/25 594/4 597/9
605/20 606/17 607/6 610/11
613/22 614/9 615/1 615/8 615/10
619/23 635/2 639/19 640/7 641/2
641/5 641/13 642/2 643/3 644/6
645/24 655/19 656/17 657/18
659/6 663/25 674/9 679/24 680/7
687/23 689/5 689/7 689/15
689/18 691/18 695/11 697/19
697/20 697/22 697/24 698/19
701/18 703/11 705/9 711/16
714/3 714/24 715/14 723/2
725/12 725/21 728/7 728/20
729/9 729/9 730/15 731/11 737/4
739/13 739/24 742/8 742/8
744/24 744/24 745/17
who's [9] 481/13 499/2 546/13
548/11 682/4 693/18 705/16
725/18 745/25
whoever [1] 579/2
whole [4] 504/22 638/16 679/2
704/10
whom [4] 537/24 577/10 614/8
732/13
whose [1] 642/19
why [41] 457/24 478/7 481/15
482/22 500/25 522/6 523/20
525/23 528/7 532/3 533/23 536/4
539/16 540/13 543/11 544/12
546/7 548/3 550/16 551/19 558/4
558/7 570/16 586/6 586/12
594/21 615/20 631/23 632/18
637/18 637/19 665/4 665/21
667/1 667/13 671/7 678/8 694/7
712/8 723/14 747/7
widely [6] 500/3 508/5 582/22
611/3 685/4 695/2
widened [1] 503/1
will [29] 432/5 432/6 465/19
483/10 496/3 496/4 502/18
502/19 512/13 512/13 512/14
525/20 539/18 542/14 558/12
604/24 605/8 626/12 636/21
659/1 692/8 702/4 717/15 743/25
745/5 745/12 745/16 747/14
748/21
William [2] 439/17 585/19
willingly [1] 536/15
WILSON [109] 429/6 431/9
434/21 462/6 465/16 466/8

467/10 467/11 468/24 472/12
477/10 477/12 478/23 480/23
481/4 481/5 483/1 483/18 485/3
485/22 486/14 487/18 488/1
488/4 488/21 498/8 499/16
500/11 500/18 501/9 502/14
503/9 505/5 505/7 505/21 508/15
509/14 510/6 511/3 511/6 516/13
518/5 518/10 518/15 519/3 520/4
520/15 521/9 523/16 523/21
524/24 525/12 526/2 528/22
529/22 530/17 531/7 531/13
531/19 531/22 533/3 534/1
537/16 539/16 542/11 542/15
543/22 549/1 549/7 550/23
551/10 551/17 551/21 553/16
561/19 564/16 567/24 568/3
568/13 569/18 569/24 570/13
571/9 571/24 572/21 573/6
573/19 574/8 575/7 576/24 577/2
577/8 581/22 582/14 617/9
617/14 619/2 629/6 644/6 707/15
710/13 712/23 718/4 718/8
719/15 724/25 742/11 742/12
745/18
Wilson's [47] 455/25 459/14
462/8 469/15 469/19 470/15
475/10 475/18 484/16 485/21
488/12 488/25 493/4 496/13
497/25 502/23 505/3 511/13
516/14 522/8 528/5 529/2 529/6
529/13 529/19 529/25 530/5
530/7 531/1 532/15 532/24 533/8
533/14 533/20 534/17 546/20
563/20 565/21 566/1 566/14
574/13 581/6 583/2 583/14
740/11 742/11 746/21
wind [2] 580/16 644/22
winded [1] 436/3
wings [1] 432/1
wins [1] 471/20
Winthrop [1] 446/1
wipe [1] 491/25
WISC [5] 650/16 664/15 665/2
665/4 665/8
WISC-III [2] 650/16 665/4
WISC-R [1] 665/2
wisdom [1] 739/12
wish [3] 558/17 740/4 741/15
wished [2] 450/17 740/8
withdraw [4] 595/16 641/4
727/12 732/23
withdrawn [2] 452/21 712/1
within [32] 434/5 442/14 473/10
474/25 478/23 479/4 492/5 492/7
493/4 493/6 493/16 498/23
502/15 502/20 539/16 567/3
571/11 573/19 573/25 574/8
596/13 603/25 623/15 624/19
624/24 642/18 656/11 707/24
708/3 714/13 731/16 744/4
without [16] 523/14 554/14
555/20 574/20 579/6 597/21
599/18 600/6 612/5 612/24
644/16 644/23 657/10 688/2
697/7 699/10
witness [56] 431/22 432/1 432/4
432/5 432/6 433/5 455/18 470/10
511/11 512/3 512/4 512/6 512/18
512/19 512/20 513/15 513/24
514/11 517/14 547/16 547/22
548/7 548/11 554/12 554/13
554/15 554/19 555/16 557/4

**[right-middle column]**

557/5 557/11 558/1 558/20 559/4
559/21 560/1 576/21 620/20
638/3 661/10 661/22 669/19
696/22 744/25 746/19 747/19
747/20 747/21 748/1 748/3 748/5
748/5
witness's [3] 512/7 512/8 517/19
witnesses [11] 511/18 511/22
512/21 517/17 559/10 559/16
577/20 580/25 730/23 744/20
750/2
woman [1] 450/16
women [1] 680/8
won't [4] 512/9 610/3 674/25
705/5
wondering [1] 744/5
Woodcock [4] 565/15 566/5
566/8 566/20
Woodcock-Johnson [4] 565/15
566/5 566/8 566/20
Woods [2] 576/7 747/10
word [12] 445/5 454/3 474/7
495/2 592/10 598/10 598/12
600/3 625/3 654/14 703/13 709/8
wording [4] 587/20 630/14
655/9 655/9
words [25] 449/4 450/1 471/2
471/14 471/19 493/23 499/2
502/17 520/7 540/18 567/1
595/15 604/22 606/16 632/19
633/9 652/18 653/14 660/11
673/4 682/16 683/19 730/8
732/23 748/17
wordy [1] 458/16
work [87] 434/3 436/19 437/6
438/6 438/21 438/22 440/7
441/21 443/24 448/8 449/21
449/23 450/2 450/4 451/24
451/25 452/24 453/13 453/16
453/20 454/11 454/17 472/3
483/4 483/5 483/7 483/8 483/10
483/11 483/13 483/17 484/1
490/25 503/5 503/8 503/9 503/10
503/16 503/16 503/19 504/15
504/18 505/8 505/21 536/7
536/16 538/3 538/5 538/7 570/9
570/15 570/17 570/19 570/21
570/23 570/24 576/8 577/12
579/14 579/18 579/21 579/21
580/1 580/5 580/9 583/1 583/5
609/10 609/12 610/5 610/6
611/23 612/24 613/2 613/19
640/9 642/16 660/21 674/25
702/16 707/25 708/3 708/4
722/12 722/12 722/20 722/23
worked [17] 437/15 452/17
496/9 503/11 504/6 504/12
504/18 563/10 575/14 575/25
576/8 576/10 576/11 613/12
613/22 630/2 630/7
working [27] 433/1 438/25
443/25 450/16 452/3 452/24
454/18 497/21 503/19 579/3
579/5 579/24 609/8 613/15 614/1
626/5 659/6 707/18 707/21
707/25 714/22 717/19 717/21
722/10 735/16 737/2 747/23
works [3] 466/3 577/13 704/6
world [12] 472/18 567/15 599/20
602/16 611/14 649/4 708/20
709/17 710/1 714/10 718/3 727/4
worst [1] 614/4

worth [7] 454/6 525/3 572/25
573/1 580/13 627/11 717/16
worthwhile [2] 541/22 668/9
worthy [1] 498/1
would [350]
would've [2] 660/15 669/6
wouldn't [19] 523/13 525/10
582/20 592/3 596/22 598/8
600/22 625/16 625/20 625/25
627/4 639/3 642/1 643/16 666/4
666/11 673/2 736/2 736/23
wrap [2] 729/1 740/9
write [13] 451/9 456/19 544/11
544/13 544/14 600/24 602/2
607/13 653/22 655/14 699/9
737/3 737/5
write-ups [1] 451/9
writing [14] 440/3 440/7 443/5
477/2 543/22 546/13 559/5 584/7
584/9 588/1 671/17 681/22
690/13 737/6
writings [1] 444/11
written [20] 449/11 460/24
462/25 502/17 504/3 539/25
540/4 561/5 582/21 603/2 614/14
617/1 664/1 685/1 685/2 685/11
687/3 698/11 698/16 735/24
wrong [21] 474/15 521/13 536/6
587/6 592/20 608/16 632/1 632/2
638/3 638/16 657/1 657/3 657/3
664/22 669/10 675/19 700/17
700/23 701/7 706/9 736/19
wrote [17] 444/8 448/11 513/8
535/19 544/15 589/17 592/20
629/2 651/24 655/17 655/19
656/15 680/9 689/24 695/22
699/16 700/3

**Y**

Yates [14] 584/1 584/2 584/6
591/6 591/8 592/21 592/24
593/11 744/24 746/1 746/5 746/6
746/11 747/3
Yates' [1] 746/9
yawned [2] 650/14 653/1
yeah [16] 432/9 511/5 526/22
569/2 577/15 602/2 604/16 606/2
655/13 657/14 665/10 669/20
685/22 731/8 733/6 734/2
year [24] 447/14 452/2 455/11
463/13 493/10 509/3 509/4 526/7
540/24 541/21 542/2 549/4 575/6
583/9 597/4 605/24 683/13
683/13 684/10 684/10 690/5
690/5 704/1 720/23
year-old-boy [1] 605/24
years [66] 435/11 436/6 437/15
438/5 442/23 442/25 450/11
453/23 454/2 455/13 457/22
459/14 462/6 468/3 470/22
473/24 477/3 480/3 485/12
493/12 501/14 501/17 501/19
503/21 509/2 510/6 521/10 529/8
533/14 534/1 541/18 541/19
541/23 541/24 543/12 564/21
568/14 569/13 570/5 607/17
610/18 613/20 619/20 620/13
642/19 659/15 662/14 663/13
666/5 668/1 672/15 683/14
684/18 685/7 685/12 702/21
704/19 711/6 712/6 713/19
732/15 740/12 740/13 741/7
741/10 741/13

**Y**

yes [624]

yesterday [12]  482/25 488/11
499/17 504/17 521/22 569/22
617/6 617/8 617/16 617/18 628/7
650/11

yet [6]  550/1 550/24 551/11
553/22 579/19 700/16

yield [1]  459/25

yielded [2]  566/11 653/13

yielding [1]  734/1

YORK [22]  429/1 429/15
429/16 429/21 429/21 430/7
430/7 431/4 499/25 577/18 585/8
591/2 591/9 593/1 663/19 709/19
709/21 712/7 712/16 712/24
713/14 718/4

you [1532]

you'd [7]  495/13 545/14 588/10
597/20 654/4 690/24 738/10

you'll [4]  511/23 561/4 598/11
671/5

you're [105]  433/1 449/13 450/5
453/16 454/13 457/3 459/24
460/9 462/4 462/22 467/1 469/6
475/7 476/22 477/11 477/12
480/22 484/5 490/3 490/20
493/21 506/25 507/9 507/9
508/14 508/18 508/19 508/24
509/16 510/11 542/14 545/17
545/20 545/21 545/22 561/5
567/13 582/9 582/10 582/10
588/14 588/17 589/1 589/5
590/14 594/24 602/23 606/8
617/3 619/3 619/25 623/12
625/18 626/5 627/4 630/15
639/14 639/21 639/21 643/11
643/23 649/1 649/7 649/10 654/1
658/12 658/16 666/4 669/14
669/17 671/7 672/15 672/20
680/17 685/16 687/15 689/21
693/14 697/10 698/12 699/19
700/2 700/3 706/7 710/14 711/18
717/18 719/6 721/7 723/6 723/17
727/17 728/25 730/23 734/21
735/7 736/7 736/14 736/20
740/11 740/22 740/23 741/9
743/9 748/16

you've [47]  438/25 449/5 451/22
453/4 454/11 462/25 478/18
496/9 505/23 514/14 552/23
553/5 555/3 584/15 584/21 590/7
596/22 603/13 621/9 634/11
635/16 648/13 649/20 649/21
653/14 658/21 659/5 660/5 678/8
683/7 684/15 684/15 684/17
687/20 688/18 690/20 693/2
696/1 696/6 698/11 706/1 710/11
713/16 713/16 726/14 732/2
742/1

you-all [1]  659/9

young [7]  477/3 480/2 526/10
530/21 553/18 662/24 732/11

younger [4]  540/22 540/24
543/20 568/5

Youngstown [1]  454/25

your [319]  431/10 431/16
431/23 433/5 433/6 433/11
433/16 433/21 434/1 434/14
434/23 434/25 435/3 435/10
437/5 437/12 437/18 438/15
439/14 440/9 441/20 443/5

443/24 444/11 447/16 450/1
450/7 450/12 451/2 451/6
451/21 451/24 452/24 452/24
453/20 454/11 454/12 454/17
456/19 456/20 457/3 465/15
466/12 466/16 467/4 469/15
470/6 476/8 476/9 477/1 478/4
483/11 485/22 486/16 488/14
489/24 491/9 495/6 498/3 499/4
502/2 502/22 503/4 505/20
506/11 508/18 511/3 512/20
512/25 513/10 513/23 516/21
517/11 518/13 527/9 535/21
536/16 537/11 537/14 539/3
539/6 539/10 539/12 539/22
540/10 540/12 540/21 542/19
543/10 543/23 544/21 545/8
545/9 547/11 547/12 548/1
548/14 548/21 548/24 550/13
550/14 551/12 551/15 551/16
553/14 553/15 554/6 554/14
554/25 555/8 555/11 555/23
558/2 558/7 559/9 560/4 560/18
561/10 562/20 563/18 564/5
565/7 567/22 568/7 568/10 570/1
570/10 570/11 571/14 571/15
571/17 572/16 574/15 575/5
577/8 579/1 581/10 582/6 584/11
584/16 584/24 586/1 589/5
589/16 589/17 590/10 592/10
594/14 594/15 596/17 597/3
597/22 599/1 599/8 600/19 602/4
602/16 602/19 603/5 603/12
604/23 604/24 605/9 606/15
606/20 607/1 607/22 608/6
608/21 610/2 611/3 611/7 611/15
611/17 611/23 612/22 612/23
613/12 614/1 614/17 615/9
615/20 615/21 616/2 618/15
618/16 619/18 622/11 623/3
625/6 625/15 626/3 627/18
627/18 629/3 629/11 630/14
630/24 632/16 633/17 636/1
636/11 636/11 636/14 636/18
637/8 637/9 637/17 639/20
640/24 645/17 648/17 648/21
649/13 649/16 649/20 649/22
655/10 656/22 659/1 659/25
661/16 667/15 668/1 670/13
671/1 673/4 674/7 674/12 674/20
675/1 676/2 677/21 678/15
678/24 679/7 679/9 679/16
679/17 681/25 682/10 682/20
682/24 683/7 683/19 684/15
684/16 685/9 687/19 688/15
688/18 688/19 688/20 690/14
691/21 694/13 697/3 698/1 699/8
699/16 700/3 700/7 700/24 701/8
702/5 702/15 702/18 703/14
703/20 704/7 704/16 706/1
706/15 706/18 707/1 709/5
709/23 710/8 710/13 710/13
713/4 715/7 715/24 717/2 718/3
718/9 718/17 719/2 719/21 723/5
725/24 726/7 726/15 726/21
727/3 729/1 729/12 729/25
731/24 731/24 731/24 732/13
733/7 733/13 734/15 734/15
736/14 737/19 738/14 739/17
739/19 741/4 743/15 744/19
747/9 747/17 748/18 749/6 749/7

yours [2]  449/14 594/1

yourself [7]  483/10 483/16

485/23 524/13 600/17 659/25
680/25

youth [2]  522/20 616/10

**Z**

Zealand [3]  683/11 683/20
686/15

zero [17]  449/22 470/21 643/14
643/16 721/19 721/19 721/20
721/22 722/7 722/18 723/7
740/12 740/25 741/6 741/13
741/22 741/24