UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

UNITED STATES OF AMERICA

      -against-

RONELL WILSON,

                    Defendant.
---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**04-CR-1016 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On February 7, 2013, the court found that Defendant Ronell Wilson was not intellectually disabled[1] and, therefore, was eligible to receive the death penalty for the 2003 murder of two undercover police detectives. See United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013) ("Wilson II").[2] In reaching that decision, the court determined that Wilson had failed to show that he suffered from significantly subaverage intellectual functioning, a necessary prerequisite to a finding of intellectual disability. Id. at 368. Accordingly, the court declined to consider other requirements for a finding of intellectual disability—namely, whether Wilson suffered from significant deficits in adaptive functioning.[3] Id. On July 24, 2013, a jury returned a unanimous verdict of death. (July 24, 2013, Special Jury Verdict Form (Dkt. 1437).) Consistent with this verdict, the court sentenced Wilson to death on September 11, 2013. (Addendum to J. & Order (Dkt. 1469).)

---

[1] Although the court previously used the term "mentally retarded," the accepted terminology for this condition has changed. See Hall v. Florida, 134 S. Ct. 1986, 1990 (2014) (noting that the terms "mental retardation" and "intellectual disability" describe "identical phenomen[a]," and that both the U.S. Code and American Psychiatric Association have switched to using "intellectual disability"). The court uses "intellectually disabled" except where citing to sources that predate this change.

[2] The court refers to the prior Atkins decision in this case as "Wilson II" because it was part of Wilson's second sentencing process.

[3] The three requirements are: "(1) significantly subaverage intellectual functioning; (2) significant deficits in adaptive behavioral skills; and (3) onset of those limitations before the age of 18." Wilson II, 922 F. Supp. 2d at 343. In Wilson II, the court used the terms "adaptive behavioral skills" and "adaptive functioning" interchangeably. For the sake of clarity, the court will use only "adaptive functioning" going forward.

On June 25, 2014, the Second Circuit issued an order, <u>sua sponte</u>, remanding Wilson's case to this court to "reconsider its decision that Wilson is not intellectually disabled, in light of <u>Hall v. Florida</u>, 134 S. Ct. 1986 (2014)." <u>United States v. Wilson</u>, 571 F. App'x 19, 19 (2d Cir. 2014) (Mem.) (internal citations omitted). The Second Circuit further instructed:

> The District Court should address whether it needs to consider evidence of Wilson's adaptive deficits given Wilson's IQ scores. The District Court may consider any other issue it deems appropriate and conduct additional factfinding if warranted. We express no opinion regarding how, if at all, <u>Hall</u> affects the District Court's original analysis.

<u>Id.</u> at 19-20.

Here, the court interprets <u>Hall</u> as holding that, where application of the standard error measurement with a confidence interval of 95% results in a range of possible intelligence quotient ("IQ") test scores that reach 70 or below, the defendant has demonstrated that he or she suffers from significantly subaverage intellectual functioning. Under this interpretation, Wilson has satisfied this first requirement; therefore, the court must consider evidence of Wilson's adaptive functioning in order to determine whether he is intellectually disabled. For the reasons stated below, the court finds that Wilson has demonstrated significant deficits in adaptive functioning, and he therefore meets the legal standard for proving intellectual disability. Accordingly, Wilson is ineligible to receive the death sentence that has been imposed on him.

# I. BACKGROUND

## A. Procedural History

The court presumes familiarity with the facts of this case. However, an overview of the procedural history is in order. On December 20, 2006, a jury convicted Wilson of five capital counts[4] stemming from his 2003 robbery and murder of New York Police Department detectives

---

[4] The jury also convicted Wilson of five non-capital counts. (Jury Verdict (Dkt. 351).)

James Nemorin and Rodney Andrews. (Jury Verdict (Dkt. 351); see also Second Superseding Indictment (Dkt. 179) ¶¶ 7, 9.) The same jury voted unanimously to impose the death penalty (Jan. 30, 2007, Special Jury Verdict Form (Dkt. 360)), and the court accordingly sentenced Wilson to death (J. (Dkt. 407)). On appeal, the Second Circuit affirmed Wilson's convictions but vacated his death sentence on the ground that the penalty proceeding had been corrupted by prosecutorial misconduct. United States v. Whitten, 610 F.3d 168 (2d Cir. 2010). The circuit court remanded the case to this court for a retrial of the penalty phase. Id. at 205.

On remand, Wilson argued that he was intellectually disabled and, therefore, ineligible for the death penalty under the Eighth Amendment, see Atkins v. Virginia, 536 U.S. 304 (2002), and the Federal Death Penalty Act (the "FDPA"), 18 U.S.C. § 3596(c). After a nine-day evidentiary hearing (the "Atkins hearing") (Atkins Hr'g Tr. ("Tr.") (Dkts. 1002, 1008, 1528-30, 1531-34)), and the submission of post-hearing briefs (Def.'s Mem. (Dkt. 982); Gov't Mem. (Dkt. 984); Def.'s Reply (Dkt. 999)), the court found that Wilson was not intellectually disabled, because his IQ scores indicated sufficient intellectual functioning. Wilson II, 922 F. Supp. 2d at 368. As a result, the court did not consider evidence of deficits in Wilson's adaptive functioning. Id. Wilson proceeded to a second penalty trial before a new jury. The second jury also voted unanimously to impose the death penalty (July 24, 2013, Special Jury Verdict Form), and the court again sentenced Wilson to death (Addendum to J. & Order).

On May 27, 2014, the Supreme Court issued its decision in Hall v. Florida. In that case, the petitioner challenged a Florida law that foreclosed further exploration of a capital defendant's purported intellectual disability if his or her IQ score was greater than 70. 134 S. Ct. at 1990. The Florida Supreme Court had affirmed the lower court ruling that Hall was not intellectually

disabled, based on his IQ scores above 70, without conducting further analysis.[5]  Id. at 1992.

The U.S. Supreme Court noted that Florida law conflicted with the majority of states that had

rejected strict IQ score cutoffs in favor of considering a score's "standard error of measurement,"

or "SEM."  Id. at 1996.  The Court also observed that Florida's approach disregarded the

"unanimous professional consensus" in the medical field that IQ scores should be read not as a

single fixed number but as a range quantified by the SEM.  Id. at 2000.  Accordingly, the Court

held that Florida's strict cutoff rule created an "unacceptable risk that persons with intellectual

disability will be executed," in violation of the Eighth Amendment.  Id. at 1990.  The Court

further declared that "[b]y failing to take into account the standard error measurement, Florida's

law not only contradicts the test's own design but also bars an essential part of a sentencing

court's inquiry into adaptive functioning."  Id. at 2001.

It was in light of Hall that the Second Circuit remanded Wilson's case a second time.  See

Wilson, 571 F. App'x at 19.  However, the Circuit's remand order did not indicate precisely how

or even whether Hall affected this court's original analysis of Wilson's Atkins claim.  Id.

at 19-20.  Accordingly, the court ordered the parties to submit additional briefing setting forth

the pertinent issues from Hall and proposing what further steps the court should take pursuant to

the remand order.  (See Tr. of July 1, 2014, Proceedings (Dkt. 1504) at 5.)  Wilson filed his

briefing as a motion for reconsideration, along with six expert declarations.  (Mot. for Recons.

("Def.'s Mot.") (Dkt. 1505).)  The Government submitted a response in opposition (Resp. in

Opp'n ("Gov't Resp.") (Dkt. 1508)), and Wilson submitted a reply (Ltr. in Reply ("Def.'s

Reply") (Dkt. 1509)).

---

[5] Hall had received nine IQ test scores ranging from 60 to 80, but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving seven scores ranging from 71 to 80.  Hall, 134 S. Ct. at 1992.

On April 28, 2015, the court ordered further briefing on the question of whether the 2013 publication—after the original <u>Atkins</u> hearing—of an updated version of the American Psychiatric Association's (the "APA") <u>Diagnostic and Statistical Manual of Mental Disorders</u> (5th ed. 2013) (the "DSM-V"), required the court to conduct additional factfinding with regard to Wilson's <u>Atkins</u> claim.  (Apr. 28, 2015, Order (Dkt. 1510).)  Wilson filed a response requesting a hearing (Def.'s Not. in Resp. (Dkt. 1513)), and he submitted an additional expert declaration in support thereof (Def.'s Ltr.-Reply (Dkt. 1520)).  The Government filed a response opposing a further hearing.  (Gov't Ltr.-Resp. (Dkt. 1519).)

On October 22, 2015, the court ordered the parties to further brief the following question: "In analyzing Wilson's adaptive functioning, what additional evidence, if any, would the court need to consider, beyond that which is already in the record from the previous <u>Atkins</u> hearing?" (Oct. 22, 2015, Order (Dkt. 1522) at 2.)  Wilson filed a response (Def.'s Ltr.-Resp. (Dkt. 1524)), as did the Government (Gov't's Pre-Trial Mem. (Dkt. 1525)).

**B.       Issues Presented on Remand**

As outlined below, the court has identified three main issues presented by the Second Circuit's remand.  First, the court addresses whether the intervening publication of the DSM-V fundamentally alters the legal standard or requires the court to re-open the <u>Atkins</u> hearing to conduct further factfinding.  Second, the court must determine whether <u>Hall</u>'s treatment of IQ scores requires the court to reconsider its prong one analysis of Wilson's intellectual functioning. Third, assuming Wilson demonstrates significantly subaverage intellectual functioning, the court must determine whether Wilson satisfies the remaining independent requirements of the legal standard for intellectual disability—namely, significant deficits in adaptive functioning and onset of the condition before the age of 18.

## II.    LEGAL STANDARD FOR INTELLECTUAL DISABILITY

In 1988, Congress enacted the FDPA, which provides that "a sentence of death shall not be carried out upon a person who is [intellectually disabled]."  18 U.S.C. § 3596(c).  In 2002, the Supreme Court held in Atkins that the execution of intellectually disabled defendants violates the Eighth Amendment's bar on cruel and unusual punishment.  See Atkins, 536 U.S. at 321; see also United States v. Davis, 611 F. Supp. 2d 472, 473 (D. Md. 2009) (noting that with Atkins, "the federal policy embodied in the [FDPA] became a constitutional imperative").

In Wilson II, this court noted that neither the FDPA nor Atkins mandated a particular definition of intellectual disability, and that Atkins expressly left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."  Id. at 337 (quoting Atkins, 536 U.S. at 317).  As this issue was a question of first impression in the Second Circuit, the court provided a lengthy discussion of the process by which it would identify the appropriate legal standard.  See id.

The court first declared that it would consider New York law in determining the definition of intellectual disability, but that it also would rely heavily on the clinical definitions promulgated by the American Association of Intellectual and Developmental Disabilities (the "AAIDD") and the APA, in keeping with the approach taken by most federal courts in Atkins cases.  See id. at 338 (citing cases).  The court emphasized, however, that clinical definitions inform, but do not dictate, the legal standard for intellectual disability.  See id. at 339 ("The court will thus rely heavily upon clinical definitions and expert testimony to determine the definition of [intellectual disability] for capital punishment purposes, but, particularly where these definitions and testimony are ambiguous or conflicting . . . it will apply its own judgment as to

the 'appropriate ways' to enforce the ultimately legal prohibition on executing [intellectually disabled] offenders." (emphasis in original) (quoting Atkins, 536 U.S. at 317)).

The court then turned to the leading clinical sources and found that the definitions for intellectual disability set forth by the APA and the AAIDD were essentially identical. Id. at 341; see APA, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"); AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD 2010 Manual"). Considering those clinical standards, and in an approach consistent with other federal courts, the court held that the legal standard for intellectual disability required a person to satisfy three necessary elements: "(1) significantly subaverage intellectual functioning; (2) significant deficits in adaptive behavioral skills; and (3) onset of those limitations before the age of 18." Wilson II, 922 F. Supp. 2d at 343 (citing AAIDD 2010 Manual at 7, 27, 41; DSM-IV at 49; Taylor v. Quarterman, 498 F.3d 306, 307 (5th Cir. 2007); United States v. Northington, No. 07-CR-550, 2012 WL 4024944, at *3 (E.D. Pa. Sept. 12, 2012); Davis, 611 F. Supp. 2d at 475); see also United States v. Williams, 1 F. Supp. 3d 1124, 1137-39 (D. Haw. 2014) (citing Wilson II and adopting the same legal standard); United States v. Montgomery, No. 11-CR-20044 (JPM), 2014 WL 1516147, at *4-5 (W.D. Tenn. Jan. 28, 2014) (same).

In evaluating intellectual functioning specifically, the court determined that it would rely primarily on IQ scores, noting that "both the AAIDD and the APA define significantly subaverage intellectual functioning by reference to an IQ score approximately two standard deviations below the mean, or 70." 922 F. Supp. 2d at 344 (citing AAIDD 2010 Manual at 27; DSM-IV at 49). The court determined that it would apply one test-specific standard error measurement ("SEM") to each score, id. at 347-49, resulting in a 68% confidence interval—the

"range of scores within which one could be [68]% confident that a person's true IQ score falls,"
id. at 345.[6]  Next, the court declared that it would adjust Wilson's scores based on the so-called
"Flynn effect," which takes into account a gradual upward trend in the population-wide average
IQ score over time.  Id. at 349-51.  The court also decided that it would take into account the
"practice effect"—that is, the expectation that an individual's IQ score may improve over time as
a result of familiarity with the particular test—but that it would not apply any particular point
adjustment to Wilson's scores on that basis.  Id. at 353-54.

The court further held that while the standard for intellectual disability under the Eighth
Amendment and the FDPA was a legal matter, the ultimate issue of whether Wilson was, in fact,
intellectually disabled was "for the court to decide as a factual matter, 'based upon all of the
evidence and determinations of credibility.'"  Id. at 343 (citing In re Briseno, 135 S.W.3d 1, 9
(Tex. Crim. App. 2004)).  Finally, the court held that on the issue of intellectual disability,
Wilson would bear the burden of proof by a preponderance of the evidence.  Id. at 343.

As explained below, these same general legal principles apply to Wilson today, with one
critical caveat:  While states and lower federal courts continue to bear the responsibility for
establishing legal standards for intellectual disability, Hall establishes rules for the use of IQ
scores in determining whether capital defendants meet those standards.  Because the court's past
treatment of Wilson's IQ scores differs from the approach mandated by Hall, the court must
reconsider its original conclusion that Wilson is not intellectually disabled.

---

[6] The court's opinion in Wilson II and Justice Alito's dissent in Hall both refer to a "66% confidence interval" as
representing the use of one SEM.  See Wilson II, 922 F. Supp. 2d passim; Hall, 134 S. Ct. at 2010-11 (Alito, J.,
dissenting).  This is an error based on a misprint in the AAIDD 2010 manual.  See AAIDD 2010 Manual at 36, 57;
see also Jacob Gershman, Alito's Statistics Lesson Misses the Mark in Recent Dissent Experts Say, Wall St. J.: L.
Blog (May 28, 2014, 2:43 PM), http://blogs.wsj.com/law/2014/05/28/justice-alitos-statistics-lesson-misses-the-
mark-in-recent-dissent-experts-say/ (quoting the AAIDD President as characterizing the use of 66% as a "simple
misprint").  The correct figure should be 68%, but the error does not affect the actual calculation of the confidence
interval itself, because that is derived from the SEM.  Regardless, the court has altered relevant citations throughout
this decision to reflect the correct figure.

**A.     Effect of the DSM-V**

1.     Effect of the DSM-V on the Three-Prong Test for Intellectual Disability

Independent of Hall, Wilson argues that the DSM-V has fundamentally reconfigured the test for intellectual disability into a holistic inquiry of intellectual and adaptive functioning.  (See Def.'s Mot. at 20.)  While in Wilson II the court relied on the prior edition of the manual, the DSM-IV, Wilson maintains that the DSM-V represents "a paradigm shift in the [APA]'s conceptualization of intellectual disability and its diagnostic criteria," and "emphatically underscores a shift away from any suggestion that IQ scores predominate and toward a concurrent assessment of both elements."  (Id.)  Now, Wilson contends, "IQ scores are but one factor to be considered, in the exercise of clinical judgment, along with the full range of clinically relevant information, including, especially, adaptive functioning evidence, to determine whether a person has significant limitations in intellectual functioning."  (Id.)  The court disagrees.

To be clear, the court has never suggested that IQ scores "predominate" in the overall analysis of intellectual disability.  Rather, the court simply found that the first prong of the analysis—intellectual functioning—is "primarily evaluated using standardized tests that measure a person's 'Intelligence Quotient,' or 'IQ.'"  Wilson II, 922 F. Supp. 2d at 343.  This finding was consistent with federal case law and clinical authority.  See United States v. Hardy, 762 F. Supp. 2d 849, 876 (E.D. La. 2010) ("The Court, in keeping with the views of the APA and the [AAIDD], has and will rely on Hardy's IQ test score to determine whether he meets the first criterion of the definition of [intellectual disability].");  Thomas v. Allen, 614 F. Supp. 2d 1257, 1264 (N.D. Ala. 2009); AAIDD 2010 Manual at 31 ("Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from

appropriate, standardized and individually administered assessment instruments.").[7]

Consequently, because significantly subaverage intellectual functioning is <u>one</u> of the necessary elements of a finding of intellectual disability, the court found that it was unnecessary to consider adaptive functioning where it determined that Wilson could not satisfy the intellectual functioning prong based on his IQ scores.

Moreover, it is far from clear that the DSM-V constitutes the "paradigm shift" that Wilson claims it does on this matter. Most importantly, <u>Hall</u>—which did not fundamentally reshape the relationship between intellectual and adaptive functioning considerations—itself cited the DSM-V repeatedly in reaching its holding. <u>See Hall</u>, 134 S. Ct. at 1990, 1991, 1994, 2000, 2001. Yet <u>Hall</u> did not hold that courts always must assess evidence of adaptive functioning regardless of the defendant's IQ test scores. As explained more fully <u>infra</u> Part II.B.1, <u>Hall</u> instead requires that courts consider adaptive functioning only where the margin of error surrounding a defendant's IQ test score includes numbers 70 or below.

Wilson also has not shown that the DSM-V constitutes such a meaningful change from the DSM-IV that the <u>legal</u> standard for establishing intellectual disability under the FDPA must

---

[7] Whereas the APA previously defined significantly subaverage intellectual functioning as "an [IQ] of approximately 70 or below on an individually administered IQ test," DSM-IV at 49, the DSM-V now defines this criterion in terms of "[d]eficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing," DSM-V at 33. While some courts have determined that the DSM-V "de-emphasizes" the role of IQ scores in the analysis of intellectual disability generally, <u>see</u> <u>Williams</u>, 1 F. Supp. 3d at 1138; <u>Hernandez v. Stephens</u>, 537 Fed. App'x 531, 533 n.1, this does not appear to represent a significant change in the clinical treatment of IQ scores for the analysis of intellectual functioning specifically. While the reference to "IQ" may have been removed from this section of the DSM-V, these tests continue to play a uniquely important role in the analysis of intellectual functioning. <u>See</u> DSM-V at 37 ("Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence."); <u>Williams</u>, 1 F. Supp. 3d at 1140 (noting that, while the DSM-V de-emphasizes IQ scores as determinants of intellectual <u>disability</u>, "it nevertheless remains accepted that IQ tests are the best available tools for measuring intellectual <u>functioning</u>" (emphasis added)). Furthermore, the AAIDD continues to frame prong one in terms of IQ scores. <u>See</u> AAIDD 2010 Manual at 31 ("[I]ntellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments.").

change accordingly. While Wilson proffers purported expert testimony suggesting that the DSM-V "represents a paradigm shift," this testimony fails to explain exactly how the DSM-V is so different.

First, Wilson's expert points out that while the DSM-IV described intellectual disability as "subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning," the DSM-V now describes it as "includ[ing] both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." (Decl. of Marc J. Tassé ("Tassé Decl.") (Def.'s Mot., Ex. E (Dkt. 1505-5)) ¶ 31.) With respect to the FDPA, however, this appears to be a distinction without a difference. According to the DSM-V, a diagnosis of intellectual disability continues to require the following three criteria to be met: deficits in intellectual functioning, deficits in adaptive functioning, and onset of these deficits during the developmental period. DSM-V at 33. This is essentially the same understanding advanced in the DSM-IV and articulated by the Supreme Court in Hall.

Next, Wilson argues that this purported "paradigm shift" is underscored by the new manner in which the DSM-V distinguishes between levels of severity of intellectual disability. He proffers expert testimony stating that "[t]he various levels of severity [mild, moderate, severe, and profound] are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required." (Def.'s Mot. at 20 (quoting Tassé Decl. ¶ 31).) But Wilson does not explain why the use of adaptive functioning evidence to determine the severity of an intellectual disability should affect the question whether a person is intellectually disabled in the first place. Moreover, while assessment of adaptive functioning apparently determines the level of support an intellectually disabled person may require in terms of social services, it does not follow that assessment of a defendant's intellectual functioning

should therefore be subsumed by adaptive functioning for the purpose of determining "whether imposition of a death sentence in a particular case would serve a valid penological end." Hall, 134 S. Ct. at 2006 (Alito, J., dissenting ("In a death-penalty case, intellectual functioning is important because of its correlation with the ability to understand the gravity of the crime and the purpose of the penalty, as well as the ability to resist a momentary impulse or the influence of others.")).

Ultimately, the stark difference between psychological and penological goals explains why the determination of intellectual disability for the purpose of the FDPA is a legal, rather than a clinical, decision. See Wilson II, 922 F. Supp. 2d at 356 ("[E]ven assuming that it is proper for psychologists to use a holistic approach when interpreting IQ scores in light of their clinical judgment, this does not mean that a court should meld the two prongs together when making a legal determination of who is ineligible for the death penalty." (emphasis in original)). In Hall itself, the Court pointed out that while it relied substantially upon clinical approaches for guidance, it was the Court's "independent assessment that an individual with an IQ test score 'between 70 and 75 or lower,' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 134 S. Ct. at 2000. The Court explained:

> In addition to the views of the States and the Court's precedent, this determination is informed by the views of medical experts. These views do not dictate the Court's decision, yet the Court does not disregard these informed assessments. It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. Atkins itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

Id. (emphasis added) (internal citations omitted).  Yet even as the Court in Hall placed

substantial reliance on the DSM-V, the decision was grounded in a framework whereby the legal

test for intellectual disability remained composed of three necessary and independent elements.

Significantly, Wilson does not argue that the Supreme Court misunderstood or misinterpreted the

DSM-V in Hall, and this court is bound by that decision.  Accordingly, the court finds that the

DSM-V does not affect the independent, three-prong legal framework for determining

intellectual disability.

           2.       Effect of the DSM-V on the Definition of Adaptive Functioning

       Although the court previously did not reach the issue of Wilson's adaptive functioning,

see Wilson II, 922 F. Supp. 2d at 368, the court did cite the clinical definitions of adaptive

functioning as set forth by the APA and the AAIDD, id. at 355.  At the time, the APA described

adaptive functioning as "how effectively individuals cope with common life demands and how

well they meet the standards of personal independence expected of someone in their particular

age group, sociocultural background, and community setting."  DSM-IV at 42.  To satisfy prong

two, the DSM-IV required deficits in at least two of ten skill areas: "communication, self-care,

home living, social/interpersonal skills, use of community resources, self-direction, functional

academic skills, work, leisure, health and safety."  Id. at 49.  The AAIDD, on the other hand,

defined (and continues to define) prong two broadly as "significant limitations . . . in conceptual,

social, and practical adaptive skills."  AAIDD 2010 Manual at 21.  To meet this prong under the

AAIDD definition, an individual must show deficits in one of these three general domains.  Id.

at 6.

       Subsequent to the court's decision in Wilson II, the APA updated the DSM and, in turn,

its definition of adaptive functioning.  The DSM-V definition now uses similar language to that

of the AAIDD, framing adaptive functioning in terms of conceptual, social, and practical domains.  DSM-V at 37-38.

Given the fact that the DSM-V was published after the 2012 Atkins hearing, the court initially was concerned that additional factfinding might be required in order to apply the new definition to Wilson's case.  Accordingly, the court twice ordered further briefing from the parties addressing the questions of whether the DSM-V's adaptive functioning language represented a material change from the DSM-IV and whether the revision required the consideration of any additional evidence beyond that which was already included in the Atkins hearing record.  (See Apr. 28, 2015, Order; Oct. 22, 2015, Order.)  Specifically, the court was interested in whether the DSM-V represented a narrowing or broadening of the APA's definition of adaptive functioning, such that certain evidence of an individual's adaptive functioning that was not considered under a DSM-IV analysis might be relevant to a DSM-V analysis, and vice versa.  If that had been the case, the court was prepared to re-open the Atkins hearing to consider such evidence.  However, for the following reasons, the court has determined that the DSM-V does not mark such a substantive change to the clinical definition of adaptive functioning that a new hearing would be required.

First, although Wilson interprets the DSM-V as representing "a paradigm shift in the [APA]'s conceptualization of intellectual disability and its diagnostic criteria," (Def.'s Mot. at 2), he has not shown that a new hearing would allow him to present additional evidence of deficits in his adaptive functioning that was not presented in the initial Atkins hearing.  Instead, a hearing would simply provide the parties' experts with an opportunity to further explain their different interpretations of the DSM-V.  As both parties have already submitted expert declarations explaining their respective interpretations, in-person testimony likely would consist of those

experts simply repeating their arguments. Nor does either side suggest that the court's adaptive functioning analysis would reach a different result today than in 2012. See Williams, 1 F. Supp. 3d at 1152 (noting that two experts had testified prior to the publication of the AAIDD 2010 Manual and the DSM-V, but finding that "Defendant has presented no convincing evidence (if any) that these opinions would be different . . . under newer clinical standards"). In fact, in his response to the court's October 22, 2015, Order, Wilson declared that he had "already established the fact of his deficits in adaptive functioning on the basis of the existing record," and that the court "need not take additional evidence on that factual question." (Def.'s Ltr.-Resp. at 3.)[8]

Second, even if the DSM-V did represent a material change from the DSM-IV, it would only serve to further harmonize the clinical standards of the APA and the AAIDD, minimizing any potential inconsistencies in the definitions which may have been present at the 2012 Atkins hearing. In fact, it appears to be a regular pattern that the APA updates its standards to track changes in the AAIDD's definition. As the district court in Hardy explained,

> '[T]he three broad domains of adaptive behavior in [the AAIDD's] definition represent a shift from the requirement . . . that a person have limitations in at least 2 of the 10 specific skill areas listed in the [AAIDD's] 1992 definition,' which was the model for the approach . . . used by the APA [in the DSM-IV]. . . . The AAIDD moved away from that model because '[t]he three broader domains of conceptual, social, and practical skills . . . are more consistent

---

[8] Instead, Wilson appears to believe that the parties' dispute as to the meaning of the DSM-V entitles him to an evidentiary hearing on that issue. (See Def.'s Ltr.-Resp. at 5 (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) ("If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made."))).) However, Wilson's reliance on Puglisi is misplaced. In that case, the district court had declined to conduct an evidentiary hearing on a motion claiming ineffective assistance of counsel, pursuant to 28 U.S.C. § 2255. By statute, the movant was entitled to a hearing on this claim unless the motion, files, and records conclusively demonstrated that the prisoner was not entitled to relief. Puglisi, 586 F.3d at 213. The Second Circuit likened the decision to deny a statutorily required hearing to a summary judgment determination, and it observed that if material facts are in dispute a hearing should be held to resolve the Section 2255 motion. Id. Here, no statute requires a hearing as to the meaning of the DSM-V.

with the structure of existing measures and with the body of research
on adaptive behavior.'

762 F. Supp. 2d at 879 (quoting American Association of Mental Retardation, <u>Mental</u>

<u>Retardation: Definition, Classification, and Systems of Supports</u> (10th ed. 2002) at 73, 78)); <u>see</u>

<u>also</u> <u>McManus v. Neal</u>, 779 F. 3d 634, 654 n.8 (7th Cir. 2015) ("The DSM-V, like the AAIDD,

now looks to the conceptual, social, and practical domains. The older list of skill areas has been

subsumed into these categories."); <u>id.</u> at 651 (characterizing the AAIDD and APA definitions of

adaptive functioning as "essentially equivalent").

Moreover, the fact that the DSM-IV definition of intellectual disability was also

considered to be "essentially identical" to that of the AAIDD, <u>see</u> <u>Wilson II</u>, 922 F. Supp. 2d

at 341 (citing cases), further supports the court's conclusion that the overall clinical standard has

not changed significantly since the 2012 <u>Atkins</u> hearing. See <u>Smith v. Ryan</u>, --- F.3d ---, No. 10-

CR-99011, 2016 WL 454337, at *29 (9th Cir. Feb. 4, 2016), <u>as corrected</u> (Feb. 17, 2016)

("Although the same professional manuals cited in <u>Atkins</u> are no longer the most current

versions, the same conclusion is equally likely with respect to the more recent editions."); <u>Chase</u>

<u>v. State</u>, 171 So.3d 463, 471 (Miss. 2015) ("The [AAIDD and DSM-V definitions of intellectual

disability] have not materially altered the diagnosis of intellectual disability [cited in <u>Atkins</u>] but

have provided new terminology."); <u>Williams</u>, 1 F. Supp. 3d at 1146-47 (finding that, "in the end,

the exact wording of the various standards makes little substantive difference," and that "with the

recent release of the [DSM-V] . . . the Court need not decide which definition of prong two is

preferable or correct, because the differences between them are mostly theoretical").

Accordingly, the court sees no reason to hold a new hearing simply because the APA has updated its manual.[9] Instead, in analyzing Wilson's adaptive functioning, the court will rely on the evidence in the record from the 2012 <u>Atkins</u> hearing, the post-hearing briefing, and all submissions from the parties following the Second Circuit's 2014 remand order. The court will apply the definitions of adaptive functioning set forth in the DSM-V and the AAIDD 2010 Manual, as well as those publications' articulations of the standard for the second prong of a finding of intellectual disability. Because the court finds that the DSM-V is "essentially equivalent" to the DSM-IV and has "subsumed" the DSM-IV's list of skill areas into the same three categories used by the AAIDD (the conceptual, social, and practical domains), <u>see</u> <u>McManus</u>, 779 F. 3d at 654 n.8, the court will interpret any testimony that references the DSM-IV in light of the DSM-V's updated terminology.

### B.     Prong I: Intellectual Functioning

<u>Hall</u> presents the court with three specific issues that it must address in reconsidering whether Wilson has demonstrated significant deficits in intellectual functioning. First, the court responds to Wilson's argument that, as with the DSM-V, <u>Hall</u> fundamentally reconfigures the relationship between the intellectual and adaptive functioning prongs of the test for intellectual disability. Second, the court describes <u>Hall</u>'s effect on the determination of which SEM and

---

[9] While the court does not share the <u>Hall</u> dissent's belief that the DSM-V "fundamentally alters the first prong of the longstanding, [three]-pronged definition of intellectual disability," the court nonetheless echoes the concern that tying Eighth Amendment law too closely to the views of professional associations "will lead to instability and continue to fuel protracted litigation," <u>Hall</u>, 134 S. Ct. at 2006 (Alito, J., dissenting). As the dissent points out, standards adopted by these associations are unpredictable and frequently change. <u>Id.</u> A legal standard that is too dependent on the exact wording of these clinical standards "implicitly calls upon the Judiciary either to follow every new change in the thinking of these professional organizations or to judge the validity of each new change." <u>Id.</u>; <u>see also</u> <u>Brown v. State</u>, 168 So.3d 884, 900-01 (Miss. 2015) (Dickinson, J., dissenting) ("It seems to me that—rather than exempting from the death penalty all persons who bear the label '[intellectually disabled]' . . . as continually defined, changed, and amended by persons who bear no duty or responsibility to meet the judiciary's constitutional concerns—we should consider a judicial definition of intellectual disability that directly addresses the constitutional concerns expressed by the <u>Atkins</u> Court.").

confidence interval to apply to Wilson's IQ scores. Third, the court interprets Hall's effect on the treatment of multiple, inconsistent IQ scores.

1.      Relationship between Intellectual and Adaptive Functioning

Before Hall, it appeared clear that a finding of intellectual disability required a showing of deficits in both intellectual functioning and adaptive functioning. See Atkins, 536 U.S. at 318 ("[C]linical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills." (emphasis added)). In other words, subaverage intellectual functioning and significant limitations in adaptive functioning were both necessary and independent elements; a defendant was required to prove both in order to demonstrate that he was intellectually disabled and, thus, ineligible for the death penalty. As a result, the court concluded in Wilson II that where a defendant failed to show an adequate deficit in intellectual functioning, it was not necessary to consider whether the defendant was also deficient in adaptive functioning. 922 F. Supp. 2d at 357 ("Because the law is clear that [intellectual disability] contains three necessary elements, the court must determine if these elements are independently satisfied.").

Wilson argues—as does the Hall dissent—that Hall merges what previously were separate and independent requirements into two factors that must simultaneously be considered. (Def.'s Mot. at 21 (arguing that this court's "refusal to consider evidence of adaptive function, its treatment [of] the intellectual functioning and adaptive functioning elements as distinct and sequential, determined exclusively by IQ scores" was "squarely rejected in Hall." (citing 134 S. Ct. at 2001 ("It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment.")).) See Hall, 134 S. Ct. at 2007 (Alito, J., dissenting) ("[T]he Court establishes a standard that conflates what have long been understood to be two independent

18

requirements for proving intellectual disability."); id. at 2008 ("[T]he Court now holds that when a defendant's IQ score is as high as 75, a court must 'consider factors indicating whether the person has deficits in adaptive functioning.' In other words, even when a defendant has failed to show that he meets the first prong of the well-accepted standard for intellectual disability . . . evidence of the second prong . . . can establish intellectual disability." (citation omitted)). As a result, Wilson argues that courts must holistically consider evidence of deficits in both adaptive and intellectual functioning in determining whether a capital defendant is intellectually disabled under the FDPA. (Def.'s Mot. at 22.) However, neither Wilson's nor the dissent's conclusions are warranted by a careful reading of the Supreme Court's decision in Hall.

In Hall, the Court held that "an individual with an IQ test score 'between 70 and 75 or lower,' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 134 S. Ct. at 2000 (citing Atkins, 536 U.S. at 309 n.5). It is true that this language represents a change from Atkins. While Atkins left to the states the responsibility for establishing their own processes for determining whether a defendant was intellectually disabled, see 536 U.S. at 317, after Hall, states may no longer implement a strict cut-off for defendants whose reported IQ test scores are 70 or higher. See Hall, 134 S. Ct. at 2001. Instead, courts are now required to take the SEM into account when evaluating IQ test scores. See id. As Wilson and the Hall dissent point out, these two aspects of Hall were not required by Atkins. See id. at 2003 (Alito, J., dissenting).

It is not true, however, that this holding fundamentally reconfigured the relationship between the first two prongs of the test for intellectual disability. Rather, Hall simply clarifies what constitutes sufficient evidence of a deficit in intellectual functioning. Since courts must now view an IQ test "score" as a range of scores derived from the SEM, the result of Hall is that

a defendant with an IQ score of—for example—71 (with a SEM of anything greater than 0.5 and a 95% confidence interval), is now deemed to have presented sufficient evidence of significantly subaverage intellectual functioning.  See Hall, 134 S. Ct. at 2001 ("[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.").

By contrast, Hall does not stand for the proposition that courts must always examine evidence of deficits in adaptive functioning, regardless of the defendant's intellectual functioning.  While the majority used expansive language in portions of its opinion, see id. at 2001, the decision required an analysis of adaptive functioning only for defendants who receive scores for which the margin of error creates a range that includes 70 or below, see id. at 1996 ("For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning.").  Most importantly, the logic of the decision was limited to cases in which the defendant's IQ score was only "somewhat higher than 70."  Id. at 1999.  In these "borderline" cases, because "IQ test scores should be read not as a single fixed number but as a range," and the confidence interval associated with a test score of 75 includes a score of 70—the traditional benchmark for significantly subaverage intellectual functioning—the defendant's IQ range would demonstrate a deficit in intellectual functioning.  See id. at 1996 (noting that the SEM "allows clinicians to calculate a range within which one may say an individual's true IQ score lies").  Since these defendants thus would have satisfied the first prong of the test, Hall merely requires that they be permitted to introduce evidence of deficits in adaptive functioning, as would

any other capital defendant who satisfied prong one.  Therefore, <u>Hall</u> clearly applies only to those defendants whose test results have a margin of error that includes a score of 70 or below.[10]

Although Wilson seizes on particular language in <u>Hall</u> that suggests the decision should be construed more broadly, this effort is unpersuasive.  Wilson focuses on a comment at the end of the decision, where the majority stated, "It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment."  <u>Hall</u>, 134 S. Ct. at 2001 (citing DSM-V at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score.")).  However, this aside is not a necessary premise in the court's holding, and therefore it must be construed as dicta.[11]

In addition, the statement must be interpreted in the context in which it was written. Immediately prior to this remark, the Court articulated its holding that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."  <u>Id.</u>  Immediately following the Court's comment, it explained that Florida's statute, "as interpreted by its courts, misuses IQ score on its own terms; and <u>this, in turn</u>, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has [an] intellectual disability."  <u>Id.</u> (emphasis added).  Significantly, this language implies that it was the Florida court's treatment of the IQ score as a fixed point which resulted in the error, not its failure to consider adaptive functioning regardless of IQ test score.  In other

---

[10] The Eleventh Circuit has construed <u>Hall</u> similarly.  <u>See</u> <u>In re Henry</u>, 757 F.3d 1151, 1162-63 (11th Cir. 2014) (holding, after <u>Hall</u>, that defendants are not entitled to present evidence of deficits in adaptive functioning regardless of their IQ test scores).

[11] The <u>Hall</u> dissent also dismissed this "vague assertion," noting that "deficits in adaptive behavior cannot be used to establish deficits in mental functioning because the two prongs are meant to show distinct components of intellectual disability."  <u>Id.</u> at 2008.

words, this application of Florida's statute was unconstitutional not because it failed to consider adaptive functioning as a general matter, but because it resulted in the failure to consider adaptive functioning specifically where the IQ score indicated the defendant had demonstrated a deficit in intellectual functioning. The Court did not say, however, that adaptive functioning must always be considered. Accordingly, this court will continue to apply the independent, three-prong test in its analysis of Wilson's <u>Atkins</u> claim.

2.    <u>What SEM and Confidence Interval to Apply to a Defendant's IQ Score</u>

The most significant feature of <u>Hall</u> is its focus on the SEM and Florida's failure to take measurement error into account when analyzing defendants' intellectual functioning. Unfortunately, <u>Hall</u> does not provide clear guidance with respect to how lower courts should apply this concept in practice.

First, the Court did not indicate whether courts should apply the SEM associated with each individual test score, or a SEM of five across all test scores. On the one hand, the Court held that "when a defendant's IQ test score falls within <u>the test's acknowledged and inherent margin of error</u>, the defendant must be able to present additional evidence of intellectual disability."[12] 134 S. Ct. at 2001 (emphasis added). Given the Court's observation that each test has a unique margin of error, <u>see, e.g.</u>, <u>id.</u> at 1995 (noting that "[e]ach IQ test has a standard error of measurement," which "is a statistical fact, a reflection of the inherent imprecision of the test itself" (internal citation and quotation marks omitted)), this language suggests that lower courts are to apply the specific SEM associated with that particular test, which is what this court did in

---

[12] From a literal standpoint, this phrasing is somewhat confusing. The question is not whether the defendant's test score falls within the test's margin of error; a test score always falls within a margin of error—that is a central premise of the Court's decision in <u>Hall</u>. Instead, the question is whether the margin of error surrounding a defendant's test score includes a test score that suggests significantly subaverage intellectual functioning, i.e., a score of 70 or below.

Wilson II.  See 922 F. Supp. 2d at 347.  On the other hand, given the Court's apparent holding that "an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning," Hall could also be read to require that lower courts apply one blanket SEM of plus or minus five, regardless of the test-specific SEM.  134 S. Ct. at 2000; see also id. at 2010 (Alito, J., dissenting).[13]

Second, the Court did not provide clear guidance on the appropriate confidence level lower courts should apply to this analysis.  Assuming courts should apply the test-specific SEM—instead of a blanket five-point margin of error—Hall does not explicitly state whether courts should apply one or two SEMs in constructing the range of possible IQ test scores.  In other words, the Court does not indicate whether lower courts must utilize a 68% confidence interval (defined as IQ test score ± one SEM) or a 95% confidence interval (defined as IQ test score ± two SEMs) to determine the defendant's IQ score range.  Although the Court consistently referred to the use of "the SEM" in the singular, see, e.g., id. at 1995 ("each separate score must be assessed using the SEM"), 1999 ("clinical definitions have long included the SEM"), 2000 ("By failing to take into account the SEM and setting a strict cutoff at 70, Florida goes against the unanimous professional consensus." (citation and internal quotation marks omitted)), the decision nonetheless contains language which explicitly suggests that application of a five-point margin would result in a 95% confidence interval (i.e., two SEMs), see id. at 1995 ("A score of 71, for instance is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with 68% confidence."); id. ("For example,

---

[13] The Hall Court cited Atkins for the proposition that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition."  Id. at 1999 (citing Atkins, 536 U.S. at 309 n.5).

the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Stanford-Binet 5 is 2.30 IQ test points." (citing amicus brief of the APA)).  Yet if Hall really meant that lower courts should apply a 95% confidence interval, it is unclear why the Court would repeatedly emphasize a five-point margin, when—if the average SEM is between 2.16 and 2.30—the use of a five-point range would be over-inclusive in some cases (where two SEMs is less than five points) and under-inclusive in others (where two SEMs is greater than five points).

The Hall dissent anticipated that the majority's decision would "surely confuse States attempting to comply with its opinion," especially in this regard.  See id. at 2010.  The dissent explained:

> First, the Court unjustifiably assumes a blanket (or very common) error measurement of 5.  That assumption gives rise to the Court's holding that a defendant must be permitted to introduce additional evidence when IQ tests reveal an IQ as high as 75.  SEMs, however, vary by IQ test and test-taker, and there is no reason to assume a SEM of 5 points; indeed, it appears that the SEM is generally "estimated to be three to five points" for well-standardized IQ tests. And we know that the SEM for Hall's most recent IQ test was 2.16—less than half of the Court's estimate of 5.

> Relatedly, the Court misreads the authorities on which it relies to establish this cutoff IQ score of 75.  It is true that certain professional organizations have advocated a cutoff of 75 and that Atkins cited those organizations' cutoff.  But the Court overlooks a critical fact: Those organizations endorsed a 75 IQ cutoff based on their express understanding that "one standard error of measurement [SEM]" is "three to five points for well-standardized" IQ tests.  In other words, the number 75 was relevant only to the extent that a single SEM was "estimated" to be as high as 5 points.  Here, by contrast, we know that the SEM for Hall's latest IQ test was less than half of that estimate; there is no relevance to the number 75 in this case.  To blindly import a five-point margin of error when we know as a matter of fact that the relevant SEM is 2.16 amounts to requiring consideration of more than two SEMs—an approach that finds no support in Atkins or anywhere else.

Because of these factual errors and ambiguities, it is unclear to me whether the Court concludes that a defendant is constitutionally entitled to introduce non-test evidence of intellectual disability (1) whenever his score is 75 or lower, on the mistaken understanding that the SEM for most tests is 5; (2) when the [68]% confidence interval (using one SEM) includes a score of 70; or (3) when the 95% confidence interval (using two SEMs) includes a score of 70. In my view, none of these approaches is defensible.

An approach tied to a fixed score of 75 can be dismissed out of hand because, as discussed, every test has a different SEM.

The other two approaches would require that a defendant be permitted to submit additional evidence when his IQ is above 70 so long as the [68]% or 95% confidence interval (using one SEM or two SEMs, respectively) includes a score of 70, but there is no foundation for this in our Eighth Amendment case law. As Hall concedes, the Eighth Amendment permits States to assign to a defendant the burden of establishing intellectual disability by at least a preponderance of the evidence. In other words, a defendant can be required to prove that the probability of a 70 or sub–70 IQ is greater than 50%. Under the Court's approach, by contrast, a defendant could prove significantly subaverage intellectual functioning by showing simply that the probability of a "true" IQ of 70 or below is as little as [16]% (under a one-SEM rule) or 2.5% (under a two-SEM rule). This totally transforms the allocation and nature of the burden of proof.

Id. at 2010-11 (Alito, J., dissenting) (internal citations omitted).

Notwithstanding the validity of the dissent's critique, this court must approach the task of applying Hall in light of these apparent contradictions. Read literally, Hall may be interpreted as requiring lower courts to apply a strict IQ cutoff at 75. See id. at 1996 ("For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning.").[14] As the dissent points out,

---

[14] See, e.g., In re Henry, 757 F.3d at 1162-63 ("The Supreme Court never said that a petitioner who could only establish an IQ score of, say, 78 would be entitled anyway to make up the difference with other evidence of deficiencies. The problem petitioner has under Hall is he can point to no IQ test yielding a score of 75 or below. Thus, building in the standard error approach explicated by the Supreme Court in Hall would not entitle Henry to the additional opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning.").

however, a blanket cutoff at 75 should be "dismissed out of hand," because "every test has a different SEM," id. at 2011 (Alito, J., dissenting), a fact highlighted by the majority itself, see id. at 1995. Moreover, such an approach might run counter to Hall itself. In situations where a given test's SEM is greater than five, a blanket cutoff at 75 would run afoul of Hall's requirement to apply the SEM.

But the question of whether the court should apply a 68% or 95% confidence interval is particularly vexing, as it has yet to be explicitly decided by any federal court,[15] and it has significant implications in Wilson's case in particular. As the court noted in Wilson II, application of the 68% confidence interval results in only one test for which Wilson's IQ score range falls to 70 or below, see 922 F. Supp. 2d at 359, and the court previously expressed a belief that this test (the December 5, 1994, test conducted by Dr. Nagler) was an outlier, see id. at 362, 367-68. If the court were to apply a 95% confidence interval, however, two tests—other than the Nagler score—would reflect a range of scores that fall to 70 or below, including one test before Wilson's 18th birthday. See id. at 358 (showing that the bottom end of the 95% confidence interval for the administration of a test by Dr. Aranoff on October 27, 1993, was 69.98). After Hall, the presence of even one score at or below 70 is sufficient to show significant subaverage intellectual functioning and, accordingly, require consideration of evidence of adaptive functioning. (See infra Part II.B.3.)

_____

(internal citation and quotation marks omitted)); Jenkins v. Allen, No. 08-CV-869 (VEH) (SGC), 2015 WL 1388899, at * 14 (N.D. Ala. Mar. 31, 2015) (applying blanket five-point SEM).

[15] One district court, in the social security context, has implicitly sanctioned an administrative law judge's utilization of a 95% confidence interval for the purpose of determining whether a subject was intellectually disabled. See Davis ex rel. J.E.C. v. Colvin, No. 14-CV-104, 2014 WL 4954470, at *9 n.11 (E.D. Wis. Oct. 2, 2014). Conversely, a district court in Hawaii has acknowledged that the 95% confidence interval may be "too high for Atkins purposes," but the court in that case declined to decide which interval was most appropriate because the defendant was found not to be intellectually disabled even under the higher interval. See Williams, 1 F. Supp. 3d at 1150 n.27 (citing Wilson II, 922 F. Supp. 2d at 347).

As a result, the appropriate course of action in Wilson's case effectively turns on the question of whether courts should apply one or two test-specific SEMs to a defendant's IQ test score in determining the appropriate range. Although the court previously determined that a 68% confidence interval was more appropriate in the <u>Atkins</u> context, 922 F. Supp. 2d at 347-48, the most coherent interpretation of <u>Hall</u> requires the court to apply the larger, 95% confidence interval, derived by adding to and subtracting from each of Wilson's IQ scores two test-specific SEMs. By indicating that the margin for measurement error was "generally" plus or minus five points,[16] based on an average SEM of 2.16 or 2.30—depending on the test—the Supreme Court all but explicitly stated that lower courts should apply two SEMs in conducting this analysis.[17] <u>See Hall</u>, 134 S. Ct. at 1995 ("A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with 68% confidence."). In fact, it is unclear why the Court would include a discussion of the 95% confidence interval if it reflected an unnecessarily cautious approach.

Moreover, the general tone of the Supreme Court's decision strongly suggests that courts should not apply narrow margins of error when assessing intellectual functioning for the purpose of determining eligibility for the death penalty. <u>See id.</u> at 2000 ("An IQ score is an

---

[16] The <u>Hall</u> dissent suggests that the majority opinion's use of a five-point margin reflects a mistaken belief in a "blanket (or very common) [SEM] of 5." 134 S. Ct. at 2010 (Alito, J., dissenting). However, the dissent's interpretation ignores the fact that the majority was well aware that each test has a test-specific SEM. <u>See id.</u> at 1995. Therefore, the court finds it more likely that the majority used five points to illustrate the application of two SEMs and a 95% confidence interval, given that five is roughly the equivalent of two SEMs in Hall's case.

[17] Of course, in eschewing the application of a blanket five-point SEM, the court runs the risk that application of a 95% confidence interval might result in a finding that a defendant whose lowest IQ test score is greater than 75 has satisfied the first prong of the test for intellectual disability. In fact, this is exactly what happens in Wilson's case: Because Wilson's October 27, 1993, FSIQ score of 76.68 has a SEM of 3.35, the 95% confidence interval reaches 69.98. (<u>See infra</u> Part III.A.) Although this appears to extend <u>Hall</u> further than the decision literally requires, given the tension between the Court's statements about IQ test scores between 70 and 75 and its statements about Florida's failure to apply a standard error measurement, this result is compelled by the logic of the Court's decision.

approximation, not a final and infallible assessment of intellectual functioning."); id. at 2001 ("Intellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number." (internal citations omitted)); id. at 1990 (holding that Florida's "rigid rule . . . creates an unacceptable risk that person's with intellectual disability will be executed"). While this reading does not require lower courts to examine evidence of a defendant's adaptive functioning in every case, it suggests that in close cases such as this, courts should resolve uncertainty in favor of defendants. The court finds that the application of a two-SEM, 95% confidence interval reflects an approach most in keeping with this directive.

3.     Treatment of Multiple Test Results

Hall does not provide explicit guidance with respect to how courts should treat multiple IQ test results, some of which permit a finding of significantly subaverage intellectual functioning and some of which do not. In particular, the Sumpreme Court was silent regarding the treatment of possible outliers and whether lower courts should compute averages. At its most explicit, Hall provides that "[e]ven when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. Id. at 1995 (emphasis added) (citing Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological

Assessment 286, 289-291, 318 (D. Saklofske, C. Reynolds, V. Schwean, eds. 2013)).[18]

Notwithstanding the lack of clear guidance on this issue, the facts in <u>Hall</u> require lower courts to consider evidence of adaptive functioning if even one valid IQ test score generates a range that falls to 70 or below. In <u>Hall</u>, the petitioner's valid IQ test scores were 71, 72, 73, and 80. <u>Id.</u> at 2007 n.9 (Alito, J., dissenting). Nonetheless, in concluding that Florida's statute was unconstitutional, the Court focused on the fact that the statute would permit execution of a defendant whose score was as low as 71. <u>Id.</u> at 1992, 1995, 2001 ("Florida seeks to execute a man because he scored a 71 instead of 70 on an IQ test."); <u>see also id.</u> at 2007 (Alito, J., dissenting) ("[O]ne would get the impression from reading the Court's opinion that Hall introduced only one test score (of 71)."). Although Hall had consistently achieved IQ test scores above 70, including one score as high as 80, this did not change the Court's analysis. <u>See id.</u> at 1995-96 ("[B]ecause the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning."); <u>see also id.</u> at 2011 (Alito, J., dissenting) ("The Court never explains why its criticisms of the uncertainty resulting from the use of a single IQ score apply when a defendant consistently scores above 70 on <u>multiple</u> tests. Contrary to the Court's evident assumption, the well-accepted view is that multiple consistent scores establish a much higher degree of confidence." (emphasis in original)).

Thus, the court interprets <u>Hall</u> to require a prong 2 analysis if any IQ test, evaluated in the context of a 95% interval, reflects a range falling to 70 or below.

---

[18] <u>See also</u> Reply Br. for Pet., <u>Hall v. Florida</u>, No. 12-10882, 2014 WL 689553, at *10 n.3 (Feb. 24, 2014) ("The analysis of multiple IQ test scores is more complicated than taking the highest score or looking at a pattern of scores to form a gestalt judgment about "true" IQ. Doing so, or even using an average, may systematically overestimate a person's true intellectual functioning relative to his or her peers." (citing Schneider at 290, 318)).

## C.     Prong II: Adaptive Functioning

As explained above, the APA defines adaptive functioning in terms of three broad

domains:

> The conceptual (academic) domain involves competence in
> memory, language, reading, writing, math reasoning, acquisition of
> practical knowledge, problem solving, and judgment in novel
> situations, among others. The social domain involves awareness of
> others' thoughts, feelings, and experiences. empathy, interpersonal
> communication skills; friendship abilities; and social judgment,
> among others. The practical domain involves learning and self-
> management across life settings, including personal care, job
> responsibilities, money management, recreation, self-management
> of behavior, and school and work task organization, among others.

DSM-V at 37-38.  The AAIDD, similarly, defines prong two as "significant limitations . . . in

conceptual, social, and practical skills."  AAID 2010 Manual at 21.  To meet prong two, the

DSM-V states that a person's adaptive functioning in at least one of these three domains must be

"sufficiently impaired that ongoing support is needed in order for the person to perform

adequately in one of more life settings at school, at work, at home, or in the community."

DSM-V at 38.   Moreover, "the deficits in adaptive functioning must be directly related to the

intellectual impairments described in [prong one]."  Id.

In analyzing Wilson's adaptive functioning, the court will also look to examples from

case law where courts have reached prong two for purposes of resolving Atkins claims.  See,

e.g., Williams, 1 F. Supp. 3d at 1145-48, 1161-67; United States v. Salad, 959 F.

Supp. 2d 865, 878 (E.D. Va. 2013) ("Prong two generally requires a more expansive

investigation of a defendant's life history and skill levels than could be fully evaluated through

use of a normed instrument."); Davis, 611 F. Supp. 2d at 491 (describing the prong two analysis

as "amorphous").  Although some of these cases pre-date the DSM-V, the court finds their

interpretations of the AAIDD standard particularly helpful, as the DSM-V now mirrors that terminology. For example, <u>Salad</u> summarizes the AAIDD framework as follows:

> The AAIDD Manual provides several important guidelines for analyzing adaptive behavior. First, the analysis is often retrospective, in that it examines past behavior for evidence of conformity or non-conformity to the baseline standards for the subject's age and background. AAIDD [2010] Manual at 46; <u>see also</u> <u>Hardy</u>, 762 F.Supp.2d at 881 (noting that, in the context of an <u>Atkins</u> claim[], the analysis is always retrospective). Second, in the absence of standardized measurements, analysts should examine multiple sources of information for "convergence"; exercise "reasonable caution" in resolving conflicting reports; and avoid drawing conclusions from isolated performances. AAIDD [2010] Manual at 48. That is, an evaluation should not rely primarily on an individual's self-report of his skill level, but rather should rely on information gathered from third parties who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." <u>Id.</u> at 47. Third, the analysis should focus on average ability, not peak functioning. <u>Id.</u> (describing this broader focus as a "critical distinction" between prongs one and two). And finally, clinicians should be mindful that subjects with mild intellectual disability present a complex picture of strengths and weaknesses, and analysts should not evaluate a subject's performance based on inaccurate stereotypes of disabled individuals. <u>See</u> <u>id.</u> at 7 ("[L]imitations often coexist with strengths.").

959 F. Supp. 2d at 878.

As with the prong one analysis, however, the court is faced with several specific issues that it must address in analyzing Wilson's adaptive functioning. First, the court describes the weight that should be given to results from standardized measures of adaptive functioning administered by the Government's and Wilson's experts. Second, the court addresses the probative value of adaptive functioning evidence that is derived from criminal and prison records. Finally, the court address whether prong two requires proof that a defendant's adaptive deficits are caused by intellectual disability, as opposed to other disorders or disabilities.

1.     <u>Importance of Standardized Measures of Adaptive Functioning</u>

Although not a formal component of the diagnostic criteria in either the DSM-V or the

AAIDD Manual, both standards direct clinicians to use standardized measures of adaptive

functioning when possible.  <u>See</u> DSM-V at 37 ("Adaptive functioning is assessed using both

clinical evaluation and individualized, culturally appropriate, psychometrically sound

measures."); AAIDD 2010 Manual at 43 ("[S]ignificant limitations in adaptive behavior should

be established through the use of standardized measures normed on the general population[.]").

The AAIDD cautions, however, that "clinicians must recognize that adaptive behavior

instruments are imperfect measures of personal competence that distinguish persons with and

without ID as they face the everyday demands of life."  AAIDD 2010 Manual at 51.

Federal courts have been reluctant to rely heavily on such tests, particularly in the <u>Atkins</u>

context where they often are based on retrospective recollections of an individual's youth.  In

<u>Hardy</u>, for example, the district court noted that "the selection of the tests used to assess adaptive

behavior, the persons selected as informants, the conduct of the interviews, and the ultimate

interpretation of the tests' results are a good deal more dependent on subjective clinical judgment

than the assessment of IQ."  762 F. Supp. 2d at 883.  The court concluded that "as the degree to

which a matter is left to an individual clinician's judgment increases, so does the degree to which

the Court must rely on its assessment of the relative competence and credibility of the individual

experts before it to resolve disputes between them."  <u>Id.</u>; <u>see also</u> <u>Williams</u>, 1 F. Supp. 3d

at 1147-48 (determining that it would place "some weight" on the results of standardized tests,

but noting that the "breadth of evidence enables the court to take a multifactorial approach");

<u>Salad</u>, 959 F. Supp. 2d at 878 ("Prong two generally requires a more expansive investigation of a

defendant's life history and skill levels than could be fully evaluated through use of a normed instrument.").

In this case, experts on both sides administered standardized assessments of Wilson's adaptive behavior to a range of individuals who knew him. (See Olley Rep. (Dkt. 960) at 26-27; Denney Rep. (Dkt. 956) at 26-36.) However, while these tests are designed to assess current adaptive functioning in the community, all were administered retrospectively, and only after Wilson was incarcerated and facing the possibility of a death sentence. Cf. Williams, 1 F. Supp. 3d at 1163 (noting that the ABAS test "is typically used to assess someone's current adaptive behavior, and not retrospectively while a testing subject is incarcerated" (emphasis in original) (internal citations omitted)). The results are, predictably, inconclusive.

Accordingly, the court will consider the results of these tests (see Part III.B.2 (describing the results obtained by Drs. Olley and Denney)), but it will place significantly greater weight on the clinical judgment of the experts the court finds most credible, along with record evidence from Wilson's youth. See Montgomery, 2014 WL 1516147, at *47 ("Where standardized assessment tools cannot be used or are unreliable, however, the Court must consider other sources of information, including 'school records, medical records, and previous psychological evaluations; or interviews with individuals who know the person and have had the opportunity to observe the person in the community.'" (citing AAIDD 2010 Manual at 48)); Davis, 611 F. Supp. 2d at 492 (finding "a relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible, and to look for consistency and convergence over time").

Although the Government does not dispute the lengthy record of Wilson's adaptive deficits before the age of 18, it emphasizes numerous examples of Wilson's adaptive strengths while in prison. However, the court finds that such evidence, while relevant, must be accorded reduced weight in the analysis of whether or not Wilson satisfies prong two.

For one, "[t]he point of an Atkins hearing is to determine whether a person was [intellectually disabled] at the time of the crime and therefore ineligible for the death penalty, not whether a person is currently [intellectually disabled] and in need of special services." Hardy, 762 F. Supp. 2d at 881. This is not necessarily to suggest that individuals outgrow or may be "cured" of their intellectual disabilities, but rather that, in an Atkins context, the analysis must be retrospective in order to determine whether the defendant's disability arose during the developmental period and affected his or her capacity for judgment, understanding, and self-control at the time of the crime. As the court in Hardy explained,

> Certainly a person's level of adaptive functioning in the present might provide some information about his abilities during the developmental period as, all things being equal, a person without limitations in the present is less likely to have had limitations before, and a person with limitations today is more likely to have had them during the developmental period. But particularly with the mildly [intellectually disabled], who tellingly used to be labeled the "educable," [DSM–IV] at 43, the [AAIDD] has been clear that a person's current strengths and weaknesses are not the best evidence of the relevant facts in an Atkins hearing.

Id. (citing AAIDD 2010 Manual at 95-96).

Furthermore, the clinical standard for intellectual disability asks whether an individual's adaptive deficits are "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one of more life settings at school, at work, at home, or in the community." DSM-V at 38. The clear implication of this language is that intellectually disabled

individuals may be able to perform adequately if they are provided ongoing support, such as the structure, observation, instruction, and discipline that incarceration necessarily entails. However, the ability to perform adequately with ongoing support does not negate a finding of intellectual disability. "After all, [intellectually disabled] individuals who are placed in medical institutions because of the severity of their limitations do not cease to be [intellectually disabled] due to the fact that the institutions in which they have been placed provide them care." United States v. Shields, No. 04-CR-20254 (BBD), slip op. at 26 (W.D. Tenn. May 11, 2009); see also Hardy, 762 F. Supp. 2d at 899 (noting that "an institutional environment of any kind necessarily provides 'hidden supports'"). Accordingly, one of the AAIDD's key factors in the assessment of adaptive functioning requires that "the person's strengths and limitations in adaptive skills should be documented within the context of the community and cultural environment typical of the person's age peers," rather than in comparison to other inmates. AAIDD 2010 Manual at 45. The AAIDD further explains that "[t]he diagnosis of [intellectual disability] is not based on the person's street smarts, behavior in jail or prison, or criminal adaptive functioning." AAIDD, User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports 20 (11th ed. 2012) ("AAIDD User's Guide").

Finally, while the court does not question the honesty of the many prison officials who have evaluated and worked with Wilson over the years, the fact that they have only known Wilson in a correctional setting leads the court to treat their observations with measured skepticism. See Hardy, 762 F. Supp. 2d at 900 ("[P]rison officers' observations are limited to an extremely unusual set of circumstances, and are likely to be filtered through their experience with other prisoners, many of whom also suffer from intellectual limitations. Their intuitive 'control group' is therefore not representative of the general population [.]"); Montgomery, 2014

WL 1516147, at *50 (noting that "post-incarceration adaptive functioning must be assessed in light of its potentially limited probative value"). Accordingly, the court will consider evidence from Wilson's time in prison, but the court will give greater weight to evidence from Wilson's developmental period when the evidence is contradictory or inconclusive—as it often is.

3.    Causation

The Government concedes that Wilson has deficits in adaptive functioning. (Gov't's Mem. at 41.) In fact, all three of the Government's experts acknowledged at the Atkins hearing that Wilson demonstrated deficits in several of the skill areas identified by the DSM-IV, including academic skills, communication, and social and interpersonal relations. (See Tr. at 1938-39, 2017-19 (Denney), 1849 (Patterson), 2064-68 (Mapou).) However, the Government and its experts maintain that "those deficits are explainable and, more importantly, not the result of [intellectual disability]." (Gov't's Mem. at 41.) Instead, the Government insists that Wilson's deficits are attributable to a range of other problems, including ADHD, a learning disability, oppositional defiant disorder, and a willful conduct disorder. (Id. at 40-43.) According to the Government, because Wilson has not proven that his "deficits in adaptive functioning . . . are specifically caused by [intellectual disability]," he fails to meet prong two of the legal standard for intellectual disability. (Id. at 44 (emphasis added).) However, the court finds that proof of such specific causation is not required. Instead, Wilson must show that his significant deficits in adaptive functioning are, at most, directly related to his intellectual deficits. See DSM-V at 38.

At the time of the Atkins hearing, the clinical standards for prong two did not include a causation requirement of any kind. (See Tr. at 2020-25.) Even now, neither standard mentions causation among the diagnostic criteria. See DSM-V at 33; AAIDD 2010 Manual at 6. However, in the explanatory text of the DSM-V, the APA has added the following sentence: "To

meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [prong one]." DSM-V at 38. While this might seem to represent a heightening of the APA standard, both Wilson and the Government agree that this language does not, in fact, demonstrate a material change from the DSM-IV. (Def.'s Ltr.-Resp. at 12; Gov't's Pre-Trial Mem. at 5.) However, the Government presumably believes that the clinical standard has always implicitly required proof of causation, despite the fact that this was not stated in the DSM-IV or the AAIDD 2010 Manual. (See Gov't's Mem. at 41-44.)

With respect to the DSM-V's effect on the legal standard for prong two, the court finds that this single sentence is insufficient to impose a requirement for a defendant to prove specific causation. By requiring that adaptive functioning deficits "directly relate" to intellectual functioning deficits, the DSM-V appears simply to have clarified the most logical approach to a diagnosis of intellectual disability.[19] The court assumes that a clinician would not diagnose intellectual disability on the basis of adaptive functioning deficits that were related to something else entirely, such as a physical disability or traumatic event. However, where an individual has demonstrated significantly subaverage intellectual functioning, along with significant adaptive

---

[19] The court finds the testimony of Dr. Bruce Shapiro, Wilson's expert, on this point to be particularly helpful. As Dr. Shapiro explained,

> [O]ne of the concerns about the diagnostic criteria for [intellectual disability] was that there was a possibility that people who just scored poorly on an IQ test would be called intellectually disabled. And the reason for the second set of criteria in large measure is to ensure that the impairment is not just one of test taking, but rather that the impairment moves into everyday life kinds of activities . . . . When immigrants, since we're in Brooklyn, came over to Ellis Island, they would be administered IQ tests and be deemed intellectually limited and with no deficit in their adaptive behavior . . . . There was a concern about over-diagnosing people based on the test score.

(Tr. (Dkt. 1528) at 49.)

deficits that relate to such intellectual impairment, that individual has satisfied the first two diagnostic criteria for intellectual disability.[20]  To require this individual to further prove that he satisfies these criteria <u>because</u> he is intellectually disabled would render the criteria meaningless. Indeed, the Government's approach would transform the standard for intellectual disability into an impossible test:  In order for a defendant to show that he was intellectually disabled, he would need to prove that he satisfied the criteria because he was intellectually disabled.  As though trapped on an M.C. Escher staircase, the defendant would climb to the top only to find he had returned to the bottom.

Likewise, the court finds that a defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability.  The APA has clearly stated as much:  "The diagnosis criteria for [intellectual disability] do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder."  DSM-IV at 47.  Even assuming that Wilson suffers from other disorders or disabilities such as ADHD, a learning disability, or a behavior disorder, this does not preclude a finding that he also suffers from intellectual disability.  Indeed, many of these other conditions are strongly associated with intellectual disability.  <u>See</u> DSM-V at 40 (explaining that "[c]o-occurring conditions . . . are frequent in intellectual disability).  According to the APA, impulse-control disorders and ADHD are among the most common co-occurring disorders with intellectual disability.  <u>Id.</u> Furthermore, "Individuals with intellectual disability . . . may also exhibit aggression and

---

[20] As Dr. Olley, Wilson's expert, notes, "[T]he definition of [intellectual disability] does not require that a cause be identified for impairments in intelligence or adaptive behavior.  The definition is a 'functional' one; that is, it is diagnosed by evidence of impaired functioning."  (Olley Rep. at 10.)  This strikes the court as a sensible, if unavoidably imprecise, approach to diagnosing a disability.  Unlike an infectious or genetic disease, intellectual disability is not typically diagnosed by a blood test or a cheek swab.  Instead, clinicians identify this disability based on the best evidence of an individual's intellectual impairments and the effect of those impairments on his or her ability to function in society.

disruptive behaviors, including harm of others or property destruction." Id. Dr. Mapou, who testified for the Government, declared that it was possible to have both intellectual disability and a learning disability. (Tr. at 2084.) Even Dr. Denney, who also testified for the Government, conceded that many of the symptoms of a learning disability overlap with the symptoms of mild intellectual disability. (Id. at 1938.)

Nonetheless, the Government essentially asks the court to break down each deficit and determine what portion of each is attributable to a learning disability, emotional disturbance, ADHD, or a conduct disorder, to name but a few of the many diagnoses that have been applied to Wilson throughout his life. Yet the court can find no such requirement in the clinical guidelines. Nor does the court believe that such an approach would comply with the legal requirement, as articulated by Hall, to avoid the "unacceptable risk that persons with intellectual disability will be executed" in violation of the Eighth Amendment. 134 S. Ct. at 1990. Accordingly, in analyzing Wilson's adaptive functioning, the court will not engage in a detailed causation analysis for every demonstrated deficit.

## III. DISCUSSION

### A. Prong I: Wilson's Intellectual Functioning

As explained above, the court interprets Hall as holding that where application of the test-specific standard error measurement drawn to a confidence interval of 95% results in a range that reaches 70 or below, the defendant has demonstrated significantly subaverage intellectual functioning. Applying this framework, Wilson has at least one IQ test score from before age 18 with a range that demonstrates significantly subaverage intellectual functioning. This approach differs from that taken in Wilson II, where the court applied a 68% confidence interval. See 922 F. Supp. 2d at 347-48. Otherwise, the court does not disturb its original analysis of Wilson's

intellectual functioning.  See id. at 357-68.  The court will not repeat that analysis in its entirety here; however, a brief summary is in order.

The following chart displays the results of the nine IQ tests that Wilson has taken over the course of his life.  The tests are of four different types: the Wechsler Intelligence Scale for Children-Revised ("WISC-R"), the Wechsler Intelligence Scale for Children-Third Edition ("WISC-III"), the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), and the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV").  (See James IQ Charts (Dkt. 982-2).)  From left to right, the chart displays: the date the test was given; Wilson's age (years/months);[21] the last name of the test administrator; the test edition; the verbal IQ ("VIQ"), performance IQ ("PIQ"), and full scale IQ ("FSIQ") scores Wilson obtained; the FSIQ after applying an adjustment to account for the Flynn effect of 0.33 points per year since the test was normed ("Flynn FSIQ"), see Wilson II, 922 F. Supp. 2d at 349-51, 357 n.17; the SEM for the test associated with the age of the examinee, see id. at 357 n.18; and the 68% and 95% confidence intervals ("CI") around the Flynn-adjusted scores.[22]

---

[21] Wilson was born on May 6, 1982.  (Mapou Rep. (Dkt. 958) at 1.)  He committed the murders on March 10, 2003. Whitten, 610 F.3d at 173.

[22] Although the court applies the 95% confidence interval here (see Part II.B.2), it includes the 68% confidence interval for illustrative purposes, and because that is the interval the court applied in Wilson II.  See 922 F. Supp. 2d at 345.

| DATE | AGE | EXAMINER | TEST | VIQ | PIQ | FSIQ | FLYNN FSIQ | SEM | 68% CI | 95% CI |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/06/89 | 6/8 | Abramson | WISC-R | 81 | 90 | 84 | 78.39 | 3.41 | 74.98 to 81.80 | 71.57 to 85.21 |
| 12/11/91 | 9/7 | Drezner | WISC-III | 79 | 81 | 78 | 77.34 | 3.35 | 73.99 to 80.69 | 70.64 to 84.04 |
| 10/27/93 | 11/6 | Aranoff | WISC-III | 72 | 90 | 78 | 76.68 | 3.35 | 73.33 to 80.03 | 69.98 to 83.38 |
| 12/05/94 | 12/7 | Nagler | WISC-III | 65[23] | 80 | 70 | 68.35 | 3.00 | 65.35 to 71.35 | 62.35 to 74.35 |
| 4/24/97 | 14/11 | Frank[24] | WISC-III | | | | | | | |
| 4/25/98 | 15/11 | Giglio | WISC-III | 70 | 95 | 80 | 77.03 | 2.60 | 74.43 to 79.63 | 71.83 to 82.23 |
| 1/07/00 | 17/8 | Popp | WAIS-III | 78 | 92 | 84 | 82.35 | 2.58 | 79.77 to 84.93 | 77.19 to 87.51 |
| 10/17/03 | 21/5 | Drob | WAIS-III | 71 | 85 | 76 | 73.36 | 2.37 | 70.99 to 75.73 | 68.62 to 78.10 |
| 6/28/12 | 30/1 | Denney | WAIS-IV | 80 | 92 | 80 | 78.02 | 2.12 | 75.90 to 80.14 | 73.78 to 82.26 |

The court previously determined that it would consider the practice effect in interpreting Wilson's IQ scores, but that "[s]everal considerations diminish the importance" of the effect in Wilson's case, 922 F. Supp. 2d at 359; namely, that he had never taken two tests within the same year, that his later FSIQ scores suggested a minimal practice effect at most, and that his most

---

[23] Dr. Nagler reported a VIQ of 66 and an FSIQ of 71, but her raw data revealed an arithmetic error in the calculation of the VIQ. (See James Rep. (Dkt. 959) at 8; James IQ Charts.) The Government acknowledged that this error occurred (see Gov't's Mem. at 6 n.4), and so the court used the corrected score, which dropped the FSIQ to 70. Wilson II, 922 F. Supp. 2d at 358 n.21.

[24] Dr. Frank administered only five subtests; his testing did not produce an IQ score. (James Rep. at 11.)

recent IQ test in 2012 was administered so long after his previous test as to make the practice effect "likely minimal if not nonexistent," id. at 350. Accordingly, the court concluded that the practice effect likely had not inflated Wilson's scores. Id.

From the chart, it would appear that two of Wilson's test scores demonstrate significantly subaverage intellectual functioning. In other words, the 95% confidence intervals for two tests—administered before the age of 18—reach 70 or below: the 1993 Aranoff test and the 1994 Nagler test. However, although the court finds that Wilson has satisfied the requirements of prong one, the court has several concerns about the reliability of these results.

First, the court notes that had it not decided to apply a Flynn-effect adjustment to Wilson's scores, see Wilson II, 922 F. Supp. 2d at 349-51, only the Nagler test score would satisfy prong one.[25] Yet the court previously characterized this score as an "unreliable outlier" because of Wilson's observed behavior during the exam:

> Dr. Nagler wrote that Wilson was "resistant and confrontational throughout"; that he "squirmed in place, put his fingers in his mouth, and yawned continuously"; that "[h]e blurted out questions and generally utilized a careless, impulsive approach"; and that when items became "somewhat difficult he became frustrated and gave up." (Denney Rep. at 10.) Although Dr. Nagler did not indicate that the results of her test administration were invalid as a result of Wilson's attitude, she did find that, "because of complicating emotional, social and cultural factors, [he] ha[d] not achieved at a level commensurate with ability." (Denney Rep. at 10.)

922 F. Supp. 2d at 362.

Considering the Flynn-effect adjustment, however,[26] an additional test result now satisfies prong one: the 1993 WISC-III administered by Dr. Ellen Aranoff. Yet this test also

---

[25] Application of the 95% confidence interval to the non-adjusted FSIQ scores would result in lower boundaries of 77 (Abramson), 71.3 (Drezner), 71.3 (Aranoff), 64 (Nagler), 74.8 (Giglio), and 78.84 (Popp).

[26] The court sees no reason to change its decision to consider the Flynn effect. See Wilson II, 922 F. Supp. 2d at 349-51. However, the court notes that neither Atkins nor Hall requires courts to take the Flynn effect into account. See Hall, 134 S. Ct. passim (making no mention of the Flynn effect); Hooks v. Workman, 689

presents reliability concerns. The court previously described Dr. Aranoff's notes from this test administration:

> Dr. Aranoff noted that Wilson's responses to testing were inconsistent: he was cooperative at first, but "on later occasions his anxiety, irritability and preoccupation with personal problems and issues interfered with his ability to respond to presented test questions," and "[i]n these instances, his involvement in examination content was inadequate and detrimental to performing optimally on psychological tests." (Denney Rep. at 9.) Thus, she concluded, Wilson's "present results d[id] not constitute the best estimates of [his] cognitive abilities." (Id.) She further noted the significant difference between Wilson's VIQ and PIQ (the latter of which was in the average range), and explained that "language deficits" may have caused his low functioning on the verbal subtests. (Patterson Rep. [Dkt. 957] at 9.)

Id. at 362. Furthermore, as the court noted, "Dr. Aranoff reported inconsistent PIQ scores; she twice reported it as 90 and once as 93." Id. at 358 n.20 (citing James IQ Charts). The court determined that it would use the lower of these two scores, yielding an FSIQ of 78; however, "[i]f the higher of the two scores were used, the FSIQ would be 80 (the FSIQ Dr. Aranoff reported throughout her report)." Id. If the court had used this higher score, Wilson's Flynn FSIQ would have been 78.68,[27] and the lower boundary of the 95% confidence interval would fall at 71.98.[28] Under the court's interpretation of Hall (see supra Part II.B.2), that number does not demonstrate significantly subaverage intellectual functioning, and Wilson would fail prong one.

F.3d 1148, 1170 (10th Cir. 2012) ("Atkins does not mandate an adjustment for the Flynn Effect. Moreover, there is no scientific consensus on its validity."); see also United States v. Candelario-Santana, 916 F. Supp. 2d 191, 207 (D.P.R. 2013) (declining to consider the Flynn effect and citing cases where other courts have declined to accept its application).

[27] The Flynn-effect deduction of 0.33 points times four years equals 1.32. Accordingly, 80 minus 1.32 equals 78.68. (See James IQ Charts.)

[28] Given the test-specific SEM of 3.35, application of the 95% confidence interval (78.68 ± 6.7) would result in a range from 71.98 to 85.38. (See James IQ Charts.)

Nonetheless, the court will not move the goalposts on this analysis. Having already decided to consider the lower of the two Aranoff scores, the court now finds that Wilson's score on that test—a Flynn FSIQ of 76.68 with a 95% confidence interval reaching 69.98—satisfies prong one, as required by Hall. Because Wilson has thus demonstrated significantly subaverage intellectual functioning, the court must consider whether he also suffers from significant deficits in adaptive functioning.

**B.     Prong II: Wilson's Adaptive Functioning**

In analyzing Wilson's adaptive functioning, the court will begin with an overview of Wilson's background, drawing from a voluminous record extending to Wilson's early childhood and including contemporaneous accounts and evaluations from teachers, social workers, probation officers, and mental health professionals. Next, the court considers the credibility of the seven witnesses who testified regarding Wilson's adaptive functioning at the 2012 Atkins hearing and in their reports. Finally, the court provides its factual determination of Wilson's adaptive functioning.

1.     Wilson's Background[29]

Wilson was born on May 6, 1982. (Olley Rep. at 1.) His mother had an eighth-grade education, and she abused alcohol and crack cocaine while she was pregnant with him. (Shapiro Rep. at 13.) Wilson's father was a longtime alcoholic with a history of treatment for psychiatric problems—he did not actively participate in Wilson's life. (Woods Rep. at 7.) Wilson was reportedly healthy when he was born; however, at age 20 months he was hospitalized for meningococcal meningitis, a bacterial brain infection that is often fatal and is considered a

---

[29] The following facts from Wilson's background are those that the court finds most relevant to its analysis of Wilson's adaptive functioning. The court does not attempt to provide a comprehensive summary of all the evidence in the record.

significant risk factor for intellectual disability in survivors.  (Shapiro Rep. at 18.)  Wilson's mother acknowledged that he had been lethargic, vomiting, and feverish for several weeks before he was brought to the hospital.  (Woods Rep. at 8.)  He was hospitalized for two weeks, and family members claim that he was never the same after his illness:  he cried often, appeared lethargic, and was unable to follow simple instructions appropriate for a child his age.  (Id.)  At age three, he was taken to the emergency room by an aunt, one day after swallowing boric acid.  (Shapiro Rep. at 14.)  All told, records show that from birth to age five Wilson was brought to the emergency room six different times for various medical emergencies.  (Woods Rep. at 8.)  Family members report that he did not learn to speak until he was three years old, and even then his speech was often unintelligible.  (Id.)

At age five, the Administration for Children's Services removed Wilson and his siblings from their mother's custody and placed them in foster care.  (Id.)  The neglect petition noted that Wilson's mother left her children alone for long periods of time, and that she and two maternal aunts, who also lived in the household, had been abusing crack cocaine.  (Id.)  Wilson later moved in with his paternal aunt, Lillian Barnes.  (Id. at 9.)

Wilson's kindergarten records indicate "satisfactory" performance.  (Id. at 8.)  However, by the time he was in the first grade, he did not know the days of the week, the months of the year, or the letters of the alphabet.  (Id. at 9.)  A teacher at the time noted, "He makes loud humming sounds when he can't do the work with the rest of the class.  When I speak to him or ask him a question, he becomes motionless and rigid and doesn't move."  (Olley Rep. at 4.)  He was described as a "very withdrawn" child who had difficulty obeying rules but was reported to do better with one-on-one instruction.  (Woods Rep. at 9.)  Achievement tests showed that

Wilson performed below age expectancy in the "receptive vocabulary" and "general information fund" domains.  (Id.)

By age six, Wilson's emotional and behavioral problems were well documented.  He threw tantrums at school, crying, screaming, and assaulting peers so that he frequently had to be physically restrained by teachers and staff.  (Id.)  Over the next year, Wilson was taken three times from school to Elmhurst hospital for emergency psychiatric treatment.  (Olley Rep. at 3.)  The first time, he was released the same day.  (Id.)  The second time, he was hospitalized for approximately three weeks after saying that he wanted to die and refusing to leave the classroom when a fire broke out at his school.  (Id.)  It took four teachers to drag him out.  (Woods Rep. at 9.)  On another occasion, he stood in the middle of a busy street and refused to move as cars drove past him.  (Id.)  Upon his release, Wilson was transferred to a different school and placed in a special education program with a focus on children with emotional and behavioral disturbances, though he was not placed in the program for children with intellectual disabilities.  (Denney Rep. at 7.)  Wilson's individual education plan identified him as emotionally disturbed and recommended that he receive weekly individual counseling sessions.  (Woods Rep. at 10.)

The third time Wilson was sent to Elmhurst, he was placed on suicide watch and remained in inpatient treatment for five weeks.  (Olley Rep. at 3.)  Admission notes indicated that he had bitten two teachers, kicked another teacher, broken furniture, and banged his head against the wall.  (Shapiro Rep. at 15-16.)  He told teachers that he wanted to die and tried to jump out of a window.  (Woods Rep. at 10.)  His aunt reported that he had asked his cousin to kill him.  (Id.)  Wilson was prescribed various psychiatric medications from that point until the age of 14.  (Olley Rep. at 4.)

At age seven, Wilson was enrolled in School District 75, which provides citywide support programs for students with various cognitive delays, emotional challenges, or multiple disabilities. (Woods Rep. at 10.) He also continued to receive outpatient mental health treatment. (Id.) Wilson's second-grade school records note that he had trouble naming objects in pictures, matching letters with sounds, telling time, and performing simple addition. (Id.) By the end of the year, Wilson was still functioning below average, and his treating psychiatrist reported that he was "unable to maintain gains" in his academics. (Id.) Family members recall that Wilson continued to wet the bed at this age and had trouble brushing his teeth and cleaning himself. (Olley Rep. at 16.)

By age eight, Wilson continued to function below grade level in both reading and math. (Shapiro Rep. at 16.) At that time, he began seeing Joyce Guerrero, a licensed social worker, at Queens Neuropsychiatric Institute. (Woods Rep. at 11.) According to an intake interview, Wilson's memory, intelligence, judgment, and insight were impaired, and he was given a diagnosis of "moderate mental retardation." (Woods Rep. at 11; Olley Rep. at 4.) However, that diagnosis was later changed to reflect a possible non-psychotic mental disorder due to brain damage. (Denney Rep. at 7.) Ms. Guerrero remembers Wilson as a child who acted like an older person with dementia. (Woods Rep. at 11.) She recalls that Wilson was very gullible and subject to manipulation by his older brother, and that she had to draw pictures for Wilson in order for him to understand what she was saying. (Id.)

By age 11, school records indicate that Wilson frequently tried to escape the classroom, often resorting to violence. (Shapiro Rep. at 11.) Other children called him "retard." (Id. at 16.) Clinical records from that time note his extremely poor eye contact, and that he stared off into the distance. (Woods Rep. at 11.) Notes from a psychiatric evaluation indicate that Wilson kept

falling asleep during the examination, sucking his thumb, and stroking his ear. (Denney Rep. at 16.) Another evaluation concluded that Wilson "continues to do poorly and to have significant problems in all areas of his life." (Woods Rep. at 11.)

Notes from an evaluation at age 12 state, "Despite many services in place, [his] condition has not improved and may have deteriorated some." (Woods Rep. at 12.) That same year marked the start of Wilson's criminal activity, when he was arrested for throwing a bottle at a police car with a group of other children at the housing projects where he lived. (Id.) He was convicted as a Youthful Offender and sentenced to 12 months of probation. (Id.) His probation officer noted that Wilson presented as intellectually limited and was functioning at the third-grade level. (Id.)

At age 13, Wilson's school records indicate that he was functioning significantly below grade level in language, math, spelling, and oral comprehension. (Shapiro Rep. at 17.) He did not understand how to use a map or a book. (Id.) Teachers noted that he had difficulty following class rules, implementing coping strategies, managing conflicts, and controlling his impulses; and that he needed direct supervision to complete tasks, had a limited fund of knowledge, and had broad impairments in functional academics. (Olley Rep. at 6.) He also continued to suck his thumb and demonstrate disruptive behavior. (Shapiro Rep. at 13.)

At age 14, Wilson was arrested for a second time and charged with five counts of felony robbery. (Woods Rep. at 12.) This time, his probation officer noted that he "present[ed] as slow and somewhat dull intellectually." (Id.) A clinical evaluation performed by Staten Island Family Court Services reported that his speech was slow, he had difficulty formulating his thinking, and his reading was at a second-grade level. (Id.) The doctor performing the evaluation noted his

opinion that Wilson's delinquent activity was not the result of deeply entrenched sociopathic behavior, but rather demonstrated an attempt to make friends.  (Id.)

Wilson was arrested for a third time, again at age 14, for selling drugs to an undercover police officer.  (Id. at 13.)  An evaluation by Dr. Mitchell Frank of Queens Family Court reported that Wilson was reading at a second-grade level, and Dr. Frank estimated his intelligence to be in the borderline range.  (Id.)  Dr. Frank described Wilson as "a fairly limited youth intellectually," and he noted, "There is a danger that he is exploitable criminally because of the above issues."  (Id.)  Later that year, Wilson's teacher reported to his probation officer that Wilson appeared to be mildly intellectually disabled.  (Id.)  The teacher also noted that Wilson was withdrawn, looked sloppy, and continued to suck his thumb.  (Id.)

At age 15, Wilson was returned to his mother's custody and enrolled in another special education school within District 75.  (Id. at 14.)  On the first day of school, the Vice Principal reported that Wilson exhibited bizarre behaviors, such as moving his desk into the closet during class and trying to close the door.  (Id.)  Soon thereafter, Wilson was arrested for first degree robbery and incarcerated at Brookwood Secure Center ("Brookwood"), a maximum security prison for young adults.  (Id.)  Staff there described him as intellectually limited and a follower. (Id.)  One psychiatric nurse later reported her fear that he would be recruited criminally by someone in the unit, and she found it hard to believe he was 16 years old.  (Id.)  In an undated Brookwood mental health questionnaire, residents were asked to respond to the following statement: "There is something wrong with the way my mind works?"  Wilson checked, "Yes." (Id. at 29.)

By the time Wilson was discharged from Brookwood at age 17, educational records show an improvement to a fourth-grade reading level.  (Id. at 15.)  Nonetheless, tests taken at age 18

indicated that his literacy remained at a second-to fourth-grade level.  (Shapiro Rep. at 17-18.)  His counselor at Brookwood concluded that Wilson "ha[d] not yet acquired necessary skills for independent living."  (Woods Rep. at 14.)  Upon his release from Brookwood, Wilson moved in with Vanessa Lindley, a maternal cousin, and he was placed in special education classes.  (Id. at 15.)  He was again diagnosed as learning disabled, and evaluations placed him at a third-grade level in reading and a fourth-grade level in math.  (Id.)  Although Lindley encouraged Wilson to find a job, she recalls that he was unable to fill out an application, in part because he did not understand the question that asked where he had lived for the previous eight years.  (Olley Rep. at 15.)

Around age 18, Wilson became romantically involved with Monica Cook, 10 years his senior.  (Denney Rep. at 33.)  Wilson moved in with Cook soon thereafter, and they remained a couple for approximately three years, until his arrest in this case.  (Id.)  Cook recalls that when they first started dating, she had to remind Wilson to change his underwear and bathe.  (Woods Rep. at 24.)  Cook and Lindley worked together to get Wilson accepted into a city employment program; however, Cook claims that when he was tested, his scores were too low to qualify.  (Id. at 26.)  Instead, Wilson was enrolled in a program to learn how to fill out applications.  (Id.)  After the September 11, 2001, terrorist attacks, Wilson was hired by a temp agency to remove debris from the World Trade Center site; he worked for three days but was not called back.  (Olley Rep. at 10.)  According to Cook, when Wilson received his first and only paycheck, he did not understand what it was and never cashed it.  (Woods Rep. at 24.)  Wilson's Social Security records indicate a total earnings of $38 for his entire life.  (Tr. at 503.)

Also around age 18, Wilson's criminal activity became more violent.  Trial testimony indicated that he was a self-admitted member of the Bloods gang by this time, and at 19 he was

arrested for slashing an individual on the side of the face, requiring 300 stitches.  (Denney Rep. at 17.)  Wilson was charged with first degree gang assault and second degree criminal possession of a weapon for the attack.  (Id.)  On March 10, 2003, at the age of 20, Wilson and his accomplices were involved in negotiating a gun deal with undercover detectives James Nemorin and Rodney Andrews, when Wilson shot each of them once in the back of the head, killing them instantly.  (Patterson Rep. at 1.)  When Wilson and his co-defendants searched the victims' bodies, they found money, weapons, and police identification.  (Id. at 2.)  They left the bodies on the darkened street and left the scene in the victims' vehicle; Wilson was arrested two days later. Whitten, 610 F.3d at 175.

While incarcerated, Wilson has sent numerous emails to friends and family members, and he has sent letters to Cook, although Cook claims that Wilson pays a fellow inmate to write the letters on his behalf.  (Olley Rep. at 22.)  Wilson also appears to have written coherent notes to prison staff about his medical concerns.  (See Denney Rep. at 21.)  Prison records report that he passes his time by reading, and his property list shows that he owns several books, though the titles are not indicated.  (Denney Rep. at 20.)  Other reports indicate that he uses the books to memorize inspirational quotations.  (Patterson Rep. at 6.)  Regular clinical evaluations performed by prison officials report normal mental health, and none suggest that he suffers from an intellectual disability.  (Denney Rep. at 20.)  Educational records from prison indicate high passing scores on a pre-GED placement test and good progress in GED classes.  (Id. at 22.) Wilson has also worked as a prison orderly and in the kitchen, and he has received positive performance reviews for both positions.  (Id.)

Wilson's violence and disruptive behavior have continued in prison.  At trial, the court and the jury heard testimony from inmates and correctional staff describing Wilson's threats and

assaults against others, as well as his ability to incite violence by other prisoners due to his membership in the Bloods gang. See United States v. Wilson, 967 F. Supp. 2d 673, 678-79 (E.D.N.Y. 2013). Perhaps most notably, Wilson was found to have interrogated and threatened inmates whom he believed had told on him when it was discovered that he had engaged in a sexual relationship with a female prison guard. (See id. at 580.)

In sum, the record of Wilson's life shows a deeply disturbed and intellectually limited child who became a deeply disturbed, intellectually limited, and ruthlessly violent young man. Evidence from Wilson's time in prison suggests that he has benefited intellectually from a structured environment, but that his behavioral problems have persisted. Nonetheless, Wilson's prison records are often hard to square with the numerous evaluations he received in his youth. Ultimately, as explained above (see supra Part II.C.2), the court finds that this prison evidence, while relevant, is of limited probative value.

### 2. Credibility Determinations

"One of the crucial functions of the Court in deciding an Atkins claim is to determine the credibility of the witnesses presented at the evidentiary hearing." Montgomery, 2014 WL 1516147, at *8; see also Candelario-Santana, 916 F. Supp. 2d 191, 211 (D.P.R. 2013) ("Because of the relative subjectivity of the adaptive behavior analysis, the importance of clinical judgment becomes greater under prong two than under prong one. When assessing adaptive behaviors, therefore, courts must make their own independent determinations of the clinicians' judgment and credibility."); Hardy, 762 F. Supp. 2d at 883 ("[A]s the degree to which a matter is left to an individual clinician's judgment increases, so does the degree to which the Court must rely on its assessment of the relative competence and credibility of the individual experts before it to resolve disputes between them.").

Wilson called three expert witnesses: (1) Bruce Shapiro, M.D. (Tr. (Dkts. 1528, 1529));
(2) John Olley, Ph.D. (id. (Dkts. 1530, 1002)); and (3) George Woods, Jr., M.D. (id. (Dkt. 1532).
The Government called three experts as well: (1) Raymond Patterson, M.D. (id. (Dkt. 1533)); (2)
Robert Denney, Psy.D. (id. (Dkts. 1533, 1534)); and (3) Robert Mapou, Ph.D. (id. (Dkt.
1534)).[30]  Wilson's experts all testified that he demonstrated significant deficits in adaptive
functioning, and that he therefore satisfied the second prong of the definition of intellectual
disability.  (Shapiro Rep. (Dkt. 961) at 17-21; Olley Rep. at 14-24, 26-27; Woods Rep.
(Dkt. 962) at 29.)  The Government's witnesses conceded that Wilson demonstrated deficits in
several specified areas of adaptive functioning; nonetheless, they maintained that Wilson did not
satisfy prong two because these deficits were not due to intellectual disability but, instead, were
the result of learning disabilities, ADHD, or behavioral disorders.  (See Tr.
at 1938-39, 1849, 2017-19, 2064-68.)  The court reviews each expert's testimony below, but the
court focuses primarily on Drs. Olley and Denney, as the court found their testimony to be the
most illuminating.

> **a.      Dr. Bruce Shapiro**

Dr. Shapiro is a developmental pediatrician with over 35 years of professional
experience.  (Shapiro Rep. at 1.)  He has diagnosed and treated over 2,000 individuals with
intellectual disability (id.), and has published in the area of neurodevelopmental disabilities (id.
at 5).  Dr. Shapiro earned his medical degree at Boston University, and did his pediatric training
at Children's Hospital in Washington, D.C.  (Tr. at 17.)  He is currently a professor of pediatrics
at Johns Hopkins University and a clinician at the Center for Development and Learning at the
Kennedy Krieger Institute, a facility specializing in the care of children with neurodevelopmental

---

[30] The court heard testimony from a total of eleven witnesses at the Atkins hearing; however, the court focuses on the expert witnesses who testified specifically regarding the issue of adaptive functioning.

and related disorders.  (Shapiro Rep. at 3; Tr. at 15.)  Dr. Shapiro is licensed to practice medicine

in Maryland and is certified as a diplomate in Neurodevelopmental Disabilities by the American

Board of Pediatrics.  (Shapiro Rep. at 3.)  He is also a past president of the Society for

Developmental Pediatrics and a past member of the AAIDD.  (Id.)  On November 26, 2012, the

court qualified Dr. Shapiro as an expert for the defense on intellectual disability.  (Tr. at 39.)

Dr. Shapiro based his testimony and report off of Wilson's medical and educational

records, as well as the reports and interviews by other experts in this case.  (Shapiro Rep. at 2.)

His conclusion is that Wilson's intellectual disability has long been "overshadowed by his severe

behavior disturbance" (id. at 16), and that Wilson's early first-hand diagnoses of ADHD,

learning disabilities, and other disorders (id.), reflect incomplete or inappropriate assessments by

clinical and educational staff (id. at 15).  Dr. Shapiro determined that Wilson demonstrated

significant deficits in all three adaptive functioning domains—conceptual, social, and practical—

under the AAIDD 2010 standard[31] (id. at 7, 17-22), and that he met the criteria for a diagnosis of

mild intellectual disability (id. at 22).

The court finds Dr. Shapiro to be highly credible with regard to the general issue of

intellectual disability in children, and he is clearly experienced with the challenges involved in

diagnosing individuals with multiple disabilities and disorders.  However, while the court credits

Dr. Shapiro's testimony regarding intellectual disability as a phenomenon, the court will not give

as much weight to his individual assessment of Wilson.  Most importantly, Dr. Shapiro did not

personally examine Wilson or conduct any interviews of witnesses who know Wilson well.  (Id.

at 2.)  Dr. Shapiro explained that "in developmental disability centers, it is typical for the

---

[31] Dr. Shapiro also determined that Wilson demonstrated deficits in all ten of the adaptive skill sets articulated by the DSM-IV, with significant deficits in the following six: communication, home-living, social/interpersonal skills, use of community resources, functional academics, and health and safety.  (Shapiro Rep. at 19-21.)

assessment process to involve a team approach, relying on different mental health and medical specialties." (Id.) That may be the case; however, in the context of an Atkins proceeding, the court is reluctant to assign significant weight to testimony based on second-hand observations, particularly when testimony and record evidence are available from individuals who have evaluated Wilson in person.

### b.     Dr. John Olley

Dr. Olley is a licensed psychologist in North Carolina with over 35 years of professional experience. (Olley Rep. at 1.) He has a bachelor's degree in psychology from the College of William and Mary, a master's degree in general experimental psychology from Wake Forest University, and a Ph.D. in psychology with an emphasis on what was then termed mental retardation from George Peabody College, which has since merged with Vanderbilt University. (Tr. at 439.) He serves as a clinical scientist at the Carolina Institute for Developmental Disabilities and as a clinical professor in the Division of Rehabilitation Psychology and Counseling in the School of Medicine at the University of North Carolina at Chapel Hill. (Olley Rep. at 1.) He is a past president of the APA's Division on Intellectual and Developmental Disabilities and a fellow and life member of the AAIDD. (Id. at 1-2.) Since 1988, Dr. Olley's primary professional focus has been the assessment and diagnosis of individuals with developmental and intellectual disabilities. (Tr. at 437.) On November 28, 2012, the court qualified Dr. Olley as an expert for the defense on intellectual disability. (Id. at 455.)

The court finds Dr. Olley to be credible. He is particularly experienced in the issue of Atkins evaluations. He has published articles on the retrospective assessment of adaptive functioning in Atkins cases and has developed criteria for the use of the ABAS-II standardized measure of adaptive behavior. (Olley Rep. at 13.) At the time of the Atkins hearing in this case,

Dr. Olley had been retained in approximately 18 <u>Atkins</u> cases. (Tr. at 447.) The court finds it especially notable that Dr. Olley was twice retained for an <u>Atkins</u> case by the Government and concluded that the defendants in those cases were <u>not</u> intellectually disabled. (<u>Id.</u> at 448.) Dr. Olley has also conducted evaluations for the defense where he concluded that the defendants were not intellectually disabled and, accordingly, he was not called to testify in those cases. (<u>Id.</u> at 449.) Of further note, as a state employee, Dr. Olley receives no direct financial benefit from his work as an expert witness in these cases. (<u>Id.</u> at 450.)

Like Dr. Shapiro, Dr. Olley reviewed Wilson's medical, educational, social services, and legal records. (Olley Rep. at 2.) In contrast to Dr. Shapiro, however, Dr. Olley conducted 14 in-person interviews of 12 individuals, including two of Wilson himself. (<u>Id.</u> at 2.) In addition to these interviews, Dr. Olley administered the ABAS-II to Cheryl Hadden (Wilson's mother), Depetra McMaster (Wilson's sister), Monica Cook (Wilson's former girlfriend), and Vanessa Lindley (Wilson's cousin). (<u>Id.</u> at 13.) As described below, the results of these tests were mixed.

The ABAS-II generates scaled scores for each of 10 adaptive skill areas. (<u>Id.</u> at 26.) Scaled scores range from one to 19, with any score below four indicating a significant deficit. (<u>Id.</u>) All participants reported significant deficits in Wilson's "functional academics," with Lindley, Cook, and McMaster finding further significant deficits in his "self-direction." (<u>Id.</u> at 37.) Lindley reported significant deficits in "leisure"; McMaster in "self-care" and "social"; and both McMaster and Cook in "home living" and "health and safety." (<u>Id.</u>)

The test also yields a General Adaptive Composite score and Composite Standard scores in each of the AAIDD's adaptive functioning domains. (<u>Id.</u> at 26.) As with IQ tests, analysis of these scores involves population means, standard deviations, and confidence intervals: With a

general population mean of 100 and a standard deviation of 15, a Standard Score of 70 or below indicates significantly impaired adaptive functioning. (Id. at 26-27.) Wilson received General Adaptive Composite scores of 72 from Hadden, 56 (from McMaster), 64 (from Cook) and 74 (from Lindley). (Id. at 27.) All raters rated Wilson lowest in the conceptual domain. (Id.)

As Dr. Olley noted, "such scores would be expected to vary, because each rater has an individual perspective based on knowing Mr. Wilson at different times and under different circumstances." (Id. at 26.) Accordingly, and for the reasons stated in Part II.C.1, the court will consider these scores but will not assign them the same weight given to Wilson's IQ scores in the prong one analysis. Instead, the court will assign significantly greater weight to Dr. Olley's overall conclusions, which he states were "drawn from several sources, including documents, ratings on the ABAS-II, interview information, and informed clinical judgment." (Id. at 13.)

Based on his review of the record evidence and his interpretation of the ABAS-II test results that he obtained, Dr. Olley concluded that Wilson "had significant impairments in adaptive behavior in childhood and at the time of the crime for which he has been committed," and that he met the criteria for intellectual disability as set forth by the APA and AAIDD. (Id. at 28.) Specifically, Dr. Olley concluded that Wilson demonstrated the greatest deficits in the AAIDD's conceptual domain, and that he demonstrated significant deficits in all but two of the ten skill areas of the DSM-IV: self-care and use of community resources. (Tr. at 466.) Dr. Olley further reported that he was unable to document any areas in which Wilson showed adaptive behavior strengths. (Olley Rep. at 28.)

### c. Dr. Gregory Woods, Jr.

Dr. Woods is a licensed physician in private practice, with a focus on neuropsychiatry, psychopharmacology, and forensic consultations. (Woods Rep. at 2.) As of 2012, he had 29

years of experience treating individuals with developmental disabilities, acquired brain injuries, and cognitive impairments secondary to neuropsychiatric disorders. (Id.) He attests that 15% of his practice is devoted to treating individuals with intellectual disabilities. (Id.) Dr. Woods is a fellow of the American Psychiatric Association, a member of the APA and AAIDD, among other organizations, and he is the Secretary General of the International Academy of Law and Mental Health. (Id.) He teaches forensic psychiatry at Morehouse School of Medicine and is a lecturer on mental health and the law at the University of California Berkeley School of Law. (Id.) As of 2012, Dr. Woods had completed 39 Atkins evaluations and had testified in six Atkins hearings or depositions, exclusively for the defense. On December 3, 2012, the court qualified Dr. Woods as an expert for the defense on neuropsychiatry and intellectual disability. (Tr. at 1499.)

Dr. Woods based his report on Wilson's records, as well as a series of 27 interviews, including five interviews of Wilson himself and 11 interviews of nine of Wilson's family members. (Woods Rep. at 3.) He also interviewed several of the clinicians and counselors from Wilson's youth. (Id.) As a result of his evaluation, Dr. Woods determined that Wilson was "significantly impaired in adaptive functioning, clearly functioning in the significantly sub-average range of adaptive behavior." (Id. at 21.) Dr. Woods found that Wilson had "strengths in visual spatial ability and relatively weak mathematic ability," but that his deficits were broad and pervasive enough to meet the AAIDD's standards for mild intellectual disability. (Id. at 29.) Dr. Woods elaborated at the hearing that he was particularly confident in reaching his conclusion because of the breadth of the evidence reaching back to Wilson's childhood: "I think in this particular case, the information is very strong because Mr. Wilson lived a documented life from the time of five, certainly, through the time of even through today." (Tr. at 1544.)

The court found reason to question Dr. Woods's credibility at the Atkins hearing, based in part on Dr. Woods's selective recounting of testimony and details from the guilt phase of Wilson's trial and the court's previous sentencing, considering the fact that Dr. Woods was not present at any of those proceedings.  (Id. at 1542-45.)  The court is also conscious of the fact that, unlike Dr. Olley, Dr. Woods's Atkins experience has been exclusively for the defense. Nonetheless, the court credits Dr. Woods's expertise in diagnosing and treating individuals with intellectual disabilities.

### d.　　Dr. Raymond Patterson

Dr. Patterson is a general and forensic psychiatrist in private practice.  (Patterson Rep. (Dkt. 957) at 1.)  He received his medical degree from Howard University College of Medicine in 1977.  (Tr. at 1739.)  After medical school, Dr. Patterson worked at St. Elizabeth's Hospital in Washington, D.C. from 1979 to 1987, first as a staff psychiatrist, then as medical director of the maximum security component, and eventually serving as Administrator of Forensic Services. (Id. at 1740.)  In 1992, he served for less than a year as the Commissioner of Mental Health for the District of Columbia, before becoming the superintendent of a maximum security hospital in Maryland and the Director of Forensic Services for the State of Maryland.  (Id. at 1740-41.)  Dr. Patterson has also served as a special expert for the Court of Appeals for the Ninth Circuit, a court monitor for the state courts of New Jersey, and has been appointed by federal district courts including the district courts for the Eastern District of Virginia and for the District of Columbia. (Id. at 1744.)  Dr. Patterson has testified in court many times; he estimates that in criminal cases, he has been called to testify by the Government 95% of the time.  (Id. at 1747.)  However, this case was the first time that Dr. Patterson had testified at an Atkins hearing.  (Id. at 1768.)  On

December 4, 2012, the court qualified Dr. Patterson as an expert for the Government in general and forensic psychiatry.  (Id. at 1765.)

Dr. Patterson conducted an "independent forensic psychiatric examination" of Wilson, performed at the Metropolitan Detention Center for approximately one hour and 20 minutes. (Patterson Rep. at 1-2.)  He also reviewed the trial records in this case, as well as Wilson's educational, clinical, and other medical records.  (Id.)  Dr. Patterson did not interview anyone other than Wilson himself; nor did he perform any standardized measures of adaptive functioning.  Based on his examination of Wilson and his review of the record, Dr. Patterson determined that Wilson had a learning disability and met the criteria for a diagnosis of "Antisocial Personality Disorder with Narcissistic Features."  (Id. at 18.)  Nonetheless, Dr. Patterson conceded in his testimony that Wilson had deficits in academic and social functioning skills, although he attributed those to Wilson's learning disability.  (Tr. at 1846-49.)

The court finds several reasons to question Dr. Patterson's testimony.  For one, in contrast to all of the defense experts, Dr. Patterson was not qualified as an expert in intellectual disability.  (See Tr. at 1765.)  He also conceded that he did not have expertise in child psychiatry (id. at 1750), and cross-examination made clear that he did not have specific experience evaluating or diagnosing individuals with intellectual disability (id. at 1763-65).  In response, Dr. Patterson claimed that every examination he has ever conducted has necessarily included an evaluation for intellectual disability (id. at 1764), an assertion the court finds to be unlikely.  In fact, while Dr. Patterson is clearly very accomplished, his background appears to be largely administrative and bureaucratic in nature, notwithstanding his substantial experience testifying in court.  Furthermore, the vast majority of Dr. Patterson's clinical experience has been in the context of correctional and maximum security institutions, and he readily conceded that he

preferred evaluating patients "in correctional settings as compared to an office setting where the observation is not as vigilant." (Tr. at 1770.) This statement is concerning, and it gives the court reason to doubt Dr. Patterson's objectivity. Most importantly, Dr. Patterson's focus on criminal and prison evidence runs counter to the clinical standards. <u>See</u> AAIDD User's Guide at 20. Accordingly, the court will not give significant weight to his testimony.

*e.* ***Dr. Robert Denney***

Dr. Denney is a neuropsychologist and forensic psychologist. (Tr. at 1880.) He has a degree from the Lutheran Bible Institute and a doctorate in Psychology from the Forest Institute of Professional Psychology, where—as of 2012—he held the position of Associate Professor and Director of Neuropsychology. (<u>Id.</u>) He also maintains an independent private practice and teaches as an adjunct professor at Evangel University. (<u>Id.</u> at 1879.) Dr. Denney completed his clinical internship at the U.S. Medical Center for Federal Prisoners and worked there as a staff psychologist from 1991 to 2011. (<u>Id.</u> at 1881.) As of 2012, Dr. Denney had been retained to work on one other <u>Atkins</u> case besides this one, although he has testified in numerous other cases, mostly regarding competency to stand trial. (<u>Id.</u> at 1890.) On December 4, 2012, the court qualified Dr. Denney as an expert for the Government in the areas of forensic and clinical psychology, as well as neuropsychology. (<u>Id.</u> at 1891.)

Dr. Denney reviewed Wilson's medical, educational, criminal, and prison records in conducting his adaptive functioning assessment. (Denney Rep. at 2.) He also administered standardized assessment measure to 10 different individuals, including Wilson himself. (<u>Id.</u>) Like Dr. Olley, Dr. Denney administered the ABAS-II to McMaster, Cook, and Lindley. (<u>Id.</u>) However, Dr. Denney also administered the ABAS-II to Wilson, Shabucalik Geralds (Wilson's former friend), and Shanell Barnes (Wilson's cousin). (<u>Id.</u>) Whereas Dr. Olley administered the

ABAS-II to Hadden (Wilson's mother), Dr. Denney administered the Vineland-II to her instead. Dr. Denney also administered the Vineland-II to Pat Hogan (Wilson's aunt), Annie Barnes (Wilson's paternal grandmother), and Lillian Barnes (Wilson's paternal aunt). (Id.)

The results of the tests administered by Dr. Denney were inconclusive, as they were for Dr. Olley. Even for individuals who were administered the same test by both experts, the resulting scores were higher when the test was administered by Dr. Denney. In particular, while McMaster reported an ABAS-II General Adaptive Composite score of 56 with Dr. Olley, she reported a 64 with Dr. Denney, although both scores fell in the "extremely low" classification. (Id. at 46.) Likewise, Lindley reported a score of 80 (compared to a 74 with Dr. Olley), and Cook reported a 68 (compared to a 64 with Dr. Olley). (Id. at 46-47.) The other individuals to whom Dr. Denney administered the ABAS-II reported scores falling in the "average" classification, including Wilson himself. (Id.) Dr. Denney did not provide a thorough explanation of the Vineland-II test or its scoring mechanism; however, his report indicates that the Vineland-II scores ranged from "adequate" to "moderately low." (Id.)

Given that these scores are so subjective, see Hardy, 762 F. Supp. 2d at 883, the fact that Drs. Denny and Olley did not administer the same tests to the same individuals makes it difficult for the court to conduct a meaningful comparison of the results. Likewise, the wide variation in scores among respondents raises concerns about reliability. Accordingly, the court will not assign significant weight to this aspect of Dr. Denney's assessment. Instead, as with Dr. Olley, the court will assign greater weight to Dr. Denney's overall conclusions and clinical judgment, based on the breadth of the evidence. (See Part II.C.1.) However, as compared to Dr. Olley, the court finds Dr. Denney's testimony to be less credible and will assign it less weight.

Most significantly, Dr. Denney espoused an approach to assessing adaptive functioning that is directly at odds with the clinical standard.  As noted previously, Dr. Denney believed that it was necessary to prove that Wilson's adaptive deficits were caused by intellectual disability as opposed to any number of other disorders or disabilities.  However, Dr. Denney admitted that this approach contradicted the clinical standard, specifically that of the AAIDD.  (See Tr. at 2010 ("[L]ook, he's got these deficits, but the [AAIDD] says that you totally disregard the cause of those deficits in your analysis regarding intellectual disability.  I disagree with that.").)[32]  While Dr. Denney was emphatic in this belief, he was unable to cite any scientific literature, scholarly journals, or alternative clinical standard that supported his approach.  (See id. at 2025.)

Furthermore, Dr. Denney's explanations for Wilson's deficits were at times incoherent.  After first conceding that Wilson suffered longstanding deficits in academic, social, and communication skills (Tr. at 1938-39),[33] Dr. Denney became much more equivocal the following day (see id. at 2023 ("I think I did say that and I'm afraid I miscommunicated what I was really thinking.")).  At that point, he opined instead that Wilson's deficits should not be considered deficits at all because they were willful (id. at 2021), though it was unclear on what basis Dr.

---

[32] Dr. Denney conceded this conflict several times under cross-examination, including in the following exchange:

> A:  That's where I would disagree with the AAIDD manual, saying that you can have these deficits for any reason and that it would attribute to intellectual disability.
>
> Q:  Okay.  So two things you said there:  One, you acknowledge the manual says you don't parse out causation?
>
> A:  Correct, it does say that.
>
> Q:  And you simply disagree with that?
>
> A:  That's correct.

(Tr. at 1939.)

[33] Dr. Denney also conceded that Wilson suffered deficits, but "less so," in home living and self-care.  (Tr. at 1939.)

Denney made that determination. In fact, it seemed as though Dr. Denney believed Wilson's problems were willful simply because they persisted as he got older:

> A: I mean, there was misconduct, don't get me wrong. But at some point you have to attribute that to the maladaptive environment. But eventually, the child gets to the point where the child has got to stand on his own two feet and make decisions. And in Mr. Wilson's case, I believe that then became clearly reflective of a conduct disorder. That is a willful choice. . . .
>
> Q: I see. So what you're now doing is saying, well, you look at the deficits and you, as an expert, discern whether he's acting willfully or not, mental state of willfulness, and if you decide he's acting willful, then the deficit doesn't count as an adaptive deficit for intellectual disability. Right?
>
> A: Well, I think that's too simplistic to parse it down that fine.
>
> Q: Isn't that what you're saying?
>
> A: I don't—I don't mean to say it that way necessarily.

(Id. at 2025.)

Likewise, Dr. Denney conceded, "the record clearly shows he's had a pretty significant verbally mediated learning disability from the beginning . . . and that carried on through his academic career to a large degree," and that this "could be considered a deficit." (Id. at 2018.) Yet Dr. Denney later maintained that Wilson had grown out of his learning disability, and that "[h]e was delayed in his academic skills largely because of his lack of willingness to apply himself in school." (Id. at 2022.) However, Dr. Denney did not explain how he was able to discern that Wilson's serious and undisputed academic difficulties were of Wilson's own making.

Ultimately, the court suspects that Dr. Denney's evaluation of Wilson's adaptive functioning may have been influenced by his clear belief that Wilson's IQ scores did not justify a diagnosis of intellectual disability. (See Denney Rep. at 45 ("The presence of intellectual

functioning in the high borderline to low average range or higher makes the need for an adaptive behavior assessment moot in terms of potential ID diagnosis."); Tr. at 1893 (stating that given Wilson's IQ scores, "I don't believe the need for formal adaptive function assessment exists in this case").) Absent significant intellectual impairments, a clinician might reasonably focus on other potential causes for a patient's adaptive difficulties, perhaps even to diagnose and treat a learning disability or ADHD. However, considering the court's determination, in light of <u>Hall</u>, that Wilson's IQ scores <u>do</u> satisfy prong one, and given the clear language of the clinical standards, Dr. Denney's reliance on alternative explanations is untenable.

### f.    Dr. Robert Mapou

Dr. Mapou is a clinical neuropsychologist affiliated with a group practice. (Tr. at 2027.) He completed his doctoral degree in psychology, with a specialization in clinical psychology, at Emory University. (<u>Id.</u>) The focus of his practice is the evaluation of learning disabilities and attention deficit hyperactivity disorder in adolescents and adults, and he has written a book and several book chapters on that topic. (<u>Id.</u> at 2029.) This case was his first time testifying in an <u>Atkins</u> proceeding. (<u>Id.</u> at 2073.) On December 5, 2012, the court qualified Dr. Mapou as an expert for the Government in clinical neuropsychology, learning disabilities, and ADHD. (<u>Id.</u>)

Dr. Mapou conducted a review and screening of Wilson for learning disabilities and ADHD. (Mapou Rep. (Dkt. 958) at 1.) He concluded that Wilson may have suffered from both in childhood, but that Wilson had ceased to show symptoms of ADHD and that his learning disability had transitioned to a form of dyslexia. (<u>Id.</u> at 35.) However, as Dr. Mapou explained, "I did not look at adaptive functioning. . . . Dr. Denney was doing an extensive look at adaptive functioning, it made no sense for me to do exactly the same thing." (Tr. at 2063-64.) Instead, Dr. Mapou testified that his role was to determine whether Wilson's deficits were best accounted

for by a learning disability or ADHD. (Id. at 2069.) Despite the fact that Dr. Mapou did not do a formal assessment of adaptive functioning, he nonetheless testified that Wilson showed significant deficits in functional academic skills, communication, and social-interpersonal skills. (Id. at 2064-69.)

While the court has no reason to doubt Dr. Mapou's credibility with regard to learning disabilities, his testimony was not particularly helpful in determining whether Wilson was intellectually disabled before 18 and at the time of the crime. Given the general agreement that it is possible for an individual to have both a learning disability and an intellectual disability (see Tr. at 2084), and the court's determination that the legal standard for intellectual disability does not require the ruling out of other disabilities (see Part II.C.3), the court will not give significant weight to Dr. Mapou's conclusions, as they are based on an incomplete analysis. However, the court finds it notable that Dr. Mapou was the third of the Government's three experts to testify that Wilson demonstrated adaptive functioning deficits. (Tr. 2064-68.)

3.    Findings of Fact

A preponderance of the evidence before the court indicates that Wilson has significant deficits in adaptive functioning. See Davis, 611 F. Supp. 2d at 492 ("[T]he best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible, and to look for consistency and convergence over time.") Wilson has lived an exceptionally well-documented life (see Tr. at 1544), and records extending to his infancy describe, with near consistency, severe and debilitating difficulties with learning, communicating, and controlling his behavior.

Nonetheless, "[t]he assessment of adaptive functioning is no easy task." Wiley v. Epps, 625 F.3d 199, 218 (5th Cir. 2010). While a defendant might have a handful of IQ scores,

he or she is likely to have a seemingly infinite amount of anecdotal evidence presenting conflicting examples of adaptive strengths and weaknesses. See Davis, 611 F. Supp. 2d at 491 (observing that "[a]daptive behavior is a broader category, and more amorphous, than intellectual functioning" and "[t]he assessment of adaptive behavior is more difficult to quantify when a subject is presently incarcerated"). For these reasons, adaptive functioning tends to be assessed "on the inherently subjective bases of interviews, observations, and professional judgment." Id. (citation omitted). The subjective nature of this assessment necessarily leads courts to rely more heavily on expert witnesses, at the same time that it "increases . . . the opportunity for disputes between clinicians." Hardy, 762 F. Supp. 2d at 88.

The experts in this case actually agreed on more than one might expect. In fact, all six experts who testified on this issue determined that Wilson had deficits, in some cases significant, in various areas of adaptive functioning. (See Olley Rep. at 15-24; Shapiro Rep. at 17-18; Woods Rep. at 21-28; Tr. at 1846-51 (Dr. Patterson), 2064-68 (Dr. Mapou), 1938-39, 2018-25 (Dr. Denney).) However, Drs. Denney and Patterson insisted that Wilson failed prong two because of a causation requirement that does not appear in the clinical standards and for which they could cite no sources of support. (See Tr. at 2025.) As the court determined (see supra Part II.C.3), a requirement to prove that deficits are caused by intellectual disability ignores the fact that the prong two analysis is itself a diagnostic criterion for intellectual disability. Moreover, while the DSM-V requires a "direct relationship" between the two categories of deficits, this is far from a requirement that a defendant rule out other causes of his or her condition. See DSM-V at 38; DSM-IV at 47 (directing that "the diagnosis [for intellectual disability] should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder"). (See also Gov't's Pre-Trial Mem. at 5 (agreeing with Wilson that the "direct

relation" requirement of the DSM-V does not represent a heightening of the standard from the DSM-IV).)

Relatedly, the Government emphasizes any evidence in the record which might support a diagnosis of a learning disability, as opposed to intellectual disability. Yet the court heard testimony that it was possible for an individual to have both. (See, e.g., Tr. at 342 (Dr. Shapiro's testimony that "you can have intellectual disability and a learning disability at the same time"); id. at 2084 (Dr. Mapou agreeing that it was possible).) Dr. Olley also testified compellingly that schools and clinicians may be more likely to diagnose learning disability in young people in order to avoid the stigma of intellectual disability. (Tr. at 499.) See also Hardy, 762 F. Supp. 2d at 911 (noting that it may not be particularly important that a defendant was not classified as intellectually disabled during his youth "because schools have a strong bias against classifying a student as retarded and parents do not want the label or the stigma associated with it"). In fact, considering that symptoms of the two disabilities often overlap (Tr. at 1938), it seems reasonable to treat evidence of a learning disability as further indication that an individual suffers from adaptive functioning deficits, particularly where that individual has also been found to suffer from significantly subaverage intellectual functioning. See Brumfeld v. Cain, 135 S. Ct. 2268, 2280 (2015) ("An individual . . . who was placed in special education classes at an early age, was suspected of having a learning disability, and can barely read at a fourth-grade level, certainly would seem to be deficient in both 'understanding and use of language' and 'learning'—two of the six [areas of adaptive functioning identified by the state court].").

Accordingly, the court finds that Wilson has demonstrated significant deficits in the general domains of conceptual and social skills. Although only the DSM-V references a "direct relation" requirement, see DSM-V at 38, the court finds that, in any event, Wilson's adaptive

deficits are directly related to his intellectual deficits. While Wilson has demonstrated deficits in the practical domains as well, there is insufficient evidence of these deficits to support a finding of continued significance. The court summarizes these findings below.

### a. *Conceptual Domain*

"The conceptual (academic) domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." DSM-V at 37-38. Wilson's experts all determined that he demonstrated significant deficits in this domain. (See Olley Rep. at 15, 22-23; Shapiro Rep. at 17-18; Woods Rep. at 21-23, 26-27.) The court believes that this determination is clearly supported by the wealth of the evidence in the record, and it is notable that all of the Government's experts conceded this point at various times. (See Tr. at 1938-39, 2017-19 (Dr. Denney), 1849 (Dr. Patterson), 2064-68 (Dr. Mapou).)

Wilson's academic record is one of overwhelming failure. Family members report that he was slow to talk (Woods Rep. at 8), and school records show that he was similarly delayed in acquiring skills appropriate for a child his age (see, e.g. id. at 10). As Wilson grew older, he fell further behind his peers, struggling with literacy, math, and knowledge of basic facts such as days of the week and the alphabet. (Id. at 9.) By the time Wilson was 14, he still had not progressed beyond a second-grade reading level. (Id. at 12.) Although the Government points to the fact that he improved his academic performance at Brookwood, where he was "forced to attend classes" (Gov't Mem. at 41), literacy tests from age 18 showed that he still had only reached a fourth-grade level (Shapiro Rep. at 17-18). Even after his incarceration at age 20, Wilson's former girlfriend asserted that he paid a fellow inmate to write her letters on his behalf. (Olley Rep. at 22.)

Wilson's intellectual difficulties were not merely confined to test results, but rather were apparent to those around him. Other children called him "retard" (Shapiro Rep. at 11) and "spesh" (for "special education") (Olley Rep. at 18), and he manifested persistent baby-like behavior, including sucking his thumb until at least the age of 14 (Woods Rep. at 12). Clinical evaluations revealed impaired judgment, a teacher reported that he might be intellectually disabled, and his probation officers described him as "intellectually limited" and "dull." (Id.)

The Government maintains that Wilson's isolated academic successes prove that his academic failures were the result of a learning disability and a willful decision not to apply himself in school. (See Tr. at 2021-22.) For support, the Government points to Wilson's several passing grades at Brookwood and in his Adult Basic Learning Examination in prison. (See Denney Rep. at 22.) However, the court finds it more likely that these successes are due to the structured environment of the correctional facilities in which Wilson was and is confined. See Hardy, 762 F. Supp. 2d at 899 (noting that "an institutional environment of any kind necessarily provides 'hidden supports'"). Furthermore, while the court emphasizes that the issue in this case is not whether Wilson has a learning disability (see supra Part II.C.3), the court finds that Wilson's broad and persistent deficits across multiple areas of academic functioning suggest that he suffered from greater intellectual impairments than could be explained by a learning disability alone. See Davis, 611 F. Supp. 2d at 483 ("In short, the Court finds that the defendant does not exhibit the type of 'unexpected' underachievement that is indicative of a learning disability. . . . Even if the Court were to conclude that the defendant had a language-based learning disability, that disability is clearly superimposed upon other, existing intellectual deficiencies.").

The Government also points to criminal evidence to argue that Wilson possessed unimpaired conceptual capacity. In particular, the Government emphasizes audio recordings

from the crime which reveal Wilson confidently giving directions. (Gov't Mem. at 44.) The Government also argues that Wilson's experience selling drugs and his position in a gang show that he did not suffer impaired adaptive functioning. (Id. at 43.) While the court recognizes that this evidence is intuitively hard to reconcile with a finding that Wilson is intellectually disabled, the court credits the testimony of Wilson's experts who maintained that such examples of adaptive capacity are not inconsistent with intellectual disability. (See Tr. at 1537.) See also United States v. Shields, 480 F. App'x 381, 391 (6th Cir. 2012) (Clay, J., dissenting) (dissenting on other grounds but agreeing with the district court's determination that the defendant was intellectually disabled even though "[h]e is skilled at convincing others around him to accomplish tasks on his behalf, he ignores social strictures . . . he deceives others to achieve his personal objectives. . . . [and he] is often deceptive and manipulative"); Hardy, 762 F. Supp. 2d at 902-03 (noting that the defendant was a "reasonably successful street level crack cocaine distributer within the projects" but concluding that "a person with mild [intellectual disability] is capable of running such an operation," and that such a person also is capable of shooting someone and committing other capital crimes).

Accordingly, the court finds by a preponderance of the evidence that Wilson has demonstrated significant deficits in the conceptual domain of adaptive functioning. These deficits developed concurrently with Wilson's intellectual functioning deficits during his developmental period, and they persisted at least through the time of the crime.

### b.      Social Domain

"The social domain involves awareness of others' thoughts, feelings and experiences; empathy, interpersonal communication skills; friendship abilities; and social judgment, among others." DSM-V at 37-38. Wilson's experts all determined that he demonstrated significant

deficits in this domain (see Olley Rep. at 17-20; Shapiro Rep. at 18; Woods Rep. at 25), and all of the Government's experts conceded this point as well (see Tr. at 1938-39, 2017-19 (Denney), 1849 (Patterson), 2064-68 (Mapou)).

Wilson was hospitalized several times for psychiatric treatment when he was as young as six, and he was frequently characterized by teachers and doctors as emotionally disturbed. (See Denney Rep. at 7; Woods Rep. at 10.) His behavior was so self-destructive at age 6 that he was considered to be a suicide risk. (Olley Rep. at 3.) Although the expression of his emotional and behavioral problems changed as he got older, records from age 14 note his poor relationships with teachers and other children, and adults expressed concern that he was criminally exploitable. (Woods Rep. at 12, 14.) Furthermore, while the Government and Dr. Denney maintain that Wilson's behavior problems were the result of a willful conduct disorder (see Gov't's Mem. at 41), this interpretation appears to be based largely on Dr. Denney's intuition rather than reliable evidence (see Tr. at 2025 ("I mean, there was misconduct, don't get me wrong. . . . But eventually, the child gets to the point where the child has got to stand on his own two feet and make decisions. And in Mr. Wilson's case, I believe that then became clearly reflective of a . . . . willful choice[.]").) In fact, it appears that Wilson's behavior, along with his academic performance, has only ever shown any noticeable improvement when he has been institutionalized and subject to the strict controls of a correctional environment.

The court therefore finds by a preponderance of the evidence that Wilson has demonstrated significant deficits in the social domain of adaptive functioning. These deficits developed concurrently with Wilson's intellectual functioning deficits during his developmental period, and they persisted at least through the time of the crime.

### c. Practical Domain

"The practical domain involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." DSM-V at 37-38. Wilson's experts determined that he demonstrated significant deficits in this domain. (See Olley Rep. at 16-17, 20-21, 24; Shapiro Rep. at 18; Woods Rep. at 24-28.) However, the Government's experts were in agreement that he did not. (See Tr. at 1938-39, 2017-19 (Denney), 1849 (Patterson), 2064-68 (Mapou).)

The record suggests that Wilson has suffered from practical adaptive deficits, although the evidence is scarcer for this domain. At age 14, a clinical evaluation concluded that he "ha[d] not yet acquired necessary skills for independent living." (Woods Rep. at 14.) Consistent with this prediction, Wilson has never lived independently and appears always to have been dependent on an older woman to help him manage his life. According to family members, he failed his driver's license test six times and never passed. He has also never had a bank account, and his only work experience outside of prison was several days of manual labor for which he was not called back. (Olley Rep. at 10.) However, as the Government points out, Wilson has only spent a little over three years of his life outside of prison since he was 15, and he therefore has had a limited amount of time in which he could have lived independently or developed practical skills. (Gov't Mem. at 44.) Accordingly, while the court finds that Wilson has demonstrated deficits in this domain, there is insufficient evidence to indicate that these deficits were significant or that they persisted through the time of the crime. However, because Wilson has demonstrated significant deficits in at least one domain, he satisfies the second criterion for a diagnosis of intellectual disability under the standards of both the APA and the AAIDD.

### C.    Prong III: Age of Onset

The third element of the test for intellectual disability is a requirement that the condition must have arisen during the developmental period.  See DSM-V at 33 (requiring "[o]nset of intellectual and adaptive deficits during the developmental period"); AAIDD 2010 Manual at 1 ("This disability originates before 18.").  "This does not mean that a defendant must be diagnosed with [intellectual disability] before the age of eighteen, only that the disability's defining symptoms must have manifested themselves before the age of eighteen.  That is, disability does not necessarily have to have been formally identified, but it must have originated during the developmental period."  Williams, 1 F. Supp. 3d at 1148 (internal quotation marks and citations omitted).

This issue was not contested in Wilson's case.  Even so, the evidence clearly supports a finding that Wilson's intellectual and adaptive deficits developed before the age of 18.  Accordingly, Wilson has satisfied the final element.

\*      \*      \*

To be candid, the court harbors doubts as to whether Wilson would be considered intellectually disabled by most clinicians.  However, the Supreme Court's decision in Hall strongly suggests that the legal standard for intellectual disability in Atkins cases has become more protective than the clinical standard.  See Hall, 134 S. Ct. at 1990 (decrying the "unacceptable risk that persons with intellectual disability will be executed").  (See supra Part II.B.2 (interpreting Hall to require the application of a 95% confidence interval to IQ scores).)

The court has no objections to applying this standard.  But the court appreciates the concern expressed by the Hall dissent—that the majority's decision would "surely confuse States attempting to comply with its opinion."  134 S. Ct. at 2010 (Alito, J., dissenting).  The court

adds, however, that while state courts often have the benefit of detailed statutes and common law governing Atkins claims, federal district courts are frequently left to rely on nothing but the general language of the FDPA and the often murky precedents of the Supreme Court.

Although the court recognizes that the federal death penalty is most often effectively a life sentence,[34] the fact remains that the Government continues to seek this penalty against defendants across the country, some of whom have colorable claims of intellectual disability. It would be in the interests of justice for defendants, efficiency for the courts, and closure for the victims, for the Supreme Court or Congress to provide clearer guidance on the level of risk that is acceptable when deciding these claims.[35]

Finally, in reaching this decision, the court in no way minimizes or excuses the cruelty and depravity of Wilson's actions. Having presided over this tragic case for more than a decade, the court quite frankly finds it impossible to muster any sense of sympathy for this defendant. Nor does the court lightly disregard the thoughtful judgment of two juries of Wilson's peers who found death to be an appropriate sentence for his crimes. The court also recognizes with great sadness the pain that this decision is likely to cause for the families of James Nemorin and Rodney Andrews. Regardless of one's views on the death penalty, these families have suffered enough. Ultimately, however, this decision is not based on sympathy for the defendant or for his victims; nor is it based on a particular view of the efficacy or appropriateness of the death

---

[34] The federal government has executed only three prisoners since 1963, although 60 prisoners are currently on federal death row under active death sentences. See Federal Death Penalty, Death Penalty Information Center, http://www.deathpenaltyinfo.org/federal-death-penalty (last visited Mar. 10, 2016).

[35] This observation rings true for the circuit courts as well. The Second Circuit has twice remanded Wilson's death sentence, most recently declining to take the opportunity to clarify its views on the legal standard governing such a sentence. This case has now stretched on for years, cost an untold amount of public funds, and prolonged the suffering of the victims' families.

penalty generally. Rather, it is based on a careful interpretation of evolving Supreme Court

precedent and a sober review of the evidence.

## IV.     CONCLUSION

In light of Hall v. Florida, 134 S. Ct. 1986 (2014), the court GRANTS Defendant Ronell

Wilson's Motion for Reconsideration (Dkt. 1505) of his Atkins claim. Wilson has shown by a

preponderance of the evidence that he meets the legal standard for intellectual disability. He has

demonstrated significantly subaverage intellectual functioning, along with significant deficits in

adaptive functioning in at least one domain of assessment. These deficits arose during Wilson's

developmental period, and they persisted through the time of the crime. Accordingly, Wilson is

ineligible for the death penalty under the Eight Amendment, see Atkins v. Virginia, 536 U.S. 304

(2002), and the Federal Death Penalty Act, 18 U.S.C. § 3596(c). The court will issue an

amended judgment reflecting a sentence of life imprisonment, pursuant to the Second Circuit's

Mandate. (See Mandate (Dkt. 1503) (citing United States v. Jacobsen, 15 F.3d 19, 22

(2d Cir. 1994) (noting that the issuance of a mandate ensures that the district court will have the

power to enter a new judgment)).)

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York                    NICHOLAS G. GARAUFIS
         March 15, 2016                              United States District Judge